**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Action No.: |
| v. | ) | **1:06-CV-1000-MEF-WC** |
| | ) | **JURY TRIAL DEMANDED** |
| PERDUE FARMS INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR AN ORDER PERMITTING COURT-SUPERVISED**
**NOTICE TO EMPLOYEES OF THEIR OPT-IN RIGHTS**

Defendant Perdue Farms, Inc. ("Defendant," "Perdue," "Employer," or "the Company") respectfully submits this Memorandum of Law in Opposition to Plaintiffs' Motion for an Order Permitting Court-Supervised Notice to Employees.

Court-supervised notice to employees should not issue because Plaintiffs have offered no credible evidence that there are other similarly situated current or former Perdue employees who want to join this lawsuit, and Plaintiffs cannot prevail on the underlying Complaint, which misstates Perdue's pay and time recording practices and completely overlooks that the Company's industry-leading pay practices were developed in conjunction with and approved by the United States Department of Labor ("DOL"). There is no dispute on the current factual record that Defendant's policies are fully compliant with the Fair Labor Standards Act, and were declared a "model" for the industry by the Department of Labor. The attached Declarations make clear that Plaintiffs have filed an unsupportable lawsuit against Perdue that alleges facts that have absolutely nothing to do with the way Perdue operates its poultry processing plant in

Dothan, Alabama. Therefore, for the reasons set forth in this Memorandum, Plaintiffs' Motion

must be denied.

## Background and Preliminary Statement

Plaintiffs filed this lawsuit on November 3, 2006, and filed an Amended Complaint on

July 5, 2007, alleging violations of the Fair Labor Standards Act ("FLSA" or the "Act"), 29

U.S.C. § 201, et seq. (Am. Compl. ¶¶ 1, 27–51) Plaintiffs and employees who have opted-in to

the lawsuit are hourly employees at Perdue's poultry processing plant in Dothan, Alabama.[1]

Plaintiffs allege that Perdue violated the FLSA by failing to account for hourly employees'

compensable time, which resulted in a failure to pay Plaintiffs and others similarly situated for

hourly wages and overtime premium pay deemed compensable under the Act. (Id. ¶ 42)

Specifically, Plaintiffs allege that Perdue violated the FLSA by failing to pay for time spent

donning and doffing required non-unique equipment, and for time spent walking to and from

designated time clock areas and break areas. (Id. ¶¶ 43–44) Plaintiffs' Complaint is one of more

than eight nearly identical actions filed by this same Plaintiffs' law firm against poultry

companies across the Southeast.

On November 5, 2007, Plaintiffs filed a Motion for an Order Permitting Court-

Supervised Notice to Employees, which requests Court-authorized notice to past and present

---

[1] Various courts have commented that early participation of a district court in the notice process is warranted if it is necessary to ensure that all potential plaintiffs receive timely notice of a pending suit. Davis v. Pokphand (USA), Inc., 303 F. Supp. 2d 1272, 1275 (M.D. Ala. 2004) (citing Hoffman-LaRoche, Inc. v. Sperling, 493 U.S. 165, 171 (1989)). There is no need for Court-supervised notice in this case in part because it is clear that the hourly processing employees at Perdue's poultry processing plant in Dothan, Alabama are already aware of the lawsuit. In January 2007, Plaintiffs started to file Notices of Consent to Join this lawsuit as Party Plaintiffs, and filed additional Notices in eight out of the following nine months. As recently as October 31, 2007, three Perdue employees submitted Notices of Consent to Join this lawsuit. In total, this Court has received as many as 209 such Notices. As argued elsewhere in this Memorandum of Law, Plaintiffs have filed an unsupportable lawsuit against Perdue. The sheer number of employees signing Notices of Consent to Join this lawsuit lends no merit to Plaintiffs' claims, but the high number of Notices of Consent to Join does demonstrate that there is already widespread knowledge of the pending lawsuit without the need for Court-supervised notice.

employees and seeks collective treatment of their FLSA action under the FLSA's opt-in provisions.[2] Plaintiffs' Motion is the same for all material purposes as the notice motion that Plaintiffs' counsel filed in their lawsuit against Perdue in the United States District Court for the Middle District of Georgia, Alford v. Perdue Farms, Inc., (M.D. Ga. 5:07-cv-00087-CAR). Plaintiffs' Motion must be denied because Plaintiffs have offered no credible evidence in support of their allegations and therefore have failed to meet the burden required in this Circuit, and others, for issuance of notice.

The only supposed "evidence" that Plaintiffs cite in support of their Motion are thirty-three Declarations filed by a small sample of Plaintiffs in this case. These Declarations have no evidentiary value. The Declarations are boilerplate, "fill-in-the-blank" template documents that have been used and reused in at least seven other poultry industry cases by the same Plaintiffs' counsel. On their face, the Declarations make no reference to Perdue Farms, Inc. or the working conditions and pay practices at Perdue's poultry processing facility in Dothan, Alabama. These Declarations alone are not sufficient evidence for the Court to grant Plaintiffs' Motion, even under the "lenient" standard at this stage of the proceedings. Plaintiffs cite no other facts and present no other evidence.

For all material purposes, each of the Declarations filed by Plaintiffs in this case are identical to each other and to Declarations filed against other poultry industry employers across the Southeast. The Declarations filed by Plaintiffs in this case are also identical for all material purposes to the Declarations that Plaintiffs' counsel used in the Alford case filed against Perdue in Georgia. In the Alford case, Perdue deposed certain Plaintiffs before responding to Plaintiffs' notice motion. Those depositions established that the Declarations offer no probative evidence

---

[2] Under the "opt-in" framework of the FLSA, no employee shall be a party plaintiff of any such action unless he or she gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. See 29 U.S.C. § 216(b).

and should be stricken because they do not meet the requirement that they be based on the declarant's personal knowledge.

In this case, on December 14, 2007, Perdue noticed the depositions of eight Plaintiffs who filed Declarations in support of Plaintiffs' Motion for Court-Supervised Notice. Perdue proffered that the depositions would confirm that Plaintiffs' Declarations have no evidentiary value because they are conclusory, non-specific to this Employer, are not based on personal information, and do not accurately reflect the working conditions at Perdue's Dothan, Alabama facilities or Perdue's methods of capturing compensable time. On December 20, 2007, this Court entered an Order, on Plaintiffs' Motion, to quash Perdue's notices of deposition and to stay discovery pending the Court's decision on Plaintiffs' notice motion. (Dkt. No. 58)[3]

Instead of deposing a representative sample of Plaintiffs, Perdue has gathered 19 Declarations from hourly poultry processing employees who work for Perdue in Dothan, Alabama and who have not opted-in to this lawsuit. See Ex. A. The Declarations Perdue has gathered are based on the Declarants' personal knowledge and describe in the employees' own words how Perdue records their time for pay purposes. These Declarations, and the Declarations of the Perdue Vice President of Human Resources and Perdue's Internal Audit—Project Lead, establish definitively that Perdue's poultry processing employees are paid for all hours worked from their first principal activity of the work day until the end of the last principal activity of the work day, except for any time taken for unpaid meal breaks or any bona fide off duty time.

---

[3]     Perdue intends to file a Motion for Summary Judgment and accompanying Memorandum of Law seeking dismissal of Plaintiffs' Amended Complaint, but Perdue first must resolve any inherent factual discrepancies between the Declarations filed by Plaintiffs in support of their notice motion, and the Declarations filed by Perdue that are attached to the instant Memorandum of Law. See Ex. A. Therefore, concurrent with this filing, Perdue is also filing a Motion to Lift the Stay of Discovery so that Perdue can take the depositions of a reasonable sampling of Plaintiffs who filed Declarations in this case. As stated above, Perdue has a legitimate basis to believe that these depositions will prove that Plaintiffs' Declarations have no evidentiary value because they are conclusory, non-specific to this Employer, are not based on personal knowledge, and do not accurately reflect the working conditions at Perdue's Dothan, Alabama facilities or Perdue's methods of capturing compensable time.

Plaintiffs are paid for all compensable time, including sanitizing their departmental equipment and before beginning work and donning and doffing such departmental gear as smocks, gloves, and sleeves.

Plaintiffs' generic Declarations, which have been "cut" from other poultry lawsuits and "pasted" into the case against Perdue, are indicative of the fundamental deficiency in Plaintiffs' Motion for Court-Supervised Notice and their underlying Complaint. Plaintiffs and their counsel, who evidently have extensive litigation experience with other poultry companies, have not done adequate due diligence into the pay and time recording practices at Perdue's poultry processing facilities and have failed to perform an inquiry into the allegations of their Complaint that is reasonable under the circumstances.[4] Instead, Plaintiffs have presented information about widespread industry practices, which they erroneously assume to be factual at Perdue's operations, both in their Complaint and in the instant Motion.

It is a matter of public record that in 1997 and again in 2000, the United States Department of Labor ("DOL") launched a systematic investigation into the poultry industry's pay practices for poultry processing employees, particularly with regard to line time practices and so-called "donning and doffing" of clothing and gear worn in the processing function. It is also a matter of public record that Perdue entered into a Consent Judgment with the DOL on May 9, 2002. (See Ex. B, Heflin Decl. ¶¶ 3–4, 10) There is no record that any other poultry company has taken a similar course of action. Pursuant to the terms of the Consent Judgment, Perdue developed ground-breaking donning and doffing procedures and time recording practices

---

[4]    Fed. R. Civ. P. 11(b) states that counsel, when filing a pleading or motion, are certifying that its allegations and factual contentions have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

that are unique in the poultry industry and are fully compliant with the FLSA.  (<u>Id.</u>, ¶¶ 10–11)[5]

Perdue representatives worked together with the DOL over a period of one year to develop a

system to capture compensable time in all of its poultry processing facilities.[6]  Specifically,

Perdue does not calculate pay entitlements based on line time, master time cards, or any other

similar practices.  In Perdue's poultry-processing plants, there is no off-the-clock donning and

doffing, walking, or waiting.  All of that time is captured by a state-of the-art, electronic time

clock system that is activated by each hourly employee at the beginning and end of the work day.

Perdue's poultry-processing employees are paid for all hours worked from their first principal

activity of the work day until the end of the last principal activity of the work day, except for any

time taken for bona fide unpaid meal breaks or other bona fide off-duty time.

Finally, it is also a matter of public record that Secretary of Labor Elaine Chao lauded

Perdue's agreement and revised practices as a "major victory for the workers."  (<u>See</u> Ex. B,

Heflin Decl. ¶¶ 18-19, Tab 4); <u>see also</u>, Steven Greenhouse, <u>Poultry Plants to Pay Workers $10</u>

<u>Million in Compensation</u>, N.Y. TIMES, May 10, 2002, at 20; Kirsten Haukebo, <u>Poultry Workers</u>

<u>Await Back Pay From Perdue</u>, THE COURIER JOURNAL, June 2, 2002, at 1E; Ted Shelsby, <u>Perdue</u>

<u>to Pay Back Wages</u>, THE BALTIMORE SUN, May 10, 2002, at 1C; Angela Swinson, <u>Perdue Settles</u>

<u>Donning, Doffing Dispute; DOL Sues Tyson Foods on Similar Charges</u>, DAILY LABOR REPORT,

May 10, 2002, at A-5 (attached collectively hereto as Ex. D).  Similarly, Tammy McCutchen,

who at the time was the DOL's Administrator of the Wage and Hour Division, stated that

---

[5]    <u>See also</u> Ex. B, Heflin Decl. ¶ 18, Tab 5, which is a letter from the Office of the Solicitor, U.S. Department of
Labor, dated August 16, 2002, stating:  "Based upon [its] review, the Wage and Hour Division has determined
that Perdue's practices at these facilities are consistent with the agreement between Perdue Farms and the
Department of Labor."

[6]    Even before Perdue was formally served with this lawsuit, Perdue's counsel voluntarily disclosed to Plaintiffs'
counsel that Perdue's industry-leading pay practices for its hourly poultry processing employees were
developed in conjunction with and approved by the United States Department of Labor and were unique in the
poultry industry.  (Ex. C, Letter from J. Kelley to R. Camp and R. Celler, dated January 29, 2007)

Perdue's decision to change its pay practices was a significant development and should be a "model for the industry."  (See Ex. B, Heflin Decl. ¶¶ 18–19, Tab 4); see also Ex. D.

<u>Argument</u>

I.    **Plaintiffs' Motion Must Be Denied Because Plaintiffs Have Failed To Meet Their Burden Of Establishing That There Are Similarly Situated Individuals Who Want To Join This Lawsuit.**

Plaintiffs must establish that there are other similarly situated individuals who desire to opt in to this action, and that its allegations against Perdue have adequate evidentiary support. See Freeman v. Wal-Mart Stores, Inc., 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) ("unsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden") (citing Haynes v. Singer Co., Inc., 696 F.2d 884, 887 (11th Cir. 1983)).  Plaintiffs' Motion must be denied because they have utterly failed to meet their burden of proof.

Plaintiffs have provided no credible, detailed allegations and evidence in support of their Motion.  See, e.g., Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358 (M.D. Ala. 1999).  The only legally sufficient Declarations in this case—including the 19 hourly employee Declarations that are attached to this Memorandum of Law—based on personal knowledge and which describe in the employees' own words how and when they swipe the time clock and what activities are paid for, demonstrate that Perdue's methods for recording time and compensating its hourly employees are fully compliant with the FLSA.  See Ex. A.  Contrast these Declarations with Plaintiffs' filing.  Plaintiffs' Declarations clearly are not in employees' own words, and are phrased in a conclusory fashion on a preprinted form.  Plaintiffs' Declarations do not state that the employees work for Perdue, do not state what the employees' jobs are, do not state how the employees swipe in and swipe out, and do not state what and how the employees don and doff work-related clothing and gear before and after using the time clocks.  There simply is no

justification on this record that Perdue's pay practices at its poultry processing plant in Dothan, Alabama violate the Act and thus, no notice should issue.

> **A.    Contrary To Plaintiffs' Claims, The <u>Hipp</u> Two-Tiered Analysis Is Not A Universal Mandate For Conditional Class Certification In FLSA Cases.**

Plaintiffs' egregiously overstate the Eleventh Circuit's "two-tiered" approach to conditional class certification articulated in <u>Hipp v. Liberty Nat'l. Life Ins. Co.</u>, 252 F.3d 1208 (11th Cir. 2001). Plaintiffs argue that under the <u>Hipp</u> two-tiered analysis, the Court at the motion stage must make a determination, based solely on pleadings and affidavits, whether notice of the lawsuit should be sent to potential class members. (Pls.' Mot. at 9–10) Plaintiffs insist that this determination shall be made using a "fairly lenient" standard and "typically results" in the court granting the request to send notice to potential class members and conditionally certifying a representative class. (<u>Id.</u> at 10)

While it is true that the burden on Plaintiffs at the notice stage is described as "not heavy," it is not a pro-forma or "minimal one." <u>Reed v. Mobile County School Sys.</u>, 246 F. Supp. 2d 1227, 1237 (S.D. Ala. 2003). Moreover, the "lenient" standard described is not a universal mandate for issuance of notice. Even in <u>Hipp</u>, the court noted that the lenient standard at stage one only "typically" results in authorization of notice. 252 F.3d at 1218. While district courts in the Eleventh Circuit generally have followed the <u>Hipp</u> two-tiered approach, the Court has clearly stated that "[n]othing in our circuit precedent . . . requires district courts to use this approach." <u>Id.</u> at 1219. "The decision to create an opt-in class under § 216(b), like the decision to certify a class under Rule 23, remains soundly within the discretion of the district court." <u>Id.</u>

The power to authorize notice must be exercised with discretion and only in appropriate cases. <u>Haynes v. Singer Co.</u>, 696 F.2d 884, 886 (11th Cir. 1983). This Court should carefully consider the parties' submissions and apply a "stricter standard" to this case than the result-

oriented approach proposed by Plaintiffs.  Holt v. Rite Aid Corp., 333 F. Supp. 2d 1265, 1274 (M.D. Ala. 2004) (applying a stricter standard in ruling on plaintiff's motion for court-facilitated notice because the parties presented evidence on the issue of whether the putative class members were similarly situated); Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 498 (D. N.J. 2000) (stating where discovery had been conducted, "[i]t is appropriate, therefore, for the Court to apply a stricter standard in its analysis of the question before it, and in doing so, finds that plaintiffs have not met their burden").

This Court should make a preliminary inquiry into the merits of this case before ruling on or putting the parties to the expense of notice or class proceedings.  See Freeman v. Wal-Mart Stores, Inc., 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) ("It would be a waste of the Court's and the litigant's time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action . . . .").

**B.     Plaintiffs' Declarations Do Not Support A Finding That Notice Should Be Sent To Putative Class Members.**

Nothing in Plaintiffs' Declarations support the proposition that there are other similarly situated individuals who want to join this lawsuit.  No such evidence emerges from the thirty-three boilerplate Declarations filed by Plaintiffs in this case.  (Dkt. Nos. 49-4 and 49-5; see, e.g., Ex. E, Thornton Decl.)  Rather than proffering factual support for their argument, Plaintiffs rely on Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358 (M.D. Ala. 1999), to argue that these Declarations render the Court's favorable decision on their Motion merely a procedural formality.

Plaintiffs misconstrue the Harper case and misstate the applicable standard.  Far from being a procedural formality, sending notice to potential class members in this case requires Plaintiffs to provide detailed and substantial evidence of alleged FLSA violations **and** the

existence of similarly situated individuals who want to join the lawsuit. 185 F.R.D. at 363. The court in Harper first **rejected** in part plaintiffs' motion to conditionally certify a huge, diverse class of employees. Id. The court ultimately found that a smaller class of employees was the appropriate conditionally certified class, because only for that smaller class could the plaintiffs meet their burden with "substantial, detailed allegations of FLSA violations and provided evidentiary support that they, like other members of the putative opt-in plaintiff class, were the victims of employment practices . . . ." Id. at 365.

### 1.    Plaintiffs' Declarations Have No Evidentiary Value And Should Be Stricken.

Plaintiffs' generalized Declarations, conclusory allegations and legal conclusions should be stricken. See Grayson v. K Mart Corp., 79 F.3d 1086, 1097 (11th Cir. 1996) (stating that the plaintiff must offer "detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary") (citations omitted).

Plaintiffs' Declarations are identical to scores of others filed against other poultry employers in several other poultry cases around the Southeast filed by this same law firm.[7] These identical Declarations are legally insufficient to be admitted as evidence. Each statement in the Declarations, other than the Declarant's name, city of employ, and employment dates, is phrased in a conclusory fashion on a preprinted form that was prepared by attorneys prior to any discussion with the Declarants. (See Ex. E, Thornton Decl.) The Declarations fail to accurately describe Perdue's method of capturing compensable time, do not identify Perdue as the

---

[7]    See Ex. F, enclosing sample of identical Declarations filed in Dobbins v. Tyson Chicken, Inc., N.D. Ala. 4:06CV04912, Dkt. No. 24-4, filed April 10, 2007; Adams v. Wayne Farms LLC, M.D. Ala. 1:06CV00950, Dkt. No. 50-4, filed March 9, 2007; Anderson v. Wayne Farms, LLC, M.D. Ala. 2:06CV00951, Dkt. No. 39-4, filed March 5, 2007; Carlisle v. GoldKist, Inc., N.D. Ala. 4:06CV01982-CLS, Dkt. No. 22-2, filed March 2, 2007; Atchison v. GoldKist, Inc., N.D. Ala. 4:06CV01983, Dkt. No. 21-2, filed March 2, 2007; Belue v. Wayne Farms, LLC, N.D. Ala. 4:06CV02095, Dkt. No. 28-4, filed February 20, 2007; Bolden v. Wayne Farms LLC, N.D. Ala. 5:06CV02096, Dkt. No. 33-4, filed February 19, 2007; and Benford v. Pilgrim's Pride Corp., N.D. Ala. 5:06-CV-02337, Dkt. No. 22-4, filed February 13, 2007.

Declarants' employer, do not allege the specific processing area in which the Declarants allegedly work or worked, and make no effort whatsoever to establish that there are similarly situated individuals at the Perdue poultry processing facility in Dothan, Alabama who want to join the lawsuit.  See Wombles v. Title Max of Ala. Inc., No. 03CV1158, 2005 WL 3312670, at *4–5 (M.D. Ala. Dec. 7, 2005) (holding five nearly identical affidavits to join FLSA class was insufficient to establish that others desired to opt in); Smith v. Tradesmen Int'l, Inc., 289 F. Supp. 2d 1369, 1371 (S.D. Fla. 2003) (rejecting as evidence of similarly situated employees three identical affidavits by employees and finding it more prudent to conduct additional discovery to meet burden of proof).  Indeed, the Declarations make no mention of Perdue's operations at all.

Moreover, each of Plaintiffs' boilerplate Declarations is replete with unsubstantiated legal conclusions, such as line activities are "necessary, integral, and indispensable" to the Declarant's overall activities, that "due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable," and that other individuals "have been subjected to the illegal pay practices described above."  (Ex. E, Thornton Decl. ¶¶ 6, 9)  Such conclusory assertions are consistently rejected as sufficient evidence for sending notice to potential class members.  E.g., Freeman v. Wal-Mart Stores, Inc., 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) ("[U]nsupported assertions of widespread violations are not sufficient to meet the Plaintiff's burden.") (citing Haynes v. Singer Co., Inc., 696 F.2d 884, 887 (11th Cir. 1983)); H & R Block, Ltd. v. Housden, 186 F.R.D. 399, 400 (E.D. Tex. 1999) (finding movants could not satisfy the

first step of the two-step approach when all they had done was submit affidavits making conclusory allegations).[8]

### 2. Plaintiffs' Declarations Are Not Even Consistent With Plaintiffs' Discovery Responses In This Case.

The evidentiary value of Plaintiffs' Declarations is further diminished because they are inconsistent with Plaintiffs' written discovery responses in this case. Some of Plaintiffs' Interrogatory Responses deny knowledge of information that the Plaintiffs swear to in their Declarations. For example, the Declarations assert that each Plaintiff is entitled to overtime for those hours worked over forty. (Ex. E, Thornton Decl. ¶ 8) In Plaintiffs' uniform Interrogatory Responses, however, when asked to provide information about the weeks in which Plaintiffs claim they worked in excess of forty hours, Plaintiffs state they are unable to answer that question. (See Ex. G, Pl. Thornton's Interrog. Resp. No. 5) In addition, while the Declarations purport to describe, in detail, how Perdue allegedly failed to pay them for "pre-production line" and "post-production line" activities, Plaintiffs could not explain in their own Interrogatory Responses, what "pre" or "post" production time was or even how they swipe in and out at the time clocks. (Compare Ex. E, Thornton Decl. ¶ 6, with Ex. G, Pl. Thornton's Interrog. Resp. Nos. 9 and 11)

In short, Plaintiffs have provided no probative evidence in support of their Motion or their claims of FLSA violations. Plaintiffs have offered only unsupported, conclusory allegations, which belie any understanding of the substance of their Declarations or the allegations against Perdue, and are not sufficient evidence for this Court to authorize class notice. See Haynes, 696 F.2d at 887 (finding no abuse of discretion for district court's refusal to

---

[8]   Plaintiffs' are also unable to create genuine issues of material facts in dispute simply by putting forth their boilerplate declarations. See Beard v. Annis, 730 F.2d 741, 743 (11th Cir. 1984) (stating affidavits did not create a disputed issue of fact because they were ultimate or conclusory facts and conclusions of law).

authorize class notice where plaintiff's counsel offered only unsupported allegations of widespread FLSA violations); Horne v. United Servs. Auto. Ass'n, 279 F. Supp. 2d 1231, 1235–36 (M.D. Ala. 2003) (denying collective action status where the court has found insufficient proof that there were similarly situated persons who desired to join the lawsuit).

## II.    Plaintiffs' Lawsuit, Their Instant Motion, And Supporting Declarations Are Based On Erroneous Information That Has Nothing To Do With How Perdue Compensates Its Hourly Poultry Processing Employees.

The generality and absence of substance in Plaintiffs' Declarations accentuate the fundamental flaw in Plaintiffs' case against Perdue—namely, Plaintiffs' Complaint and their Declarations assert alleged facts that have nothing to do with the way Perdue operates its poultry processing plant in Dothan, Alabama.  Perdue's true working conditions and pay practices are reflected in the statements of the 19 hourly processing employees who submitted Declarations in support of Perdue's Opposition to Plaintiffs' Motion for Court-Supervised Notice, and in the Declarations of its Vice President of Human Resources and its Internal Audit—Project Lead.

On May 9, 2002, Perdue became the only major poultry processor to enter into a Consent Judgment with the DOL concerning the donning and doffing of work clothing by hourly poultry processing employees and so-called "line time" work time recording practices that have been prevalent in the poultry industry for many years.  (See Ex. B, Heflin Decl. ¶¶ 4–5)  Perdue's Consent Judgment with the DOL reflects a distinct break from the "line time" framework for marking the first principal activity of hourly poultry processing employees' compensable work shifts, which had been used historically across the poultry processing industry.  (Ex. B, Heflin Decl. ¶¶ 5–7; Ex. H, Tabinowski Decl. ¶ 11)  Perdue does not use "line time" practices and instead records the first principal activity with a Kronos time clock, a "state of the art" web-based centralized electronic time recording system to record the time worked by hourly poultry processing employees.  (Ex. B, Heflin Decl. ¶¶ 5-12; see Ex. H, Tabinowski Decl. ¶ 5)  The

Kronos system captures all compensable time from the first principal activity to the last principal activity in a typical work day.  (Ex. B, Heflin Decl. ¶ 13)

Perdue's Kronos, timekeeping, and compensation practices are complaint with the FLSA:

- Under the Perdue system, hourly poultry processing employees don Company supplied work clothing items on compensable time and walk to the work station from the clock, also on compensable time.  (Ex. B, Heflin Decl. ¶¶ 9, 12–13; Ex. H, Tabinowski Decl. ¶ 8; Ex. A, Johnson Decl. ¶¶ 5-6, Cawthon Decl. ¶ 6, Green Decl. ¶¶ 6–7, Mack Decl. ¶¶ 5-6, Banks Decl. ¶ 6, Floyd Decl. ¶¶ 6–10, Leonard Decl. ¶ 2, Hickman Decl. ¶¶ 4–6, Durr Decl. ¶¶ 3–4, 6–7, Richards Decl. ¶¶ 5–7, Clark Decl. ¶¶ 5, 7, Reynolds Decl. ¶ 3, Harris Decl. ¶¶ 2, 4, 7, Davis Decl. ¶¶ 4–5, Hudson Decl. ¶¶ 2-4, Marsh Decl. ¶¶ 4, 6, Smith Decl. ¶¶ 4-6, Beacham Decl. ¶¶ 6, 11, Beaty Decl. ¶¶ 4-5)

- All hourly poultry processing employees are provided two thirty minute unpaid meal breaks during which they are completely relieved from work duty.  (Ex. B, Heflin Decl. ¶¶ 13, 15; Ex. H, Tabinowski Decl. ¶ 12; Ex. A, Johnson Decl. ¶¶ 7–10, Cawthon Decl. ¶¶ 6, 8, Green Decl. ¶¶ 7, 11-12, Mack Decl. ¶¶ 8, 11, Banks Decl. ¶¶ 8, 10, 12, Floyd Decl. ¶¶ 11, 15-16, Leonard Decl. ¶¶ 4, 6, Hickman Decl. ¶¶ 2, 8, Durr Decl. ¶¶ 1, 8, Richards Decl. ¶¶ 2, 8, Clark Decl. ¶¶ 1, 8, 9, Reynolds Decl. ¶¶ 4–5, Harris Decl. ¶¶ 5–6, Davis Decl. ¶¶ 2, 6, Hudson Decl. ¶¶ 1, 5, Marsh Decl. ¶ 7, Smith Decl. ¶¶ 7–8, Beacham Decl. ¶ 8, Beaty Decl. ¶ 6)

- Hourly poultry processing employees doff required gear before the meal breaks commence on compensable time, and don gear for the continuation of their shifts after the period ends, also on compensable time.  (Ex. B, Heflin Decl. ¶¶ 13, 15; Ex. H, Tabinowski Decl. ¶ 13; Ex. A, Johnson Decl. ¶¶ 7, 9–11, Cawthon Decl. ¶¶ 6–8, Green Decl. ¶¶ 8–9, 11–13, Mack Decl. ¶¶ 8-12, Banks Decl. ¶¶ 8-13, Floyd Decl. ¶¶ 12–16, Leonard Decl. ¶¶ 5, 7, Hickman Decl. ¶¶ 4, 7-8, Durr Decl. ¶¶ 4, 8, Richards Decl. ¶¶ 5, 8, Clark Decl. ¶¶ 5, 8, 10, Reynolds Decl. ¶¶ 3, 6, Davis Decl. ¶¶ 4, 7, Hudson Decl. ¶¶ 3, 6, Marsh Decl. ¶¶ 4, 7, Smith Decl. ¶¶ 5, 7–8, Beacham Decl. ¶¶ 9, 11, Beaty Decl. ¶¶ 5–7)

- At the end of their shifts, hourly poultry processing employees doff Company supplied work clothing items on compensable time and walk to the clock from the work station, also on compensable time.  (Ex. B, Heflin Decl. ¶¶ 9, 13; Ex. H, Tabinowski Decl. ¶ 9; Ex. A, Johnson Decl. ¶¶ 12–13, Cawthon Decl. ¶ 9, Green Decl. ¶¶ 13–15, Mack Decl. ¶ 13, Banks Decl. ¶ 13, Floyd Decl. ¶¶ 17-18, Leonard Decl. ¶ 8, Hickman Decl. ¶¶ 4, 9, Durr Decl. ¶¶ 4, 9, Richards Decl. ¶¶ 5, 9, Clark Decl. ¶¶ 5, 11, Reynolds Decl. ¶¶ 3, 7, Harris Decl. ¶¶ 2, 7-8, Davis Decl. ¶¶ 4, 8, Hudson Decl. ¶¶ 3, 7, Marsh Decl. ¶¶ 4, 7, Smith Decl. ¶¶ 5, 9, Beacham Decl. ¶¶ 10–11, Beaty Decl. ¶¶ 5, 8)

Simply stated, contrary to the baseless assertions in Plaintiffs' pleadings and Declarations, in Perdue's poultry processing plants, there is no "off the clock" donning and doffing, walking or waiting. As stated above, Defendant is prepared to file a Motion for Summary Judgment and accompanying Memorandum of Law seeking dismissal of Plaintiffs' Amended Complaint.[2]

**III.    If The Court Orders That Notice Is To Be Provided, And It Is Perdue's Position That It Should Not Issue Such An Order, The Court Should Refuse To Use The Notice Requested By Plaintiff.**

For all the foregoing reasons, Plaintiffs' Motion should be denied and notice should not be sent to potential opt-in Plaintiffs. If the Court were to conclude otherwise, however, the Court should deny Plaintiffs' request to use the Notice attached to their Motion, and instead direct the parties to meet and confer in order to devise a mutually acceptable and accurate notice. Tucker v. Labor Leasing, Inc., 872 F. Supp. 941, 950 (M.D. Fla. 1994) (ordering the parties to "meet and agree to a form of notice" to potential class members the contents of the notice and consent form and provide a joint proposed notice in an FLSA case). Such a course of action is particularly warranted in light of the fact that many aspects of Plaintiffs' proposed notice are patently improper, unfairly prejudicial, and/or entirely inaccurate. The deficiencies include, but are not limited to, the following:

- The Court's name and caption of the action should not appear at the top of the proposed notice, as doing so creates the impression that the litigation itself is Court-endorsed. See, e.g., Goerke v. Commercial Contractors and Supply Co., Inc., 600 F. Supp. 1155, 1160 (N.D. Ga. 1984) ("This court . . . has no power to draft a notice in the present case, to approve a proposed notice, or to permit the sending of a notice

---

[2]    If the Court grants Perdue's Motion for Summary Judgment, then Plaintiffs' Motion will be rendered moot, because FLSA plaintiffs who cannot withstand summary judgment may not assert a claim under the FLSA on behalf of similarly situated employees. Jastremski v. Safeco Ins. Cos., 243 F. Supp. 2d 743, 745 n. 1 (N.D. Ohio 2003); see also Graffy v. Jewel Foods Stores, No. 83 C 9313, 1985 WL 3352, at *2 (N.D. Ill. Oct. 29, 1985) (denying notice and stating "[s]ince both named plaintiffs' actions are concluded by summary judgment, their class action is too insubstantial to be certified.").

which contains in any way any indication that this court has approved such notice or has approved of the bringing of this lawsuit.");

- The proposed notice sets forth an improper class period of three years when the applicable FLSA period is two years. See 29 U.S.C. § 255;

- The proposed notice improperly refers to Perdue's use of a "master time system," which Perdue does not use and has not used in the period covered by this Complaint;

- The proposed notice sets forth Plaintiffs' counsel as the collector and administrator of the consent forms; and

- The notice unnecessarily includes a warning regarding retaliation when there has been no evidence, or even any allegation, of retaliation in the First Amended Complaint.

Accordingly, if the Court orders Notice of any kind, the parties should be ordered to submit a mutually agreeable Notice within 30 days of the Court's Order. If the parties cannot agree, they should submit their separate proposals for the Court's decision. If the Court does not order the parties to make a joint submission of a proposed Notice, Defendants respectfully request the opportunity to address in more detail the issues regarding the content, procedures for, and timing of any such notice.

## Conclusion

Plaintiffs' efforts to forge a collective action covering hundreds of employees should be rejected. Plaintiffs have not and cannot establish any credible evidence to support their Motion for an Order Permitting Court Supervised Notice to Employees of their Opt-In Rights. Hourly poultry processing employees are paid in accordance with the FLSA and its implementing regulations. As such, Perdue operates differently from most of the other poultry processing plants against whom Plaintiffs have filed similar lawsuits and substantially similar court documents. In addition, Plaintiffs' boilerplate and inaccurate Declarations are not credible evidence in support of their Motion and should be stricken. Accordingly, Plaintiffs' Motion should be denied, together with such other and further relief as the Court deems appropriate.

Dated: January 14, 2008                    Respectfully submitted,

                                           **/s/Brian Z. Liss**
                                           James J. Kelley (admitted pro hac vice)
                                           D.C. Bar No. 194746
                                           202-739-5095
                                           jkelley@morganlewis.com
                                           Brian Z. Liss (admitted pro hac vice)
                                           D.C. Bar No. 468886
                                           202-739-5579
                                           bliss@morganlewis.com
                                           **Morgan, Lewis & Bockius LLP**
                                           1111 Pennsylvania Avenue, N.W.
                                           Washington, DC  20004
                                           202-739-3001 (fax)

                                           Sandra B. Reiss
                                           Alabama Bar No.  ASB-3650-S80S
                                           **Ogletree, Deakins, Nash,**
                                           **Smoak & Stewart, P.C.**
                                           One Federal Place, Suite 1000
                                           1819 5th Avenue North
                                           Birmingham, Alabama 35203
                                           205-328-1900
                                           205-328-6000 (fax)
                                           sandra.reiss@odnss.com

                                           *Counsel for Defendant Perdue Farms, Incorporated*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 14th day of January 2008, I caused a copy of the foregoing Defendant Perdue Farms Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion for an Order Permitting Court-Supervised Notice to Employees of their Opt-in Rights to be served via electronic mail using the CM/ECF system, which will send a notice of electronic filing as well as the full text of the Memorandum of Law in Opposition to Plaintiffs' Motion for an Order Permitting Court-Supervised Notice to Employees of their Opt-in Rights to Plaintiffs' counsel of record who are confirmed to be individually registered for e-filing and will receive the same electronically from the Court.

*/s/Brian Z. Liss*
Brian Z. Liss (admitted pro hac vice)
D.C. Bar No. 468886
202-739-5579
bliss@morganlewis.com
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
202-739-3001 (fax)

*Counsel for Defendant Perdue Farms, Incorporated*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **Case Action No.:** |
| v. ) | **1:06-CV-1000-MEF-WC** |
| ) | **JURY TRIAL DEMANDED** |
| PERDUE FARMS INCORPORATED, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## <u>DECLARATION OF LETICIA JOHNSON</u>

I, Leticia Johnson, depose and state the following based on my personal knowledge:

1.  I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2.  I began working with the Perdue plant in Dothan, Alabama on August 2, 1999.  I have always worked in the leg deboning department.

3.  I work from 7:15 AM to 5PM Monday through Friday.  Sometimes I work on Saturdays and get paid time and a half for hours worked over forty.  I get paid $9.35 per hour.

4.  I arrive early at 6:30 AM, so that I can get my bump hat, hair net, safety glasses, my badge and stop watch out of my trunk.  I also have to put my boots on which are located in my trunk. I choose to take these items home with me.

5.  After putting on these items, I walk through the gate past security.  I enter the facility and I may sit in the break room and drink a cappuccino until about 7:05.  At around 7:10 AM, I

get up and walk to my assigned Kronos time clock. I make sure I have on my bump hat, ear

plugs, hair net, and safety glasses before going upstairs to swipe in.

6.    At 7:15, I swipe in at the third time clock. I get a smock and gloves and then sanitize

my hands. Because I am a support leader, I help set up the equipment the department needs to

work with that day. I do this until the other leg deboners come in. I make sure I set up and

sanitize their mouse traps, arm guards, chain gloves, and extra latex gloves. I also use the same

equipment when I debone. I then debone until it is time for my first thirty-minute unpaid meal

break.

7.    Around 10:20 AM when it is time for me to take a break, I clean off, take off my

chain glove and leave it in a tub, place my rubber gloves in the pocket of my smock, hang my

smock, and throw away my plastic sleeves and apron. I then swipe out for break. I keep on my

bump hat, safety glasses, ear plugs, and work boots.

8.    During my break I may go to the cafeteria, or get in my car and drive to get

something eat if there is a long line in the cafeteria. I can do whatever I want during my break,

as long as I'm back within thirty minutes.

9.    Around 10:45 I walk back upstairs to make sure I clock in on time. At 10:50 AM, I

clock back into my area. I then go back to the designated area, where we hang our coats. I put

on my smock, apron, sleeves, and gloves. I then sanitize my hands and my apron and put on my

chain glove.

10.  I debone until about 1:20 PM. When it is time for my second break, I repeat the same

process. During my second break, I get soda, water, and chips and sit in the break room.

Around 1:45 I head back upstairs from the table. I try to go upstairs early because other people

may be swiping in at the same time. I swipe in at 1:50 PM. I cannot swipe in before my thirty minutes are up.

11. I put back on my smock, apron, sleeves, and gloves. I then sanitize my hands and my apron and put on my chain glove. I get on the line and wait for my lead person to give me a knife. I work until it is time to go home.

12. When it is time to go home, I wash my hands, put my chain glove in the tub, throw away my rubber gloves, plastic sleeves and apron. I throw my dirty smock and cotton gloves into a big yellow cart.

13. I finally clock out to go home around 5PM. I keep on my safety glasses until after I clock out. I keep on my bump hat, hair net, ear plugs, and work boots until I get back to the parking lot. I put those items in my car trunk and drive home.

14. When I first started at Perdue, I attended orientation. I learned about when to clock in and clock out, and how to clock in and out when it is time for my break. I also received training on what items I need to have on before I clock in.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

*Leticia Johnson*

Leticia Johnson

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **DARRYL ANDERSON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case Action No.:** |
| **v.** ) | **1:06-CV-1000-MEF-WC** |
| ) | **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INCORPORATED,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF CHERYN CAWTHON

I, Cheryn Cawthon, depose and state the following based on my personal knowledge:

1.  I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2.  I began working with the Perdue plant in Dothan, Alabama on November 3, 2003.  I work on the cone line cutting tenders.

3.  I work from 7:45 AM to 5 PM, Mondays through Fridays. Sometimes I work on Saturdays and get paid time and a half for hours worked over forty.  I get paid $9.35 per hour.

4.  I drive to work from Blakely Georgia, and arrive here early at around 7AM to avoid traffic.  I bring my hat, ear plugs, hair net, safety badge, and safety glasses with me from home.

5.  I sit in my car until about 7:20 AM and then walk through security.  I stand in the hallway until it is time to swipe in.

6.  At about 7:44 AM, I go up one flight of stairs and swipe in to my assigned clock. After I swipe in, I go to the coat rack and put on my lab coat, apron, sleeves, and gloves. I dip

my hand in the chlorinated water and do hand exercises. I then begin cutting the bones out of chicken breasts. I work until my first break at 10:20 AM. Before I go to break, I take off my lab coat, arm guard, and cutting gloves. I throw away my sleeves and apron. I then swipe out on my assigned time clock. I keep on my bump cap and hair net during break. I sit in the break room or go outside. About four minutes before I need to swipe in, I get up and walk upstairs toward the time clock. I wait until thirty minutes have passed before swiping in. I swipe in at 10:50 AM.

7.   After swiping in, I put on my lab coat, sleeves, apron, gloves, and cutting glove. I then sanitize my hands, bind my arm guard and then go back to cutting tenders.

8.   I do this until my second break at 1:20 PM. I repeat the process during my second break. After returning from my second break, I cut tenders and may rotate to cutting breasts until about 4:30. I may leave earlier depending on the amount of chicken we have.

9.   When it is time to go home, I lay my knife down, take my arm guard off, remove my apron, and cutting gloves, and throw away my sleeves. I then swipe out and go downstairs to leave. I keep my safety glasses on until I get downstairs, and I keep my bump cap and hair net on until I get to my car.

10. When I first began working at Perdue, my supervisor told me I had to have my bump cap on before swiping in. She also taught me how to use my Kronos time-keeping card.

11. Above the time clocks, there are signs that show what I should have on before I swipe in and after I swipe in.

I declare under penalty of perjury that the forgoing is true and correct.


Dated:  January 3, 2008

                                        *Cheryn Cawthon*
                                        Cheryn Cawthon

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al., )
)
Plaintiffs, )
)
v. )   Case Action No.:
)   1:06-CV-1000-MEF-WC
PERDUE FARMS INCORPORATED, )   JURY TRIAL DEMANDED
)
Defendant. )
)

## DECLARATION OF LILLIE GREEN

I, Lillie Green, depose and state the following based on my personal knowledge:

1. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2. I began working with the Dothan facility of Perdue on August 11, 2003. I first began working in the deboning department sorting rib cages. I still work in the deboning area but now I do scrape tests.

3. My shift begins at 7:15 AM and ends between 3 and 5 PM, depending on the chicken processors. I work Monday through Friday, and am paid $9.35 per hour. If I work overtime, I receive time and a half my hourly wage.

4. I carpool to work everyday and bring with me my bump hat, ear plugs, hair net, safety glasses, work boots, Kronos time-keeping badge, and identification badge. I arrive at the plant around 7 AM or five minutes after 7.

5.   I walk to the front gate and pass through security.  I put my badge up as I walk past security, and then enter the building.  When I enter the building, I go to the break room or get a soda on the first floor.

6.   Around 7:14 AM I leave the break room and go upstairs to my assigned time clock. At 7:15 AM I swipe my Kronos time-keeping card.

7.   After I swipe in, I put on my smock first and then my plastic sleeves.  I get dip pans from the tub room for sanitizing gloves.  I set up my machine to get ready for the scrape tests.  I then begin scraping rib cages and measuring the meat that is on there. I continue to work until my first unpaid meal break at 10:30.

8.   Around twenty-five minutes after the hour, I remove my arm guard, I clean my machine and then close it.  I take off my smock and put it on my numbered hook.  I put my gloves in the pockets of my smock.  I then take off my sleeves, and my plastic apron and throw them away.

9.   I swipe out at my assigned clock, which is fourth from the door.  This is the same clock I used to swipe in, and the clock my supervisor assigned me to.

10. I keep on my bump hat, hair net, ear plugs, safety glasses, and work boots.  When I get to the bottom of the stairs from the deboning department I take off my safety glasses.

11. During my break, I choose to use the ladies room, then I go to the food area, eat food, and then sit and eat.  I eat for thirty minutes and come back at 11AM and swipe in at the same clock I swiped out from.

12. After I swipe in, it takes me about a couple of seconds to go back to my department, and put on my smock, then my sleeves, my apron, and gloves.  I begin working until my second break which is at 1:30 PM.  I repeat the process of taking off my items for my second break.

During my break, I sit in the break room. It takes me a couple of seconds to get to the break room from the clock where I swipe out. It's not that far away.

13. I swipe back in at 2PM. I put back on my smock, my sleeves, my apron, my gloves, sanitize my gloves, and then I begin scraping the rib cages. I continue to work until 3 or 5 PM, depending on the amount chickens we receive in the department.

14. When it is time to go home, I clean my machine, pull off my gloves, arm guard, knives, and sharpener, and return them to the line leader. I throw away my plastic sleeves and my apron. I put my smock in the laundry basket and then I clock out.

15. After I clock out I may walk to my locker and put my bump cap and ear plugs in my locker. Or, I may take them home with me, with my safety glasses and my work boots.

16. When I first began working with Perdue, my supervisor showed me how to use my equipment, how to put on my safety clothing and what items I needed to have on before I swipe in. My supervisor also showed me how to use my Kronos time-keeping card and where to use it.

17. There are signs by the break room that show everything I need to have on before and after I swipe in. The signs are all around the break room.

I declare under penalty of perjury that the forgoing is true and correct.


Dated: January 3, 2008

Lillie Green
Lillie Green

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case Action No.:** |
| **v.** | ) | **1:06-CV-1000-MEF-WC** |
| | ) | **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INCORPORATED,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DECLARATION OF BRENDA MACK

I, Brenda Mack, depose and state the following based on my personal knowledge:

1. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2. I began working with Perdue's Dothan, Alabama facility on May 7, 2007. I work in TSM making chicken breast tenders.

3. I work Monday through Friday and occasionally on Saturdays, for which I get paid over time. My shift begins at 8:00 AM and ends at 5:00 PM. I am paid $9.35 per hour.

4. When I arrive at work in the morning, I have on my hair net, ear plugs, hard hat, and water resistant shoes. I do not have to use safety glasses because I wear prescription glasses. When I get out of my car, I walk past the booth with two security guards and show my Perdue identification badge as I past by the guards.

5. As soon as I enter the building I walk to the breakroom and talk with friends until three minutes to eight. At three minutes to eight I walk upstairs to my department

time clock. At 8 AM I swipe my Kronos time-keeping badge at clock number two, which is for my department. I have never had to wait to swipe in.

6. After I swipe in, I have three minutes to put on my Perdue smock, my white apron, my cotton gloves, rubber gloves, and sanitize my hands. I then do a hand exercise led by line leader.

7. After that, I begin working in any position I choose, such as the loader, the patter, the slicer, or separater.

8. At either 10 AM or 10:30 I will take my first break. My line leader will announce when it's break. When it is time for break I take off my rubber sleeves, my rubber gloves, cotton gloves, apron, and my white Perdue smock. I place my white Perdue smock on a hook with my name on it. I then go to my assigned clock and swipe out.

9. I swipe out, I walk to the cafeteria. It takes about two to three minutes to get to the cafeteria. I eat a small meal with friends. I may use the restroom after I eat. During my break I have own my bump hat, hair net, ear plugs, work boots, and my badges. I give myself three minutes before the end of my break period to go back upstairs to swipe back in. If I took my break at 10:30 AM, I would swipe back in at 11 AM.

10. I follow the same process I went through in the morning after I swipe. I remove my smock from my hook, put it on, then put on my plastic sleeves, my apron, my cotton gloves, and rubber gloves. I sanitize my hands.

11. I then begin working in the next rotation from where I started in the morning. I work in that rotation until my second unpaid meal break begins at 1:30. I repeat the same process to remove my equipment. I walk to a different breakroom right next to the cafeteria, where I sit and talk with friends, until three minutes until it is time to go back up to the floor.

2

12. At 2PM I swipe in to begin my last round of work for the day. After I swipe back in, I get dressed and sanitize again while on the clock. I then work at my next rotation until it is time to go home. Around 5PM, my supervisor announces that the day is over.

13. When my supervisor announces the end of my workday, I make sure all of my meat is out of my tray. I throw away all of my disposable items, such as my rubber gloves, apron, and sleeves. I place my cotton gloves and my smock into two separate barrels for laundry. Then, I swipe out and walk out of the building. It takes me about four minutes to get to the exit of the building.

14. When I get back in my car I still have on my boots, my bump hat, my hair net, and my ear plugs. As soon as I get into my car, I take these items off.

15. When I first began working with Perdue, I had one week of orientation. I learned about what goes on in the other departments of the plant and about safety. I also learned how to use my Kronos time-keeping badge. I learned that we must have our bump hat, ear plugs, hair net, and shoes on before we swipe in, and that we could not touch any other items until after we swipe in.

16. At all the time clocks, there are before and after signs showing me what is appropriate to wear before and after I swipe in.

I declare under penalty of perjury that the forgoing is true and correct.


Dated: January 3, 2008

_Brenda Mack_
Brenda Mack

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **DARRYL ANDERSON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case Action No.:** |
| **v.** ) | **1:06-CV-1000-MEF-WC** |
| ) | **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INCORPORATED,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF LISA BANKS

I, Lisa Banks, depose and state the following based on my personal knowledge:

1.  I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

2.  I began working with Perdue's Dothan, Alabama facility on November 19, 2004.  I first began working in the hand portions department which was second processing.  I began am currently working on the kill floor in August 2006.

3.  My shift begins at 5:42 AM and ends at approximately 2:45 PM.  I am paid $9.85 per hour.

4.  When I drive to work I have my work boots on.  I then walk through the guard check and flash my identification card.

5.  After I enter the building, I go to my locker and put my lunch in my locker.  I choose to leave my hair net, safety glasses, and bump hat in my locker.  I remove these items from my licker and put them on, because I must have them on before I swipe in.

6.  At 5:42, I swipe in at the kill floor time clock.  The time clock is right by locker. After I swipe in, I go through two sets of double doors.  I then take my smock off of a numbered hook.  I put on my smock, apron, and gloves.  I go through another set of doors, sanitize my gloved hands in chlorinated water and go to my assigned work station.

7.  I have recently been promoted to a trainer, so now I work in whatever station I am needed to work in.

8.  I take my first break at 8:15 AM.  When my line leader tells me it is time for break, I throw away my plastic sleeves and hang up my smock and my apron on a hook, and place my gloves in my smock pocket.

9.  I then go through two sets of double doors and swipe my card through the time clock. After I swipe out for break, I choose to go to my locker, remove my safety glasses and bump hat, and get my jacket and a drink.  I then leave the facility and walk around the parking lot to get exercise.

10. Before my thirty minutes are over I return to my locker, get my bump cap and safety glasses, and return to the time clock by 8:45.  The time clock will not allow me to swipe in before thirty minutes are up.

11. After I swipe back in, I proceed to put on my apron, smocks, sleeves, and my gloves. I then sanitize my hands and begin working until it is time for my second break.

12. I take my second break at 11:15 AM.  I follow the same procedure for removing my equipment.  After swiping out, I choose to go to the bathroom, and then to the breakroom and eat my lunch.  After about twenty-eight minutes I go back to my locker, and get my bump cap, ear plugs which are connected to my hat, and safety glasses.

13. I swipe back in at 11:45 AM, and put on my gloves, sleeves, apron, and smock, and sanitize my hands and begin to work.  At the end of my shift I remove my gloves, sleeves, apron, and smock and swipe out.

14. My locker is right by my time clock. I takes me less then a minute to get to my locker. I go to my locker and put away my bump cap, ear plugs, safety glasses, and retrieve my personal items. I then leave the building and return to my car.

15. If I work for more than forty hours in one week, I receive time and a half my salary. I have never been asked to do any work on my own time.

16. When I first started at Perdue, a trainer showed me how to use my Kronos time-keeping card. The trainer and my supervisors told me what items I could not put on until I swiped in.

17. There are also very large signs and visual aids in English and Spanish at the time clocks showing me what I should have on.

I declare under penalty of perjury that the forgoing is true and correct.


Dated: January 3, 2008

_Lisa Banks_
Lisa Banks

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.,               )
                                        )
            Plaintiffs,                 )
                                        )
     v.                                 )        Case Action No.:
                                        )        1:06-CV-1000-MEF-WC
PERDUE FARMS INCORPORATED,              )        JURY TRIAL DEMANDED
                                        )
            Defendant.                  )
                                        )

## DECLARATION OF ERIKA FLOYD

I, Erika Floyd, depose and state the following based on my personal knowledge:

1.    I am over the age of eighteen and am not a party to this action.  I understand that I am

not required to sign this declaration and that I would suffer no retaliation if I decided not to sign.

I am signing this declaration voluntarily and without any duress, threats, intimidation or

coercion.

2.    I began working with Perdue in Dothan, Alabama on July 23, 2007.  I began and am

currently working in the deboning department.

3.    My shift begins at 10:15 PM  and ends at 7:55 AM.  I am paid $9.55 per hour.  When

I work over forty hours, I receive time and one half my salary.

4.    When I arrive at work, before I enter the building, I have on my hard hat, ear plugs,

hair net, and work boots.  I bring these items from home and I take them home with me.

5.    I have a Kronos time-keeping card and a Perdue identification badge.  I show my

identification badge to a security guard before entering the building when I arrive at work.  After

enter the building, and before going up to the second floor, I put on my safety glasses.

6.    When I arrive at the second floor, I swipe my Kronos time-keeping card at 10:15PM.

All of the time clocks are located in the same area on the wall.  I swipe my Kronos time-keeping

card on the third time clock because my supervisor told me to use that clock. There are supervisors present me when I clock in.

     7.   After I swipe in, I put on my white smock. Before I go to my department, I make sure the line leader has her proper equipment ready, that maintenance has cleaned up, set up the knives, arm guards and foot stands.

     8.   I wait for the rest of the deboning crew to arrive. As safety, I supervise the crew as they put on their gloves and other equipment, sanitize, and exercise. I then go downstairs to count the chickens and monitor the line speed. I then return to the deboning area.

     9.   When I return to the deboning area, I put on my apron, cutting gloves, cotton gloves, and my arm guard if I have to use a knife or scissors.

     10. I begin to debone chickens. I may also be asked to grate chicken, or cut tenders.

     11. I have two unpaid meal breaks. My first meal break is from 1AM – 1:30 AM. My second meal break is from 4AM to 4:30 AM. The "line leader" tell us when it is time to take our break.

     12. Before I swipe out for break, I have to check the work area, clean the floor, place ice under the remaining chicken, and do my safety checks.

     13. I then remove my smock and place it on a hook. I also remove my gloves, arm guard, and plastic shield.

     14. I then walk to the Kronos time-keeping clock and swipe out for break. After I swipe out, I leave on my ear plugs, bump hat, and work boots. I then remove my safety glasses.

     15. During my break, I go outside to my car and drink coffee, eat, or drive to a store. When I return from break, I put back on my safety glasses before I go into the second door upstairs to clock back in.

16. I swipe in with my Kronos time-keeping card thirty minutes after I swiped out for break. I cannot swipe in before my thirty minutes are up. After I swipe back in, I put on my smock and other equipment and begin working.

17. At the end of my shift, once other deboners leave, I help clean my area and sanitize all the utensils. Before I swipe out, I remove my gloves. Then, I remove my smock and place it in the laundry bin. I then swipe out for the day and go downstairs. I remove my safety glasses.

18. Once I go downstairs, I take a bag of dirty cutting gloves to the supply room. After I leave the supply room, I walk to my car with my earplugs in my ear, bump hat on my head, and work boots still on my feet.

19. When I first began working with Perdue, my supervisors showed me how to swipe in and swipe out on the Kronos time-keeping machines.

20. My supervisors told me what equipment I need to have on before and after I swipe in and out for my shift.

21. During orientation, I received my identification badge, Kronos time-keeping card, learned about pay polices, safety, the different equipment I would have to use, the clothing I needed to wear. This information is also in my employee handbook.

22. There are signs throughout the building that say what you should have on before you enter the building.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 13, 2008

Erika Floyd

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case Action No.: |
| | ) 1:06-CV-1000-MEF-WC |
| PERDUE FARMS INCORPORATED, | ) JURY TRIAL DEMANDED |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF SANFORD LEONARD

I, Sanford Leonard, depose and state the following based on my personal knowledge:

1. I was hired by Cooking Good, now Perdue Farms, in approximately March 1994. My first position was on the Kill Floor where I took the chickens that weren't properly cleaned on the line and finished the job. My current job is in Debone where I take the chicken waste and dump it. I am also responsible for cleaning up around the truck where the wasted is dumped. I work the night shift, or first shift. My current hourly wage is 9.35 an hour.

2. I drive to work and normally arrive at 10:20p.m. and clock in at 10:30p.m. I do not put any gear on before I clock in. After I clock in, I put on my hairnet, bumpcap, earplugs, safety glasses, apron, sleeves and white coat.

3. When they put in the Kronos time card system, I was told not to do any work before I clocked in. My clock in station is closest to my work station.

4. I have two breaks during my shift. The breaks last 30 minutes and we can leave the plant during that time.

5. Before I clock out for breaks, I take off my apron, sleeves, and white coat. I leave on my bump cap, hairnet and take my earplugs out of my ear.

6.  I have tried to clock in before the 30 minutes is up for the break, and the card swipe will not be accepted.

7.  After I clock back in from break, I put on the apron, sleeves, jacket and go to my work station.

8.  I normally clock out around 8:30 a.m. after I finish cleaning around the truck.  Before I clock out from my shift, I take off my apron, and sleeves and throw them away.  I place my jacket in a buggycart for washing.  I put my safety glasses in my locker.

9.     I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign.  I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:  January 4, 2008

Sanford Leonard

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DARRYL ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Case Action No.:** |
| v. | ) | **1:06-CV-1000-MEF-WC** |
| | ) | **JURY TRIAL DEMANDED** |
| PERDUE FARMS INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF LINDA LEE

I, Linda Lee, depose and state the following based on my personal knowledge:

1.  I am aware of the lawsuit against Perdue, but I cannot participate in the lawsuit because I know I do not work until I swipe in at the time clock. I am thankful for my job and have been with Perdue for 17 years and will celebrate my eighteenth anniversary on November 30, 2008.

2.  When I was first hired on November 30, 1990, I originally worked for Showell Farms as a liver cutter. Perdue Farms bought Showell about 12 years ago. I have performed almost every job on the line. In my current job, I work on the kill floor after the live hang. I cut open the birds that the machine fails to cut. I work on the day shift and my hours are from 5:42a.m. until sometime between 2:00p.m. and 2:30p.m. depending on when the line goes down.

3.  I drive myself to work every day. When I arrive at the plant, I put on my bumpcap, safety glasses and ear plugs. I normally arrive at the plant around 5:30a.m. Then I wait until it is 5:42a.m. and clock in. After I clock in, I put on my assigned white jacket, gloves, check to make sure my ear plugs are in and my apron. I cannot put on my gloves, jacket or apron before I clock in.

4. I have been told not work before I "hit the clock" and I will get in trouble if I put on my apron, gloves, or jacket before I "hit the clock." We had a meeting to go over this rule.

5. I get a breakfast break and a lunch break. If I have to go the bathroom during a non-break time, I do not have to clock out. When it is time for break, I take off my apron, gloves and jacket before I swipe out at the time clock. No one can clock out with an apron, smock or gloves on.

6. We get 30 minutes for each breakfast and lunch break. If I try to clock in before the 30 minute break is over, the clock will not accept the swipe. During our breaks, we can go anywhere, including off the premises.

7. After we clock back in from break, we put on our smocks, gloves and aprons.

8. When Perdue first put in the Kronos clock system, supervisors made sure we learned how to use it and stood by the clock to make sure we used it properly.

9. When the last birds come down the line, my shift is over. I take off my apron, gloves and jacket and place it back on my assigned hook (No. 25) and then I clock out.

10. I believe the pay system is fair at Perdue, because I cannot work until I clock in and cannot work after I clock out.

11. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

Linda Lee

1-WA/2878098.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| DARRYL ANDERSON, et al.,      ) | |
| ) | |
| Plaintiffs,      ) | |
| ) | **Case Action No.:** |
| v.      ) | **1:06-CV-1000-MEF-WC** |
| ) | **JURY TRIAL DEMANDED** |
| PERDUE FARMS INCORPORATED,      ) | |
| ) | |
| Defendant.      ) | |
| ) | |

<u>**DECLARATION OF JEANNIE HICKMAN**</u>

I, Jeannie Hickman, depose and state the following based on my personal knowledge:

1.  I am an hourly poultry processing employee and I work for Perdue Farms in Dothan, Alabama. I currently work on leg de-bone. My job is to take a knife and remove the bone from chickens' leg quarters. I have had this job since November 2001. I was hired by Perdue in Dothan on November 16, 1998. My first job was as a shoulder cutter. I also graded breasts, which means I made sure there was no skin or bones on the breast before it was packaged. I also washed the meat and did other various jobs before I started working in leg de-bone in 2001.

2.  My hourly rate is $9.35 per hour. Sometimes I work overtime, and I when I do I get paid time and a half for any hours over 40 in one week. I work the day shift, which is called the second shift, and I usually work from 7:47 p.m. central time until about 5:00 p.m. I get two unpaid 30-minute breaks during my shift.

3.  When I do my job I have to wear a bump cap, a hair net, safety glasses, an apron, a smock (also called a lab coat), protective sleeves, cotton gloves, cutting gloves, rubber gloves, ear plugs, and boots. I can take home with me my bump cap, boots, safety glasses, hair net, and

ear plugs. I do take them home with me. I put on my boots, bump cap, safety glasses, hair net, and ear plugs when I get out of my car when I arrive at the Dothan facility.

4. I have and use a Kronos time card that I use to clock-in and clock-out at a time clock. I have to use a specific time clock that they told me to use. There are other time clocks that other employees are told to use. As soon as I clock-in, that is when I start getting paid. As soon as I clock-out, that is when I stop getting paid.

5. I typically arrive at the Dothan parking lot between 7:15 a.m. and 7:30 a.m. for my shift start time. When I arrive, I usually sit in my car and listen to radio. When it is time to start my shift, I put on my boots, bump cap, safety glasses, hair net, and ear plugs, get out of my car and walk to the building. When I enter the building, I use the restroom and then sit in the break room until it is my clock-in time. In the break room, I either just sit quietly or work on a puzzle book.

6. At my shift start time, I swipe my time card in at my time clock, which is when I start getting paid. At this time, I am already wearing my boots, bump cap, safety glasses, hair net, and ear plugs. After I clock-in, I go get my lab coat (or apron) and put it on. Then I get my gloves and sleeves and I put them on. Then I sanitize my gloves and go to my line. Then we do our hand exercises and then I start to get to work.

7. My supervisor lets us know when it is time to take a break. My first break is usually at around 10:20 a.m. My second break is usually around 1:20 p.m. When my breaks start, I wash off my boots, and take off my apron and sleeves, which are disposable. Then I wash and dry my gloves and put them in my smock pocket. Then I hang up my smock. Then I go clock-out.

8.   I go to the break room on my breaks, where I eat my sandwich and work my puzzle book, and of course go to the bathroom.  I could leave the building if I wanted to but I want to stay in the break room.  When my break is over, I clock back in.  I then put my smock back on, put on a clean apron and clean sleeves, put my gloves back on, sanitize them, and get back to work on the line.  I cannot clock back in before 30 minutes are up – the time clock won't let me,

9.   When my shift is over, I take everything off before I clock-out, except for my bump cap, ear plugs, hair net, and boots.  I take those things off when I get to my car.  Some people put them in their lockers but I put them in my car.

10. Perdue has trained me not to put on my apron, smock, protective sleeves, cotton gloves, cutting gloves, and rubber gloves until after I clock-in.  They have signs at the time clocks that tell us the same thing.

11. I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.


Dated:  January 4, 2008

_Jeannie Hickman_
Jeannie Hickman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **DARRYL ANDERSON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case Action No.:** |
| **v.** ) | **1:06-CV-1000-MEF-WC** |
| ) | **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INCORPORATED,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF VICTORIA DURR

I, Victoria Durr, depose and state the following based on my personal knowledge:

1. I work as an hourly chicken processing employee for Perdue Farms in Dothan, Alabama. I have worked for Perdue for about 10 or 11 years. My current job is lead person in evisceration. Before becoming a lead person, I worked on the production line in evisceration. My shift starts at 5:30 a.m. and ends no later than 2:15 p.m. I get two 30-minute unpaid breaks. I work five days a week, Monday through Friday. My hourly rate is $9.60 per hour. If I work more than 40 hours in one week I get paid overtime at time and a half.

2. My job requires me to make sure the line keeps going and that everyone does their job. I also work on the line when necessary, which is often. Generally speaking, evisceration is the process of the birds' innards being removed from the birds before they go to more processing. Evisceration also includes "final trim," which is where birds go who have been marked by the United States Department of Agriculture quality assurance representative at the Dothan facility as having bruised legs or broken wings. The final trim evisceration line cuts off the bruised legs and broken wings, before the birds go to the chiller and to further processing.

3.   I am required to wear a lab coat, an apron, rubber gloves, arm guards, chain gloves (or cutting gloves), bump cap, ear plugs, hair net, safety glasses, and steel-toed boots.  Of these items, I can take home my hair net, bump cap, boots, safety glasses, and ear plugs, or I can leave them in my locker.  I choose to take all of these items home with me.  I choose to put on my boots, hair net and bump cap after I park my car in the parking lot.  I choose to put on my glasses after I clock-in, even though I could put on my glasses before I clock in.  I also put on my lab coast, apron, rubber gloves, arm guards, and chain gloves after I clock in.

4.   I wear a Kronos time card around my neck.  I swipe my time card when I start my shift and when I come back from breaks.  I also swipe my time card when I leave for breaks and at the end of the day.  My paid time starts when I clock-in.  My paid time ends when I clock out.

5.   I use a specific time clock every day.  Everyone on evisceration uses the same clock, but there are other time clocks for use by other employees in other departments.  The time clock I use is located in the hallway next to the lockers, before entering the department.  Supervisors are assigned to watch the employees swipe in and swipe out and to watch the employees put on their gear and clothing.

6.   I arrive at the facility at about 5:15 a.m. for my 5:30 a.m. shift.  I park my car, put on my boots, hat, and hair net, and then walk through the gate and go to the hallway to get ready to clock in.  I could go to the break room or to the bathroom or anywhere else before I clock-in, but I choose to go to the hallway and hang out before I clock-in.  There are people there to socialize with while I wait.

7.   At 5:30 a.m., I clock-in and put on my ear plugs and safety glasses while I walk through the door.  Then I put on my lab coat, apron, and go get supplies – knives, scissors, arm guards, chain gloves, and cutting gloves – from a locker.  I take the supplies to quality assurance

to be checked for quality. After being approved by quality, I put out the equipment and gear for the employees to use and wear. Then I sanitize my hands in the sanitizing liquid, sanitize my rubber gloves, and then put on my rubber gloves.

8.  My first 30-minute unpaid break usually starts at about 9:15 a.m. My second 30-minute unpaid break usually starts at about 12:15 p.m. When my breaks start, I rinse off my apron and gloves, and then take them off and my coat. Then I put my gloves in my coat pocket, and hang the coat and apron up on my rack, and then walk through the door and clock-out. I continue to wear my bump cap, hair net, ear plugs, and boots. I usually take my break in the break room. I could go wherever I want, but I choose to go to the break room. When my break is over, I clock-in, and then put everything back on. I cannot clock-in before 30 minutes has passed.

9.  When my shift is over, I put my equipment away, take off my apron and coat, throw away my rubber gloves, and walk through the door and clock out and go home.

10. Perdue trained me on how to use Kronos. Perdue told us that we are supposed to clock-in before putting on our apron, gloves, smocks, and arm guards. There are signs near the time clocks that remind us of this.

11. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:  January 3, 2008

Victoria Durr
Victoria Durr

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al.,    ) | |
|                               ) | |
| Plaintiffs,    ) | Case Action No.: |
|                               ) | 1:06-CV-1000-MEF-WC |
| v.    ) | JURY TRIAL DEMANDED |
|                               ) | |
| PERDUE FARMS INCORPORATED,    ) | |
|                               ) | |
| Defendant.    ) | |

## DECLARATION OF TAMMY RICHARDS

I, Tammy Richards, depose and state the following based on my personal knowledge:

1. I was hired by Perdue Farms in Dothan, Alabama on October 17, 2002. I am an hourly chicken processing employee. I work in slicing, which is where the breast is cut in half. Employees who work the slicing line guide the breast through a machine that does the cutting. The cut breast then travels into another machine for further processing. I am a support leader for my supervisor. I have worked in slicing for about two years. I have also worked in "portion," which is another place where the breast is cut and weighed before it goes to further processing.

2. I work second shift, which is the day shift. My shift is 7:00 a.m. until 6 p.m. I get two unpaid 30-minute breaks. I work 50 hours a week. I get paid approximately $9.35 per hour, and I get paid overtime at time and a half for the hours worked over 40 in each week.

3. I am required to wear steel-toed boots, safety glasses, ear plugs, hair net, bump cap, smock, white lab coat, protective arm sleeves, and protective rubber and cotton gloves. I can take my hair net home with me, but normally I just throw it away each day. I also can take my boots, glasses, ear plugs, hair net and bump cap home with me, because they are my own

personal items. I choose to take these items home with me, although I also could leave them in my locker.

4. I put my boots on when I get dressed in the morning. I put on my safety glasses, ear plugs, hair net and bump cap just before I clock-in, although I could put them on any time before then, such as at my car or in the break room. I put on my smock, lab coat, sleeves, and gloves after I clock-in, just before I start working.

5. I have a Kronos time card that I wear around my neck. I clock-in and out, or swipe it, at my assigned Kronos time clock. There are other time clocks around the building, but I have to use the one that is assigned to me. Supervisors watch me when I use the time clocks. I start getting paid when I clock-in. I stop getting paid when I clock-out.

6. I normally arrive at work at about 6:30 a.m. for my 7:00 a.m. start time. When I arrive at 6:30, I sit at my car until it is time for me to clock-in. I could also use the break room or go anywhere else I want before my shift starts, but I choose to just chill in my car.

7. When it is time for my shift to start, I go to the trunk of my car and get my bump cap, ear plugs, time card, and hair net, and put them on. I then walk into the building and go to my assigned time clock, where I clock-in. After I clock-in, I get my supplies – knives, arm guards, sharpeners, and meat identification tags. Then I put on my smock, gloves, and lab coat, and then dip the supplies in bleach water and distribute the supplies to the lines.

8. My first 30-minute unpaid break starts at about 11:30 a.m. or 12:00 p.m. My second 30-minute unpaid break usually starts at about 3:00 p.m. When my break starts, I take off my smock, lab coat, sleeves, and gloves. I throw away my smock and sleeves, and hang up my smock and lab coat. Then I go to clock out. After I clock out I go to the break room to eat. I could go anywhere I want to, but I like the break room. I wear my bump cap, hair net, safety

glasses, boots and ear plugs during my break. When my break ends, I go to clock back in. The time clock will not let me clock in before 30 minutes has passed. After I clock back in, I put back on my smock, lab coat, sleeves, and gloves, and get back to work.

9. When my shift ends, I clean the supplies, and then take off my smock, sleeves, gloves, and lab coat. Then I clock out and go home.

10. Perdue trained me how to use Kronos and when to put on my required gear. They told me not to touch my smock, lab coat, sleeves, or gloves before clocking in and I follow those rules. There are signs all over the facility that remind us of these rules. There are signs by the time clocks and supervisors are also there to remind us.

11. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

Tammy Richards

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case Action No.:** |
| **v.** | ) | **1:06-CV-1000-MEF-WC** |
| | ) | **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INCORPORATED,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DECLARATION OF MARY CLARK

I, Mary Clark, depose and state the following based on my personal knowledge:

1. I work for Perdue in Dothan, Alabama as an hourly chicken processing employee. I work the first shift, which is the night shift. I start working at 10:35 p.m. and stop working at 7:45 a.m. I work four days a week, Monday through Thursday. I get two 30-minute breaks,

2. I was hired on October 1, 2007. I work on "cone de-bone," which means I cut the wings off the frame of the bird and pull the breasts off the frame of the bird. I put the wings and breasts on separate conveyor belts and they travel to more processing. I also cut the tenders from the bird and check the tenders to see if they are "good" or "bad." If they are bad I put them to the side. If they are good, I send them to another part of the plant for more processing.

3. When I do my job I have to wear a smock, an apron, protective gloves, arm guards, a bump cap, ear plugs, a hair net, goggles, and steel-toed boots.

4. I can take my hat, boots, ear plugs, hair net, and goggles home with me, and I usually do that. I put on my hat in the parking lot or in the break room before I start my shift. I put my boots on when I wake up and get dressed for work at home. I put on my ear plugs, hair net, and goggles just before I go to the time clock to clock-in.

5.   I have a Kronos time card.  I use it to clock-in when my shifts starts, to clock-out

when my shift ends, and also when my breaks start and end.  There are a lot of time clocks

around the Dothan facility.  There is one time clock that I have to use, and it is located near the

production line where I work.  Other employees on other lines use different time clocks.  There

is a supervisor watching me when I clock-in and when I clock-out.  My paid time starts when I

clock-in.  My paid time ends when I clock-out.

6.   I normally get to work at about 10:22 p.m., or sometimes even earlier, for my 10:35

p.m. shift start time.  When I get to work, I sit in the break room and wait for my shift to start.  I

don't have to sit there, but I want to sit there and talk to my friends, until it is time for my shift to

start.

7.   At my shift start time I go to my assigned Kronos time clock and clock-in.  Then I go

to the spot where my smock is located and I put-on my smock.  Then I go to my team leader and

get my apron and gloves, and I put on my apron and gloves.  Then I walk to my line and dip my

hands in the sanitizing liquid.  Then I do some hand exercises so that my hands do not get stiff,

and then I start to work.  I also put on arm guards on the line before I start to work.

8.   My first 30-minute break is from 1 to 1:30 a.m.  My second 30-minute break is 4 to

4:30 a.m.  When my breaks start, I leave the line, wash my hands, and take off my gloves and

apron.  Then I walk over to a hook on the wall and take off my smock.  Then I go to my Kronos

time clock and clock-out.

9.   During my break I go to the break room and eat and drink something and talk to my

friends.  I could go wherever I want to go, but I choose to go to the break room on my breaks.  I

continue to wear my boots, bump cap, hair net, ear plugs, and goggles while I am on break.

10. When my break is over, I go first to my Kronos time clock and clock-in. Then I put back on my smock, apron, and gloves, and go back to the line and start working again. I cannot clock back in early. I have to take full 30-minute breaks.

11. When my shift ends, I take off my smock, put my apron in a wash bucket, take off my gloves, and then go to my Kronos time clock to clock-out. Then I go home.

12. When I first started at Perdue in Dothan I was given training on how to user Kronos. I learned how to use the time clocks and I learned that I must put on smocks, aprons, and protective gloves after I clock-in, and that I must take them off before I clock-out.

13. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.


Dated: January 3, 2008

*Mary Clark*

Mary Clark

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Action No.: |
| v. | ) | 1:06-CV-1000-MEF-WC |
| | ) | JURY TRIAL DEMANDED |
| PERDUE FARMS INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF MALACKER REYNOLDS

I, Malacker Reynolds, depose and state the following based on my personal knowledge:

1.  My job at the Perdue Farms facility in Dothan, Alabama is to cut wings off birds as they pass by me on a conveyor belt.  I also grade wings, which means I throw out the bad ones, which are the ones that are little bloody.  I rotate from cutting and grading every shift.  I was hired by Cooking Good, now Perdue Farms, on March 24, 1995.  I work the day shift from about 7:48 a.m. until about 5 p.m.  I sometimes work overtime and when I do I get paid time and a half for every hour over 40 hours in one week.

2.  I am required to wear ear plugs, safety glasses, a smock, an apron, gloves, sleeves, boots, a bump cap, and a hair net to do my job.  I can and do take home with me my cap, hair net, glasses, boots, and ear plugs.  The other items I leave at work and take off before I clock-out.

3.  I use my Kronos time card to clock in and to clock out.  I have a time clock that I have to use.  It is assigned to me.  I am paid for all the time from when I clock in until I clock out.  Supervises watch me clock in and clock out.

4.  I normally get to work in the morning at about 7:15 a.m.  I arrive a little early and sit in my car and drink coffee and read the paper.  I can go anywhere I want before I clock in but I

choose to spend that time in my car.  While I am in my car, I put on my hair net, ear plugs, and bump cap.  My boots are already on – I put then on at home – and my goggles are hanging around my neck.  When it is close to the time to clock-in, I walk into the building and head to the break room where I might sit for a few more minutes.  When it is time to clock-in I walk to my time clock and clock in.

5.   After I clock in I put on my lab coat and apron and gloves and sleeves.  Then I go the line, where I sanitize my hands and do my hand exercises.  Then I start to work.

6.   I take off my coat and apron and gloves and sleeves before I clock out for my breaks. I put them on after I clock in when I return from breaks.  My breaks are 30-minutes.  They are unpaid and I get two of them each shift.  I can go wherever I want on my break, but I bring my own lunch and I choose to stay in the break room and eat my lunch there.

7.   When I leave at the end of my shift, I take off my lab coat and apron and gloves and sleeves before I clock out.

8.   Perdue trained us and there are signs that remind us when to put on and take off our lab coats and aprons and gloves and sleeves.  We are supposed to put them on after we clock in. We are supposed to take them off after we clock out.

9.   I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:  January 4, 2008

Malacker Reynolds

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al.,     ) | |
|          ) | |
|     Plaintiffs,     ) | |
|          ) | **Case Action No.:** |
|     v.     ) | **1:06-CV-1000-MEF-WC** |
|          ) | **JURY TRIAL DEMANDED** |
| PERDUE FARMS INCORPORATED,   ) | |
|          ) | |
|     Defendant.     ) | |
|          ) | |

## DECLARATION OF LAWANDA HARRIS

I, Lawanda Harris, depose and state the following based on my personal knowledge:

1.  I was hired by Perdue on March 16, 2001.  I was hired into Debone and worked on cutting the whole leg.  I am still in that same position on the day shift.  My current hourly rate is $9.35 an hour.

2.  I use the Kronos time card system.  I understand I cannot do any work until I am clocked in.

3.  I drive to work each day and arrive at the plant around 7:35a.m. to 7:40a.m.  I put on my boots, hair net, and bump cap at home and put on my I.D. badge right before I get out of the car.

4.  I clock in at 7:47a.m. After that, I get my coat off the rack, get my apron and walk around the corner to get my gloves in my department.  I either dip my gloves or wash them at the sink.  Then I get my arm guards and chain gloves and traps (to sharpen my knife) and go to my work station.

5.  During my shift I get two breaks.  I normally leave the plant and get something to eat. Before I clock out for break, I wash out my gloves, throw away my sleeves and apron and hang up my coat.

6.  Sometimes when I forget what time I have clocked out for break, and clock back in before the thirty minutes is up, the clock will reject my swipe.  I have to wait the total thirty minutes.

7.  I have never had to work off the clock since the Kronos system was put in place.

8.  I normally clock out between 4:47 and 5:00p.m. Before I clock out at the end of the day, they pick our knives up, and I throw away my sleeves, rubber gloves and apron in the garbage.  I put my traps and arms guard in the tub and I put my cotton gloves and coat in a basket for washing.  Then I clock out for the day.

9.  I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:  January 4, 2008

Lawanda Harris

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Case Action No.:** |
| v. | ) | **1:06-CV-1000-MEF-WC** |
| | ) | **JURY TRIAL DEMANDED** |
| PERDUE FARMS INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF VICKIE DAVIS

I, Vickie Davis, depose and state the following based on my personal knowledge:

1.   I am an hourly poultry processing employee at Perdue Farms' Dothan, Alabama facility.  I was hired by Perdue in Dothan in approximately 2003.  I work on the "IP Cone" line, which is where we de-bone chicken.  In particular, we cut the shoulder to open up the bird and cut the wing off from the chicken breast.  I also work at the grading table, where I grade chicken breast, which means I make sure that there are no bones or skin on them.  Every hour I rotate back and forth from the IP Cone line and the grading table.

2.   I currently work the second shift, which is the day shift.  My shift starts at 7:45 a.m., and lasts nine hours.  I have two 30-minute unpaid breaks during each shift.  I currently am paid $9.35 per hour.  If I work more than 40 hours per week, I would get paid overtime at time and a half.

3.   To do my job, I need to wear a bump cap, hair net, ear plugs, safety glasses, steel-toed boots, smock, apron, protective sleeves, cotton gloves, cutting gloves, and plastic gloves.  I can take home my boots, hair net, ear plugs, safety glasses, and bump cap, and that is what I do.  I

wear my boots from home. I put on the hair net, ear plugs, safety glasses, and bump cap when I arrive at the plant but before I clock-in. I could put them on earlier, but I choose not to do that.

4.    I have a Kronos time card that I wear around my neck while I am at work. I use the time card to clock-in and clock-out at shift start and end time, and at my break start and stop times. I have a specific time clock that I have to use. My time clock is near the production line where I work. There are other time clocks that employees in other departments use. When I clock-in, supervisors are there to watch me do that. Supervisors are also there when I clock-out. When I clock-in, that is when my paid time starts. When I clock-out, that is when my paid time ends. I do not do any work before I clock in or after I clock out.

5.    I arrive at the plant in Dothan at about 7:30 a.m. for my 7:45 p.m. shift start time. I drive in and park in the parking lot. Then I come into the building and use the restroom. Before 7:45 I can go anywhere I want, but I choose to wait by the lockers so that I can talk to people and socialize. I head towards the time clock so that I can be there right at 7:45 to clock-in. When I clock-in, I am already wearing my boots, hair net, ear plugs, safety glasses, and bump cap. After I clock-in, I go to the rack to get my smock and apron, and then I walk to the production line. At the line, I put on my gloves and sleeves. After I put on my gloves, I then dip my hands into the sanitizing liquid. When everyone reaches our work stations, we do an exercise with our hands to try and prevent injuries.

6.    My first 30 minute unpaid break starts around 10:15 a.m. My second 30 minute unpaid break starts around 1:15 p.m. I have to take 30 minute breaks. I cannot clock back in before 30 minutes have passed. I can go wherever I want during my break, but usually I just take my breaks in the break room.

7.   When my breaks start, I leave the work station and take off my apron and sleeves and throw them in the trash.  I leave my cutting gloves at the work station.  I then take off and hang up my smock, and take off my cotton gloves.  I take off and throw away the plastic gloves.  Then I clock out.  I continue to wear my bump cap, boots, goggles and ear plugs when I am on break. When my 30 minute break is over, I clock back in, and then I get my smock and put it on, and then I put on a new apron and new gloves.  After my gloves are on my hands, I dip my hands again in sanitizing liquid, and then I get back to work.

8.   At the end of my shift, I leave the work station.  I put my arm guards in a tub, take off my cutting gloves and put them on a table, throw away my plastic gloves and apron, put my smock in a big basket, and put my cotton gloves away in a box.  Then I go clock-out and go home.  I can take off my bump cap, hair net, boots, and ear plugs whenever I want after I clock-out.

9.   Perdue trained us on how to use Kronos and how to clock in and clock out.  Perdue trained us not to touch or put on our smock, apron, protective sleeves, cotton gloves, cutting gloves, or plastic gloves before we clock in.  There are signs near the time clocks that remind us not to touch these items before we clock in.

10. I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:  January 3, 2008

_Vickie Davis_
Vickie Davis

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| DARRYL ANDERSON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PERDUE FARMS INCORPORATED,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case Action No.:
**1:06-CV-1000-MEF-WC
JURY TRIAL DEMANDED**

## DECLARATION OF LINDA HUDSON

I, Linda Hudson, depose and state the following based on my personal knowledge:

1. I have worked for Perdue Farms in Dothan, Alabama since July 2007. Before that, I also worked for Perdue between June and October 2006. I am an hourly chicken processing employee. My hourly rate is $9.35 per hour. I work the day shift, or second shift, which means my hours are about 8 a.m. to 5 p.m., with two 30-minute unpaid breaks. My job now is in portions. My job is to slice the meat with a knife into different portions.

2. To do my job, I have to wear a bump cap, ear plugs, safety goggles, a hair net, cutting gloves, cotton gloves, latex gloves, steel-toed boots, arm guards or sleeves, an apron, and a lab coat. The only items I am allowed to take home are my bump cap, ear plugs, safety goggles, and ear plugs. I do take them home with me. I put on my boots in the morning at home. I put on my bump cap, ear plugs, and safety goggles just before I clock-in at shift start time. The rest of the equipment and clothing I have to wear, I put on after I clock in.

3. I have a Kronos time card that Perdue gave me. I use the time card to clock in and clock out. I clock in and clock out at a Kronos time clock that has been assigned to me. There are other time clocks that other processing employees are assigned to use. When I clock in and

clock out, most of the time there are supervisors watching me. My paid time starts when I clock in. I do not do any work before I clock in. My paid time ends when I clock out. I do not do any work after I clock out.

4.    I arrive at the plant at around 7:45 a.m. for my 8:00 a.m. shift. When I first get to the plant, I go to the bathroom, wash my hands, and wait in the break area for the time for me to clock in. I can go wherever I want before I clock in, but I want to wait in the break area. At 8:00 a.m. I clock in. When I clock in I am already wearing my bump cap, safety goggles, and ear plugs, and also my boots, which I put on at home. After I clock in, I go to get my coat, apron, sleeves, and gloves, and I put them on. Then I go to my position on the line, dump my hands in sanitizing liquid and then get to work.

5.    My line leader tells us when it is time for break. My breaks usually happen at 10:35 a.m. and then again at about 1:35 p.m. They last 30 minutes, and are unpaid. I can go wherever I want during my breaks, but I choose to go outside and sit on a bench to eat and drink.

6.    When it is time for a break, I take off my arm guard, apron, coat, and gloves, and put them in the assigned areas. Then I go clock out to start my break. I do not do any work on my break. I have to take a full 30 minute break. I cannot clock back in early. When it is time to clock back in, I go to my time clock and clock in. After I clock in, I put on my coat, my apron, my gloves, and my sleeves, and go back to the line. I sanitize my gloves again and get back to work.

7.    When my shift is over, I leave the line and take off my coat, apron, gloves, and sleeves. Then I go to the Kronos time clock and clock out. Then I leave to go home.

8.    Perdue trained me during orientation about how to use the Kronos time clocks. I learned how to use the time cards. I also learned to make sure that we put on our coat, apron,

gloves, and sleeves after we clock in, and to make sure that we take them off before we clock out when we leave for breaks and at the end of the day. There are signs near the break area and near the time clocks that remind me of how to do this.

9. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

Linda Hudson

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

DARRYL ANDERSON, et al.,           )
                                   )
          Plaintiffs,              )
                                   )        **Case Action No.:**
     v.                            )        **1:06-CV-1000-MEF-WC**
                                   )        **JURY TRIAL DEMANDED**
PERDUE FARMS INCORPORATED,         )
                                   )
          Defendant.               )
                                   )

## DECLARATION OF MARY MARSH

I, Mary Marsh, depose and state the following based on my personal knowledge:

1.   I was hired by Perdue Farms in Dothan, Alabama on September 6, 1991.  My job now is line leader in jumbo de-bone.  Jumbo de-bone is where we take the bones out of the front half of the chickens, which is where the breasts, wings, and tenders come from.  The chickens we de-bone already have had their legs cut off.  In addition to the de-bone processing that I do, I also monitor my line to make sure that everything is running well.

2.   My hourly rate is $9.85 per hour.  I work the day shift, which means I start work at 7 a.m.  My shift end time varies, but I often work until about 6 p.m.  I usually work overtime every week, and I get paid time and a half for all hours over 40 in a week.

3.   I am required to wear a bump cap, a hair net, safety glasses, steel-toed boots, ear plugs, a smock, an apron, protective sleeves, cloth gloves, cutting gloves, and rubber gloves.  I am allowed to take home my hair net, bump cap, glasses, and ear plugs, or I can leave them in my locker.  I choose to leave them in my locker at work.  I also leave my boots in my locker.  Before I clock-in, I put on my boots, then my bump cap, ear plugs, and hair net.

4.   I clock in and clock out with my Kronos time card.  I start getting paid when I clock in.  I stop getting paid when I clock out.  I use a time clock that is near the lockers and right before you enter the kill floor.  That time clock has been assigned to me.  There are other time clocks that other processing employees use.

5.   I normally get to the plant at around 6:15 a.m. for my shift that starts at 7 a.m.  When I arrive, I go to the break room to sit down.  I can also sit outside or somewhere else before my shift starts, but I choose to sit in the break room because it is quiet and empty at that time.  I usually just sit there and read the Bible.

6.   When it is time to clock in, I go to my locker and get my bump cap, hair net, boots, and ear plugs, and I put them on.  Then I clock in.  After I clock in I put on my safety glasses and then I walk to my assigned production area.  When I get to my assigned production area, I put on my apron, smock, lab coat, sleeves, and gloves.  All of this happens after I clock in.

7.   During the day I get two 30-minute unpaid breaks.  During my breaks I can go wherever I want.  I choose to take my breaks in the break room.  When it is time for my breaks, I take off my gloves, apron, sleeves, smock, and lab coat.  Then I go to clock out.  I cannot take a break that is shorter than 30 minutes because the time clock will not let me clock in before 30 minutes have passed.  When my break is over, I come back to the time clock and clock in.  After I clock back in after my break is over, I put back on my gloves, apron, sleeves, smock, and lab coat.  When I leave for the day, I make sure to take off my gloves, apron, sleeves, smock, and lab coat before I clock out.

8.   Near the time clocks there are signs in both English and Spanish that tell us to clock in before touching any gloves, apron, sleeves, smocks, or lab coats.  There is a picture on the sign to make it clear to everyone.

9.  I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.


Dated:  January 3, 2008

_____
Mary Marsh

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>PERDUE FARMS INCORPORATED, )<br><br>Defendant. ) | Case Action No.:<br>1:06-CV-1000-MEF-WC<br>JURY TRIAL DEMANDED |

## DECLARATION OF DANEASHIA SMITH

I, Daneashia Smith, depose and state the following based on my personal knowledge:

1.  I was hired by Perdue on July 29, 2005, and started as a shoulder cutter on the day shift. I later moved to TSM, which is a slicing machine where the breast meat is cut and I remain on the day shift. My hours are from 7:30a.m. to 5p.m. I am the Operator on my line, which means I change blades on the machines, show new employees how to do the job and just perform extra duties based on my experience.

2.  I currently make $9.60 an hour. When I started, I made $7.50 an hour. I normally work 40 hours a week, but at times, I work weekends where I make time and a half.

3.  I ride with other employees to work. Before I come to work, I put on my boots, badge, stopwatch, safety glasses and hair net which I keep at home. I am required to wear these items while working. I put on my bumpcap and my earplugs right before I clock in.

4.  I use a Kronos card to clock in. I do not perform any work before I clock in with my Kronos card. I usually arrive at work around 6:45a.m. due to the hours of the person that I ride with and I clock in at 7:30a.m. From 6:45.m. to 7:30a.m. I usually just sit in the breakroom

1

before my shift starts, talking with co-workers.  I but my bumpcap and ear plugs on in the breakroom.

5.   At 7:30a.m. I clock in.  There are supervisors around the time clock at the time I clock in.  As soon as I clock in, my paid time starts running and it stops, after I clock out.  I do not do any work before I clock in, or after I clock out.

6.   After I clock in, I walk to my work station, and then I put on my smock, apron, cutting gloves, sleaves and rubber gloves over my cutting gloves.

7.   I get two breaks per shift.  Each break is 30 minutes long.  When the line leader says it is time for break, I tell the people around me and I, along with others, take off my apron, smock, gloves and then we clock out.  We go to the break room or anywhere else we choose. We can leave the premises during the break.

8.   We have to clock in after a full thirty minutes, or the time clock will reject the swipe of the Kronos card.  After we clock back in from break, we put on our smock, apron, and gloves.

9.   At the end of the shift, I take off my apron, smock, gloves, and then I clock out.

10. When I was hired in 2005, I was given my Kronos card and I.D. badge.  I was taught how to use to use the Kronos card, and I was told not to do any work before I clocked in.

11. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.


Dated: January 3, 2008

Daneashia Smith

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DARRYL ANDERSON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case Action No.:** |
| **v.** ) | **1:06-CV-1000-MEF-WC** |
| ) | **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INCORPORATED,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF REGINA A. BEACHAM

I, Regina A. Beacham, depose and state the following based on my personal knowledge:

1.  I was hired by Perdue Farms on August 31, 1998. I was hired into the Debone department on the night shift, and still work in this department, but I now work on the day shift. I cut the breast from the shoulders of the chicken.

2.  My current hourly rate is $9.35 an hour. I normally work 40 hours a week, but when I work overtime, I get paid time and a half.

3.  When Perdue put in the Kronos time card system, I was taught how to use it. I was taught I could not have on my apron, smock, gloves or sleeves before I clocked in. I was also told I had to take these items off before I clocked out.

4.  If someone clocks in with these items already on, they are written up.

5.  I drive to work and normally arrive around 7:00a.m. and I have to clock in at 7:15.a.m. I put on my I.D. badge, stopwatch and boots in the car. I put on my ear plugs and bump cap when I get in the building.

6.  The time clock I swipe in on is the closest one to my job station. After I clock in, I hang up everyone's smock and then I put on my smock, apron, gloves and sleeves.

7.  Next, I wait for night shift to leave and then I put out the knives at each spot on the line.  Then, I began to work at anytime between 7:45 – 8:00a.m.

8.  I get two 30 minute breaks per shift.  When it is break time, I take my apron and sleeves and through them away and put up my smock.  During my break, I can go anywhere I want as long as am back in 30 minutes.   I have clocked in before my 30 minutes is up, but the Kronos system rejected my swipe and I had to wait for the full thirty minutes to run, before I could swipe in.

9.  After I swipe in after a break, I put my smock back on as well as my apron, sleeves and wash my gloves before I go back on line.

10.  My shift normally ends at 5:00p.m.  When my shift ends, I take off my apron, sleeves and rubber gloves and throw them in the trash and place my smock in the hamper.  Then I clock out.

11.  I have never worked off the clock at Perdue. I do not have a problem with the time clock system at Perdue.

12.     I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign.  I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:  January 3, 2008

*Regina A. Beacham*

Regina A. Beacham

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case Action No.: |
| v. ) | 1:06-CV-1000-MEF-WC |
| ) | JURY TRIAL DEMANDED |
| PERDUE FARMS INCORPORATED, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DECLARATION OF COFFY BEATY

I, Coffy Beaty, depose and state the following based on my personal knowledge:

1. I was hired by Perdue Farms on July 16, 2007. I work on the day shift, in Leg Debone. This is the department I have worked in since I was hired.

2. When I was hired I was told how to use the Kronos system. I was told I could not do any work until I clocked in. I was told this in a training class when I was hired.

3. I clock in at 7:47 a.m. I normally drive or ride with someone to work. I normally arrive at the plant at 7:30a.m. and hang out in the breakroom until it is time to clock in. Before I get here I put on my boots, hairnet, bumpcap and I.D. badge.

4. After I clock in, I put on my apron, smock, cotton gloves and latex gloves. After I put on my latex gloves, I wash them and then I put on my sleeves. When I get to my work station, I do hand exercises while waiting for the knives.

5. I have never worked off the clock since I have been with Perdue Farms. In fact, they do not want us in the plant after we clock out in order to make sure we are not working off the clock.

6. I get two breaks a shift. They last 30 minutes each. Before I clock out for break, I wash our hands, throw away our apron and sleeves and hang up my smock. I can leave Perdue during my break if I need to. I have tried to clock back in before my thirty minutes is up, but the clock will reject the swipe until the 30 minutes is up.

7. When I clock back in from a break, I get my smock, and put on my apron and arm sleeves. I also put on my gloves and wash them and start back to work.

8. My shift normally ends between 4:40 and 5:00p.m. Before I clock out for the end of the day, we throw away our rubber gloves, aprons and sleeves, and put our cotton gloves and smocks in a box for laundering.

9. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 4, 2008

Coffy Beaty

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Case Action No.:** |
| v. | ) | **1:06-CV-1000-MEF-WC** |
| | ) | **JURY TRIAL DEMANDED** |
| PERDUE FARMS INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF ROBERT H. HEFLIN

I, Robert H. Heflin, depose and state the following based on my personal knowledge:

1.      I have been the Vice President of Human Resources for Perdue Farms, Inc. ("Perdue"), the nation's third largest poultry company, since approximately 1998.  As Vice President of Human Resources I am responsible for the all of Perdue's training, employee development, compensation, benefits, and employee relations functions.  I have held a number of other jobs since I was first hired by Perdue in 1977, including Director of Human Resources for Poultry Operations, Director of Human Resources for Fresh Poultry Division, Director of Human Resources for the Northeast Region, Manager of Training and Development, Manager of Corporate Recruitment, and Human Resources Manager of Non-processing.

2.      The time recording and pay practices at Perdue's poultry processing plants, including the poultry processing plant in Dothan, Alabama, were established in a close working arrangement with representatives from the United States Department of Labor ("DOL").

3.      In 1997 and 2000, the DOL Wage and Hour Division conducted systematic investigations of the nation's poultry processing plants.  The purpose of the investigations was to identify wage and hour compliance issues and to encourage the poultry industry to improve

employee working conditions. The investigation revealed what the DOL contended to be violations of wage and hour and overtime laws throughout the nation's poultry industry.

4.    On May 9, 2002, after negotiating and reaching an agreement with the DOL, Perdue entered into a Consent Judgment with the DOL regarding Perdue's timekeeping and pay practices. A copy of the Consent Judgment is attached to this Declaration at Tab 1. The Consent Judgment is the result of a landmark settlement with the DOL of its investigation into Perdue's donning and doffing policies and procedures. The Consent Judgment included, among other things, a plant-by-plant inspection by the DOL's Wage and Hour Administration and a final certification of compliance with all FLSA time recording and pay practices in all of Perdue's poultry processing plants. The Consent Judgment mandated Perdue's compliance within one year of the entry of the Consent Judgment. A copy of the letter from the DOL confirming that Perdue is complying with the terms of the Consent Judgment is attached to this Declaration at Tab 2.

5.    Perdue was the first major poultry processor to enter into a Consent Decree with the DOL concerning the donning and doffing of work clothing by hourly poultry processing employees and so-called "line time," "gang time," or "master time" work time recording practices that have been prevalent in the poultry industry for many years. Perdue's Consent Judgment with the DOL reflects a distinct break from the "line time", "gang time," and "master time" practices framework for marking the first principal activity of hourly poultry processing employees' compensable work shifts. On information and belief, Perdue was the first, and may be one of only a few poultry processing Companies to abandon the "line time," "gang time," and "master time" practices.

6.    "Line time" would begin at a predetermined time for each department—when the first chicken arrived at the first employee's individual work station on a particular line. Employees were required to be at their duty station on the line by the time the first chicken arrived at that point. The ending time was captured when a supervisor or line worker manually inserted a punch card into a time clock located near the production line. Employees were permitted to leave their duty stations when the last chicken crossed their place on the line. The "line time" system did not compensate employees for time spent putting on and taking off their special protective gear and equipment, such as gloves, hand or arm guards, aprons or smocks, and cutting equipment.

7.    The Consent Judgment expressly states that Perdue's hourly poultry processing employees will be paid for all hours worked from their first principal activity of the work day until the end of the last principal activity of the work day, except for any time taken for bona fide unpaid meal breaks or other bona fide off-duty time.

8.    The Consent Judgment states that "first principal activity" could include: (1) the donning of clothing and equipment at the plant, but not including items that the employee is free to put-on at home, such as hair nets, bump caps, ear plugs, glasses, and footwear; (2) any subsequent time taken for employees to sanitize themselves and their equipment; and (3) the time spent walking or waiting after the first principal activity is performed. The Consent Judgment also states that hourly poultry processing employees will be paid until the end of their last principal activity.

9.    The Consent Judgment makes it clear that Perdue will record and pay for the time taken by its hourly poultry processing employees to perform donning and doffing before and after their bona fide unpaid break periods.

10.    Pursuant to the Consent Judgment, Perdue undertook to develop donning and doffing procedures and time recording practices, which are fully compliant with the terms of the Consent Judgment. Perdue representatives and representatives from the DOL's Office of the Solicitor and the DOL's Wage and Hour Administration, along with a Regional Solicitor and the Director of the Poultry Task Force, worked together, plant-by-plant, in all of Perdue's processing facilities, over a period of one year, to develop systems which captured all compensable time from the first principal activity to the last principal activity in a typical work day in a Perdue poultry processing plant.

11.    Within a one-year period following the entry of the Consent Judgment, Perdue brought all of its plants into compliance with the Consent Judgment and the DOL certified that each of the covered plant's pay practices were consistent with the requirements of the Consent Judgment and the clarifying side letter agreement.

12.    Perdue's compliance with the Consent Judgment included the time and attendance recording system, developed with the assistance of the Kronos Corporation ("Kronos"), which captures hours worked from the employees' first principal activity of the day until the end of the last principal activity of the work day. The Perdue Kronos time recording system and pay practices were developed with the specific assistance and approval of the DOL.

13.    The Kronos time-keeping system captures the time employees spend performing donning and doffing before and after their bona fide thirty-minute unpaid meal breaks. Kronos' clock and card-swiping systems are strategically placed at various locations throughout the poultry processing plant. Each Perdue hourly poultry processing employee is assigned a swipe card and each employee uses the card to swipe in and out each day. Perdue employees are paid

for all time captured by the Kronos system, which includes all compensable time from the first principal activity to the last principal activity of each hourly poultry processing employee.

14.    Since the Kronos system was introduced in Perdue's poultry processing plants, including the one in Dothan, Alabama, Perdue has not calculated pay entitlements based on line time, master time cards, or any other similar practices.  In Perdue's poultry processing plants, there is no "off the clock" donning and doffing, walking or waiting, and Perdue does not use "line time" to determine hours of work for compensation purposes.

15.    The process Perdue devised in Dothan—which is the same process that is in all Perdue's other poultry processing facilities—is very different from the allegations set forth in the Amended Complaint filed against Perdue in this case.  Under the Perdue system, hourly poultry processing employees don and doff Company supplied work clothing items on compensable time and walk to the work station from the clock, also on compensable time.  All hourly poultry processing employees are provided two thirty minute unpaid meal breaks during which they are relieved from work duty.  Hourly poultry processing employees doff required gear before the meal breaks commence and don gear for the remainder of their shift after the period ends.  The time clock helps Perdue regulate the meal periods.  It does not permit an employee to clock back in until at least thirty minutes has passed since the employee clocked out.

16.    As stated above, Perdue does not use any type of "line time" or "master time" time recording system and has not used such a system since 2002.  Perdue no longer uses "line time" practices and now records the first principal activity with an electronic time clock recording system.

17.    All hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama are trained to comply with the Consent Judgment and the donning and doffing

guidelines contained therein. In Dothan, for example, there was a DOL awareness training program that all hourly poultry processing employees were required to attend.

18.    The Consent Judgment and subsequent design and implementation of Perdue's donning and doffing and time keeping policies and practices came at no small cost to Perdue. A DOL press release issued contemporaneously with the Consent Judgment reported that the Consent Judgment was worth approximately $10 million to Perdue's hourly poultry processing employees. A copy of the press release can be found at Tab 4 to this Declaration. The press release also stated that Perdue had agreed to compensate more than 25,000 current and former employees for time spent donning and doffing work clothing and protective gear. A copy of a letter confirming payment can be found at Tab 5 to this Declaration.

19.    In addition, the DOL used the signing and execution of Perdue's Consent Judgment as an opportunity to tout its own efforts to enforce compliance with the applicable wage and hour rules and regulations. Secretary of Labor Elaine Chao was quoted in the DOL's press release as saying she was pleased that Perdue signed the Consent Judgment and that it was a major victory for workers. Similarly, Tammy McCutchen, who at the time was the DOL's Administrator of the Wage and Hour Division, stated that Perdue's decision to change its pay practices was a significant development and should be a model for the industry.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: _January 10th_, 2008

_Robert H. Heflin_
Robert H. Heflin

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NORTHEASTERN DIVISION

RECEIVED
IN CLERK'S OFFICE

MAY 0 9 2002

U.S. DISTRICT COURT
MID. DIST. TENN.

ELAINE L. CHAO, Secretary )
of Labor, United States )
Department of Labor, )
                               )
        Plaintiff             )
                               )
v.                             )
                               )
PERDUE FARMS INCORPORATED,    )
                               )
        Defendant             )

CIVIL ACTION

FILE NO. 2 - 0 2 - 0 0 3 3

JUDGE HAYNES

## CONSENT JUDGEMENT

This cause came on for consideration upon Plaintiff's motion and Defendant, without admitting any violation of law, consents to the entry of this Judgment, without further contest. It is, therefore,

ORDERED, ADJUDGED and DECREED that Defendant, its officers, agents, servants, employees and all persons in active concert or participation with them who receive actual notice hereof are permanently enjoined from violating the provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, et seq., hereinafter referred to as the Act, in any of the following manners:

A. 1. Defendant shall not, contrary to §§ 7 and 15(a)(2) of the Act, 29 U.S.C. §§ 207 and 215(a)(2), employ any of its employees in any workweek who are engaged in commerce or in the

PER_ALF0000451

production of goods for commerce, or in an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of the Act, for more than 40 hours in a workweek unless such employee is compensated for such hours in excess of 40 at an overtime rate of at least one and one-half times the regular rate at which such employee is employed.

2.  Each hourly paid processing employee who works on the production line during a production shift will be paid for all hours worked from the start of his or her first principal activity of the work day until the end of the last principal activity of his or her work day, with the exception of any time taken for bona fide meal breaks or bona fide off-duty time.

3.  A principal activity is any activity that is integral and indispensable to the employee's work and includes such activities as the donning, doffing, and sanitizing of any clothing or equipment (excluding such items that the employee is free to put on at home, such as hair nets, bump caps, ear plugs, glasses and footwear) which is required by law, the employer, or the nature of the work, and not merely a convenience to the employee and not directly related to the specific work.

This Section A shall become fully effective within one year of the entry of this Judgment. During this one-year interim period, Defendant shall bring an additional 25% of its plants into compliance with Section A at the end of each 90-day period elapsing from the date of this Judgment. During the interim period, Defendant shall pay each employee employed on the

PER_ALF0000452

production line during a production shift at any plant that does not meet the requirements of this Section A, an additional 8 minutes of compensation for each day worked. An overtime premium will be added to this amount where appropriate.

B. Defendant shall not, contrary to §§ 11(c) and 15(a)(5) of the Act, 29 U.S.C. §§ 211(c) and 215(a)(5), fail to make, keep and preserve adequate and accurate employment records of the wages and hours of each employee. Such records will accurately capture all hours worked by each employee as prescribed by Regulation found at 29 C.F.R. Part 516.

C. Defendant agrees to use its best efforts to maintain future compliance with the Fair Labor Standards Act, as amended. Should a federal court of appeals after the date of this decree render a final, published and precedential opinion in a poultry processing case brought by the Secretary of Labor under the FLSA involving donning and doffing practices which are not materially distinguishable from Defendant's practices at facilities within that circuit, then Defendant, in any such facilities within that circuit, shall be entitled to act consistent with that circuit court's decision until it is reversed, overruled or otherwise nullified. The Plaintiff reserves the right to monitor Defendant's future compliance with the Act and this Consent Judgment through its compliance program and authority. Should the Plaintiff detect any non-compliance, the Plaintiff agrees to provide notice of such non-compliance to the Defendant and an

PER_ALF0000453

opportunity to correct any deficiency prior to taking any enforcement action.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendant hereby is restrained from withholding payment of back wages to each hourly paid processing employee working on a production line during a production shift in the two-year period prior to the date of the filing of the Complaint in this action, for whom the Secretary has sought relief in Paragraph VIII.2 of the Complaint. The amount paid to each current or former employee will be equal to the amount owed to each employee for working 8 minutes per day, based upon the regular rate paid on the date of the work, in addition to the amount already paid by Defendant for each day worked. Such payments will include an overtime premium as described in section A above, where applicable.

To comply with this provision of this Judgment, Defendant shall, within 120 days from the date of this Judgment, deliver to Plaintiff's representatives the schedule of current or former employees described below. Within 180 days from the date of this Judgment, Defendant shall deliver checks to all employees who have been located. Within 12 months from the date of the Judgment, Defendant shall complete its efforts to locate employees and distribute back wages, provide Plaintiff a list of all unlocated employees and deliver to Plaintiff a check in the net amount due all unlocated employees. Defendants will distribute such amounts to the named employees or to their

PER_ALF0000454

personal representatives, less all legally mandated deductions, including income tax and the employee's share of F.I.C.A. Defendant shall endeavor to locate current and former employees and distribute back wages as expeditiously as possible.

Plaintiff will have the right to review and verify Defendant's calculations to determine compliance with this Agreement. This review may include reasonable on site review of payroll records and interviews as appropriate.

Within 30 days of making such payments, Defendant will provide Plaintiff proof of such payment in the form of Forms WH-58 signed by each individual to whom said amounts have been paid.

For any individuals to whom Defendant is unable, after a diligent search, to deliver the payments set out above within the time required herein, Defendant shall deliver to the United States Department of Labor, Wage and Hour Division, 60 Forsyth Street, S.W., Room 7M40, Atlanta, Georgia  30303, a certified or cashier's check or money order made payable to the "Wage and Hour Division--Labor," for the net amount due after appropriate deductions for income tax and the employee's share of F.I.C.A. In the event of default by Defendant in making such payment, post-judgment interest shall be assessed on any unpaid amount at the rate established pursuant to 28 U.S.C. §1961.

Defendant shall remain responsible for the employer's share of F.I.C.A. arising from or related to the back wages paid hereunder. Defendant also shall provide Plaintiff's attorneys

PER_ALF0000455

with a schedule showing its employer I.D. number and a schedule showing the employment dates, plant at which employed, last-known address, social security number, gross back wage amount, deductions, and net amount as to each employee.

Plaintiff shall distribute back wages to the named employees who could not be located by Defendant, or to their personal representatives, and any amounts not so distributed by the Plaintiff within the period of three (3) years after date of this Judgment, because of inability to locate the proper persons or because of such persons' refusals to accept such sums, shall be deposited with this Court, pursuant to 28 U.S.C. § 2041.

Neither Defendant nor anyone on its behalf shall directly or indirectly solicit or accept the return or refusal of any sums paid as back wages under this Judgment. Nor shall they retaliate against any employee for any action taken by any employee in connection with the investigation or settlement of this cause, or for asserting any rights under this Judgment. Defendant will not raise an employee's immigration status as a defense to the payment of back wages in any suit alleging such retaliation.

FURTHER ORDERED each party shall bear its own attorney's fees and expenses incurred by such party in connection with any stage of this case, including but not limited to, attorney's fees that may be available under the Equal Access to Justice Act, as amended.

This _10th_ day of _May_, 2002.

UNITED STATES DISTRICT JUDGE

PER_ALF0000456

6

UNITED STATES DISTRICT JUDGE

PER_ALF0000457

Defendant consents to entry
of the foregoing Judgment:

By: _____

JACOB J. MODLA
Haynsworth Baldwin Johnson
  & Greaves, LLC
400 West Trade Street
Charlotte, N.C. 28202-1627
(704) 342-2588
(704) 342-4379 (FAX)

Attorneys for Defendant

Plaintiff moves entry of
the foregoing Judgment:

EUGENE SCALIA
Solicitor of Labor

JAYLYNN K. FORTNEY
Regional Solicitor

THERESA BALL
Associate Regional Solicitor

_____
BRIAN DOUGHERTY
Attorney

Office of the Solicitor
U.S. Department of Labor

2002 Richard Jones Road
Suite B-201
Nashville, TN 37215
Tel: 615/781-5330 Ext. 237
Fax #615/781-5321
Attorneys for Plaintiff

8

PER_ALF0000458

This correspondence clarifies the Consent Judgment (Agreement) in Chao v. Perdue Farms Inc., Case No. 2:02-CV-0073 (M.D. Tenn.), executed on May 9, 2002. As we have discussed, the parties to the Agreement intend to assure that Perdue Farms Inc. (Perdue) achieves future compliance with the Fair Labor Standards Act (FLSA), 29 U.S.C. 201 et seq.

Specifically, under the Agreement, and to the extent not excepted under 29 U.S.C. 203(o), Perdue will record and pay for the time taken from the first principal activity, which could be donning of clothing and equipment at the plant (excluding such items that the employee is free to put on at home, such as hair nets, bump caps, ear plugs, glasses and footwear). This includes any subsequent time taken for employees to sanitize themselves and their equipment and the time spent walking or waiting after the first principal activity has been performed. Similarly, at the end of the production shift, employees will be compensated until the completion of the last principal activity. The only uncompensated time during the workday will be during any bona fide meal periods or bona fide off-duty time. Before and after the bona fide meal periods, Perdue will record and pay for the time taken by employees to don or doff clothing and equipment, and to sanitize themselves and their equipment.

There are any number of ways in which this compliance can be accomplished. One method for doing so would be to organize employees into working groups. When the first member of the group is given his or her equipment by a supervisor as part of the group, the entire group would be "clocked in" by the supervisor and the time recorded. From the time of the "clock in" all employees in the group would be paid for all hours with the exception of bona fide meal breaks or bona fide off-duty time. At the end of the day, the work group would be "clocked out" when the last person in the group completes taking off or cleaning (whichever comes last) his or her last piece of equipment as part of the group included in the paragraph above. Persons who arrive or are relieved off schedule or are assigned additional duties will be compensated in accordance with actual time worked.

As part of the Agreement, Perdue will make diligent efforts to locate all of its present and former workers who are owed back wages under the Agreement. These efforts will include utilizing the services of the Internal Revenue Service in cooperation with the Department of Labor, Lexis-Nexus, and a mutually agreeable credit bureau, or an equivalent search service, to locate former

PER_ALF0000459

employees.  This obligation to locate workers shall not apply to
any worker due less than $100 in gross back wages.

Perdue will inform the Wage and Hour Division (Wage-Hour) that
it has met the requirements of the FLSA and this agreement with
respect to each Perdue facility.  Wage-Hour, after receiving
that notification, will review the payment and record-keeping
practices at the facility for which notification is given and
will attempt to complete this review within 90 days.  When Wage-
Hour has completed its review and has determined that the pay
practices at the facility are consistent with this agreement,
Wage-Hour will so certify.

The principle underlying the Agreement, that all work time from
the first principal activity to the last principal activity must
be compensated, except for bona fide meal breaks or bona fide
off-duty time, is a principle that the Wage and Hour Division
intends to apply consistently throughout the poultry processing
industry.

By: _____

JACOB J. MODLA
Haynsworth Baldwin Johnson
& Greaves, LLC
400 West Trade Street
Charlotte, N.C. 28202-1627
(704) 342-2588
(704) 342-4379 (FAX)

Attorneys for Defendant

EUGENE SCALIA
Solicitor of Labor

JAYLYNN K. FORTNEY
Regional Solicitor

THERESA BALL
Associate Regional Solicitor

_____
BRIAN DOUGHERTY
Attorney

Office of the Solicitor
U.S. Department of Labor

2002 Richard Jones Road
Suite B-201
Nashville, TN 37215
Tel: 615/781-5330 Ext. 237
Fax #615/781-5321
Attorneys for Plaintiff

**U.S. Department of Labor**       Office of the Solicitor
                                    Washington, D.C. 20210



AUG 16 2002

Jack Kelly
Kelly & Associates, Inc.
925 15th Street N.W.
5th Floor
Washington D.C. 20005

Re: Chao v. Perdue Farms Inc., No. 2-02-003 (M.D. Tenn.)

Dear Jack:

As you know, pursuant to the Consent Judgment executed May
9, 2002, and the correspondence clarifying the Judgment in
the above styled action, Perdue Farms has agreed to record
and pay for the time taken by production employees at the
beginning of the production shift to don clothing and
equipment, sanitize themselves and their equipment, and
walk or wait after any one of these activities has been
performed.  Similarly at the end of the production shift,
Perdue has agreed to compensate employees for the time
taken to doff clothing and equipment, to clean or sanitize
themselves or their equipment, and any waiting or walking
time prior to the completion of these activities.  The only
uncompensated time during the workday will be during any
bona fide meal periods.  Before and after the bona fide
meal periods, Perdue will record and pay for the time taken
by employees to don or doff clothing and equipment, and to
sanitize themselves and their equipment.  Walking and
waiting time will also be compensated until the employee
has completed these tasks at the beginning of any meal
period, and after one of these tasks has begun at the end
of any meal period.

The Wage and Hour Division has reviewed the changes
implemented by Perdue to record all hours of work for
production employees at the facilities located in
Fayetteville, North Carolina, Robbins, North Carolina,
Emporia, Virginia and Salisbury, Maryland.  Based upon this
review, the Wage and Hour Division has determined that
Perdue's practices at these facilities are consistent with
the agreement between Perdue Farms and the Department of
Labor. In conformity with the Consent Judgment, Perdue may
begin to pay employees according to the individual time
records compiled under its current practices, if Perdue has
not already begun to do so.

The Department reserves the right to review payroll records consistent with the agreement at a point in time when payroll records will fully reflect the current practices at the named facilities.

We greatly appreciate your diligent cooperation in these matters.

Sincerely,

Jonathan M. Kronheim
Counsel for Trial Litigation

Mary Ziegler
Farm Labor Team Leader

PER_ALF0000462

# Department of Labor
# Awareness Training Documentation
# Perry, GA

I have attended the Department of Labor Consent Agreement
Awareness Training and I fully understand how critical my role
is to insure Perdue's success.

- ❑ My primary responsibility is to insure the integrity of
  the first principle activity, the 30-minute lunch break
  and the last principle activity.
- ❑ I also understand failure to properly manage my
  plant's DOL procedures could result in disciplinary
  action.
- ❑ Any questions I have will be addressed with my
  plant's DOL Implementation Team.

*Annie J. Bray*

**Signature**

3-22-04

**Date**

PER_ALF0000089

Bray, Annie J.11592N

# News Release



U.S. Department of Labor

For Immediate Release

Office of Public Affairs
Washington, D.C.
USDL: 02-286

Thursday, May 09, 2002
Contact:  Sue Hensley
Phone:  (202) 693-4650

## Perdue Farms Agrees To Change Pay Practices And Pay Millions In Back Wages To 25,000 Poultry Workers

**WASHINGTON, DC** – The U.S. Department of Labor today announced the filing of one of the largest consent judgments in the history of its Wage and Hour Division.

Under the consent judgment with Perdue Farms, Inc., which is estimated to be worth over $10 million to Perdue poultry workers, the company agreed to change current and future pay practices at all of its domestic poultry processing facilities, and compensate more than 25,000 current and former employees for time spent "donning and doffing" work clothing and protective gear.

"This is a major victory for the workers, who will now get paid what they are entitled to and be compensated for health and safety precautions at their plants," said Secretary of Labor Elaine L. Chao. "I am pleased that Perdue has stepped forward to do the right thing. Most poultry workers are immigrants who are paid less than $7.00 an hour. This agreement with Perdue is a major step in protecting these low-wage workers."

The agreement with Perdue resolves a dispute over a poultry industry practice of not paying workers for time spent donning, doffing and sanitizing at the plant. Poultry processing workers are required to be ready to work, with work clothing and protective gear on, when the production line starts running, but are not paid for the time spent putting on the gear or cleaning up at the end of day. Perdue is the first poultry company to agree to pay workers for all hours worked, including time spent on these work-connected activities.

Tammy D. McCutchen, Administrator of the Wage and Hour Division, stated, "It's important that Perdue has agreed to change its pay practices at all its plants across the country, to ensure future compliance with the Fair Labor Standards Act. We hope this settlement with Perdue will be a model for the industry."

The consent judgment was filed in the U.S. District Court for the Middle District of Tennessee by the Labor Department's Solicitor's Office, and must be approved by that court.

The FLSA requires that covered employees be paid the minimum wage of $5.15 per hour for all hours worked and time and one-half their regular rate of pay for hours worked over 40 per week. The FLSA also requires

U.S. Labor Department releases are accessible on the Internet at http://www.dol.gov. The information in this news release will be made available in alternate format upon request (large print, Braille, audio tape or disc) from **PER_ALF0000448** Please specify which news release when placing your request. Call (202) 693-7773 or TTY (202) 69

# News Release



U.S. Department of Labor

For Immediate Release

| | |
|---|---|
| Office of Public Affairs | Thursday, May 09, 2002 |
| Washington, D.C. | Contact: Sue Hensley |
| USDL: 02-286 | Phone:  (202) 693-4650 |

employers to maintain accurate time and payroll records.  For more information about the FLSA, call the Department of Labor's toll-free help line at 1-866-4USWAGE (1-866-487-9243).  Information is also available on the Internet at www.dol.gov.

###

PER_ALF0000449

**Ogletree Deakins**
ATTORNEYS AT LAW

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

2301 Sugar Bush Road
Suite 600 (27612)
Post Office Box 31608
Raleigh, North Carolina 27622
Telephone: 919.787.9700
Facsimile: 919.783.9412
www.ogletreedeakins.com

Bruce A. Petesch
bruce.petesch@ogletreedeakins.com

August 17, 2006

Jonathan M. Kronheim, Esq.
U.S. Department of Labor
Office of the Solicitor
Suite N-2716
200 Constitution Ave. NW
Washington, D.C. 20210

Re:    Chao v. Perdue Farms Incorporated
       Civil Action File No. 2-02-0033 (Judge Haynes)

Dear Mr. Kronheim:

This letter is to advise you that Perdue Farms Incorporated has complied with all terms of the Consent Judgment entered in the United States District Court for the Middle District of Tennessee, Northeastern Division, in the above-referenced case. Specifically, Perdue Farms:

1.      Within the one-year period following the entry of the Consent Judgment, brought all of its plants into compliance with Section A of the Consent Judgment, and further, the Office of the Solicitor, United States Department of Labor has had a representative visit each of the covered plants, and review the payment and record-keeping practices at each facility, and has certified that each of the covered plant's pay practices are consistent with the requirements of the Consent Judgment and the clarifying side letter agreement.

2.      Within the time permitted following the entry of the Consent Judgment, paid to each hourly paid employee or former employee who worked on the production line during a production shift in the two-year period prior to the date of the filing of the Complaint in the above-reference action, an amount equal to the amount owed to each employee for working eight (8) minutes per day, based upon the regular rate paid on the date of work, in addition to the amount already paid by Perdue Farms for each day worked, and including an overtime premium as described in Section A of the Consent Judgment where applicable. Perdue Farms has delivered checks for all back wages, less all legally mandated deductions, to all employees and former employees who have been located; and further, Perdue Farms, having diligently endeavored to locate all current and former employees entitled to back pay

Atlanta, GA • Austin, TX • Birmingham, AL • Charleston, SC • Charlotte, NC • Chicago, IL • Columbia, SC • Dallas, TX • Greensboro, NC • Greenville, SC • Houston, TX • Indianapolis, IN
Kansas City, MO • Los Angeles, CA • Miami, FL • Morristown, NJ • Nashville, TN • Phoenix, AZ • Raleigh, NC • St. Thomas, VI • San Antonio, TX • Tampa, FL • Torrance, CA • Washington, DC

PER_ALF0000463

Jonathan M. Kronheim, Esq.
August 17, 2006
Page 2



pursuant to the Consent Judgment and by methods approved by the Office of the Solicitor, United States Department of Labor including utilizing the services of the Internal Revenue Service and a mutually agreed to search service, is at this time providing the Department of Labor with a list of all unlocated former employees and a check in the amount due all unlocated employees.

By copy of this letter I am forwarding, or having forwarded by separate cover, pursuant to the instructions of the Office of the Solicitor, United States Department of Labor, to the addressees identified below, the following documentation establishing that Perdue Farms has fully complied with the terms of the above-referenced Consent Judgment and clarifying side letter agreement:

1.    To Jill Brown, U.S. Department of Labor, 1018 Porto Bello Road, Pendleton, IN 46064:

      Disc 1 – Perdue Farms Incorporated – M&T Bank Excel paid files:
            38971129 (November 2002 paid file)
            38971227 (December 2002 paid file)
            38970131 (January 2003 paid file)

      Disc 2 – containing three (3) Excel file folders:
            File Folder 1 – Perdue Farms' Address Files
                  Deluca Check Register with Addresses
                  Perdue Termination Addresses October 2002
                  Settlement Services Addresses

            File Folder 2 – Perdue Farms' Reconciliation Files
                  Settlement Services Outstanding Checks
                  IRS Mailing Outstanding Checks
                  Original Payout Outstanding Checks
                  Bank Reconciliation – June 2006 ($293,564.85 less one (1) outstanding check for $232.37 from the Settlement Service mailing)

            File Folder 3 – Perdue Farms' Payment Files
                  Initial Payout – Active Associates
                  Deluca Initial Check Register
                  IRS Search Check Register
                  Settlement Services Check Register
                  Initial Payout – Terminated Associates

PER_ALF0000464

Jonathan M. Kronheim, Esq.
August 17, 2006
Page 3



Hard Copies:
    Signed WH-58s from the original payout that were returned after
    the WH-58s were sent to the Department of Labor

    Signed WH-58s from the IRS mailing

    Signed WH-58s from the Settlement Services mailing

2.    To the SE Region Lockbox, U.S. Department of Labor – Southeast Region, P.O. Box 880904, Dallas, TX 75388-0904 (by separate cover):

    A check for $293,564.85 representing the net amount due to the unlocated employees.

If the outstanding check for $232.37 does not clear by the September bank statement reconciliation, we will cancel the check and forward the amount to the lock box with a letter to you.

Perdue Farms believes that it has fully complied with the terms of, and obligations imposed by, the above-referenced Consent Judgment and the clarifying side letter agreement, and having done so, that this matter is now closed. We would appreciate your confirmation that our understanding is correct.

Jon, both on behalf of Perdue Farms, and me personally, I want to thank you and the Office of the Solicitor for the cooperation and assistance that has been provided in working through this matter.

With high regards, I remain

Very truly yours,

Bruce A. Petesch

BAP:ep

cc:    Ms. Jill Brown (w/enclosures)
        Mr. Dave Tabinowski
        Mr. Robert Heflin
        Herbert D. Frerichs, Jr., Esquire

PER_ALF0000465

Jonathan M. Kronheim, Esq.
August 17, 2006
Page 4



bcc:    Jack Kelly, Esquire

4253910.1

PER_ALF0000466

Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: 202.739.3000
Fax: 202.739.3001
www.morganlewis.com

# Morgan Lewis
### COUNSELORS AT LAW

**James J. Kelley, II**
Partner
202.739.5095
jkelley@morganlewis.com

January 29, 2007

## FOR SETTLEMENT PURPOSES ONLY
## NOT ADMISSIBLE IN ANY PROCEEDING

Robert Camp, Esquire
Cochran, Cherry, Givens, Smith,
Lane & Taylor, PC
163 West Main Street
P.O. Box 927
Dothan, Alabama 36302

Richard Celler, Esquire
Morgan & Morgan
284 South University Drive
Fort Lauderdale, Florida 33324

Re:    **Anderson, et al. v. Perdue Farms, Incorporated**
       **Civil Action No. 1:06 CV 1000 – WKW**

Gentlemen:

As we have discussed, this letter sets forth the actual time recording and pay practices in Perdue's Dothan, Alabama processing facility. As we explained, these actual practices were established in a close working arrangement with representatives from the United States Department of Labor (DOL) in accordance with a settlement agreement between Perdue Farms, Inc. and the United States Department of Labor dated May 9, 2002. (DOL Settlement) Under that settlement, which was an outgrowth of the DOL's Poultry Donning and Doffing Initiative, Perdue undertook to develop donning and doffing procedures and time recording practices compliant with the Act which could be a model for the industry. Perdue representatives and representatives from the Office of the Solicitor, the Wage and Hour Administration, a Regional Solicitor and the Director of the Poultry Task Force worked together, plant-by-plant and shift by shift, in all eighteen Perdue processing facilities. for nearly one year to develop systems which captured all compensable time from the first principal activity to the last activity in a typical work day in a Perdue processing plant. The Dothan, Alabama facility was the third facility visited and when the process was completed, the combined team returned to Dothan to finally approve the process in application. As you will note, the process they devised, which is actually

January 29, 2007
Page 2

Morgan Lewis
COUNSELORS AT LAW

in place in Dothan (and all other Perdue facilities), is sharply at odds with the allegations set forth in the Complaint you filed against Perdue Farms, Inc.

With respect to time recording, the key to the Perdue process is the time and attendance recording system developed with the assistance of the Kronos Corporation. Kronos' clock and swiping systems are strategically situated at various locations throughout the Plant. Each Perdue production employee is assigned a swipe card and swipes into the Kronos system each workday at a designated starting area **before** donning or acquiring work related equipment and clothing. (Some non-unique gear is worn to/from home.) After swiping into the system, the employees don the required clothing, collect their gear and walk to the production line or other work area on paid time.

Perdue provides an unpaid 30 minute break period each day. Employees leave the work area, doff their required clothing and gear at a designated place and swipe out on the Kronos system **before** commencing the unpaid break period. Employees are not allowed to swipe back in until 30 minutes later. In fact, the Kronos system will not permit an employee to swipe back in within 30 minutes of when the employee swiped out. **After** swiping back in, employees don their gear and walk to the work station, on paid time, to resume work.

The process is reversed at the end of the work day. Employees walk back from the work area, doff required clothing and gear and deposit it in assigned bins and **then** swipe out on the designated Kronos clock. Perdue employees are paid for all time captured by the Kronos system. As we have explained previously, since this system was introduced in the Perdue plants, Perdue has not calculated pay entitlements based on line time, master time cards or any other similar practices.

Under these circumstances, there is no meaningful purpose to be served by pursuing this litigation. Perdue has voluntarily modified its time recording system and pay practices with the specific assistance and approval of the United States Department of Labor. The Perdue employees on board in 2002 were already made whole under the DOL settlement and since the introduction of the Kronos system have indisputably been paid in accordance with the Fair Labor Standards Act and its implementing regulations. We appreciate that your prior experience in the poultry industry may have given you some insight into long standing business practices common to many poultry processors. We also appreciate your candid admission that you have never been in a Perdue plant. As we hope you can now appreciate, at least since the middle of 2003, Perdue has operated very differently than much, if not all, of the poultry processing industry and, as far as we are aware, is unique in the industry in these regards.

**Morgan Lewis**

COUNSELORS AT LAW

January 29, 2007
Page 3

        We have also discussed your allegation that the security clearance process starts the regular workday. Perdue acknowledges that all employees and visitors to the Perdue plant are required to display a badge and are subject to minimal security monitoring procedures. **All persons**, not just production related employees, who enter Perdue production areas are subject to the security process. Perdue maintains that passing a security checkpoint does not constitute work and is, by no means, an integral activity of a poultry production employee. Under the Act, only that preliminary time which is "an integral and indispensable part of the principal activities … for which other workmen are employed" constitutes "principal activities." See *Steiner v. Mitchell*, 350 U.S. at 256 and *IBP v. Alvarez*, Slip Op. at 7. We can all agree that since 9/11, security procedures have become commonplace but as we have advised you previously, we have searched diligently and have uncovered no case which establishes that clearance of the security checkpoint constitutes the first principal activity of the work day for any class of employees. Legally, we believe the effort involved satisfies the traditional regulatory standards for preliminary time under Section 4 of the Portal-To-Portal Act and 29 CFR § 790.7. Even if it did not, the minimum time involved in walking past the security checkpoint and flashing a badge would qualify as *de minimus*.

        For the reasons we describe, no valid claim can be brought against Perdue for so-called "donning and doffing" or walking time to and from the production line and while we do not believe that a valid claim could be raised with respect to security screening, we suggest that if you were to establish security clearance as a first principal activity, a claim could be raised at any subsequent time. Clearly, it does not serve your purposes to litigate that issue, standing alone, against this Company. Perdue is a long term member of the Dothan business community and would be prepared to deal with such allegations in the future if the state of the law evolves to the point where it is so required.

Sincerely,

James J. Kelley
Attorney for
Perdue Farms, Incorporated

1-WA/2694896.1

8 of 13 DOCUMENTS

Copyright 2002 The New York Times Company
The New York Times

May 10, 2002 Friday
Late Edition - Final

**SECTION:** Section A; Column 4; National Desk; Pg. 20

**LENGTH:** 429 words

**HEADLINE:** Poultry Plants to Pay Workers $10 Million in Compensation

**BYLINE:** By STEVEN GREENHOUSE

**BODY:**

The Labor Department announced a $10 million settlement with Perdue Farms yesterday over the company's failure to pay poultry workers for time spent putting on and removing clothes and protective gear.

The department also sued Tyson Foods yesterday, charging it with similarly not paying workers for such time.

In the Perdue settlement, one of the largest reached by the Labor Department's Wage and Hour Administration, the company agreed to pay its workers in the future for all time spent putting on and removing protective gear.

"This is a major victory for the workers, who will now get paid what they are entitled to and be compensated for health and safety precautions at their plants," Labor Secretary Elaine L. Chao.

The Clinton administration had begun an enforcement action to get poultry companies to pay workers for that time after poultry processors had for decades refused to do so.

Labor Department officials assert that this dressing and undressing was part of work-related safety procedures, while the companies insisted that these procedures should be considered part of the employees' personal time.

Perdue is to distribute the $10 million to 25,000 former and current workers. Eugene Scalia, the department's top lawyer, estimated that workers spend eight minutes a day dressing and undressing, which translates to about $500 a year in unpaid work.

The settlement covers two years, meaning many workers will receive $1,000 in back pay. Mr. Scalia said the back pay would also go to illegal immigrants who worked for Perdue.

The Tyson lawsuit, filed in Federal District Court in Birmingham, Ala., accuses the company of underpaying workers at its plant in Blountsville, Ala. Tyson has 65,000 poultry processing workers.

In a statement, Tyson insisted that it was complying with wage and hour laws. It said putting on and removing safety equipment like smocks, hair nets and earplugs was nothing more than putting on clothing, like construction workers putting on a hard hat.

Tyson noted that the Department of Labor's position contradicted several judicial decisions, which found that these procedures should be considered part of personal time.

After years of protesting that poultry workers were not paid for "donning and doffing," the United Food and Commercial Workers union praised the Perdue settlement and the Tyson lawsuit. The union said the settlement was "a step in the right direction for fair pay for some of the nation's most underpaid workers."

Jim Perdue, chairman of Perdue Farms, said the settlement ended confusion about the issue.

**URL:** http://www.nytimes.com

**LOAD-DATE:** May 10, 2002

3 of 3 DOCUMENTS

Copyright 2002 The Courier-Journal (Louisville, KY)
All Rights Reserved
The Courier-Journal (Louisville, KY)

June 2, 2002 Sunday Met and metro Editions

**SECTION:** BUSINESS; Pg. 01E

**LENGTH:** 924 words

**HEADLINE:** Poultry workers await back pay from Perdue;
Additional money part of settlement

**BYLINE:** HAUKEBO KIRSTEN, khaukebo@courier-journal.com

**BODY:**

with U.S. agency

Byline: KIRSTEN HAUKEBO

Source: The Courier-Journal

Dateline: BEAVER DAM, Ky.

Every day after arriving at work, Jo Daugherty dons steel-toed boots plus knee-high rubber waders, a hairnet, lab coat, earplugs and white cotton gloves topped with green rubber gloves.

She's legally required to put on the clothing and safety gear before taking her place sorting wings at Perdue Farms' chicken processing plant in Cromwell. But until recently, the company wasn't legally required to pay her for the time she spent doing so.

Now, because of a settlement last month between Perdue and the U.S. Department of Labor, she and other workers soon will be paid for time spent dressing for work, sanitizing their safety gear and cleaning up afterward. They'll also be eligible for two years of back pay at a rate of eight minutes per day, which could add up to about $1,000 for Daugherty and other workers.

Daugherty, 35, whose husband also works at the plant, said they plan to use the money to replace windows on their house and maybe take their two children on a trip. "I'm glad the company has to pay," she said. "They owe it to us."

But another worker at the plant, 36-year-old Brenda Bradley, said the money doesn't come close to compensating employees for their time. Workers must remove the clothing anytime they leave the factory floor, whether for a break or their 30-minute lunch.

"We deserve a lot more," she said. "A good 15 minutes a day (to put on and remove the protective clothing) is more like it. I don't know anybody that can do it six times in eight minutes."

Page 2
Poultry workers await back pay from Perdue;Additional money part of settlement The Courier-Journal (Louisville, KY)
June 2, 2002 Sunday Met and metro Editions

The settlement comes after workers, encouraged by the United Food and Commercial Workers Union, filed suit against Perdue and Tyson Foods in 1999. Some of the original plaintiffs worked at the Cromwell plant, said union organizer Paul Whitely. (Those workers declined to be interviewed for this story.)

In the May 9 agreement with the government, Perdue agreed to pay an estimated $10 million in back wages to 25,000 workers, hundreds of them in Kentucky. Tyson was less cooperative. The Labor Department filed suit against the company in Alabama.

"It seems like a nickel-and-dime rip-off, and it is on a weekly basis," said Greg Denier, spokesman for the United Food and Commercial Workers Union. "On a yearly basis it could mean an extra $500 to $1,000. For someone making $8 an hour, that's a lot of money."

The union represents workers at all of Kentucky's chicken plants except Cromwell, where workers recently defeated an organizing effort by a vote of 318 to 248.

For its part, Perdue said it initiated talks with the Labor Department almost three years ago to determine whether it was required to pay for preparation and clean-up time.

"For many years various lawsuits have left this issue unresolved, thus creating confusion in the workplace," said Perdue Farms Chairman Jim Perdue. Of the settlement, he said, "This is not a fine or a penalty but the thoughtful resolution of an unsettled issue that directly benefits our associates by putting additional money in their hands."

Workers at the Cromwell plant will begin receiving the additional pay on Friday, retroactive to May 10, when the agreement was reached, said Sue Hensley, a Labor Department spokeswoman.

The company has up to a year to pay workers the money they're owed for the past two years.

Daugherty is paid $8.41 per hour cutting wings off chicken carcasses with scissors and packing them in trays for sale in grocery stores. The four-year plant veteran said she has been timed at the breakneck speed of 50 wings per minute. She stands on a metal platform as chickens zoom past on an assembly line.

Mary Lou Yates, who also works on the wing line, said that when she started working at the plant three years ago, she enjoyed working and talking with her fellow employees.

Now there are fewer workers on the line, but the pace has remained the same, she said. She said she must work so frantically that she can't carry on any sort of conversation to make the day pass more quickly. She also said she's expected to lift heavy boxes and do other chores that previously had not been part of the job.

"I need the money, but I don't know how much longer I can take it," said Yates, whose previous job was stitching pockets on jeans at a garment factory.

To assure food safety, the wing line is kept as cold as a refrigerator. Workers layer on thermal underwear, coveralls, sweats and sweaters to stay warm.

In a January 2001 report, the Labor Department found "extensive violations" of wage and hour laws at 51 randomly selected chicken processing plants. The main violation, the report said, was that employees weren't paid for time spent putting on and sanitizing required safety gear.

The workers' lawsuit against Perdue will continue, said Lisa Pederson, assistant counsel of the United Food and Commercial Workers Union. Some issues weren't resolved by the settlement with

Page 3
Poultry workers await back pay from Perdue;Additional money part of settlement The Courier-Journal (Louisville, KY)
June 2, 2002 Sunday Met and metro Editions

the government, including making sure the company accounts for all the hours worked when calculating retirement benefits. But the agreement resolves the suit's major issues, she said.

"Overall this is a great thing for workers."

Tammy McCutchen, administrator of the Labor Department's Wage and Hour Division, said, "We hope this settlement with Perdue will be a model for the industry."

A worker packed chicken at the Perdue plant in Cromwell, Ky. Employees are required to wear safety clothing, including gloves, hairnets, boots and waders.

**GRAPHIC:** Jo Daugherty, left, is glad she'll get paid for the time it takes to put on and take off required clothing and safety gear. But Brenda Bradley, center, a fellow worker at Perdue's Cromwell plant, said a back-pay deal falls short. And Mary Lou Yates said the job has gotten harder.; PERDUE FARMS PHOTO

**LOAD-DATE:** August 6, 2002

Copyright 2002 The Baltimore Sun Company
All Rights Reserved
The Baltimore Sun

May 10, 2002 Friday FINAL Edition

**SECTION:** BUSINESS, Pg. 1C

**LENGTH:** 509 words

**HEADLINE:** Perdue to pay back wages;
 Poultry producer settles Labor Dept. dispute, will give more than $10 million

**BYLINE:** Ted Shelsby

**SOURCE:** SUN STAFF

**BODY:**

Perdue Farms Inc., the giant Salisbury-based poultry processing company, agreed yesterday to pay workers more than $10 million in back wages after settling a long-running dispute with the U.S. Labor Department.

Secretary of Labor Elaine I. Chao said the money will go to about 25,000 Perdue workers across the country whom the company refused to pay for the time needed to put on and take off protective clothing and gear needed to perform their jobs.

The settlement is "one of the largest consent judgments in the history" of the department's Wage and Hour Division, Chao said. "This is a very important and, I believe, historic development."

She described the settlement as "a major victory for workers" who will now be paid the full wages to which they are entitled.

At the same time, Chao disclosed that the government had filed a lawsuit against Tyson Foods Inc. after no settlement was reached in a similar case.

The government charges that the failure to pay workers for time needed to dress and undress for work is a violation of the Fair Labor Standards Act.

Yesterday's actions are likely to be just the first step in a much wider enforcement program. Chao noted that there are 174 poultry processing plants in the United States, employing about 250,000 workers. She said the government's investigation indicates the practice is prevalent throughout the industry.

Jim Perdue, chairman of Perdue Farms, said the settlement was a result of discussions the company initiated with the Labor Department almost three years ago.

"For many years various lawsuits have left this issue unresolved, thus creating confusion in the workplace," Perdue said. "It is always our goal to adhere to the law."

Tyson, based in Springdale, Ark., issued a statement saying that it was in full compliance with all wage and hour laws and is disappointed by the government's decision to file suit.

Tyson said the position taken by the Labor Department is clearly contradicted by three federal court decisions and more than 50 years of industry practice sanctioned by the Department of Labor.

During a conference call with reporters yesterday, Labor Department officials said that at least two courts, one in Texas and one in Delaware, "ruled wrongly" in not requiring payments for dressing time.

The Labor Department said the Perdue settlement provides current and past workers an average of $500 a year. The settlement covers two years.

The government said it took workers about eight minutes a day to put on and take off protective clothing and gear.

Carole Morison, executive director of the Delmarva Poultry Justice Alliance, a watchdog group based in Pocomoke City, Md., said she was "pleased that Perdue has chosen to do the right thing. It is unfortunate that Tyson chose not to do the right thing."

She said poultry workers welcome the settlement, but she insisted that they are being short-changed by the process. "Our records show that workers were losing a half-hour's pay a day while dressing. That's 2 1/2 hours a week."

**LOAD-DATE:** May 10, 2002



**No. 91**
**Friday, May 10, 2002**
ISSN 1522-5968

Page A-5

# News

Wage & Hour

## Perdue Settles Donning, Doffing Dispute; DOL Sues Tyson Foods on Similar Charges

Poultry processor Perdue Farms Inc. has agreed to settle a Labor Department lawsuit by changing its pay practices and paying current and former employees for the time spent putting on and taking off safety clothing and equipment, DOL announced May 9 (*Chao v. Perdue Farms Inc.*, M.D. Tenn., No. 2:02-CV-0033 *consent decree filed* 5/9/02).

The agreement settles a three-year dispute between the company and the government over whether employees should be paid for time spent "donning and doffing" safety attire.

Meanwhile the Department of Labor filed a lawsuit against another poultry producer, Tyson Foods Inc., seeking to change pay practices and recover back wages for employees not currently being compensated for donning and doffing (*Chao v. Tyson Foods Inc.*, N.D. Ala., No. CV-02-TMP-1174-S, *complaint filed* 5/9/02).

Although the Labor Department estimated that approximately 25,000 current and former Perdue workers will be paid about $10 million as a result of the consent decree, the company has said an amount has yet to be determined and will not be for six months.

"We do think that the figures are an overstatement," said Tita Cherrier, a Perdue company spokeswoman.

The Labor Department has estimated that preparation takes eight minutes per day and the payment should amount to about $500 per employee per year.

All poultry workers employed with Perdue for any time during the past two years will be compensated. Payments will begin in six months, Cherrier said.

### First in Industry

The settlement makes Perdue the first in the industry to address the issue of

donning and doffing protective clothing. "It's important that Perdue has agreed to change its pay practices at all its plants across the country, to ensure future compliance with the Fair Labor Standards Act. We hope this settlement with Perdue will be a model for the industry," said Tammy D. McCutchen, administrator of DOL's Wage and Hour Division.

Poultry processing workers are required to be ready to work and clothed in working clothing and protective gear when the production line starts running. They generally are not paid for the time spent in preparation or cleaning up at the end of the day.

The United Food and Commercial Workers union said Perdue's agreement to settle the case is a step in the right direction for fair pay and that some of the nation's most underpaid workers are in the poultry industry.

"Today's ruling is only part of the long-term campaign for justice in the poultry industry. The UFCW will continue to fight, with the support of our coalition partners, for better wages, benefits and working conditions for all poultry workers," said Bill Schmitz, international vice president.

Perdue Farms Chairman Jim Perdue in a statement said he is glad the issue has been resolved.

"For many years, various lawsuits have left this issue unresolved, thus creating confusion in the workplace. It is for that reason that it was important to us to resolve this issue. This agreement makes clear that our associates will continue to be paid accurately for all work activities," Perdue said. "It is always our goal to adhere to the law as we always have and with this action we will now be able to completely focus on providing for our customers with the highest quality poultry products."

Labor Secretary Elaine Chao called the settlement an historic event. "Workers will now be paid for what they're entitled to," Chao said.

### Tyson Accused of Violating FLSA

The poultry department of Tyson Foods is being asked to pay workers for time spent donning, doffing, and sanitizing the plant.

Under the FLSA, employers are required to be paid the minimum wage of $5.15 per hour for all hours worked and time and one-half their regular rate for working more than 40 hours per week. Employers also are required to maintain accurate time and payroll records. ✎

*By Angela Swinson*

Contact customer relations at: customercare@bna.com or 1-800-372-1033
ISSN 1522-5968
Copyright © 2002, The Bureau of National Affairs, Inc.
Copyright FAQs | Internet Privacy Policy | BNA Accessibility Statement | License

Reproduction or redistribution, in whole or in part, and in any form,
without express written permission, is prohibited except as permitted by the BNA Copyright Policy,
http://www.bna.com/corp/index.html#V

 

# DECLARATION:

1.    My name is Cornelia Thornton.

2.    I am a Plaintiff in this action.

3.    I make this Declaration based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.    I worked for Defendant, as a poultry-processing laborer in and among others, in the City of Dothan, County of Houston, State of Alabama, from approximately Aug 23, 2002 until Mr. Presently. As a poultry-processing laborer, I was specifically employed by Defendant to assist in the production and/or processing of poultry for Defendant and its customers. In this capacity, the Defendant paid me on an hourly basis.

5.    During my employment with Defendant, I personally observed, on a daily basis, that hourly processing employees primarily worked in two (2) general areas: (1.) 1st processing, where poultry is placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled; or (2.) 2nd processing, where poultry after completing 1st processing, is placed or hung on lines and is further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc... for delivery to plant customers. Because the work we perform admittedly is unskilled, it is similar in nature regardless of hourly employees' titles, supervisor or department. That is, I have observed all hourly employees are interchangeable and therefore are required to work open positions throughout the plant on a daily basis as production requirements dictate. I personally have worked many positions other than my assigned job and have been moved various times, sometimes daily, as production requirements demand, working across department lines and under various supervisors.

6.    During my entire employment with Defendant, I was not fully paid for required pre-production and post-production activities that are necessary,

integral, and indispensable to my overall employment responsibilities. Such as the time it takes to clear security and the compensable walk time that ensues thereafter; donning and doffing of certain sanitary and personal protective equipment such as hairnets, beard nets, and ear plugs; time spent cleaning and sanitizing myself; wait time associated with cleaning and sanitizing myself; walking to and from the designated time clocks after already performing compensable activities; time deducted as unpaid breaks, that due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable; and time spent walking to, and clearing, security at the end of the day.

7.      As further evidence of my similarity to my co-laborers, both in 1st and 2nd processing, I also personally observed that "hours worked" for my co-laborers and me was recorded under the same wage compensation system in which individual employee time clock punches are the basis for starting and ending hours worked but employees are required to clock in after clearing security and donning required sanitary and personal hygiene equipment as well as clock out before doffing required sanitary and personal hygiene equipment, returning smocks to assigned smock bins, and clearing security.

8.      As a result of this practice, Defendant failed to pay me in full, for all hours worked. Since Defendant failed to properly count all hours worked, in those weeks that Defendant recorded I worked over forty (40) hours, I am owed overtime for those hours. Alternatively, in those weeks in which Defendant recorded I worked less than forty (40) hours, but had Defendant properly counted all hours worked, I would have worked over forty (40) hours, I am likewise owed overtime for those hours over forty (40).

9.      During my employment with Defendant, and as described above, I personally observed that there were numerous co-employees with whom I worked, that: (a) performed the same or similar job duties as I performed; (b) worked the same amount of hours that I worked per workweek; and (c) were paid in the same manner in which I was paid (not receiving pay for work described in ¶¶6-8 above). To my knowledge, there are/were hundreds of

2

individuals employed by Defendant who have been subjected to the pay practices described above, many of which already have joined this lawsuit but many of which are unaware of this lawsuit because they are no longer employed.

10.    I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the ___11___ day of _May_ , 2007.


_Cornelia Thornton_
PLAINTIFF'S NAME

_Cornelia Thornton_
PLAINTIFF'S SIGNATURE


STATE OF _Alabama_ .
COUNTY OF _Houston_ .


I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the ___11___ day of May, 2007

[SEAL]

_Jennifer LeAnn Dee_
NOTARY PUBLIC
My Commission Expires: _4/20/10_

3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA,
# MIDDLE DIVISION

| | | |
|---|---|---|
| **FLORENCE DOBBINS, et al.,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | **CIVIL ACTION NO.** |
| v. | § | **4:06-cv-04912-RDP** |
| | § | |
| **TYSON CHICKEN, INC.,** | § | |
| et al., | § | |
| | § | |
| Defendant. | § | |
| | § | |

### Exhibit 1

### AFFIDAVITS/DECLARATIONS OF
### SYLVESTER MORAGNE, CLIFFORD GREGORY SMITH,
### ANTHONY THOMAS.

## DECLARATION:

1.    My name is _Sylvester Morague_.

2.    I am a Plaintiff in this action.

3.    I make this Declaration based on my personal knowledge.  I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.    To the best of my knowledge, I worked for Defendant, as a poultry-processing laborer in and among others, in the City of Albertville, County of Marshall, State of Alabama, from approximately ___05 - 13 - 02___ until ___Present___.  As a poultry-processing laborer, I was specifically employed by Defendant to assist in the production and/or processing of poultry for Defendant and its customers.  In this capacity, the Defendant paid me on an hourly basis.

5.    During my employment with Defendant, I personally observed, on a daily basis, that hourly processing employees primarily work in two (2) general areas: (1.) 1st processing, where poultry is placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled; or (2.) 2nd processing, where poultry after completing 1st processing, is placed or hung on lines and is further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc... for delivery to plant customers.  Because the work we perform admittedly is unskilled, it is similar in nature regardless of hourly employees' titles, supervisor or department.  That is, all hourly employees are interchangeable and therefore are required to work open positions throughout the plant on a daily basis as production requirements dictate.

6.    During my entire employment with Defendant, I was not fully paid for required pre-production line and post-production line activities that are necessary, integral, and indispensable to my overall employment responsibilities.  Such as the time it takes to clear security and the

compensable walk time that ensues thereafter; donning and doffing protective and sanitary equipment; cleaning and sanitizing that equipment, as well as myself; wait time associated with cleaning and sanitizing equipment, as well as myself; walking to and from the production line from my locker, or dressing area after already performing compensable activities; time deducted as unpaid breaks, that due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable; waiting in line to return required supplies, tools, and other equipment needed for line activities; time spent waiting at the line prior to the start of the master time clock; time spent continuing work after the master time clock has stopped; and time spent walking to, and clearing, security at the end of the day.

7.    As further evidence of my similarity to my co-laborers, both in 1st and 2nd processing, I also personally observed that "hours worked" for my co-laborers and me is/was recorded under a wage compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked.    Instead, hours worked are recorded under a system known as line time, master time, master key, gang time, etc... (generally referred to as "master time"), where hours recorded by Defendant are reflected by the swiping and/or recording of time by a supervisor and/or manager of Defendant, that simultaneously clocks multiple employees in and out during the workday, regardless of the actual time worked by my co-laborers and myself.

8.    As a result of this practice, Defendant failed to pay me in full, for all hours worked.  Since Defendant failed to properly count all hours worked, in those weeks that Defendant recorded I worked over forty (40) hours, I am owed overtime for those hours. Alternatively, in those weeks in which Defendant recorded I worked less than forty (40) hours, but had Defendant properly counted all hours worked, I would have worked over forty (40) hours, I am likewise owed overtime for those hours over forty (40).

9.    During my employment with Defendant, and as described above, I personally observed that there were numerous co-employees with whom I

2

worked, that: (a) performed the same or similar job duties as I performed; (b) worked the same amount of hours that I worked per workweek; and (c) were paid in the same illegal manner in which I was paid (not receiving pay for work described in ¶¶7-8 above). To my knowledge, there are/were hundreds of individuals employed by Defendant who have been subjected to the illegal pay practices described above, many of which already have joined this lawsuit.

10.    I personally am aware that other and additional current and former hourly processing employees will join this litigation if they are given notice of it and an opportunity to join it. Numerous employees have expressed their desire to join this litigation, but have not done so to date because of fear of retaliation by Defendant and its managers. To that end, Defendant and its managers have attempted to discourage and/or intimidate my co-workers from joining this lawsuit by issuing both express and implied threats involving job security.

11.    I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the _____ day of February, 2007.


_Sylvester Morague_
PLAINTIFF'S NAME

X _Sylvester Morague_
PLAINTIFF'S SIGNATURE

3

STATE OF ALABAMA,

COUNTY OF MARSHALL.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the _____ 16 _____ day of February, 2007.



_____

NOTARY PUBLIC

My Commission Expires: 01/17/2011

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

| SAMUEL ADAMS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-CV-00950-MEF-WC |
| | § | |
| WAYNE FARMS LLC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

## AFFIDAVIT/DECLARATION OF
## SAMUEL ADAMS

## DECLARATION:

1.    My name is _Samuel Adams_

2.    I am a Plaintiff in this action.

3.    I make this Declaration based on my personal knowledge.  I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.    To the best of my knowledge, I worked for Defendant, as a poultry-processing laborer in and among others, in the City of Jack, County of Coffee, State of Alabama, from approximately ___3/2006___ until ___Present___.  As a poultry-processing laborer, I was specifically employed by Defendant to assist in the production and/or processing of poultry for Defendant and its customers.  In this capacity, the Defendant paid me on an hourly basis.

5.    During my employment with Defendant, I personally observed, on a daily basis, that hourly processing employees primarily work in two (2) general areas: (1.) 1st processing, where poultry is placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled; or (2.) 2nd processing, where poultry after completing 1st processing, is placed or hung on lines and is further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc... for delivery to plant customers.  Because the work we perform admittedly is unskilled, it is similar in nature regardless of hourly employees' titles, supervisor or department.  That is, all hourly employees are interchangeable and therefore are required to work open positions throughout the plant on a daily basis as production requirements dictate.

6.    During my entire employment with Defendant, I was not fully paid for required pre-production line and post-production line activities that are necessary, integral, and indispensable to my overall employment responsibilities.  Such as the time it takes to clear security and the

compensable walk time that ensues thereafter; donning and doffing protective and sanitary equipment; cleaning and sanitizing that equipment, as well as myself; wait time associated with cleaning and sanitizing equipment, as well as myself; walking to and from the production line from my locker, or dressing area after already performing compensable activities; time deducted as unpaid breaks, that due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable; waiting in line to return required supplies, tools, and other equipment needed for line activities; time spent waiting at the line prior to the start of the master time clock; time spent continuing work after the master time clock has stopped; and time spent walking to, and clearing, security at the end of the day.

7.    As further evidence of my similarity to my co-laborers, both in 1st and 2nd processing, I also personally observed that "hours worked" for my co-laborers and me is/was recorded under a wage compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked.   Instead, hours worked are recorded under a system known as line time, master time, master key, gang time, etc... (generally referred to as "master time"), where hours recorded by Defendant are reflected by the swiping and/or recording of time by a supervisor and/or manager of Defendant, that simultaneously clocks multiple employees in and out during the workday, regardless of the actual time worked by my co-laborers and myself.

8.    As a result of this practice, Defendant failed to pay me in full, for all hours worked.  Since Defendant failed to properly count all hours worked, in those weeks that Defendant recorded I worked over forty (40) hours, I am owed overtime for those hours. Alternatively, in those weeks in which Defendant recorded I worked less than forty (40) hours, but had Defendant properly counted all hours worked, I would have worked over forty (40) hours, I am likewise owed overtime for those hours over forty (40).

9.    During my employment with Defendant, and as described above, I personally observed that there were numerous co-employees with whom I

2

worked, that: (a) performed the same or similar job duties as I performed; (b) worked the same amount of hours that I worked per workweek; and (c) were paid in the same illegal manner in which I was paid (not receiving pay for work described in ¶¶7-8 above). To my knowledge, there are/were hundreds of individuals employed by Defendant who have been subjected to the illegal pay practices described above, many of which already have joined this lawsuit.

10.   I personally am aware that other and additional current and former hourly processing employees will join this litigation if they are given notice of it and an opportunity to join it. Numerous employees have expressed their desire to join this litigation, but have not done so to date because of fear of retaliation by Defendant and its managers. To that end, Defendant and its managers have attempted to discourage and/or intimidate my co-workers from joining this lawsuit by issuing both express and implied threats involving job security.

11.   I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the ___3___ day of ___March___, 2007.


___Samuel Adams___
PLAINTIFF'S NAME

___Samuel Adams___
PLAINTIFF'S SIGNATURE

3

STATE OF ALABAMA,

COUNTY OF PIKE.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3rd day of March, 2007.

[SEAL]

NOTARY PUBLIC

My Commission Expires:  01/17/2011

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
### NORTHERN DIVISION

| | | |
|---|---|---|
| DARREN ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 2:06-cv-00951-MEF-DRB |
| | § | |
| WAYNE FARMS LLC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

## AFFIDAVITS/DECLARATIONS OF

### KEVIN K. KEITH, MICHAEL LAWRENCE, RUBY STEPHENS, DARLENE SULLEN, ARTRICA MOORE, KATRINA MURRAY, THELMA D. PEEBLES.

## DECLARATION:

1.    My name is Kevin K. Keith.

2.    I am a Plaintiff in this action.

3.    I make this Declaration based on my personal knowledge.  I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.    To the best of my knowledge, I worked for Defendant, as a poultry-processing laborer in and among others, in the City of Union Springs, County of Bullock, State of AL, from approximately 03-08-00 until President.  As a poultry-processing laborer, I was specifically employed by Defendant to assist in the production and/or processing of poultry for Defendant and its customers.  In this capacity, the Defendant paid me on an hourly basis.

5.    During my employment with Defendant, I personally observed, on a daily basis, that hourly processing employees primarily work in two (2) general areas: (1.) 1st processing, where poultry is placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled; or (2.) 2nd processing, where poultry after completing 1st processing, is placed or hung on lines and is further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc... for delivery to plant customers.  Because the work we perform admittedly is unskilled, it is similar in nature regardless of hourly employees' titles, supervisor or department.  That is, all hourly employees are interchangeable and therefore are required to work open positions throughout the plant on a daily basis as production requirements dictate.

6.    During my entire employment with Defendant, I was not fully paid for required pre-production line and post-production line activities that are necessary, integral, and indispensable to my overall employment responsibilities.  Such as the time it takes to clear security and the

compensable walk time that ensues thereafter; donning and doffing protective and sanitary equipment; cleaning and sanitizing that equipment, as well as myself; wait time associated with cleaning and sanitizing equipment, as well as myself; walking to and from the production line from my locker, or dressing area after already performing compensable activities; time deducted as unpaid breaks, that due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable; waiting in line to return required supplies, tools, and other equipment needed for line activities; time spent waiting at the line prior to the start of the master time clock; time spent continuing work after the master time clock has stopped; and time spent walking to, and clearing, security at the end of the day.

7.   As further evidence of my similarity to my co-laborers, both in 1st and 2nd processing, I also personally observed that "hours worked" for my co-laborers and me is/was recorded under a wage compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked.   Instead, hours worked are recorded under a system known as line time, master time, master key, gang time, etc... (generally referred to as "master time"), where hours recorded by Defendant are reflected by the swiping and/or recording of time by a supervisor and/or manager of Defendant, that simultaneously clocks multiple employees in and out during the workday, regardless of the actual time worked by my co-laborers and myself.

8.   As a result of this practice, Defendant failed to pay me in full, for all hours worked.  Since Defendant failed to properly count all hours worked, in those weeks that Defendant recorded I worked over forty (40) hours, I am owed overtime for those hours. Alternatively, in those weeks in which Defendant recorded I worked less than forty (40) hours, but had Defendant properly counted all hours worked, I would have worked over forty (40) hours, I am likewise owed overtime for those hours over forty (40).

9.   During my employment with Defendant, and as described above, I personally observed that there were numerous co-employees with whom I

2

worked, that: (a) performed the same or similar job duties as I performed; (b) worked the same amount of hours that I worked per workweek; and (c) were paid in the same illegal manner in which I was paid (not receiving pay for work described in ¶¶7-8 above). To my knowledge, there are/were hundreds of individuals employed by Defendant who have been subjected to the illegal pay practices described above, many of which already have joined this lawsuit.

10.    I personally am aware that other and additional current and former hourly processing employees will join this litigation if they are given notice of it and an opportunity to join it. Numerous employees have expressed their desire to join this litigation, but have not done so to date because of fear of retaliation by Defendant and its managers. To that end, Defendant and its managers have attempted to discourage and/or intimidate my co-workers from joining this lawsuit by issuing both express and implied threats involving job security.

11.    I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the ___10___ day of ___February___, 2007.


___Kevin K. Keith___
**PLAINTIFF'S NAME**

___X Kevin K. Keith___
**PLAINTIFF'S SIGNATURE**

3

STATE OF ALABAMA,

COUNTY OF BULLOCK.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforesaid, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 10th day of February, 2007.

_____

NOTARY PUBLIC

My Commission Expires: 01/17/2011

FILED

2007 Mar-02 AM 10:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## DECLARATION:

1.    My name is *Billy Ray Brooks* .

2.    I am a Plaintiff in this action.

3.    I make this Declaration based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.    To the best of my knowledge, I worked for Defendant, as a poultry-processing laborer in and among others, in the City of Boaz, in the County of *Marshall* , State of Alabama, from approximately *11-1989* until *Present* . As a poultry-processing laborer, I was specifically employed by Defendant to assist in the production and/or processing of poultry for Defendant and its customers. In this capacity, the Defendant paid me on an hourly basis.

5.    During my employment with Defendant, I personally observed, on a daily basis, that hourly processing employees primarily work in two (2) general areas: (1.) 1st processing, where poultry is placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled; or (2.) 2nd processing, where poultry after completing 1st processing, is placed or hung on lines and is further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc... for delivery to plant customers. Because the work we perform admittedly is unskilled, it is similar in nature regardless of hourly employees' titles, supervisor or department. That is, all hourly employees are *interchangeable* and therefore are required to work open positions throughout the plant on a daily basis as production requirements dictate.

6.    During my entire employment with Defendant, I was not fully paid for required pre-production line and post-production line activities that are necessary, integral, and indispensable to my overall employment responsibilities. Such as the time it takes to clear security and the

compensable walk time that ensues thereafter; donning and doffing protective and sanitary equipment; cleaning and sanitizing that equipment, as well as myself; wait time associated with cleaning and sanitizing equipment, as well as myself; walking to and from the production line from my locker, or dressing area after already performing compensable activities; time deducted as unpaid breaks, that due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable; waiting in line to return required supplies, tools, and other equipment needed for line activities; time spent waiting at the line prior to the start of the master time clock; time spent continuing work after the master time clock has stopped; and time spent walking to, and clearing, security at the end of the day.

7.    As further evidence of my similarity to my co-laborers, both in 1st and 2nd processing, I also personally observed that "hours worked" for my co-laborers and me is/was recorded under a wage compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked.   Instead, hours worked are recorded under a system known as line time, master time, master key, gang time, etc... (generally referred to as "master time"), where hours recorded by Defendant are reflected by the swiping and/or recording of time by a supervisor and/or manager of Defendant, that simultaneously clocks multiple employees in and out during the workday, regardless of the actual time worked by my co-laborers and myself.

8.    As a result of this practice, Defendant failed to pay me in full, for all hours worked.  Since Defendant failed to properly count all hours worked, in those weeks that Defendant recorded I worked over forty (40) hours, I am owed overtime for those hours. Alternatively, in those weeks in which Defendant recorded I worked less than forty (40) hours, but had Defendant properly counted all hours worked, I would have worked over forty (40) hours, I am likewise owed overtime for those hours over forty (40).

9.    During my employment with Defendant, and as described above, I personally observed that there were numerous co-employees with whom I

2

worked, that: (a) performed the same or similar job duties as I performed; (b) worked the same amount of hours that I worked per workweek; and (c) were paid in the same illegal manner in which I was paid (not receiving pay for work described in ¶¶7-8 above). To my knowledge, there are/were hundreds of individuals employed by Defendant who have been subjected to the illegal pay practices described above, many of which already have joined this lawsuit.

10.    I personally am aware that other and additional current and former hourly processing employees will join this litigation if they are given notice of it and an opportunity to join it. Numerous employees have expressed their desire to join this litigation, but have not done so to date because of fear of retaliation by Defendant and its managers. To that end, Defendant and its managers have attempted to discourage and/or intimidate my co-workers from joining this lawsuit by issuing both express and implied threats involving job security.

11.    I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 17th day of February, 2007.


*Billy Ray Brooks*
PLAINTIFF'S NAME

X *Billy R Brooks*
PLAINTIFF'S SIGNATURE

3

STATE OF ALABAMA,

COUNTY OF MARSHALL.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the ____17th____ day of February, 2007.

[SEAL]

_____
NOTARY PUBLIC

My Commission Expires: __01|17|2011__

4

FILED

2007 Mar-02 AM 10:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## DECLARATION:

1.      My name is *MARie Delgado*.

2.      I am a Plaintiff in this action.

3.      I make this Declaration based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.      To the best of my knowledge, I worked for Defendant, as a poultry-processing laborer in and among others, in the City of Guntersville, County of Marshall, State of Alabama, from approximately *01-02-97* until *Present*. As a poultry-processing laborer, I was specifically employed by Defendant to assist in the production and/or processing of poultry for Defendant and its customers. In this capacity, the Defendant paid me on an hourly basis.

5.      During my employment with Defendant, I personally observed, on a daily basis, that hourly processing employees primarily work in two (2) general areas: (1.) 1st processing, where poultry is placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled; or (2.) 2nd processing, where poultry after completing 1st processing, is placed or hung on lines and is further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc... for delivery to plant customers. Because the work we perform admittedly is unskilled, it is similar in nature regardless of hourly employees' titles, supervisor or department. That is, all hourly employees are interchangeable and therefore are required to work open positions throughout the plant on a daily basis as production requirements dictate.

6.      During my entire employment with Defendant, I was not fully paid for required pre-production line and post-production line activities that are necessary, integral, and indispensable to my overall employment responsibilities. Such as the time it takes to clear security and the

compensable walk time that ensues thereafter; donning and doffing protective and sanitary equipment; cleaning and sanitizing that equipment, as well as myself; wait time associated with cleaning and sanitizing equipment, as well as myself; walking to and from the production line from my locker, or dressing area after already performing compensable activities; time deducted as unpaid breaks, that due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable; waiting in line to return required supplies, tools, and other equipment needed for line activities; time spent waiting at the line prior to the start of the master time clock; time spent continuing work after the master time clock has stopped; and time spent walking to, and clearing, security at the end of the day.

7.    As further evidence of my similarity to my co-laborers, both in 1st and 2nd processing, I also personally observed that "hours worked" for my co-laborers and me is/was recorded under a wage compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked.    Instead, hours worked are recorded under a system known as line time, master time, master key, gang time, etc... (generally referred to as "master time"), where hours recorded by Defendant are reflected by the swiping and/or recording of time by a supervisor and/or manager of Defendant, that simultaneously clocks multiple employees in and out during the workday, regardless of the actual time worked by my co-laborers and myself.

8.    As a result of this practice, Defendant failed to pay me in full, for all hours worked.  Since Defendant failed to properly count all hours worked, in those weeks that Defendant recorded I worked over forty (40) hours, I am owed overtime for those hours. Alternatively, in those weeks in which Defendant recorded I worked less than forty (40) hours, but had Defendant properly counted all hours worked, I would have worked over forty (40) hours, I am likewise owed overtime for those hours over forty (40).

9.    During my employment with Defendant, and as described above, I personally observed that there were numerous co-employees with whom I

2

worked, that: (a) performed the same or similar job duties as I performed; (b) worked the same amount of hours that I worked per workweek; and (c) were paid in the same illegal manner in which I was paid (not receiving pay for work described in ¶¶7-8 above). To my knowledge, there are/were hundreds of individuals employed by Defendant who have been subjected to the illegal pay practices described above, many of which already have joined this lawsuit.

10. I personally am aware that other and additional current and former hourly processing employees will join this litigation if they are given notice of it and an opportunity to join it. Numerous employees have expressed their desire to join this litigation, but have not done so to date because of fear of retaliation by Defendant and its managers. To that end, Defendant and its managers have attempted to discourage and/or intimidate my co-workers from joining this lawsuit by issuing both express and implied threats involving job security.

11. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the _17th_ day of February, 2007.


MARiE Delgado
PLAINTIFF'S NAME

X Marie Delgado
PLAINTIFF'S SIGNATURE

3

STATE OF ALABAMA,

COUNTY OF MARSHALL.

     I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

     Given under my hand and official seal this the _____17th_____ day of February, 2007.

[SEAL]

                     _____

                     NOTARY PUBLIC

                     My Commission Expires: 01|17|2011

4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA,
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JIMMY W. BELUE, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 4:06-cv-02095-RDP |
| | § | |
| WAYNE FARMS LLC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

## AFFIDAVITS/DECLARATIONS OF
LARCENA CARLISLE, MARTIN CHAMBERS, JEFFREY
CHANDLER, JIMMY J. GLOVER, CAROLYN A. GURLEY,
CAROLYN S. HOGELAND, WENDY L. MENDEL, MAGDALENA
MIGUEL, BETTY M. MORGAN, JUDY OLIVER, BRUCE THURMAN
POE, BETTY TIPTON, JENIFER RENEE WYNN.

# DECLARATION:

1.    My name is _Larcena Carlisle_.

2.    I am a Plaintiff in this action.

3.    I make this Declaration based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.    To the best of my knowledge, I worked for Defendant, as a poultry-processing laborer in and among others, in the City of Albertville, County of Marshall, State of Alabama, from approximately _11-30-88_ until _Present_. As a poultry-processing laborer, I was specifically employed by Defendant to assist in the production and/or processing of poultry for Defendant and its customers. In this capacity, the Defendant paid me on an hourly basis.

5.    During my employment with Defendant, I personally observed, on a daily basis, that hourly processing employees primarily work in two (2) general areas: (1.) 1st processing, where poultry is placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled; or (2.) 2nd processing, where poultry after completing 1st processing, is placed or hung on lines and is further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc... for delivery to plant customers. Because the work we perform admittedly is unskilled, it is similar in nature regardless of hourly employees' titles, supervisor or department. That is, all hourly employees are interchangeable and therefore are required to work open positions throughout the plant on a daily basis as production requirements dictate.

6.    During my entire employment with Defendant, I was not fully paid for required pre-production line and post-production line activities that are necessary, integral, and indispensable to my overall employment responsibilities. Such as the time it takes to clear security and the

compensable walk time that ensues thereafter; donning and doffing protective and sanitary equipment; cleaning and sanitizing that equipment, as well as myself; wait time associated with cleaning and sanitizing equipment, as well as myself; walking to and from the production line from my locker, or dressing area after already performing compensable activities; time deducted as unpaid breaks, that due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable; waiting in line to return required supplies, tools, and other equipment needed for line activities; time spent waiting at the line prior to the start of the master time clock; time spent continuing work after the master time clock has stopped; and time spent walking to, and clearing, security at the end of the day.

7.     As further evidence of my similarity to my co-laborers, both in 1st and 2nd processing, I also personally observed that "hours worked" for my co-laborers and me is/was recorded under a wage compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked.   Instead, hours worked are recorded under a system known as line time, master time, master key, gang time, etc... (generally referred to as "master time"), where hours recorded by Defendant are reflected by the swiping and/or recording of time by a supervisor and/or manager of Defendant, that simultaneously clocks multiple employees in and out during the workday, regardless of the actual time worked by my co-laborers and myself.

8.     As a result of this practice, Defendant failed to pay me in full, for all hours worked.  Since Defendant failed to properly count all hours worked, in those weeks that Defendant recorded I worked over forty (40) hours, I am owed overtime for those hours. Alternatively, in those weeks in which Defendant recorded I worked less than forty (40) hours, but had Defendant properly counted all hours worked, I would have worked over forty (40) hours, I am likewise owed overtime for those hours over forty (40).

9.     During my employment with Defendant, and as described above, I personally observed that there were numerous co-employees with whom I

2

worked, that: (a) performed the same or similar job duties as I performed; (b) worked the same amount of hours that I worked per workweek; and (c) were paid in the same illegal manner in which I was paid (not receiving pay for work described in ¶¶7-8 above). To my knowledge, there are/were hundreds of individuals employed by Defendant who have been subjected to the illegal pay practices described above, many of which already have joined this lawsuit.

10.    I personally am aware that other and additional current and former hourly processing employees will join this litigation if they are given notice of it and an opportunity to join it. Numerous employees have expressed their desire to join this litigation, but have not done so to date because of fear of retaliation by Defendant and its managers. To that end, Defendant and its managers have attempted to discourage and/or intimidate my co-workers from joining this lawsuit by issuing both express and implied threats involving job security.

11.    I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on this the ___16th___ day of February, 2007.


_Larcena Carlisle_
**PLAINTIFF'S NAME**

_Larena Carlisle_
**PLAINTIFF'S SIGNATURE**

3

STATE OF ALABAMA,

COUNTY OF MARSHALL.


I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the _____16th_____ day of February, 2007.

[SEAL]

_____
NOTARY PUBLIC

My Commission Expires: **01|17|2011**

4

## DECLARATION:

1.  My name is ___Martin Chambers___.

2.  I am a Plaintiff in this action.

3.  I make this Declaration based on my personal knowledge.  I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.  To the best of my knowledge, I worked for Defendant, as a poultry-processing laborer in and among others, in the City of Albertville, County of Marshall, State of Alabama, from approximately ___08-04-88___ until ___Present___.  As a poultry-processing laborer, I was specifically employed by Defendant to assist in the production and/or processing of poultry for Defendant and its customers.  In this capacity, the Defendant paid me on an hourly basis.

5.  During my employment with Defendant, I personally observed, on a daily basis, that hourly processing employees primarily work in two (2) general areas: (1.) 1st processing, where poultry is placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled; or (2.) 2nd processing, where poultry after completing 1st processing, is placed or hung on lines and is further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc... for delivery to plant customers.  Because the work we perform admittedly is unskilled, it is similar in nature regardless of hourly employees' titles, supervisor or department.  That is, all hourly employees are interchangeable and therefore are required to work open positions throughout the plant on a daily basis as production requirements dictate.

6.  During my entire employment with Defendant, I was not fully paid for required pre-production line and post-production line activities that are necessary, integral, and indispensable to my overall employment responsibilities.  Such as the time it takes to clear security and the

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA,
### NORTHEASTERN DIVISION

JAMES E. BOLDEN, et al.,                §
                                        §
        Plaintiffs,                     §
                                        §          CIVIL ACTION NO.
                                        §          5:06-cv-02096-IPJ
v.                                      §
                                        §
WAYNE FARMS LLC.,                       §
                                        §
        Defendant.                      §
                                        §

## AFFIDAVITS/DECLARATIONS OF
### BESSIE M. BAILEY, CHERYL BOLDEN, JAMES EDWARD BOLDEN, PATSY MAE COOPER, ANGELA DOUGLAS, ANITA ELLIOT, CAROLYN FRANKLIN, JOSEPH FRANKLIN HAMPTON, EVA MAE JONES, GLADYS MATHEWS.

## DECLARATION:

1.  My name is _Bessie M. Bailey_ .

2.  I am a Plaintiff in this action.

3.  I make this Declaration based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.  To the best of my knowledge, I worked for Defendant, as a poultry-processing laborer in and among others, in the City of _Decatur_ , County of _Morgan_ , State of _AL_ , from approximately _January 1990_ until _present_ . As a poultry-processing laborer, I was specifically employed by Defendant to assist in the production and/or processing of poultry for Defendant and its customers. In this capacity, the Defendant paid me on an hourly basis.

5.  During my employment with Defendant, I personally observed, on a daily basis, that hourly processing employees primarily work in two (2) general areas: (1.) 1st processing, where poultry is placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled; or (2.) 2nd processing, where poultry after completing 1st processing, is placed or hung on lines and is further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc... for delivery to plant customers. Because the work we perform admittedly is unskilled, it is similar in nature regardless of hourly employees' titles, supervisor or department. That is, all hourly employees are interchangeable and therefore are required to work open positions throughout the plant on a daily basis as production requirements dictate.

6.  During my entire employment with Defendant, I was not fully paid for required pre-production line and post-production line activities that are necessary, integral, and indispensable to my overall employment responsibilities. Such as the time it takes to clear security and the

compensable walk time that ensues thereafter; donning and doffing protective and sanitary equipment; cleaning and sanitizing that equipment, as well as myself; wait time associated with cleaning and sanitizing equipment, as well as myself; walking to and from the production line from my locker, or dressing area after already performing compensable activities; time deducted as unpaid breaks, that due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable; waiting in line to return required supplies, tools, and other equipment needed for line activities; time spent waiting at the line prior to the start of the master time clock; time spent continuing work after the master time clock has stopped; and time spent walking to, and clearing, security at the end of the day.

7.    As further evidence of my similarity to my co-laborers, both in 1st and 2nd processing, I also personally observed that "hours worked" for my co-laborers and me is/was recorded under a wage compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked.    Instead, hours worked are recorded under a system known as line time, master time, master key, gang time, etc... (generally referred to as "master time"), where hours recorded by Defendant are reflected by the swiping and/or recording of time by a supervisor and/or manager of Defendant, that simultaneously clocks multiple employees in and out during the workday, regardless of the actual time worked by my co-laborers and myself.

8.    As a result of this practice, Defendant failed to pay me in full, for all hours worked.  Since Defendant failed to properly count all hours worked, in those weeks that Defendant recorded I worked over forty (40) hours, I am owed overtime for those hours. Alternatively, in those weeks in which Defendant recorded I worked less than forty (40) hours, but had Defendant properly counted all hours worked, I would have worked over forty (40) hours, I am likewise owed overtime for those hours over forty (40).

9.    During my employment with Defendant, and as described above, I personally observed that there were numerous co-employees with whom I

2

worked, that: (a) performed the same or similar job duties as I performed; (b) worked the same amount of hours that I worked per workweek; and (c) were paid in the same illegal manner in which I was paid (not receiving pay for work described in ¶¶7-8 above). To my knowledge, there are/were hundreds of individuals employed by Defendant who have been subjected to the illegal pay practices described above, many of which already have joined this lawsuit.

10.    I personally am aware that other and additional current and former hourly processing employees will join this litigation if they are given notice of it and an opportunity to join it. Numerous employees have expressed their desire to join this litigation, but have not done so to date because of fear of retaliation by Defendant and its managers. To that end, Defendant and its managers have attempted to discourage and/or intimidate my co-workers from joining this lawsuit by issuing both express and implied threats involving job security.

11.    I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the ___10th___ day of ___February___, 2007.


___Bessie M. Bailey___
**PLAINTIFF'S NAME**

___X Bessie M. Bailey___
**PLAINTIFF'S SIGNATURE**

3

STATE OF _Alabama_ ,
COUNTY OF _Morgan_ .

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that _Bessie M. Bailey_, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the _10th_ day of _February_, 2007.

[SEAL]

_Sheri R. Hughes_
NOTARY PUBLIC

My Commission Expires: _01-11-2011_

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA,
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| IRENE BENFORD, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 5:06-cv-02337-TMP |
| | § | |
| PILGRIM'S PRIDE CORP., | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT / DECLARATION OF
### <u>JUNE B. FUQUA</u>

## DECLARATION:

1.   My name is _June B. Fuqua_.

2.   I am a Plaintiff in this action.

3.   I make this Declaration based on my personal knowledge.  I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.   To the best of my knowledge, I worked for Defendant, as a poultry-processing laborer in and among others, in the City of _Athens_, County of _Limestone_, State of _AL_, from approximately _July 7, 1987_ until _Present_.  As a poultry-processing laborer, I was specifically employed by Defendant to assist in the production and/or processing of poultry for Defendant and its customers.  In this capacity, the Defendant paid me on an hourly basis.

5.   During my employment with Defendant, I personally observed, on a daily basis, that hourly processing employees primarily work in two (2) general areas: (1.) 1st processing, where poultry is placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled; or (2.) 2nd processing, where poultry after completing 1st processing, is placed or hung on lines and is further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc... for delivery to plant customers.  Because the work we perform admittedly is unskilled, it is similar in nature regardless of hourly employees' titles, supervisor or department.  That is, all hourly employees are interchangeable and therefore are required to work open positions throughout the plant on a daily basis as production requirements dictate.

6.   During my entire employment with Defendant, I was not fully paid for required pre-production line and post-production line activities that are necessary, integral, and indispensable to my overall employment responsibilities.  Such as the time it takes to clear security and the

compensable walk time that ensues thereafter; donning and doffing protective and sanitary equipment; cleaning and sanitizing that equipment, as well as myself; wait time associated with cleaning and sanitizing equipment, as well as myself; walking to and from the production line from my locker, or dressing area after already performing compensable activities; time deducted as unpaid breaks, that due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable; waiting in line to return required supplies, tools, and other equipment needed for line activities; time spent waiting at the line prior to the start of the master time clock; time spent continuing work after the master time clock has stopped; and time spent walking to, and clearing, security at the end of the day.

7.     As further evidence of my similarity to my co-laborers, both in 1st and 2nd processing, I also personally observed that "hours worked" for my co-laborers and me is/was recorded under a wage compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked.     Instead, hours worked are recorded under a system known as line time, master time, master key, gang time, etc... (generally referred to as "master time"), where hours recorded by Defendant are reflected by the swiping and/or recording of time by a supervisor and/or manager of Defendant, that simultaneously clocks multiple employees in and out during the workday, regardless of the actual time worked by my co-laborers and myself.

8.     As a result of this practice, Defendant failed to pay me in full, for all hours worked.  Since Defendant failed to properly count all hours worked, in those weeks that Defendant recorded I worked over forty (40) hours, I am owed overtime for those hours. Alternatively, in those weeks in which Defendant recorded I worked less than forty (40) hours, but had Defendant properly counted all hours worked, I would have worked over forty (40) hours, I am likewise owed overtime for those hours over forty (40).

9.     During my employment with Defendant, and as described above, I personally observed that there were numerous co-employees with whom I

2

worked, that: (a) performed the same or similar job duties as I performed; (b) worked the same amount of hours that I worked per workweek; and (c) were paid in the same illegal manner in which I was paid (not receiving pay for work described in ¶¶7-8 above).  To my knowledge, there are/were hundreds of individuals employed by Defendant who have been subjected to the illegal pay practices described above, many of which already have joined this lawsuit.

10.     I personally am aware that other and additional current and former hourly processing employees will join this litigation if they are given notice of it and an opportunity to join it.  Numerous employees have expressed their desire to join this litigation, but have not done so to date because of fear of retaliation by Defendant and its managers.  To that end, Defendant and its managers have attempted to discourage and/or intimidate my co-workers from joining this lawsuit by issuing both express and implied threats involving job security.

11.     I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the ___10___ day of ___February___, 2007.


___June B. Fiqua___
PLAINTIFF'S NAME

x ___June B. Fiqua___
PLAINTIFF'S SIGNATURE

3

STATE OF _Alabama_ ,
COUNTY OF _Morgan_ .

    I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that _June B. Fuqua_ , whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal this the ___10___ day of ___
_February_ , 2007.

[SEAL]

                       _Sheri R. Hughes_
                       NOTARY PUBLIC

                       My Commission Expires: __01-11-2011__

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.      )
                                      )
          **Plaintiffs,**      )
                                      )    **Case No.: 1:06-CV-1000-MEF-WC**
**v.**                            )
                                      )
**PERDUE FARMS INCORPORATED,**    )
                                      )
          **Defendant.**      )

**PLAINTIFF CORNELIA THORNTON'S RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES**

**COMES NOW** the Plaintiff, Cornelia Thornton, and offers the foregoing responses to

Defendant's First Set of Interrogatories:

**GENERAL OBJECTIONS**

1.      Plaintiff reserves her right to supplement or amend her responses to these

Interrogatories with any and all relevant information that may come to her attention as the

discovery process continues, as allowed or required by the Federal Rules of Civil Procedure.

2.      Plaintiff objects to the Interrogatories (including definitions and/or instructions) to

the extent that they seek to impose duties or obligations beyond those required by the Federal

Rules of Civil Procedure.

3.      Plaintiff objects to these Interrogatories on the grounds many of them contain

subparts, therefore, they exceed the maximum number of Interrogatories permitted under Rule

33.

4.      Plaintiff objects to the Interrogatories in their entirety to the extent that they (1)

seek information that is neither relevant to this action nor reasonably calculated to lead to

discovery of admissible evidence, or are (2) ambiguous, (3) overly broad, (4) unduly burdensome and/or (5) harassing.

5.     Plaintiff objects to the Interrogatories on the grounds that they are overly broad, harassing, and unduly burdensome to the extent that they seek information already in Defendant's possession.

6.     Plaintiff objects to any Interrogatory that calls for information protected by the attorney-client privilege, the attorney work product doctrine, the trade secrets privilege, the party communications privilege, or any other applicable evidentiary privilege provided by federal law.

7.     Any response herein is subject to the objections set forth above, as well as to any specific objections listed in the response. Neither the failure to make a specific objection to a particular Interrogatory on the basis set forth above, nor any answer given by Defendant to such Interrogatory shall constitute a waiver of any general or specific objection made herein or any waiver of objections to admissibility of future use, including, but not limited to, trial.

Subject to and without waiver of the foregoing General Objections, which are incorporated by reference in each of the following responses, Plaintiff specifically responds and objects as follows:

## ANSWERS AND OBJECTIONS TO INTERROGATORIES

### Interrogatory No. 1:

Identify each individual whom you or any representative acting on your behalf believe has knowledge or information concerning this action, including but not limited to the subject matter of this action, the injuries claimed, the damages sought and/or any of the allegations contained in Plaintiffs' Amended Complaint. Please specify the substance of the knowledge and the date of your most recent communication with each such individual.

**Response to Interrogatory No. 1:**

**Plaintiff objects to this response to the extent it calls for information that is protected by the attorney-client privilege and work-product doctrine. Plaintiff further objects that the information requested exceeds the burdens placed on her by the Federal Rules of Civil Procedure and that the form requested should be interpreted as multiple sub-parts and count toward the total number of interrogatories allowed. Without waiving said objections, plaintiff states that she is not aware of any individuals, beyond the named parties and Perdue Farms employees, who may have information responsive to this request. Plaintiff will supplement this response if it becomes necessary.**

**Interrogatory No. 2:**

Identify each individual whom you or any representative acting on your behalf have communicated, spoken or otherwise corresponded with about this action, including, but not limited to, any communication or correspondence regarding joining or in any other way being involved in or becoming a part of this action. Please specify the substance of each communication and the date of your most recent communication with each such individual.

**Response to Interrogatory No. 2:**

**Plaintiff objects to this response to the extent it calls for information that is protected by the attorney-client privilege and work-product doctrine. Plaintiff further objects that the information requested exceeds the burdens placed on her by the Federal Rules of Civil Procedure and that the form requested should be interpreted as multiple sub-parts and count toward the total number of interrogatories allowed. Without waiving said objections, plaintiff states that she is not aware of any individuals, beyond the named parties, and Perdue Farms employees that may have information responsive to this request. Plaintiff will supplement this response if it becomes necessary.**

**Interrogatory No. 3:**

Identify every job you have held at Defendant's Dothan, Alabama, facility between January 2004, and the present, and for every job identified, please describe in detail your work and non-work duties, beginning from the time you arrived at the Dothan, Alabama, facility and began to work, and ending with the time you finished work and then left the Dothan, Alabama, facility, including but not limited to, your travel time, break time (approximate start and stop time of each break); meal period (approximate state and stop time of each meal period), and donning and doffing activities.

### Response to Interrogatory No. 3:

**Plaintiff is not in possession of the information requested nor is she able to complete the information in the manner requested. Plaintiff believes that the information requested can be accurately (but perhaps not exactly) formulated only after Defendant produces the payroll and employment records it maintains. In addition, this information will be given through expert testimony. Plaintiff will attempt to supplement this response if it is necessary when said information is produced. Plaintiff states that she has worked in multiple areas of the plant. Plaintiff has worked jobs outside her job title as production needs dictate. At the time of signing her opt-in consent, Plaintiff believes her job was titled Debone worker. Plaintiff cannot name all positions she has worked while employed due to the numerous jobs worked at varying times. Plaintiff states Defendant should be in possession of documentation showing positions worked and corresponding time periods.**

### Interrogatory No. 4:

For the period of your employment with Defendant since January 2004, identify your supervisors and the dates they supervised you, and all positions you held and the dates that you held them.

### Response to Interrogatory No. 4:

**Plaintiff believes that the information requested can be accurately (but perhaps not exactly) formulated only after Defendant produces the payroll and employment records it maintains. Plaintiff will attempt to supplement this response if it is necessary when said information is produced without waiving these objections the plaintiff states that her supervisors were Sharon Melton, Jeff Shock, and George Cooper and the position she held was Debone worker.**

### Interrogatory No. 5:

From January 1, 2004, to the present, relative to each week in which you claim that you worked for Defendant "in excess of forty (40) hours per week," please provide the following information:

    (a)    Identify each such work week by the date (i.e. day, month and year) of the first day of the work week;

    (b)    Identify which hour(s), and on which day(s), you allege to have worked overtime; and

    (c)    Identify the witness(es) who were present on each occasion (identified above) that you performed overtime work.

**Response to Interrogatory No. 5:**

**Plaintiff states that she is not in possession of the information necessary to answer fully the request and that currently she is not able to complete the information in the manner requested. Plaintiff believes that the information requested can be accurately (but perhaps not exactly) formulated only after Defendant produces the payroll and employment records as well as payroll policies it maintains.**

**Interrogatory No. 6:**

With respect to the claims set forth in Plaintiffs' Amended Complaint, identify each type of damage you allegedly suffered, other than damages for unpaid wages, and for each damage identified, specify the amount of the damages, the pay period(s) in which the damages are alleged to have arisen, and the method(s) of calculating or computing each category of damage.

**Response to Interrogatory No. 6:**

**The estimated damages for Plaintiff cannot be derived without review of the time and pay records believed to be in Defendant's possession. Similarly, Plaintiff believes he may have to obtain an expert to accurately provide this information. Plaintiffs cannot obtain an expert until they receive this data. Plaintiff believes that she is entitled to receive one and one-half hours pay for every hour worked each week, in excess of 40 hours. Plaintiff believes she is owed money for all uncompensated time. At the very least, Plaintiff is entitled to the statutory minimum allowed by law for each hour worked less that 40 hours. Plaintiff believes she is entitled to liquidated damages in an amount equal to their compensatory damages. At this time, Plaintiff cannot reasonably ascertain any estimate of claims for costs or attorneys' fees.**

**Interrogatory No. 7:**

Identify all individuals, including experts, whom you or any other person on your behalf believe may be called as a witness to testify in this case, and, for each such witness, specify the substance of their testimony.

**Response to Interrogatory No. 7:**

**Plaintiff states that she is not aware of any individuals, beyond the named parties, responsive to this request. No determination has been made with regard to expert witnesses. Plaintiff will supplement this response if it becomes necessary.**

**Interrogatory No. 8:**

Identify each handbook, policy, agreement, memoranda, directive, statement or communication, or portion thereof, which you believe support your claims against Defendant.

> **Response to Interrogatory No. 8:**
>
> **Plaintiff states that he/she is not in possession of the information necessary to answer fully the request and that currently she is not able to complete the information in the manner requested. Plaintiff believes that the information requested can be accurately formulated only after Defendant produces the payroll and employment records as well as payroll policies it maintains.**

**Interrogatory No. 9:**

Describe the circumstances when you are required to clock or swipe in and out at the time clocks at any and all times of the day, including before and after break time, from the time you arrive at the Dothan, Alabama, facility and you contend you begin to work, and ending with the time you contend you finish work.

> **Response to Interrogatory No. 9:**
>
> **Plaintiff objects to this response to the extent the form requested exceeds the burdens placed on her by the Federal Rules of Civil Procedure and that the form requested should be interpreted as multiple sub-parts and count toward the total number of interrogatories allowed. For the reasons set forth in Plaintiff's Response to Interrogatory 3, Plaintiff states that she is not currently able to complete the information in the manner requested. Plaintiff states that she is not in possession of the information necessary to answer fully the request and that currently she is not able to complete the information in the manner requested. Plaintiff believes that the information requested can be accurately (but perhaps not exactly) formulated only after Defendant produces the payroll and employment records as well as payroll policies it maintains and Defendant is in possession of the information sought. Plaintiff will attempt to supplement this response when said information is produced.**

**Interrogatory No. 10:**

With respect to the claims set forth in Paragraph 15 of Plaintiffs' Amended Complaint, please provide the following information:

      (a)      Describe how your employment status is verified and documented when you arrive at or depart from the Dothan, Alabama, facility;

      (b)      Describe how your person and personal possessions are searched when you arrive

at or depart from the Dothan, Alabama, facility; and

(c)    Identify how often each work week from 2004 to the present your person and personal possessions have been searched when you arrive at or depart from the Dothan, Alabama, facility.

**Response to Interrogatory No. 10:**

**Plaintiff objects to this Interrogatory on the grounds that it seeks information that is not relevant to any issue in this litigation. Plaintiffs will be amending their Complaint to remove the allegation that passing through security when entering and leaving the facility should be compensable.**

**Interrogatory No. 11:**

Identify the source, including any and all documents, of the allegation, as contained in Paragraph 21 of the Plaintiffs' Amended Complaint, that "as a matter of policy and practice, Perdue does not pay its hourly employee for required pre-production and post-production activities that are necessary and integral to their overall employment responsibilities, such as the time it takes to clear security, donning and doffing of hair nets, beard nets, and ear plugs, cleaning and sanitizing themselves, walking to and from security, and the time spent walking to the designated time clock near the production line and from the time clock area to the smock bin, after already performing compensable activities."

**Response to Interrogatory No. 11:**

**Plaintiff states that she is not in possession of the information necessary to answer fully the request and that currently she is not able to complete the information in the manner requested. This information will be supplied through expert testimony.**

**Interrogatory No. 12:**

Identify the source, including any and all documents, of the allegation, as contained in Paragraph 22 of Plaintiffs' Amended Complaint that you are required to wash and sanitize, don and doff hair nets, beard nets, and ear plugs, and walk a considerable distance to and from time clocks, while on unpaid breaks.

**Response to Interrogatory No. 12:**

**Plaintiff states that she is not in possession of the information necessary to answer fully the request and that currently she is not able to complete the information in the manner requested.**

**Interrogatory No. 13:**

Describe each and every form of "non-unique gear," as reference in Paragraph 25 of Plaintiffs' Amended Complaint, that you allege Defendant requires or required you to wear.

**Response to Interrogatory No. 13:**

**For the reasons set forth in Plaintiff's Response to Interrogatory 5, Plaintiff states that she is not currently able to complete the information in the manner requested. Plaintiff believes that the information requested can be accurately (but perhaps not exactly) formulated only after Defendant produces the payroll and employment records it maintains. Plaintiff will attempt to supplement this response if necessary when said information is produced. The term "required" is vague. Plaintiff states as a Debone worker she utilized or wore smock, ear plugs, bump cap, arm sleeves, boots, protective glasses and gloves all of which she felt the job required.**

**Interrogatory No. 14:**

Identify the source, including any and all documents, of all Company and/or government regulations, referenced in Paragraph 25 of Plaintiffs' Amended Complaint.

**Response to Interrogatory No. 14:**

**Plaintiff states that she is not in possession of the information necessary to answer fully the request and that currently she is not able to complete the information in the manner requested. Plaintiff believes that the information requested can be accurately (but perhaps not exactly) formulated only after Defendant produces the payroll and employment records as well as payroll policies it maintains.**

**Interrogatory No. 15:**

Identify each person in the Perdue facility in Dothan, Alabama, whom you contend has FLSA claims similar to yours.

**Response to Interrogatory No. 15:**

**Plaintiff objects to this Interrogatory to the extent that it seeks information that is in Defendants' possession or is readily available to Defendant and is vague and overly broad. Without waiving said objections, Plaintiff states that she is not aware of Perdue employees with FLSA claims similar to her other than the Plaintiffs in this lawsuit.**

**Interrogatory No. 16:**

If someone assisted you in answering any of these Interrogatories, as to each such Interrogatory identify the individual and the assistance he/she provided, and the name of each and every Plaintiff other than yourself to whom such assistance was provided.

**Response to Interrogatory No. 16:**

**Other than my attorneys, none.**

**Interrogatory No. 17:**

If applicable, identify all employers for whom you have worked since your employment at the Perdue facility in Dothan, Alabama, and for each job state its location, the name(s) of your supervisor(s) and anyone with who you communicated while interviewing or applying for the employment, and the dates of your employment.

**Response to Interrogatory No. 17:**

**Plaintiff objects to this response to the extent it calls for information that is protected by the attorney-client privilege and work-product doctrine. Plaintiff further objects that the information requested exceeds the burdens placed on her by the Federal Rules of Civil Procedure and that the form requested should be interpreted as multiple sub-parts and count toward the total number of interrogatories allowed.**

**Interrogatory No. 18:**

List all of your previous employers from 1998 to the present date, including the dates of each employment, the employers' address, and your job title(s), job duties, and for reasons for leaving the jobs.

**Response to Interrogatory No. 18:**

**Plaintiff objects to this response to the extent it calls for information that is protected by the attorney-client privilege and work-product doctrine. Plaintiff further objects that the information requested exceeds the burdens placed on her by the Federal Rules of Civil Procedure and that the form requested should be interpreted as multiple sub-parts and count toward the total number of interrogatories allowed.**

**Interrogatory No. 19:**

Please state whether you have been involuntarily terminated from a job or asked to leave or resign from a job. If yes, please list those jobs and include the reasons why you were involuntarily terminated and/or asked to leave or resign, the names and addresses of the employers, and the dates you were involuntarily terminated and/or asked to leave or resign.

**Response to Interrogatory No. 19:**

**Plaintiff objects to this Interrogatory on the grounds that it seeks information that is not relevant to any issue in this litigation and not likely to lead to the discovery of admissible evidence.**

## Interrogatory No. 20:

Please state whether you have ever been arrested, and if so, please state the arresting entity, the reasons for the arrest, whether you were convicted, and if so what penalty you received, including whether the crime was a misdemeanor or felony.

### Response to Interrogatory No. 20:

**Plaintiff objects to this Interrogatory on the grounds that it seeks information that is not relevant to any issue in this litigation and not likely to lead to the discovery of admissible evidence.**

## Interrogatory No. 21:

Please state whether you have ever filed for bankruptcy and if so the date you filed for bankruptcy, the type of bankruptcy (e.g., Chapter 7 or 13), and whether you are currently in bankruptcy.

### Response to Interrogatory No. 21:

**Yes. I filed Chapter 13 bankruptcy on 10/01/2002. It was discharged on 09/06/2006.**

Dated: ~~March~~ Oct 4, 2007

Respectfully submitted,

**THE COCHRAN FIRM, P.C.**

**ROBERT J. CAMP**
505 North 20th Street, Suite 825
Birmingham, AL 35203
(205) 930-6900 (Phone)
(205) 930-6910 (Fax)

– and –

Samuel A. Cherry, Jr.
Lance H. Swanner
**THE COCHRAN FIRM, P.C.**
163 West Main Street
P. O. Box 927
Dothan, AL 36302
(334) 793-1555 (Phone)
(334) 793-8280 (Fax)

*Attorneys for Plaintiffs*

| STATE OF ALABAMA | ) |
| --- | --- |
| | ) |
| COUNTY OF HOUSTON | ) |

The undersigned does swear and affirm that the above responses were based on personal knowledge of the undersigned with respect to the questions of which she has personal knowledge and with the assistance of counsel and experts on matters about which she does not have personal knowledge or opinions.

Acknowledged before me this 23 day of September, 2007.

**NOTARY PUBLIC**

My Commission Expires: 4/20/10

## CERTIFICATE OF SERVICE

I hereby certify that on ~~September~~ Oct 8 , 2007, I served copies of the foregoing to all counsel of record by placing a copy of the same in the U. S. Mail, with postage prefixed and addressed as follows:

Brian Z. Liss, Esq.                    Sandra B. Reiss, Esq.
James J. Kelly, Esq.                   OGLETREE, DEAKINS, NASH, SMOAK & STEWART
MORGAN, LEWIS & BOCKIUS                 1819 5th Avenue North
1111 Pennsylvania Avenue, NW            One Federal Place, Suite 1000
Washington, DC 20004                    Birmingham, AL 35203

**ROBERT J. CAMP**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case Action No.:** |
| v. | ) | **1:06-CV-1000-MEF-WC** |
| | ) | **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INCORPORATED,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DECLARATION OF DAVE TABINOWSKI

I, Dave Tabinowski, depose and state the following based on my personal knowledge:

1.     I am currently employed by Perdue Farms, Inc. ("Perdue") as the Company's Internal Audit—Project Lead.  I am also a Certified Internal Auditor.  As Perdue's Internal Audit—Project Lead, I am responsible, inter alia, for auditing and monitoring Perdue's practices related to wage and hour issues including payroll, capturing first and last principal activity, and the Kronos time recording system.

2.     Through my job as Perdue's Internal Audit—Project Lead, I am very familiar with Perdue's time recording and pay practices for hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama, and at Perdue's other locations around the country.  In September 2005 I conducted a routine "First and Last Principal Activity Audit" at Perdue's poultry processing plant in Dothan, Alabama, and I returned in March 2007 to conduct an additional on-site review.  As a result, I know how hourly poultry processing employees in Dothan are paid and how their time is recorded.

3.     Perdue's poultry processing plant in Dothan, Alabama plant operates five days per week, three shifts per day.  Poultry processing is performed on the night shift (the third shift) and

the day shift (the first shift). Sanitation is performed on the afternoon shift (the second shift). The base rate of pay for hourly poultry processing employees in Perdue's poultry processing plant in Dothan, Alabama is $9.35 per hour. Hourly poultry processing employees are scheduled to work 37.5 hours per a five-day week. Hourly poultry processing employees may be asked to work a sixth day based on production needs and, in fact, depending upon product demand, a significant amount of overtime may be worked. Whenever overtime is worked, it is paid at time and a half each employee's regular rate of pay.

4.    First Processing is the area of the plant where live chickens are introduced into the plant and placed or hung on hooks or shackles for killing, cleaning, eviscerating, and chilling. Employees who work in this area of the plant are called "First Processing employees." Second Processing employees receive the chickens by conveyor from First Processing. Chickens are cut-up, marinated, de-boned, weighed, sized, and packed in Second Processing.

5.    Perdue's poultry processing plant in Dothan, Alabama uses "Kronos," which is a "state of the art" web-based centralized electronic time recording system to record the time worked by hourly poultry processing employees. Time and attendance records are recorded by Kronos, and these records are stored electronically and maintained on a processing server at Perdue's corporate headquarters in Salisbury, Maryland. Each hourly poultry processing employee is provided a personal Kronos "swipe" card, which assigns an individual electronic number to that employee. Employees' time is captured by one of several Kronos time clocks that are designed to capture all principal work activities. There are two Kronos time clocks in the First Processing section of the facility. There are six Kronos time clocks in the Second Processing section of the facility.

6.     Perdue provides a parking lot on the facility complex for its Dothan employees to use.  Processing employees park their cars in the parking lot and then walk to their designated entrance door to the facility.  On their way to the facility entrance, employees walk through a gate in a chain link fence.  Employees visibly display their Perdue identification cards to a third-party security guard as they pass the security guard's booth.  They do not have to stop, or even pause, as they pass the guard.  Employees do not swipe in at the gate.

7.     In the Dothan facility, there are locker rooms, rest rooms, and break rooms for use by the employees.  Many employees proceed to the employee break room before starting their shift.  While employees await the beginning of their shift, they are not required to account for their time or activities.

8.     At the employee's specific start time, and before donning or acquiring work-related equipment and clothing, or performing any other required work activities, hourly poultry processing employees take their assigned Kronos access cards and swipe into their assigned Kronos system time-clocks at designated starting areas.  After swiping into the system, the hourly poultry processing employees enter their department, don their required clothing, and collect their required gear from hooks, shelves, or bins.  Employees sanitize after they put on their required departmental clothing and gear.  Employees then walk to their work stations and begin to work.  All of this occurs while on paid time.

9.     The process is reversed at the end of the work day.  When their supervisor notifies them that their shift has ended, employees remove their gloves, aprons, and any other required clothing and gear, dispose of them in the trash, and place cotton gloves in plastic bags for rewashing.  Some employees choose to remove their earplugs, hair nets, and beard nets at this time.  Employees then swipe out on the designated Kronos time clocks.  After swiping out at

their assigned Kronos time clocks, processing employees may place their personal items—ear plugs, hair and beard nets, and safety goggles—in their lockers, or take the items home with them. Employees exit the facility and return to the employee parking lot.

10.     Required clothing and gear includes smocks, gloves, and hand or arm guards. The hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama also wear personal items such as bump caps, steel toed boots, hair and beard nets, and ear plugs, which they may choose to don on their own time. Donning of these personal items is not compensable, but hourly poultry processing employees are permitted to don non-unique items after clocking-in, and many choose to do so.

11.     Hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama are paid for all time captured by the Kronos system. Since the Kronos system was introduced at the Dothan poultry processing facility in 2002, Perdue has not calculated pay entitlements based on line time, master time cards, or any other similar practices.

12.     Hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama have two 30-minute unpaid meal breaks in each 8 hour shift, during which time they are relieved from work duty. Employees may take their 30-minute unpaid meal breaks wherever they choose, such as the break room or cafeteria, or they may go outside.

13.     Supervisors notify their employees when it is time for their breaks to begin. Their first break generally occurs approximately two hours after their shifts begin. When it is time for their break, the hourly poultry processing employees leave their work area and walk to their designated doffing area, where they doff their required clothing and gear. All of this occurs while the hourly poultry processing employees are "on-the-clock," which means they are paid for this time. After the hourly poultry processing employees doff their required clothing and gear,

they then walk to their designated Kronos time clock and swipe-out using their Kronos access card. While on break, employees retain their hair nets, beard nets, and ear plugs, and do not remove their boots.

14.    Hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama start their unpaid meal breaks only after they swipe out using the Kronos system. The system does not permit hourly poultry processing employees to swipe back in until thirty minutes later. In fact, the Kronos system will not allow hourly poultry processing employees to swipe back in within thirty minutes of when they swiped out. Near the end of the break period, employees walk to their assigned Kronos time clock near their work station to swipe in. After swiping back in, poultry processing employees don their gear, pick-up any necessary equipment, and walk to the work station, on paid time, to resume work for the remainder of their shift. Employees also sanitize their outer garments before resuming their work.

15.    There are signs instructing the hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama not to perform "work" before clocking-in. These signs are in English and Spanish and are located near the Kronos time clocks. In addition, signs remind employees to clock in before touching any required items. Poultry processing employees are warned that failure to comply with these rules could result in disciplinary action.

16.    When Perdue instituted the Kronos system in Dothan, it trained all hourly employees on its use. Since that time, all new poultry processing employees are given orientation and training that describe the relevant donning, doffing, and time clock policies and procedures.

17.    The orientation and training materials define "donning," "doffing," and "first and last principal activities," and also make it clear that the Department of Labor and the Fair Labor Standards Act require employees to be paid for time spent donning and doffing required items, and that employees get paid from the first principal activity until the last principal activity, excluding unpaid breaks.  The materials also describe in detail the appropriate donning and doffing practices, including: the requirements to clock-in prior to donning supplies at the shift start time and when returning from unpaid break; the requirements to clock-out after doffing when leaving at the end of the shift or on an unpaid break; and the fact that all unpaid lunch breaks may be no less than 30 minutes long.  The orientation and training materials remind each poultry processing employee that failure to comply with these policies could lead to disciplinary action.

18.    Poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama can review their time worked as recorded by Kronos, but they do not need to review their time in order to be paid.  Supervisors review the time as recorded by Kronos before the end of each week to correct any mistakes.  Sometimes employees forget to clock in or clock out, and supervisors can correct these issues to make sure that each employee is paid properly.  Once the time is approved by a supervisor, it is submitted electronically for payment.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: _January 9_, 2008

_Dave Tabinowski_
Dave Tabinowski