## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS , INC.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

### REPLY TO DEFENDANT'S OPPOSITION TO
### PLAINTIFFS' MOTION FOR AN ORDER PERMITTING
### COURT-SUPERVISED NOTICE TO EMPLOYEES OF THEIR
### <u>OPT-IN RIGHTS</u>

Comes now Plaintiffs, and respectfully request that this Court give no weight to the Defendant's Response and enter an order granting Plaintiffs' Motion for Court Supervised Notice.  As grounds for said request, Plaintiffs aver that,

### INTRODUCTION

1.    Defendant's Response is simply a smoke and mirrors show designed to distract the Court's attention from the merits of Plaintiff's Motion for Court-Supervised Notice and improperly redirect it to focus on irrelevant merit based and credibility determinations related to the underlying claims.

2.     As Plaintiffs have maintained, so long as a "colorable basis" for the claim exists, the Court need not make any credibility determinations or resolve credibility issues at the initial FLSA certification stage.

3.     In fact, Defendant's Response fails to cite a single genuine argument that would show Plaintiffs' are dissimilar for notice purposes.  The only reasons proffered as to why the Court should deny notice is that a) Defendant feels it is fully compliant with the FLSA in light of its 2002 settlement with the DOL, b) allegedly all employees have notice of the litigation, and c) Plaintiffs' declarations supporting notice allegedly lack evidentiary value and credibility and thus Plaintiffs have failed to show they are similarly situated.

**4.**     While Plaintiffs do not see the need to refute each and every one of Defendant's attacks, Plaintiffs nonetheless will reply to those attacks which are most egregious in an attempt to keep the parties' eyes on the ball.

## ARGUMENT

### *Defendant's Merit Based Assertions Regarding Plaintiffs Underlying Claims*

5.     Defendant places great emphasis on the fact that it entered into a settlement agreement with the Department of Labor in May of 2002, and therefore Defendant definitively states it complies with the FLSA.

6.      Plaintiff has not tried to hide the fact that this settlement took place and in fact, before this Court, Plaintiffs have acknowledged this settlement and the fact that Defendant does not pay "line time" or "master time" the same as typical poultry processors.  *See* Pltfs' Motion for Court Supervised Notice, Dckt. 49 at 2, ¶2 and Pltfs' Motion to Quash Notices of Deposition and Discovery, Dckt. 55 at 1, ¶2.

7.      After conferring with Defendant's counsel and receiving clarification regarding Defendant's pay practices in light of their 2002 settlement (hereinafter "consent judgment") with the Department of Labor, pre *IBP, Inc. v. Alvarez,* 126 S. Ct. 514 (2005), Plaintiffs amended their Complaint on July 5, 2007, to reflect Defendant's pay practices.

8.      Nonetheless, Defendant tries to blacken Plaintiffs' eyes stating, "Plaintiffs' Complaint is one of more than eight nearly identical actions filed by this same Plaintiffs' law firm against poultry companies across the Southeast."  *See* Def's Response at 2.  <u>This is a falsity</u>.  As this Court is personally aware, most poultry cases center around a company's use of master time or line time.  Plaintiffs' amended complaint clearly departs from other complaints filed against poultry companies in that it does not make allegations that plaintiffs are paid via master time or line time and it

clearly denotes that individuals are paid on the basis of individual time clock punches but they are not paid for <u>all</u> donning and doffing activities, walk time, etc. that occurs before individually clocking in and after individually clocking out and during both breaks.  See Pltfs' Amended Complaint at ¶¶ 16 – 18, ¶21 and ¶24.

9.     The gravaman of Plaintiffs' case is not that Plaintiffs are paid line time or master time and thus they are working off the clock but that post *Alvarez*, 126 S. Ct. 514, 546 U.S. at 37 (2005), even though Defendant pays its employees differently than other processors, Plaintiffs still are not paid for all compensable time worked.  Giving Defendant the benefit of the doubt that it relied on this "consent judgment" in good faith, Plaintiffs amended their Complaint modifying damages sought limiting damages to the last two years dating back to October 31, 2004 instead of the last three years and withdrawing claims of willfulness.  As the Court will see below, Plaintiffs trust in Defendant that it acted in good faith may have been misplaced.

10.     The landscape pre-*Alvarez* was much different at the time Defendant entered into their settlement with the Department of Labor.  The Supreme Court had not clarified the first and last principal activity or how that first

and last principal activity affects the continuous workday rule. Evidence of this landscape is shown where as a matter of course, Defendant's CEO, Jim Perdue, post settlement with the DOL, is quoted no less than three times stating, the settlement ended confusion about the issue, referring to the compensability of donning and doffing. See Def's Response, Exhibit D at 2, 4, and 7.

11.     But the issue was not resolved legally speaking. The issue was only resolved at that time with regard to DOL enforcement actions. Defendant has incorrectly interpreted their settlement and consent judgment to be binding and precedential into perpetuity regardless of the Supreme Court's ruling on the matter.

12.     In *IBP v. Alvarez*, the Supreme Court referenced its holding in *Steiner v. Mitchell*, 350 U.S. 247, 254 (1956), that the Court had concluded that in enacting the Portal-to-Portal Act Congress still intended that an employee's activities to fall "within the protection of the FLSA," if they are an integral part of or are essential to the principal activities of the employees. *Alvarez*, 546 U.S. at 37.   As such, the Supreme Court in *Alvarez* held, "that <u>any activity</u> that is integral and indispensable to a principal activity is itself a principle activity under § 4(a) of the Portal-to-Portal Act," and is thus

compensable.  *Id*.  The *Alvarez* Court dealing with consolidated pork and poultry cases involving burdensome armor commonly worn in the pork industry and less cumbersome equipment such as hair nets, smocks and ear plugs, commonly worn in the poultry industry, did not differentiate between the two types of equipment.  In other words, donning "gear that is integral and indispensable to employees' work is a principle activity and thus under the continuous workday any walking time that occurs after the beginning of the employees' first principal activity and before the end of the employee's last principal activity is excluded from the scope of the Portal to Portal Act and is covered by the FLSA.  *Alvarez*, 546 U.S. at 37, 40.

13.     Under this interpretation Plaintiffs' are entitled to walk time as well as compensation for the donning and doffing of any required clothing or gear, even ear plugs and or hair nets.

14.     This interpretation is consistent with the Third Circuit's decision in *De Asencio v. Tyson*, See Exhibit A, in which on appeal the Court was required to address jury instructions defining work as that definition relates to the donning and doffing of hair nets, beard nets, ear plugs, safety glasses, and smocks.  500 F.3d 361, 364 (3rd Cir. 2007).  The *De Asencio* Court reasoned in light of the Supreme Court's decision in *Alvarez*, that such

donning and doffing activity constitutes "work" as a matter of law. *Id* at 373. The Court went on to offer guidance with regard to this work and the de minimus doctrine finding the jury must consider not only the donning and doffing activities but they must also aggregate the post donning/pre doffing walk time and consider the aggregate of the claim not merely the claim on a daily basis. *Id* at 374 - 375.

15.    Despite the decisions in *Alvarez* and *De Asencio*, Defendant intentionally wears blinders in an attempt to preserve their so called good faith reliance on their 2002 Department of Labor consent judgment.[1]

16.    On multiple occasions throughout Defendant's Response, Defendant states, Perdue poultry processing employees are paid for all hours worked from their first principal activity of the work day until the end of their last

---

[1] *See* attached Exhibit B, Excerpt at Tabinowski Depo at pg. 5 lines 24 – 25 and pg. 6 line 1 – 12 (Tabinowski, Internal Auditor charged with ensuring Defendant's wage & hour compliance, testifying in the *Alford v. Perdue* case in the M.D. of Georgia that he has not heard of *IBP v. Alvarez* and is unfamiliar with any Supreme Court decision within the last 5 years that may have modified what is considered compensable with regard to donning and doffing);   Excerpt at Tabinowski Depo at pg. 22 lines 3 – 15 (Tabinowski testifying Perdue has not revised or revamped its donning and doffing procedures since 2002 when the Consent Judgment was entered into with the DOL);   Excerpt at Tabinowski Depo at pg. 79 lines 16 – 24 (Tabinowski testifying it his opinion Defendant is essentially willing to live by or die by the consent judgment with the DOL). *See* Def's Response, Exhibit B Tab 1 at 3, ¶ C (Pursuant to the Consent Judgment entered into by Defendant, Defendant is obligated to use its best efforts to maintain future compliance with the FLSA). *See Mcghlaughlin v. Richland Shoe Company*, 486 U.S. 128 (1988) (defendant's conduct was "willful" where employer knew or showed reckless disregard as to whether its conduct was prohibited by statute).

principal activity of the work day, except for any time taken for unpaid meal breaks or any bona fide off duty time. *See* Def's Response at 4 and 6. Defendant even states Plaintiffs are paid for all compensable time, including… donning and doffing … *See* Def's Response at 5. Dave Tabinowski, Internal Audit– Project Lead, responsible for auditing Perdue's wage and hour practices states, "… before donning or acquiring work related equipment and clothing… hourly poultry processing employees take their assigned Kronos access cards and swipe into their assigned Kronos system time-clocks…" *See* Def's Response, Exh. H at ¶ 8.

17.    But this is not true. Plaintiffs don or doff hair nets, beard nets, ear plugs, safety glasses, bump caps and boots before clocking in and after clocking out. Defendant's own proffered declarations of employees not participating in the lawsuit evidence this fact and the fact that supervisors trained employees to don and doff certain equipment before clocking in and after clocking out[2].

---

[2] *See* Def's Response, Exhibit A: Declaration of Leticia Johnson at ¶¶ 4 – 6; Declaration Cheryn Cawthon at ¶¶ 9 – 10; Declaration of Lillie Green at ¶¶ 10 and 16; Declaration of Brenda Mack at ¶¶ 14 – 15; Declaration of Lisa Banks at ¶16;  Declaration of Erika Floyd at ¶¶ 4 – 6 and ¶20; Declaration of Jeannie Hickman at ¶9; Declaration of Mary Clark at ¶4; Declaration of Vickie Davis at ¶ 3; Declaration of Linda Hudson at ¶2; Declaration of Mary Marsh at ¶ 3.

18.    Consistent with these declarants' testimony, Mr. Tabinowski for Defendant defines required clothing as smocks, gloves and hand or arm guards.  He defines non-required clothing, calling it "personal," as bump caps, steel toed boots, hair and beard nets, and ear plugs and as such those items can be donned on the employees' own time.  *See* Def's Response, Exh. H at ¶ 10.  But in *Alford v. Perdue Farms, Inc.*, (M.D. Ga. 5:07-cv-00087-CAR), which Defendant is so fond of referencing in this case, under oath Mr. Tabinowski contradicts himself stating hair nets, beard nets, boots, and ear plugs are required:

> Q.    … Does Perdue require employees to wear hair nets on the line?
> A.    It is an industry wide requirement and from a food safety point also.

*See* attached Exhibit B, Excerpt at Tabinowski Depo at pg. 9 lines 20 – 25 and pg. 10 lines 1- 2.

> Q.    And would you agree that a beard net if an employee has a beard is required by Perdue as well?
> A.    It's required pretty much by the industry.
> Q.    Okay.
> A.    It's food safety also.

Excerpt at Tabinowski Depo at pg. 10 lines 22 – 25 and pg. 11 line 1.

> Q.    Let's talk about non-compensable that Perdue does not pay employees to don or doff.
> A.    Items similar to hair nets and beard nets is also boots.

Q.    Are they required to wear them on the line either by Perdue or by safety standards in the industry?
A.    The industry would require those for safety reasons, yes.

Excerpt at Tabinowski Depo at pg. 12 lines 11 – 13, and lines 21 – 25.

Q.    …Are ear plugs required by line employees either by Perdue or safety standards in the industry?
A.    It is an industry-wide requirement…

Excerpt at Tabinowski Depo at pg. 16 lines 3 – 6.

19.    As such, it is clear that Defendant does not compensate its employees for the donning and doffing of <u>all required</u> equipment in violation of its own employee training in which Defendant makes clear to new hire employees that the Department of Labor and Fair Labor Standards Act require employees to be paid for time spent donning and doffing <u>required</u> items… *See* Def's Response, Exh. H at ¶ 17.

### *Hipp Analysis Revisited*.

20.    The Eleventh Circuit recommends the utilization of a two tiered approach when considering whether to allow a FLSA claim to proceed as a collective action.  *Hipp v. Liberty National Life Insurance Company*, 252 F.3d 1208, 1218 (11th Circuit); At the first tier, because the court has minimal evidence, this determination is made using a fairly lenient

standard, and <u>typically results</u> in "conditional certification" where the class of putative class members is given notice and an opportunity to opt-in. *Id.*

21.    This Court has determined the *Hipp* analysis is appropriate and should be followed in this action.  *See* Court's Memorandum Opinion and Order, Document 58 (The Court would rather be consistent with the approach suggested in *Hipp* and consistent with other Courts in this circuit).

22.    As such, Defendant's contention that the Court is not required to use the *Hipp* approach is irrelevant and Defendant's assertion that the Court should apply a "stricter standard" in determining if notice is appropriate is misplaced because the cases cited by Defendant supporting their position, *Holt v. Ride Aid Corp.* and *Morisky v. Public Serv. Elec. & Gas*, are both cases in which extensive discovery had been conducted prior to a decision on notice.  *See* Def's Response at 8; See *Holt*, 333 F.Supp. 2d 1265, 1274 (M.D. Ala. 2004) and *Morisky,* 111 F. Supp. 2d 493, 497 – 498, D. N.J. 2000) (Court stating, "This case is somewhat different. It is clearly beyond the first tier of the above analysis…  Further, pursuant to the most recent scheduling order issued by Magistrate Judge Rosen, discovery was to have been completed by January 14, 2000, well before the present motion was filed).

**Defendant's Assertion Plaintiffs Have Failed to Show the Existence of Similarly Situated Individuals Who want to Join the Lawsuit.**

23.    Defendant's assertion that Plaintiffs have failed to show the existence of similarly situated individuals who want to join the lawsuit is asinine.

24.    Defendant acknowledges more than 200 individuals have filed consents to join in this action and as recently as October 2007 three additional individuals have joined.  *See* Def's Response at 2, fn. 1.  In fact, Plaintiffs filed notices of four (4) additional individuals January 18, 2008, Dckt. 62, two of which are presently employed by Defendant.  This alone shows there are individuals still interested in joining this action.  This Court found in *Burks et al. v. Equity Group Eufaula Division, LLC*, 2:07-cv-01081, … more than 180 opt in plaintiffs was ample evidence that other employees wish to opt-in to the case.  *Burks*, Dckt. 49 at 2-3.

25.    Despite this fact, Defendant argues the sheer number of consents to join lends no merit to Plaintiffs' claims but the high number of notices demonstrates that there is already widespread knowledge of the pending lawsuit and no need for notice.   *See* Def's Response at 2, fn. 1.

26.    This argument too flies in the face of reason.  Courts often rely on the existence of opt-in plaintiffs as evidence that individuals wish to join the

litigation[3] and the large number of filed consents does not show everyone in the potential class has received notice.  The only way such a correlation could be rationale is if there are 200 known potential class members and all 200 members previously filed consents to join.  Any other analysis of the opt-in numbers is mere speculation.  Even if Defendant could successfully show all presently employed putative class members have notice, there is no feasible way Defendant could show all formerly employed putative class members have notice.  And, if Defendant's conclusion is true, what prejudice would Defendant suffer if notice is issued?  Under Defendant's assumption everyone who wants to join has already done so and Plaintiff bears the cost of notice.[4]

---

[3] *See* Plaintiff's Motion for Notice, Document No. 49, Exhibit 9 at 4, Judge Seymour in *Benbow v. Gold Kist, Inc.* acknowledging and relying on the existence of 1300 opt-in plaintiffs when granting plaintiffs' motion for class notice.  *See* Plaintiff's Motion for Notice, Document No. 49, Exhibit 3 at 5, Judge Johnson's order granting class notice in *Aguilar v. Pilgrims Pride Corp.* acknowledging the existence of 93 opt-in plaintiff's at the time of plaintiff's motion for court supervised notice established an alleged illegal pay practice.  *See* Plaintiff's Motion for Notice, Document No. 49, Exhibit 5 at 8;  Judge L. Scott Coogler's order granting nationwide notice in the national collective action, *Richter, et al. v. Dolgencorp, Inc., et al.*, acknowledging that the existence of 30 opt-in plaintiffs established an alleged class-wide discrimination; *See also* Plaintiff's Motion for Notice, Document 49, Exhibit 7 at 8, Judge R. David Proctor's order granting notice acknowledging the existence of at least 43 opt-in plaintiffs established alleged illegal pay practices.
[4] See Exhibit C, Excerpt of Transcript of Proceedings at pp. 43 – 45.  (Bush Appointee, Judge Clay D. Land, in the Middle District of Georgia acknowledging defendant Tyson is not prejudiced by the issuance of notice regardless of the cases ultimate outcome).

27.     Plaintiffs have shown the existence of similarly situated individuals who want to join the lawsuit**.**

### Defendant's Assertion Plaintiffs Have Failed to Show They and Others are Similarly Situated For Notice Purposes.

28.     Defendant's argument that Plaintiffs have failed to show they are similarly situated fails also.

29.     Plaintiffs submitted the declarations of thirty three party plaintiffs evidencing their similarity.  Through those declarations Plaintiffs show they are all required to perform work off the clock, they are all interchangeable with regard to job duties, they are all paid hourly, they are all paid under the same compensation system and there are numerous individuals affected by this policy which will come forward if notice is granted.  *See* Plntfs' Motion For Court Notice, Dckt. 49, Exhibits 1 and 2 at ¶¶ 4 – 5, ¶¶ 6 – 7, and ¶ 9.

30.     Defendants own declarants admit they are all paid using the Kronos time keeping system and they all describe similar procedures for clocking in and out.  *See* Def's Response, Exhibit A.

31.     Consistent with all declarants' statements, Mr. Tabinowski concedes that Defendant pays all of its 1st and 2nd processing employees in the same way, that all employees are interchangeable, and that under the "consent judgment" standard operating procedures are similar plant to plant.   *See*

14

Exhibit B, Excerpt at Tabinowski Depo at pp. 29 – 30, pp. 30 – 32, pg. 47 lines 8 – 19, pg. 72 lines 9 -14 and pg. 80 lines 18 - 25.

32.     As to Defendant's attacks on Plaintiffs declaration regarding the form and content of the declarations, this argument is nothing short of a "red herring" to try and discredit Plaintiffs and their counsel.    In short, Defendant argues that because of the form of these declarations (which require plaintiffs to fill in their name, dates of employment, and signature) and because of purported discrepancies in Plaintiff's declarations as compared to Defendant's nineteen declarations, that Plaintiffs' declarations should somehow  not pass muster as relevant evidence for notice purposes.

Simply put, the reality of the situation is that many of the employees in this matter are not well educated and in some cases they are illiterate.  The fact that Plaintiffs' counsel has chosen to utilize a form declaration to make participation in this lawsuit easier for workers to complete and submit should not be of any concern as to the merits of notice or damages in this lawsuit.  Defendant's counsel has even prepared affidavits on behalf of their clients to ease participation of lay people.  *See* Exhibit B, Excerpt at Tabinowski Depo at pp. 58 - 59 (Tabinowski states Defense Attorney Brian Liss prepared the affidavit he submitted as support opposing notice in

*Alford*).   This Court as well as others routinely accepts similar or identical affidavits as relevant, credible evidence for notice purpose.   See Plntfs' Motion to Stay Discovery, Dckt. 55, at ¶ 7.

33.   Defendant continues to try to discredit Plaintiffs misrepresenting a disparity between Plaintiffs' declarant Cornelia Thornton and her interrogatory responses.  *See* Def's Response at 12.   A juxtaposition of the two documents shows Ms. Thornton's interrogatory responses do not contradict her positions in her declaration.   She simply states she is unable to fully answer the question because she lacks the necessary information and Defendant is in possession of the information requested.

34.   But it doesn't stop there; Defendant goes even further inaccurately comparing Plaintiffs declarations to declarations in a Tyson case in which those declarants are clearly making claims related to the payment and use of master time and line time.   Nowhere do Plaintiffs' declarations in this matter refer to line time and the declarations specifically acknowledge an individual time clock system.  *See Generally* Plntfs' Motion For Court Notice, Dckt. 49.

35.   The *Scott* Court recognized attacks on plaintiffs similar to the attacks made by Defendant in this case are effectively an attack on the merits of the

claims finding the "court need not evaluate the merits of plaintiffs' claims in order to determine whether the similarly situated group exists". *Id*. Similarly, the court in *Kreher v. City of Atlanta, Ga*, 2006 WL 739572, at 84 (N.D.Ga. March 20, 2006) found in determining the appropriateness of notice, there is no need for the Court to address the merits of plaintiffs' claims in order to determine whether a similarly situated group exists, quoting *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 55 (S.D.N.Y. 2005).[5]

36.    Accordingly, Plaintiffs have shown they and other putative class members are similarly situated.

***Judicial Economy and Sub-Classing***

37.    Defendant is silent to whether proceeding with notice in this case would serve judicial economy. In *Hoffman-La Roche, Inc. v. Sperling*, 110 S. Ct. 482 (1989), the Court explained that collective actions permit:

---

[5] *See Barrus v. Dick's Sporting Goods, Inc.*, 465 F. Supp.2d 224, 230 (W.D.N.Y. 2006) (The court describes defendants response to notice in the form of affidavits from current employees which challenge many of the observations and conclusions contained in the affidavits of former employees submitted by plaintiffs to be misplaced at this juncture… The court states the affidavits were undoubtedly intended to attack the veracity and credibility of the former employees and found, "It is not the Court's role to resolve factual disputes, decide substantive issues going to the ultimate merits or make credibility determinations at the preliminary certification stage of an FLSA collective action. *See Kalish v. High Tech Institute, Inc*. 2005 WK 1073645, *2 (D.Minn. April 22, 2005) (so long as a "colorable basis" for the claim exists, court need not make any credibility determinations at the initial FLSA certification stage).

"plaintiffs the advantage of lower individual costs to vindicate their rights by the polling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged … activity." *Id.* at 485. "For these benefits to be realized, however, persons who may have been aggrieved by the unlawful conduct must be provided accurate and timely notice of the collective action so that they can make informed decisions about whether to participate." *Id.*

38.    It is unclear to the undersigned how judicial economy will not be served by addressing the claims against Defendant in this one action. The result of denying notice as Defendant requests will necessitate this Court to address identical claims in over 200 separate cases thereby clogging the docket with copy cat lawsuits. This would be nothing short of an utter waste of the parties', and more importantly the Court's resources.

39.    While Plaintiffs believe they have met their burden at this first stage of analysis, Plaintiffs assert any issue or concerns that this Court may have related to differing job titles, etc. can easily be addressed by the Court during the second stage analysis under *Hipp* through the utilization sub-classes. For example, while Plaintiffs have broken the class down into 1st and 2nd processing employees, and shown employees are interchangeable,

the Court could develop a sub-class for more specific departments, production lines, etc.

40.     Courts across the country have consistently held that in the interest of judicial economy, the utilization of sub-classes is a viable method of case management and traditionally is considered at the second stage analysis. *Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 564 (E.D. Va 2006) (existence of sub-classes do not "undermine the benefit associated with collective actions, including judicial economy and efficiency by avoiding multiple lawsuits and repetitious evidence"); *Gieseke v. First Horizon Home Loan Corp.* 408 F.Supp.2 557m 564 (E.D. Va. 2006) (recognizing subclassing as a "manageability" issue that could be addressed at the post discovery decertification stage); *King v. Koch Foods of Mississippi, LLC*, 2007 U.S. Dist. LEXIS 26746, *10-11 (S.D. Miss. Apr. 10, 2007) ("In granting conditional certification], the court is aware that discovery may show that certain plaintiffs are not similarly situated, and if this is the case, the court can decertify that class or can create subclasses."); *Molina v. First Line Solutions, LLC*, 2007 U.S. Dist. Lexis 47658m *38 (N.D. Ill. June 20, 2007) (granting conditional certification even thought "viability of subclasses" may need to be considered at second-stage of

Section 16(b) analysis);  *Ryan v. Staff Care, Inc.*, 2007 U.S. Dist. Lexis 49060, *13 n. 3 (N.D. Texas July 6, 2007) (while differences in employee's pay classifications might demonstrate "the need for subclassing in this case, "such differences did not warrant denial of conditional certification); *Jacobs v. New York Foundling Hosp.*, 483 F. Supp. 2d 251, 265 – 66 (E.D.N.Y. 2007) ("if at a later point in this litigation, I find [multiple job descriptions render class members dissimilar], I will have discretion to create subclasses or to dismantle the collective action."); *Vaszlavik v. Storage Technology Corp.,* 175 F.R.D. 672, 681 (D. Colo. 1997) (granting conditional certification and deferring issue of "whether appropriate subclasses can be crafted")

41.    Conditionally certifying this case and issuing notice promotes judicial economy.

***Form of Notice***

42.    Plaintiffs agree, should this Court grant notice, the parties should have an opportunity to devise a mutually acceptable notice.

43.    That being said, Plaintiffs disagree that the name and caption of the case should not be included on the notice.

44.     Also, upon review, the Court will see Plaintiffs' proposed notice does not refer to the use of master time system and it does not seek a 3 year look back.

45.     Furthermore, Plaintiffs' counsel has been the collector and administrator of notice in three poultry cases in this state and is currently slated to provide notice and collect consent forms in the action, *In Re Wayne Farms LLC FLSA Litigation*, 2:07md1872, in the Southern District of Mississippi.

46.     Lastly, all notices have some form of anti-retaliation provision to ensure employees are comfortable asserting their rights.  Regardless of whether retaliation has occurred or is expected to occur, the very nature of the employee/employer relationship requires such a disclosure.

### *Posting of Notice*

47.     Because of high turnover rates and because it has been Plaintiffs' counsel's experience that the return rate for notice is 15 – 20% due to inaccurate payroll data, Plaintiffs request in addition to mailing notice the Court require Defendant to post notice in the break rooms under glass or other means of protection.

48.    The act of posting notice of an FLSA lawsuit in a defendant's workplace is not a foreign concept.

49.    Indeed, this very approach has been adopted by numerous other courts in adopting the broad remedial and notice purposes under the FLSA.  *See Johnson v. Am. Airlines, Inc*. 531 F. Supp. 957, 961 (N.D. Tex 1982) (finding direct mail and posting on company bulletin boards as reasonable); *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 493 (E.D. Cal. April19, 2006) (finding that first class mail combined with posting provided the "best notice practicable" to the potential class); *Veliz v. Cintas Corp.*, 2004 WL 2623909, at *2 (N.D. Cal. Nov. 12, 2004) (requiring employer to post notice and consent forms in all of its work sites).

## CONCLUSION

As evidenced above, Plaintiffs meet their burden for permitting notice to proceed.  The existence of more than 200 opt-in plaintiffs and Plaintiffs' supporting declarations raise a "colorable basis" that the claim exists and as such the Court need not make any credibility determinations or resolve factual issues at this initial FLSA certification stage.  As well, through Plaintiffs' pleadings, Plaintiffs' supporting declarations, Defendant's declarations and the testimony of Defendant's representative responsible for

wage & hour compliance, Plaintiffs have shown they are similar situated and the existence of others who wish to join.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that this Court as soon as practicably possible grant Plaintiffs' motion for an order permitting court supervised notice to employees of their opt-in rights.

Dated:  January 22, 2008          Respectfully submitted,

**THE COCHRAN FIRM, P.C.**

/s/ Robert J. Camp
**ROBERT J. CAMP (CAM064)**
505 North 20th Street, Suite 825
Birmingham, AL  35203
(205) 244-1115 (Phone)
(205) 244-1171 (Fax)

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2008, I electronically filed Plaintiffs' Reply with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to:

Sandra B. Reiss                 Lance Harrison Swanner
sandra.reiss@odnss.com       lswanner@cochranfirm.com

James J. Kelley                  Bernard D. Nomberg
jkelley@morganlewis.com      bnomberg@cochranfirm.com

Brian Z. Liss                          Samuel A. Cherry, Jr.
bliss@morganlewis.com                  scherry@cochranfirm.com



/s/ Robert J. Camp
**ROBERT J. CAMP**

# EXHIBIT
# A

500 F.3d 361
500 F.3d 361, 154 Lab.Cas. P 35,336, 12 Wage & Hour Cas.2d (BNA) 1541
**(Cite as: 500 F.3d 361)**

▷De Asencio v. Tyson Foods, Inc.
C.A.3 (Pa.),2007.

United States Court of Appeals,Third Circuit.
Melania Felix **DE ASENCIO**; Manuel A. Gutierrez;
Asela Ruiz; Eusebia Ruiz; Luis A. Vigo; Luz
Cordova; Hector Pantajos, on behalf of themselves
and all other similarly situated individuals,
Appellants
v.
**TYSON FOODS, INC.**
No. 06-3502.

Argued July 12, 2007.
Filed Sept. 6, 2007.

**Background:** Current and former employees at
chicken-processing plant brought action under Fair
Labor Standards Act (FLSA) and Pennsylvania Wage
Payment and Collection Law (WPCL), seeking
compensation for time spent donning and doffing
work gear. Following reversal of grant of motion for
class certification as to WPCL class, 342 F.3d 301,
jury trial was held. The United States District Court
for the Eastern District of Pennsylvania, Robert F.
Kelly, J., entered judgment in favor of employer.
Employees appealed.

**Holding:** The Court of Appeals, Sloviter, Circuit
Judge, held that jury instruction impermissibly
directed jury to consider whether employees
demonstrated some sufficiently laborious degree of
exertion in deciding whether their activities were
compensable under Portal to Portal Act.

Reversed and remanded.

West Headnotes

**[1] Labor and Employment 231H ☞2316**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime
Pay
         231HXIII(B)4 Operation and Effect of
Regulations
            231Hk2311 Working Time

231Hk2316 k. Preliminary or
Postliminary Activities in General. Most Cited Cases
Cumbersomeness or difficulty of an activity cannot
be considered in deciding whether an activity is
"work," as required for the activity to be
compensable by the Portal to Portal Act. Portal-to-
Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a).

**[2] Labor and Employment 231H ☞2312**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime
Pay
         231HXIII(B)4 Operation and Effect of
Regulations
            231Hk2311 Working Time
               231Hk2312 k. In General. Most
Cited Cases

**Labor and Employment 231H ☞2316**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime
Pay
         231HXIII(B)4 Operation and Effect of
Regulations
            231Hk2311 Working Time
               231Hk2316 k. Preliminary or
Postliminary Activities in General. Most Cited Cases
Activity must be "work" to qualify for coverage
under the FLSA, and that "work," if preliminary or
postliminary, will be compensable under the Portal-
to-Portal Act if it is integral and indispensable to the
principal activity. Portal-to-Portal Act of 1947, §
4(a), 29 U.S.C.A. § 254(a).

**[3] Labor and Employment 231H ☞2173(1)**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(A) In General
         231Hk2171 Constitutional and Statutory
Provisions
            231Hk2173 Purpose
               231Hk2173(1) k. In General. Most
Cited Cases
The FLSA has a broad remedial purpose. Fair Labor

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

**[4] Labor and Employment 231H ☞2398**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)6 Actions
                231Hk2395 Trial
                    231Hk2398 k. Instructions. Most Cited Cases
Instruction to jury that, in determining whether donning and doffing of work gear by employees of chicken-processing plant was "work," as required for such activities to be compensable under Portal to Portal Act, jury was required to consider whether gear was cumbersome, was heavy, or required concentration to don and doff, impermissibly directed jury to consider whether employees demonstrated some sufficiently laborious degree of exertion, as opposed to some form of activity controlled or required by employer and pursued for benefit of employer. 29 U.S.C.A. § 254(a).

**[5] Labor and Employment 231H ☞2316**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)4 Operation and Effect of Regulations
                231Hk2311 Working Time
                    231Hk2316 k. Preliminary or Postliminary Activities in General. Most Cited Cases
Exertion is not required for activity to constitute "work," as required for the activity to be compensable under the Portal to Portal Act. Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a).

**[6] Labor and Employment 231H ☞2312**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)4 Operation and Effect of Regulations
                231Hk2311 Working Time
                    231Hk2312 k. In General. Most Cited Cases
The de minimis doctrine provides a limiting principle to FLSA compensation for trivial calculable quantities of work. Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

**[7] Labor and Employment 231H ☞2398**

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(B) Minimum Wages and Overtime Pay
            231HXIII(B)6 Actions
              231Hk2395 Trial
                  231Hk2398 k. Instructions. Most Cited Cases
District court should not have instructed jury in liability portion of bifurcated trial that additional time for which it paid some employees in chicken-processing plant was defense to employees' FLSA claim that they were being denied pay for donning and doffing work gear, inasmuch as questions regarding such payments would be more appropriately resolved at damages stage. Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a).

**\*362**Thomas J. Elliott, Frederick P. Santarelli (Argued), Franco A. Corrado, Elliott, **\*363** Greenleaf & Siedzikowski, Blue Bell, PA, for Appellants.

Michael J. Mueller (Argued), Joel M. Cohn, Michael S. McIntosh, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for Appellee.

Howard M. Radzely, Solicitor of Labor, Steven J. Mandel, Associate Solicitor, Paul L. Frieden, Counsel for Appellate Litigation, Joanna Hull (Argued), U.S. Department of Labor, Washington, DC, for Amicus Curiae Appellants, Secretary of Labor.

Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, DC, Thomas J. Walsh, Jr., Arnold E. Perl, Patrick D. Riederer, Ford & Harrison LLP, Memphis, TN, for Amicus Curiae Appellee, Chamber Commerce of the United States.

David R. Wylie, D. Christopher Lauderdale, Jackson Lewis LLP, Greenville, SC, for Amicus Curiae Appellee, National Chicken Council and American Meat Institute.

Before: SLOVITER, ALDISERT, and ROTH, Circuit Judges.

*OPINION OF THE COURT*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SLOVITER, Circuit Judge.

In instructing the jury in this case brought by poultry workers under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA" or "Act"), the District Court stated that in considering whether the workers' donning, doffing and washing was "work" under the Act, the jury must consider whether the activities involved physical or mental exertion. The jury decided the issue of work against the workers and therefore never reached the defenses proffered by the employer. The workers appeal, arguing that the District Court's instruction on donning and doffing was erroneous as a matter of law.[FN1] This is an issue that has created considerable interest.[FN2]

> FN1. The National Chicken Council and the American Meat Institute, as well as the Chamber of Commerce of the United States of America, have submitted briefs as amici curiae in support of Tyson. The Secretary of Labor has submitted a brief as amicus in support of the appellant workers.

> FN2.See, e.g., Rachael Langston, *IBP v. Alvarez: Reconciling the FLSA With the Portal-To-Portal Act*, 27 Berkeley J. Emp. & Lab. L. 545 (2006); Lynn M. Carroll, *Employment Law-Fair Labor Standards Act Requires Compensation for Employees Walking to and From Workstations-IBP, Inc. v. Alvarez*, 40 Suffolk U.L.Rev. 769 (2007); Robert J. Rabin, *A Review of the Supreme Court's Labor and Employment Law Decisions: 2005-2006 Term*, 22 Lab. Law 115 (Fall 2006); Tresa Baldas, *I Have to Put That on? Pay me for the Time!*, The National Law Journal, July 2, 2007, at 6; Nicholas D'Ambrosio, *When Donning and Doffing Work Gear is Considered Compensable Time*, The Business Review, September 8, 2003, http:// www. bizjournals. com/ albany/ stories/ 2003/ 09/ 08/ smallb 3. html; Michael Matza, *Settlement Gives Meat Workers More Pay*, Phila. Inquirer, June 13, 2007, at C01.

## I.

Plaintiffs/Appellants are current and former chicken processing plant workers in New Holland, Pennsylvania, who brought this action against Tyson Foods, Inc. ("Tyson"), arguing that Tyson does not pay them for the time they spend "donning and doffing," as well as washing, their work gear. Tyson requires its employees to put on and take off safety and sanitary clothing (i.e., "donning and doffing"), and engage in washing activities, pursuant to government regulations and corporate or local policy and practice.[FN3]*364 This time must be spent six times a day: before and after their paid shifts and two daily meal breaks. Most employees generally wear a smock, hairnet, beard net, ear plugs, and safety glasses.[FN4] Additional sanitary and protective items that certain employees wear include a dust mask, plastic apron, soft plastic sleeves, cotton glove liners, rubber gloves, a metal mesh glove, and rubber boots.

> FN3. Tyson's internal operating requirements provide that a worker may not keep the gear at home and wear it to the plant nor can a worker wear the gear home. *See* App. at 1402-03, 1798; *see also*9 C.F.R. § 416.1*et seq.* (1996) (requiring that food processing establishments "must be operated and maintained in a manner sufficient to prevent the creation of insanitary conditions and to ensure that product is not adulterated").

> FN4. At oral argument, Tyson disputed that it necessarily required such gear, but the parties stipulated that the clothing was required in their joint pre-trial memorandum. Tyson notes in its brief that some employees wear less than the typical set of gear, pointing to testimony where a worker wore "just the smock[,]" App. at 876, or where workers did not wear smocks or safety glasses.

Tyson's witness Michael Good, the complex's manager, testified that these activities take six to ten minutes collectively per shift (presumably per employee). Appellants' expert estimated that the activities take 13.3 minutes per shift.[FN5] Although Tyson does not record the time its workers spend on donning and doffing, Tyson avers that certain of the employees receive an extra fifteen minutes of compensation "which is enough to fully compensate the plaintiffs for the very activities that are the basis for this suit." Appellee's Br. at 6. However, Good testified at trial that employees in the "receiving, killing, and picking" and "evisceration" departments do not receive the extra fifteen minutes of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 361
500 F.3d 361, 154 Lab.Cas. P 35,336, 12 Wage & Hour Cas.2d (BNA) 1541
(Cite as: 500 F.3d 361)

compensation.

> FN5. Although appellants' expert had originally estimated the actions took 15.7 minutes, Tyson's expert excluded certain noncompensable activities, such as swiping of time card and time spent before the donning of gear, and appellants do not disagree. See *IBP, Inc. v. Alvarez*, 546 U.S. 21, 40-41, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005) (predonning waiting time, and waiting for supplies, not a principal activity and excluded from coverage under Portal-to-Portal Act of 1947, 29 U.S.C. § 251 et seq.); *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 689, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) (ignoring swiping-at-clock time).

Appellants filed suit against **Tyson** on August 22, 2000, under both the FLSA and state law (the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 Pa. Cons.Stat. §§ 260.1-260.45) on behalf of themselves and similarly situated co-workers at **Tyson's** chicken processing complex, alleging that **Tyson** was liable to its employees for time spent donning, doffing and washing. See *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 304, 312 (3d Cir.2003). Appellants sought collective treatment of their FLSA action under the Act's opt-in provisions; 540 workers joined the suit. On interlocutory appeal, this court decided that "the District Court did not exercise sound discretion in granting supplemental jurisdiction over the WPCL action," and denied certification of the WPCL class with respect to all plaintiffs. *De Asencio*, 342 F.3d at 312.

**Tyson** subsequently moved for summary judgment, arguing first, that "the acts of donning, doffing, and sanitizing protective clothing and equipment are not work as defined by the FLSA."App. at 2357. Second, **Tyson** argued that, "if such activities are work, then they are *de minimis* and thus should not be compensated." [FN6]*Id.* Third, **Tyson** alleged that the activity, if work, would nevertheless be "not compensable under the Portal to Portal Act."*Id.* In denying summary judgment on each of *365 these bases, the District Court concluded that it would be "hasty" to rule on the mixed law/fact question of whether the activity was compensable "work" without further development of the record. It observed that there was "minimal relevant case law in our jurisdiction" and "there is significant

disagreement among the jurisdictions who have considered these issues." *Id.* The Court believed "such a decision would be a mistake and a disservice to the body of law on which we depend" and concluded that, in view of the "many disputed factual issues intertwined with the legal issues" on these three points, "summary judgment is not appropriate and would be premature at this time." App. at 2357, 2359.

> FN6. The *de minimis* doctrine is discussed further infra; generally, certain brief moments of work may be deemed difficult to quantify and record and are therefore considered uncompensable.

Trial commenced in this action in June 2006.[FN7] In their joint pretrial memorandum, the parties identified the legal issues at trial to be "1. Whether the activities and time at issue constitute 'work' for purposes of the FLSA?... 2. Whether the time incurred on such activities is de minimis for purposes of the FLSA? 3. Whether the 'opt-ins' [to the class] are similarly situated and have put on representative evidence for purposes of the FLSA?"App. at 2478. To expedite the trial, Tyson withdrew "its position that the clothes-changing and washing activities were not 'integral and indispensible' to the principal activities that the plaintiffs were hired to perform." *Id.*

> FN7. Appellants also argue that the District Court erred in refusing to postpone the trial to "avoid inherent prejudice from the intense extraordinary public debate and onslaught of negative publicity about immigrant workers in America, which pervaded the national and local media immediately prior to and throughout the time of the June, 2006 trial." Appellants' Br. at 4-5. Because of our disposition of this case, this is a moot issue.

During the charging conference, the parties sparred over the definition of "work" that would be read to the jury. Appellants' counsel argued that "[a]ny instruction that equates work with the need for any level of physical or mental exertion directly contradicts the [Supreme Court's] decision in *IBP v. Alvarez*, where the [C]ourt expressly stated [that] exertion is not, in fact, necessary for an activity to constitute work under the FLSA," and counsel cited to *Armour & Co. v. Wantock*, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944), in support of that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proposition. App. at 2035. In response, Tyson's counsel argued that *Alvarez* does not overrule the Supreme Court's pre-*Armour* definition of work as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed. 949 (1944). They argued that the *Armour* decision, which held that time on call spent by a private firefighting force could be deemed "work," merely "talks about a situation where an individual is engaged to wait," App. at 2036, and that "[w]e don't have that situation here. Here we have a situation where they're alleging that certain types of physical activities are work, and it's our position that in that context, it's *Tennessee Coal*... [that] should be applied and that's what our instruction tracks, [y]our Honor." App. at 2037. In response, appellants' counsel emphasized that the Supreme Court's *Alvarez* decision "unanimously, unanimously stated that" the *Armour* decision "clarif[ied] that exertion is not, in fact, necessary for an activity to constitute work under the FLSA, period. And I don't know how you can get around that." App. at 2037.

The District Court ultimately gave the following work instruction:
**\*366** Work is what we're talking about. What-does the activity the plaintiffs claim they were doing or performing, was it work? To find that an employee should be paid for an activity under the Fair Labor Standards Act, you first need to determine whether or not the activity at issue is work. The law states that work is any physical or mental exertion, whether burdensome or not, controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and its business....

I said it requires exertion, either physical or mental, but exertion is not, in fact, necessary for all activity to constitute work under the Fair Labor Standards Act[. T]here-an employer, if he chooses, may hire a worker to do nothing or to do nothing but wait for something to happen. So that would be an exception *of the usual situation where the definition of work requires exertion.*

The plaintiffs claim that their donning, doffing, washing and rinsing activities are work. In deciding whether these activities are work under the law, you may consider the following factors. For each job position, *if the donning, doffing and washing at issue do not require physical or mental exertion, the activities are not work. Therefore, you may ask*

*yourself, is the clothing heavy or cumbersome, or is it lightweight and easy to put on or take off? Does an employee need to concentrate to wash their hands or gloves or put on or take off these clothes? Can an employee put on or take off their clothes or wash their hands or gloves while walking, talking or doing other things?*

App. at 2209-11 (emphasis added).

Following two and one-half hours of deliberation, the jury submitted a written question to the Court: "What is the meaning of exertion in the definition of work? Physical, or should we determine what or how much exertion?" App. at 3096, 2236. Following argument from the parties, the District Court read the jury the Webster's Dictionary definition of "exertion" and re-read the above jury charge on "work." App. at 2236-39. Thereafter, the jury returned a unanimous verdict finding plaintiffs had not "provided representative evidence that [the activities at issue] are 'work' " for purposes of the FLSA. App. at 3094-95. As a result, the jury did not reach the questions on the back of the verdict form as to whether the work was *de minimis* or whether appellants had been paid extra minutes to compensate for such time. Based on the jury's verdict, the District Court entered judgment on behalf of Tyson Foods.

## II.

"Although we generally review jury instructions for abuse of discretion, our review is plenary when the question is whether a district court's instructions misstated the law." *United States v. Dobson,* 419 F.3d 231, 236 (3d Cir.2005) (internal citations and quotations omitted). "As on all occasions when we consider jury instructions[,] we consider the totality of the instructions and not a particular sentence or paragraph in isolation." *United States v. Coyle,* 63 F.3d 1239, 1245 (3d Cir.1995).

Appellants, and the Secretary of Labor as amicus, argue that although the jury instructions noted that "exertion is not, in fact, necessary" for activity to constitute work under the FLSA, the District Court erred in informing the jury that such exertionless work is an exception to the "usual situation[.]" They assert it was error to inform the jury that "[f]or each job position, if the donning, doffing and washing at issue do not require physical or mental exertion, the activities are not work." **\*367**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

App. at 2210. In response, Tyson argues that the "heavy or cumbersome" language in the instruction was appropriate, relying in the main upon *Reich v. IBP, Inc.,* 38 F.3d 1123, 1125-26 (10th Cir.1994) (holding that "[t]he placement of a pair of safety glasses, a pair of earplugs and a hardhat into or onto the appropriate location on the head takes all of a few seconds and requires little or no concentration," so that these activities did not meet the "physical or mental exertion" requirement and accordingly could not be considered "work" under the FLSA).

The FLSA does not define the term "work." In its opinion in *Alvarez* issued in 2005, a unanimous Supreme Court provided a concise survey of how its case law has defined the term:

> Our early cases defined [work] broadly. In *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1944), we held that time spent traveling from iron ore mine portals to underground working areas was compensable; relying on the remedial purposes of the statute and Webster's Dictionary, we described "work or employment" as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." The same year, in *Armour & Co. v. Wantock,* 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944), we clarified that "exertion" was not in fact necessary for an activity to constitute "work" under the FLSA. We pointed out that "an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen." Two years later, in *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), we defined "the statutory workweek" to "include all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." Accordingly, we held that the time necessarily spent by employees walking from time clocks near the factory entrance gate to their workstations must be treated as part of the workweek.

*Alvarez,* 546 U.S. at 25-26, 126 S.Ct. 514 (certain internal citations omitted).

The *Alvarez* Court then discussed how, in response to *Anderson,* 328 U.S. at 691-92, 66 S.Ct. 1187, where the Court held that the term "workweek" in the FLSA included the time employees spent walking from time clocks near a factory entrance to

their workstations, Congress passed the Portal-to-Portal Act in order to shield employers from unexpected liability. The Act excluded the activities of "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities[.]" *Alvarez,* 546 U.S. at 27-28, 126 S.Ct. 514 (quoting 29 U.S.C. § 254). The *Alvarez* Court explained, however, that "the Portal-to-Portal Act does not purport to change this Court's earlier descriptions of the term[ ] 'work.' " *Id.* at 28, 126 S.Ct. 514.

The *Alvarez* decision was a consolidated appeal of *Alvarez v. IBP, Inc.,* 339 F.3d 894 (9th Cir.2003), and *Tum v. Barber Foods, Inc.,* 360 F.3d 274 (1st Cir.2004). The Supreme Court held, in response to a question raised in both cases, that the time employees spend walking between changing areas (where they had donned required protective gear) and production areas, and time spent waiting to remove that gear at the end of the work day is compensable under the FLSA, as amended by the Portal-to-Portal**368 Act. The Court further held, in response to a question raised only in *Tum,* that time spent waiting to receive gear before the work shift begins is not compensable, although it emphasized that its analysis would be different if an employer required its employees to arrive at a certain time and then wait to don the gear.

It is useful to examine the lower court opinions in *Tum* and *Alvarez.* In *Alvarez,* beef and pork slaughter and processing employees brought an FLSA action, arguing that they should be compensated for donning and doffing of their gear (which was, for certain employees, heavier and more elaborate than that at issue in the instant case, including a chain-mail type material for knife-wielding employees. The Court of Appeals for the Ninth Circuit explained the breadth of the definition of "work" under the FLSA, and then explained how the Portal-to-Portal Act and the *de minimis* doctrine nevertheless operate to narrow the compensability of such work. The Court of Appeals observed, as did the Supreme Court in its consideration of the case, that *Tennessee Coal* defined work as "physical or mental exertion (*whether burdensome or not* ) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *Alvarez,* 339 F.3d at 902 (citations and internal quotations omitted) (emphasis added). The Court of Appeals

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

explained:

Definitionally incorporative, [*Tennessee Coal*]'s "work" term includes even non-exertional acts. *See* [*Armour*] (noting that even "exertion" is not the *sine qua non* of "work" because "an employer ... may hire a man to do nothing, or to do nothing but wait for something to happen"). Plaintiffs' donning and doffing, as well as the attendant retrieval and waiting, constitute "work" under [*Tennessee Coal*'s] and *Armour's* catholic definition: "pursued necessarily and primarily for the benefit of the employer,"... these tasks are activity, burdensome or not, performed pursuant to IBP's mandate for IBP's benefit as an employer. The activities, therefore, constitute "work."

*Id.* (certain internal citations omitted).

The Ninth Circuit's opinion observed, however, that the conclusion "[t]hat such activity is 'work' as a threshold matter does not mean without more that the activity is necessarily compensable." *Id.* It explained how two sources of law in particular may operate to block compensation for such broadly defined "work." The first is the Portal-to-Portal Act, which, the court explained:

relieves an employer of responsibility for compensating employees for "activities which are preliminary or postliminary to [the] principal activity or activities" of a given job. 29 U.S.C. § 254(a) (1999). Not all "preliminary or postliminary" activities can go uncompensated, however. "[A]ctivities performed either before or after the regular work shift," the Supreme Court has noted, are compensable "if those activities are an integral and indispensable part of the principal activities."

*Alvarez,* 339 F.3d at 902 (quoting *Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed. 267 (1956)).

As to the second of the two sources, the Court of Appeals explained that *de minimis* work is also noncompensable, and cited to *Anderson,* 328 U.S. at 692, 66 S.Ct. 1187 ("When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours ... such trifles may be disregarded [, for] [s]plit-second absurdities are not justified by the actualities or working conditions or by the policy of the [FLSA].").

**\*369** The *Alvarez* Court of Appeals then agreed

with the district court's post-bench-trial conclusions in its findings of fact and conclusions of law as to why certain of the donning and doffing were compensable and others were not. As all the donning/doffing/washing was mandated and necessary to the principal work being performed, the donning and doffing was compensable as an integral and indispensable part of the principal activity pursuant to the Portal-to-Portal Act. Nonetheless, the court concluded that the donning of certain items, such as safety goggles and hardhats, was noncompensable as *de minimis.* It stated:

While we do not suggest that the donning of such gear is "trifl[ing]," *see* [*Anderson*], 328 U.S. at 692 [66 S.Ct. 1187], we do believe that neither FLSA policy nor "the actualities" of plaintiffs' working conditions justify compensation for the time spent performing these tasks. Accordingly, donning and doffing of all protective gear is integral and indispensable ... and generally compensable. However, the specific tasks of donning and doffing of non-unique protective gear such as hardhats and safety goggles is noncompensable as *de minimis*... In sum, we agree with the district court's conclusion, but for different reasons in part. In this context, "donning and doffing" and "waiting and walking" constitute compensable work activities except for the *de minimis* time associated with the donning and doffing of non-unique protective gear.

*Alvarez,* 339 F.3d at 904 (certain internal citations omitted).

On appeal, the Supreme Court, in its *Alvarez* opinion, referenced its holding in *Steiner v. Mitchell,* 350 U.S. 247, 254, 76 S.Ct. 330, 100 L.Ed. 267 (1956). In *Steiner,* the Supreme Court had concluded that in enacting the Portal-to-Portal Act Congress still intended that an employee's activities fall "within the protection of the [Fair Labor Standards] Act if they are an integral part of and are essential to the principal activities of the employees." 350 U.S. at 254, 76 S.Ct. 330. The *Steiner* Court therefore held "that activities performed either before or after the regular work shift ... are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed...."*Id.* at 256, 76 S.Ct. 330. Subsequently, the Supreme Court held in *Alvarez,*"that any activity that is 'integral and indispensable' to a 'principal activity' *is itself* a 'principal activity' under § 4(a) of the Portal-to-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Portal Act," and is thus compensable under the FLSA. *Alvarez,* 546 U.S. at 37, 126 S.Ct. 514 (emphasis added); *see also Mitchell v. King Packing Co.,* 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956) (applying *Steiner* to hold that workers in a meat packing plant were entitled to compensation for the time spent sharpening their knives, because the knife-sharpening activities were an integral part of, and indispensable to, the principal activities for which the workers were employed).

Accordingly, in *Alvarez,* the Court noted that the employer "does not challenge the holding below that, in light of *Steiner,* the donning and doffing of unique protective gear are 'principal activities' under [Section] 4 of the Portal-to-Portal Act" but, rather, challenged whether post-donning/pre-doffing walking time was compensable under the Portal-to-Portal Act.*Alvarez,* 546 U.S. at 32, 126 S.Ct. 514. The Court concluded that such walking time after donning is compensable because the donning was an unchallenged principal activity and therefore it triggered the start *370 of the workday.[FN8] In other words, donning "gear that is 'integral and indispensable' to employees' work is a 'principal activity' under the statute," and, thus, "during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of [the Portal-to-Portal Act's exclusion of walking time], and as a result is covered by the FLSA."*Alvarez,* 546 U.S. at 37, 40, 126 S.Ct. 514.

> FN8. In *Alvarez,* the Court noted that "[T]he Department of Labor has adopted the continuous workday rule, which means that the 'workday' is generally defined as 'the period between the commencement and completion on the same workday of an employee's principal activity or activities.' [29 C.F.R.] § 790.6(b). These regulations have remained in effect since 1947, see 12 Fed.Reg. 7658 (1947), and no party disputes the validity of the continuous workday rule." *Alvarez,* 546 U.S. at 29, 126 S.Ct. 514.

The Supreme Court next turned to the decision in *Tum v. Barber Foods, Inc.,* 360 F.3d 274 (1st Cir.2004). In that case, the Court of Appeals had agreed that "[i]n the context of this case, Employees are required by [employer] Barber Foods and or government regulation to wear the gear. Therefore,

[donning and doffing] are integral to the principal activity and therefore compensable." *Id.* at 279, 360 F.3d 274.[FN9] However, the Court of Appeals had held that the pre-donning waiting time, post-donning walking time, pre-doffing waiting time and pre-doffing walking time were all excluded from FLSA coverage by the Portal-to-Portal Act. The Supreme Court disagreed with almost all of these holdings. The Court held that the Court of Appeals was incorrect with regard to its treatment of post-donning walking time, and pre-doffing waiting and walking time. It stated, "[b]ecause doffing gear that is 'integral and indispensable' to employees' work is a 'principal activity' under the statute, the continuous workday rule mandates that time spent waiting to doff is not affected by the Portal-to-Portal Act and is instead covered by the FLSA."*Alvarez,* 546 U.S. at 40, 126 S.Ct. 514. Moreover, it also stated that the Court of Appeals was incorrect in concluding that the "walking time was a species of preliminary and postliminary activity excluded from FLSA coverage...."*Id.* at 39, 126 S.Ct. 514.

> FN9. The district court in *Tum* ruled in a pretrial motion that donning/doffing was integral to plaintiffs' employment at the chicken processor in question, thus removing it from exclusion under the Portal-to-Portal Act, and this, as noted, was affirmed on appeal to the First Circuit. The jury in *Tum,* however, had "concluded that such time was *de minimis* and therefore not compensable" and so, nevertheless, ruled for Barber on the question of compensation for this work. *Alvarez,* 546 U.S. at 39, 126 S.Ct. 514.

The Supreme Court only affirmed the Court of Appeals' conclusion, that *pre*-donning waiting time was not a "principal activity." It explained that the Portal-to-Portal Act mandated that such preshift activities are uncompensable: "unlike the donning of certain types of protective gear, which is *always* essential if the worker is to do his job, the waiting may or may not be necessary in particular situations or for every employee. It is certainly not 'integral and indispensable' in the same sense that the donning is. It does, however, always comfortably qualify as a 'preliminary' activity." *Id.* at 40, 126 S.Ct. 514. The Court observed, however, that such a conclusion would be different if "Barber required its employees to arrive at a particular time in order to begin waiting." *Id.* at 40 n. 8, 126 S.Ct. 514.

500 F.3d 361
500 F.3d 361, 154 Lab.Cas. P 35,336, 12 Wage & Hour Cas.2d (BNA) 1541
(Cite as: 500 F.3d 361)

[1][2] In light of the foregoing, we conclude that *Alvarez* not only reiterated the broad definition of work, but its treatment of walking and waiting time under the *371 Portal-to-Portal Act necessarily precludes the consideration of cumbersomeness or difficulty on the question of whether activities are "work." Activity must be "work" to qualify for coverage under the FLSA, and that "work," if preliminary or postliminary, will still be compensable under the Portal-to-Portal Act if it is "integral and indispensable" to the principal activity. Under *Alvarez,* such activities are, *in themselves,* principal activities. Although we recognize, of course, that whether donning and doffing is work was not directly at issue in Alvarez,[FN10] the Court could not have concluded that walking and waiting time are compensable under the Portal-to-Portal Act if they were not work themselves.

> FN10. The Supreme Court observed that Alvarez's employer did not challenge that the donning and doffing of unique gear are principal activities. *Alvarez,* 546 U.S. at 32, 126 S.Ct. 514.

Tyson relies upon *Reich v. IBP, Inc.,* 38 F.3d 1123, 1127 (10th Cir.1994), a pre-*Alvarez* case, in support of the District Court's use of the "cumbersome" language in the jury charge. In *Reich,* the Court of Appeals for the Tenth Circuit held that the donning and doffing of standard, non-unique protective material, such as hard hats, earplugs, safety footwear, and safety eyewear, was not "work" in light of *Tennessee Coal* and its progeny. 38 F.3d at 1125. Of some importance, the *Reich* court acknowledged that it "could also be said that the time spent putting on and taking off these items is *de minimis* as a matter of law, although it is more properly considered not work at all. Requiring employees to show up at their workstations with such standard equipment is no different from having a baseball player show up in uniform, a businessperson with a suit and tie, or a judge with a robe. It is simply a prerequisite for the job, and is purely preliminary in nature." *Id.* at 1126 n. 1.

Following issuance of the *Alvarez* decision, at least one district court in the Tenth Circuit has considered and rejected the continued viability of *Reich.* In *Garcia v. Tyson Foods, Inc.,* 474 F.Supp.2d 1240 (D.Kan.2007), the court stated that it was convinced that the Circuit, if given the

opportunity to revisit the issues in *Reich,* would approach its analysis of the pertinent issues differently in light of *Alvarez,* regardless of whether the Circuit ultimately reached the same conclusions concerning compensability. Significantly, the Circuit did not analyze the issues through the lens of the continuous workday rule as clarified by the Supreme Court in *Alvarez.* In light of *Alvarez,* it would seem that the Circuit, if revisiting *Reich* today, would focus not on whether the donning and doffing constituted 'work' within the meaning of *Tennessee Coal,* but on whether standard protective clothing and gear are 'integral and indispensable' to the work performed by production employees. Indeed, the Circuit in *Reich,* although in dicta, certainly stated that standard clothing and gear are integral and indispensable to the work performed by production employees, suggesting that the Circuit might reach a different conclusion on compensability if analyzed in the context of *Alvarez.*

> *Id.* at 1246.

The *Garcia* court rejected the argument that the Tenth Circuit's post-*Reich* opinion in *Smith v. Aztec Well Servicing Co.,* 462 F.3d 1274 (10th Cir.2006), was indicative of the continuing vitality of *Reich* after *Alvarez.* It noted that "the Circuit's ultimate holding in *Smith*-that travel time was not *372 compensable-was based on its conclusions that the plaintiffs' travel time was not integral and indispensable to the plaintiffs' principal activities and that the plaintiffs' travel time did not otherwise fall within the continuous workday. This analysis, a markedly different one than the *Reich* analysis, is in accord with *Alvarez* and further suggests that the Circuit, if revisiting *Reich,* would approach that case differently." *Garcia,* 474 F.Supp.2d at 1247 (certain internal citations omitted). Unlike the District Court in *Garcia,* we will not speculate about what another Court of Appeals would do if it reconsidered the issue in light of *Alvarez.*

We conclude instead that the better view is that stated in *Ballaris v. Wacker Siltronic Corp.,* 370 F.3d 901 (9th Cir.2004), which rejected *Reich* and reaffirmed the analysis the Ninth Circuit had previously set forth in its opinion in *Alvarez,* which was affirmed by the Supreme Court. The *Ballaris* court noted that, generally, preliminary and postliminary activities remain compensable so long as those activities are an integral and indispensable part of the principal activities. It observed that 29

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 361
500 F.3d 361, 154 Lab.Cas. P 35,336, 12 Wage & Hour Cas.2d (BNA) 1541
(Cite as: 500 F.3d 361)

C.F.R. § 790.8(c)"provides: 'Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance. If an employee in a chemical plant, for example, cannot perform his principal activities without putting on certain clothes, changing clothes *on the employer's premises* at the beginning and end of the workday would be an integral part of the employee's principal activity.' ...Further, 'where the changing of clothes *on the employer's premises* is required by law, *by rules of the employer*, or by the nature of the work,' the activity may be considered integral and indispensable to the principal activities." *Ballaris*, 370 F.3d 901, 910 (quoting 29 C.F.R. § 790.8(c)) (emphasis added by *Ballaris* court).

In *Ballaris*, plaintiffs were silicon wafer manufacturing workers who were required to "gown," i.e., don "bunny suits," and certain of whom were also obligated to don plant uniforms underneath the suits as well. The *Ballaris* court, relying on its decision in *Alvarez*, explained that the exertion of the changing activities was not at issue in deciding whether they were "work" or not: "In *Alvarez*, we held that donning and doffing of all protective gear was compensable worktime. We further held that, in considering whether putting on and taking off safety goggles was excluded, the ease of donning and ubiquity of use did not make the donning of such equipment any less integral and indispensable. We clarified that the term 'work,' as used in the FLSA, includes even *non-exertional* acts. We also made it clear that the donning and doffing of various types of safety gear, as well as the attendant retrieval and waiting, constituted 'work.' " *Ballaris*, 370 F.3d at 910-11 (internal quotations and citations omitted) (emphasis added).

The *Ballaris* court then explained that the fact that the employer required, and strictly enforced, its policy that employees don the attire, and, furthermore, that "this activity was performed at both broad and basic levels for the benefit of the company," led to the conclusion that the activity was not precluded by the Portal-to-Portal Act as merely preliminary. *Id.* (internal quotations to panel decision in *Alvarez* omitted) (citing *Dunlop v. City Electric, Inc.*, 527 F.2d 394, 399-401 (5th Cir.1976) (suggesting that the employer's directive to perform an action weighs in favor of compensability)). The *Ballaris* decision thus supports a much broader definition of "work" in the first instance, and notes

that such "work" may nevertheless be deemed *373 uncompensable under the Portal-to-Portal Act if it is not integral and indispensable to a given job.[FN11]

> FN11. The Secretary of Labor also highlights an interesting provision of the FLSA, 29 U.S.C. § 203(o), which provides, under the heading of "Hours Worked," that "[i]n determining ... the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee." Of course, no such collective-bargaining agreement is at issue in this case, but the very existence of this carve-out for changing time under the heading "Hours Worked" in the statute provides at least some indication that such activity is itself properly considered "work" under the FLSA. See *Turner v. City of Philadelphia*, 262 F.3d 222, 224 and 224 n. 1 (3d Cir.2001) (examining § 203(o) and noting that "[w]e assume *arguendo*, as plaintiffs would have us do, that *clothes and uniform change time would ordinarily be included within hours worked*... Defendants do not dispute this point."). No mention of the "cumbersome" or "heavy" nature of the changing or washing may be found in the statute. See *Steiner*, 350 U.S. at 255, 76 S.Ct. 330 (observing that the "clear implication" of the statute is that changing and washing *is* a principal activity unless otherwise excluded from coverage by statute).

[3][4][5] In light of the broad remedial purpose of the FLSA, *see, e.g., Brock v. Richardson*, 812 F.2d 121, 123 (3d Cir.1987) ("The Fair Labor Standards Act is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted."), we conclude that it was error for the jury instruction to direct the jury to consider whether the gear was cumbersome, heavy, or required concentration to don and doff. This language in effect impermissibly directed the jury to consider whether the poultry workers had demonstrated some sufficiently

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

laborious *degree* of exertion, rather than some form of activity controlled or required by the employer and pursued for the benefit of the employer; *Armour* demonstrates that exertion is not in fact, required for activity to constitute "work."

### III.

In light of the foregoing analysis, the undisputed facts established that the donning and doffing activity in this case constitutes "work" as a matter of law. Because the jury was erroneously instructed on the definition of "work," we will remand to the District Court for further proceedings consistent with the above analysis.[FN12] Although preliminary or postliminary work is non-compensable under the Portal-to-Portal Act if the work is not " 'integral and indispensable' to [the] 'principal activit[ies]' " of a given job, *Alvarez*, 546 U.S. at 37, 126 S.Ct. 514, we note that Tyson explicitly withdrew any defense that, if work, donning or doffing was not integral or indispensable in the joint pre-trial memorandum. We leave it to the District Court to determine the preclusive effect, if any, of this withdrawal in any further proceedings.

> FN12. Appellants also challenged the continuous workday instruction given at trial. The continuous workday is generally defined as "the period between the commencement and completion on the same workday of an employee's principal activity or activities." *Alvarez*, 546 U.S. at 29, 126 S.Ct. 514 (internal quotations and citations omitted). We believe a correct definition of work would alleviate any concerns that appellants would have on this point were there to be a second trial; in any event, the District Court properly instructed the jury on the continuous workday rule, and "[n]o litigant has a right to a jury instruction of its choice, or precisely in the manner and words of its own preference." *Douglas v. Owens*, 50 F.3d 1226, 1233 (3d Cir.1995).

[6] On remand, the District Court will also need to consider the *de minimis* doctrine,*374 which provides a limiting principle to compensation for trivial calculable quantities of work. **Tyson** argues that any guidance we may give as to the content of the doctrine would be merely advisory; we disagree. *See Douglas*, 50 F.3d at 1228 ("In light of our decision to remand for a new trial, it is not necessary

to address the issue of the jury instruction regarding the law governing the use of force against prisoners. Nonetheless, because of the likelihood that this issue will undoubtedly arise again during the new trial, we will give directions on the issue to the district court."); *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1566 (Fed.Cir.1984) ("Trans-World raises both of those issues in its appeal. Nyman's first response is that we should not consider those issues, on the ground that since the jury did not reach the question of damages because it concluded that both patents were invalid, Trans-World is seeking an advisory opinion on an issue that neither the jury nor the district court decided. Those issues, however, undoubtedly will arise on the retrial of the question of damages that will be held.").

We therefore proceed to provide some comments on the *de minimis* doctrine. In *Anderson,* the Court explained that "[t]he workweek contemplated ... must be computed in light of the realities of the industrial world. When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." *Anderson,* 328 U.S. at 692, 66 S.Ct. 1187.

The Court of Appeals for the Ninth Circuit has held that, "in determining whether otherwise compensable time is *de minimis,* we will consider (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Lindow v. United States,* 738 F.2d 1057, 1063 (9th Cir.1984) (holding that time difficult to calculate, small in the aggregate, and irregularly performed is *de minimis).* The regulation appearing in 29 C.F.R. § 785.47 notes that:

In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. (*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946))[.] This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

500 F.3d 361
500 F.3d 361, 154 Lab.Cas. P 35,336, 12 Wage & Hour Cas.2d (BNA) 1541
**(Cite as: 500 F.3d 361)**

and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

Appellants argue that the *de minimis* charge that the District Court gave only instructed the jury to consider whether the donning/doffing activities were *de minimis,* and not whether that time, when aggregated with post-donning/pre-doffing walking time, was *de minimis.* App. at 2212-15. We agree that this is an issue that should be reconsidered on remand. *See*\*375*Lindow,* 738 F.2d at 1063 ("[W]e will consider the size of the aggregate claim. Courts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim."); *Reich v. New York City Transit Authority,* 45 F.3d 646, 652 (2d Cir.1995) (same).

[7] Finally, appellants assert that the District Court should not have charged the jury that so-called "additional" or "extra" minutes, which Tyson claimed it gave certain workers some of the time as non-"work" compensation, was a defense under the FLSA for the uncompensated time. They argue in particular that the damages and liability portions of the trial were bifurcated, and the issue of payment was to be addressed at a later phase of the proceedings. We agree. It is clear that all of the workers in the class were not so compensated. To the extent this issue may arise again on remand, we believe that questions regarding such payments are more appropriately resolved at the damages stage.

### IV.

For the foregoing reasons, we will reverse and remand this matter to the District Court for further proceedings consistent with this opinion.

C.A.3 (Pa.),2007.
De Asencio v. Tyson Foods, Inc.
500 F.3d 361, 154 Lab.Cas. P 35,336, 12 Wage & Hour Cas.2d (BNA) 1541

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# B

# In The Matter Of:

*David Alford, Sr., et al. v.*
*Perdue Farms, Inc.*

---

*David J. Tabinowski*
*December 12, 2007*

---

*American Court Reporting Company, Inc.*
*52 Executive Park S, Suite 5201*
*Atlanta, Georgia  30329*
*800-445-2842*
*WWW.ACRGA.COM*

Original File 54811.TXT, Pages 2-95 (94)

**Word Index included with this Min-U-Script®**

Page 3

[1]
[2]                            C O N T E N T S
                           E X A M I N A T I O N
[3]                                                        Page
[4]   Examination by Mr. Celler . . . . . . . . .        4, 87
[5]   Examination by Mr. Liss . . . . . . . . . .           81
[6]
[7]                      E X H I B I T S

      FOR THE PLAINTIFF:
[8]
      Number           Description              Identified
[9]
[10]    1   Perdue Farms Incorporated Departmental    14
            Counseling Record regarding associate
[11]        Maggie Lawson dated 3/15/05
[12]    2   Disciplinary Record regarding associate   16
            Sharhonda Harrell dated 4/4/05
[13]
        3   Power Point Presentation, Bates stamped   36
[14]        PER_ALP0000013
[15]    4   First Principal Activity - Associate      48
            Performance Standards and Perry Plant
[16]        Discipline Program
[17]    5   Declaration of Dave Tabinowski            57
[18]    6   Plaintiff's Notice of Taking Deposition   65
            for subject deposition
[19]
[20]    7   First Principal Activity - Associate      69
            Performance Standards and Perry Plant
            Discipline Program, signed by Annie J.
[21]        Bray dated 3/16/07
[22]    8   First Principal Activity - Associate      71
            Performance Standards and Perry Plant
[23]        Discipline Program, signed by Mary L.
            Harrell dated 3/21/07
[24]
        9   Timecard for Rhynada Collier -            80
[25]        9/27/04-10/3/04

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

MACON DIVISION

DAVID ALFORD, SR., et al.,)
                          )
        Plaintiff,        ) CIVIL ACTION FILE
                          )
vs.                       ) NO. 5:07-CV-00087-CAR
                          )
PERDUE FARMS, INC.,       )
                          )
                          )
        Defendant.        )
_____ /

                - - -

        The deposition of DAVID J. TABINOWSKI, taken on behalf of the Plaintiff, pursuant to the stipulations agreed to herein, taken for the purpose of cross-examination and discovery and any other purpose authorized by the Georgia Civil Practice Act; the reading and signing of the deposition being reserved; taken before Alice E. Simmons, Registered Professional Reporter, commencing at 9:56 a.m., on this, the 12th day of December, 2007, at Morgan & Morgan, 191 Peachtree Street, N.E., Suite 4200, Atlanta, Georgia.

Page 2

[1]   APPEARANCES OF COUNSEL:
[2]   For the Plaintiff:
[3]            RICHARD B. CELLER, ESQUIRE
               DEIDRE JOHNSON, ESQUIRE
[4]            TISHA TALLMAN, ESQUIRE
               MORGAN & MORGAN
[5]            191 Peachtree Street, N.E.
               Suite 4200
[6]            Atlanta, Georgia  30303
               E-mail:  Djohnson@forthepeople.com
[7]
      For the Defendant:
[8]
               BRIAN E. LISS, ESQUIRE
[9]            MORGAN, LEWIS & BOCKIUS, LLP
               1111 Pennsylvania Avenue, N.W.
[10]           Washington, D.C.  20004
               (202) 739-5579
[11]           E-mail:  bliss@morganlewis.com
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

                P R O C E E D I N G S
[1]
[2]             DAVID J. TABINOWSKI,
[3]   having been duly sworn, was examined and
[4]   testified as follows:
[5]             CROSS-EXAMINATION
[6]   BY MR. CELLER:
[7]   Q   Good morning.  I already know the answer
[8]   to this, but please state your name.
[9]   A   David J. Tabinowski.
[10]  Q   And Mr. Tabinowski, are you currently
[11]  employed?
[12]  A   Yes.
[13]  Q   Who do you work for?
[14]  A   Perdue Farms.
[15]  Q   And what do you do for Perdue Farms?
[16]  A   I'm project lead in the internal audit
[17]  department.
[18]  Q   Can you give me what I will refer to as a
[19]  Cliff Note version of what that means?
[20]  A   Well, my duties in the internal audit
[21]  department are related to payroll and immigration and
[22]  first and last principal activity.
[23]  Q   What type of training did you have -- or
[24]  strike that.
[25]         Have you had any training with regard to

---

Page 5

[1] the Fair Labor Standards Act to determine what a
[2] principal or a final activity is?
[3]   A   Well, training as far as from a wage and
[4] hour, I had 10-plus years as payroll manager and
[5] worked closely with HR. I was involved heavily with
[6] our agreement with the Department of Labor on our
[7] donning and doffing issues.
[8]   Q   And when was that agreement or that
[9] consent decree issued, if you know?
[10]   A   I believe it was signed by us in May of
[11] 2002.
[12]   Q   And how long have you been in the current
[13] position that you hold for Perdue?
[14]   A   In internal audit it's since 1999.
[15]   Q   And have you held that position
[16] consistently throughout today?
[17]   A   Yes.
[18]   Q   As part of your job duties, are you
[19] responsible for reviewing recent case law decisions
[20] or decisions that come out of the courts that
[21] interpret donning and doffing or Fair Labor
[22] Standards Act?
[23]   A   No.
[24]   Q   Have you ever heard of a decision called
[25] Alvarez v. IVP?

---

Page 7

[1]   A   (Reviews document).  No.
[2]   Q   Let me ask you a couple of questions about
[3] it and just make sure that ... Before I ask you
[4] that, where do you work out of?
[5]   A   Salisbury, Maryland.
[6]   Q   And do you have a division that you're
[7] responsible for at Perdue, like a region?
[8]   A   No.  We do not have divisions as far as
[9] poultry processing.  So ... The answer to that is no.
[10]   Q   Okay.  How is it that if you work in
[11] Maryland you would be able to testify with regard to
[12] the practices in Perry, Georgia?
[13]   A   Part of my job is to visit all the plants
[14] within the company.
[15]   Q   And when is the last time that you visited
[16] the plant in Perry, Georgia?
[17]   A   The early part of 2007.
[18]   Q   Sometime in April of '07; is that correct?
[19]   A   February, March, April, something like that.
[20]   Q   And just so you know, I'm not trying to
[21] trick you, your declaration said April of '07.
[22]   A   Said April, right.
[23]   Q   I usually do this in the beginning, but
[24] have you ever had your deposition taken before?
[25]   A   Yes, I've had depositions taken.

---

Page 6

[1]   A   No.
[2]   Q   Do you know whether the Supreme Court has
[3] modified its position in the last five years since
[4] the consent decree was issued with Perdue regarding
[5] what is considered compensable with regard to
[6] donning and doffing?
[7]   MR. LISS:  Objection, calls for an answer
[8] that would require a legal interpretation.
[9]   MR. CELLER:  That's fine.
[10] BY MR. CELLER:
[11]   Q   You can answer.
[12]   A   No.
[13]   MR. CELLER:  Brian, do you have a copy of
[14] the deposition notice?
[15]   MR. LISS:  I have a copy of the first
[16] deposition notice.
[17]   MR. CELLER:  Yeah, it's fine, I just want
[18] to make sure he's the proper corporate
[19] representative.  Can I borrow it for one
[20] second?
[21]   MR. LISS:  (Presents).
[22] BY MR. CELLER:
[23]   Q   Let me show you what we'll mark eventually
[24] as Exhibit 1, we're waiting for a copy, and ask you
[25] if you've ever seen that document before.

---

Page 8

[1]   Q   Just a couple of quick rules.  The court
[2] reporter is taking down everything we're saying, and
[3] you're doing a great job.  I need you to answer
[4] verbally.  If I ask you a yes or no, please answer
[5] yes or no and if you want to explain, feel free to
[6] do so.
[7]   A   Okay.
[8]   Q   If I ask you a question and you don't
[9] understand it, let me know and I'm more than happy
[10] to rephrase it.
[11]   A   Okay.
[12]   Q   And if I ask you a question and you answer
[13] it, I'm going to assume that you understood it.  Can
[14] I get your agreement on that?
[15]   A   Yes.
[16]   Q   Prior to April of 2007, when was the last
[17] time you visited the Perry, Georgia plant?
[18]   A   That was the first time that I had visited
[19] the plant.
[20]   Q   And what was the purpose of your visit?
[21]   A   We were doing our ... I was doing my first
[22] and last principal activity audits.
[23]   Q   Can you describe for me what that means?
[24]   A   Basically I go into the plant and evaluate
[25] their compliance with our consent agreement.

Case 1:06-cv-01000-MEF-WC    Document 63-3    Filed 01/22/2008    Page 16 of 26
Perdue Farms, Inc.                                                    Darla Autery, et al. v. Perdue
                                                          December 12, 2007

---

**Page 9**

[1]   Q.   Okay. Would it be fair to say that you
[2] limit your investigation to what the parameters are
[3] set forth in the consent decree?
[4]   A.   That is the primary part of the audits. If
[5] I do see something else that might be of some concern,
[6] then I'll bring it to somebody's attention. But it's
[7] primarily the consent agreement.
[8]   Q.   Are you familiar with the term principal
[9] activity as it's used in the Perdue nomenclature?
[10]  A.   Yes.
[11]  Q.   To your knowledge is there a standard
[12] definition at Perdue as to what First Principal
[13] Activity means?
[14]  A.   Yes.
[15]  Q.   Can you describe for me what your
[16] understanding of that term is?
[17]  A.   First Principal Activity at the beginning of
[18] a shift or start of the break is either doing actual
[19] work and donning and doffing the specific items.
[20]  Q.   Okay. We're going to talk a bit about the
[21] specific items at issue. Does Perdue require
[22] employees to wear hair nets on the line?
[23]  A.   It is an industry-wide requirement, and from
[24] a food safety standpoint also.
[25]  Q.   So would you agree that it's not optional

**Page 10**

[1] for an employee to wear a hair net on the line?
[2]   A.   It is not optional, but it's a personal
[3] item.
[4]   Q.   What do you mean by a personal item?
[5]   A.   They can wear it home with them, store it in
[6] their locker.
[7]   Q.   Are there any requirements that Perdue
[8] imposes upon employees for the washing or caring for
[9] of hair nets?
[10]  A.   They don't wash or care, they'll throw them
[11] away and get a new one.
[12]  Q.   If, for example, you determine that an
[13] employee wore a hair net home one day and then wore
[14] it back to work the next day, would that be
[15] considered acceptable?
[16]  A.   From my audit standpoint I would not look at
[17] that but from ... someone else maybe. I can't answer
[18] that question really.
[19]  Q.   What are some of the other items that
[20] Perdue considers to be personal?
[21]  A.   Beard net.
[22]  Q.   And would you agree that a beard net if an
[23] employee has a beard is required by Perdue as well?
[24]  A.   It's required pretty much by the industry.
[25]  Q.   Okay.

**Page 11**

[1]   A.   It's food safety also.
[2]   Q.   Do you know who Jerry Garcia is? He's not
[3] an employee, he's a former rock musician.
[4]   A.   Oh, yeah. He just died a while back.
[5]   Q.   Correct. Do you remember what he looked
[6] like?
[7]   A.   Yeah.
[8]   Q.   If I were to show up at work to Perdue
[9] looking like Jerry Garcia with a beard out to my
[10] shoulders.
[11]  A.   Uh-huh (affirmative).
[12]  Q.   Would I be required to wear a hair net by
[13] Perdue? A beard net, I'm sorry.
[14]  A.   Any production facility would require that
[15] to be worn. Any food production.
[16]  Q.   Okay.
[17]  A.   Or ... you know, as far as I'm concerned
[18] food business would do it.
[19]  Q.   Okay.
[20]  A.   Even delis.
[21]  Q.   What are some other personal
[22] protective ... Can we refer to it as PPE, is that
[23] the right term?
[24]  A.   Well, there's different terms.
[25]  Q.   Okay, so let's just call it personal

**Page 12**

[1] equipment, let's use your terms. What are some
[2] other items of personal equipment that employees at
[3] Perdue are required to wear?
[4]   A.   Required?
[5]   Q.   Required.
[6]   MR. LISS:  Objection. Required by whom?
[7] BY MR. CELLER:
[8]   Q.   Either required by Perdue policy or by
[9] safety standards.
[10]  A.   Compensable or non-compensable?
[11]  Q.   Let's talk about non-compensable that
[12] Perdue does not pay employees to don or doff.
[13]  A.   Items similar to the hair net and beard net
[14] is also boots.
[15]  Q.   Okay. What type of boots?
[16]  A.   They are steel toed boots, steel toed tennis
[17] shoes. It is their preference in what they purchase.
[18]  Q.   Okay.
[19]  A.   And they can wear that home and wear it to
[20] wherever.
[21]  Q.   Are they required to wear them on the line
[22] either by Perdue or by safety standards in the
[23] industry?
[24]  A.   The industry would require those for safety
[25] reasons, yes.

---

Page 13

[1]     Q   And if an employee was not wearing the
[2] appropriate boots on the line, they could be written
[3] up by Perdue, correct?
[4]     A   I've never seen it happen but it probably
[5] has.
[6]     Q   And just so we can circle back, the same
[7] question with regard to the hair net and beard net,
[8] if an employee is not wearing those on the line they
[9] could be written up by Perdue for doing so, correct,
[10] or for not doing so?
[11]    A   Probably, yes.
[12]    Q   And just so we can take out any of the
[13] ambiguity, let's go ahead and mark this as
[14] Plaintiff's Exhibit 1.
[15]        MR. CELLER:  And Brian, I apologize, I got
[16]    in yesterday so I don't have copies.  But take
[17]    your time and review it.
[18]        MR. LISS:  Exhibit 2 you mean?
[19]        MR. CELLER:  We didn't mark the other one
[20]    yet.
[21]        MR. LISS:  So you're not going to mark the
[22]    notice?
[23]        MR. CELLER:  I may at some point.
[24]        MR. LISS:  Okay.
[25]        MR. CELLER:  I'm still waiting for a copy.

Page 14

[1]        MR. LISS:  So I will get a copy before I
[2]    leave?
[3]        MR. CELLER:  Yeah, we'll make copies of
[4]    everything.  And it's your production.
[5]        (Thereupon, Plaintiff's Exhibit Number 1
[6]    was marked for identification).
[7] BY MR. CELLER:
[8]     Q   Showing you what's been marked as
[9] Plaintiff's Exhibit Number 1.  Do you recognize that
[10] document?
[11]    A   No.
[12]    Q   Have you ever seen a document issued by
[13] Perdue in that form?
[14]    A   Just by the title ... I have not seen one in
[15] this form.  I've seen other types of coaching sessions
[16] or whatever.
[17]    Q   And -- go ahead.
[18]        MR. LISS:  Excuse me.  For the record, do
[19]    you want to have him describe what this is?
[20]        MR. CELLER:  Yeah, I'm going to do all
[21]    that.
[22]        MR. LISS:  Okay.
[23]        MR. CELLER:  I want to lay a predicate
[24]    first or a foundation.
[25] BY MR. CELLER:

Page 15

[1]     Q   Is there a signature on the bottom of that
[2] document by a human resource manager of Perdue?  If
[3] you know.
[4]     A   No, I can't ...
[5]     A   Let me take a look at that for a minute.
[6]     A   I can't tell.
[7]     Q   Okay.  Take a look at the context of the
[8] document and if you can describe for me what you
[9] believe that document is.
[10]    A   (Reviews document).  It's a reprimand for
[11] wearing ... having their personal protective gear on.
[12]    Q   So would you agree that based on -- Strike
[13] that.
[14]        Do you have any reason to believe that
[15] this is a document that was not issued by a Perdue
[16] manager to an employee at Perdue?
[17]    A   Could you repeat that, please?
[18]    Q   Sure.  Do you have any reason to believe
[19] that this document was not a document issued by
[20] somebody on behalf of Perdue to an employee?
[21]    A   I have no reason.
[22]    Q   Okay.  And would you agree that this is a
[23] document, what's been marked as Plaintiff's Exhibit
[24] Number 1, which reflects a reprimand to an employee
[25] for not properly adhering or wearing PPE equipment?

Page 16

[1]     A   That appears to be what it is.
[2]     Q   Okay, thanks.
[3]        Are ear plugs required by line employees
[4] either by Perdue or safety standards in the
[5] industry?
[6]     A   It is an industry-wide requirement, it is a
[7] personal item that can be taken home.
[8]     Q   And would you agree that Perdue does not
[9] pay employees for the donning or doffing of ear
[10] plugs?
[11]    A   Is it not part of our consent agreement.
[12] That item was excluded from that as being a personal
[13] item that can be worn home.
[14]    Q   So is the answer no to that question?
[15]    A   Yes.
[16]    Q   Would you agree that if an employee does
[17] not wear ear plugs on the line, he or she could be
[18] written up for that?
[19]    A   Yes.
[20]    Q   And have you ever heard of an employee or
[21] a human resources employee by the name of Anita
[22] Moreno?
[23]    A   No, I have not.
[24]        (Thereupon, Plaintiff's Exhibit Number 2
[25]    was marked for identification).

**Page 17**

BY MR. CELLER:

Q Let's go ahead and show you what's been marked as Plaintiff's Exhibit Number 2. Let me give it to your counsel first.

MR. LISS: (Reviews document).

THE WITNESS: (Reviews document).

BY MR. CELLER:

Q Showing you what's been marked as Plaintiff's Exhibit Number 2. Do you recognize the form of that document?

A Yes, I do.

Q And what is it?

A It's a disciplinary record.

Q Can you describe just for the record in what context this disciplinary record was issued?

A Failure to wear ear plugs.

Q While on the line; is that correct?

A It doesn't really say that.

Q Okay. That's a good point.

A It just says "was not wearing her ear plugs."

Q And as you sit here today as the designated corporate representative, do you have any reason to believe that this document was not issued by Perdue to an employee?

**Page 18**

A I have no reason.

Q What are some other personal items that are either donned or doffed by employees, I'm going to the refer to it as off the clock.

A Okay.

Q Or for which they're not paid, other than what we've already discussed.

A The bump cap I don't believe we've talked about.

Q What's a bump cap?

A The bump cap is a protective head gear that can be worn out in the plant.

Q Is it required to be worn either by Perdue or industry standards?

A No, it's not.

Q That's an optional piece of equipment?

A Uh-huh (affirmative).

Q Can you answer verbally?

A Yes, I'm sorry.

Q Not a problem. What about shoe covers or slip covers, have you ever heard ...

A No, I've not seen them or heard of them.

Q What about safety goggles?

A They are ... Depending on the job, they are worn and I'm actually not sure if that is a personal

**Page 19**

item or not.

Q Okay. And --

A In most cases I do not see them wearing it.

Q Okay. Do you know whether in instances where employees do wear the safety goggles they're paid for the time in putting them on, do you know either way?

A In most cases they're wearing them they're put on at the line and they're on the clock.

Q Okay. Can you identify any other personal items other than what we've identified or described that employees are required to put on off the clock?

A No.

Q The rubber boots that we discussed, are those considered to be safety boots?

A Yeah, rubber boots are steel -- the steel toed boots that I had mentioned earlier.

Q Would you agree that prior to clocking in, Perdue requires employees to have these personal items on?

A From a safety standpoint through other organizations that is a requirement.

Q But specifically with regard to Perdue's policies, Perdue requires its employees to have that personal equipment on prior to clocking in, correct?

**Page 20**

A They're required to have some type of foot coverage or the other items also, yes.

Q And they're not paid for putting those items on, correct?

A No. In our consent agreement those items were agreed upon to be non-compensable items.

Q Let me ask you a question. Do you know whether since the date of the consent agreement the law has changed as to whether those personal items are now considered compensable if put on?

MR. LISS: Objection to the form of the question.

MR. CELLER: Yeah, it's not well asked. Let me ask it a different way.

BY MR. CELLER:

Q As you sit here today, do you know whether the law now requires that employees be paid for putting on the personal items that we've described?

MR. LISS: Objection to the form.

MR. CELLER: Fair enough.

BY MR. CELLER:

Q You can answer.

A In my opinion we are bound by the consent agreement and that's what we are conducting our operations by.

**Page 21**

[1]     Q   When's the first time you got a cell
[2] phone?
[3]       MR. LISS: Objection.
[4] BY MR. CELLER:
[5]     Q   In your life.
[6]     A   Three, four years ago.
[7]     Q   Was it one of those bigger cell phones?
[8]     A   Not necessarily -- No.
[9]     Q   Have you had the same cell phone for three
[10] or four years?
[11]     A   No.
[12]     Q   When did you get a new cell phone?
[13]       MR. LISS: Objection to the line of
[14] questions. Let's not play games and get to the
[15] point.
[16]       MR. CELLER: We're not but I --
[17]       THE WITNESS: Yeah, you've got to get
[18] home.
[19] BY MR. CELLER:
[20]     Q   I know, I know, but I'm almost done. I've
[21] got to fill some time and I've got to justify my
[22] existence to Atlanta. I guess the question --
[23]     A   The answer to the question, my wife's phone
[24] broke so we got new ones.
[25]     Q   Fair enough. I'll move off the cell

**Page 22**

[1] phones, I'm just having a little bit of fun with
[2] you.
[3]     I guess my question is this: Do you know
[4] whether Perdue has revised or revamped its donning
[5] and doffing procedures since the implementation of
[6] the consent decree in 2001 --
[7]     A   2002.
[8]     Q   -- 2002 to become more current with the
[9] times?
[10]     A   I'm not aware of that.
[11]     Q   And as far as your investigations when you
[12] go out and do an audit on site, you're still
[13] operating solely within the parameters of the 2002
[14] consent decree; is that correct?
[15]     A   That is correct.
[16]     Q   So, for example, when you do your audit,
[17] you don't count or look to see whether these
[18] personal items are being put on on or off the clock;
[19] is that right?
[20]     A   The ones that are listed that we just
[21] discussed, yeah, I watch and see what they're putting
[22] on, but if it's a compensable item then it will be an
[23] issue.
[24]     Q   Okay.
[25]     A   But if not, then I just move on.

**Page 23**

[1]     Q   So would you agree that in doing your
[2] audits, you don't consider as compensable time the
[3] time employees spend putting on these ear plugs and
[4] walking to punch in, for example?
[5]       MR. LISS: Objection to the form. You've
[6] added now an element.
[7]       MR. CELLER: I'll take out the element.
[8] What's the element, the ear plugs?
[9]       MR. LISS: Walking.
[10]       MR. CELLER: Okay. We'll go to walking
[11] next.
[12] BY MR. CELLER:
[13]     Q   Would you agree that Perdue does not
[14] consider as compensable time the time employees
[15] spend putting on these personal items?
[16]     A   Well, most of the times those items have
[17] already been put on when they get out of their car.
[18] They come to work with those items on and that was
[19] probably -- or, in fact, one of the basis for having
[20] them excluded from compensable time because they are
[21] put on out in the parking lot at home, they wear their
[22] boots to whatever.
[23]     Q   How do you know that?
[24]     A   I see them.
[25]     Q   Have you ever seen them at the Perry

**Page 24**

[1] facility do that?
[2]     A   Yes, walking from the parking lot.
[3]     Q   How many days did you spend at the Perry
[4] facility doing your audit?
[5]     A   I was three days at the Perry plant.
[6]     Q   And you would agree that during those
[7] three days you also observed employees putting that
[8] equipment on, meaning the personal equipment, in the
[9] plant, correct?
[10]       MR. LISS: Objection to the form. We now
[11] have a list of personal equipment and I think
[12] you should specify. Of course you can answer.
[13] BY MR. CELLER:
[14]     Q   Right, all the items that we've been
[15] discussing that are excluded from being compensated,
[16] you would agree that you've seen employees put those
[17] items on prior to clocking in in the plant?
[18]     A   Some, yes.
[19]     Q   Okay. Now, have you ever done or do you
[20] know whether Perdue has ever done a time study to
[21] see how long it takes from the moment an employee
[22] walks in the front door of the plant to the front
[23] door of second processing to clock in?
[24]       MR. LISS: Objection to the form.
[25] BY MR. CELLER:

David Hofford, et al v.    Document 63-3    Filed 01/22/2008    Page 9 of 26
Case 1:000-MEF-WC
Perdue Farms, Inc.       David J. Tabinowski
December 12, 2007

Page 25

[1]   Q   That's okay, you can answer.
[2]   A   From the front door to where second
[3] processing clocks in? At the time Perry – No, there
[4] was never one done at the Perry facility.
[5]   Q   Have you made that walk before?
[6]   A   Yes.
[7]   Q   How long does the walk take?
[8]   A   10 seconds.
[9]   Q   It's your testimony that it's a 10 second
[10] walk from the front doors to the time clock at the
[11] Perry facility in second processing?
[12]   A   Yeah. If you walk purposefully to the ...
[13]   Q   Okay.
[14]   A   There could be some people you want to talk
[15] to or whatever, and so it's a matter -- if you want to
[16] walk from the front door to the clock, not very long.
[17]   Q   Okay. Let me ask you the same question
[18] with regard to the front door to the first
[19] processing doors and time clock. Is it the same
[20] entrance?
[21]   A   It's the same front entrance but not the
[22] same entrance to the clocks.
[23]   Q   Do you know whether a time study has ever
[24] been done to determine how long it takes to walk
[25] from the front doors of the Perdue facility in Perry

Page 26

[1] to the time clock in first processing?
[2]   A   I am not aware of any.
[3]   Q   Have you done that walk before?
[4]   A   Yes.
[5]   Q   And how long approximately does it take?
[6]   A   A little bit less time than the one in
[7] second processing.
[8]   Q   So it's closer to the front door?
[9]   A   Yes.
[10]   Q   Is there a break room that you're aware of
[11] at the Perry facility?
[12]   A   Yes.
[13]   Q   Do you know whether a time study has ever
[14] been done to determine how long it takes to walk
[15] from the second processing time clock to the break
[16] room?
[17]   A   The second processing to the ... five
[18] seconds.
[19]   Q   Okay.
[20]   A   It's very close.
[21]   Q   And what about with regard to the first
[22] processing, let me ask you the two questions, one,
[23] do you know whether a time study has ever been done?
[24]   A   No, not to my knowledge.
[25]   Q   And as far as the walk from the first

Page 27

[1] processing to the break room, do you know
[2] approximately how long that takes?
[3]   A   It's about the same time because there's two
[4] break rooms.
[5]   Q   Okay, fair enough. Can you describe for
[6] me the process if you know, and we can break it down
[7] by first and second processing unless you think
[8] they're both the same for description purposes, how
[9] the procedure works from the time an employee walks
[10] in the door in the morning and the time they punch
[11] in for the beginning of their shift?
[12]   A   Okay. It depends on the individual. They
[13] walk in and they'll sit in the break area, have coffee
[14] or whatever. And when they're scheduled time to
[15] start, they'll go in and swipe in and go in, put their
[16] gear on to go to their respective locations.
[17]   Q   Do you know whether there's a line in the
[18] morning for employees to swipe in?
[19]   A   There are sometimes; sometimes not. It
[20] depends on when they all get to the clock. It's their
[21] preference on what time to get there.
[22]   Q   And if they're not on the line exactly at
[23] the time scheduled, they get reprimanded, correct?
[24]   A   There's a period of time that is given
[25] to ... if there is a number of people going to the

Page 28

[1] same department that are in line, there is a
[2] time that will not cause them to be late.
[3]   Q   Okay. I believe it's approximately two
[4] minutes; is that correct?
[5]   A   That's ... (Nods head affirmatively). In
[6] most cases, yes.
[7]   Q   Okay. To your knowledge has Perdue ever
[8] examined how long employees will wait in line prior
[9] to punching in?
[10]   A   To my knowledge, no.
[11]   Q   Have you ever seen or personally have you
[12] ever personally observed how long an employee could
[13] wait in line to punch in?
[14]   A   I have not paid attention to that fact.
[15]   Q   And would you agree that while employees
[16] are waiting to punch in, they've already donned
[17] their personal gear as we've described previously
[18] during this deposition?
[19]   A   Yeah.
[20]   Q   Okay.
[21]   A   There's a lot of times as I said some of
[22] them wear it from their car.
[23]   Q   Okay. And some of them also put it on in
[24] the plant, though, correct?
[25]   A   Yes.

David J. Tabinowski
December 12, 2007

David Alford, Sr., et al. v.
Perdue Farms, Inc.

---

Page 29

[1] **Q** Okay. Have you ever heard the expression
[2] "first processing"?
[3] **A** Yes.
[4] **Q** And what about "second processing"?
[5] **A** Yes.
[6] **Q** Can you give me again a brief Cliff Note
[7] description of what first processing means versus
[8] second processing?
[9] **A** Okay. First processing is, in a Cliff Note
[10] version, is from live hang to the chillers.
[11] **Q** And what about second processing?
[12] **A** Second processing is from birds coming out
[13] of the chillers to a process designated by sales
[14] requirements or raw material requirements.
[15] **Q** So, for example, would you agree that
[16] first processing -- and tell me if this is an
[17] accurate description -- is getting the birds ready
[18] to be cut and I guess manufactured for sale, and
[19] second processing would be the actual deboning and
[20] cutting of that product?
[21] **A** Yes. First processing would be getting the
[22] bird ready for further processing.
[23] **Q** Okay. Are all first and second processing
[24] employees paid the same way, not the same amount,
[25] but in the same way?

---

Page 30

[1] **MR. LISS:** Objection.
[2] **BY MR. CELLER:**
[3] **Q** Hourly, salary?
[4] **A** Yes. Hourly.
[5] **Q** Okay. And are they all subject to the
[6] same timekeeping system of individual swipes once
[7] they get in?
[8] **A** They all use the Kronos clocks.
[9] **Q** Would you agree that employees who work in
[10] first processing can be moved around in different
[11] positions on any given day within first processing?
[12] **A** We ... There is a rotation plan within each
[13] department that we move people around within the
[14] department for carpal tunnel, you know, for
[15] work-related ... just the stress on the parts of the
[16] body. But that is ... that is an industry item also,
[17] where we just shift them around within the department.
[18] **Q** Would you agree that employees within
[19] first processing, excuse the spin, are
[20] interchangeable?
[21] **A** In first processing?
[22] **Q** Yeah.
[23] **A** That's a tough one to answer. Depending on
[24] the individual, I think they could all switch around,
[25] but would they want to is another question.

---

Page 31

[1] **Q** All right. Forgetting about what the
[2] employees want, if Perdue wants an employee to work
[3] in hanging on one day and -- What's another
[4] processing?
[5] **A** Evisceration.
[6] **Q** -- and evisceration the next day, Perdue
[7] could make the decision to switch them, correct?
[8] **A** They would ask. They would ask for
[9] volunteers.
[10] **Q** And would you agree that the people that
[11] work in both first and second processing would fall
[12] under the category of unskilled laborers, do you
[13] understand?
[14] **MR. LISS:** Objection to the form of the
[15] question.
[16] **BY MR. CELLER:**
[17] **Q** Have you ever heard the expression
[18] unskilled labor?
[19] **A** Yes.
[20] **Q** What's your understanding of what
[21] unskilled labor means?
[22] **A** My opinion is that they have just got
[23] on-the-job training and do the job as they've been
[24] shown and they have no formal type education. That's
[25] just my opinion on that.

---

Page 32

[1] **Q** Using your definition, would you agree
[2] that all employees in first and second processing
[3] perform unskilled labor for Perdue on the line?
[4] **A** In that definition, yes.
[5] **Q** Okay. And let me jump back for a moment.
[6] We were talking about how safety standards require
[7] the employees to put on that personal equipment that
[8] they're not compensated for, do you remember when we
[9] were discussing that earlier.
[10] **A** (Nods head affirmatively).
[11] **Q** Just answer verbally for me.
[12] **A** Yes. I'm sorry.
[13] **Q** That's okay.
[14] Would you agree that Perdue benefits or
[15] receives a benefit from employees complying with
[16] these safety standards in the industry?
[17] **A** No, I do not.
[18] **Q** Okay. Does Perdue -- I'm sorry, go ahead.
[19] **A** Other than complying with OSHA laws and
[20] things like that.
[21] **Q** And if Perdue was not in compliance with
[22] OSHA laws, they can be subject to penalties and
[23] things like that, correct?
[24] **A** Yes.
[25] **Q** So then by requiring its employees to put

---

David Alford, Sr., et al. v.
Perdue Farms, Inc.

David J. Tabinowski
December 12, 2007

---

Page 33

[1] on this personal gear that they're not compensated
[2] for, Perdue does receive a benefit by maintaining in
[3] compliance with OSHA standards, correct?
[4] **MR. LISS:** Objection to the form of the
[5] question in that it's been asked and answered.
[6] **MR. CELLER:** Sure.
[7] **BY MR. CELLER:**
[8] **Q** You can answer.
[9] **A** I don't believe we receive, the company-wise
[10] as itself, any benefit other than being in compliance
[11] with OSHA or any other safety rules and the items that
[12] are listed in our consent agreement that they're
[13] allowed to wear.
[14] **Q** Would you agree that by requiring its
[15] employees to wear these personal items, Perdue also
[16] benefits in the sense that it cuts down on workplace
[17] injuries or contamination of product?
[18] **A** That's obvious, yes.
[19] **Q** Okay. So by wearing a hair net, that's
[20] likely going to prevent hair from going into the
[21] poultry, correct?
[22] **A** That's industry standard, yes.
[23] **Q** And as a customer of Perdue -- I don't
[24] know if you eat Perdue or not, if you eat Tyson I'm
[25] going to tell them -- but if you eat Perdue, you

---

Page 34

[1] would agree you wouldn't want a hair in your
[2] chicken?
[3] **A** That's right. And you wouldn't want a hair
[4] in your deli going to a Subway either.
[5] **Q** Understood.
[6] **A** So ...
[7] **Q** Understood.
[8] **A** That is we're complying.
[9] **Q** Of all the personal equipment that we
[10] discussed that employees are not compensated for
[11] putting on -- and this will speed up the depo if
[12] it's the right answer, no pressure -- would you
[13] agree that all employees in first and second
[14] processing are required to wear that equipment?
[15] **MR. LISS:** Objection to the form of the
[16] question.
[17] **THE WITNESS:** They for safety reasons are
[18] worn, yes.
[19] **BY MR. CELLER:**
[20] **Q** And the reason why I ask, just so you
[21] know, is instead of us going through position by
[22] position in first processing and second processing,
[23] I'd rather just ask you generally if all the
[24] employees in first and second processing wear this
[25] personal gear.

---

Page 35

[1] **A** Yes.
[2] **Q** And they would be required to wear that
[3] gear for every work shift, correct?
[4] **A** Yes.
[5] **Q** You said that you were involved in the
[6] consent decree discussions with the Department of
[7] Labor back in 2001, correct?
[8] **A** I was involved in meetings. My main
[9] function was to orchestrate or coordinate the back
[10] pay.
[11] **Q** Okay. As you sit here today, do you have
[12] any knowledge as to why these personal items were
[13] excluded from being compensable by either Perdue or
[14] the Department of Labor?
[15] **A** I was not involved in those discussions.
[16] **Q** Do you know who would be or who would have
[17] knowledge of that item or topic other than Brian?
[18] **A** Someone in our HR department. There was an
[19] individual who has retired that was the coordinator of
[20] all of that with the Department of Labor and with
[21] Kronos, so there are individuals that are still in the
[22] company that were involved in that.
[23] **Q** Based on your experience at the Perry
[24] facility, your personal observations, do you have
[25] any knowledge as to whether some or most or none of

---

Page 36

[1] the employees at Perry are illiterate, meaning
[2] unable to read?
[3] **A** I can't answer that. It would only be my
[4] guess that yeah, there's some.
[5] **Q** Okay.
[6] **A** But I don't know that for a fact.
[7] **Q** In disseminating policies and procedures
[8] to employees regarding donning and doffing, do you
[9] know whether Perdue undertakes any investigation or
[10] efforts to ensure that illiterate employees are
[11] explained how the procedures work?
[12] **A** There are times during the new hire
[13] orientation where they are told the policies of the
[14] company and they are asked whether they understand
[15] them.
[16] **Q** And is their response recorded or is it
[17] something that's handwritten?
[18] **A** There is an item ... I believe in the Perry
[19] operation they have a check-off list where they
[20] initial the items that were discussed to them.
[21] **Q** Okay.
[22] (Thereupon, Plaintiff's Exhibit Number 3
[23] was marked for identification).
[24] **BY MR. CELLER:**
[25] **Q** Let me show you what we've marked as

---

David J. Tabinowski
December 12, 2007

David Alford, Sr., et al. v.
Perdue Farms, Inc.

---

Page 37

[1] Plaintiff's Exhibit Number 3. Let me give it to
[2] your attorney first. Which I'll represent to you is
[3] some type of -- it appears to be a Power Point
[4] training prepared by Perdue with regard to its
[5] donning and doffing procedures.
[6]      MR. LISS: (Reviews document).
[7]      THE WITNESS: (Reviews document).
[8] BY MR. CELLER:
[9]      Q   Showing you what's been marked as
[10] Plaintiff's Exhibit Number 3, I'll just ask you
[11] initially if you recognize that document.
[12]      A   Yes.
[13]      Q   What is it?
[14]      A   It's new hire documentation that they go
[15] through with all new hires at the plant.
[16]      Q   And would you agree that that Power Point
[17] describes, in short order, not in full detail,
[18] Perdue's current position on what is considered to
[19] be compensable as far as donning and doffing?
[20]      MR. LISS: Objection to the form of the
[21] question. You can ask what this witness'
[22] opinion is.
[23]      MR. CELLER: Yeah.
[24] BY MR. CELLER:
[25]      Q   Let's do it this way. Based on your

Page 38

[1] corporate capacity as a testifying witness here
[2] today, would you agree -- I'll even say based on
[3] your opinion -- that that is an accurate description
[4] of Perdue's current policies and procedures
[5] regarding donning and doffing?
[6]      A   (Reviews document). At the Perry plant,
[7] yes.
[8]      Q   At the Perry plant. Is this the same
[9] Power Point -- actually it's irrelevant, I don't
[10] care what happens at other plants.
[11]      MR. CELLER: That's a collective action
[12] mentality.
[13] BY MR. CELLER:
[14]      Q   Let me show you a couple of pages from
[15] this and let's talk about them. Just for the record
[16] so we can mark it properly, this is marked ... the
[17] page is -- and I'm the idiot who Bates stamps and
[18] staples over it -- Perdue 16.
[19]      I'm showing you Perdue 16. Is that an
[20] accurate description of how Perdue defines donning
[21] and doffing?
[22]      A   That is used as a -- the beginning part of
[23] the discussion of the donning and the doffing.
[24]      Q   Okay.
[25]      A   As just a recap or a brief basic definition

Page 39

[1] of the word donning and doffing.
[2]      Q   Okay.
[3]      A   And ... Okay, that's it.
[4]      Q   That's fine. Now, you see the word
[5] clothing at the end of that sentence?
[6]      A   (Nods head affirmatively).
[7]      Q   Answer verbally, please.
[8]      A   Yes.
[9]      Q   Thanks.
[10]      Who decided to use that word "clothing,"
[11] do you know?
[12]      A   Don't know.
[13]      Q   What is your understanding or your opinion
[14] as to what is deemed to be clothing pursuant to
[15] Perdue's description here?
[16]      A   That is a reference where -- to the gear
[17] that is compensable.
[18]      Q   Okay. Let's go to the next page. I'm
[19] showing you what I believe should be Perdue 14.
[20]      MR. LISS: What page?
[21]      MR. CELLER: I think it's 14, it's
[22] consecutive. Is that 14?
[23]      MR. LISS: I thought 16 was ...
[24]      MR. CELLER: Oh, I'm sorry, then 17. It's
[25] 17.

Page 40

[1] BY MR. CELLER:
[2]      Q   Showing you Perdue 17, can you take a
[3] look, please, and read into the record the
[4] description of how Perdue defines First Principal
[5] Activity?
[6]      A   "The first physical act which is required by
[7] law, company, and/or nature of the job, by the
[8] associate (donning)."
[9]      Q   Okay.
[10]      A   In parentheses.
[11]      Q   Now, we discussed previously that the
[12] personal items that are six that he employees
[13] respect not paid for are required, correct?
[14]      A   By other organizations or agencies and you
[15] know foot safety, those type things.
[16]      Q   Do you know whether there's a law, for
[17] example, an OSHA law or regulation that requires
[18] that equipment to be worn?
[19]      THE WITNESS: No.
[20]      MR. LISS: Objection to the form, calls
[21] for a legal analysis.
[22] BY MR. CELLER:
[23]      Q   If you know.
[24]      A   I don't know.
[25]      Q   Okay. Taking your prior testimony where

---

Min-U-Script®    American Court Reporting Company, Inc.

Case 1:06-cv-01000-MEF-WC     Document 63-3     Filed 01/22/2008     Page 13 of 26
David Alford, Jr., et al. v.
Perdue Farms, Inc.

David J. Tabinowski
December 12, 2007

---

**Page 41**

[1] we agreed that it was required, not necessarily by
[2] Perdue but by some agency.
[3]    A   I ...
[4]    Q   Go ahead.
[5]    A   The requirement is -- on our end is not a
[6] requirement by a compensable item, if we're talking
[7] about the items that we call personal that they can be
[8] taken home.
[9]    Q   I understand what you're saying, but just
[10] to bring it into a more clear perspective, when we
[11] marked Plaintiff's Exhibits 1 and 2, Perdue would
[12] require these items to be worn because if employees
[13] don't wear them they get written up, correct?
[14]    A   They're required for other reasons, safety
[15] reasons.
[16]    Q   Regardless of the reasons, Perdue requires
[17] them to be worn?
[18]    A   You could say that, yes.
[19]    Q   So would you agree then based upon the
[20] requirement that they need to be worn, those items
[21] should fall based upon this definition in Perdue 17
[22] as being compensable or as donning?
[23]      MR. LISS:  Objection.
[24] BY MR. CELLER:
[25]    Q   You can answer.

**Page 42**

[1]    A   I don't believe so.
[2]    Q   Why not?
[3]      MR. LISS:  Objection.
[4]      THE WITNESS:  We have an agreement with
[5]    the government that excluded them because they
[6]    can be worn home and they can be stored in the
[7]    locker or taken home, they are not part of the
[8]    production environment.
[9] BY MR. CELLER:
[10]    Q   Okay. Take a look at Last Principal
[11] Activity, which is the bullet point right
[12] underneath.
[13]    A   Uh-huh (affirmative).
[14]    Q   And I'm going to ask you the same line of
[15] questioning. First, can you read that into the
[16] record?
[17]    A   Okay. "The last physical act which is
[18] required by law, company, and/or nature of the job, by
[19] the associate (doffing)".
[20]    Q   Okay. Now, doffing essentially means
[21] taking off the gear at the end of the day, correct?
[22]    A   At the end of the day, yes.
[23]    Q   Or, for example, on a break?
[24]    A   Yes.
[25]    Q   Perdue does not pay its employees for the

**Page 43**

[1] time they take off that personal gear when they
[2] begin their break, correct?
[3]    A   Nine ... Normally they do not take that gear
[4] off. They'll be in the break area with their hair
[5] nets still on. They may pull their beard net down
[6] over their face to eat, the ear plugs in like a
[7] from their bump cap, but normally they wear them when
[8] they go to break.
[9]    Q   Are there any studies that you're aware of
[10] that Perdue has conducted at its Perry facility that
[11] will confirm what you just testified to?
[12]    A   No, I'm not aware of any studies, no.
[13]    Q   And at the end of the day when employees
[14] change their work shift, would you agree that
[15] Perdue does not pay them for taking off that
[16] personal equipment as they're leaving the plant?
[17]    A   Depending on their preference, some may take
[18] them off and some may not.
[19]    Q   Okay. But again --
[20]    A   Some store them in their locker, which
[21] they're allowed, and some wear it home.
[22]    Q   And if you can read the final bullet point
[23] into the record.
[24]    A   "You get paid from the time you perform the
[25] First Principal Activity," which is in capital letters

**Page 44**

[1] FPA, "to the Last Principal Activity," which is in
[2] capital letters, LPA, "excluding any unpaid breaks."
[3]    Q   Let me ask you a hypothetical question.
[4] Let's assume in some crazy world that somebody
[5] determined that the ear plugs were considered to be
[6] items that needed to be compensated when put on.
[7] Would you agree then that within these definitions
[8] of First Principal Activity and Last Principal
[9] Activity that they would be considered compensable?
[10]      MR. LISS:  Objection to the form of the
[11]    question.
[12] BY MR. CELLER:
[13]    Q   Please don't ask me to repeat it because I
[14] don't think I could.
[15]    A   I'm trying to come up with an answer.
[16]    Q   Okay, fair enough.
[17]    A   In my area what I'm focusing on right now,
[18] that has not come up. And if we were required by an
[19] adjustment I guess to our consent agreement to include
[20] it then we would, but right now the consent agreement
[21] does not include that.
[22]    Q   Do you have any knowledge as to whether
[23] since the consent decree was created in 2002 Perdue
[24] has requested any type of updated guidance as to
[25] whether that agreement is still in compliance with

---

David J. Tabinowski
December 12, 2007

**Page 45**

[1] law?

[2]     MR. LISS: Objection.

[3] BY MR. CELLER:

[4]     Q   If you know.

[5]     A   I'm not aware.

[6]     Q   Do you know whether Perdue receives any

[7] types of case updates or, you know, law flashes from

[8] the Department of Labor to ensure that they're still

[9] complying with the laws and regulations?

[10]     MR. LISS: Objection.

[11] BY MR. CELLER:

[12]     Q   You can answer again, if you know.

[13]     A   I'm not sure. I would assume somebody would

[14] but I'm not sure.

[15]     Q   Let's go to the next part of it.

[16]     Okay. Showing you, what is that, 18? It

[17] should be 18.

[18]     A   (Reviews document).

[19]     Q   Why don't we just rip it apart and I'll

[20] re-staple it at the end.

[21]     A   I believe it's 18.

[22]     Q   You can just pull the whole thing apart,

[23] don't worry about it.

[24]     A   It might rip the numbers off. It's 18.

[25]     Q   That would make my job more difficult.

**Page 46**

[1]     Take a look at bullet point 1 on number

[2] 18. And it says there, "All associates must be

[3] clocked in prior to," and it's bold and underlined,

[4] "donning supplies."

[5]     A   (Nods head affirmatively).

[6]     Q   I'm assuming based upon our prior

[7] conversations that Perdue excludes from the words

[8] supplies the personal equipment that we've

[9] discussed?

[10]     A   Correct.

[11]     Q   And the same thing with regard to the next

[12] bullet point where it says, "You must doff supplies

[13] prior to clocking out," again, Perdue does not

[14] consider those personal items to be considered

[15] supplies?

[16]     A   Correct.

[17]     Q   Is that right?

[18]     A   (Nods head affirmatively).

[19]     Q   Okay. If we go to Perdue 19, is this an

[20] accurate description of what Perdue considers on the

[21] left side of the document items that are not

[22] compensated for being put on or taken off, and on

[23] the right side items that employees are compensated

[24] for?

[25]     A   Yes.

**Page 47**

[1]     Q   Next page.

[2]     MR. LISS: Just to be clear, do you want

[3] him to read into the record what's on the left

[4] side and what's on the right side?

[5]     MR. CELLER: Sure.

[6] BY MR. CELLER:

[7]     Q   Why don't you do that.

[8]     A   On the ones that are not considered

[9] compensable are ear plugs, hair nets, beard nets,

[10] safety boots, and bump caps.

[11]     On the right side, which is in

[12] compensable, are lab coats, gloves, clip boards,

[13] tools, aprons, sleeves, paperwork, etc.

[14]     Q   Let's go to number 20. Would you agree

[15] that this is consistent with what we've previously

[16] discussed, that employees are required to have those

[17] personal items that we just described on the

[18] left-hand side on prior to swiping in?

[19]     A   Yes.

[20]     Q   I think that may be it, sorry. I'm going

[21] to let you flip them.

[22]     A   I could mess it up for you.

[23]     Q   No, please, because then Brian's copies

[24] are going to be all screwed up. You can just flip

[25] the whole thing if you don't mind.

**Page 48**

[1]     Do you know who prepared this Power Point?

[2]     A   Now, this would be a guess on a specific

[3] person, but I'm going to guess someone in the human

[4] resource department because they are the ones that

[5] conduct or coordinate the new hire orientation.

[6]     MR. CELLER: Off the record for a second.

[7]     (Thereupon, an off-the-record discussion

[8] ensued).

[9]     (Thereupon, Plaintiff's Exhibit Number 4

[10] was marked for identification).

[11] BY MR. CELLER:

[12]     Q   Showing you what's been marked as

[13] Plaintiff's Exhibit Number 4, do you recognize that

[14] document?

[15]     A   (Reviews document).

[16]     Q   What is it?

[17]     A   It is a standard operating procedure for the

[18] Perry facility for start of shift, break, and end of

[19] shift.

[20]     Q   And would you agree that that is an

[21] accurate statement of Perdue's current -- I'm trying

[22] to think of a nice description for it -- current

[23] policies and procedures regarding First Principal

[24] Activity at the Perry facility?

[25]     A   (Reviews document).

---

Min-U-Script®

---

Page 49

[1]   Q   You can take your time and look through
[2] it.
[3]   A   (Reviews document). Yes.
[4]   Q   When the employees come in in the morning
[5] and they finally swipe their cards, they go out to
[6] the line and work for a finite period of time,
[7] correct?
[8]   A   (Nods head affirmatively).
[9]   Q   I'm just setting this up to explain where
[10] I'm going.
[11]   A   Roundabout, yes. Yes.
[12]   Q   How many lunch breaks do the employees who
[13] work in first and second processing get?
[14]   A   They at the Perry plant receive two.
[15]   Q   And do you know what times they ... Well,
[16] I assume that the times vary depending on
[17] department, correct?
[18]   A   Yes.
[19]   Q   What are the breaks that they get? Are
[20] they two 30-minute unpaid breaks?
[21]   A   Yes.
[22]   Q   Now, can you explain to me how employees
[23] know it's time to go to break?
[24]   A   It depends. Well, they know when their
[25] supervisor tells them.

---

Page 50

[1]   Q   When they are told to go to break, can you
[2] explain for me the procedures that they must undergo
[3] before clocking out as far as taking off their gear?
[4]   A   There are designated areas where they hang
[5] their gear and then proceed to the clocks.
[6]   Q   Once they punch out for lunch break, can
[7] you describe for me the process by -- or how
[8] employees go to break and then what the procedure is
[9] for coming back to break? Is that too vague of a
[10] question, or do you want me to be more specific?
[11]   A   No, I can answer that. It depends on the
[12] associate what they do after they swipe out. They get
[13] a full 30-minute break, they can do what they feel
[14] like doing, they can go outside if they want and eat
[15] their lunch out there if they brought it. Or there is
[16] a cafeteria at the Perry plant, they can eat at the
[17] cafeteria. Or they can just sit around in the break
[18] areas and chat. It all depends on them. There are
[19] microwaves there available for them to heat up their
[20] food.
[21]   Q   And is there a bell or a whistle or
[22] something that notifies employees that their break
[23] period is almost over and they need to start heading
[24] back to work?
[25]   A   No.

---

Page 51

[1]   Q   So are employees aware or are they told
[2] that approximately five to seven minutes before
[3] their break is over they need to start heading back
[4] in?
[5]   A   They are not told anything.
[6]   Q   Do you know whether employees actually
[7] start heading toward the time clocks to put their
[8] gear on prior to the 30 minutes being over?
[9]   A   There are some that head to the clocks
[10] sooner than others, but they are not forced.
[11]   Q   How many employees based upon your
[12] knowledge typically go to break at once?
[13]   A   It varies.
[14]   Q   Can you give me the range based on your
[15] best observation?
[16]   A   The maximum I want to say is around 200?
[17]   Q   And what's the minimum?
[18]   A   One.
[19]   Q   Okay, understood.
[20]       How many time clocks are there in first
[21] processing for employees to punch in on?
[22]   A   Five.
[23]   Q   And are those the total number of time
[24] clocks where employees need to punch in for or punch
[25] out on for breaks or at the end of the day?

---

Page 52

[1]   A   They use the same clocks.
[2]   Q   How long approximately does it take to
[3] punch in and out?
[4]   A   Oh, a matter of seconds to swipe them
[5] through the clock.
[6]   Q   They're required to double swipe, right?
[7]   A   That is their procedure.
[8]   Q   At Perry?
[9]   A   At Perry.
[10]   Q   Have you ever seen at the end of a lunch
[11] break where let's say there's 200 employees where
[12] employees are waiting in line 10 deep to wait to
[13] swipe in on a time clock?
[14]   A   I have seen that, yes.
[15]   Q   And if employees are not on the line
[16] within I'll say 32 minutes, because they get a two
[17] minute grace period, after their lunch break, they
[18] would be written up, correct?
[19]   A   Yes.
[20]   Q   So if an employee is required to wait to
[21] punch in, what do you estimate to be --
[22]   A   They are not required to wait to punch in.
[23]   Q   You're right. If an employee is waiting
[24] to punch in, what do you estimate to be the wait
[25] time if there are 200 employees trying to clock in

---

Page 53

[1] to be on time?

[2] A I wouldn't have the vaguest idea what an
[3] average would be.

[4] Q Would you agree with me that the realities
[5] of the situation would require that an employee
[6] start getting in line to punch back in prior to the
[7] 30 minutes expiring so that they can be on time?

[8] A In some of their thinkings, yes, they know
[9] it's a 30-minute break and there are clocks available
[10] in the break area where they could see what time their
[11] break is up and then they'll start heading to the
[12] clock, yes.

[13] Q But they'll start heading toward the clock
[14] prior to the end of the 30-minute period?

[15] A It's their preference to do that if they
[16] want. And if they want they feel comfortable going to
[17] the clock sooner than later, yeah.

[18] Q Well, do you think it's feasible for 200
[19] employees to head to the time clock and clock in
[20] within two minutes? Can that happen?

[21] A Remember, there are a number of clocks, that
[22] they're not all on the same clock.

[23] Q Okay. But I guess — you said there were
[24] five clocks in first processing, right?

[25] A Yes.

Page 54

[1] Q And how many in second processing?

[2] A I believe there are six.

[3] Q Okay. And based upon your observation,
[4] would you say maybe five seconds it takes maximum to
[5] swipe in and out?

[6] A With two swipes, yes.

[7] Q So then would you agree with me that
[8] employees are required — not required, but the
[9] realities of the situation are that if an employee
[10] is going to be back on the line in a timely manner,
[11] they would have to leave their lunch period early to
[12] do so?

[13] A In the reality of our breaks if ... and
[14] there are supervisors at the clocks, and if
[15] individuals are on the line and it does for some
[16] reason take longer than the two minutes, they are not
[17] written up. They are not written up just because they
[18] are late. Each occurrence or instance is looked into
[19] and the supervisor being there will see Mary was in
[20] line, she was toward the end, someone had a problem
[21] with their card, it took longer for them to get
[22] through, they would not be written up.

[23] Q And I'm not focusing on the write-ups as
[24] much as I am whether employees actually have to
[25] leave their break early to clock in on time.

Page 55

[1] A They don't have to, not at the Perry
[2] facility.

[3] Q I understand. Do you think it's realistic
[4] for an employee to take a full 30-minute lunch and
[5] then walk to the time clock to punch in to be back
[6] on the line for their scheduled shift?

[7] A If they're in the break area they could do
[8] that, yes.

[9] Q Okay. Are there locker rooms at the
[10] Perdue facility?

[11] A In the Perry facility, yes.

[12] Q I'm sorry, Perry, yes.

[13] A Yes.

[14] Q What is the purpose of having the locker
[15] rooms there?

[16] A That's to store their coats, purses,
[17] personal items. They can store bump caps and things
[18] like that.

[19] Q Does every employee have a locker?

[20] A Now, I ... they should, but since the plant
[21] has grown, they — and when I was down there I know
[22] they didn't have enough, they were going to get some
[23] more, but everyone will have one, and it may not be
[24] the case now but it depends on the growth of the
[25] plant.

Page 56

[1] Q Okay.

[2] A But ...

[3] Q Are the locker rooms separate for men and
[4] women?

[5] A The locker rooms are not. Or the locker
[6] area, let me change that. It's not a room, it's a
[7] locker area. They have separate other rooms for men
[8] and woman.

[9] Q Okay, fair enough.

[10] At the end of the day, and we discussed
[11] about going to breaks and punching back in. At the
[12] end of the day when the employee's shift is over,
[13] can you describe for me from the time they clock out
[14] to the time they leave the doors what takes place?
[15] When I say leave the doors, leave the plant.

[16] A They get off — whenever the shift is done
[17] they'll doff their gears and dispose of them
[18] accordingly, whether to throw them away or put them in
[19] a bin for re-washing.

[20] Q Okay.

[21] A Clock out. And then either head to their
[22] car, head to their locker, go back to the cafeteria,
[23] sit down.

[24] Q Okay.

[25] A Have a coffee or whatever. They might be

Case 1:06-cr-01000-MEF-WC    Document 63-3    Filed 01/22/2008    Page 17 of 26
David Alford, Sr., et al.                                                David J. Tabinowski
Perdue Farms, Inc.                                                      December 12, 2007

Page 57

[1] carpooling with somebody. So there's various things
[2] that could be done.
[3]    Q   Are they required to do any paperwork or
[4] anything else once they have clocked out at the end
[5] of the day?
[6]    A   No. No one is required to do any paperwork
[7] after they've clocked out.
[8]    Q   And would you agree that at the end of the
[9] day after they've clocked out, many of these
[10] employees at that point will then begin taking off
[11] their ear plugs and beard nets and hair nets?
[12]    A   It's a possibility. Again, some of them
[13] wear it to their car.
[14]    Q   Fair enough. Are they paid for that time
[15] from when they clock out to the time they walk to
[16] their car if they're still wearing their gear?
[17]    A   No. That is a non-compensable item in our
[18] consent agreement.
[19]    Q   Okay, fair enough.
[20]        (Thereupon, a brief recess ensued at
[21]    approximately 10:55 a.m. and the proceedings
[22]    subsequently resumed at approximately 11:00
[23]    a.m. with all parties present).
[24]        (Thereupon, Plaintiff's Exhibit Number 5
[25]    was marked for identification).

Page 58

[1] BY MR. CELLER:
[2]    Q   Let me show you what's been marked as
[3] Plaintiff's Exhibit Number 5 and ask you to turn to
[4] the last page of the document and ask you -- not to
[5] the very last page, I guess the last page with your
[6] signature, or with a signature.
[7]    A   Yes.
[8]    Q   Is that your signature on that document?
[9]    A   Yes.
[10]    Q   And what is the document you're holding
[11] marked as Plaintiff's Exhibit 5?
[12]    A   Declaration of Dave Tabinowski.
[13]    Q   And did you prepare that? Did you type
[14] that yourself?
[15]    A   No, I did not.
[16]    Q   Do you know who typed it?
[17]        MR. LISS: Objection to the form of the
[18]    question.
[19]        THE WITNESS: No, I don't know who typed
[20]    it.
[21] BY MR. CELLER:
[22]    Q   Can you describe --
[23]        MR. CELLER: And, Brian, I'm cautious of
[24]    the attorney-client issue, so if I encroach on
[25]    it, just stop me.

Page 59

[1] BY MR. CELLER:
[2]    Q   Can you describe to me how that document
[3] came to be?
[4]        MR. LISS: Objection to the form of the
[5]    question. That's asking for attorney-client
[6]    privileged information.
[7] BY MR. CELLER:
[8]    Q   What information did you rely upon to
[9] prepare that declaration?
[10]    A   I didn't prepare it but I read it. And at
[11] the time I thought everything was accurate.
[12]    Q   Did you make any edits to it prior to
[13] signing it?
[14]    A   No, I did not.
[15]    Q   How long did you review it before you
[16] signed it?
[17]    A   I was on the road so it wasn't ... it was
[18] like a five minute deal.
[19]    Q   Did you review any of your notes from the
[20] Perry facility, your on-site, prior to signing that
[21] declaration?
[22]    A   No, I was not. I did not.
[23]    Q   Did you take any notes when you were
[24] on-site at the Perry facility in April of '07?
[25]    A   I have some audit papers, yes.

Page 60

[1]    Q   And where are those papers now?
[2]    A   They are in our ... we have a software
[3] system called Auto Audit, we have electronic work
[4] papers.
[5]        MR. CELLER: Can I get those, Brian?
[6]        MR. LISS: You haven't requested it to
[7]    date. Submit a request in writing and we'll
[8]    review it for any potential objections and
[9]    whether or not it's discoverable information.
[10]        MR. CELLER: I think you guys have to
[11]    supplement, I mean, if documents ... But we'll
[12]    talk about that after the deposition.
[13]        MR. LISS: I know we have an obligation to
[14]    supplement when appropriate, I'm not saying
[15]    that your request now is one that we would need
[16]    to supplement for.
[17]        MR. CELLER: Fair enough.
[18] BY MR. CELLER:
[19]    Q   Are employees required to wash their
[20] hands -- Strike that.
[21]        Before we get there, as you sit here
[22]    today, do you believe that everything that's
[23]    contained within this declaration is true and
[24]    accurate to the best of your knowledge?
[25]    A   At this time, no.

Page 61

[1]  **Q**   Can you tell what changes, if any, you
[2]  would make?
[3]  **A**   There are two items in here that should
[4]  change.
[5]  **Q**   Tell me what they are.
[6]  **A**   When I got to back to the office, the audit
[7]  was done in February of '07, and they do have two
[8]  breaks versus one.
[9]       **MR. LISS:**  Let me just ...
[10]      **MR. CELLER:**  Yeah.
[11]      **MR. LISS:**  Just to streamline this,
[12]  because if you don't ask now I'm going to ask
[13]  later.
[14]      **MR. CELLER:**  Sure.
[15]      **MR. LISS:**  Maybe it would be good to go to
[16]  the paragraph and make the change on the
[17]  record.
[18] **BY MR. CELLER:**
[19]      **Q**   Do it.  Do you want a pen?
[20]      **A**   I've got one right here.
[21]      **MR. LISS:**  And why don't you describe what
[22]  you're doing.
[23] **BY MR. CELLER:**
[24]      **Q**   Articulate it, yeah.
[25]      **A**   Okay.  On page 1 I am changing in item 2, it

Page 62

[1]  appears to be the second sentence, it says, "In April
[2]  of this year I conducted a First Principal Activity
[3]  Audit," I'm changing that from April to February.
[4]       And ... Let me find it.  On the other one
[5]  on page 3, item number 8 where it says, "Hourly
[6]  poultry processing employees at Perdue's poultry
[7]  processing plant in Perry, Georgia have one
[8]  30-minute unpaid break," I am changing the "one"
[9]  30-minute break to "two" 30-minute breaks.
[10]      **Q**   Okay.
[11]      **A**   Do you want me to initial it and date it?
[12]      **MR. LISS:**  (Shakes head negatively).
[13] **BY MR. CELLER:**
[14]      **Q**   You're sitting here under oath so I have
[15]  no issue with that.
[16]      **MR. LISS:**  And I can tell you just on the
[17]  record that we're going to supplement this with
[18]  a second declaration, just to clarify it for
[19]  the record.
[20]      **MR. CELLER:**  And just so I understand,
[21]  Brian, will those be the only changes in your
[22]  declaration or will there be others?
[23]      **MR. LISS:**  Those – as far as I
[24]  understand, this is Dave's declaration, these
[25]  are the only two corrections that he has

Page 63

[1]  directed to my attention; if there are others
[2]  we would certainly clarify as well.
[3]       **MR. CELLER:**  Okay, fair enough.
[4]       **MR. LISS:**  And there might also be a
[5]  second declaration.
[6]       **MR. CELLER:**  Okay, fair enough.
[7]  **BY MR. CELLER:**
[8]       **Q**   Other than those two changes that you've
[9]  made here today, are there any other changes that
[10]  you would make to this declaration as you sit here
[11]  today?
[12]      **A**   Not to my knowledge right now.
[13]      **Q**   And were you as truthful in preparing this
[14]  declaration as you have been under oath here today?
[15]      **A**   Yes.
[16]      **Q**   Okay.
[17]      **A**   With the changes.
[18]      **Q**   Is there anything that you've testified to
[19]  so far here today that you believe you may have
[20]  mis-testified or that's inaccurate?
[21]      **A**   No.
[22]      **Q**   What did you do to prepare for your
[23]  deposition here today?  I don't want to know who you
[24]  met with, I just want to know what you did.
[25]      **A**   When I got back to the office after knowing

Page 64

[1]  that I was going to be deposed, I reviewed my audits
[2]  at the Perry location.
[3]       **Q**   You didn't bring those notes with you, did
[4]  you?
[5]       **A**   No.
[6]       **Q**   Are you sure about that?
[7]       **A**   No, I don't have them.
[8]       **Q**   Are they in your car?
[9]       **A**   I don't have a car here.
[10]      **Q**   Anything other than ... Did you do
[11]  anything other than review those audit notes from
[12]  the February of '07 audit?
[13]      **A**   Talk with people.
[14]      **Q**   Other than your attorney or any attorneys
[15]  that represent Perdue, did you speak with anybody at
[16]  the Perry, Georgia facility to prepare for your
[17]  deposition here today?
[18]      **A**   I talked with an individual just to verify
[19]  my notes that there were two breaks versus one.
[20]      **Q**   Who was that individual?
[21]      **A**   Steve Passwater.
[22]      **Q**   What does he do for Perry?
[23]      **A**   He is the regional accounting manager.
[24]      **Q**   One more question on the notes.  Are they
[25]  in your luggage here today?

**Page 65**

[1] **A** No. I have copies of this but that's it.

[2] **Q** And by "this" you're referring to the

[3] declaration?

[4] **A** Uh-huh (affirmative).

[5] **Q** Okay. How long was your conversation with

[6] that gentleman you just identified?

[7] **A** On that related matter?

[8] **Q** Yeah.

[9] **A** 30 seconds.

[10] **Q** Did you speak with anybody else other than

[11] attorneys at Perdue's Perry facility regarding

[12] preparation for your deposition here today?

[13] **A** No.

[14] **Q** Did you review any other documents other

[15] than what you've identified as your audit notes to

[16] prepare for your deposition here today?

[17] **A** No.

[18] **Q** Let's go ahead and back-mark this as

[19] Plaintiff's Exhibit Number 6.

[20] (Thereupon, Plaintiff's Exhibit Number 6

[21] was marked for identification).

[22] BY MR. CELLER:

[23] **Q** I'll represent to you this is a Notice of

[24] Taking Deposition in this matter.

[25] **A** Okay.

**Page 66**

[1] **Q** And as Brian was trained, as was I, I'm

[2] not going to ask you if you're the person with the

[3] most knowledge, I'm just going to ask you if you're

[4] the appropriate corporate representative to testify

[5] to the three topics identified here today.

[6] **A** Two of the three.

[7] **Q** Which ones are you prepared to testify to?

[8] **A** I am not able to testify on the knowledge of

[9] the hours worked by plaintiffs.

[10] **Q** Okay. Do you know who would be?

[11] **A** That would be Steve Passwater and possibly

[12] corporate payroll.

[13] **MR. CELLER:** Brian, will you make them

[14] available for a reopening?

[15] **MR. LISS:** I wanted to mention, this was

[16] actually the topic of my e-mail to Deidre.

[17] **MR. CELLER:** Yeah.

[18] **MR. LISS:** You know, certainly I can't

[19] imagine we would oppose you being able to

[20] depose Steve Passwater. I have to say, if

[21] you're really asking for information about

[22] hours worked by plaintiffs while employed by

[23] Perdue, that we could just give you the

[24] information.

[25] **MR. CELLER:** Well, I guess here's the

**Page 67**

[1] question. Are you guys willing to stipulate

[2] that whatever is on their time records is what

[3] Steve — what is it, Steve Passwater is it?

[4] **MR. LISS:** Steve Passwater.

[5] **MR. CELLER:** That he would testify that

[6] those are true and correct copies of the hours

[7] worked?

[8] **MR. LISS:** You know, assuming that I would

[9] have a chance to review the documents and show

[10] them to him, I would imagine that would be the

[11] case, yes.

[12] **MR. CELLER:** Okay. For now let's say we

[13] may want to depose him, but unlikely.

[14] **MR. LISS:** Okay.

[15] BY MR. CELLER:

[16] **Q** The other two topics would you agree — Do

[17] you mind if I call you Dave?

[18] **A** Yeah, that's fine.

[19] **Q** Dave, would you agree that you're the

[20] person that's been designated as the proper

[21] representative --

[22] **A** Yes.

[23] **Q** Okay, fair enough.

[24] Now, let me show you ... Let's go back and

[25] mark this or refer to what's been marked as

**Page 68**

[1] Plaintiff's Exhibit Number 4. Do you recall looking

[2] at that document?

[3] **A** Yes.

[4] **Q** When was that document first implemented

[5] or prepared by Perdue?

[6] **A** At the Perry location?

[7] **Q** Yes.

[8] **A** I'm not sure of the specific date. Once

[9] we ... it was shortly after the acquisition.

[10] **Q** And when was the acquisition?

[11] **A** 2004 I believe.

[12] **Q** And who did you guys acquire it from, do

[13] you know?

[14] **A** I believe it was Cagle.

[15] **Q** And were all of the employees who were

[16] working at Cagle, not all of them but was the plan

[17] that whoever was working at Cagle just now stayed on

[18] as a Perdue employee?

[19] **A** No. I believe they went and did a rehire of

[20] everyone.

[21] **Q** Do you know whether the same number of

[22] employees -- or strike that.

[23] Do you know whether a number of employees

[24] that came over to Perdue were initially from

[25] Cagle's?

Page 69

[1]  **A** I can't answer it truthfully, but I'm going
[2] to say the majority of them were.
[3]      (Thereupon, Plaintiff's Exhibit Number 7
[4] was marked for identification).
[5] BY MR. CELLER:
[6]  **Q** Let me show you what we're going to mark
[7] as Plaintiff's Exhibit Number 7.
[8]      MR. LISS: Are they both number 7 or is
[9] one 7 and one 8?
[10]      MR. CELLER: No, one's 7 and one's going
[11] to be 8.
[12]      MR. LISS: Okay.
[13]      MR. CELLER: We'll mark Annie Bray as 7.
[14] BY MR. CELLER:
[15]  **Q** I'm showing you what's been marked as
[16] Plaintiff's Exhibit Number 7, which I'll represent
[17] to you is a First Principal Activity Performance
[18] Standards and Perry Plant Discipline Program signed
[19] by one of our plaintiffs in this case, Annie Bray.
[20]  **A** Uh-huh (affirmative).
[21]  **Q** Here's my question for you. Ms. Bray has
[22] worked for Perdue since the time they acquired the
[23] plant is our understanding.
[24]  **A** (Nods head affirmatively).
[25]  **Q** Can you explain to me why for the first

Page 70

[1] time in her file she was given a copy of this policy
[2] in March of '07?
[3]      MR. LISS: Objection to the form of the
[4] question.
[5] BY MR. CELLER:
[6]  **Q** Strike that.
[7]      Let me ask you this question. Do you know
[8] why this document was first signed by Ms. Bray in
[9] '07?
[10]      MR. LISS: Objection. Again, it doesn't
[11] say that.
[12]      MR. CELLER: That's fine.
[13] BY MR. CELLER:
[14]  **Q** You can answer it.
[15]  **A** No.
[16]  **Q** Subsequent to learning that Perdue was
[17] going to be sued, do you know whether Perry took any
[18] measures to ensure compliance with the overtime
[19] laws?
[20]      MR. LISS: Objection to the form of the
[21] question.
[22] BY MR. CELLER:
[23]  **Q** If you know.
[24]  **A** Repeat that, please.
[25]  **Q** Strike. That's fine.

Page 71

[1]      Do you know whether Perdue upon learning
[2] of this lawsuit enacted any type of measures to
[3] determine whether its practices were in compliance
[4] with the Fair Labor Standards Act?
[5]      MR. LISS: Objection to the form of the
[6] question.
[7]      THE WITNESS: I'm not aware of any.
[8] BY MR. CELLER:
[9]  **Q** And as you sit here today, do you know why
[10] this document was executed on March 16th, 2007?
[11]  **A** No, I cannot, truthfully.
[12]  **Q** Did Perdue require or does Perdue require
[13] each of its employees at the Perry facility to
[14] execute the document, the form of which is marked as
[15] Plaintiff's Exhibit Number 4?
[16]  **A** All new hires I believe according to the
[17] Power Point would be required to do that.
[18]  **Q** What about old hires?
[19]  **A** That would be a management decision whether
[20] to go back or not.
[21]      (Thereupon, Plaintiff's Exhibit Number 8
[22] was marked for identification).
[23]      MR. CELLER: We'll do the next one as 8,
[24] Brian.
[25]      MR. LISS: Okay. (Reviews document).

Page 72

[1] BY MR. CELLER:
[2]  **Q** Who in management by the way made that
[3] decision to determine whether employees were going
[4] to sign off on this document?
[5]      MR. LISS: Objection to the form of the
[6] question.
[7] BY MR. CELLER:
[8]  **Q** You can answer.
[9]  **A** Each of our plants during the consent
[10] agreement phase prepared Standard Operating Procedures
[11] similar to this, not the same but similar to this that
[12] was reviewed by the government and approved by the
[13] government and they are reviewed by new hires during
[14] their orientation.
[15]  **Q** Did you --
[16]  **A** Some have them signed but Perry has them
[17] sign the bottom of it.
[18]  **Q** Is it your understanding that if an
[19] employee received this type of training at the Perry
[20] facility, they would have signed off on this
[21] document?
[22]  **A** If they received the new hire training, yes.
[23]  **Q** Do you know --
[24]  **A** Or in the case of -- in this case this was a
[25] new -- an older individual, or "older" being working

**Page 73**

[1] at the plant, they were -- they went through an
[2] orientation of that matter.
[3]    Q   Do you know whether some employees who
[4] have worked at the Perry facility since 2005 do not
[5] have copies of what we've marked as Plaintiff's
[6] Exhibit Number 4 in their file?
[7]    A   I am not aware of that.
[8]    Q   Can you think of any reason why it
[9] wouldn't be in any of those employees' files?
[10]   A   Not any reason, no.
[11]   Q   Okay, is it -- Well, I'm not going to ask
[12] if it's possible.
[13]       Let's show you what's been marked as
[14] Plaintiff's Exhibit Number 8 which I'll represent to
[15] you is again another First Principal Activity
[16] Associate Performance Standards and Perry First
[17] Discipline Program executed by --
[18]   A   Mary Harrell.
[19]   Q   Mary Harrell.  Who I'll also represent to
[20] you was hired well prior to March 18th of '07.
[21]       MR. LISS:  Just for the record, you read
[22]       the title wrong.
[23]       MR. CELLER:  That's all right.
[24]       MR. LISS:  But I can agree, we're talking
[25]       about Exhibit 8, whatever it says on the top --

**Page 74**

[1]       MR. CELLER:  Fair enough.
[2]       MR. LISS:  -- is what it says.
[3] BY MR. CELLER:
[4]    Q   Would you agree that -- Strike that.
[5]       Do you have any knowledge as to why this
[6] document was signed by her on March 18th, 2007?
[7]    A   No.
[8]    Q   Do you know whether prior to March 18th of
[9] 2007 this document or any form similar to that was
[10] given to her?
[11]   A   No, I'm not aware.
[12]   Q   Let me ask you the same question with
[13] regard to Plaintiff's Exhibit Number 7.  Do you know
[14] whether prior to March 16th of 2007 this document or
[15] something similar to it was given to Ms. Bray?
[16]   A   I'm not aware.
[17]   Q   Are employees required to wash their hands
[18] prior to getting on the line?
[19]   A   They wash their hands on the clock.
[20]   Q   On the clock.  Okay.  And at the end of
[21] the day are they required to wash their hands?
[22]   A   It is a personal preference to do so.
[23]   Q   Okay.  But are they required to do so?
[24]   A   I've never seen that being a requirement to
[25] wash their hands to leave the plant, no.

**Page 75**

[1]    Q   Would there be -- To your knowledge based
[2] upon keeping in compliance with safety concerns --
[3] Strike that.
[4]       When employees wash their hands, those
[5] that do at the end of the day, is it on or off the
[6] clock?
[7]    A   They are given the opportunity to wash their
[8] hands on the clock.  I have seen where they have gone
[9] straight to the bathroom off the clock and did the
[10] same.
[11]   Q   Okay.
[12]   A   So we give them the opportunity to wash
[13] their hands.
[14]   Q   What about during breaks.  When the break
[15] whistle blows, do employees wash their hands prior
[16] to going on break?
[17]       MR. LISS:  Objection to the form of the
[18]       question.  There's no break whistle.
[19]       MR. CELLER:  Strike that.  No whistle,
[20]       okay.
[21] BY MR. CELLER:
[22]   Q   Prior to employees going on break, are
[23] they required to wash their hands?
[24]   A   They do that as a personal preference.
[25] There is no requirement to wash their hands, we give

**Page 76**

[1] them the opportunity to wash their hands.  There are
[2] sinks available.
[3]    Q   But while they're on the clock, there's no
[4] directive that they wash their hands prior to going
[5] to lunch break, correct?
[6]    A   No.  If they want to go eat their lunch,
[7] it's fine, they can go.
[8]    Q   And what about washing their hands when
[9] they get back on the clock after their break?
[10]   A   It's after the clock.
[11]   Q   So they clock in and then wash their
[12] hands?
[13]   A   Yes.
[14]   Q   When employees -- Strike that.
[15]       How many bathrooms are there at the Perry
[16] facility for line employees to use?
[17]   A   I don't know how many there are.  There's
[18] two main ones, there's a men's and a ladies in the
[19] main area.  I'm sure there's more but I don't know ...
[20] For my knowledge, one.
[21]   Q   Do you know, for example, how many urinals
[22] or how many stalls are in each one?
[23]   A   No.
[24]   Q   Did you ever see any employees, based on
[25] your three-day experience at the Perry facility,

David J. Tabisewski
December 12, 2007

06-cv-01000-MEF-WC     Document 63-3     Filed 01/22/2008     David J. Tabisewski v.
Perdue Farms, Inc.

---

**Page 77**

[1] lining up to use the bathroom or waiting to use the
[2] bathroom?
[3]    A   I've never seen a line.
[4]    Q   I want to talk a little bit ... When they
[5] go on break you mentioned some of the employees
[6] will, for example, hang their ear plugs off
[7] their ... I don't remember what you said, but their
[8] ear plugs hang?
[9]    A   Yeah.  There's a little strap in your bump
[10] cap where you can tie -- instead of -- you take them
[11] out, if you didn't have it tied to the bump cap they
[12] would fall off and you'd lose them.  So the majority
[13] of them just put a loop on it and tie it to their bump
[14] cap so when they take it off, it's there.  And then
[15] when they're getting ready to put them back in they
[16] just grab them.
[17]    Q   Is it your testimony that Perdue does not
[18] require its employees to take off any of this gear
[19] -- when I say gear, the personal equipment that
[20] they're not compensated for -- prior to going to the
[21] break room?
[22]    A   They're not required to take them off.
[23]    Q   Let me ask you a question.  Do you believe
[24] that there would be a safety concern, for example,
[25] let's say an employee was eating, I don't know, I

**Page 78**

[1] know we're at a poultry facility, but sushi with raw
[2] fish or something and it gets on their beard net, is
[3] there not a concern that when they go back to work
[4] that there could be contamination of the poultry
[5] based upon what they ate?
[6]    A   That's a possibility.
[7]    Q   But Perdue does not require them to take
[8] this gear off, meaning anything that could possibly
[9] come back in contact?
[10]    A   Not that I'm aware of there isn't any
[11] requirement.
[12]    Q   Do you whether OSHA or the law requires
[13] Perdue to require these employees to take that gear
[14] off?
[15]    MR. LISS:  Objection to the form of the
[16] question.
[17] BY MR. CELLER:
[18]    Q   If you know.
[19]    A   I don't know.
[20]    Q   Do you believe that, based on your
[21] experience in your employment with Perdue, do you
[22] believe it would be good safety hygiene for
[23] employees to remove these products prior to eating
[24] personal food?
[25]    MR. LISS:  Objection to the form of the

**Page 79**

[1]    question and remind you of the nature of this
[2]    deposition.
[3]    MR. CELLER:  Understood.
[4] BY MR. CELLER:
[5]    Q   You can answer.
[6]    A   That's an obvious, yes.
[7]    Q   Do you have any knowledge as to why Perdue
[8] wouldn't require that?
[9]    A   No, I don't.
[10]    Q   Would you agree that if it was required,
[11] Perdue would be obligated to compensate employees
[12] for the time they spent taking that equipment off?
[13] If you know.
[14]    A   If that was included in our consent
[15] agreement.  Yeah, right.
[16]    Q   Would it be fair to say that Perdue is
[17] essentially willing to live by or die by that
[18] consent decree as to what they're required to comply
[19] with under the law?
[20]    MR. LISS:  Objection to the form of the
[21]    question.
[22] BY MR. CELLER:
[23]    Q   You can answer.
[24]    A   Yes, that's my opinion.
[25]    Q   Fair enough.

**Page 80**

[1]    (Thereupon, Plaintiff's Exhibit Number 9
[2]    was marked for identification).
[3] BY MR. CELLER:
[4]    Q   I show you what's been marked as
[5] Plaintiff's Exhibit 9.  I don't expect that you've
[6] ever seen this particular document, but have you
[7] seen anything similar to this issued by Perdue?
[8]    A   Yes.
[9]    Q   What is that?
[10]    A   That's issued by Perdue.  It's an
[11] electronically created generated time card created by
[12] the Kronos system.
[13]    Q   And in that work week that's reflected in
[14] Plaintiff's Exhibit Number 9, would you agree that
[15] that employee worked overtime hours during that work
[16] week?
[17]    A   Yes.
[18]    Q   And would you agree that not included
[19] within the overtime hours worked would be the time
[20] that we've discussed ad nauseam here today regarding
[21] the donning and doffing of the personal gear that
[22] we've addressed?
[23]    MR. LISS:  Objection to form of the
[24]    question.
[25]    THE WITNESS:  Yeah.

---

Dave Stafford, et al v. CV 00-MEF-WC      Document 63-3      Filed 01/22/2008      Page 23 of 26
Perdue Farms, Inc.

David J. Tabnowski
December 12, 2007

**Page 81**

BY MR. CELLER:

[2] **Q** You can answer. Do you understand what
[3] I'm saying?

[4] **A** Yeah, because they're not compensable items
[5] in our opinion.

[6] **Q** Okay. And so you would agree that the
[7] time spent -- the time that employees spend putting
[8] that personal gear on is not reflected in their
[9] hours worked?

[10] MR. LISS: Objection.

[11] BY MR. CELLER:

[12] **Q** You can answer.

[13] **A** They are not reflected in that time, yes.

[14] MR. CELLER: All good.

[15] MR. LISS: I just have a few questions.

[16] **DIRECT EXAMINATION**

[17] BY MR. LISS:

[18] **Q** Dave, are poultry processing employees ...
[19] Strike that.

[20] Reference has been made to employees at
[21] various points throughout this deposition.

[22] **A** Uh-huh (affirmative).

[23] **Q** Have your answers been exclusively
[24] regarding hourly poultry processing employees?

[25] **A** Yes.

**Page 82**

[1] **Q** So I'll continue to use the word
[2] "employees" with that in mind.

[3] **A** (Nods head affirmatively).

[4] **Q** Are employees permitted to put on personal
[5] gear after they clock in?

[6] **A** Yes.

[7] **Q** Are employees permitted to doff personal
[8] gear before they clock out?

[9] **A** Sure, yes.

[10] **Q** And if one of those two were to happen,
[11] then the donning and doffing of personal gear would
[12] be compensable; is that right?

[13] **A** Yes.

[14] **Q** So in reference to Exhibit 9, this time
[15] card, do you know whether or not Ms. Collier chose
[16] to don or doff personal gear before or after she had
[17] clocked in or out?

[18] **A** No, I do not.

[19] **Q** So, in fact, she might have been paid for
[20] the donning or the doffing?

[21] **A** Yes, it's a possibility.

[22] MR. CELLER: Brian, I've got 3 if you're
[23] looking for it if you need it.

[24] MR. LISS: Okay, I'm good. Thank you.

[25] BY MR. LISS:

**Page 83**

[1] **Q** Do you know if Perry conducts training for
[2] its employees after the initial new hire training?

[3] **A** Training after the new hire orientation?
[4] There are coaching sessions given if needed. And
[5] there can be team meetings where they get together as
[6] a group where they would discuss that.

[7] **Q** But you think that during those subsequent
[8] training meetings the supervisor would provide the
[9] associate, the employee, with written information?

[10] MR. CELLER: Object to the form.

[11] THE WITNESS: Provide them with a written
[12] form?

[13] BY MR. LISS:

[14] **Q** With any written information was my
[15] question.

[16] **A** No, not necessarily.

[17] **Q** Would it be possible?

[18] **A** Possible, yes.

[19] **Q** Again, just to clear up the record, we've
[20] been talking about swiping and punching. What word
[21] describes best how employees, you know, enter their
[22] time card at the time clock?

[23] MR. CELLER: Form.

[24] THE WITNESS: When they get to the clock
[25] they swipe in. And normally it's a green light

**Page 84**

[1] to make sure that it is taken. In their
[2] training they require them to swipe a second
[3] time to show -- which would be an amber light
[4] saying punch restricted or swipe restricted.
[5] That would signify that the first swipe took
[6] and they proceed to their designated area to
[7] don their gear.

[8] BY MR. LISS:

[9] **Q** But it's a swipe?

[10] **A** Yes.

[11] **Q** Do all employees start their shift at the
[12] same time?

[13] **A** No.

[14] **Q** Are the shifts staggered?

[15] **A** Yes.

[16] **Q** How are they staggered?

[17] **A** Based on product flow on the front end and
[18] production schedules on the second processing or back
[19] end.

[20] **Q** And, similarly, are break times staggered?

[21] **A** Yes.

[22] **Q** How are they staggered?

[23] **A** In a line dependent area which is first
[24] processing. Once the line hangers go on break, as the
[25] birds move down the line, the individuals as the birds

David J. Tarnowski
December 12, 2007
1:06-cv-01000-MEF-WC     Document 63-3     Filed 01/22/2008     Page 24 of 26
David Alford, Sr., et al. v.
Perdue Farms, Inc.

Page 85

[1] pass will go to break. So it's like a snowball -- or
[2] a rolling effect.
[3]     Second processing is pretty much dependent
[4] on product availability and requirements for
[5] production.
[6]     And most of the time they stagger their
[7] departments also.
[8]     Q   You testified that there were five clocks
[9] in first processing?
[10]    A   First processing is five, yes.
[11]    Q   And that there were six in second
[12] processing?
[13]    A   Yes, I believe there are six.
[14]    Q   Generally speaking, where are the time
[15] clocks located?
[16]    A   There are four in both hallways leading to
[17] the production area, and one in the receiving area in
[18] first processing and one in what we call a Chick-Fil-A
[19] area.
[20]    Q   What accounts for the location of the time
[21] clocks?
[22]    A   The locations were -- I would have to assume
[23] they were -- the four were put in the hallways to
[24] protect it from sanitation waters and to keep them
[25] from breaking down if they ... and ease of access to

Page 86

[1] the production area.
[2]    Q   You testified that you conducted a first
[3] and last Principal Activity Audit in February of
[4] 2007; is that right?
[5]    A   Yes.
[6]    Q   Did you have occasion to return to Perry
[7] after that time?
[8]    A   Yes, I have.
[9]    Q   Did you observe the First and Last
[10] Principal Activity process and procedures at Perry
[11] when you returned?
[12]    MR. CELLER: Object to form. You can
[13] answer.
[14]    THE WITNESS: It was an unofficial review
[15] of all of the steps that I was able to look at.
[16] It was not a formal audit, but I did review
[17] items that were addressed during the audit, the
[18] first audit.
[19] BY MR. LISS:
[20]    Q   What did you see?
[21]    A   Every item that was noted in the first audit
[22] had been corrected and were working fine.
[23]    MR. LISS: No further questions.
[24]    MR. CELLER: I've just got a couple of
[25] redirect.

Page 87

[1]                 RECROSS-EXAMINATION
[2] BY MR. CELLER:
[3]    Q   When was it, Dave, that you went back
[4] after the February audit?
[5]    A   Here's where I've got to think month-wise.
[6] I believe it was end of June or end of July of this
[7] year.
[8]    Q   What prompted or initiated you having to
[9] go back if you had already done an audit just months
[10] prior?
[11]    A   I was asked to go down to the plant.
[12]    Q   Who asked you?
[13]    MR. LISS: Objection to the form of the
[14] question.
[15]    MR. CELLER: What's the problem with that
[16] one, Brian? What's the problem with that one?
[17]    MR. LISS: Form of the question.
[18] BY MR. CELLER:
[19]    Q   Do you understand the question?
[20]    A   Yes.
[21]    Q   All right. Who asked you?
[22]    A   My boss.
[23]    Q   Who's that?
[24]    A   Stan Howath.
[25]    Q   Can you say that again?

Page 88

[1]    A   Stan Howath is my boss.
[2]    Q   Is Stan a lawyer?
[3]    A   No, he's not.
[4]    Q   Did Stan tell you why he wanted you to go
[5] to the plant?
[6]    MR. LISS: You can answer.
[7]    THE WITNESS: Yes.
[8] BY MR. CELLER:
[9]    Q   What was the purpose or what did he tell
[10] you was the reason?
[11]    A   I was to meet Brian.
[12]    Q   Okay. And I don't want to know anything
[13] you discussed with Brian. What did you do during
[14] that secondary visit in June or July of '07? What
[15] was the --
[16]    A   Gave Brian a walk-through of the plant.
[17]    Q   Okay. Were there times that you spent at
[18] the plant in that visit in June or July of '07, was
[19] there any work you did outside of Brian's presence?
[20]    A   No.
[21]    Q   During that visit in June or July of '07,
[22] did you specifically look at or do any type of
[23] analysis regarding the personal gear that we
[24] discussed Perdue doesn't pay for as being
[25] compensable?

**Page 89**

[1]  A   No.

[2]  Q   Do you understand my question?

[3]  A   I did not.

[4]  Q   Was the focus of your June or July '07

[5] visit simply to focus on whether the requirements of

[6] the 2002 consent decree were still being implemented

[7] or upheld?

[8]  A   My primary purpose was to give Brian a

[9] walk-through.

[10]  Q   Okay, fair enough.

[11]      Are employees given any type of extra

[12] minutes or credit at the end of the work week for

[13] any time spent donning or doffing these personal

[14] gear?

[15]  A   No.

[16]  Q   Now, you testified -- Brian asked you some

[17] questions whether employees are permitted to don and

[18] doff the personal equipment on the clock, do you

[19] remember that?

[20]  A   Yes.

[21]  Q   And you said that they are?

[22]  A   They could, yes.

[23]  Q   But that's not Perdue's policy, is it?

[24]  A   They could walk through the door and put

[25] their ear plugs in.

**Page 90**

[1]  Q   Okay. But that's not Perdue's policy,

[2] correct?

[3]  A   (Reviews document). That's that policy,

[4] yes.

[5]  Q   Would you agree that what we've marked --

[6]  A   I believe that -- Let me answer that. If

[7] they walked in without their ear plugs or bump cap on,

[8] they would not get written up, no.

[9]  Q   I just want to make sure referring to

[10] Plaintiff's Exhibit 3 document 20 which you

[11] testified was accurate on direct.

[12]  A   Right.

[13]  Q   That employees according to this policy

[14] are required to have their personal gear on before

[15] swiping it, and you said yes, do you remember that?

[16]  A   Yes, correct.

[17]  Q   So, now, on cross you changed your answer

[18] and said no, they could put them on on the clock.

[19]  A   They could.

[20]  Q   Okay. If they could, it would be in

[21] violation of what we've identified as Plaintiff's

[22] Exhibit Number 3, document 20, correct?

[23]  A   According to that, yes.

[24]  Q   So there would be an inconsistency, would

[25] you agree, between the implementation of Perdue's

**Page 91**

[1] policy and the reality of the situation?

[2]      MR. LISS:  Objection to the form of the

[3] question.

[4] BY MR. CELLER:

[5]  Q   Do you understand my question?

[6]  A   Rephrase that a little bit.

[7]  Q   You would agree with me that the written

[8] policy of Perdue is that employees must have

[9] personal items on before swiping in?  Is that

[10] correct?

[11]  A   In most cases they do, yes.

[12]  Q   But not what they actually do, I'm asking

[13] about the policy.  Would you agree that the policy

[14] is that they have -- the written policy is that they

[15] have to have these items on before swiping in?

[16]  A   Yes.  That document says have.

[17]  Q   From what I understand from your

[18] testimony, would you agree that even though that's

[19] the written policy, it's not necessarily being

[20] enforced by Perdue?

[21]      MR. LISS:  Objection, that wasn't his

[22] testimony.

[23]      MR. CELLER:  That's okay.

[24] BY MR. CELLER:

[25]  Q   If you understand my question.

**Page 92**

[1]  A   Enforcement, as far as that question, no,

[2] they're probably not.

[3]  Q   Are there any other policies which Perdue

[4] is relying on as part of their donning and doffing

[5] procedures that may be in writing that they may not

[6] be enforcing that stringently?

[7]      MR. LISS:  Objection to the

[8] characterization of what Perdue is relying or

[9] not relying on.  The question other than that

[10] is fine.

[11]      THE WITNESS:  I wouldn't know.

[12]      MR. CELLER:  Anything else?

[13]      Tell me about your cell phones.  I'm just

[14] kidding, I've got no further questions.

[15]      THE WITNESS:  I've got a picture of my

[16] granddog.

[17]      MR. CELLER:  That's all right.

[18]      (Thereupon, the deposition was concluded at

[19] 11:33 a.m.)

[20]

[21]

[22]

[23]

[24]

[25]

Page 93

```
[1]        C E R T I F I C A T E
[2]  G E O R G I A :
[3]  COUNTY OF FULTON:
[4]       I hereby certify that the foregoing transcript
[5]  was taken down, as stated in the caption, and the
[6]  proceedings were reduced to typewriting under my
[7]  direction and control.
[8]       I further certify that the transcript is a true
[9]  and correct record of the evidence given at the said
[10] proceedings.
[11]      I further certify that I am neither a relative or
[12] employee or attorney or counsel to any of the parties,
[13] nor financially or otherwise interested in this
[14] matter.
[15]      This the 14th day of December, 2007.
[16]
[17]                    _____
                       ALICE E. SIMMONS, B-1193
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
```

Page 94

```
[1]                   DISCLOSURE
[2]  STATE OF GEORGIA
[3]  COUNTY OF FULTON
[4]  DEPOSITION OF DAVID TABINOWSKI
[5]
[6]       Pursuant to Article 8.B. of the Rules and
     Regulations of the Board of Court Reporting of the
[7]  Judicial Council of Georgia, I make the following
     disclosure:
[8]
[9]       I am a Georgia Certified Court Reporter.  I am
     here as an independent contractor for American
[10] Court Reporting Company, Inc.
[11]      The firm was contacted by the offices of
     DEIDRE M. JOHNSON, Esquire, to provide court reporting
[12] services for this deposition.  The firm will not be
     taking this deposition under any contract that is
[13] prohibited by OCGA 15-14-37 (a) and (b).
[14]      Option A:  The firm has no contract/agreement
     to provide reporting services with any party to the
[15] case, any counsel to the case, or any reporter or
     reporting agency from whom a referral might have
[16] been made to cover this deposition.  The firm will
     charge its usual and customary rates to all parties
[17] in the case, and a financial discount will not be
     given to any party to this litigation.
[18]
[19]      (Signature of Attorneys optional)
[20]
[21]                        December 12, 2007
     ALICE E. SIMMONS, CCR B-1193
[22]
[23]
     _____    _____
[24] Attorney for Plaintiff        Date
[25] _____    _____
     Attorney for Defendant        Date
```

Page 95

```
[1]        E R R A T A   S H E E T
[2]  IN RE:  DAVID ALFORD, SR. V. PERDUE FARMS, INC.
[3]  CIVIL ACTION FILE NO: 5:07-CV-00087-CAR
[4]  DEPOSITION TAKEN ON:  December 12, 2007
[5]       I have read the transcript of my deposition
     and find that no changes are necessary.
[6]
[7]       Having read the transcript of my deposition,
     I wish to make the following changes (Please state
[8]  reason.)
[9]  Page / Line /            Change / Reason
[10] _____           _____
[11] _____           _____
[12] _____           _____
[13] _____           _____
[14] _____           _____
[15] _____           _____
[16] _____           _____
[17] _____           _____
[18]
[19]
[20]
                         _____
                              DAVE TABINOWSKI
[21]
[22] Sworn to and subscribed before me,
[23] _____, Notary Public.
[24] This _____ day of _____, 2007.
[25] My Commission Expires:
```

**EXHIBIT**
**C**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

)
)
)
)          CASE NO.
)          4:07—MD—01854 (CDL)
IN RE:  TYSON FOODS, INC.   )
FAIR LABOR STANDARDS ACT    )     DATE:  11/14/2007
LITIGATION                  )
)
)          PRETRIAL CONFERENCE
)
)
)

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CLAY D. LAND,

UNITED STATES DISTRICT JUDGE

Proceedings recorded by mechanical stenography;
transcript produced by computer.

Betsy J. Peterson, RPR
Federal Official Court Reporter
P.O. Box 924
Columbus, Georgia  31902—0924
706  317  3111

1                          APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS:

4        MS. CHRISTINE WEBBER
         cwebber@cmht.com
5        MR. JOSEPH M. SELLERS
         jsellers@cmht.com
6        Cohen, Milstein, Hausfeld & Toll, PLLC
         Suite 500, West Tower
7        1100 New York Avenue, NW
         Washington, DC 20005-3934
8        (202) 408-4600

9        MR. PREYESH MANIKLAL
         preyeshmaniklal@gcmdlaw.com
10       Maniklal & Dennis, LLP
         4360 Chamblee Dunwoody Road
11       Suite 428
         Atlanta, GA 30341
12       (404) 875-0630

13       MR. ROBERT J. CAMP
         rcamp@cochranfirm.com
14       The Cochran Firm
         505 North 20th Street
15       Suite 825
         Birmingham, AL 35203
16       (205) 244-1115

17       MR. ROGER K. DOOLITTLE
         Attorney at Law
18       rogerkdoolittle@aol.com
         Briarwood One Building
19       450 Briarwood Drive
         Suite 500
20       Jackson, MS 39206
         (601) 957-9777

21

22       MR. ROBERT E. DEROSE II
         bderose@bnhmlaw.com
         Barken Neff Handelman Meizlish, LLP
23       360 S Grant Avenue
         Columbus, OH 43215
24       (614) 221-4221

25

```
 1        MR. PETER D. WINEBRAKE
          pwinebrake@winebrakelaw.com
 2        The Winebrake Law Firm, LLC
          Twining Office Center
 3        715 Twining Road
          Suite 114
 4        Dresher, PA 19025
          (215) 884-2491
 5
          MS. ANN K. WIGGINS
 6        awiggins@wcqp.com
          Wiggins, Childs, Quinn & Pantazis, LLC
 7        1400 Southtrust Tower
          Birmingham, AL 35203
 8        (205) 328-0640

 9        MS. CANDIS A. MCGOWAN
          cmcgowan@wcqp.com
10        Wiggins, Childs, Quinn & Pantazis, LLC
          The Kress Building
11        301 19th Street
          Birmingham, AL 35203
12        (205) 314-0611

13

14   ON BEHALF OF THE DEFENDANTS:

15
          MR. MICHAEL MUELLER
16        mmueller@akingump.com
          Akin, Gump, Strauss, Hauer & Feld, LLP
17        Robert S. Strauss Building
          1333 New Hampshire Avenue
18        Washington, D.C. 20036
          (202) 887-4113
19

20        MS. LISA SCHRETER
          lschreter@littler.com
21        Littler Mendelson, PC
          3348 Peachtree Road, NE
22        Suite 1100
          Atlanta, GA 30326-1008
23        (404) 233-0330

24

25
```

1          MR. SELLERS:  Your Honor, may I speak to a

2    couple of things?

3          First of all, in the Fox case, I think it's

4    important for the Court to recognize the discovery in

5    that case ended in 2001.  So it did not extend back --

6    there's been no discovery whatsoever, by either side, of

7    any events that occurred over the last three years,

8    which would presumably be the focus of most of the

9    discovery at this juncture because that's the period

10   that's covered by the statute of limitations under the

11   Fair Labor Standards Act.

12         THE COURT:  Let me ask you this:  Who has

13   the -- I'm presuming that it's the plaintiffs' burden to

14   bear the cost of notification preliminarily.  Is that

15   correct?

16         MR. SELLERS:  That's correct.

17         THE COURT:  So what is the burden on defendant

18   of deciding the certification issue initially, based on

19   no discovery, and then if the Court concludes based on

20   the well-pled complaint that it should be certified --

21   and then the plaintiffs have the burden of notifying all

22   these people of their opt-in rights, knowing that all

23   that could be for naught if the Court later

24   de-certifies -- then what is the burden from the

25   defendant's perspective of having the matter decided

1    based on limited or no discovery in that first step

2    other than just putting them through as many hoops as

3    you can put them through?

4            MR. MUELLER:  If I understand the question

5    right --

6            THE COURT:  There's going to be no expense to

7    you in notification; correct?  If the Court certifies

8    and says notify, then that's no expense to you.

9            MR. MUELLER:  Not really.  We have to come up

10   with the names and addresses.

11           THE COURT:  Okay.

12           MR. MUELLER:  And they're asking for names and

13   addresses going back to 1996.  This is not as easy as it

14   sounds, but --

15           THE COURT:  All right.  It's not significant.

16           MR. MUELLER:  It's not an insignificant burden

17   on us to go through the process.

18           THE COURT:  Okay.

19           MR. MUELLER:  And I think that's -- if that's

20   Your Honor's only question.

21           THE COURT:  Well, I'm just trying to see how

22   your rights are prejudiced by deciding the initial

23   certification decision on no discovery.

24           I could see how they would be prejudiced if it

25   were your burden solely to notify everybody and go

1   through that expense.  That may be for naught if

2   discovery later indicates it should not have been

3   conditionally certified.  But I'm really seeing how you

4   are significantly prejudiced --

5            MR. MUELLER:  Well, from --

6            THE COURT:  -- because -- I mean, you say that

7   it may cost you something to look at the addresses, but

8   you're saving the cost of having to do the initial

9   discovery.  I don't know how all that is going to

10  offset.  I guess you can use that same discovery later

11  on.

12           But it seems clear to me that the framework, at

13  least envisioned by Hipp, is that we're not going to

14  fight certification full bore twice.  We're going to

15  fight it in phases.  In one the Court's going to do an

16  initial review of the well-pled complaints to determine

17  whether there are sufficient allegations and the record

18  is sufficient to determine whether it should go to the

19  next step, and that is be conditionally certified so

20  that people can be notified of their opt-in right.  And

21  then you're going to be able to do this discovery and

22  then file a motion to de-certify it, if you're able to

23  pierce the allegations in their complaint and show that

24  that's not the facts, that's not a fact, that -- and

25  therefore, the Court should de-certify.