**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

_____
)
**DARRYL ANDERSON, et al.,**                     )
)
**Plaintiffs,**                          )
)          **Case Action No.:**
**v.**                             )          **1:06-CV-1000-MEF-WC**
)          **JURY TRIAL DEMANDED**
**PERDUE FARMS INCORPORATED,**          )
)
**Defendant.**                         )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

James J. Kelley                          Sandra B. Reiss
(DC Bar No. 194746)*                     Alabama Bar No.  ASB-3650-S80S
jkelley@morganlewis.com                  **Ogletree, Deakins, Nash, Smoak**
Lexer I. Quamie                              **& Stewart, P.C.**
(DC Bar No. 502908)*                     One Federal Place, Suite 1000
202-739-5955                             1819 5th Avenue North
lquamie@morganlewis.com                  Birmingham, Alabama  35203
**Morgan, Lewis & Bockius LLP**             205-328-1900
1111 Pennsylvania Avenue, N.W.           205-328-6000 (fax)
Washington, D.C.  20004                  sandra.reiss@odnss.com
202-739-5095
202-739-3001 (fax)


Dated:  May 16, 2008                     *Counsel for Defendant, Perdue Farms*
                                         *Incorporated*


*James J. Kelley and Lexer I. Quamie have been admitted to this Court pro hac vice.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

I.      INTRODUCTION ................................................................................................... 1

II.     STATEMENT OF UNDISPUTED FACTS .......................................................... 3

        A.      Poultry-processing Employee's Typical Shift at the Dothan Processing
                Plant ..........................................................................................................3

        B.      A Typical Day for an Hourly Poultry-processing Employee .....................4

        C.      Perdue Has Not Used "Line" time or "Gang" Time as a Time-Recording
                System Since 2003 .....................................................................................8

        D.      Perdue's Kronos Time-Keeping System ..................................................11

        E.      Hourly Poultry-Processing Employees' DOL Awareness Training ........12

III.    PROCEDURAL HISTORY ................................................................................. 13

IV.     STANDARD FOR SUMMARY JUDGMENT ................................................... 14

V.      ARGUMENT ....................................................................................................... 15

        A.      Plaintiffs' Compensable Activities Are Identified By The Portal-to-Portal
                Act and Federal Case Law. ......................................................................15

        B.      Perdue Properly Compensates Employees For All Work Commencing
                After Their First Principal Activity .........................................................18

        C.      Perdue Is Not Required To Compensate Plaintiffs For The Preliminary
                And Postliminary Activities They Have Alleged Require Payment ........21

                1.      Putting On And Removing Hair Nets, Beard Nets, Ear Plugs, And
                        Slip Resistant Footwear Are Not Compensable Activities. .........21

                2.      A Requirement To Wear Certain Items Does Not Automatically
                        Render Plaintiffs' Activities Compensable .................................23

                3.      Plaintiffs' Alleged Activities During Breaks Are Not
                        Compensable ................................................................................25

                4.      Plaintiffs Spend Minimal Time Clearing Security Before Entering
                        Or Departing The Dothan Facility. ..............................................28

        D.      Plaintiffs Cannot Create a Genuine Issue of Material Fact By Relying On
                Documents Not Based on Personal Knowledge. .......................................28

# TABLE OF CONTENTS
## (continued)

**Page**

    1.    Plaintiffs' Are Paid For Sanitizing Their Equipment Even Though Such Sanitizing Is A Preliminary Activity.................................................29

    2.    Plaintiffs' Amended Complaint Erroneously Asserts That Plaintiffs Are Not Compensated For Removing Their Smocks. ..............................29

E.    Even If The Time Plaintiffs Spend Engaging In The Above Activities Is Work, It Is *De Minimis* And Therefore Not Compensable.....................................29

VI.    CONCLUSION .............................................................................................. 31

## TABLE OF AUTHORITIES
### (continued)

Page

### FEDERAL CASES

Abbe v. City of San Diego,
   Nos. 05cv1629 and 06cv0538, 2007 WL 4146696 (S.D. Cal. Nov. 9, 2007) ........................24

Alford v. Perdue Farms, Inc.,
   No. 5:07-cv-87, 2008 WL 879413 (M.D. Ga. Mar. 28, 2008) ...................................21, 23, 30

Alvarez v. IBP, Inc.,
   339 F.3d 894 (9th Cir. 2003) ...........................................................................................21, 31

Anderson v. Cagle's, Inc.,
   488 F.3d 945 (11th Cir. 2007) ................................................................................................14

Anderson v. Mt. Clemens Pottery Co.,
   328 U.S. 680 (1946)..........................................................................................................15, 30

Anderson v. Pilgrim's Pride Corp.,
   147 F. Supp. 2d 556 (E.D. Tex. 2001)........................................................... 17, 21-24, 27, 31

Bagrowski v. Maryland Port Authority,
   845 F. Supp. 1116 (D. Md. 1994)...........................................................................................24

Bonilla v. Baker Concrete Construction, Inc.,
   487 F.3d 1340 (11th Cir. 2007) .......................................................................................23, 28

Bridges v. Amoco Polymers,
   19 F. Supp. 2d 1375 (S.D. Ga. 1997)......................................................................................18

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)................................................................................................................14

Chapman v. AI Transport,
   229 F.3d 1012 (11th Cir. 2000) .............................................................................................14

Cherup v. Pittsburgh Plate Glass Co.,
   350 F. Supp. 386 (N.D. W. Va. 1972) ....................................................................................29

Ciemnoczolowski v. Q.O. Ordinance Corp.,
   228 F.2d 929 (8th Cir. 1955) .................................................................................................17

Davis v. Charoen Pokphand (USA), Inc.,
   302 F. Supp. 2d 1314 (M.D. Ala. 2004) .................................................................................26

De Asencio v. Tyson Foods, Inc.,
   500 F.3d 361, 373 (3d Cir. 2007).............................................................................................30

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

Fox v. Tyson Foods, Inc.,
    No. CV-99-BE-1612-M, 2002 WL 32987224 (N.D. Ala. Feb. 4. 2002)................................22

Gorman v. Consolidated Edison Corporation,
    488 F.3d 586 (2d Cir. 2007)..................................................................17, 18, 24, 28

IBP, Inc. v. Alvarez,
    546 U.S. 21 (2005)...................................................................................17, 18, 23, 27

Jastremski v. Safeco Insurance Companies,
    243 F. Supp. 2d 743 (N.D. Ohio 2003)...................................................................14

Kohleim v. Glynn County,
    915 F.2d 1473 (11th Cir. 1990) ...............................................................................25

Lindow v. United States,
    738 F.2d 1057 (9th Cir. 1984) .................................................................................30

Martin v. City of Richmond,
    504 F. Supp. 2d 766 (N.D. Cal. 2007) .....................................................................16

Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation,
    475 U.S. 574 (1986)..................................................................................................14

Mize v. Jefferson City Board of Education,
    93 F.3d 739 (11th Cir. 1996) ...................................................................................28

Nardone v. General Motors, Inc.,
    207 F. Supp. 336 (D.N.J. 1962) ...............................................................................17

Pace v. Capobianco,
    283 F.3d 1275 (11th Cir. 2002) ...............................................................................15

Pressley v. Sanderson Farms, Inc. (Processing Division),
    No. Civ.A. H-00-420, 2001 WL 850017 (S.D. Tex. Apr. 23, 2001).......................31

Reich v. IBP, Inc.,
    38 F.3d 1123 (10th Cir. 1994) ............................................................................22, 31

Reich v. Oscar Mayer Foods Corp.,
    No. 4:93CV204, 1995 WL 1765643 (E.D. Tex. Mar. 2, 1995)...............................24

Steiner v. Mitchell,
    350 U.S. 247 (1956)............................................................................................16, 17

## TABLE OF AUTHORITIES
### (continued)

**Page**

Tum v. Barber Foods,
360 F.3d 274 (1st Cir. 2004) .................................................................27

Vega ex rel. Trevino v. Gasper,
36 F.3d 417 (5th Cir. 1994) ..................................................................27

## FEDERAL STATUTES

29 U.S.C. § 202(a) ..........................................................................15

29 U.S.C. § 254(a)(1) .......................................................................15

29 U.S.C. § 254(a)(2) .......................................................................16

29 C.F.R. § 785.19(a) .......................................................................25

29 C.F.R. § 785.47 ..........................................................................30

29 C.F.R. § 790.7(g) .....................................................................16, 26

29 C.F.R. § 790.8(a) .......................................................................16

29 C.F.R. § 790.8(c) .......................................................................26

Fed R. Civ. P. 56(c) ........................................................................14

## MISCELLANEOUS

Wage and Hour Adv. Mem. No. 2006-2, at 2-3 (May 31, 2006) ................................25

Labor Department Survey Finds Pervasive Labor Law Non-Compliance in Poultry
Processing Plants, U.S. NEWSWIRE, Jan. 10, 2001 ......................................8

Tom Ramstack, Survey Finds Poultry Plants Flout Wage Rules, THE WASHINGTON
TIMES, Jan. 15, 2001 .................................................................8

Defendant Perdue Farms, Inc. ("Defendant," "Perdue," or "the Company") respectfully submits this Memorandum in Support of its Motion for Summary Judgment under Federal Rule of Civil Procedure 56.

## I.    <u>INTRODUCTION</u>

Plaintiffs' First Amended Complaint is factually and legally defective as it misstates how Perdue compensates Plaintiffs and misstates the law governing Perdue's obligation to compensate Plaintiffs.  Plaintiffs have filed this action seeking back pay and other relief from Perdue for alleged wage and overtime pay violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 <u>et seq.</u>

In the course of their employment, Plaintiffs wear such departmental specific clothing as smocks, gloves, aprons, and safety gear such as hand and arm guards.  (Stmt. Facts ¶ 25). Plaintiffs also wear personal items such as hair nets, ear plugs, work boots, and safety glasses. (Stmt. Facts ¶ 20).  Plaintiffs do not dispute that they are paid for the time spent donning and doffing their departmental work clothing but allege in this suit that Perdue has violated the FLSA by failing to pay for time spent donning and doffing their non-unique personal items; for time spent walking to and from designated time clock areas, and break areas; and for time spent clearing security at the beginning of their shift.  (First Am. Compl. ¶¶ 42–46).

Perdue is entitled to summary judgment because the donning and doffing of such items as ear plugs, hair nets, beard nets, and footwear are preliminary and postliminary to employees' principal work activities under the Portal-to-Portal Act and are therefore not compensable. Despite Plaintiffs' allegations, they are similarly not entitled to compensation for their walking time during breaks, waiting time prior to swiping their time card at the start of the work day and following unpaid meal breaks, or waiting time prior to clearing security.  These activities are noncompensable under the FLSA and the Portal-to-Portal Act.  Alternatively, the time Plaintiffs

1

spend on the foregoing activities is *de minimis* and not entitled to compensation.  As detailed in the Statement of Undisputed Facts, Perdue had previously entered into a comprehensive settlement and Consent Judgment with the United States Department of Labor ("DOL") to resolve any uncertainty regarding the lawfulness of its donning and doffing practices.  (Stmt. Facts ¶ 59).  Pursuant to that settlement, Perdue representatives worked together with the DOL to develop ground-breaking donning and doffing procedures and time-recording practices that are compliant with the FLSA.  Perdue's donning and doffing pay practices have been expressly approved and endorsed by the DOL (Stmt. Facts ¶¶ 68–69) and were recently confirmed as lawful by the United States District Court for the Middle District of Georgia in <u>Alford v. Perdue Farms, Inc.</u>, No. 5:07-cv-87, 2008 WL 879413, at *6 (M.D. Ga. Mar. 28, 2008).  There can be no disputing that Perdue's poultry-processing employees are paid for all hours worked from their first principal activity of the work day until the end of the last principal activity of the work day, except for any time taken for their unpaid meal breaks or any bona fide off duty time.  The record shows that Plaintiffs are paid for all compensable time, including sanitizing their departmental equipment before beginning work and donning such departmental gear as smocks, gloves, and sleeves.

Plaintiffs' claims are unsustainable both factually or legally.  Counsel for Perdue has attempted to inform Plaintiffs' Counsel of the inaccuracies in their claims against Perdue.  (Stmt. Facts ¶ 70).  Yet, Plaintiffs have persisted in maintaining this action and filing an Amended Complaint based on factual allegations wholly inapplicable to Perdue.  Based on the undisputed material facts and the applicable law, Plaintiffs' Amended Complaint must be dismissed in its entirety.

II.    <u>**STATEMENT OF UNDISPUTED FACTS**</u>

1. Plaintiffs are current and former First and Second Processing employees at the Perdue poultry-processing facility in Dothan, Alabama.  (First Am. Compl. ¶ 9).

A.    <u>**Poultry-processing Employee's Typical Shift at the Dothan Processing Plant**</u>

2. Perdue's poultry-processing plant in Dothan, Alabama operates five days per week, three shifts per day.  (Ex. B, Second Tabinowski Decl. ¶ 4)

3. Poultry processing is performed on the night shift (the third shift) and the day shift (the first shift).  (<u>Id.</u>)

4. The base rate of pay for hourly poultry processing employees on the day shift at Perdue's poultry processing plant in Dothan, Alabama is $8.15 per hour. This amount increases to $9.35 per hour after sixty days of employment with Perdue.  The base rate of pay for hourly poultry processing employees on the evening shift is $8.25 per hour.  This amount increases to $9.45 per hour after sixty days of employment with Perdue.  The base rate of pay for hourly processing employees on the night shift is $8.45 per hour.  This amount increases to $9.55 after sixty days of employment with Perdue.  (<u>Id.</u>)

5. Hourly poultry-processing employees are scheduled to work 37.5 hours per five-day week.  (<u>Id.</u>)

6. Hourly poultry-processing employees may be asked to work a sixth day based on production needs and, in fact, depending upon product demand, a significant amount of overtime may be worked.  (<u>Id.</u>)

7. Whenever overtime is worked, it is paid at a rate of time and one half of each employee's regular rate of pay.  (<u>Id.</u>)

8. First Processing is the area of the plant where live chickens are introduced into the plant and placed or hung on hooks or shackles for killing, cleaning, eviscerating, and chilling.  Employees who work in this area of the plant are called "First Processing Employees."  (<u>Id.</u> at ¶ 5)

9. Second Processing employees receive the chickens by conveyor from First Processing.  Chickens are cut up, marinated, deboned, weighed, sized, and packed in Second Processing.  (Id.)

**B.**  **A Typical Day for an Hourly Poultry-processing Employee**

10. Processing employees park their cars in the parking lot on the facility complex and then walk to their designated entrance door to the facility.  (Id. at ¶ 7)

11. On their way to the facility entrance, employees walk through a gate in a chain link fence.  (Id.)

12. Employees visibly display their Perdue identification cards to a third-party security guard as they pass the security guard's booth at the gate.  (Id.; Ex. E, Cawthon Decl. ¶ 5; Floyd Decl. ¶ 5; Green Decl. ¶ 5)

13. Employees do not have to stop, or even pause, as they pass the guard, nor do they swipe in at the gate.  (Id.)

14. In the Dothan facility, there are locker rooms, rest rooms, and break rooms for use by the employees.  (Ex. B, Second Tabinowski Decl. ¶ 8)

15. Employees await the beginning of their shift, and are not required to account for their time or activities before beginning their shift.  (Id.; Ex. E, Davis Decl. ¶ 5; Durr Decl. ¶ 6)

16. Many employees proceed to the employee break room before swiping in for their shift.  (Ex. B, Second Tabinowski Decl. ¶ 8; Ex. E, Clark Deck. ¶ 6; Hickman Decl. ¶5)

17. Employees' time is captured by one of several Kronos time system clocks designed to capture all principal work activities.  (Ex. B, Second Tabinowski Decl. ¶ 6)

18. Every employee is issued an electronic card that the employee "swipes" through the clock, which is read electronically.  (Id.; Ex. E, Banks Decl. ¶ 6; Mack Decl. ¶ 5; Reynolds Decl. ¶ 3)

19. There are two Kronos time clocks in the First Processing section of the facility. There are six Kronos time clocks in the Second Processing section of the facility. (Ex. B, Second Tabinowski Decl. ¶ 6)

20. Before swiping in with their Kronos time-keeping card, hourly poultry-processing employees at Perdue's poultry-processing plant in Dothan, Alabama are required to have, in their possession, personal items—bump caps, hair and/or beard nets, ear plugs, and slip-resistant footwear—which they may put on at the plant, en route to the plant, or at home. (Id. at ¶¶ 10–11; Green Decl. ¶ 15; Hickman Decl. ¶ 9; Mack Decl. ¶ 14)

21. Hourly poultry-processing employees are permitted to don these personal items after clocking in, and many choose to do so. (Ex. B, Second Tabinowski Decl. ¶ 11)

22. Employees walk to their assigned time clock to swipe their cards at their specific shift start time. (Id. at ¶ 14; Ex. E, Hudson Decl. ¶ 3; Mack Decl. ¶ 5)

23. At the designated shift start time, and before acquiring work-related equipment and clothing, or performing any other required work activities, hourly poultry-processing employees use their assigned Kronos access cards to swipe into Kronos system time clocks. (Ex. B, Second Tabinowski Decl. ¶ 9; Ex. E, Hudson Decl. ¶ 3; Mack Decl. ¶ 5)

24. After swiping their cards, employees enter their department and obtain their required departmental items from hooks, shelves, or bins. (Ex. B, Second Tabinowski Decl. ¶ 9)

25. Required departmental items may include gloves, hand or arm guards, aprons or smocks, and cutting equipment. (Id. at ¶ 11; ; Ex. E, Davis Decl. ¶ 3; Marsh Decl. ¶ 6)

26. Employees put or "don" their required departmental gear items while "on the clock." (Ex. B, Second Tabinowski Decl. ¶ 9; Ex. E, Banks Decl. ¶ 6; Reynolds Decl. ¶ 5; Richards Decl. ¶ 7)

27. Employees sanitize after they put on their required departmental gear items while on the clock.  (Ex. B, Second Tabinowski Decl. ¶ 9; Ex. E, Davis Decl. ¶ 5; Durr Decl. ¶ 7; Mack Decl. ¶ 6)

28. Employees then proceed to their work station and begin to work.  (Ex. B, Second Tabinowski Decl. ¶ 9)

29. After working for approximately two hours, the employees are notified by their supervisor that it is time for their first thirty-minute unpaid meal break. (Id. at ¶ 14; Ex. E, Marsh Decl. ¶ 7; Richards Decl. ¶ 8; Smith Decl. ¶ 8)

30. All hourly poultry-processing employees are provided two thirty-minute unpaid meal breaks, during which time they are completely relieved from work duty.  (Ex. A, Heflin Decl. ¶ 16; Ex. B, Second Tabinowski Decl. ¶ 13; Ex. E, Marsh Decl. ¶ 7; Richards Decl. ¶ 8; Smith Decl. ¶ 8)

31. When it is time for their first break, employees remove their aprons, gloves, arm guards, and return their departmental equipment and other required equipment while still "on the clock."  (Ex. B, Second Tabinowski Decl. ¶ 14; Ex. E, Cawthon Decl. ¶ 6; Davis Decl, ¶ 7; Hickman Decl. ¶ 7)

32. Employees proceed to their department Kronos clock and swipe out to begin their break.  (Ex. B, Second Tabinowski Decl. ¶ 15; Ex. E, Cawthon Decl. ¶ 6; Davis Decl, ¶ 7; Hickman Decl. ¶ 7)

33. Employees may take their thirty-minute unpaid meal breaks wherever they choose, such as the break room, cafeteria, or they may go outside.  (Ex. B, Second Tabinowski Decl. ¶ 13; Ex. E, Hudson Decl. ¶ 5; Lee Decl. ¶ 6; Richards Decl. ¶ 8)

34. While on break, employees retain their hair nets, beard nets, ear plugs, and do not remove their footwear.  (Ex. B, Second Tabinowski Decl. ¶ 14; Ex. E, Cawthon Decl. ¶ 6; Green Decl. ¶ 10; Mack Decl. ¶ 9)

35. Near the end of the first break period, employees walk to their assigned Kronos clock near their work station to swipe in.  (Ex. B, Second Tabinowski Decl. ¶ 15)

36. After the thirty-minute unpaid meal period has elapsed, employees swipe in at their Kronos clock.  (Id.; Ex. E, Banks Decl. ¶ 10; Clark Decl. ¶ 10; Durr Decl. ¶ 8)

37. The Kronos time clocks will not record swipes before thirty minutes have elapsed.  (Id.)

38. After swiping in, employees put on their special departmental gear and pick up any necessary equipment for the second portion of their shift.  (Ex. B, Second Tabinowski Decl. ¶ 15; Ex. E, Green Decl. ¶ 12; Hudson Decl. ¶ 6)

39. Employees then sanitize their outer garments before resuming their work. (Ex. B, Second Tabinowski Decl. ¶ 9; Ex. E, Davis Decl. ¶ 5; Durr Decl. ¶ 7; Mack Decl. ¶ 6)

40. Employees continue to work, until their supervisor notifies them that it is time for their second thirty-minute unpaid meal break.  (Ex. B, Second Tabinowski Decl. ¶ 14; Ex. E, Banks Decl. ¶¶ 12–13; Hickman Decl. ¶ 7; Mack Dec. ¶ 11)

41. The process is repeated.  (supra ¶¶ 32–40)

42. When their supervisor notifies them that their shift has ended, employees remove their gloves, aprons, and any other required clothing and gear, dispose of them.  (Ex. B, Second Tabinowski Decl. ¶ 10; Ex. E, Clark Decl. ¶ 11; Davis Decl. ¶ 8; Floyd Decl. ¶ 17; Hickman Decl. ¶ 9)

43. Some employees choose to remove their earplugs, hair nets, and beard nets at this time.  (Ex. B, Second Tabinowski Decl. ¶ 10)

44.  Employees then swipe out on the designated Kronos time clocks.  (Id.; Ex. E, Cawthon Decl. ¶ 9; Clark Decl. ¶ 11; Hudson Decl. ¶ 7)

45. After swiping out at their assigned Kronos time clock, processing employees may place their personal items—ear plugs, hair and beard nets, and safety glasses—in their lockers, or take the items home with them.  (Ex. B, Second Tabinowski Decl. ¶ 10; Ex. E, Green Decl. ¶ 15; Hickman Decl. ¶ 9; Mack Decl. ¶ 14)

46. Employees exit the facility and return to the employee parking lot.  (Ex. B, Second Tabinowski Decl. ¶ 10)

**C.    Perdue Has Not Used "Line" time or "Gang" Time as a Time-Recording System Since 2003**

47. Before 2002, virtually all poultry companies, including Perdue used the same time-recording system.  (Ex. A, Second Heflin Decl. ¶ 6)

48. The prevailing practice in the poultry industry is and has been to pay production employees according to "line time," "master time", or "gang time".  (Id.)

49. Under "Line time" work time would begin at a predetermined time for each department—when the first chicken arrived at the first employee's individual work station on a particular line.  (Id. at ¶ 7)

50. Employees were required to be at their duty station on the line by the time the first chicken arrived at that point.  (Id.)

51. The ending time was captured when a supervisor or line worker manually inserted a punch card into a time clock located near the production line.  (Id.)

52. Employees were permitted to leave their duty stations when the last chicken crossed their place on the line.  (Id.)

53. The "line time" system did not compensate employees for time spent putting on and taking off their special protective gear and equipment, such as gloves, hand or arm guards, aprons or smocks, and cutting equipment.  (Id.)

54. In 1997 and 2000, the U.S. Department of Labor's ("DOL") Wage and Hour Division conducted a systemic investigation of the nation's poultry-processing plants.  (Id. at ¶ 4); Labor Department Survey Finds Pervasive Labor Law Non-Compliance in Poultry Processing Plants, U.S. NEWSWIRE, Jan. 10, 2001; Tom Ramstack, Survey Finds Poultry Plants Flout Wage Rules, THE WASHINGTON TIMES, Jan. 15, 2001, at D3 (attached collectively hereto as Ex. F).

55. The purpose of the investigation was to identify FLSA wage and hour compliance issues and to encourage the poultry industry to improve employee working conditions.  (Ex. A, Second Heflin Decl. ¶ 4)

56. The investigation revealed what the Department of Labor contended to be violations of wage and hour and overtime laws.  (Id.)

57. On May 9, 2002, after several years of discussions with representatives from the United States DOL, Perdue entered into a Consent Judgment with the DOL regarding Perdue's timekeeping and pay practices.  (Id. at ¶ 5, Tabs 1 and 2)

58. The Consent Judgment mandated Perdue's compliance within one year of the entry of the Judgment.  (Id.)

59. Perdue was the first major poultry processor to enter into a Consent Judgment with the DOL concerning the donning and doffing of work clothing by hourly poultry-processing employees and so-called "line time" work time-recording practices that have been prevalent in the poultry industry for many years.  (Id. at ¶ 6)

60. Perdue's Consent Judgment with the DOL reflects a distinct departure at Perdue from the "line time," "gang time," and "master time" practices framework for marking the first principal activity of hourly poultry-processing employees' compensable work shifts.  (Id.)

61. The Consent Judgment expressly states that Perdue's hourly poultry-processing employees will be paid for all hours worked from their first principal activity of the work day until the end of the last principal activity of the work day, except for any time taken for bona fide unpaid meal breaks or other bona fide off-duty time.  (Id. at ¶ 8, Tab 1)

62. The Consent Judgment states that the "first principal activity" could include: (1) the donning of clothing and equipment at the plant, but not including items that the employee is free to put on at home, such as hair nets, bump caps, ear plugs, glasses, and footwear; (2) any subsequent time taken for employees to

sanitize themselves and their equipment; and (3) the time spent walking or waiting after the first principal activity is performed.  (Id. at ¶ 9, Tab 1)

63. Finally, the Consent Judgment clarifies that Perdue will record and pay for the time taken by its hourly poultry-processing employees to perform donning and doffing before and after their bona fide unpaid break periods.  (Id. at ¶ 10, Tab 1)

64. Perdue representatives and representatives from the DOL's Office of the Solicitor and the DOL's Wage and Hour Administration, in conjunction with a Regional Solicitor and the Director of the Poultry Task Force, worked together, plant-by-plant, in all of Perdue's processing facilities, including the Dothan plant, over a period of one year, to develop systems which captured all compensable time from the first principal activity to the last principal activity in a typical work day in a Perdue poultry-processing plant.  (Id. at ¶ 11)

65. Within a one-year period following the entry of the Consent Judgment, Perdue brought all of its plants into compliance with the Consent Judgment and the DOL certified that each of the covered plant's pay practices were consistent with the requirements of the Consent Judgment and the clarifying side letter agreement.  (Id. at ¶ 12, Tab 1)

66. Perdue's compliance with the Consent Judgment included the abandonment of "line time" and the implementation of the Kronos time-keeping system that captures hours worked from the employees' first principal activity of the day until the end of the last principal activity of the work day.  (Id. at ¶ 13)

67. The Kronos time-keeping system captures the time employees spend donning and doffing before and after their bona fide thirty-minute unpaid meal breaks. (Id. at ¶ 14)

68. On August 16, 2002, the DOL sent a letter to Perdue stating it determined that Perdue's practices were consistent with the terms of the Consent Judgment between Perdue and the DOL.  (Id. at ¶ 12, Tab 2)

69. On August 17, 2006, Perdue sent a letter to the DOL confirming payment and full compliance with the 2002 Consent Judgment and clarifying side letter agreement.  (Id. at ¶ 19, Tab 4)

70. Counsel for Perdue informed Counsel for Plaintiffs of the DOL Consent Judgment, how Perdue's pay practices and time-keeping policies are different from other poultry companies, and why Plaintiffs have no cognizable claim against Perdue.  (See Letter from J. Kelley to R. Camp and R. Celler (dated Jan. 29, 2007) attached hereto as Ex. G)

**D.     Perdue's Kronos Time-Keeping System**

71. The key to Perdue's donning and doffing and time recording policies is the time and attendance recording system developed with the assistance of the Kronos Corporation.  (Ex. A, Second Heflin Decl. ¶ 13)

72. The Kronos time-keeping system is a "state of the art" web-based centralized electronic time recording system developed to record the time worked by hourly poultry-processing employees.  (Ex. B, Second Tabinowski Decl. ¶ 6)

73. Each hourly poultry-processing employee is provided a personal Kronos "swipe" card, which assigns an individual electronic number to that employee. (Id.; Second Heflin Decl. ¶ 14)

74. Kronos clocks and card-swiping systems are strategically placed at various locations throughout the poultry-processing plant.  (Ex. A, Second Heflin Decl. ¶ 14)

75. Time and attendance records are recorded by the Kronos system, and these records are stored electronically and maintained on a processing server at Perdue's corporate headquarters in Salisbury, Maryland.  (Ex. B, Second Tabinowski Decl. ¶ 6)

76. Perdue employees are paid for all time captured by the Kronos system, which includes all compensable time from the first principal activity to the last principal activity of each hourly poultry-processing employee.  (Id. at ¶ 12)

77. In Perdue's poultry-processing plants, there is no "off the clock" donning and doffing.  (Ex. A, Second Heflin Decl. ¶ 15)

78. The time clocks also regulate the length of the thirty-minute unpaid meal break periods.  The time clocks do not permit an employee to clock back in until at least thirty minutes have passed since the employee clocked out.  (Id. at ¶ 16)

79. Poultry-processing employees at Perdue's poultry-processing plant in Dothan, Alabama are permitted to review their time worked as recorded by the Kronos system, but they do not need to review their time in order to be paid.  (Ex. B, Second Tabinowski Decl. ¶ 19)

80. Supervisors review the time as recorded by the Kronos system before the end of each week to correct any mistakes.  (Id.)

81. When employees forget to clock in or clock out, supervisors can correct the omission to assure that each employee is paid properly.  (Id.)

82. Once the time is approved by a supervisor, it is submitted electronically for payment.  (Id.)

83. If poultry-processing employees find an error on their paycheck, they may approach a supervisor to help correct the error.  (Id. at ¶ 20)

84. If the supervisor verifies that a mistake has been made, a retroactive pay correction is inputted into the current week's Kronos time card.  (Id.)

85. Typically, the next scheduled paycheck will reflect the required correction, however, in some cases, a separate check is sent to make the poultry-processing employees whole.  (Id.)

**E.    Hourly Poultry-Processing Employees' DOL Awareness Training**

86. All hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama are trained to comply with the Consent Judgment and the donning and doffing guidelines contained therein.  (Ex. B, Second Tabinowski Decl. ¶ 17; Ex. E, Mack Decl. ¶ 15; Reynolds Decl. ¶ 8; Richards Decl. ¶ 10)

87. In addition, since 2005, all new poultry-processing employees are given Perdue's orientation and training brochure that describes in detail Perdue's donning and doffing procedures. (Ex. B, Second Tabinowski Decl. ¶ 17–18; Ex. C, Orientation Training Materials; Ex. D, Orientation and Training Brochure)

88. The training materials define "donning," "doffing," and "first and last principal activities," and also inform all employees that the DOL and the Fair Labor Standards Act require employees to be paid for the time employee performed the first principal activity to the last principal activity, excluding any unpaid breaks. (Ex. B, Second Tabinowski Decl. ¶ 18)

89. The training materials also describe in detail the appropriate donning and doffing practices, including: the requirements to clock in prior to donning supplies at the shift start time and when returning from unpaid break; the requirements to clock out after doffing when leaving at the end of the shift or on an unpaid break; and the fact that all unpaid lunch breaks may be no fewer than thirty minutes long. (Id.)

90. The training materials remind each poultry-processing employee that failure to comply with these policies could lead to disciplinary action. (Id.)

## III.    PROCEDURAL HISTORY

Plaintiffs initially filed a Complaint against Perdue on November 2, 2006, alleging violations of the FLSA, 29 U.S.C. §§ 201, et seq. On July 5, 2007, Plaintiffs filed an Amended Complaint to clarify Perdue's payroll practice, by removing the allegations of the First Complaint that it compensated Plaintiffs using "line time" or "master time." On November 5, 2007, Plaintiffs filed a Motion for an Order Permitting Court-Supervised Notice to Employees, seeking collective treatment of their FLSA action under the FLSA's opt-in provisions. On February 25, 2008, this Court granted Plaintiffs' Motion for an Order Permitting Court

Supervised Notice. The Court ruled that Notice must be sent to the potential opt-in plaintiffs on or before May 9, 2008.

If the Court grants Perdue's instant Motion for Summary Judgment, potential opt-in receipt of Notice will be rendered moot, because FLSA plaintiffs who cannot withstand summary judgment may not assert a claim under the FLSA on behalf of similarly situated employees. Jastremski v. Safeco Ins. Cos., 243 F. Supp. 2d 743, 745 n.1 (N.D. Ohio 2003).

## IV.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is to be granted where, as here; the record evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c); see also Anderson v. Cagle's, Inc., 488 F.3d 945, 951 (11th Cir. 2007). If the evidence in the record "could not lead a . . . trier of fact to find for the non-moving party, there is no genuine issue for trial," the court must grant the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case").

"The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (quoting Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (internal marks and citations omitted)).

Plaintiffs cannot raise a genuine issue of material fact by relying on declarations that are irrelevant or not based on personal knowledge.  See Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002) ("Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, 'upon information and belief'--instead of only knowledge--from raising genuine issues of fact sufficient to defeat summary judgment.") (internal citation ommitted).

## V.    ARGUMENT

### A.    Plaintiffs' Compensable Activities Are Identified By The Portal-to-Portal Act and Federal Case Law.

Congress enacted the Fair Labor Standards Act ("FLSA" or "Act") to establish standards for ensuring a "minimum standard of living necessary for health, efficiency, and general well-being of workers."  29 U.S.C. § 202(a).  Although the FLSA requires overtime compensation for work performed, it does not specify what activities constitute work, and has left the task of defining the term "work" to the courts.

In Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946), the Court held that "the statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises on duty or at a prescribed workplace."  Id. at 690–91.  Accordingly, the employer in Mt. Clemens Pottery Co. was required to compensate its employees for the time spent walking on work premises before clocking in and for donning and doffing aprons and overalls.  Id. at 691–93.

The Portal-to-Portal Act was enacted in 1947 to legislatively reverse the Supreme Court's expansive interpretation of the FLSA in Mt. Clemens Pottery Co. and to further address what activities do and do not constitute compensable work.  The Portal-to-Portal Act established two exceptions to the FLSA.  First, employers are not required to compensate their employees for time spent walking to and from the place where they perform their principal work activities.  29

U.S.C. § 254(a)(1).  For the purposes of this exception, "principal activities" are defined as those "which the employee is employed to perform."  29 C.F.R. § 790.8(a).  The second exception specifically overruled the Court's decision in <u>Mt. Clemens Pottery Co.</u> by excluding from the definition of work, activities that are "preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities."  29 U.S.C. § 254(a)(2).  Thus, under the FLSA—as amended by the Portal-to-Portal Act—"employees are entitled to compensation only for the performance of the 'principal activity or activities' required by their jobs, and not for tasks that are 'preliminary' or 'postliminary' to them."  <u>Martin v. City of Richmond</u>, 504 F. Supp. 2d 766, 772 (N.D. Cal. 2007).

Since the passage of the Portal-to-Portal Act, it has been the courts' responsibility to determine whether individual employee actions are compensable as "principal activities" or non-compensable as "preliminary or postliminary activities."  <u>Id.</u>  Ordinarily, time spent changing clothes before or after a work shift is not compensable because it is either "preliminary" or "postliminary."  29 C.F.R. § 790.7(g).  However, the Supreme Court held in <u>Steiner v. Mitchell</u>, 350 U.S. 247 (1956), that workers at a battery plant were entitled to compensation for the time they spent changing clothes at the beginning of their shift and showering at the end.  <u>Id.</u> at 256.  The Court ruled that under the unique circumstances of the battery plant, where shower facilities were required by state law and clothes changing was mandated by company policy, that such activities were compensable under the Fair Labor Standards Act because they were "an integral and indispensable part of the principal activities for which covered workmen are employed."  <u>Id.</u>  While that language applies to all Portal-to-Portal Act cases, <u>Steiner</u>'s outcome was clearly

driven by the very specific factual context of the battery plant.  Id. at 249–51.[1]  The Court

acknowledged this distinction and stated, "[n]or is the question of changing clothes and

showering under *normal conditions* involved [in this case] because the Government concedes

that these activities ordinarily constitute 'preliminary' or 'postliminary' activities excluded from

compensable work time as contemplated in the Act."  Id.  (emphasis added).  Several federal

courts have ruled that Steiner is limited to its particular set of facts in the battery plant.  For

example, the Second Circuit recently held that Steiner was inapplicable in the context of nuclear

power plant employees.  Gorman v. Consol. Edison Corp., 488 F.3d 586, 593 (2d Cir. 2007).

Similarly, the Eighth Circuit in Ciemnoczolowski v. Q.O. Ordinance Corp., 228 F.2d 929, 932–

34 (8th Cir. 1955) refused to apply Steiner to workers who were required to change clothes and

shower after manufacturing explosives.  In Nardone v. General Motors, Inc., 207 F. Supp. 336,

338–39 (D.N.J. 1962), the court held that the clothes changing and washing activities of battery

plant workers at issue in Steiner differed from those performed by metal finishers.  See also

Anderson v. Pilgrim's Pride Corp., 147 F. Supp. 2d 556, 563 (E.D. Tex. 2001), aff'd, 44 Fed.

Appx. 652 (5th Cir. 2002) (recognizing that most federal courts have relegated the precedential

value of the Steiner decision to its unique set of facts).

    In 2005, the Supreme Court revisited the question of what separates principal activities

from preliminary or postliminary activities.  IBP, Inc. v. Alvarez, 546 U.S. 21 (2005).  In

Alvarez, the Court was asked to decide whether employers must compensate their employees for

time spent walking to and from their job site after donning or doffing "unique protective gear."

---

[1]    In Steiner, battery plant workers had to use dangerously caustic and toxic materials and were compelled to
    change clothes and shower in facilities which state law required the employer to provide.

<u>Id.</u> at 29–30.[2]  Presented with that question, the Court held that "any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under . . . the Portal-to-Portal Act." <u>Id.</u> at 37.  Moreover, because employees are paid for a continuous workday—one that begins with the first principal activity and ends with the last—the Court held that employees must be compensated for any walking time that occurs *after* their first principal activity.  <u>Id.</u> at 37.  Employers are not required, however, to pay employees for time spent on any task that precedes their first principal activity, including walking to or from the location where they enter their time into the time recording system.  <u>Id.</u> at 40–41.  As the Court emphasized, "the fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity' . . . ."  <u>Id.</u>  Moreover, even if these activities are deemed compensable, they may be *de minimis* as a matter of law and are not entitled to overtime pay.  <u>Bridges v. Amoco Polymers</u>, 19 F. Supp. 2d 1375, 1380 n.9 (S.D. Ga. 1997).

**B.    <u>Perdue Properly Compensates Employees For All Work Commencing After Their First Principal Activity.</u>**

Pursuant to the terms of the Consent Judgment entered with the DOL, Perdue developed donning and doffing procedures and time recording practices that are compliant with the FLSA and the Portal-to-Portal Act.  (Stmt. Facts ¶¶ 64–65).

Each poultry processing employee is provided a personal Kronos time-keeping card which she swipes through a machine to record her time.  At each Plaintiff's designated start time,

---

[2]    <u>Alvarez</u> is often ambitiously cited for the proposition that "donning and doffing" all work clothing in the poultry industry is "integral and indispensable" under <u>Steiner</u>.  That was not the Court's holding.  Instead, the Court granted certiorari to clarify the scope and application of the Portal-to-Portal Act. <u>See Alvarez</u>, 546 U.S. at 30 (holding that the principal question presented by the consolidated cases is whether postdonning and predoffing walk time is specifically excluded by § 4(a)(1) of the Portal-to-Portal Act and concluding that it is not); <u>see also</u> <u>Gorman</u>, 488 F.3d at 591 (stating that at issue in the Supreme Court in <u>Alvarez</u>, was whether the employees must be paid for time waiting to enter the locker room, time in transit from the locker room to the job-site, and time in transit back to the locker room).

before donning or acquiring work-related equipment and clothing, or performing any other required work activities, Plaintiffs swipe Kronos time-keeping cards through their assigned clock.  (Id. at ¶ 24; Ex. E, Banks Decl. ¶ 6; Mack Decl. ¶ 5; Reynolds Decl. ¶ 3).  Plaintiffs then don their required clothing which may include smocks, gloves, and hand or arm guards.  (Stmt. Facts ¶¶ 25–27; Ex. E, Banks Decl. ¶ 6; Reynolds Decl. ¶ 5; Richards Decl. ¶ 7).  This is their first principal activity for the work day and they are compensated for this activity and all activities thereafter.  (Stmt. Facts ¶ 26).  Plaintiffs then sanitize themselves and their departmental equipment and walk to their work stations on paid time.  (Id. at ¶¶ 29–30; Ex. E, Davis Decl. ¶ 5; Durr Decl. ¶ 7; Mack Decl. ¶ 6).

Plaintiffs have two thirty-minute unpaid meal periods during each shift.  (Stmt. Facts ¶ 30; Ex. E, Marsh Decl. ¶ 7; Richards Decl. ¶ 8; Smith Decl. ¶ 8).  When it is time for their break, Plaintiffs leave their work area and walk to their designated doffing area, where they doff their required clothing and gear.  All of this occurs while the hourly poultry-processing employees are "on-the-clock," and are paid for this time.  (Stmt. Facts ¶ 31; Ex. E, Cawthon Decl. ¶ 6; Davis Decl, ¶ 7; Hickman Decl. ¶ 7).  After the hourly poultry processing employees doff their required clothing and gear, they then walk to their designated Kronos time clock and swipe out using their Kronos time-keeping card.  (Stmt. Facts ¶ 32; Ex. E, Cawthon Decl. ¶ 6; Davis Decl, ¶ 7; Hickman Decl. ¶ 7).

Plaintiffs do not regularly remove the personal items during their unpaid meal break periods and are not required to do so.  (See Ex. E, Cawthon Decl. ¶ 6; Green Decl. ¶ 10; Mack Decl. ¶ 9 ).  Plaintiffs start their unpaid meal break only after they swipe out using the Kronos time-keeping system.  (Stmt. Facts ¶ 32; Ex. E, Banks Decl. ¶ 9; Lee Decl. ¶ 5; Marsh Dec. ¶ 7).  Any walking or waiting Plaintiffs do after they have swiped out is postliminary to their "on the

clock" activities.  It is undisputed that Plaintiffs may use their meal break time as they choose.
(Stmt. Facts ¶ 33; Ex. E, Hudson Decl. ¶ 5; Lee Decl. ¶ 6; Richards Decl. ¶ 8).  At the end of the
meal period, the employees clock back in before redonning their departmental gear.  The Kronos
time-keeping system does not permit hourly poultry-processing employees to swipe back in
within thirty minutes of when they swiped out, thus ensuring they receive their full meal period.
(Stmt. Facts ¶ 37; Ex. E, Banks Decl. ¶ 10; Clark Decl. ¶ 10; Durr Decl. ¶ 8).  After swiping back
in after the meal break, Plaintiffs don their gear and walk to the work station, on paid time, to
resume work.  (Stmt. Facts ¶¶ 38–39; Ex. E, Green Decl. ¶ 12; Hudson Decl. ¶ 6).

Under Perdue's pay practices, Plaintiffs are fully compensated for the time spent
donning, doffing, and sanitizing their departmental equipment.  Plaintiffs repeat the procedure
for their second meal break and then work for the remainder of their shift.  (Stmt. Facts ¶¶ 40–
41; Ex. E, Banks Decl. ¶¶ 12–13; Hickman Decl. ¶ 7; Mack Dec. ¶ 11).  At the end of their shift,
Plaintiffs remove their gloves, aprons, and any other required departmental gear and dispose of
them in designated bins, concluding their last principal activity for their work day.  (Stmt. Facts ¶
42; Ex. E, Clark Decl. ¶ 11; Davis Decl. ¶ 8; Floyd Decl. ¶ 17; Hickman Decl. ¶ 9).  Plaintiffs
then swipe out, on their assigned Kronos time clock, to conclude their shift.  (Stmt. Facts ¶ 45;
Ex. E, Cawthon Decl. ¶ 9; Clark Decl. ¶ 11; Hudson Decl. ¶ 7).  After swiping out at the
designated Kronos time clock, processing employees may place their personal safety items, such
as their ear plugs, hair and beard nets, and safety glasses in their lockers or many choose to take
these items home with them.  (Stmt. Facts ¶ 45; Ex. E, Green Decl. ¶ 15; Hickman Decl. ¶ 9;
Mack Decl. ¶ 14).  As described fully below, Perdue's pay practices are consistent with the
requirements of the Consent Judgment and the controlling case law.

**C.    Perdue Is Not Required To Compensate Plaintiffs For The Preliminary And Postliminary Activities They Have Alleged Require Payment.**

**1.    Putting On And Removing Hair Nets, Beard Nets, Ear Plugs, And Slip Resistant Footwear Are Not Compensable Activities.**

Plaintiffs are simply incorrect in their assertion that the time they spend putting on and removing their hair nets, beard nets, ear plugs, and footwear is compensable.  (First. Am. Compl. ¶ 43).  See Alford, 2008 WL 879413, at *6 (holding donning and doffing of non-unique personal safety gear is a preliminary activity excluded from the FLSA's coverage by the Portal-to-Portal Act).  There is no dispute that Perdue requires its employees to wear hair nets, beard nets, ear plugs, and safety boots (see Stmt. Facts ¶ 20) but there is also no dispute that the time spent putting on and removing such non-unique personal safety items, under these circumstances, is not compensable.  Plaintiffs can take these items home and are only required to have the items on their person before swiping in for their work shift.  (Id. at ¶¶ 20–21; Ex. E, Clark Decl. ¶ 4; Durr Decl. ¶ 3; Floyd Decl. ¶ 4; Hickman Decl. ¶ 3).  Because Plaintiffs can and do take these items home and put them on before their first principal activity, they are not entitled to compensation from Perdue for these activities.  See Pilgrim's Pride Corp., 147 F. Supp. 2d at 563.

In a case filed against Perdue by the **same** Plaintiffs' counsel, making the **same** allegations, challenging the exact **same** policy, the district court recently dismissed plaintiffs' complaint in its entirety, ruling—as it should here—that plaintiffs are appropriately paid for all compensable activity, and that time spent donning and doffing the personal gear at issue is preliminary and postliminary under the Portal-to-Portal Act, 29 U.S.C. § 254.  Alford, 2008 WL 879413, at *6 ("[a]s a matter of law, the activities for which Plaintiffs seek compensation were preliminary and postliminary activities not subject to compensation under the FLSA.").

The Alford decision is consistent and fully aligned with controlling case law.  For example, in Alvarez v. IBP, Inc., 339 F.3d 894, 903 (9th Cir. 2003), affirmed by the Supreme

Court on other grounds, the Ninth Circuit held that there was no liability to compensate plaintiffs for "donning and doffing nonunique gear such as hardhats and safety goggles." The Alvarez v. IBP, Inc. court also concluded that the time spent donning and doffing those items was *de minimus*. In addition, in Reich v. IBP, Inc., the Tenth Circuit determined that putting on such gear was not work and was therefore not subject to compensation. 38 F.3d 1123, 1125–26 (10th Cir. 1994); see also Pilgrim's Pride Corp., 147 F. Supp. 2d at 563 (holding that donning and doffing non-unique personal gear qualified as preliminary and postliminary activities for which employees were not entitled to compensation).

This case is distinguishable from the Northern District of Alabama's decision that donning and doffing of sanitary equipment is "work" within the meaning of the FLSA in Fox v. Tyson Foods, Inc., No. CV-99-BE-1612-M, 2002 WL 32987224, at *9–10 (N.D. Ala. Feb. 4, 2002) because, in that case, the employer did not compensate employees for time spent donning and doffing any personal or departmental required gear, cleaning equipment, and waiting in line, and asserted these activities were not work. This is simply not the case here. Unlike the employees in Fox, Plaintiffs here are compensated for all activities beginning with their first principal activity of their shift, as mandated by the Portal-to-Portal Act, which includes donning and doffing of their departmental equipment, such as their aprons, arm guards, gloves, smocks, and any cutting equipment. The district court's decision in Fox also predates the Supreme Court's decision in Alvarez and the ensuing case law.

The Department of Labor's distinction between non-unique, personal gear that employees may put on at home as non-compensable from the compensable departmental equipment, and the case law that support this distinction are clear. Plaintiffs are simply not entitled to

compensation for donning and doffing of required ear plugs, hardhats, or safety goggles.  See Alford, 2008 WL 879413, at *2.

### 2.    A Requirement To Wear Certain Items Does Not Automatically Render Plaintiffs' Activities Compensable.

Plaintiffs have argued that because hairnets, beardnets and hardhats are required by the employer or government regulation, the time spent putting them on must be compensable.  The case law holds otherwise.  Indeed, simply having a requirement to wear the non-unique personal items at issue here does not automatically render the required activity "integral and indispensable" to the employees' principal jobs.  See Alvarez, 546 U.S. at 40–41 (observing that activities which are "necessary" (or indispensable) to a principal activity are not thereby "integral and indispensable").  Similarly, in Bonilla v. Baker Concrete Construction Inc., the Eleventh Circuit held that a requirement to conduct a certain activity does not automatically render the required activity integral and indispensable to the principle work activity for which an employee is employed.  487 F.3d 1340, 1344–45 (11th Cir. 2007), cert. denied, 128 S. Ct. 813 (2007).[3]  The argument that simply because personal protective equipment is required, donning and doffing those items is per se compensable has been rejected by numerous courts.  See Alford, 2008 WL 879413, at *3 (stating the wearing of hair nets is more comparable to washing and dressing before work, which, even though required or for the employer's benefit, is preliminary to the principal activities for which the employees are engaged).  See also Pilgrim's Pride Corp., 147 F. Supp. 2d at 563.  In Pilgrim's Pride Corp., taking on and off sanitary and safety clothing and equipment—a hair net, ear plugs, rubber boots, and cotton and/or rubber gloves—qualified as preliminary and postliminary activities for which employees were not

---

[3]    In Bonilla, the Eleventh Circuit rejected employees' claims that the requirement to pass through TSA screening to do their jobs at the Miami International Airport was integral and indispensable to do their jobs.  487 F.3d at 1344.  In contrast to the plaintiffs' contention here, the court ruled that the "integral and indispensable" test is not a but-for test of causal necessity.  Id.

entitled to compensation because the court found that these activities were not integral and indispensable to the employees' principal jobs, even though the employer and federal law required employees to wear sanitary and safety equipment.  Id.; see also Gorman, 488 F.3d at 594–95 ("Donning and doffing of generic protective gear is not rendered integral by being required by the employer or by government regulation" and finding a helmet, safety glasses, and boots may be indispensable without being integral, and donning them are "relatively effortless," non-compensable, preliminary tasks); Abbe v. City of San Diego, Nos. 05cv1629 and 06cv0538, 2007 WL 4146696, at *6 (S.D. Cal. Nov. 9, 2007) (denying motion for summary judgment where employees put on required gear at home, and neither law nor workplace policy mandated that employees dress at work); Bagrowski v. Md. Port Auth., 845 F. Supp. 1116, 1121 n.6 (D. Md. 1994) (noting that police officers were not entitled to compensation under FLSA for time spent donning and doffing uniforms and required gear at work where they had the option to get dressed and undressed at home); see also Reich v. Oscar Mayer  Foods Corp., No. 4:93CV204, 1995 WL 1765643, at *2 (E.D. Tex. Mar. 2, 1995) (finding that the time spent by employees changing into their uniforms or putting on safety glasses, ear plugs, or bump caps is preliminary and postliminary and employees are not entitled to compensation for that time under the FLSA).

Moreover, the fact that some plaintiffs contend they choose to keep their general protective gear at work, does not render the donning and doffing of these items compensable.  It is undisputed that Perdue offers employees the option to don their general protective gear at home or keep those items at work at work.  (See Stmt. Facts ¶¶ 21–22; Ex. E, Banks Decl. ¶ 5; Clark Decl. ¶ 4; Durr Decl. ¶ 3; Floyd Decl. ¶ 4; Hickman Decl. ¶ 3). Because Plaintiffs are permitted to, and many do, bring their general protective safety gear items from home, they are not entitled to compensation for putting on and removing their personal safety gear.  In a recent

advisory memorandum following the Supreme Court's decision in <u>Alvarez</u>, the Department of Labor restated its view that the FLSA does not require compensation where employees don and doff protective gear at home.  The DOL stated "[i]t is our longstanding position that if employees have the option and the ability to change into the required gear at home, changing into that gear is not a principal activity, even when it takes place at the plant."  <u>See</u> Ex. H, Wage and Hour Adv. Mem. No. 2006-2, at 2–3 (May 31, 2006).  The DOL's Advisory Memorandum is entitled to substantial weight and judicial deference.  <u>See</u> <u>Kohleim v. Glynn County</u>, 915 F.2d 1473, 1477 n.20 (11th Cir. 1990) (applying the FLSA regulations and stating that although they are not binding on the courts, "they nonetheless serve as 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance'") (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)).

### 3.    Plaintiffs' Alleged Activities During Breaks Are Not Compensable.

There is no genuine issue of material fact that the employees do not engage in compensable activities during their unpaid meal periods.   The Plaintiffs receive two thirty-minute unpaid meal breaks during which they are relieved from work duties.  (<u>See</u> Stmt. Facts ¶ 30;  Ex. E, Clark Decl. ¶ 8; Davis Decl. ¶ 6; Floyd Decl. ¶ 11).  The Department of Labor has promulgated regulations determining whether meal periods constitute hours worked.  Under 29 C.F.R. § 785.19(a) bona fide meal periods are not work time.  In order to qualify as a bona fide meal period, the employee must be completely relieved from duty: "[t]he employee is not relieved if he is required to perform any duties, whether active or inactive, while eating."  29 C.F.R. § 785.19(a).  The Eleventh Circuit has previously stated, "the essential consideration in determining whether a meal period is a bona fide meal period or a compensable rest period is whether the employees are in fact relieved from work for the purpose of eating a regularly scheduled meal."  <u>Kohleim</u>, 915 F.2d at 1477.  The undisputed facts in this case show that

Perdue employees are completely relieved from duty for a minimum of thirty minutes. Plaintiffs complete their work activity and remove their departmental gear while on the clock before they swipe out. (Stmt. Facts ¶¶ 42–44; Ex. E, Cawthon Decl. ¶ 9; Clark Decl. ¶ 11; Davis Decl. ¶ 8; Green Decl. ¶ 14).

The present case is distinguishable from <u>Davis v. Charoen Pokphand (USA), Inc.</u>, 302 F. Supp. 2d 1314, 1325–26 (M.D. Ala. 2004) where employees alleged they spent ten to fifteen minutes of their two thirty-minute break periods washing up and donning and doffing clothing and protective gear. <u>Id.</u> Here, plaintiffs conduct all donning, doffing, and sanitizing activity while on the clock and before beginning their thirty-minute unpaid meal period. (Stmt. Facts ¶¶ 31, 38–39; Ex. E, Cawthon Decl. ¶¶ 6–7; Davis Decl. ¶7; Hickman Decl. ¶¶ 7–8; Richards Decl. ¶ 8). There is no dispute that Plaintiffs are relieved from duty for the full thirty-minute period and there is no record of any employee performing work duties during the meal break.

<b>a.     <u>Plaintiffs' Wait Times Before And After Swiping In Are Not Compensable.</u></b>

The Plaintiffs erroneously allege that the time spent waiting to swipe their time-keeping Kronos cards at the end of their break periods or before beginning their first principal activity of the day is compensable. (First Am. Compl. ¶ 44). Waiting in line to punch a time clock is explicitly excluded from compensable activity under DOL regulations. 29 C.F.R. § 790.8(c). The regulation states: "activities such as checking in and out and waiting in line to do so would not ordinarily be regarded as integral parts of the principal activity or activities." <u>Id.</u> Similarly, in defining which activities are considered preliminary or postliminary, the DOL regulation provides that activities such as "checking in and out and waiting in line to do so, changing clothes, washing up or showering, and waiting in line to receive pay checks are not normally compensable." 29 C.F.R. § 790.7(g). The DOL regulations provide instruction about which

activities require compensation and according to the regulations, Plaintiffs are not entitled to compensation for the alleged wait time.

The DOL's regulatory interpretation has been enforced by the Supreme Court. See Alvarez, 546 U.S. at 42 (stating § 4(a)(2) of the Portal-to-Portal Act excludes from the scope of the FLSA the time employees spend waiting to don the first piece of gear that marks the beginning of the continuous day). The Court noted that waiting to don or waiting to swipe "comfortably qualif[ies] as a 'preliminary' activity." See id. at 40; see also Tum v. Barber Foods, 360 F.3d 274, 282 (1st Cir. 2004), aff'd in relevant part, rev'd in part by Alvarez, 546 U.S. 21 (finding that a short amount of time spent waiting in line for gear is the type of activity that the Portal-to-Portal Act excludes from compensation as preliminary); Vega ex rel. Trevino v. Gasper, 36 F.3d 417, 425 (5th Cir. 1994) ("Wait time is compensable when it is part of a principal activity of the employee, but not if it is a preliminary or postliminary activity.").

b.    **Plaintiffs' Walk Times During Breaks Are Not Compensable.**

Plaintiffs' walk times before they swipe in at the start of the day and after they swipe out at the end of their shifts are not compensable activities. The Portal-to-Portal Act excludes walking time that occurs before employees commence their principal activity or activities. See Alvarez, 546 U.S. at 41 (stating that it is indisputable that the Portal-to-Portal Act evinces Congress's intent to repudiate Mt. Clemens Pottery Co.'s holding that such walking time was compensable under the FLSA); see also Pilgrim's Pride Corp., 147 F. Supp. 2d at 563 n.12 ("The Court also concludes that the 'walk time' to an employee's work station is not compensable under the Portal-to-Portal Act."). Accordingly, Plaintiffs' walking activity that occurs while on their unpaid meal breaks is also preliminary and postliminary to the work conducted on the clock. Here, Plaintiffs create no genuine issue of material fact regarding the compensability of their walk time.

**4.      Plaintiffs Spend Minimal Time Clearing Security Before Entering Or Departing The Dothan Facility.**

Plaintiffs assert they are not compensated for the "time it takes security to clear them and allow them into the facility and the compensable time afterwards prior to the commencement of production work." (First Am. Compl. ¶ 15). On their way to the facility entrance, employees walk through a gate and visibly display their Perdue identification cards to security guards as they pass the security guards booth. (See Stmt. Facts ¶ 11–12; Ex. E, Cawthon Decl. ¶ 5; Floyd Decl. ¶ 5; Green Decl. ¶ 5). Plaintiffs are not entitled to compensation for this time. See Bonilla, 487 F.3d at 1344–45 (holding that the time employees spent going through the mandatory security screening was not compensable under the FLSA because that screening is not "integral and indispensable" to a principal activity . . ."); see also Gorman, 488 F.3d at 593 (holding that security procedures are necessary but not integral to principal work activities and are modern paradigms of the preliminary and postliminary activities described in the Portal-to-Portal Act). The few seconds that Plaintiffs spend walking past the security gate waving their employee identification cannot qualify as an activity for which Plaintiffs must be compensated.

**D.      Plaintiffs Cannot Create a Genuine Issue of Material Fact By Relying On Documents Not Based on Personal Knowledge.**

In light of Perdue's Settlement with the DOL, case law affirming Perdue's pay policies, and clear DOL regulations, Plaintiffs cannot create a genuine issue of material fact simply by making brazen misstatements of fact. Moreover, Plaintiffs may not rely on the unsubstantiated allegations in their Complaint or conclusory statements in their Declarations to create a genuine issue of material fact about time for which they believe they should be compensated. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) ("For factual issues to be considered genuine, they must have a real basis in the record.") (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).

1.    **Plaintiffs' Are Paid For Sanitizing Their Equipment Even Though Such Sanitizing Is A Preliminary Activity.**

In generalized and generic declarations, Plaintiffs erroneously allege Perdue does not pay them for the time spent cleaning and sanitizing themselves.  (First Am. Compl. ¶ 23).  Plaintiffs sanitize after donning their departmental gear.  (Stmt. Facts ¶ 39; Ex. E, Davis Decl. ¶ 5; Durr Decl. ¶ 7; Mack Decl. ¶ 6).  There is no record evidence to the contrary.  Plaintiffs cannot create a genuine issue of material fact by making blanket statements that they are not paid for sanitizing when the record facts are to the contrary.  Perdue compensates Plaintiffs for time spent sanitizing their equipment and themselves after they have swiped in for their work shift.  (Stmt. Facts ¶ 27). See Cherup v. Pittsburgh Plate Glass Co., 350 F. Supp. 386, 392 (N.D. W. Va. 1972) (holding that showering and changing clothes, which was accomplished near the end of the shift, was on company time and there could be no additional compensation).

2.    **Plaintiffs' Amended Complaint Erroneously Asserts That Plaintiffs Are Not Compensated For Removing Their Smocks.**

Plaintiffs' Amended Complaint also inaccurately alleges that Plaintiffs are not compensated for time spent depositing their smocks in a bin when they are "off the clock".  (First Am. Compl. ¶ 19).  Contrary to Plaintiffs' assertions, Perdue does compensate Plaintiffs for time spent donning and doffing their smocks.  (Stmt. Facts ¶¶ 25–26, 32, 43; Ex. E, Banks Decl. ¶¶ 6, 13; Reynolds Decl. ¶¶ 5, 7; Richards Decl. ¶¶ 7, 9).

E.    **Even If The Time Plaintiffs Spend Engaging In The Above Activities Is Work, It Is _De Minimis_ And Therefore Not Compensable.**

Plaintiffs can provide no evidence that they perform any principal activities for which they are not paid.  Even if the Court deems Plaintiffs' donning and doffing, and walking and waiting activities as principal activities, which it should not, the time spent performing these activities is still not compensable, because it is a _de minimis_ portion of the workday, taking it

outside the requirements of the FLSA as a matter of law.  Activity may not require compensation

if it involves only a few minutes of work beyond scheduled work hours.  Mt. Clemens Pottery

Co., 328 U.S. at 692.  "[T]he *de minimis* doctrine . . . provides a limiting principle to

compensation for trivial calculable quantities of work."  De Asencio v. Tyson Foods, Inc., 500

F.3d 361, 373 (3d Cir. 2007).  Work lasting only a few seconds or minutes beyond the scheduled

working hours may legally be disregarded.  Id. at 374 (citing Mt. Clemens Pottery Co., 328 U.S.

at 692).  The DOL regulations addressing *de minimis* time under the FLSA state:

> In recording working time under the Act, insubstantial or
> insignificant periods of time beyond the scheduled working hours,
> which cannot as a practical administrative matter be precisely
> recorded for payroll purposes, may be disregarded.  The courts
> have held that such trifles are *de minimis*.  (Anderson v. Mt.
> Clemens Pottery Co., 328 U.S. 680, (1946)).  This rule applies
> only where there are uncertain and indefinite periods of time
> involved of a few seconds or minutes duration, and where the
> failure to count such time is due to considerations justified by
> industrial realities.

29 C.F.R. § 785.47.

The *de minimis* doctrine precludes Plaintiffs from recovering because the time involved is

insubstantial and insignificant to be a compensable activity.  In Alford, the Middle District of

Georgia held that the donning and doffing activities Plaintiffs seek compensation for "are *de

minimis*  and not entitled to additional compensation."  2008 WL 879413, at *1.  See also De

Asencio, 500 F.3d at 374 (stating that time spent on difficult to calculate, small, and irregularly

performed work is *de minimis*) (citing Lindow v. United States, 738 F.2d 1057, 1062–63 (9th

Cir. 1984)).  "Most courts have found daily periods of approximately ten minutes *de minimis*

even though otherwise compensable."  Lindow, 738 F.2d at 1062.

Plaintiffs are hardly able to account for the minor amount of time it would take to insert

and remove their ear plugs or put on a hair net.  The time Plaintiffs spend doing such a minimal

act is slight and is not compensable.  See Alvarez v. IBP, Inc., 339 F.3d at 903, aff'd on other

grounds, 546 U.S. 21, 26 (2005) (stating time spent donning and doffing "protective gear such as

hardhats and safety goggles" is not compensable because the time it takes to don and doff these

items is "de minimis as a matter of law."); Pilgrim's Pride Corp., 147 F. Supp. 2d at 564 (finding

that time spent dressing and sanitizing was de minimis when even slow dressers spend no more

than 1–2 minutes each time they don their equipment and even less time to doff their equipment);

see also Reich v. IBP, Inc., 38 F.3d at 1126 n.1 (stating donning and doffing non-unique

protective gear is de minimis as a matter of law); Pressley v. Sanderson Farms, Inc. (Processing

Div.), No. Civ.A. H-00-420, 2001 WL 850017, at *3 (S.D. Tex. Apr. 23, 2001) ("[T]he

regularity of [these daily] activities weigh in favor of finding these activities to be de minimis.").

Finally, federal courts have found that collective action claims for compensation based on

the types of activities challenged here are de minimis, even though such claims may be

substantial in the aggregate when combined across all class members. See Alvarez v. IBP, Inc.,

339 F.3d at 904; Reich v. IBP, Inc., 38 F.3d at 1126 & n.1.

## VI.    CONCLUSION

Plaintiffs' Amended Complaint should be dismissed in its entirety.  In 2002, Perdue

Farms met voluntarily with the United States Department of Labor and settled the question of its

compliance with the Fair Labor Standards Act by agreeing to work with the Department and

representatives from its Poultry Taskforce and Solicitor's office, in developing donning and

doffing policies which the Secretary of Labor has heralded as a model for the industry.  There is

no dispute that the DOL's Office of the Solicitor and the DOL's Wage and Hour Administration

have found that Perdue's pay policies are in full compliance with the FLSA.  There is also no

dispute that the U.S. District Court in Georgia ruled that the DOL was legally correct in arriving

at that conclusion.  No other poultry company has taken this DOL-authorized approach.  Perdue eliminated all forms of "line time" and installed sophisticated electronic time recording systems to capture every minute of compensable time from the first principal activity of the work day until the end.  After a year's worth of effort, the Department of Labor certified the Company's efforts as compliant with the Act.

Plaintiffs' counsel have embarked on a systemic attack against poultry-industry employers who continue to hew to traditional donning and doffing and line time charging practices.  Perdue does not defend those practices and leaves to another court the question as to whether they satisfy the requirements of the Act.  Instead, unlike the other industry employers, Perdue has been pro-active, has paid substantial sums to its poultry-processing employees, and—with government imprimatur—established a system unlike any other in the industry.  Plaintiffs have failed totally to demonstrate that Perdue's system fails to provide statutory compensation for any work time deemed compensable by the Act, the Department's regulations, or the case law.  Their Amended Complaint must be dismissed.

Dated: May 16, 2008                        Respectfully submitted,


                                  */s/  Lexer I. Quamie*

                                  James J. Kelley  (D.C. Bar No. 194746)*
                                  202-739-5095
                                  jkelley@morganlewis.com
                                  Lexer I. Quamie  (D.C. Bar No. 502908)*
                                  202-739-5955
                                  lquamie@morganlewis.com
                                  Morgan, Lewis & Bockius LLP
                                  1111 Pennsylvania Avenue, NW
                                  Washington, D.C.  20004
                                  202-739-3001 (fax)


                                  Sandra B. Reiss (Alabama Bar No.  ASB-3650-S80S)
                                  Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
                                  One Federal Place, Suite 1000
                                  1819 5th Avenue North
                                  Birmingham, Alabama 35203
                                  205-328-1900
                                  205-328-6000 (fax)
                                  sandra.reiss@odnss.com

                                  *Counsel for Defendant, Perdue Farms Incorporated*


*\* James J. Kelley and Lexer Quamie have been admitted to this Court pro hac vice.*

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on this 16th day of May 2008, I caused a copy of the

foregoing Memorandum in Support of Defendant's Motion for Summary Judgment to be served

via electronic mail and first class U.S. mail upon:

Robert J. Camp
505 North 20th Street, Suite 825
Birmingham, AL 35203
(205) 930-6900 (Phone)
(205) 930-6910 (Fax)
rcamp@cochranfirm.com


*/s/ Lexer I. Quamie*
Lexer I. Quamie (admitted pro hac vice)
D.C. Bar No. 502908
202-739-5955
lquamie@morganlewis.com
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
202-739-3001 (fax)

*Counsel for Defendant, Perdue Farms Incorporated*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

_____

|  |  |  |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case Action No.:** |
| **v.** | ) | **1:06-CV-1000-MEF-WC** |
| | ) | **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INCORPORATED,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

**EXHIBIT LIST
FOR DEFENDANT'S MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

<u>Exhibit A</u>     Second Declaration of Robert H. Heflin

          <u>Tab 1</u>   Consent Judgment

          <u>Tab 2</u>   August 16, 2002 Letter confirming compliance with Consent Judgment

          <u>Tab 3</u>   May 9, 2002 Department of Labor News Release

          <u>Tab 4</u>   August 17, 2006 Letter to Jonathan Kronheim, U.S. Department of Labor

<u>Exhibit B</u>     Second Declaration of Dave Tabinowski

<u>Exhibit C</u>     Orientation Training Materials

<u>Exhibit D</u>     Orientation and Training Brochure

<u>Exhibit E</u>     Declarations from Lisa Banks, Cheryn Cawthon, Mary Clark, Vickie Davis, Victoria Durr, Erika Floyd, Lillie Green, Jeannie Hickman, Linda Hudson, Leticia Johnson, Linda Lee, Brenda Mack, Mary Marsh, Malacker Reynolds, Tammy Richards, and Daneashia Smith, Poultry Processing Employees at Perdue's Dothan, Alabama Facility

<u>Exhibit F</u>     <u>Labor Department Survey Finds Pervasive Labor Law Non-Compliance in Poultry Processing Plants</u>, U.S. NEWSWIRE, Jan. 10, 2001; Tom Ramstack, <u>Survey Finds Poultry Plants Flout Wage Rules</u>, THE WASHINGTON TIMES, Jan. 15, 2001, at D3

Exhibit G       January 29, 2007 Letter from J. Kelley to Robert Camp and Richard Celler

Exhibit H       Department of Labor, Wage and Hour Advice Memoranda No. 2006-2 (May 31, 2006)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.,          )
                                  )
        Plaintiffs,               )
                                  )
    v.                            )    Case Action No.:
                                  )    1:06-CV-1000-MEF-WC
PERDUE FARMS INCORPORATED,        )    JURY TRIAL DEMANDED
                                  )
        Defendant.                )
                                  )

## SECOND DECLARATION OF ROBERT H. HEFLIN

I, Robert H. Heflin, depose and state the following based on my personal knowledge:

1.    I have been the Vice President of Human Resources for Perdue Farms, Inc.

("Perdue"), the nation's third largest poultry company, since approximately 1998. As Vice

President of Human Resources I am responsible for all of Perdue's training, employee

development, compensation, benefits, and employee relations functions. I have held a number of

other jobs since I was first hired by Perdue in 1977, including Director of Human Resources for

Poultry Operations, Director of Human Resources for Fresh Poultry Division, Director of Human

Resources for the Northeast Region, Manager of Training and Development, Manager of

Corporate Recruitment, and Human Resources Manager of Non-processing.

2.    I submitted a Declaration in this case dated January 10, 2008. This Second

Declaration contains additional information and is intended to supersede my prior Declaration.

3.    The time recording and pay practices at Perdue's poultry processing plants,

including the poultry processing plant in Dothan, Alabama, were established in a close working

arrangement with representatives from the United States Department of Labor ("DOL").

Post-it® Fax Note    7671    Date 5/15    # of pages ▶ 7
To Skylar Quaine    From Kim Caray
Co./Dept.    Co.
Phone #    Phone #
Fax # 202 739 3001    Fax #

4. In 1997 and 2000, the DOL Wage and Hour Division conducted systematic investigations of the nation's poultry processing plants. The purpose of the investigations was to identify wage and hour compliance issues and to encourage the poultry industry to improve employee working conditions. The investigation revealed what the DOL contended to be violations of wage and hour and overtime laws throughout the nation's poultry industry.

5. On May 9, 2002, after negotiating and reaching an agreement with the DOL, Perdue entered into a Consent Judgment with the DOL regarding Perdue's timekeeping and pay practices. A copy of the Consent Judgment and correspondence clarifying the Consent Judgment is attached to this Declaration at Tab 1. The Consent Judgment is the result of a landmark settlement with the DOL of its investigation into Perdue's donning and doffing policies and procedures. The Consent Judgment included, among other things, a plant-by-plant inspection by the DOL's Wage and Hour Administration and a final certification of compliance with all FLSA time recording and pay practices in all of Perdue's poultry processing plants. The Dothan, Alabama facility was the third facility visited by the Wage and Hour Administration. The Consent Judgment mandated Perdue's compliance within one year of the entry of the Consent Judgment. The Wage and Hour Administration and compliance team returned to Dothan to finally approve the process in application. A copy of the letter from the DOL confirming that Perdue is complying with the terms of the Consent Judgment is attached to this Declaration at Tab 2.

6. Perdue was the first major poultry processor to enter into a Consent Decree with the DOL concerning the donning and doffing of work clothing by hourly poultry processing employees and so-called "line time," "gang time," or "master time" work time recording practices that have been prevalent in the poultry industry for many years. Perdue's Consent

Judgment with the DOL reflects a distinct break from the "line time", "gang time," and "master time" practices framework for marking the first principal activity of hourly poultry processing employees' compensable work shifts. On information and belief, Perdue was the first, and may be one of only a few poultry processing companies to abandon the "line time," "gang time," and "master time" practices.

7.     "Line time" would begin at a predetermined time for each department—when the first chicken arrived at the first employee's individual work station on a particular line. Employees were required to be at their duty station on the line by the time the first chicken arrived at that point. The ending time was captured when a supervisor or line worker manually inserted a punch card into a time clock located near the production line. Employees were permitted to leave their duty stations when the last chicken crossed their place on the line. The "line time" system did not compensate employees for time spent putting on and taking off their special protective gear and equipment, such as gloves, hand or arm guards, aprons or smocks, and cutting equipment.

8.     The Consent Judgment expressly states that Perdue's hourly poultry processing employees will be paid for all hours worked from their first principal activity of the work day until the end of the last principal activity of the work day, except for any time taken for bona fide unpaid meal breaks or other bona fide off-duty time.

9.     The Consent Judgment states that "first principal activity" could include: (1) the donning of clothing and equipment at the plant, but not including items that the employee is free to put-on at home, such as hair nets, bump caps, ear plugs, glasses, and footwear; (2) any subsequent time taken for employees to sanitize themselves and their equipment; and (3) the time spent walking or waiting after the first principal activity is performed. The Consent Judgment

also states that hourly poultry processing employees will be paid until the end of their last principal activity.

10.    The Consent Judgment makes it clear that Perdue will record and pay for the time taken by its hourly poultry processing employees to perform donning and doffing before and after their bona fide unpaid break periods.

11.    Pursuant to the Consent Judgment, Perdue undertook to develop donning and doffing procedures and time recording practices, which are fully compliant with the terms of the Consent Judgment. Perdue representatives and representatives from the DOL's Office of the Solicitor and the DOL's Wage and Hour Administration, along with a Regional Solicitor and the Director of the Poultry Task Force, worked together, plant by plant, in all of Perdue's processing facilities, over a period of one year, to develop systems which captured all compensable time from the first principal activity to the last principal activity in a typical work day in a Perdue poultry processing plant.

12.    Within a one-year period following the entry of the Consent Judgment, Perdue brought all of its plants into compliance with the Consent Judgment and the DOL certified that each of the covered plant's pay practices were consistent with the requirements of the Consent Judgment and the clarifying side letter agreement.

13.    Perdue's compliance with the Consent Judgment included the time and attendance recording system, developed with the assistance of the Kronos Corporation ("Kronos"), which captures hours worked from the employees' first principal activity of the day until the end of the last principal activity of the work day. The Perdue Kronos time recording system and pay practices were developed with the specific assistance and approval of the DOL.

14. The Kronos time-keeping system captures the time employees spend performing donning and doffing before and after their bona fide thirty-minute unpaid meal breaks. Kronos clock and card-swiping systems are strategically placed at various locations throughout the poultry processing plant. Each Perdue hourly poultry processing employee is assigned a swipe card and each employee uses the card to swipe in and out each day. Perdue employees are paid for all time captured by the Kronos system, which includes all compensable time from the first principal activity to the last principal activity of each hourly poultry processing employee.

15. Since the Kronos system was introduced in Perdue's poultry processing plants, including the one in Dothan, Alabama, Perdue has not calculated pay entitlements based on line time, master time cards, or any other similar practices. In Perdue's poultry processing plants, there is no "off the clock" donning and doffing, walking or waiting, and Perdue does not use "line time" to determine hours of work for compensation purposes.

16. The process Perdue devised in Dothan—which is the same process that is in all Perdue's other poultry processing facilities—is very different from the allegations set forth in the Amended Complaint filed against Perdue in this case. Under the Perdue system, hourly poultry processing employees don and doff Company supplied work clothing items on compensable time and walk to the work station from the clock, also on compensable time. All hourly poultry processing employees are provided two thirty minute unpaid meal breaks during which they are relieved from work duty. Hourly poultry processing employees doff required gear before the meal breaks commence and don gear for the remainder of their shift after the period ends. The time clocks help Perdue regulate the meal periods. They do not permit an employee to clock back in until at least thirty minutes has passed since the employee clocked out.

17.    As stated above, Perdue does not use any type of "line time" or "master time" time recording system and has not used such a system since 2002. Perdue no longer uses "line time" practices and now records the first principal activity with an electronic time clock recording system.

18.    All hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama are trained to comply with the Consent Judgment and the donning and doffing guidelines contained therein.

19.    The Consent Judgment and subsequent design and implementation of Perdue's donning and doffing and time keeping policies and practices came at no small cost to Perdue. A DOL press release issued contemporaneously with the Consent Judgment reported that the Consent Judgment was worth approximately $10 million to Perdue's hourly poultry processing employees. A copy of the press release can be found at Tab 3 to this Declaration. The press release also stated that Perdue had agreed to compensate more than 25,000 current and former employees for time spent donning and doffing work clothing and protective gear. A copy of a letter confirming payment can be found at Tab 4 to this Declaration.

20.    In addition, the DOL used the signing and execution of Perdue's Consent Judgment as an opportunity to tout its own efforts to enforce compliance with the applicable wage and hour rules and regulations. Secretary of Labor Elaine Chao was quoted in the DOL's press release as saying she was pleased that Perdue signed the Consent Judgment and that it was a major victory for workers. Similarly, Tammy McCutchen, who at the time was the DOL's Administrator of the Wage and Hour Division, stated that Perdue's decision to change its pay practices was a significant development and should be a model for the industry.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: May 15th, 2008

Robert H. Heflin

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NORTHEASTERN DIVISION

RECEIVED
IN CLERK'S OFFICE

MAY 09 2002

U.S. DISTRICT COURT
MID. DIST. TENN.

ELAINE L. CHAO, Secretary          )
of Labor, United States            )
Department of Labor,               )
                                   )        CIVIL ACTION
          Plaintiff                )        FILE NO. 2-02- 0033
                                   )
v.                                 )         JUDGE HAYNES
                                   )
PERDUE FARMS INCORPORATED,         )
                                   )
          Defendant                )

## CONSENT JUDGEMENT

This cause came on for consideration upon Plaintiff's
motion and Defendant, without admitting any violation of law,
consents to the entry of this Judgment, without further contest.
It is, therefore,

ORDERED, ADJUDGED and DECREED that Defendant, its officers,
agents, servants, employees and all persons in active concert or
participation with them who receive actual notice hereof are
permanently enjoined from violating the provisions of the Fair
Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, et
seq., hereinafter referred to as the Act, in any of the
following manners:

A. 1.  Defendant shall not, contrary to §§ 7 and 15(a)(2)
of the Act, 29 U.S.C. §§ 207 and 215(a)(2), employ any of its
employees in any workweek who are engaged in commerce or in the

PER_AND000001

production of goods for commerce, or in an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of the Act, for more than 40 hours in a workweek unless such employee is compensated for such hours in excess of 40 at an overtime rate of at least one and one-half times the regular rate at which such employee is employed.

2.  Each hourly paid processing employee who works on the production line during a production shift will be paid for all hours worked from the start of his or her first principal activity of the work day until the end of the last principal activity of his or her work day, with the exception of any time taken for bona fide meal breaks or bona fide off-duty time.

3.  A principal activity is any activity that is integral and indispensable to the employee's work and includes such activities as the donning, doffing, and sanitizing of any clothing or equipment (excluding such items that the employee is free to put on at home, such as hair nets, bump caps, ear plugs, glasses and footwear) which is required by law, the employer, or the nature of the work, and not merely a convenience to the employee and not directly related to the specific work.

This Section A shall become fully effective within one year of the entry of this Judgment. During this one-year interim period, Defendant shall bring an additional 25% of its plants into compliance with Section A at the end of each 90-day period elapsing from the date of this Judgment.  During the interim period, Defendant shall pay each employee employed on the

PER_AND000002

production line during a production shift at any plant that does not meet the requirements of this Section A, an additional 8 minutes of compensation for each day worked. An overtime premium will be added to this amount where appropriate.

B.  Defendant shall not, contrary to §§ 11(c) and 15(a)(5) of the Act, 29 U.S.C. §§ 211(c) and 215(a)(5), fail to make, keep and preserve adequate and accurate employment records of the wages and hours of each employee. Such records will accurately capture all hours worked by each employee as ~~prescribed by Regulations found at 29 C.F.R. Part 516.~~

C.  Defendant agrees to use its best efforts to maintain future compliance with the Fair Labor Standards Act, as amended. Should a federal court of appeals after the date of this decree render a final, published and precedential opinion in a poultry processing case brought by the Secretary of Labor under the FLSA involving donning and doffing practices which are not materially distinguishable from Defendant's practices at facilities within that circuit, then Defendant, in any such facilities within that circuit, shall be entitled to act consistent with that circuit court's decision until it is reversed, overruled or otherwise nullified. The Plaintiff reserves the right to monitor Defendant's future compliance with the Act and this Consent Judgment through its compliance program and authority. Should the Plaintiff detect any non-compliance, the Plaintiff agrees to provide notice of such non-compliance to the Defendant and an

3

opportunity to correct any deficiency prior to taking any enforcement action.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendant hereby is restrained from withholding payment of back wages to each hourly paid processing employee working on a production line during a production shift in the two-year period prior to the date of the filing of the Complaint in this action, for whom the Secretary has sought relief in Paragraph VIII.2 of the Complaint. The amount paid to each current or former employee will be equal to the amount owed to each employee for working 8 minutes per day, based upon the regular rate paid on the date of the work, in addition to the amount already paid by Defendant for each day worked. Such payments will include an overtime premium as described in section A above, where applicable.

To comply with this provision of this Judgment, Defendant shall, within 120 days from the date of this Judgment, deliver to Plaintiff's representatives the schedule of current or former employees described below. Within 180 days from the date of this Judgment, Defendant shall deliver checks to all employees who have been located. Within 12 months from the date of the Judgment, Defendant shall complete its efforts to locate employees and distribute back wages, provide Plaintiff a list of all unlocated employees and deliver to Plaintiff a check in the net amount due all unlocated employees. Defendants will distribute such amounts to the named employees or to their

4

personal representatives, less all legally mandated deductions, including income tax and the employee's share of F.I.C.A. Defendant shall endeavor to locate current and former employees and distribute back wages as expeditiously as possible.

Plaintiff will have the right to review and verify Defendant's calculations to determine compliance with this Agreement. This review may include reasonable on site review of payroll records and interviews as appropriate.

Within 30 days of making such payments, Defendant will provide Plaintiff proof of such payment in the form of Forms WH-58 signed by each individual to whom said amounts have been paid.

For any individuals to whom Defendant is unable, after a diligent search, to deliver the payments set out above within the time required herein, Defendant shall deliver to the United States Department of Labor, Wage and Hour Division, 60 Forsyth Street, S.W., Room 7M40, Atlanta, Georgia 30303, a certified or cashier's check or money order made payable to the "Wage and Hour Division--Labor," for the net amount due after appropriate deductions for income tax and the employee's share of F.I.C.A. In the event of default by Defendant in making such payment, post-judgment interest shall be assessed on any unpaid amount at the rate established pursuant to 28 U.S.C. §1961.

Defendant shall remain responsible for the employer's share of F.I.C.A. arising from or related to the back wages paid hereunder. Defendant also shall provide Plaintiff's attorneys

PER_AND000005

with a schedule showing its employer I.D. number and a schedule showing the employment dates, plant at which employed, last-known address, social security number, gross back wage amount, deductions, and net amount as to each employee.

Plaintiff shall distribute back wages to the named employees who could not be located by Defendant, or to their personal representatives, and any amounts not so distributed by the Plaintiff within the period of three (3) years after date of this Judgment, because of inability to locate the proper persons or because of such persons' refusals to accept such sums, shall be deposited with this Court, pursuant to 28 U.S.C. § 2041.

Neither Defendant nor anyone on its behalf shall directly or indirectly solicit or accept the return or refusal of any sums paid as back wages under this Judgment. Nor shall they retaliate against any employee for any action taken by any employee in connection with the investigation or settlement of this cause, or for asserting any rights under this Judgment. Defendant will not raise an employee's immigration status as a defense to the payment of back wages in any suit alleging such retaliation.

FURTHER ORDERED each party shall bear its own attorney's fees and expenses incurred by such party in connection with any stage of this case, including but not limited to, attorney's fees that may be available under the Equal Access to Justice Act, as amended.

This _10th_ day of _May_____, 2002.

_____
UNITED STATES DISTRICT JUDGE

6

PER_AND000006

UNITED STATES DISTRICT JUDGE

7

PER_AND000007

Defendant consents to entry
of the foregoing Judgment:

By: _____

JACOB J. MODLA
Haynsworth Baldwin Johnson
& Greaves, LLC
400 West Trade Street
Charlotte, N.C. 28202-1627
(704) 342-2588
(704) 342-4379 (FAX)

Attorneys for Defendant

Plaintiff moves entry of
the foregoing Judgment:

EUGENE SCALIA
Solicitor of Labor

JAYLYNN K. FORTNEY
Regional Solicitor

THERESA BALL
Associate Regional Solicitor

_____
BRIAN DOUGHERTY
Attorney

Office of the Solicitor
U.S. Department of Labor

2002 Richard Jones Road
Suite B-201
Nashville, TN 37215
Tel: 615/781-5330 Ext. 237
Fax #615/781-5321
Attorneys for Plaintiff

8

PER_AND000008

This correspondence clarifies the Consent Judgment (Agreement) in Chao v. Perdue Farms Inc., Case No. 2:02-CV-0073 (M.D. Tenn.), executed on May 9, 2002. As we have discussed, the parties to the Agreement intend to assure that Perdue Farms Inc. (Perdue) achieves future compliance with the Fair Labor Standards Act (FLSA), 29 U.S.C. 201 et seq.

Specifically, under the Agreement, and to the extent not excepted under 29 U.S.C. 203(o), Perdue will record and pay for the time taken from the first principal activity, which could be donning of clothing and equipment at the plant (excluding such items that the employee is free to put on at home, such as hair nets, bump caps, ear plugs, glasses and footwear). This includes any subsequent time taken for employees to sanitize themselves and their equipment and the time spent walking or waiting after the first principal activity has been performed. Similarly, at the end of the production shift, employees will be compensated until the completion of the last principal activity. The only uncompensated time during the workday will be during any bona fide meal periods or bona fide off-duty time. Before and after the bona fide meal periods, Perdue will record and pay for the time taken by employees to don or doff clothing and equipment, and to sanitize themselves and their equipment.

There are any number of ways in which this compliance can be accomplished. One method for doing so would be to organize employees into working groups. When the first member of the group is given his or her equipment by a supervisor as part of the group, the entire group would be "clocked in" by the supervisor and the time recorded. From the time of the "clock in" all employees in the group would be paid for all hours with the exception of bona fide meal breaks or bona fide off-duty time. At the end of the day, the work group would be "clocked out" when the last person in the group completes taking off or cleaning (whichever comes last) his or her last piece of equipment as part of the group included in the paragraph above. Persons who arrive or are relieved off schedule or are assigned additional duties will be compensated in accordance with actual time worked.

As part of the Agreement, Perdue will make diligent efforts to locate all of its present and former workers who are owed back wages under the Agreement. These efforts will include utilizing the services of the Internal Revenue Service in cooperation with the Department of Labor, Lexis-Nexus, and a mutually agreeable credit bureau, or an equivalent search service, to locate former

PER_AND000009

employees.  This obligation to locate workers shall not apply to any worker due less than $100 in gross back wages.

Perdue will inform the Wage and Hour Division (Wage-Hour) that it has met the requirements of the FLSA and this agreement with respect to each Perdue facility.  Wage-Hour, after receiving that notification, will review the payment and record-keeping practices at the facility for which notification is given and will attempt to complete this review within 90 days.  When Wage-Hour has completed its review and has determined that the pay practices at the facility are consistent with this agreement, Wage-Hour will so certify.

The principle underlying the Agreement, that all work time from the first principal activity to the last principal activity must be compensated, except for bona fide meal breaks or bona fide off-duty time, is a principle that the Wage and Hour Division intends to apply consistently throughout the poultry processing industry.

By: _____

JACOB J. MODLA
Haynsworth Baldwin Johnson
  & Greaves, LLC
400 West Trade Street
Charlotte, N.C. 28202-1627
(704) 342-2588
(704) 342-4379 (FAX)

Attorneys for Defendant

EUGENE SCALIA
Solicitor of Labor

JAYLYNN K. FORTNEY
Regional Solicitor

THERESA BALL
Associate Regional Solicitor

_____
BRIAN DOUGHERTY
Attorney

Office of the Solicitor
U.S. Department of Labor

2002 Richard Jones Road
Suite B-201
Nashville, TN 37215
Tel: 615/781-5330 Ext. 237
Fax #615/781-5321
Attorneys for Plaintiff

**U.S. Department of Labor**      Office of the Solicitor
Washington, D.C. 20210

AUG 16 2002

Jack Kelly
Kelly & Associates, Inc.
925 15th Street N.W.
5th Floor
Washington D.C. 20005

Re: Chao v. Perdue Farms Inc., No. 2-02-003 (M.D. Tenn.)

Dear Jack:

As you know, pursuant to the Consent Judgment executed May
9, 2002, and the correspondence clarifying the Judgment in
the above styled action, Perdue Farms has agreed to record
and pay for the time taken by production employees at the
beginning of the production shift to don clothing and
equipment, sanitize themselves and their equipment, and
walk or wait after any one of these activities has been
performed. Similarly at the end of the production shift,
Perdue has agreed to compensate employees for the time
taken to doff clothing and equipment, to clean or sanitize
themselves or their equipment, and any waiting or walking
time prior to the completion of these activities. The only
uncompensated time during the workday will be during any
bona fide meal periods. Before and after the bona fide
meal periods, Perdue will record and pay for the time taken
by employees to don or doff clothing and equipment, and to
sanitize themselves and their equipment. Walking and
waiting time will also be compensated until the employee
has completed these tasks at the beginning of any meal
period, and after one of these tasks has begun at the end
of any meal period.

The Wage and Hour Division has reviewed the changes
implemented by Perdue to record all hours of work for
production employees at the facilities located in
Fayetteville, North Carolina, Robbins, North Carolina,
Emporia, Virginia and Salisbury, Maryland. Based upon this
review, the Wage and Hour Division has determined that
Perdue's practices at these facilities are consistent with
the agreement between Perdue Farms and the Department of
Labor. In conformity with the Consent Judgment, Perdue may
begin to pay employees according to the individual time
records compiled under its current practices, if Perdue has
not already begun to do so.

The Department reserves the right to review payroll records
consistent with the agreement at a point in time when
payroll records will fully reflect the current practices at
the named facilities.

We greatly appreciate your diligent cooperation in these
matters.

Sincerely,

Jonathan M. Kronheim
Counsel for Trial Litigation

Mary Ziegler
Farm Labor Team Leader

# News Release



U.S. Department of Labor

Release
Office of Public Affairs
Washington, D.C.
USDL: 02-286

For Immediate

Thursday, May 09, 2002
Contact: Sue Hensley
Phone: (202) 693-4650

## Perdue Farms Agrees To Change Pay Practices And Pay Millions In Back Wages To 25,000 Poultry Workers

**WASHINGTON, DC** – The U.S. Department of Labor today announced the filing of one of the largest consent judgments in the history of its Wage and Hour Division.

Under the consent judgment with Perdue Farms, Inc., which is estimated to be worth over $10 million to Perdue poultry workers, the company agreed to change current and future pay practices at all of its domestic poultry processing facilities, and compensate more than 25,000 current and former employees for time spent "donning and doffing" work clothing and protective gear.

"This is a major victory for the workers, who will now get paid what they are entitled to and be compensated for health and safety precautions at their plants," said Secretary of Labor Elaine L. Chao. "I am pleased that Perdue has stepped forward to do the right thing. Most poultry workers are immigrants who are paid less than $7.00 an hour. This agreement with Perdue is a major step in protecting these low-wage workers."

The agreement with Perdue resolves a dispute over a poultry industry practice of not paying workers for time spent donning, doffing and sanitizing at the plant. Poultry processing workers are required to be ready to work, with work clothing and protective gear on, when the production line starts running, but are not paid for the time spent putting on the gear or cleaning up at the end of day. Perdue is the first poultry company to agree to pay workers for all hours worked, including time spent on these work-connected activities.

Tammy D. McCutchen, Administrator of the Wage and Hour Division, stated, "It's important that Perdue has agreed to change its pay practices at all its plants across the country, to ensure future compliance with the Fair Labor Standards Act. We hope this settlement with Perdue will be a model for the industry."

The consent judgment was filed in the U.S. District Court for the Middle District of Tennessee by the Labor Department's Solicitor's Office, and must be approved by that court.

The FLSA requires that covered employees be paid the minimum wage of $5.15 per hour for all hours worked and time and one-half their regular rate of pay for hours worked over 40 per week. The FLSA also requires

# News Release



**U.S. Department of Labor**                                          For Immediate Release

Office of Public Affairs                              Thursday, May 09, 2002
Washington, D.C.                                     Contact: Sue Hensley
USDL: 02-286                                         Phone:  (202) 693-4650

employers to maintain accurate time and payroll records.  For more information about the FLSA, call the Department of Labor's toll-free help line at 1-866-4USWAGE (1-866-487-9243).  Information is also available on the Internet at www.dol.gov.

### ###

U.S. Labor Department releases are accessible on the Internet at http://www.dol.gov.  The information in this news release will be made available in alternate format upon request (large print, Braille, audio tape or disc) from the COAST office.  Please specify which news release when placing your request.  Call (202) 693-7773 or TTY (202) 693-7755.

# Ogletree
# Deakins
### ATTORNEYS AT LAW

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

2301 Sugar Bush Road
Suite 600 (27612)
Post Office Box 31608
Raleigh, North Carolina 27622
Telephone: 919.787.9700
Facsimile: 919.783.9412
www.ogletreedeakins.com

Bruce A. Petesch
bruce.petesch@ogletreedeakins.com

August 17, 2006

Jonathan M. Kronheim, Esq.
U.S. Department of Labor
Office of the Solicitor
Suite N-2716
200 Constitution Ave. NW
Washington, D.C. 20210

Re:    Chao v. Perdue Farms Incorporated
       Civil Action File No. 2-02-0033 (Judge Haynes)

Dear Mr. Kronheim:

This letter is to advise you that Perdue Farms Incorporated has complied with all terms of the Consent Judgment entered in the United States District Court for the Middle District of Tennessee, Northeastern Division, in the above-referenced case. Specifically, Perdue Farms:

1.    Within the one-year period following the entry of the Consent Judgment, brought all of its plants into compliance with Section A of the Consent Judgment, and further, the Office of the Solicitor, United States Department of Labor has had a representative visit each of the covered plants, and review the payment and record-keeping practices at each facility, and has certified that each of the covered plant's pay practices are consistent with the requirements of the Consent Judgment and the clarifying side letter agreement.

2.    Within the time permitted following the entry of the Consent Judgment, paid to each hourly paid employee or former employee who worked on the production line during a production shift in the two-year period prior to the date of the filing of the Complaint in the above-reference action, an amount equal to the amount owed to each employee for working eight (8) minutes per day, based upon the regular rate paid on the date of work, in addition to the amount already paid by Perdue Farms for each day worked, and including an overtime premium as described in Section A of the Consent Judgment where applicable. Perdue Farms has delivered checks for all back wages, less all legally mandated deductions, to all employees and former employees who have been located; and further, Perdue Farms, having diligently endeavored to locate all current and former employees entitled to back pay

PER_AND000013

Jonathan M. Kronheim, Esq.
August 17, 2006
Page 2

pursuant to the Consent Judgment and by methods approved by the Office of the Solicitor, United States Department of Labor including utilizing the services of the Internal Revenue Service and a mutually agreed to search service, is at this time providing the Department of Labor with a list of all unlocated former employees and a check in the amount due all unlocated employees.

By copy of this letter I am forwarding, or having forwarded by separate cover, pursuant to the instructions of the Office of the Solicitor, United States Department of Labor, to the addressees identified below, the following documentation establishing that Perdue Farms has fully complied with the terms of the above-referenced Consent Judgment and clarifying side letter agreement:

1.      To Jill Brown, U.S. Department of Labor, 1018 Porto Bello Road, Pendleton, IN 46064:

      Disc 1 – Perdue Farms Incorporated – M&T Bank Excel paid files:
            38971129 (November 2002 paid file)
            38971227 (December 2002 paid file)
            38970131 (January 2003 paid file)

      Disc 2 – containing three (3) Excel file folders:
          File Folder 1 – Perdue Farms' Address Files
              Deluca Check Register with Addresses
              Perdue Termination Addresses October 2002
              Settlement Services Addresses

          File Folder 2 – Perdue Farms' Reconciliation Files
              Settlement Services Outstanding Checks
              IRS Mailing Outstanding Checks
              Original Payout Outstanding Checks
              Bank Reconciliation – June 2006 ($293,564.85 less one (1) outstanding check for $232.37 from the Settlement Service mailing)

          File Folder 3 – Perdue Farms' Payment Files
              Initial Payout – Active Associates
              Deluca Initial Check Register
              IRS Search Check Register
              Settlement Services Check Register
              Initial Payout – Terminated Associates

Jonathan M. Kronheim, Esq.
August 17, 2006
Page 3

Hard Copies:
    Signed WH-58s from the original payout that were returned after
    the WH-58s were sent to the Department of Labor

    Signed WH-58s from the IRS mailing

    Signed WH-58s from the Settlement Services mailing

2.    To the SE Region Lockbox, U.S. Department of Labor – Southeast Region, P.O. Box 880904, Dallas, TX 75388-0904 (by separate cover):

    A check for $293,564.85 representing the net amount due to the unlocated employees.

If the outstanding check for $232.37 does not clear by the September bank statement reconciliation, we will cancel the check and forward the amount to the lock box with a letter to you.

Perdue Farms believes that it has fully complied with the terms of, and obligations imposed by, the above-referenced Consent Judgment and the clarifying side letter agreement, and having done so, that this matter is now closed. We would appreciate your confirmation that our understanding is correct.

Jon, both on behalf of Perdue Farms, and me personally, I want to thank you and the Office of the Solicitor for the cooperation and assistance that has been provided in working through this matter.

With high regards, I remain

Very truly yours,

Bruce A. Petesch

BAP:ep

cc:    Ms. Jill Brown (w/enclosures)
    Mr. Dave Tabinowski
    Mr. Robert Heflin
    Herbert D. Frerichs, Jr., Esquire

PER_AND000015

No.0024  P. 2

Jan.19. 2000 12:15AM

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.,           )
                                   )
         Plaintiffs,               )
                                   )        Case Action No.:
    v.                             )        1:06-CV-1000-MEF-WC
                                   )        JURY TRIAL DEMANDED
PERDUE FARMS INCORPORATED,         )
                                   )
         Defendant.                )
                                   )

SECOND DECLARATION OF DAVE TABINOWSKI

I, Dave Tabinowski, depose and state the following based on my personal knowledge:

1.      I am currently employed by Perdue Farms, Inc. ("Perdue") as the Company's
Internal Audit—Project Lead. I am also a Certified Internal Auditor. As Perdue's Internal
Audit—Project Lead, I am responsible, inter alia, for auditing and monitoring Perdue's practices
related to wage and hour issues including payroll, capturing first and last principal activity, and
the Kronos time recording system.

2.      I submitted a Declaration in this case dated January 9, 2008. This Second
Declaration contains additional information and is intended to supersede my prior Declaration.

3.      Through my job as Perdue's Internal Audit—Project Lead, I am very familiar
with Perdue's time recording and pay practices for hourly poultry processing employees at
Perdue's poultry processing plant in Dothan, Alabama, and at Perdue's other locations around
the country. In September 2005 I conducted a routine "First and Last Principal Activity Audit"
at Perdue's poultry processing plant in Dothan, Alabama, and I returned in March 2007 to
conduct an additional on-site review. As a result, I know how hourly poultry processing
employees in Dothan are paid and how their time is recorded.

l-WA/2972469.2                           1

4.     Perdue's poultry processing plant in Dothan, Alabama plant operates five days per week, three shifts per day. Poultry processing is performed on the night shift (the third shift) and the day shift (the first shift). The base rate of pay for hourly poultry processing employees on the day shift at Perdue's poultry processing plant in Dothan, Alabama is $8.15 per hour. This amount increases to $9.35 per hour after sixty days of employment with Perdue. The base rate of pay for hourly processing employees on the night shift is $8.45 per hour. This amount increases to $9.55 after sixty days of employment with Perdue. Hourly poultry processing employees are scheduled to work 37.5 hours per a five-day week. Hourly poultry processing employees may be asked to work a sixth day based on production needs and, in fact, depending upon product demand, a significant amount of overtime may be worked. Whenever overtime is worked, it is paid at time and a half each employee's regular rate of pay.

5.     First Processing is the area of the plant where live chickens are introduced into the plant and placed or hung on hooks or shackles for killing, cleaning, eviscerating, and chilling. Employees who work in this area of the plant are called "First Processing employees." Second Processing employees receive the chickens by conveyor from First Processing. Chickens are cut-up, marinated, de-boned, weighed, sized, and packed in Second Processing.

6.     Perdue's poultry processing plant in Dothan, Alabama using the "Kronos," time-recording system which is a "state of the art" web-based centralized electronic system that records the time worked by hourly poultry processing employees. Time and attendance records are recorded by Kronos, and these records are stored electronically and maintained on a processing server at Perdue's corporate headquarters in Salisbury, Maryland. Each hourly poultry processing employee is provided a personal Kronos "swipe" card, which assigns an individual electronic number to that employee. Employees' time is captured by one of several

Kronos time clocks that are designed to capture all principal work activities. There are two Kronos time clocks in the First Processing section of the facility. There are six Kronos time clocks in the Second Processing section of the facility.

7.    Perdue provides a parking lot on the facility complex for its Dothan employees to use. Processing employees park their cars in the parking lot and then walk to their designated entrance door to the facility. On their way to the facility entrance, employees walk through a gate in a chain link fence. Employees visibly display their Perdue identification cards to a third-party security guard as they pass the security guard's booth. They do not have to stop, or even pause, as they pass the guard. Employees do not swipe in at the gate.

8.    In the Dothan facility, there are locker rooms, rest rooms, and break rooms for use by the employees. Many employees proceed to the employee break room before starting their shift. While employees await the beginning of their shift, they are not required to account for their time or activities.

9.    At the employee's specific start time, and before donning or acquiring work-related equipment and clothing, or performing any other required work activities, hourly poultry processing employees take their assigned Kronos access cards and swipe into their assigned Kronos system time-clocks at designated starting areas. After swiping into the system, the hourly poultry processing employees enter their department, don their required clothing, and collect their required gear from hooks, shelves, or bins. Employees sanitize after they put on their required departmental clothing and gear. Employees then walk to their work stations and begin to work. All of this occurs while on paid time.

10.    The process is reversed at the end of the work day. When their supervisor notifies them that their shift has ended, employees remove their gloves, aprons, and any other required

No. 0024   P. 5

Jan. 19. 2000 12:16AM

clothing and gear and dispose of them. Some employees choose to remove their earplugs, hair nets, and beard nets at this time. Employees then swipe out on the designated Kronos time clocks. After swiping out at their assigned Kronos time clocks, processing employees may place their personal items—ear plugs, hair and beard nets, and safety goggles—in their lockers, or take the items home with them. Employees exit the facility and return to the employee parking lot.

11.     Required clothing and gear include smocks, cut gloves, and hand or arm guards. The hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama also wear personal items such as bump caps, slip resistant footwear, hair and beard nets, and ear plugs, which they may choose to don on their own time. Donning of these personal items is not compensable, but hourly poultry processing employees are permitted to don non-unique items after clocking-in, and many choose to do so.

12.     Hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama are paid for all time captured by the Kronos system. Since the Kronos system was introduced at the Dothan poultry processing facility in 2002, Perdue has not calculated pay entitlements based on line time, master time cards, or any other similar practices.

13.     Hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama have two 30-minute unpaid meal breaks in each 8 hour shift, during which time they are relieved from work duty. Employees may take their 30-minute meal breaks wherever they choose, such as the break room or cafeteria, or they may go outside.

14.     Supervisors notify their employees when it is time for their breaks to begin. Their first break generally occurs approximately two hours after their shifts begin. When it is time for their break, the hourly poultry processing employees leave their work area and walk to their designated doffing area, where they doff their required clothing and gear. All of this occurs

while the hourly poultry processing employees are "on-the-clock," which means they are paid for this time. After the hourly poultry processing employees doff their required clothing and gear, they then walk to their designated Kronos time clock and swipe-out using their Kronos access card. While on break, employees retain their hair nets, beard nets, and ear plugs, and do not remove their boots.

15.    Hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama start their unpaid meal breaks only after they swipe out using the Kronos system. The system does not permit hourly poultry processing employees to swipe back in until thirty minutes later. In fact, the Kronos system will not allow hourly poultry processing employees to swipe back in within thirty minutes of when they swiped out. Near the end of the break period, employees walk to their assigned Kronos time clock near their work station to swipe in. After swiping back in, poultry processing employees don their gear, pick-up any necessary equipment, and walk to the work station, on paid time, to resume work for the remainder of their shift. Employees also sanitize their outer garments before resuming their work.

16.    There are signs instructing the hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama not to perform "work" before clocking-in. These signs are in English and Spanish and are located near the Kronos time clocks. In addition, signs remind employees to clock in before touching any required items. Poultry processing employees are warned that failure to comply with these rules could result in disciplinary action.

17.    When Perdue instituted the Kronos system in Dothan, it trained all hourly employees on its use. Since that time, all new poultry processing employees are given

orientation and training that describe the relevant donning, doffing, and time clock policies and procedures.

18.    The orientation and training materials define "donning," "doffing," and "first and last principal activities," and also make it clear that the Department of Labor and the Fair Labor Standards Act require employees to be paid for time spent donning and doffing required items, and that employees get paid from the first principal activity until the last principal activity, excluding unpaid breaks. The materials also describe in detail the appropriate donning and doffing practices, including: the requirements to clock-in prior to donning supplies at the shift start time and when returning from unpaid break; the requirements to clock-out after doffing when leaving at the end of the shift or on an unpaid break; and the fact that all unpaid lunch breaks may be no less than 30 minutes long. The orientation and training materials remind each poultry processing employee that failure to comply with these policies could lead to disciplinary action.

19.    Poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama can review their time worked as recorded by Kronos, but they do not need to review their time in order to be paid. Supervisors review the time as recorded by Kronos before the end of each week to correct any mistakes. Sometimes employees forget to clock in or clock out, and supervisors can correct these issues to make sure that each employee is paid properly. Once the time is approved by a supervisor, it is submitted electronically for payment.

20.    If poultry-processing employees find an error on their paycheck, they may approach a supervisor to help correct the error. If the supervisor verifies that a mistake has been made, he inputs a retroactive pay correction into the current week's Kronos time card. Typically,

1-WA/2972469.2                                          6

the next scheduled paycheck will reflect the required correction, however, in some cases, a separate check is sent to make the poultry-processing employees whole.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: May _16_, 2008

Dave Tabinowski

# First Principal Activity - Associate Performance Standards and Dothan Plant Discipline Program

## Purpose:

To provide management/supervision with guidelines for managing the First Principal Activity Plan and provide associates with information needed in order to be compliant.

## Scope:

All plant associates performing work that is line driven or associates who are required to handle product in any form.

## Required Procedures for Compliance with Performance Standards:

## Start of Shift

Associates covered by the First Principal Activity Compliance Plan may not punch a time clock until their designated starting time. Starting times are assigned by work station and will be made known to all associates.

Associates must clock their time card in before putting on aprons, lab coats, rain suits, freezer suits, gloves or

Signature: _____     Date: _____

PER_AND000127

any other item of apparel provided by the company. Exceptions are personal protective equipment, i.e., hairnets, earplugs, bump cap, safety glasses, LOTO equipment and boots, which may be worn from home or put on before clocking their time card in.

Associates must put on **_required_ gear (aprons, lab coats, rain suits, freezer suites, and gloves),** sanitize if required, then proceed to their designated work station within an acceptable amount of time to be determined by management, but not to exceed 2 minutes.

## Start/Return From 30 Minute Break

Associates must clock their time card out for the 30 minute lunch/dinner break. A lunch/dinner break of less than 30 minutes is not permissible. Supervisors will establish the department or individual times for this break.

At the designated time for a 30 minute break, associates must first remove their required gear and place in predetermined location, and then proceed to designated time clock in an acceptable amount of time as determined by management, but not to exceed 2 minutes, to clock their time card out. Associates will not be allowed to wear any required gear (hairnets, ear plugs, boots, bump caps, glasses and LOTO equipment are allowed) outside their work area during these 30 minutes, however normal procedures as required by USDA or Quality Assurance apply during the two company paid breaks.

Signature: _____    Date: _____

PER_AND000128

Associates returning from 30 minute lunch/dinner break must clock time card in before putting on any required gear. After clocking time card in, gearing up, and sanitizing if required, proceed to work station in an acceptable amount of time as determined by management, but not to exceed 2 minutes.

## End of Shift

Associates must remove any required gear before clocking their time card out. At a time announced by management, associates remove required gear and place in predetermined location and proceed to designated time clocks in an acceptable amount of time as determined by management, but not to exceed 2 minutes to clock their time card out. **See *paragraph below,* "Miscellaneous Provisions" *regarding the use of lockers after clocking out.***

## Miscellaneous Provisions

Associates who have assigned lockers **may not** store aprons, lab coats, rain suits, freezer suits, or gloves in lockers at any time. Personal items such as: jackets, coats, purses, carry bags, boots, shoes, food, etc. may be kept in assigned lockers.

Associates are required to clock time cards at assigned time clocks only. Supervisors will inform associates of assigned time clock and its location.

Signature: _____    Date:_____

PER_AND000129

<u>Disciplinary Action</u>

**Associates are required as a condition of employment to follow the above procedures regarding clocking in and out, the donning and doffing of required apparel, the acceptable time to go to and from the time clocks to the work station, and the necessity to take a full 30 minute unpaid break. Associates who fail to abide by the provisions of the above procedures will be in violation of the standards of acceptable personal conduct at work and therefore subject to the** Perdue Farms Disciplinary Procedures **as outlined on page 28, "Disciplinary Action", of the Associate Handbook.**

Effective August 12, 2002

Signature: _____    Date: _____

PER_AND000130





### Time Clock Procedures

- It is very important to follow proper procedures when clocking in/out for reasons:
  - Safety
  - Perdue compliance with government regulations
  - Avoiding disciplinary action



### Department of Labor

The United States Department of Labor (DOL) changed their enforcement position of the Fair Labor Standards Act and now requires poultry companies to compensate their associates for time spent donning and doffing certain supplies.

PER_AND000113

1



















IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　　Case Action No.:
　　v.　　　　　　　　　　　　　　　)　　　1:06-CV-1000-MEF-WC
　　　　　　　　　　　　　　　　　　)　　　JURY TRIAL DEMANDED
PERDUE FARMS INCORPORATED,　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　　)
　　　　　　　　　　　　　　　　　　)

## DECLARATION OF LISA BANKS

I, Lisa Banks, depose and state the following based on my personal knowledge:

1.  I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

2.  I began working with Perdue's Dothan, Alabama facility on November 19, 2004.  I first began working in the hand portions department which was second processing.  I began am currently working on the kill floor in August 2006.

3.  My shift begins at 5:42 AM and ends at approximately 2:45 PM.  I am paid $9.85 per hour.

4.  When I drive to work I have my work boots on.  I then walk through the guard check and flash my identification card.

5.  After I enter the building, I go to my locker and put my lunch in my locker.  I choose to leave my hair net, safety glasses, and bump hat in my locker.  I remove these items from my licker and put them on, because I must have them on before I swipe in.

6.   At 5:42, I swipe in at the kill floor time clock.  The time clock is right by locker. After I swipe in, I go through two sets of double doors.  I then take my smock off of a numbered hook.  I put on my smock, apron, and gloves.  I go through another set of doors, sanitize my gloved hands in chlorinated water and go to my assigned work station.

7.   I have recently been promoted to a trainer, so now I work in whatever station I am needed to work in.

8.   I take my first break at 8:15 AM.  When my line leader tells me it is time for break, I throw away my plastic sleeves and hang up my smock and my apron on a hook, and place my gloves in my smock pocket.

9.   I then go through two sets of double doors and swipe my card through the time clock. After I swipe out for break, I choose to go to my locker, remove my safety glasses and bump hat, and get my jacket and a drink.  I then leave the facility and walk around the parking lot to get exercise.

10. Before my thirty minutes are over I return to my locker, get my bump cap and safety glasses, and return to the time clock by 8:45.  The time clock will not allow me to swipe in before thirty minutes are up.

11. After I swipe back in, I proceed to put on my apron, smocks, sleeves, and my gloves. I then sanitize my hands and begin working until it is time for my second break.

12. I take my second break at 11:15 AM.  I follow the same procedure for removing my equipment.  After swiping out, I choose to go to the bathroom, and then to the breakroom and eat my lunch.  After about twenty-eight minutes I go back to my locker, and get my bump cap, ear plugs which are connected to my hat, and safety glasses.

13. I swipe back in at 11:45 AM, and put on my gloves, sleeves, apron, and smock, and sanitize my hands and begin to work.  At the end of my shift I remove my gloves, sleeves, apron, and smock and swipe out.

2

14. My locker is right by my time clock. I takes me less then a minute to get to my locker. I go to my locker and put away my bump cap, ear plugs, safety glasses, and retrieve my personal items. I then leave the building and return to my car.

15. If I work for more than forty hours in one week, I receive time and a half my salary. I have never been asked to do any work on my own time.

16. When I first started at Perdue, a trainer showed me how to use my Kronos time-keeping card. The trainer and my supervisors told me what items I could not put on until I swiped in.

17. There are also very large signs and visual aids in English and Spanish at the time clocks showing me what I should have on.

I declare under penalty of perjury that the forgoing is true and correct.


Dated: January 3, 2008

Lisa Banks
Lisa Banks

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **Case Action No.:** |
| v. ) | **1:06-CV-1000-MEF-WC** |
| ) | **JURY TRIAL DEMANDED** |
| PERDUE FARMS INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF CHERYN CAWTHON

I, Cheryn Cawthon, depose and state the following based on my personal knowledge:

1. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2. I began working with the Perdue plant in Dothan, Alabama on November 3, 2003. I work on the cone line cutting tenders.

3. I work from 7:45 AM to 5 PM, Mondays through Fridays. Sometimes I work on Saturdays and get paid time and a half for hours worked over forty. I get paid $9.35 per hour.

4. I drive to work from Blakely Georgia, and arrive here early at around 7AM to avoid traffic. I bring my hat, ear plugs, hair net, safety badge, and safety glasses with me from home.

5. I sit in my car until about 7:20 AM and then walk through security. I stand in the hallway until it is time to swipe in.

6. At about 7:44 AM, I go up one flight of stairs and swipe in to my assigned clock. After I swipe in, I go to the coat rack and put on my lab coat, apron, sleeves, and gloves. I dip

my hand in the chlorinated water and do hand exercises. I then begin cutting the bones out of chicken breasts. I work until my first break at 10:20 AM. Before I go to break, I take off my lab coat, arm guard, and cutting gloves. I throw away my sleeves and apron. I then swipe out on my assigned time clock. I keep on my bump cap and hair net during break. I sit in the break room or go outside. About four minutes before I need to swipe in, I get up and walk upstairs toward the time clock. I wait until thirty minutes have passed before swiping in. I swipe in at 10:50 AM.

7.   After swiping in, I put on my lab coat, sleeves, apron, gloves, and cutting glove. I then sanitize my hands, bind my arm guard and then go back to cutting tenders.

8.   I do this until my second break at 1:20 PM. I repeat the process during my second break. After returning from my second break, I cut tenders and may rotate to cutting breasts until about 4:30. I may leave earlier depending on the amount of chicken we have.

9.   When it is time to go home, I lay my knife down, take my arm guard off, remove my apron, and cutting gloves, and throw away my sleeves. I then swipe out and go downstairs to leave. I keep my safety glasses on until I get downstairs, and I keep my bump cap and hair net on until I get to my car.

10. When I first began working at Perdue, my supervisor told me I had to have my bump cap on before swiping in. She also taught me how to use my Kronos time-keeping card.

11. Above the time clocks, there are signs that show what I should have on before I swipe in and after I swipe in.

I declare under penalty of perjury that the forgoing is true and correct.


Dated:  January 3, 2008

_Cheryn Cawthon_
Cheryn Cawthon

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| DARRYL ANDERSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **Case Action No.:** |
| v. ) | **1:06-CV-1000-MEF-WC** |
| ) | **JURY TRIAL DEMANDED** |
| PERDUE FARMS INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

### DECLARATION OF MARY CLARK

I, Mary Clark, depose and state the following based on my personal knowledge:

1.  I work for Perdue in Dothan, Alabama as an hourly chicken processing employee. I work the first shift, which is the night shift. I start working at 10:35 p.m. and stop working at 7:45 a.m. I work four days a week, Monday through Thursday. I get two 30-minute breaks,

2.  I was hired on October 1, 2007. I work on "cone de-bone," which means I cut the wings off the frame of the bird and pull the breasts off the frame of the bird. I put the wings and breasts on separate conveyor belts and they travel to more processing. I also cut the tenders from the bird and check the tenders to see if they are "good" or "bad." If they are bad I put them to the side. If they are good, I send them to another part of the plant for more processing.

3.  When I do my job I have to wear a smock, an apron, protective gloves, arm guards, a bump cap, ear plugs, a hair net, goggles, and steel-toed boots.

4.  I can take my hat, boots, ear plugs, hair net, and goggles home with me, and I usually do that. I put on my hat in the parking lot or in the break room before I start my shift. I put my boots on when I wake up and get dressed for work at home. I put on my ear plugs, hair net, and goggles just before I go to the time clock to clock-in.

5.  I have a Kronos time card.  I use it to clock-in when my shifts starts, to clock-out when my shift ends, and also when my breaks start and end.  There are a lot of time clocks around the Dothan facility.  There is one time clock that I have to use, and it is located near the production line where I work.  Other employees on other lines use different time clocks.  There is a supervisor watching me when I clock-in and when I clock-out.  My paid time starts when I clock-in.  My paid time ends when I clock-out.

6.  I normally get to work at about 10:22 p.m., or sometimes even earlier, for my 10:35 p.m. shift start time.  When I get to work, I sit in the break room and wait for my shift to start.  I don't have to sit there, but I want to sit there and talk to my friends, until it is time for my shift to start.

7.  At my shift start time I go to my assigned Kronos time clock and clock-in.  Then I go to the spot where my smock is located and I put-on my smock.  Then I go to my team leader and get my apron and gloves, and I put on my apron and gloves.  Then I walk to my line and dip my hands in the sanitizing liquid.  Then I do some hand exercises so that my hands do not get stiff, and then I start to work.  I also put on arm guards on the line before I start to work.

8.  My first 30-minute break is from 1 to 1:30 a.m.  My second 30-minute break is 4 to 4:30 a.m.  When my breaks start, I leave the line, wash my hands, and take off my gloves and apron.  Then I walk over to a hook on the wall and take off my smock.  Then I go to my Kronos time clock and clock-out.

9.  During my break I go to the break room and eat and drink something and talk to my friends.  I could go wherever I want to go, but I choose to go to the break room on my breaks.  I continue to wear my boots, bump cap, hair net, ear plugs, and goggles while I am on break.

10. When my break is over, I go first to my Kronos time clock and clock-in. Then I put back on my smock, apron, and gloves, and go back to the line and start working again. I cannot clock back in early. I have to take full 30-minute breaks.

11. When my shift ends, I take off my smock, put my apron in a wash bucket, take off my gloves, and then go to my Kronos time clock to clock-out. Then I go home.

12. When I first started at Perdue in Dothan I was given training on how to user Kronos. I learned how to use the time clocks and I learned that I must put on smocks, aprons, and protective gloves after I clock-in, and that I must take them off before I clock-out.

13. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.


Dated: January 3, 2008

*Mary Clark*
Mary Clark

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DARRYL ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Case Action No.:** |
| v. | ) | **1:06-CV-1000-MEF-WC** |
| | ) | **JURY TRIAL DEMANDED** |
| PERDUE FARMS INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF VICKIE DAVIS

I, Vickie Davis, depose and state the following based on my personal knowledge:

1.    I am an hourly poultry processing employee at Perdue Farms' Dothan, Alabama facility. I was hired by Perdue in Dothan in approximately 2003. I work on the "IP Cone" line, which is where we de-bone chicken. In particular, we cut the shoulder to open up the bird and cut the wing off from the chicken breast. I also work at the grading table, where I grade chicken breast, which means I make sure that there are no bones or skin on them. Every hour I rotate back and forth from the IP Cone line and the grading table.

2.    I currently work the second shift, which is the day shift. My shift starts at 7:45 a.m., and lasts nine hours. I have two 30-minute unpaid breaks during each shift. I currently am paid $9.35 per hour. If I work more than 40 hours per week, I would get paid overtime at time and a half.

3.    To do my job, I need to wear a bump cap, hair net, ear plugs, safety glasses, steel-toed boots, smock, apron, protective sleeves, cotton gloves, cutting gloves, and plastic gloves. I can take home my boots, hair net, ear plugs, safety glasses, and bump cap, and that is what I do. I

wear my boots from home. I put on the hair net, ear plugs, safety glasses, and bump cap when I arrive at the plant but before I clock-in. I could put them on earlier, but I choose not to do that.

4. I have a Kronos time card that I wear around my neck while I am at work. I use the time card to clock-in and clock-out at shift start and end time, and at my break start and stop times. I have a specific time clock that I have to use. My time clock is near the production line where I work. There are other time clocks that employees in other departments use. When I clock-in, supervisors are there to watch me do that. Supervisors are also there when I clock-out. When I clock-in, that is when my paid time starts. When I clock-out, that is when my paid time ends. I do not do any work before I clock in or after I clock out.

5. I arrive at the plant in Dothan at about 7:30 a.m. for my 7:45 p.m. shift start time. I drive in and park in the parking lot. Then I come into the building and use the restroom. Before 7:45 I can go anywhere I want, but I choose to wait by the lockers so that I can talk to people and socialize. I head towards the time clock so that I can be there right at 7:45 to clock-in. When I clock-in, I am already wearing my boots, hair net, ear plugs, safety glasses, and bump cap. After I clock-in, I go to the rack to get my smock and apron, and then I walk to the production line. At the line, I put on my gloves and sleeves. After I put on my gloves, I then dip my hands into the sanitizing liquid. When everyone reaches our work stations, we do an exercise with our hands to try and prevent injuries.

6. My first 30 minute unpaid break starts around 10:15 a.m. My second 30 minute unpaid break starts around 1:15 p.m. I have to take 30 minute breaks. I cannot clock back in before 30 minutes have passed. I can go wherever I want during my break, but usually I just take my breaks in the break room.

7.    When my breaks start, I leave the work station and take off my apron and sleeves and throw them in the trash. I leave my cutting gloves at the work station. I then take off and hang up my smock, and take off my cotton gloves. I take off and throw away the plastic gloves. Then I clock out. I continue to wear my bump cap, boots, goggles and ear plugs when I am on break. When my 30 minute break is over, I clock back in, and then I get my smock and put it on, and then I put on a new apron and new gloves. After my gloves are on my hands, I dip my hands again in sanitizing liquid, and then I get back to work.

8.    At the end of my shift, I leave the work station. I put my arm guards in a tub, take off my cutting gloves and put them on a table, throw away my plastic gloves and apron, put my smock in a big basket, and put my cotton gloves away in a box. Then I go clock-out and go home. I can take off my bump cap, hair net, boots, and ear plugs whenever I want after I clock-out.

9.    Perdue trained us on how to use Kronos and how to clock in and clock out. Perdue trained us not to touch or put on our smock, apron, protective sleeves, cotton gloves, cutting gloves, or plastic gloves before we clock in. There are signs near the time clocks that remind us not to touch these items before we clock in.

10. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

_Vickie Davis_
Vickie Davis

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case Action No.: |
| v. ) | 1:06-CV-1000-MEF-WC |
| ) | JURY TRIAL DEMANDED |
| PERDUE FARMS INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF VICTORIA DURR

I, Victoria Durr, depose and state the following based on my personal knowledge:

1.  I work as an hourly chicken processing employee for Perdue Farms in Dothan, Alabama. I have worked for Perdue for about 10 or 11 years. My current job is lead person in evisceration. Before becoming a lead person, I worked on the production line in evisceration. My shift starts at 5:30 a.m. and ends no later than 2:15 p.m. I get two 30-minute unpaid breaks. I work five days a week, Monday through Friday. My hourly rate is $9.60 per hour. If I work more than 40 hours in one week I get paid overtime at time and a half.

2.  My job requires me to make sure the line keeps going and that everyone does their job. I also work on the line when necessary, which is often. Generally speaking, evisceration is the process of the birds' innards being removed from the birds before they go to more processing. Evisceration also includes "final trim," which is where birds go who have been marked by the United States Department of Agriculture quality assurance representative at the Dothan facility as having bruised legs or broken wings. The final trim evisceration line cuts off the bruised legs and broken wings, before the birds go to the chiller and to further processing.

3.  I am required to wear a lab coat, an apron, rubber gloves, arm guards, chain gloves (or cutting gloves), bump cap, ear plugs, hair net, safety glasses, and steel-toed boots.  Of these items, I can take home my hair net, bump cap, boots, safety glasses, and ear plugs, or I can leave them in my locker.  I choose to take all of these items home with me.  I choose to put on my boots, hair net and bump cap after I park my car in the parking lot.  I choose to put on my glasses after I clock-in, even though I could put on my glasses before I clock in.  I also put on my lab coast, apron, rubber gloves, arm guards, and chain gloves after I clock in.

4.  I wear a Kronos time card around my neck.  I swipe my time card when I start my shift and when I come back from breaks.  I also swipe my time card when I leave for breaks and at the end of the day.  My paid time starts when I clock-in.  My paid time ends when I clock out.

5.  I use a specific time clock every day.  Everyone on evisceration uses the same clock, but there are other time clocks for use by other employees in other departments.  The time clock I use is located in the hallway next to the lockers, before entering the department.  Supervisors are assigned to watch the employees swipe in and swipe out and to watch the employees put on their gear and clothing.

6.  I arrive at the facility at about 5:15 a.m. for my 5:30 a.m. shift.  I park my car, put on my boots, hat, and hair net, and then walk through the gate and go to the hallway to get ready to clock in.  I could go to the break room or to the bathroom or anywhere else before I clock-in, but I choose to go to the hallway and hang out before I clock-in.  There are people there to socialize with while I wait.

7.  At 5:30 a.m., I clock-in and put on my ear plugs and safety glasses while I walk through the door.  Then I put on my lab coat, apron, and go get supplies – knives, scissors, arm guards, chain gloves, and cutting gloves – from a locker.  I take the supplies to quality assurance

to be checked for quality. After being approved by quality, I put out the equipment and gear for the employees to use and wear. Then I sanitize my hands in the sanitizing liquid, sanitize my rubber gloves, and then put on my rubber gloves.

8. My first 30-minute unpaid break usually starts at about 9:15 a.m. My second 30-minute unpaid break usually starts at about 12:15 p.m. When my breaks start, I rinse off my apron and gloves, and then take them off and my coat. Then I put my gloves in my coat pocket, and hang the coat and apron up on my rack, and then walk through the door and clock-out. I continue to wear my bump cap, hair net, ear plugs, and boots. I usually take my break in the break room. I could go wherever I want, but I choose to go to the break room. When my break is over, I clock-in, and then put everything back on. I cannot clock-in before 30 minutes has passed.

9. When my shift is over, I put my equipment away, take off my apron and coat, throw away my rubber gloves, and walk through the door and clock out and go home.

10. Perdue trained me on how to use Kronos. Perdue told us that we are supposed to clock-in before putting on our apron, gloves, smocks, and arm guards. There are signs near the time clocks that remind us of this.

11. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

_Victoria Durr_
Victoria Durr

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al.,     ) | |
|                   ) | |
|    Plaintiffs,        ) | |
|                   ) | Case Action No.: |
| v.                  ) | 1:06-CV-1000-MEF-WC |
|                   ) | JURY TRIAL DEMANDED |
| PERDUE FARMS INCORPORATED,  ) | |
|                   ) | |
|    Defendant.       ) | |

## DECLARATION OF ERIKA FLOYD

I, Erika Floyd, depose and state the following based on my personal knowledge:

1. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

2. I began working with Perdue in Dothan, Alabama on July 23, 2007. I began and am currently working in the deboning department.

3. My shift begins at 10:15 PM and ends at 7:55 AM. I am paid $9.55 per hour. When I work over forty hours, I receive time and one half my salary.

4. When I arrive at work, before I enter the building, I have on my hard hat, ear plugs, hair net, and work boots. I bring these items from home and I take them home with me.

5. I have a Kronos time-keeping card and a Perdue identification badge. I show my identification badge to a security guard before entering the building when I arrive at work. After enter the building, and before going up to the second floor, I put on my safety glasses.

6. When I arrive at the second floor, I swipe my Kronos time-keeping card at 10:15PM. All of the time clocks are located in the same area on the wall. I swipe my Kronos time-keeping

card on the third time clock because my supervisor told me to use that clock. There are supervisors present me when I clock in.

7.  After I swipe in, I put on my white smock. Before I go to my department, I make sure the line leader has her proper equipment ready, that maintenance has cleaned up, set up the knives, arm guards and foot stands.

8.  I wait for the rest of the deboning crew to arrive. As safety, I supervise the crew as they put on their gloves and other equipment, sanitize, and exercise. I then go downstairs to count the chickens and monitor the line speed. I then return to the deboning area.

9.  When I return to the deboning area, I put on my apron, cutting gloves, cotton gloves, and my arm guard if I have to use a knife or scissors.

10. I begin to debone chickens. I may also be asked to grate chicken, or cut tenders.

11. I have two unpaid meal breaks. My first meal break is from 1AM – 1:30 AM. My second meal break is from 4AM to 4:30 AM. The "line leader" tell us when it is time to take our break.

12. Before I swipe out for break, I have to check the work area, clean the floor, place ice under the remaining chicken, and do my safety checks.

13. I then remove my smock and place it on a hook. I also remove my gloves, arm guard, and plastic shield.

14. I then walk to the Kronos time-keeping clock and swipe out for break. After I swipe out, I leave on my ear plugs, bump hat, and work boots. I then remove my safety glasses.

15. During my break, I go outside to my car and drink coffee, eat, or drive to a store. When I return from break, I put back on my safety glasses before I go into the second door upstairs to clock back in.

16. I swipe in with my Kronos time-keeping card thirty minutes after I swiped out for break. I cannot swipe in before my thirty minutes are up. After I swipe back in, I put on my smock and other equipment and begin working.

17. At the end of my shift, once other deboners leave, I help clean my area and sanitize all the utensils. Before I swipe out, I remove my gloves. Then, I remove my smock and place it in the laundry bin. I then swipe out for the day and go downstairs. I remove my safety glasses.

18. Once I go downstairs, I take a bag of dirty cutting gloves to the supply room. After I leave the supply room, I walk to my car with my earplugs in my ear, bump hat on my head, and work boots still on my feet.

19. When I first began working with Perdue, my supervisors showed me how to swipe in and swipe out on the Kronos time-keeping machines.

20. My supervisors told me what equipment I need to have on before and after I swipe in and out for my shift.

21. During orientation, I received my identification badge, Kronos time-keeping card, learned about pay polices, safety, the different equipment I would have to use, the clothing I needed to wear. This information is also in my employee handbook.

22. There are signs throughout the building that say what you should have on before you enter the building.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January **17**, 2008

Erika Floyd

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.,          )
                                  )
        Plaintiffs,               )
                                  )
    v.                            )     Case Action No.:
                                  )     1:06-CV-1000-MEF-WC
PERDUE FARMS INCORPORATED,        )     JURY TRIAL DEMANDED
                                  )
        Defendant.                )
                                  )

## DECLARATION OF LILLIE GREEN

I, Lillie Green, depose and state the following based on my personal knowledge:

1. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2. I began working with the Dothan facility of Perdue on August 11, 2003. I first began working in the deboning department sorting rib cages. I still work in the deboning area but now I do scrape tests.

3. My shift begins at 7:15 AM and ends between 3 and 5 PM, depending on the chicken processors. I work Monday through Friday, and am paid $9.35 per hour. If I work overtime, I receive time and a half my hourly wage.

4. I carpool to work everyday and bring with me my bump hat, ear plugs, hair net, safety glasses, work boots, Kronos time-keeping badge, and identification badge. I arrive at the plant around 7 AM or five minutes after 7.

5.  I walk to the front gate and pass through security.  I put my badge up as I walk past security, and then enter the building.  When I enter the building, I go to the break room or get a soda on the first floor.

6.  Around 7:14 AM I leave the break room and go upstairs to my assigned time clock. At 7:15 AM I swipe my Kronos time-keeping card.

7.  After I swipe in, I put on my smock first and then my plastic sleeves.  I get dip pans from the tub room for sanitizing gloves.  I set up my machine to get ready for the scrape tests.  I then begin scraping rib cages and measuring the meat that is on there.  I continue to work until my first unpaid meal break at 10:30.

8.  Around twenty-five minutes after the hour, I remove my arm guard, I clean my machine and then close it.  I take off my smock and put it on my numbered hook.  I put my gloves in the pockets of my smock.  I then take off my sleeves, and my plastic apron and throw them away.

9.  I swipe out at my assigned clock, which is fourth from the door.  This is the same clock I used to swipe in, and the clock my supervisor assigned me to.

10. I keep on my bump hat, hair net, ear plugs, safety glasses, and work boots.  When I get to the bottom of the stairs from the deboning department I take off my safety glasses.

11. During my break, I choose to use the ladies room, then I go to the food area, eat food, and then sit and eat.  I eat for thirty minutes and come back at 11AM and swipe in at the same clock I swiped out from.

12. After I swipe in, it takes me about a couple of seconds to go back to my department, and put on my smock, then my sleeves, my apron, and gloves.  I begin working until my second break which is at 1:30 PM.  I repeat the process of taking off my items for my second break.

During my break, I sit in the break room. It takes me a couple of seconds to get to the break room from the clock where I swipe out. It's not that far away.

13. I swipe back in at 2PM. I put back on my smock, my sleeves, my apron, my gloves, sanitize my gloves, and then I begin scraping the rib cages. I continue to work until 3 or 5 PM, depending on the amount chickens we receive in the department.

14. When it is time to go home, I clean my machine, pull off my gloves, arm guard, knives, and sharpener, and return them to the line leader. I throw away my plastic sleeves and my apron. I put my smock in the laundry basket and then I clock out.

15. After I clock out I may walk to my locker and put my bump cap and ear plugs in my locker. Or, I may take them home with me, with my safety glasses and my work boots.

16. When I first began working with Perdue, my supervisor showed me how to use my equipment, how to put on my safety clothing and what items I needed to have on before I swipe in. My supervisor also showed me how to use my Kronos time-keeping card and where to use it.

17. There are signs by the break room that show everything I need to have on before and after I swipe in. The signs are all around the break room.

I declare under penalty of perjury that the forgoing is true and correct.


Dated: January 3, 2008

Lillie Green
Lillie Green

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case Action No.: |
| v. ) | 1:06-CV-1000-MEF-WC |
| ) | JURY TRIAL DEMANDED |
| PERDUE FARMS INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF JEANNIE HICKMAN

I, Jeannie Hickman, depose and state the following based on my personal knowledge:

1. I am an hourly poultry processing employee and I work for Perdue Farms in Dothan, Alabama. I currently work on leg de-bone. My job is to take a knife and remove the bone from chickens' leg quarters. I have had this job since November 2001. I was hired by Perdue in Dothan on November 16, 1998. My first job was as a shoulder cutter. I also graded breasts, which means I made sure there was no skin or bones on the breast before it was packaged. I also washed the meat and did other various jobs before I started working in leg de-bone in 2001.

2. My hourly rate is $9.35 per hour. Sometimes I work overtime, and I when I do I get paid time and a half for any hours over 40 in one week. I work the day shift, which is called the second shift, and I usually work from 7:47 p.m. central time until about 5:00 p.m. I get two unpaid 30-minute breaks during my shift.

3. When I do my job I have to wear a bump cap, a hair net, safety glasses, an apron, a smock (also called a lab coat), protective sleeves, cotton gloves, cutting gloves, rubber gloves, ear plugs, and boots. I can take home with me my bump cap, boots, safety glasses, hair net, and

ear plugs. I do take them home with me. I put on my boots, bump cap, safety glasses, hair net, and ear plugs when I get out of my car when I arrive at the Dothan facility.

4. I have and use a Kronos time card that I use to clock-in and clock-out at a time clock. I have to use a specific time clock that they told me to use. There are other time clocks that other employees are told to use. As soon as I clock-in, that is when I start getting paid. As soon as I clock-out, that is when I stop getting paid.

5. I typically arrive at the Dothan parking lot between 7:15 a.m. and 7:30 a.m. for my shift start time. When I arrive, I usually sit in my car and listen to radio. When it is time to start my shift, I put on my boots, bump cap, safety glasses, hair net, and ear plugs, get out of my car and walk to the building. When I enter the building, I use the restroom and then sit in the break room until it is my clock-in time. In the break room, I either just sit quietly or work on a puzzle book.

6. At my shift start time, I swipe my time card in at my time clock, which is when I start getting paid. At this time, I am already wearing my boots, bump cap, safety glasses, hair net, and ear plugs. After I clock-in, I go get my lab coat (or apron) and put it on. Then I get my gloves and sleeves and I put them on. Then I sanitize my gloves and go to my line. Then we do our hand exercises and then I start to get to work.

7. My supervisor lets us know when it is time to take a break. My first break is usually at around 10:20 a.m. My second break is usually around 1:20 p.m. When my breaks start, I wash off my boots, and take off my apron and sleeves, which are disposable. Then I wash and dry my gloves and put them in my smock pocket. Then I hang up my smock. Then I go clock-out.

8.   I go to the break room on my breaks, where I eat my sandwich and work my puzzle book, and of course go to the bathroom.  I could leave the building if I wanted to but I want to stay in the break room.  When my break is over, I clock back in.  I then put my smock back on, put on a clean apron and clean sleeves, put my gloves back on, sanitize them, and get back to work on the line.  I cannot clock back in before 30 minutes are up – the time clock won't let me,

9.   When my shift is over, I take everything off before I clock-out, except for my bump cap, ear plugs, hair net, and boots.  I take those things off when I get to my car.  Some people put them in their lockers but I put them in my car.

10. Perdue has trained me not to put on my apron, smock, protective sleeves, cotton gloves, cutting gloves, and rubber gloves until after I clock-in.  They have signs at the time clocks that tell us the same thing.

11. I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.


Dated:  January 4, 2008

_Jeannie Hickman_
Jeannie Hickman

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Action No.: |
| v. | ) | 1:06-CV-1000-MEF-WC |
| | ) | JURY TRIAL DEMANDED |
| PERDUE FARMS INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF LINDA HUDSON

I, Linda Hudson, depose and state the following based on my personal knowledge:

1.  I have worked for Perdue Farms in Dothan, Alabama since July 2007. Before that, I also worked for Perdue between June and October 2006. I am an hourly chicken processing employee. My hourly rate is $9.35 per hour. I work the day shift, or second shift, which means my hours are about 8 a.m. to 5 p.m., with two 30-minute unpaid breaks. My job now is in portions. My job is to slice the meat with a knife into different portions.

2.  To do my job, I have to wear a bump cap, ear plugs, safety goggles, a hair net, cutting gloves, cotton gloves, latex gloves, steel-toed boots, arm guards or sleeves, an apron, and a lab coat. The only items I am allowed to take home are my bump cap, ear plugs, safety goggles, and ear plugs. I do take them home with me. I put on my boots in the morning at home. I put on my bump cap, ear plugs, and safety goggles just before I clock-in at shift start time. The rest of the equipment and clothing I have to wear, I put on after I clock in.

3.  I have a Kronos time card that Perdue gave me. I use the time card to clock in and clock out. I clock in and clock out at a Kronos time clock that has been assigned to me. There are other time clocks that other processing employees are assigned to use. When I clock in and

clock out, most of the time there are supervisors watching me. My paid time starts when I clock in. I do not do any work before I clock in. My paid time ends when I clock out. I do not do any work after I clock out.

4.    I arrive at the plant at around 7:45 a.m. for my 8:00 a.m. shift. When I first get to the plant, I go to the bathroom, wash my hands, and wait in the break area for the time for me to clock in. I can go wherever I want before I clock in, but I want to wait in the break area. At 8:00 a.m. I clock in. When I clock in I am already wearing my bump cap, safety goggles, and ear plugs, and also my boots, which I put on at home. After I clock in, I go to get my coat, apron, sleeves, and gloves, and I put them on. Then I go to my position on the line, dump my hands in sanitizing liquid and then get to work.

5.    My line leader tells us when it is time for break. My breaks usually happen at 10:35 a.m. and then again at about 1:35 p.m. They last 30 minutes, and are unpaid. I can go wherever I want during my breaks, but I choose to go outside and sit on a bench to eat and drink.

6.    When it is time for a break, I take off my arm guard, apron, coat, and gloves, and put them in the assigned areas. Then I go clock out to start my break. I do not do any work on my break. I have to take a full 30 minute break. I cannot clock back in early. When it is time to clock back in, I go to my time clock and clock in. After I clock in, I put on my coat, my apron, my gloves, and my sleeves, and go back to the line. I sanitize my gloves again and get back to work.

7.    When my shift is over, I leave the line and take off my coat, apron, gloves, and sleeves. Then I go to the Kronos time clock and clock out. Then I leave to go home.

8.    Perdue trained me during orientation about how to use the Kronos time clocks. I learned how to use the time cards. I also learned to make sure that we put on our coat, apron,

gloves, and sleeves after we clock in, and to make sure that we take them off before we clock out when we leave for breaks and at the end of the day. There are signs near the break area and near the time clocks that remind me of how to do this.

9. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.


Dated:  January 3, 2008

Linda Hudson

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PERDUE FARMS INCORPORATED, <br><br> Defendant. | Case Action No.: <br> 1:06-CV-1000-MEF-WC <br> JURY TRIAL DEMANDED |

## DECLARATION OF LETICIA JOHNSON

I, Leticia Johnson, depose and state the following based on my personal knowledge:

1.  I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2.  I began working with the Perdue plant in Dothan, Alabama on August 2, 1999.  I have always worked in the leg deboning department.

3.  I work from 7:15 AM to 5PM Monday through Friday.  Sometimes I work on Saturdays and get paid time and a half for hours worked over forty.  I get paid $9.35 per hour.

4.  I arrive early at 6:30 AM, so that I can get my bump hat, hair net, safety glasses, my badge and stop watch out of my trunk.  I also have to put my boots on which are located in my trunk.  I choose to take these items home with me.

5.  After putting on these items, I walk through the gate past security.  I enter the facility and I may sit in the break room and drink a cappuccino until about 7:05.  At around 7:10 AM, I

get up and walk to my assigned Kronos time clock. I make sure I have on my bump hat, ear plugs, hair net, and safety glasses before going upstairs to swipe in.

6.  At 7:15, I swipe in at the third time clock. I get a smock and gloves and then sanitize my hands. Because I am a support leader, I help set up the equipment the department needs to work with that day. I do this until the other leg deboners come in. I make sure I set up and sanitize their mouse traps, arm guards, chain gloves, and extra latex gloves. I also use the same equipment when I debone. I then debone until it is time for my first thirty-minute unpaid meal break.

7.  Around 10:20 AM when it is time for me to take a break, I clean off, take off my chain glove and leave it in a tub, place my rubber gloves in the pocket of my smock, hang my smock, and throw away my plastic sleeves and apron. I then swipe out for break. I keep on my bump hat, safety glasses, ear plugs, and work boots.

8.  During my break I may go to the cafeteria, or get in my car and drive to get something eat if there is a long line in the cafeteria. I can do whatever I want during my break, as long as I'm back within thirty minutes.

9.  Around 10:45 I walk back upstairs to make sure I clock in on time. At 10:50 AM, I clock back into my area. I then go back to the designated area, where we hang our coats. I put on my smock, apron, sleeves, and gloves. I then sanitize my hands and my apron and put on my chain glove.

10. I debone until about 1:20 PM. When it is time for my second break, I repeat the same process. During my second break, I get soda, water, and chips and sit in the break room. Around 1:45 I head back upstairs from the table. I try to go upstairs early because other people

may be swiping in at the same time.  I swipe in at 1:50 PM.  I cannot swipe in before my thirty minutes are up.

11. I put back on my smock, apron, sleeves, and gloves.  I then sanitize my hands and my apron and put on my chain glove.  I get on the line and wait for my lead person to give me a knife.  I work until it is time to go home.

12. When it is time to go home, I wash my hands, put my chain glove in the tub, throw away my rubber gloves, plastic sleeves and apron.  I throw my dirty smock and cotton gloves into a big yellow cart.

13. I finally clock out to go home around 5PM.  I keep on my safety glasses until after I clock out.  I keep on my bump hat, hair net, ear plugs, and work boots until I get back to the parking lot.  I put those items in my car trunk and drive home.

14. When I first started at Perdue, I attended orientation.  I learned about when to clock in and clock out, and how to clock in and out when it is time for my break.  I also received training on what items I need to have on before I clock in.

I declare under penalty of perjury that the forgoing is true and correct.


Dated:  January 3, 2008

*Leticia Johnson*
Leticia Johnson

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) **Case Action No.:** |
| | ) **1:06-CV-1000-MEF-WC** |
| PERDUE FARMS INCORPORATED, | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendant. | ) |
| | ) |

## <u>DECLARATION OF LINDA LEE</u>

I, Linda Lee, depose and state the following based on my personal knowledge:

1.  I am aware of the lawsuit against Perdue, but I cannot participate in the lawsuit because I know I do not work until I swipe in at the time clock. I am thankful for my job and have been with Perdue for 17 years and will celebrate my eighteenth anniversary on November 30, 2008.

2.  When I was first hired on November 30, 1990, I originally worked for Showell Farms as a liver cutter. Perdue Farms bought Showell about 12 years ago. I have performed almost every job on the line. In my current job, I work on the kill floor after the live hang. I cut open the birds that the machine fails to cut. I work on the day shift and my hours are from 5:42a.m. until sometime between 2:00p.m. and 2:30p.m. depending on when the line goes down.

3.  I drive myself to work every day. When I arrive at the plant, I put on my bumpcap, safety glasses and ear plugs. I normally arrive at the plant around 5:30a.m. Then I wait until it is 5:42a.m. and clock in. After I clock in, I put on my assigned white jacket, gloves, check to make sure my ear plugs are in and my apron. I cannot put on my gloves, jacket or apron before I clock in.

4.  I have been told not work before I "hit the clock" and I will get in trouble if I put on my apron, gloves, or jacket before I "hit the clock."  We had a meeting to go over this rule.

5.  I get a breakfast break and a lunch break.  If I have to go the bathroom during a non-break time, I do not have to clock out.  When it is time for break, I take off my apron, gloves and jacket before I swipe out at the time clock.  No one can clock out with an apron, smock or gloves on.

6.  We get 30 minutes for each breakfast and lunch break.  If I try to clock in before the 30 minute break is over, the clock will not accept the swipe.  During our breaks, we can go anywhere, including off the premises.

7.  After we clock back in from break, we put on our smocks, gloves and aprons.

8.  When Perdue first put in the Kronos clock system, supervisors made sure we learned how to use it and stood by the clock to make sure we used it properly.

9.  When the last birds come down the line, my shift is over.  I take off my apron, gloves and jacket and place it back on my assigned hook (No. 25) and then I clock out.

10.  I believe the pay system is fair at Perdue, because I cannot work until I clock in and cannot work after I clock out.

11.     I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign.  I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:  January 3, 2008

Linda Lee

I-WA/2878098.1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DARRYL ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Action No.: |
| v. | ) | 1:06-CV-1000-MEF-WC |
| | ) | JURY TRIAL DEMANDED |
| PERDUE FARMS INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF BRENDA MACK

I, Brenda Mack, depose and state the following based on my personal knowledge:

*1.* I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

*2.* I began working with Perdue's Dothan, Alabama facility on May 7, 2007. I work in TSM making chicken breast tenders.

*3.* I work Monday through Friday and occasionally on Saturdays, for which I get paid over time. My shift begins at 8:00 AM and ends at 5:00 PM. I am paid $9.35 per hour.

*4.* When I arrive at work in the morning, I have on my hair net, ear plugs, hard hat, and water resistant shoes. I do not have to use safety glasses because I wear prescription glasses. When I get out of my car, I walk past the booth with two security guards and show my Perdue identification badge as I past by the guards.

*5.* As soon as I enter the building I walk to the breakroom and talk with friends until three minutes to eight. At three minutes to eight I walk upstairs to my department

time clock. At 8 AM I swipe my Kronos time-keeping badge at clock number two, which is for my department. I have never had to wait to swipe in.

6. After I swipe in, I have three minutes to put on my Perdue smock, my white apron, my cotton gloves, rubber gloves, and sanitize my hands. I then do a hand exercise led by line leader.

7. After that, I begin working in any position I choose, such as the loader, the patter, the slicer, or separator.

8. At either 10 AM or 10:30 I will take my first break. My line leader will announce when it's break. When it is time for break I take off my rubber sleeves, my rubber gloves, cotton gloves, apron, and my white Perdue smock. I place my white Perdue smock on a hook with my name on it. I then go to my assigned clock and swipe out.

9. I swipe out, I walk to the cafeteria. It takes about two to three minutes to get to the cafeteria. I eat a small meal with friends. I may use the restroom after I eat. During my break I have own my bump hat, hair net, ear plugs, work boots, and my badges. I give myself three minutes before the end of my break period to go back upstairs to swipe back in. If I took my break at 10:30 AM, I would swipe back in at 11 AM.

10. I follow the same process I went through in the morning after I swipe. I remove my smock from my hook, put it on, then put on my plastic sleeves, my apron, my cotton gloves, and rubber gloves. I sanitize my hands.

11. I then begin working in the next rotation from where I started in the morning. I work in that rotation until my second unpaid meal break begins at 1:30. I repeat the same process to remove my equipment. I walk to a different breakroom right next to the cafeteria, where I sit and talk with friends, until three minutes until it is time to go back up to the floor.

12. At 2PM I swipe in to begin my last round of work for the day. After I swipe back in, I get dressed and sanitize again while on the clock. I then work at my next rotation until it is time to go home. Around 5PM, my supervisor announces that the day is over.

13. When my supervisor announces the end of my workday, I make sure all of my meat is out of my tray. I throw away all of my disposable items, such as my rubber gloves, apron, and sleeves. I place my cotton gloves and my smock into two separate barrels for laundry. Then, I swipe out and walk out of the building. It takes me about four minutes to get to the exit of the building.

14. When I get back in my car I still have on my boots, my bump hat, my hair net, and my ear plugs. As soon as I get into my car, I take these items off.

15. When I first began working with Perdue, I had one week of orientation. I learned about what goes on in the other departments of the plant and about safety. I also learned how to use my Kronos time-keeping badge. I learned that we must have our bump hat, ear plugs, hair net, and shoes on before we swipe in, and that we could not touch any other items until after we swipe in.

16. At all the time clocks, there are before and after signs showing me what is appropriate to wear before and after I swipe in.

I declare under penalty of perjury that the forgoing is true and correct.


Dated: January 3, 2008

_Brenda Mack_
Brenda Mack

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al.,     ) | |
|     ) | |
| **Plaintiffs,**     ) | |
|     ) | **Case Action No.:** |
| v.     ) | **1:06-CV-1000-MEF-WC** |
|     ) | **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INCORPORATED,**     ) | |
|     ) | |
| **Defendant.**     ) | |
|     ) | |

## DECLARATION OF MARY MARSH

I, Mary Marsh, depose and state the following based on my personal knowledge:

1.   I was hired by Perdue Farms in Dothan, Alabama on September 6, 1991. My job now is line leader in jumbo de-bone. Jumbo de-bone is where we take the bones out of the front half of the chickens, which is where the breasts, wings, and tenders come from. The chickens we de-bone already have had their legs cut off. In addition to the de-bone processing that I do, I also monitor my line to make sure that everything is running well.

2.   My hourly rate is $9.85 per hour. I work the day shift, which means I start work at 7 a.m. My shift end time varies, but I often work until about 6 p.m. I usually work overtime every week, and I get paid time and a half for all hours over 40 in a week.

3.   I am required to wear a bump cap, a hair net, safety glasses, steel-toed boots, ear plugs, a smock, an apron, protective sleeves, cloth gloves, cutting gloves, and rubber gloves. I am allowed to take home my hair net, bump cap, glasses, and ear plugs, or I can leave them in my locker. I choose to leave them in my locker at work. I also leave my boots in my locker. Before I clock-in, I put on my boots, then my bump cap, ear plugs, and hair net.

4.   I clock in and clock out with my Kronos time card.  I start getting paid when I clock in.  I stop getting paid when I clock out.  I use a time clock that is near the lockers and right before you enter the kill floor.  That time clock has been assigned to me.  There are other time clocks that other processing employees use.

5.   I normally get to the plant at around 6:15 a.m. for my shift that starts at 7 a.m.  When I arrive, I go to the break room to sit down.  I can also sit outside or somewhere else before my shift starts, but I choose to sit in the break room because it is quiet and empty at that time.  I usually just sit there and read the Bible.

6.   When it is time to clock in, I go to my locker and get my bump cap, hair net, boots, and ear plugs, and I put them on.  Then I clock in.  After I clock in I put on my safety glasses and then I walk to my assigned production area.  When I get to my assigned production area, I put on my apron, smock, lab coat, sleeves, and gloves.  All of this happens after I clock in.

7.   During the day I get two 30-minute unpaid breaks.  During my breaks I can go wherever I want.  I choose to take my breaks in the break room.  When it is time for my breaks, I take off my gloves, apron, sleeves, smock, and lab coat.  Then I go to clock out.  I cannot take a break that is shorter than 30 minutes because the time clock will not let me clock in before 30 minutes have passed.  When my break is over, I come back to the time clock and clock in.  After I clock back in after my break is over, I put back on my gloves, apron, sleeves, smock, and lab coat.  When I leave for the day, I make sure to take off my gloves, apron, sleeves, smock, and lab coat before I clock out.

8.   Near the time clocks there are signs in both English and Spanish that tell us to clock in before touching any gloves, apron, sleeves, smocks, or lab coats.  There is a picture on the sign to make it clear to everyone.

9.   I am over the age of eighteen and am not a party to this action.  I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.


Dated:  January 3, 2008

_____
Mary Marsh

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.,          )
                                  )
        Plaintiffs,               )
                                  )
    v.                            )        Case Action No.:
                                  )        1:06-CV-1000-MEF-WC
PERDUE FARMS INCORPORATED,        )        JURY TRIAL DEMANDED
                                  )
        Defendant.                )
                                  )

## DECLARATION OF MALACKER REYNOLDS

I, Malacker Reynolds, depose and state the following based on my personal knowledge:

1.    My job at the Perdue Farms facility in Dothan, Alabama is to cut wings off birds as they pass by me on a conveyor belt. I also grade wings, which means I throw out the bad ones, which are the ones that are little bloody. I rotate from cutting and grading every shift. I was hired by Cooking Good, now Perdue Farms, on March 24, 1995. I work the day shift from about 7:48 a.m. until about 5 p.m. I sometimes work overtime and when I do I get paid time and a half for every hour over 40 hours in one week.

2.    I am required to wear ear plugs, safety glasses, a smock, an apron, gloves, sleeves, boots, a bump cap, and a hair net to do my job. I can and do take home with me my cap, hair net, glasses, boots, and ear plugs. The other items I leave at work and take off before I clock-out.

3.    I use my Kronos time card to clock in and to clock out. I have a time clock that I have to use. It is assigned to me. I am paid for all the time from when I clock in until I clock out. Supervises watch me clock in and clock out.

4.    I normally get to work in the morning at about 7:15 a.m. I arrive a little early and sit in my car and drink coffee and read the paper. I can go anywhere I want before I clock in but I

choose to spend that time in my car. While I am in my car, I put on my hair net, ear plugs, and bump cap. My boots are already on – I put then on at home – and my goggles are hanging around my neck. When it is close to the time to clock-in, I walk into the building and head to the break room where I might sit for a few more minutes. When it is time to clock-in I walk to my time clock and clock in.

5. After I clock in I put on my lab coat and apron and gloves and sleeves. Then I go the line, where I sanitize my hands and do my hand exercises. Then I start to work.

6. I take off my coat and apron and gloves and sleeves before I clock out for my breaks. I put them on after I clock in when I return from breaks. My breaks are 30-minutes. They are unpaid and I get two of them each shift. I can go wherever I want on my break, but I bring my own lunch and I choose to stay in the break room and eat my lunch there.

7. When I leave at the end of my shift, I take off my lab coat and apron and gloves and sleeves before I clock out.

8. Perdue trained us and there are signs that remind us when to put on and take off our lab coats and aprons and gloves and sleeves. We are supposed to put them on after we clock in. We are supposed to take them off after we clock out.

9. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 4, 2008

Malacker Reynolds

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case Action No.: |
| v.     ) | 1:06-CV-1000-MEF-WC |
| ) | JURY TRIAL DEMANDED |
| PERDUE FARMS INCORPORATED, ) | |
| ) | |
| Defendant.     ) | |
| ) | |

## DECLARATION OF TAMMY RICHARDS

I, Tammy Richards, depose and state the following based on my personal knowledge:

1.  I was hired by Perdue Farms in Dothan, Alabama on October 17, 2002. I am an hourly chicken processing employee. I work in slicing, which is where the breast is cut in half. Employees who work the slicing line guide the breast through a machine that does the cutting. The cut breast then travels into another machine for further processing. I am a support leader for my supervisor. I have worked in slicing for about two years. I have also worked in "portion," which is another place where the breast is cut and weighed before it goes to further processing.

2.  I work second shift, which is the day shift. My shift is 7:00 a.m. until 6 p.m. I get two unpaid 30-minute breaks. I work 50 hours a week. I get paid approximately $9.35 per hour, and I get paid overtime at time and a half for the hours worked over 40 in each week.

3.  I am required to wear steel-toed boots, safety glasses, ear plugs, hair net, bump cap, smock, white lab coat, protective arm sleeves, and protective rubber and cotton gloves. I can take my hair net home with me, but normally I just throw it away each day. I also can take my boots, glasses, ear plugs, hair net and bump cap home with me, because they are my own

personal items.  I choose to take these items home with me, although I also could leave them in my locker.

4.  I put my boots on when I get dressed in the morning.  I put on my safety glasses, ear plugs, hair net and bump cap just before I clock-in, although I could put them on any time before then, such as at my car or in the break room.  I put on my smock, lab coat, sleeves, and gloves after I clock-in, just before I start working.

5.  I have a Kronos time card that I wear around my neck.  I clock-in and out, or swipe it, at my assigned Kronos time clock.  There are other time clocks around the building, but I have to use the one that is assigned to me.  Supervisors watch me when I use the time clocks.  I start getting paid when I clock-in.  I stop getting paid when I clock-out.

6.  I normally arrive at work at about 6:30 a.m. for my 7:00 a.m. start time.  When I arrive at 6:30, I sit at my car until it is time for me to clock-in.  I could also use the break room or go anywhere else I want before my shift starts, but I choose to just chill in my car.

7.  When it is time for my shift to start, I go to the trunk of my car and get my bump cap, ear plugs, time card, and hair net, and put them on.  I then walk into the building and go to my assigned time clock, where I clock-in.  After I clock-in, I get my supplies – knives, arm guards, sharpeners, and meat identification tags.  Then I put on my smock, gloves, and lab coat, and then dip the supplies in bleach water and distribute the supplies to the lines.

8.  My first 30-minute unpaid break starts at about 11:30 a.m. or 12:00 p.m.  My second 30-minute unpaid break usually starts at about 3:00 p.m.  When my break starts, I take off my smock, lab coat, sleeves, and gloves.  I throw away my smock and sleeves, and hang up my smock and lab coat.  Then I go to clock out.  After I clock out I go to the break room to eat.  I could go anywhere I want to, but I like the break room.  I wear my bump cap, hair net, safety

glasses, boots and ear plugs during my break. When my break ends, I go to clock back in. The time clock will not let me clock in before 30 minutes has passed. After I clock back in, I put back on my smock, lab coat, sleeves, and gloves, and get back to work.

9.   When my shift ends, I clean the supplies, and then take off my smock, sleeves, gloves, and lab coat. Then I clock out and go home.

10. Perdue trained me how to use Kronos and when to put on my required gear. They told me not to touch my smock, lab coat, sleeves, or gloves before clocking in and I follow those rules. There are signs all over the facility that remind us of these rules. There are signs by the time clocks and supervisors are also there to remind us.

11. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.


Dated:  January 3, 2008

_Tammy Richards_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **DARRYL ANDERSON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case Action No.:** |
| **v.** ) | **1:06-CV-1000-MEF-WC** |
| ) | **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INCORPORATED,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF DANEASHIA SMITH

I, Daneashia Smith, depose and state the following based on my personal knowledge:

1.  I was hired by Perdue on July 29, 2005, and started as a shoulder cutter on the day shift. I later moved to TSM, which is a slicing machine where the breast meat is cut and I remain on the day shift. My hours are from 7:30a.m. to 5p.m. I am the Operator on my line, which means I change blades on the machines, show new employees how to do the job and just perform extra duties based on my experience.

2.  I currently make $9.60 an hour. When I started, I made $7.50 an hour. I normally work 40 hours a week, but at times, I work weekends where I make time and a half.

3.  I ride with other employees to work. Before I come to work, I put on my boots, badge, stopwatch, safety glasses and hair net which I keep at home. I am required to wear these items while working. I put on my bumpcap and my earplugs right before I clock in.

4.  I use a Kronos card to clock in. I do not perform any work before I clock in with my Kronos card. I usually arrive at work around 6:45a.m. due to the hours of the person that I ride with and I clock in at 7:30a.m. From 6:45.m. to 7:30a.m. I usually just sit in the breakroom

before my shift starts, talking with co-workers. I but my bumpcap and ear plugs on in the breakroom.

5. At 7:30a.m. I clock in. There are supervisors around the time clock at the time I clock in. As soon as I clock in, my paid time starts running and it stops, after I clock out. I do not do any work before I clock in, or after I clock out.

6. After I clock in, I walk to my work station, and then I put on my smock, apron, cutting gloves, sleaves and rubber gloves over my cutting gloves.

7. I get two breaks per shift. Each break is 30 minutes long. When the line leader says it is time for break, I tell the people around me and I, along with others, take off my apron, smock, gloves and then we clock out. We go to the break room or anywhere else we choose. We can leave the premises during the break.

8. We have to clock in after a full thirty minutes, or the time clock will reject the swipe of the Kronos card. After we clock back in from break, we put on our smock, apron, and gloves.

9. At the end of the shift, I take off my apron, smock, gloves, and then I clock out.

10. When I was hired in 2005, I was given my Kronos card and I.D. badge. I was taught how to use to use the Kronos card, and I was told not to do any work before I clocked in.

11. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

I declare under penalty of perjury that the forgoing is true and correct.


Dated: January 3, 2008

Daneashia Smith

39 of 106 DOCUMENTS

Copyright 2001 PR Newswire Association LLC
All Rights Reserved
U.S. Newswire

January 10, 2001, Wednesday

**SECTION:** NATIONAL DESK

**LENGTH:** 603 words

**HEADLINE:** Labor Department **Survey** Finds Pervasive Labor Law Non-Compliance In **Poultry** Processing Plants

**DATELINE:** WASHINGTON, Jan. 10

**BODY:**
The following was released today by the U.S. **Department of Labor:**

A second investigation-based compliance **survey** of the nation's **poultry** processing plants by the U.S. **Department of Labor's Wage and Hour** Division has found none of the plants to be in full compliance with the Fair Labor Standards Act (FLSA), the Migrant and Seasonal Agricultural Worker Protection Act (MSPA), and the Family and Medical Leave Act (FMLA).

"We are disappointed with the overall lack of compliance this **survey** found," said Bernard E. Anderson, assistant secretary for the Employment Standards Administration. "However, we note that fewer live haul crews are employed in violation of the overtime requirement since our last **survey.** We believe that this improvement in compliance is attributable to the department's extensive education and outreach efforts. We also believe that the **survey** process and continued education will help increase compliance in this highly competitive industry -- an industry that is experiencing rapid growth and high worker turnover which can often lead to compliance problems."

The department's first **survey** in 1997 found fewer than 40 percent of the plants investigated at that time in compliance with the FLSA, which sets federal minimum wage, overtime pay and child labor requirements. The majority of violations involved failure to properly pay overtime.

The 2000 **survey** was conducted from February through August and involved investigations of a randomly selected sample of 51 of the 174 plants in the U.S. Eleven plants were also in the 1997 **survey.** The 2000 **survey** again found violations of the FLSA, including failure to pay employees for all hours worked, failure to pay proper overtime, and making improper deductions from employees' wages. Since the 1997 **survey,** however, there was some improvement in the level of compliance regarding overtime pay for live haul crews.

Live haul workers catch chickens in the chicken houses and load them into cages for transportation to the processing plants.

Two plants in the 2000 **survey** had child labor violations involving hazardous occupations orders and/or the hours-of-work standards for

Labor Department Survey Finds Pervasive Labor Law Non-Compliance In Poultry Processing Plants U.S. Newswire
January 10, 2001, Wednesday

minors.

Under the Migrant and Seasonal Agricultural Worker Protection Act, contractors who provide farm labor crews must be registered with the Labor Department and must meet standards for paying crew members. MSPA also sets health and safety standards for employer-provided housing and for vehicles used to transport farm workers.

The **survey** found that fewer than 20 percent of contractors running live haul crews subject to MSPA were registered as required by MSPA. However, more than 90 percent of employer-provided housing met safety and health standards, over 80 percent of the crews used safe vehicles to transport workers, and 60 percent or more live haul workers were paid all wages owed when due.

Family and Medical Leave Act violations were found in two plants. The law allows covered workers to take up to 12 weeks of unpaid, job-protected leave per year. It also requires that group health benefits be maintained during the leave.

The department's **Wage and Hour** Division, which conducted the **survey** investigations, is meeting with each of the plants to explain the violations and obtain compliance in the future.

---

Additional information about the provisions of the FLSA, MSPA and FMLA, may be found at www.dol.gov.

KEYWORDS:

JOBS/LABOR, GOVERNMENT

CONTACT:Clinton Coleman, Jr. of the U.S. Department of    Labor, 202-693-0376

**LOAD-DATE:** January 10, 2001

Copyright 2001 The Washington Times LLC
All Rights Reserved
The Washington Times

**January** 15, 2001, Monday, Final Edition

**SECTION:** PART D; BUSINESS TIMES; Pg. D3

**LENGTH:** 864 words

**HEADLINE: Survey finds poultry plants flout wage rules**

**BYLINE:** Tom Ramstack; THE WASHINGTON TIMES

**BODY:**

The Labor Department reported last week that its **survey of poultry** plants nationwide - including one in Maryland and one in Virginia - found widespread violations of workers' rights.

Typical violations included not paying overtime and refusing to pay workers hourly wages they earned.  None of the 51 plants **surveyed** completely complied with federal labor laws, the Labor Department says.

The Labor Department refused to identify the Maryland and Virginia plants that were investigated.  "We are not releasing the names of the plants that were **surveyed** because in many cases the investigations continue," says Clint Coleman, Labor Department spokesman.

However, Salisbury, Md.-based Perdue Farms Inc.  is accused in a lawsuit pending in U.S.  District Court in Delaware of failing to adequately pay workers.

The lawsuit was one of two filed in 1999 against Perdue Farms and competitor Tyson Foods by the companies' employees with the assistance of the Washington-based United Food and Commercial Workers Union.  Both suits claim the workers were not paid wages they were owed.  The union represents 30 percent of the nation's **poultry** workers, many of whom are new immigrants.

Tita Cherrier, Perdue Farms spokesman, says, "It's our policy not to comment on pending litigation."

Jill Cashen, spokesman for the union, says the Labor Department's **survey** demonstrated examples of the union's grievances against **poultry** plants.  "We will certainly use this information and these data as an outreach tool as much as possible," she says.

A United Food and Commercial Workers Union statement says, "**Poultry** workers perform dangerous, backbreaking and unpleasant work day after day to put food on America's dinner table.  Yet the big **poultry** companies, particularly plants without union protection for workers, break the law and cheat them out of their fair wages."

Richard Lobb, spokesman for the National Chicken Council, says the Labor Department's claims involve a dispute with **poultry** producers about how to interpret federal labor laws.

"The big thing that they are arguing about consists of the fact that our companies generally do not pay employees for coming into the building, putting on their smocks and hairnets and going to their place in line," Mr. Lobb says.  "The

Survey finds poultry plants flout wage rules The Washington Times January 15, 2001, Monday, Final Edition

vast bulk of what they have in there revolves around that issue. The custom and practice in the industry is that the employees' time begins when the work starts. It does not start in the locker room. That's the way we've done it for many years."

The violations of child labor laws claimed by the Labor Department involved teen-agers who lied about their ages to get jobs, he says. "The other things in that report were minor violations." Mr. Lobb says.

The Labor Department noted some improvements since a 1997 survey of poultry plants. Nevertheless, it reported violations of the Fair Labor Standards Act (FLSA), the Migrant and Seasonal Agricultural Worker Protection Act (MSPA), and the Family and Medical Leave Act (FMLA).

The department's first survey in 1997 found fewer than 40 percent of the plants investigated complied with the FLSA, which sets federal minimum wage, overtime pay and child labor standards. Most violations involved failure to properly pay overtime.

The 2000 survey was conducted from February through August and involved investigations of a randomly selected sample of 51 of the 174 plants in the United States. Eleven of the plants also were in the 1997 survey. The 2000 survey again found violations of the FLSA, including failure to pay employees for all hours worked, failure to pay proper overtime and making improper deductions from employees' wages.

Since the 1997 survey, however, there was some improvement in the level of compliance regarding overtime pay for live haul crews, the Labor Department says.

Live haul workers catch chickens in the chicken houses and load them into cages for transportation to the processing plants.

Two plants in the 2000 survey had child labor violations involving hazardous occupations orders or hours-of-work standards for minors.

Under the Migrant and Seasonal Agricultural Worker Protection Act, contractors who provide farm labor crews must be registered with the Labor Department and must meet standards for paying crew members. The MSPA also sets health and safety standards for employer-provided housing and for vehicles used to transport farm workers.

The survey found that fewer than 20 percent of contractors running live haul crews subject were registered under requirements of the MSPA. However, more than 90 percent of employer-provided housing met safety and health standards, over 80 percent of the crews used safe vehicles to transport workers and 60 percent or more live haul workers were paid all wages owed when due.

Family and Medical Leave Act violations were found in two plants. The law allows covered workers to take up to 12 weeks of unpaid, job-protected leave per year. It also requires that group health benefits be maintained during the leave.

The Labor Department says representatives of its Wage and Hour Division would try to compel the plants to comply with the laws.

LOAD-DATE: January 15, 2001

Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: 202.739.3000
Fax: 202.739.3001
www.morganlewis.com

**Morgan Lewis**
C O U N S E L O R S   A T   L A W

**James J. Kelley, II**
Partner
202.739.5095
jkelley@morganlewis.com

January 29, 2007

**FOR SETTLEMENT PURPOSES ONLY**
**NOT ADMISSIBLE IN ANY PROCEEDING**

Robert Camp, Esquire                    Richard Celler, Esquire
Cochran, Cherry, Givens, Smith,         Morgan & Morgan
Lane & Taylor, PC                       284 South University Drive
163 West Main Street                    Fort Lauderdale, Florida  33324
P.O. Box 927
Dothan, Alabama  36302

Re:    *Anderson, et al. v. Perdue Farms, Incorporated*
       Civil Action No. 1:06 CV 1000 – WKW

Gentlemen:

As we have discussed, this letter sets forth the actual time recording and pay practices in Perdue's Dothan, Alabama processing facility. As we explained, these actual practices were established in a close working arrangement with representatives from the United States Department of Labor (DOL) in accordance with a settlement agreement between Perdue Farms, Inc. and the United States Department of Labor dated May 9, 2002 (DOL Settlement). Under that settlement, which was an outgrowth of the DOL's Poultry Donning and Doffing Initiative, Perdue undertook to develop donning and doffing procedures and time recording practices compliant with the Act which could be a model for the industry. Perdue representatives and representatives from the Office of the Solicitor, the Wage and Hour Administration, a Regional Solicitor and the Director of the Poultry Task Force worked together, plant-by-plant and shift by shift, in all eighteen Perdue processing facilities. for nearly one year to develop systems which captured all compensable time from the first principal activity to the last activity in a typical work day in a Perdue processing plant. The Dothan, Alabama facility was the third facility visited and when the process was completed, the combined team returned to Dothan to finally approve the process in application. As you will note, the process they devised, which is actually

1-WA/2694896.1

January 29, 2007
Page 2

**Morgan Lewis**
COUNSELORS AT LAW

in place in Dothan (and all other Perdue facilities), is sharply at odds with the allegations set forth in the Complaint you filed against Perdue Farms, Inc.

With respect to time recording, the key to the Perdue process is the time and attendance recording system developed with the assistance of the Kronos Corporation. Kronos' clock and swiping systems are strategically situated at various locations throughout the Plant. Each Perdue production employee is assigned a swipe card and swipes into the Kronos system each workday at a designated starting area **before** donning or acquiring work related equipment and clothing. (Some non-unique gear is worn to/from home.)   After swiping into the system, the employees don the required clothing, collect their gear and walk to the production line or other work area on paid time.

Perdue provides an unpaid 30 minute break period each day. Employees leave the work area, doff their required clothing and gear at a designated place and swipe out on the Kronos system **before** commencing the unpaid break period.  Employees are not allowed to swipe back in until 30 minutes later.  In fact, the Kronos system will not permit an employee to swipe back in within 30 minutes of when the employee swiped out.  **After** swiping back in, employees don their gear and walk to the work station, on paid time, to resume work.

The process is reversed at the end of the work day.  Employees walk back from the work area, doff required clothing and gear and deposit it in assigned bins and then swipe out on the designated Kronos clock.  Perdue employees are paid for all time captured by the Kronos system. As we have explained previously, since this system was introduced in the Perdue plants, Perdue has not calculated pay entitlements based on line time, master time cards or any other similar practices.

Under these circumstances, there is no meaningful purpose to be served by pursuing this litigation.  Perdue has voluntarily modified its time recording system and pay practices with the specific assistance and approval of the United States Department of Labor.  The Perdue employees on board in 2002 were already made whole under the DOL settlement and since the introduction of the Kronos system have indisputably been paid in accordance with the Fair Labor Standards Act and its implementing regulations.  We appreciate that your prior experience in the poultry industry may have given you some insight into long standing business practices common to many poultry processors.  We also appreciate your candid admission that you have never been in a Perdue plant.  As we hope you can now appreciate, at least since the middle of 2003, Perdue has operated very differently than much, if not all, of the poultry processing industry and, as far as we are aware, is unique in the industry in these regards.

1-WA/2694896.1

January 29, 2007
Page 3

**Morgan Lewis**
C O U N S E L O R S   A T   L A W

We have also discussed your allegation that the security clearance process starts the regular workday. Perdue acknowledges that all employees and visitors to the Perdue plant are required to display a badge and are subject to minimal security monitoring procedures. All persons, not just production related employees, who enter Perdue production areas are subject to the security process. Perdue maintains that passing a security checkpoint does not constitute work and is, by no means, an integral activity of a poultry production employee. Under the Act, only that preliminary time which is "an integral and indispensable part of the principal activities … for which other workmen are employed" constitutes "principal activities." See *Steiner v. Mitchell*, 350 U.S. at 256 and *IBP v. Alvarez*, Slip Op. at 7. We can all agree that since 9/11, security procedures have become commonplace but as we have advised you previously, we have searched diligently and have uncovered no case which establishes that clearance of the security checkpoint constitutes the first principal activity of the work day for any class of employees. Legally, we believe the effort involved satisfies the traditional regulatory standards for preliminary time under Section 4 of the Portal-To-Portal Act and 29 CFR § 790.7. Even if it did not, the minimum time involved in walking past the security checkpoint and flashing a badge would qualify as *de minimus*.

For the reasons we describe, no valid claim can be brought against Perdue for so-called "donning and doffing" or walking time to and from the production line and while we do not believe that a valid claim could be raised with respect to security screening, we suggest that if you were to establish security clearance as a first principal activity, a claim could be raised at any subsequent time. Clearly, it does not serve your purposes to litigate that issue, standing alone, against this Company. Perdue is a long term member of the Dothan business community and would be prepared to deal with such allegations in the future if the state of the law evolves to the point where it is so required.

Sincerely,

James J. Kelley
Attorney for
Perdue Farms, Incorporated

1-WA/2694896.1



**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division
Washington, D.C. 20210

May 31, 2006

WAGE AND HOUR ADVISORY MEMORANDUM NO. 2006-2

MEMORANDUM FOR REGIONAL ADMINISTRATORS
                DISTRICT DIRECTORS

FROM:          ALFRED B. ROBINSON, JR.
               Acting Administrator

SUBJECT:       IBP v. Alvarez, 126 S.Ct. 514 (2005)

This memorandum advises staff of the state of the law after the Supreme
Court's decision in IBP v. Alvarez, 126 S.Ct. 514 (2005) (together with
Barber Foods v. Tum).

The Supreme Court's Decision

The Supreme Court's unanimous decision in Alvarez holds that employees who
work in meat and poultry processing plants must be paid for the time they
spend walking between the place where they put on and take off protective
equipment and the place where they process the meat or poultry.  The Court
determined that donning and doffing gear [1] is a "principal activity" under the
Portal to Portal Act, 29 U.S.C. 254, and thus time spent in those activities,
as well as any walking and waiting time that occurs after the employee
engages in his first principal activity and before he finishes his last
principal activity, is part of a "continuous workday" and is compensable
under the Fair Labor Standards Act (FLSA), 29 U.S.C. 201 et seq. The Court
also held that waiting time before the first principal activity is not
compensable, unless the employees are required to report to work at a
specific time.

_____

[1] Although the Supreme Court did not define "donning and doffing," the First
Circuit held that donning includes the obtaining of equipment. Tum v. Barber
Foods, 331 F.3d 1, 9 (1st Cir. 2004).  That finding is consistent with the
Department's long held view.

The First Circuit's ruling is buttressed by the Court's ruling in IBP v.
Alvarez that waiting to obtain required gear is not compensable because
"unlike the donning of certain types of protective gear which is *always*
essential if the worker is to do his job, the waiting may or may not be
necessary in particular situations or for every employee" (emphasis in
original).  Since, like donning, obtaining the gear (as opposed to waiting to
obtain the gear) "is always essential if the worker is to do his job," the
compensable day starts once the employee has obtained the gear required to be
stored on the premises by taking an item out of a bin, a locker or another
designated storage area.

The Meaning of "Work"

In order to reach this result, the Supreme Court reviewed and reaffirmed its historic definition of "work" under the FLSA.  The Court stated that it has defined the terms "work" and "workweek" "broadly."   It explained that although it had initially defined "work," in Tennessee Coal, Iron & R.Co. v. Muscoda Local No 123, 321 U.S. 590 (1944), as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business," it soon clarified, in Armour & Co. v. Wantock, 323 U.S. 126 (1944), that "exertion" was not necessary for an activity to constitute "work."  Two years later, in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946), the Court noted that it defined "the statutory workweek" to "include all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." The Court in Alvarez then emphasized that, other than its express exceptions for travel to and from an employee's principal activity and for other preliminary or postliminary activities, the Portal-to-Portal Act does not change the conception of "work" or define the workday.

Therefore, the time, no matter how minimal, that an employee is required to spend putting on and taking off gear on the employer's premises is compensable "work" under the FLSA.

The Portal-to-Portal Act

As noted above, the Supreme Court's central holding in Alvarez is that time spent after the beginning of the first principal activity, including time spent walking, is not affected by section 4(a) of the Portal-to-Portal Act, 29 U.S.C. 254(a), and is therefore compensable.  In upholding the "continuous workday" principle incorporated in DOL regulations, the Court stated:

> [D]uring a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of the [Portal Act], and as a result is covered by the FLSA.

The Court therefore reversed that part of the First Circuit's decision in Tum v. Barber Foods, 331 F.3d 1, 4-5 (2003), which held that walking time which took place after the first principal activity was excluded from compensation under the Portal Act.

Similarly, in fashioning its holding, the Court rejected the argument that an activity that is integral and indispensable to a principal activity may not start the workday.  The Court noted that in Steiner v. Mitchell, 350 U.S. 247 (1956), it "made clear" that activities that are integral and indispensable to principal activities are themselves principal activities that start the workday.  As stated by the Court,

> [W]e hold that any activity that is 'integral and indispensable to a principal activity' is itself a 'principal activity' under section 4(a) of the Portal-to-Portal Act.

<u>Donning and Doffing of "Nonunique" Gear in Processing Plants</u>

The Supreme Court in <u>Alvarez</u> did not rule directly on the compensability of donning and doffing of "nonunique" gear such as hairnets, goggles, hardhats and smocks, because it was conceded or the courts below held that donning and doffing of the gear at issue in these cases was a principal activity. The Court, however, framed the issue to be decided as involving walking time after the donning of required gear "that the courts below found integral and indispensable to the employees' work." In <u>Steiner</u>, the Court held that changing into and out of old work clothes at a battery plant was an integral and indispensable part of the workers' principal activities, and therefore compensable. And the regulation at 29 C.F.R. 790.8 n.65 provides that any clothes changing on the employer's premises, which is required by law, the employer, or the nature of the work is compensable.[2] The Court in <u>Alvarez</u> ruled that the principles enunciated in <u>Steiner</u> were applicable to the cases before it, and endorsed the Secretary's regulations. Accordingly, whether required gear is "unique" or "non-unique" is irrelevant to whether donning and doffing is a principal activity.

The Ninth Circuit in <u>Alvarez</u>,339 F.3d 894,903-904 (9th Cir. 2003)indicated that the "specific tasks" of donning and doffing "non-unique" gear, such as hardhats and safety goggles (as opposed to "unique" equipment), while integral and indispensable to the employees' principal activities, were not compensable because they were "de minimis as a matter of law." As the government's Supreme Court amicus brief in <u>Alvarez</u> states, the Ninth Circuit erred in its application of the de minimis rule. The de minimis rule applies to the aggregate amount of time for which an employee seeks compensation, not separately to each discrete activity, and particularly not to certain activities "as a matter of law." The Supreme Court's continuous workday rationale renders the Ninth Circuit's "de minimis as a matter of law" discussion untenable.

However, donning and doffing of required gear is within the continuous workday only when the employer or the nature of the job mandates that it take place on the employer's premises. It is our longstanding position that if employees have the option and the ability to change into the required gear at home, changing into that gear is not a principal activity, even when it takes place at the plant. See FOH section 31b13 (dressing at home is not compensable).

<u>De Minimis Activities</u>

The Supreme Court also did not rule directly on the scope and meaning of de minimis activities, or on the effect of de minimis activities on the compensability of donning, doffing, walking and waiting time. It is important to note, however, that the "required protective gear" at issue in <u>Tum</u> included, and for some employees was limited to, lab coats, hairnets, earplugs and safety glasses. [3] The jury in <u>Tum</u> found that the donning and doffing of this gear, taken alone, was de minimis. The First Circuit ruled

---

[2] On the other hand, gear used only to keep employees' personal clothing from getting soiled is not "required by the nature of the work."
[3] The Supreme Court noted that the parties in Tum had "stipulated that four categories of workers - rotating, set-up, meatroom, and shipping and receiving associates - were required to don [and doff] protective gear." The rotating associates were required to wear lab coats, hairnets, earplugs and safety glasses. Tum v. Barber Foods, 331 F.3d at 3.

that the post-donning and pre-doffing waiting and walking was preliminary and therefore did not need to be considered in addition to the donning and doffing time.  The Supreme Court reversed and remanded to the First Circuit for further proceedings, concluding that "during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded" from the Portal Act and thus is compensable.

Alvarez thus clearly stands for the proposition that where the aggregate time spent donning, walking, waiting and doffing exceeds the de minimis standard, it is compensable.  Any other conclusion would be inconsistent with the continuous workday rule. It would also appear to render the Supreme Court's holding in Tum an advisory opinion, and leave the Court's remand of the case to the First Circuit devoid of any apparent purpose.