**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS , INC.,** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |
| | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Robert J. Camp
Bernard D. Nomberg
505 North 20th Street, Suite 825
Birmingham, AL 35203
205-244-1115 Phone
205-244-1171 fax
**rcamp@cochranfirm.com**
**bnomberg@cochranfirm.com**

Samuel A. Cherry
Lance H. Swanner
Cochran, Cherry Given Smith
Lane & Taylor
P.O. Box 927
Dothan, Alabama 36302
334-793-1555-phone
334-836-2500-facsimile
**lswanner@cochranfirm.com**
**scherry@cochranfirm.com**

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... iii

I. INTRODUCTION .......... 1

II. PLAINTIFF RESPONSE TO DEFENDANT STATEMENT OF UNDISPUTED FACTS .......... 5

III. PLAINTIFFS' ADDITIONAL UNDISPUTED FACTS .......... 20

IV. PROCEDURAL HISTORY .......... 21

V. STANDARD SUMMARY JUDGEMENT .......... 21

VI. ARGUMENT .......... 23

A. Principal Activities vs. Preliminary Activities .......... 23

B. Donning and Doffing of Hair Nets, Beard Nets, Ear Plugs, Bump Caps, Slip Resistant Boots and Safety Glasses as Principal Activities. .......... 30

C. Defendant's Assertion these Activities are Non-Compensable because Employee have an option to Take Their PPE Home .......... 32

D. Obtaining Equipment is a Principal Activity .......... 37

E. Employees Sanitizing Boots is a Principal Activity .......... 38

F. Employees Performing Compensable Activities While on break .......... 39

G. Perdue Suffers or Permits it Employees to Perform Work .......... 42

H. Clearing Security is a Principal Activity .......... 44

I. Plaintiffs' Claims Are Not *De Minimis* .......... 45

# TABLE OF AUTHORITIES

Page

**Cases**

*Allen v. Board of Public Educ. for Bibb County*,
495 F.3d 1306 (11th Cir. 2007)....................22, 42

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................22

*Anderson v. Mt. Clements Pottery Co.*,
328 U.S. 680 (1946)....................47

*Anderson v. Pilgrim's Pride Corp.*,
147 F.Supp. 2d 556 (E.D.Tex.2001)....................25

*Armour & Co. v. Wantock*,
323 U.S. 126 (1944)....................23

*Ballaris v. Wacker Siltronic Corp.*,
370 F.3d 901 (9th Cir. 2004)....................27

*Barrentine v. Arkansas-Best Freight System, Inc.*
750 F.2d 47 (8th Cir. 1984)....................24

*Bonilla v. Baker Concrete Constr., Inc.*
487 F.3d 1340 (11th Cir. 2007)....................35

*Brock v. The Claridge Hotel and Casino*,
664 F.Supp. 899, (D.N.J.1986)....................42

*Brusstar v. Southeastern Pennsylvania Transp. Authority*,
1988 WL 85657 (E.D.Pa.,1988)....................51

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................21, 22, 46

*Chao v. Tyson Foods, Inc.*,
2008 WL 2020323 (N.D. Ala.)....................*passim*

*Ciemnoczolowski v. Q.O. Ordinance Corp.*,
228 F.2d 929 (8th Cir. 1955)....................25

*Colindres v. QuietFlex Mfg.*,
427 F. Supp. 2d 737 (S.D. Tex. 2006)....................24

*Davis v. Charoen Pokphand (USA), Inc.*,
302 F.Supp.2d 1314 (M.D.Ala. 2004)............................................*passim*

*De Asencio v. Tyson*,
500 F.3d 361, (3rd Cir. 2007)...................................................*passim*

*Dunlop v. City Elec.*, Inc.
527 F.2d (5th Cir. 1976)....................................................24, 28, 44

*Fox v. Tyson Foods, Inc.*,
2002 WL 32987224 11 (N.D.Ala.)......................................30, 36-39, 48

*Frank v. Wilson & Co.*,
172 F.2d 712, 716 (7th. Cir. 1949)...................................................46

*Garcia v. Tyson Foods, Inc.*,
474 F.Supp.2d 1240 (D.Kan.2007)..................................................27

*Gorman v. Consol. Edison Corp.*,
488 F.3d 586 (2nd Cir. 2007)...........................................24, 25, 27, 28

*IBP, Inc. v. Alvarez*,
546 U.S. 21 (2005)..........................................................*passim*

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
07-cv-449-bbc (W.D. Wis. 2008)...........................................46, 47, 50

*Kohleim v. Glyn County*,
915 F.2d 1473 (11th Cir. 1990)..................................................... 35

*Lemmon v. City of San Leandro*,
538 F.Supp.2d 1200 (N.D.Cal.2007)................................................34

*Lindow v. United States*,
738 F.2d 1057 (9th Cir. 1984)...............................................24, 49, 51

*Nardone v. General Motors, Inc.*,
207 F. Supp. 336 (D.N.J 1962).....................................................25

*Reich v. IBP, Inc.*
38 F.3d 1123 (10th Cir. 1994)...............................................26, 27, 42

*Reyna v. ConAgra Foods, Inc.*,
Slip Copy, 2006WK3667231 (M.D.Ga.)..............................................42

*Samples ex rel. Samples v. City of Atlanta*,
846 F.2d 1328 (11th Cir.1988)....................22

*Spoerle v. Kraft Foods Global, Inc.*
527 F.Supp.2d 860 (W.D. Wis. 2007)....................28, 37, 46, 47

*Steiner v. Mitchell*,
350 U.S. 247 (1956).................... 24, 25, 27, 28

*Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*,
321 U.S. 590 (1944)....................23, 27

*Tum v. Barber Foods, Inc.*
331 F.3d 1 (1st Cir. 2003)....................38

**Federal Rules and Regulations**

Fed. R. Civ. P. 56(c)....................21, 22

Fed. R. Civ. P. 56(e)....................22

29 U.S.C. § 254....................23, 24

9 CFR § 307.4....................42

29 CFR § 790.6....................37, 38

29 CFR § 790.7....................36-38



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA,**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS , INC.,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Defendant.** | § | |
| | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

1. Based on almost identical evidentiary support previously submitted by Defendant, this Court has already found that it is "obvious" the equipment made subject of this suit is **necessary**, **integral**, and **indispensable** to Plaintiffs' activities. *See* Order Granting Notice, Dckt. 65, at 2 – 4. As such these activities fall outside the purview of the Portal to Portal Act because activities that are necessary, integral, and indispensable in themselves are compensable principal activities and by definition under no situation can they be considered non-compensable preliminary or postliminary activities. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 22 (2005) (Supreme Court rejecting defendant's argument that a preliminary activity can be integral and indispensable to a principal activity but not be considered a principal activity itself.)

2. Defendant places great emphasis on the fact that 6 long years ago it entered into a settlement agreement with the Department of Labor in May of 2002 and Defendant definitively states it complies with the consent judgment and as a result the FLSA.

Plaintiffs have not tried to hide the fact that this settlement took place and in fact, before this Court, Plaintiffs have acknowledged this settlement and the fact that Defendant does not pay "line time" or "master time" the same as typical poultry processors. *See* Pltfs' Motion for Court Supervised Notice, Dckt. 49 at 2, ¶ 2 and Pltfs' Motion to Quash Notices of Deposition and Discovery, Dckt. 55 at 1, ¶ 2. After conferring with Defendant's counsel and receiving clarification regarding Defendant's pay practices in light of their 2002 settlement (hereinafter "consent judgment") with the Department of Labor, Plaintiffs amended their Complaint on July 5, 2007, to reflect Defendant's pay practices. *See* Def's Motion at Exhibit G (Letter from J. Kelley to Robert Camp).

The gravamen of Plaintiffs' case is not and never has been that Plaintiffs are paid line time or master time and thus they are working off the clock. *See* Pltf's Complaint and First Amended Complaint. Instead, post *Alvarez*, 126 S. Ct. 514 (2005), even though Defendant pays its employees differently than other processors, Plaintiffs still are not paid for all compensable time worked. Giving Defendant the benefit of the doubt that it relied on this "consent judgment" in good faith, Plaintiffs amended their Complaint modifying damages sought limiting damages to the last two years dating back to October 31, 2004 instead of the last three years and withdrawing claims of willfulness.

The landscape pre-*Alvarez* was much different at the time Defendant entered into their settlement with the Department of Labor. The Supreme Court had not clarified the first and last principal activity or how that first and last principal activity affects the continuous workday rule. Evidence of this landscape is shown where as a matter of course, Defendant's CEO, Jim Perdue, post settlement with the DOL, is quoted no less than three times stating, the settlement ended confusion about the issue, referring to the

compensability of donning and doffing. *See* Def's Response in Opposition to Notice, Dckt. 59, Exhibit D at 2, 4, and 7. But the issue was not resolved legally speaking. The issue was only resolved at that time with regard to the DOL enforcement action. Defendant has incorrectly interpreted their settlement and consent judgment to be binding and precedential into perpetuity regardless of the Supreme Court's ruling on the matter. Furthermore, Defendant continues to rely on Pre-*Alvarez* cases in defining principal activities and the compensability of so called non-unique equipment.

The consent judgment entered into by Perdue has no practical effect on this litigation except to provide claim preclusion for claims arising during the applicable time period preceding the date unto which the consent judgment was entered into by Perdue. Those 2002 claims are now time barred regardless. The consent judgment is not precedential nor does it carry any res judicata or collateral estoppel indices related to issue preclusion.[1] As such, the consent judgment is irrelevant and does not warrant deference by this Court. If Defendant truly felt the consent judgment dispositive, it would have argued such in its Motion instead of offering it and inadmissible "favorable" press releases as a distraction to the Court in hopes of gaining favor with the Court.

3. Defendant's Motion for Summary Judgment before this Court is a futile attempt to relegate this action to a simple "donning and doffing" case discounting and misstating

[1] Defendant's consent judgment is void of any language which even if interpreted liberally could be construed to preclude future litigation on the issues giving rise to the consent judgment and this case. *See* Generally Def's Motion at Exhibit A, Tab 1. The Supreme Court has held in confirming its previous ruling in *United States v. International Building Co.*, 345 U.S. 502 (1953), " … settlements ordinarily occasion no issue preclusion… In most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claims presented but are not intended to preclude further litigation on any of the same issues presented. *State of Arizona v. State of California*, et al., 530 U.S. 392, 414 (2000). The differentiation between issue preclusion and claim preclusion is grounded in the fundamentals of *res judicata* doctrine in that it is the general rule issue preclusion only attaches when an issue of fact or law is litigated and determined by a valid, final judgment and that judgment is essential to the judgment. *Id.* In the case of a judgment entered by default, confession or consent, as the case is here with Perdue, none of the issues are actually litigated and as such issue preclusion does not apply. *Id.*

the law as it relates to the Supreme Court's decision in *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005). Quite the opposite, Plaintiffs' case is one in which an analysis must be conducted by the trier of fact both as to what constitutes principal activities, what is the first and last principal activity of the day under the "continuous workday rule", the compensability of activities occurring after the first principal activity but before the last principal activity, and the compensability of principal activities where Defendant has suffered or permitted Plaintiffs to perform those activities.

4. It cannot be disputed that the personal protective equipment "PPE" made subject in this suit is required by Perdue, government regulation and job necessity.[2] But Defendant has hung its hat on the outdated legally defective argument that "non-unique gear" as compared to "unique gear" is non-compensable as a matter of law under the Portal to Portal Act and or alternatively non-compensable under the *De minimis Doctrine.* (Def's Motion at 1 – 2, 21). It is undisputed that Plaintiffs as a necessary and required part of their job must clear security, obtain personal protective equipment, don hair nets, beard nets, bump caps, ear plugs, and boots, sanitize boots, as well as walk a considerable distance to the time clock, all before clocking in at the beginning of the shift. It cannot be disputed that Plaintiffs sanitize their boots upon entering and exiting the processing area at both breaks as well as doff certain equipment at both breaks, all off the clock. It cannot be disputed that at the end of the shift Plaintiffs sanitize their boots as well as doff

[2] *See* Def's Motion at 21; Exihibit 1, Def's Response to Pltf's Requests for Admission No. 54 - 56, 60, 63 – 64, 68, 72, 75 – 76, and 103; Exhibit 2, Tabinowski Depo at pg. 9 lines 20 – 25. pg. 10 lines 1- 2 and 22 – 25, pg. 11 line 1, pg. 12 lines 11 – 13 and lines 21 – 25, pg. 32 – 33 lines 5 – 18; Exhibit 3, Affidavit of Quality Control Employee Dixon at ¶ 5, ¶¶ 10 – 19; 9 C.F.R. § 416.5 (requiring clean PPE each work day); 29 CFR § 1910.136 (requiring adequate foot protection); 29 CFR 1910.133(requiring personal protective eye and face protection); 29 CFR §1910.134 (requiring head protection); and 29 CFR §1910.95 (requiring hearing protection); 29 CFR. § 1910.132 (employer required to provide employees at no cost PPE for all hazards).

hair nets, beard nets, bump caps, ear plugs and boots, all off the clock. These activities are compensable under the FLSA.

5.      Defendant's motion ignores that there are genuine issues of material fact as to whether donning and doffing ear plugs, hair nets, beard nets, bump caps, safety glasses and boots are principal activities defining the outer limits of the workday and if not are there present other activities which could be considered principal activities defining the outer limits of the work day. Plaintiffs argue clearing security, obtaining equipment before clocking in and sanitizing boots before entering and exiting the processing area before clocking in and after clocking out are also appropriately considered principal activities and as such create a general issue of material fact as to whether Defendant's time keeping practices capture this compensable time. *See* Amended Complaint at 22 – 26. Furthermore, Defendant has not submitted any evidence to support its claim that any such time not captured by Defendant's time clock is *de minimis*.

6.      A decision by a jury finding in favor of Plaintiffs on any one of these above disputed material facts will affect the outcome of the case.

7.      As such, Defendant's Motion is due to be Denied because general issues of material fact exist as to what preliminary and postliminary activities are necessary, integral, and indispensable to Plaintiffs employment and as such these activities constitute compensable principal activities which may define the outer limits of the "continuous workday".

## II.  PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

8. Plaintiffs dispute Defendant's claimed undisputed facts paragraph numbers 5, 7, 13, 15, 17, 20 – 21, 23 – 27, 30 – 31, 34, 38 – 39, 42 – 43, 64, 66 – 67, 76 – 77 and 88 – 89.

9. **Paragraph 5 of Defendant's Statement of Undisputed Facts states: "Hourly poultry-processing employees are scheduled to work 37.5 hours per five-day week."**

*Admitted with clarification*: While employees may be scheduled to work 37.5 hours per five day week, Plaintiffs routinely work 40 plus hours per work week. (Exhibit 1, Def's Response to Pltf's Request for Admission No. 38; Exhibit 3, Affidavit of Dixon at ¶ 7; Exhibit 4, Affidavits of Rollins and Wilson at ¶¶ 6; Exhibit 5, Affidavits of Hicks, Brackins, Ward, Tiller, Allen, Snell, Simon, Burkes, Woodley, Oliver, Bynum, Brown, and Washington at ¶¶ 6)

10. **Paragraph 7 of Defendant's Statement of Undisputed Facts states: "Whenever overtime is worked, it is paid at a rate of time and one half of each employee's regular rate of pay."**

*Disputed:* Defendant pays employees at the rate of time and one half their regular rate of pay when employees' overtime is recorded by the Kronos pay system. Plaintiffs routinely perform work off the clock (donning and doffing of hair nets, beard nets, safety glasses, ear plugs and boots, sanitizing boots, obtaining equipment, walk time, time spent waiting in line after beginning work and clearing security) which is not captured by Perdue's Kronos system and as a result employees do not receive time and one half their regular rate of pay for this work. (Exhibit 1, Def's Response to Pltf's Request for Admission No. 39, 40, 56; Exhibit 3, Affidavit of Dixon at ¶¶ 10 - 17, ¶¶ 22 – 23 and ¶¶ 27 - 32; Exhibit 4, Affidavits of Rollins at ¶¶ 8 - 13, ¶¶ 17 - 18 and Wilson at ¶¶ 8 - 13, ¶¶ 18 - 19; Exhibit 5, Affidavits of Hicks at ¶¶ 9 - 11, ¶¶ 14 – 16, ¶¶ 23 – 25 and ¶¶ 28 – 33, Brackins at ¶¶ 9 - 12, ¶¶ 15 – 17, ¶¶ 23 – 24, ¶ 27 and ¶¶ 31 – 33, Ward at ¶¶ 9 – 17,

¶¶ 23 - 25, ¶ 28 and ¶¶ 31 – 34, Tiller at ¶¶ 9 - 17, ¶¶ 23 – 28 and ¶¶ 30 – 34, Allen at ¶¶

9 – 17, ¶¶ 24 - 35,  Snell at ¶¶ 9 – 11, ¶ 15 and  ¶¶ 20 – 28, Simon at ¶¶ 9 - 12, ¶¶ 15 – 17

and ¶¶ 23 - 36.  Burkes at ¶¶ 9 - 12, ¶¶ 14 – 15, ¶¶ 23 – 24 and ¶¶ 28 – 33, Woodley at ¶¶

9 - 12, ¶¶ 14 – 15, ¶¶ 23 – 24 and ¶¶ 28 – 33, Oliver at ¶¶ 9 - 11, ¶¶13 – 16, and ¶¶ 20 –

29,  Bynum at ¶¶ 9 – 11, ¶¶ 14 – 16 and  ¶¶ 23 - 34,  Brown at ¶¶ 9 – 12, ¶¶ 15 – 18 and

¶¶ 23 – 35, and Washington  at ¶¶ 9 – 12, ¶¶ 16 -22.)

11.    **Paragraph 13 of Defendant's Statement of Undisputed Facts states:
"Employees do not have to stop, or even pause, as they pass the guard, nor do they
swipe in at the gate."**

*Disputed:* Employees entering and leaving the Perdue premises are subject to having their

bags, pocketbook, or other containers searched.  Additionally, employees who do not

have their ID badge are denied entrance onto the premises until the front office visually

identifies the employee and checks the employee in for the day through that office.

Furthermore, employees are subject to discipline for failing to possess their ID badge.

(Exhibit 6, Def's Document Production Bates Stamped PER_AND000022 at ¶4 and

PER_AND000179;  Exhibit 5, Affidavits of Hicks, Brackins, Ward, Tiller, Allen , Snell,

Simon, Burkes, Woodley, Oliver,  Bynum, Brown, and Washington at ¶¶ 9.)

12.    **Paragraph 15 of Defendant's Statement of Undisputed Facts states:
"Employees await the beginning of their shift, and are not required to account for
their time or activities before beginning their shift."**

*Admitted with clarification*:  Employees are not required by Perdue to account for their

time or activities at the beginning of the shift in the traditional sense such as recording

work performed prior to shift start but employees do not simply await the beginning of

their shift.  Employees are required to perform work off the clock prior to shift start

(donning of hair nets, beard nets, safety glasses, ear plugs and boots, sanitizing boots,

obtaining equipment, walk time, time spent waiting in line after donning required equipment or performing required work and clearing security). (Exhibit 1, Def's Response to Pltf's Request for Admission No. 39, 40, 56; Exhibit 3, Affidavit of Dixon at ¶¶ 10 - 17; Exhibit 4, Affidavits of Rollins and Wilson at ¶ 8, ¶¶ 10 - 19; Exhibit 5, Affidavits of Hicks, Brackins, Ward, Tiller, Allen,  Snell, Simon, Burkes, Woodley, Oliver,  Bynum,  Brown, and Washington  at ¶¶ 9 – 19.)

13.    **Paragraph 17 of Defendant's Statement of Undisputed Facts states: "Employees' time is captured by one of several Kronos time system clocks designed to capture all principal work activities."**

*Denied*:   The design and placement of Perdue's Kronos time system only captures principal work activities as those activities are defined by Perdue's Consent Judgment with the Department of Labor making the arbitrary distinction that some required personal protective and sanitary equipment constitutes a principal activity while the donning of certain other required personal protective and sanitary equipment is not considered preliminary or postliminary. As such, Perdue's time keeping system does not capture the time spent performing principal activities of donning and doffing of hair nets, beard nets, safety glasses, ear plugs and boots, sanitizing boots, obtaining equipment, walk time, time spent waiting in line after beginning work and clearing security) as alleged by Plaintiffs.   (Def's Motion at Exhibit A, Tab 1, Consent Judgment at PER_AND000002, ¶3; Exhibit 1, Def's Response to Pltf's Request for Admission No. 39, 40, 56; Exhibit 3, Affidavit of Dixon at ¶¶ 10 - 17, ¶¶ 22 – 23 and ¶¶ 27 - 32; Exhibit 4, Affidavits of Rollins and  Wilson at ¶¶ 8 - 13, ¶¶ 17 - 18; Exhibit 5, Affidavits of Hicks at ¶¶ 9 - 11, ¶¶ 14 – 16, ¶¶ 23 – 25 and  ¶¶ 28 – 33, Brackins at ¶¶ 9 - 12,  ¶¶ 15 – 17, ¶¶ 23 – 24, ¶ 27 and ¶¶ 31 – 33, Ward at ¶¶ 9 – 17, ¶¶ 23 - 25, ¶ 28 and ¶¶ 31 – 34,

Tiller at ¶¶ 9 - 17, ¶¶ 23 – 28 and ¶¶ 30 – 34, Allen at ¶¶ 9 – 17, ¶¶24 - 35, Snell at ¶¶ 9 – 11, ¶ 15 and ¶¶ 20 – 28, Simon at ¶¶ 9 - 12, ¶¶ 15 – 17 and ¶¶ 23 - 36. Burkes at ¶¶ 9 - 12, ¶¶ 14 – 15, ¶¶ 23 – 24 and ¶¶ 28 – 33, Woodley at ¶¶ 9 - 12, ¶¶ 14 – 15, ¶¶ 23 – 24 and ¶¶ 28 – 33, Oliver at ¶¶ 9 - 11, ¶¶ 13 – 16, and ¶¶ 20 – 29, Bynum at ¶¶ 9 – 11, ¶¶ 14 – 16 and ¶¶ 23 - 34, Brown at ¶¶ 9 – 12, ¶¶ 15 – 18 and ¶¶ 23 – 35, and Washington at ¶¶ 9 – 12, ¶¶ 16 -22.)

14. **Paragraph 20 of Defendant's Statement of Undisputed Facts states: "Before swiping in with their Kronos time-keeping card, hourly poultry-processing employees at Perdue's poultry-processing plant in Dothan, Alabama are required to have, in their possession, personal items-bump caps, hair and/or beard nets, ear plugs, and slip-resistant footwear- which they may put on at the plant, en route to the plant, or at home.**

*Denied*: Employees are required by Perdue to put on their bump cap, hair net, beard net, safety glasses, ear plugs and boots before clocking in, not merely have these items in their possession. Defendant describes these items as personal items. Perdue's own PowerPoint presentation for newly hired employees confirms employees must have these items on when clocking in, not simply have these items in their possession. Furthermore, many of Perdue's time clocks are located deep in the bowels of the plant in the processing area near the production line and as such Perdue's "good manufacturing practices" or GMP Policy requires employees to don these so-called "personal items" before entering the processing area because these items must be worn at all times while in the processing area. At these time clocks are signs showing the items an employee must don before clocking in and after clocking in. The signs show employees must have on their personal items, or PPE, before clocking in. Also, Perdue posts signs requiring these items be put on prior to passing through a double door which leads to the processing area. Employees are subject to discipline if they do not wear these items in the processing area.

Defendant's own proffered declarations attest to the fact that these items must be donned prior to clocking in, not simply in their possession, and that supervision trained employees must put these items on before clocking in. (Def's Exhibit B, Dec. of Tabinowski at ¶3; Exhibit 1, Def's Response to Pltf's Request for Admission No. 39, 54, 55, 56, 68, 76 and 103; Exhibit 1, Tab 1, Def's Response to Pltf' Rogs at No. 18; Exhibit 2, Tabinowski Depo at pg. 10 lines 1 – 4, pg. 12 lines 1 - 16, pg. 16 lines 3 – 13; Exhibit 3, Affidavit of Quality Control Employee Dixon at ¶¶ 10 – 15, Exhibit 4, Affidavit of Rollins and Wilson at ¶¶ 10 – 11, Tab 1 of Rollins and Wilson Affidavit, GMP Prerequisite Program at ¶¶ 10 – 11 and ¶¶ 15 – 16 and ¶ 24; Exhibit 5, Affidavits of Hicks at ¶¶ 10 – 17, Brackins at ¶¶ 12 - 17, Ward at ¶¶ 10 – 19, Tiller at ¶¶ 12 - 19, Allen at ¶¶ 12 – 19, Snell at ¶¶ 10 – 16, Simon at ¶¶ 12 – 19, Burkes at ¶¶ 12 - 18, Woodley at ¶¶ 10 - 19, Oliver at ¶¶ 11 - 16, Bynum at ¶¶ 11 - 18, Brown at ¶¶ 10 – 19, and Washington at ¶¶ 10 – 14; Exhibit 7, Def's Proffered Dec. of Banks at ¶ 5, Cawthon at ¶¶ 10 – 11, Green at ¶¶ 16 – 17, Johnson at ¶ 14, and Mack at ¶ 15; Exhibit 8, Def's Response to Pltf's Doc. Request, at Bates Stamp PER_AND000115, Slide titled "Starting Work" (Def's own training materials tell employees to have items described as personal on before swiping in at their assigned clock. Slide titled "Two Types of Items" located on the same page as "Starting Work" describes personal items as ear plugs, hair nets, beard nets, safety boots and bump caps)).

15. **Paragraph 21 of Defendant's Statement of Undisputed Facts states: "Hourly poultry-processing employees are permitted to don these personal items after clocking in, and many choose to do so.**

*Denied:* Employees are not permitted to don personal items such as bump caps, hair nets, beard nets, safety glasses, boots and ear plugs after clocking in. Employees are required

to don these items before clocking in. The PowerPoint presentation given to employees states these items must be on before clocking in. Employees are subject to discipline if these items are not donned before clocking in. Perdue supervisors train employees to don these items before clocking in. Perdue posts signs at the time clocks showing these items must be donned before clocking in. (Exhibit 1, Def's Response to Pltf's Request for Admission No. 39, 54, 56 and 103; Exhibit 2, Tabinowski Depo at pg. 10 lines 1 – 4, pg. 12 lines 1 - 16, pg. 16 lines 3 – 13; Exhibit 3, Affidavit of Quality Control Employee Dixon at ¶¶ 10 – 15, Exhibit 4, Affidavit of Rollins and Wilson at ¶¶ 10 – 11, Tab 1 of Rollins and Wilson Affidavits, GMP Prerequisite Program at ¶¶ 10 – 11 and ¶¶ 15 – 16 and ¶ 24; Exhibit 5, Affidavits of Hicks at ¶¶ 10 – 17, Brackins at ¶¶ 12 - 17, Ward at ¶¶ 10 – 19, Tiller at ¶¶ 12 - 19, Allen at ¶¶ 12 – 19, Snell at ¶¶ 10 – 16, Simon at ¶¶ 12 – 19, Burkes at ¶¶ 12 - 18, Woodley at ¶¶ 10 - 19, Oliver at ¶¶ 11 - 16, Bynum at ¶¶ 11 - 18, Brown at ¶¶ 10 – 19, and Washington at ¶¶ 10 – 14; Exhibit 7, Def's Proffered Dec. of Banks at ¶ 5, Cawthon at ¶¶ 10 – 11, Green at ¶¶ 16 – 17, Johnson at ¶ 14, and Mack at ¶ 15; Exhibit 8, Def's Response to Pltf's Doc. Request, at Bates Stamp PER_AND000115, Slide titled "Starting Work" (Def's own training materials tell employees to have items described as personal on before swiping in at their assigned clock. Slide titled "Two Types of Items" on same page describes personal items ear plugs, hair nets, beard nets, safety boots and bump caps)).

16.    **Paragraph 23 of Defendant's Statement of Undisputed Facts states: "At the designated shift start time, and before acquiring work-related equipment and clothing, or performing any other required work activities, hourly poultry-processing employees use their assigned Kronos access cards to swipe into Kronos system time clocks."**

*Denied:* Employees must obtain off the clock work related equipment and clothes prior to their designated start time and before using their assigned Knonos card. Perdue requires employees to wear clean, sanitary, clothing each day. Employees must obtain hair nets, beard nets, and ear plugs off the clock before their shift starts. (Exhibit 1, Def's Response to Pltf's Request for Admission No. 54, 55, 72, and 75; Exhibit 2, Tabinowski Depo at pg. 9 lines 20 – 25, pg. 10 lines 1 – 11; Exhibit 3, Affidavit of Quality Control Employee Dixon at ¶ 5, ¶¶ 13 – 14, and ¶¶ 22 – 23; Exhibit 4, Affidavit of Rollins and Wilson at ¶¶ 14 – 15 and ¶¶ 21 - 23; Tab 1 of Rollins and Wilson Affidavits, GMP Prerequisite Program at ¶ 5, ¶¶ 10 – 11, ¶ 15, ¶ 21, and ¶ 24; Exhibit 5, Affidavits of Brackins at ¶ 11, Ward at ¶ 11, Tiller at ¶ 11, Allen at ¶ 11, Simon at ¶ 11, Burkes at ¶ 11, Woodley at ¶ 11, Brown at ¶ 11.) As maintained by Plaintiffs, employees are required to perform other work-related activities off the clock prior to their designated shift start time. *See* Responses and evidentiary support above ¶ 10 and ¶¶ 12 – 15.

17. **Paragraph 24 of Defendant's Statement of Undisputed Facts states: "After swiping their cards, employees enter their department and obtain their required departmental items from hooks, shelves, or bins."**

*Denied:* Perdue defines required departmental gear as gloves, smocks, hand or arm guards, aprons and cutting equipment. Perdue also requires employees to wear bump caps, hair nets, beard nets, ear plugs, safety glasses and boots. Only gloves, smocks, hand or arm guards, aprons and cutting equipment is obtained from hooks, shelves or bins while on the clock. All other required items are obtained and donned off the clock. (Def's Motion at Undisputed Facts at ¶ 25; *see* Pltf's Responses and evidentiary support above ¶¶ 12 – 16).

18.    **Paragraph 25 of Defendant's Statement of Undisputed Facts states: "Required departmental items may include gloves, hand or arm guards, aprons or smocks, and cutting equipment."**

*Admit with clarification:*  In addition to gloves, hand or arm guards, aprons or smocks and cutting equipment Perdue requires employees to wear bump caps, hair nets, beard nets, boots, safety glasses, and ear plugs.   (*See* Pltf's Responses and evidentiary support above ¶¶ 12 – 17).

19.    **Paragraph 26 of Defendant's Statement of Undisputed Facts states: "Employees put or "don" their departmental gear while on the clock."**

*Admit with clarification:*  On the clock, employees put on only the departmental gear identified as gloves, hand or arm guards, aprons or smocks, and cutting equipment.  All other required gear, or equipment is donned off the clock.  (*See* Pltf's Responses and evidentiary support above ¶¶ 12 – 18).

20.    **Paragraph 27 states: "Employees sanitize after they put on their required departmental gear items while on the clock."**

*Denied:* Employees sanitize gloves, aprons, and cutting equipment while on the clock. Employees sanitize their boots upon entering and exiting the processing area at the beginning of their shift, at breaks and end of the shift, each time off the clock. (Exhibit 3, Affidavit of Quality Control Employee Dixon  at ¶ 17,   Exhibit 4, Affidavit of Rollins and Wilson at ¶ 4; Exhibit 5, Affidavits of Hicks at ¶ 15 and ¶ 24, ¶ 29, and ¶ 31, Brackins at ¶ 16, ¶ 23, ¶ 28, and ¶ 30, Ward at ¶ 16, ¶ 29, and ¶ 31, Tiller at ¶ 16, ¶ 29 and ¶ 31, Allen at ¶ 16, ¶ 29 and ¶ 31, Snell at ¶ 15, ¶ 20, and ¶ 24, Simon at ¶¶ 16 – 17, ¶ 24, ¶ 29, and ¶ 31,  Burkes at ¶ 15, ¶ 23, ¶ 30, Woodley at ¶16, ¶ 24, ¶ 29, and ¶ 31, Oliver at ¶¶ 14 - 16, ¶ 20, and ¶ 25, Bynum at ¶ 15, ¶ 23, and ¶ 28,  Brown at ¶ 16, ¶ 24, ¶ 29, and ¶ 31, and Washington  at ¶ 18).

21. **Paragraph 30 of Defendant's Statement of Undisputed Facts states: "All hourly poultry-processing employees are provided two thirty-minute unpaid meal breaks, during which time they are completely relieved from work duty."**

*Denied:* Employees are not completely relieved of duty while on break and in fact job necessity requires that they perform compensable work while on break such as donning and doffing certain personal protective equipment, i.e. ear plugs and safety glasses, etc., after clocking out and before clocking back in, walk time after clocking out but before being completely relieved from work duty, sanitizing boots upon exiting for break after clocking out and sanitizing boots coming back from break before clocking back in, obtaining new clean PPE from Supply, cleaning PPE such as safety glasses, waiting in line to clock back in after break having already performed compensable work before waiting in line and before clocking back in. Furthermore, because of this work, employees effectively only utilize 15 to 20 minutes of each of their 30 minute breaks. (Exhibit 3, Affidavit of Quality Control Employee Dixon at ¶¶ 27 – 31; Exhibit 4, Affidavit of Rollins ¶ 12 and ¶ 16 and Wilson at ¶ 12 and ¶ 17; Exhibit 5, Affidavits of Hicks at ¶¶ 23 – 29, Brackins at ¶¶ 20 - 28, Ward at ¶¶ 21 – 29, Tiller at ¶¶ 21 - 29, Allen at ¶¶ 21 – 29, Snell at ¶¶ 20 – 22, Simon at ¶¶ 21 – 29, Burkes at ¶¶ 22 - 28, Woodley at ¶¶ 21 - 29, Oliver at ¶¶ 19 - 25, Bynum at ¶¶ 20 - 28, and Brown at ¶¶ 20 – 29).

22. **Paragraph 31 of Defendant's Statement of Undisputed Facts states: "When it is time for their first break, employees remove their aprons, gloves, arm guards, and return their departmental equipment and other required equipment while still 'on the clock'."**

*Denied:* Employees do not remove or return all required equipment while on the clock before being relieved for their first break. (*See* Pltf's Responses and evidentiary support above ¶¶ 20 – 21).

23. **Paragraph 34 of Defendant's Statement of Undisputed Facts states: "While on break, employees retain their hair nets, ear plugs, and do not remove their footwear."**

*Admit with clarification:* Due to the positioning of time clocks in production areas next to the production line, employees are required to wear their hair nets, ear plugs, beard nets, bump cap, and safety glasses a considerable walking distance until the employees clear the double door at the base of the stairs which is the entrance to 1st and 2nd processing. Employees are not free to remove these items until they clear the double door. Since the items must be worn after clocking out and cannot be stored next to the line while on the clock like the other required departmental equipment, employees must retain hair nets, beard nets, ear plugs, safety glasses and bump cap in their possession because they are personally responsible for those items and Perdue charges the employee to replace lost items. (Exhibit 1, Def's Response to Pltf's Request for Admission No. 75; *See* Responses and evidentiary support above ¶ 21).

24. **Paragraph 38 of Defendant's Statement of Undisputed Facts states: "After swiping in, employees put on their special departmental gear and pick up any necessary equipment for the second portion of their shift."**

*Denied:* Employees must don required gear before clocking back in for their second portion of their shift. (*See* Pltf's Responses and evidentiary support above ¶¶ 15 – 19).

25. **Paragraph 39 of Defendant's Statement of Undisputed Facts states: "Employees then sanitize their outer garments before resuming to work."**

Denied: Employees must sanitize their boots off the clock before clocking back in from break to start their second portion of their shift. (*See* Pltf's Responses and evidentiary support above ¶ 20).

26. **Paragraph 42 of Defendant's Statement of Undisputed Facts states: "When their supervisor notifies them that their shift has ended, employees remove their gloves, aprons, and any other required clothing and gear, dispose of them."**

*Denied:* Earplugs, hair nets, bump cap, safety glasses, boots and beard nets cannot be removed immediately after clocking out because time clocks are located in the processing areas. Due to Perdue's rules and good manufacturing practices as well as USDA guideline, these items must be worn until the employee clears the entrance to first and second processing located at the base of the stairs leading to second processing. (*See* Pltf's Responses and evidentiary support above ¶¶ 14 – 15; *see also* Exhibit 5, Affidavits of Hicks at ¶¶ 30 – 36, Brackins at ¶¶ 29 - 35, Ward at ¶¶ 30 – 36, Tiller at ¶¶ 30 - 35, Allen at ¶¶ 30 – 35, Snell at ¶¶ 23 – 28, Simon at ¶¶ 30 – 37, Burkes at ¶¶ 29 - 35, Woodley at ¶¶ 30 - 35, Oliver at ¶¶ 26 - 31, Bynum at ¶¶ 29 - 35, Brown at ¶¶ 30 – 35, and Washington at ¶¶ 19 – 21).

27. **Paragraph 43 of Defendant's Statement of Undisputed Facts states: "Some of the employees choose to remove their earplugs, hair nets, and beard nets at this time.**

*Denied:* Earplugs, hair nets, and beard nets cannot be removed immediately after clocking out because time clocks are located in the processing areas. Due to Perdue's rules and good manufacturing practices as well as USDA guideline, these items must be worn until the employee clears the entrance to first and second processing located at the base of the stairs leading to second processing. (*See* Pltf's Responses and evidentiary support above ¶ 26).

28. **Paragraph 64 of Defendant's Statement of Undisputed Facts states: Perdue representatives and respresnetatives from the DOL's Office of the Solicitor and the DOL's Wage and Hour Administration , in conjunction with a Regional Solicitor and the Director of the Poultry Task Force, worked together, plant by plant, in all of Perdue's processing facilities, including the Dothan Plant, over a period of one year, to develop systems which captured all compensable time from the first principal activity to the last principal activity in a typical work day in a Perdue poultry processing plant.**

*Denied:* Plaintiffs' deny the system described above captures all compensable time from the first principal activity to the last principal activity. Perdue's system captures only compensable time as it was defined in Perdue's 2002 Consent Judgment with the DOL. (Exhibit 1, Tab 1, Consent Judgment at ; Exhibit 8, Def's Response to Pltf's Doc. Request, at Bates Stamp PER_AND000114 - 115, Slides titled "Donning and Doffing", "First Principal Activity", "Donning and Doffing Practices", "Two Types of Items", and "Starting Work"; *see also* Pltf's Responses and evidentiary support above ¶ 13 and ¶¶ 15 – 16).

29. **Paragraph 66 of Defendant's Statement of Undisputed Facts states: "Perdue's compliance with the Consent Judgment included the abandonment of "line time" and the implementation of the Kronos time-keeping system that captures hours worked from the employees' first principal activity of the work day."**

*Denied:* Plaintiffs do not deny Defendant has abandoned "line time". Like line time, Defendant's time keeping system fails to capture all principal activities. Plaintiffs deny Perdue's time keeping system captures hours worked from the employees' first principal activity of the work day. (*See* Pltf's Responses and evidentiary support above ¶ 10, ¶ 12, ¶13, ¶ 15 and ¶ 16).

30. **Paragraph 67 of Defendant's Statement of Undisputed Facts states: "The Kronos time-keeping system captures the time employees spend donning and doffing before and after their bona fide thirty-minute unpaid meal breaks."**

*Denied: See* Pltf's Responses and evidentiary support above ¶¶ 21 – 23.

31. **Paragraph 76 of Defendant's Statement of Undisputed Facts states: "Perdue employees are paid for all time captured by the Kronos system, which includes all compensable time from the first principal activity to the last principal activity of each hourly poultry-processing employee."**

*Denied:* Plaintiffs do not deny employees are paid for all time captured by the Kronos system. Plaintiffs deny the Kronos system captures all compensable time from the first

principal activity to the last principal activity of each hourly employee. (*See* Pltf's Responses and evidentiary support above ¶¶ 10 – 13).

32.    **Paragraph 77 of Defendant's Statement of Undisputed Facts states: "In Perdue's poultry-processing plants, there is no "off the clock" donning and doffing."**

*Denied:*    This Court has rejected Defendant's assertion there is no "off the clock" donning and doffing. *See* Order Granting Notice, Dckt. 65, at 2. Employees have to don and doff bump caps, hair nets, beard nets, ear plugs, safety glasses and boots off the clock. (Exhibit 1, Def's Response to Pltf's Request for Admission No. 39, 40, 56; Exhibit 3, Affidavit of Dixon at ¶¶ 10 - 17, ¶¶ 22 – 23 and ¶¶ 27 - 32; Exhibit 4, Affidavits of Rollins at ¶¶ 8 - 13, ¶¶ 17 – 18 and Wilson at ¶¶ 8 - 13, ¶¶ 18 - 19; Exhibit 5, Affidavits of Hicks at ¶¶ 9 - 11, ¶¶ 14 – 16, ¶¶ 23 – 25 and  ¶¶ 28 – 33, Brackins at ¶¶ 9 - 12, ¶¶ 15 – 17, ¶¶ 23 – 24, ¶ 27 and ¶¶ 31 – 33, Ward at ¶¶ 9 – 17, ¶¶ 23 - 25, ¶ 28 and ¶¶ 31 – 34, Tiller at ¶¶ 9 - 17, ¶¶ 23 – 28 and ¶¶ 30 – 34, Allen at ¶¶ 9 – 17, ¶¶ 24 - 35, Snell at ¶¶ 9 – 11, ¶ 15 and  ¶¶ 20 – 28, Simon at ¶¶ 9 - 12, ¶¶ 15 – 17 and ¶¶ 23 - 36. Burkes at ¶¶ 9 - 12, ¶¶ 14 – 15, ¶¶ 23 – 24 and ¶¶ 28 – 33, Woodley at ¶¶ 9 - 12, ¶¶ 14 – 15, ¶¶ 23 – 24 and ¶¶ 28 – 33, Oliver at ¶¶ 9 - 11, ¶¶13 – 16, and ¶¶ 20 – 29,  Bynum at ¶¶ 9 – 11, ¶¶ 14 – 16 and  ¶¶ 23 - 34,  Brown at ¶¶ 9 – 12, ¶¶ 15 – 18 and ¶¶ 23 – 35, and Washington  at ¶¶ 9 – 12, ¶¶ 16 -22.)

33.    **Paragraph 88 of Defendant's Statement of Undisputed Facts states: "The training materials define 'donning', 'doffing', and 'first and last principal activities,' and also inform all employees that the DOL and the Fair Labor Standards Act require employees to be paid for the time employee performed the first and last principal activity, excluding any unpaid breaks."**

*Admit with clarification:*  The training materials define donning as putting on articles of clothing.  The training materials define doffing as removing articles of clothing.  The training materials define First Principal Activity (FPA) as the first physical act which is

required by law, company, and or nature of the job, by the associate (donning). The training materials define Last Principal Activity (LPA) as the last physical act which is required by law, company/or nature of the job, by the associate (doffing). The training materials go on to state, "You get paid from the time you perform the FPA to the LPA (excluding any unpaid breaks." The training materials go on to state, "All associates must be clocked in prior to donning supplies and all associates must doff supplies prior to clocking out for break, All associates must "clock in" when returning from lunch prior to donning supplies and all employees must doff supplies prior to "clocking out". After reasonably defining the FPA and LPA as well as the donning and doffing practice, the training materials inform employees to don ear plugs, hair nets, bear nets, safety boots, and bump caps before clocking in even though as shown above these activities meet there own self proclaimed definitions of FPA and LPA in that these items are required by Perdue, USDA, OSHA, and job necessity. (Exhibit 8, Def's Response to Pltf's Doc. Request, at Bates Stamp PER_AND000114 - 115, Slides titled "Donning and Doffing", "First Principal Activity", "Donning and Doffing Practices", "Two Types of Items", and "Starting Work").

34. **Paragraph 89 of Defendant's Statement of Undisputed Facts states: "The training materials also describe in detail the appropriate donning and doffing practices, including: the requirements to clock in prior to donning supplies at the shift start time and when returning from unpaid break; the requirements to clock out after doffing when leaving at the end of the shift or on an unpaid break; and the fact that all unpaid breaks may be no fewer than thirty minutes long."**

*Denied:* The training materials describe Perdue's donning and doffing practices. Plaintiff's deny these practices are appropriate under the law. Perdue's training materials call for only departmental items to be donned or doffed on the clock leaving all other principal activities including donning and doffing of personal items to occur off the

clock.  Furthermore, the Kronos system does not record a punch to punch break shorter than 30 minutes but employees perform compensable during that 30 minutes and while waiting to clock in from break.  (Exhibit 8, Def's Response to Pltf's Doc. Request, at Bates Stamp PER_AND000115 - 116, Slides titled "Two Types of Items" and  "Lunch (Unpaid Break); . *see also* Pltf's Responses and evidentiary support above ¶¶ 21 – 25 and ¶ 33).

## III.    PLAINTIFFS' ADDITIONAL UNDISPUTED FACTS

35.    Plaintiffs claim the additional undisputed facts found below requires the denial of summary judgment.

36.    Off the clock, as an integral and indispensable part of Plaintiffs' jobs, they are required to sanitize their boots when entering and exiting the production areas of the plant. *See* below Plaintiffs Discussion and Evidentiary Support at ¶¶ 61 - 63.

37.    Off the clock, as an integral and indispensable part of Plaintiffs' jobs, they must obtain hair nets, beard nets, ear plugs, safety glasses upon entering and exiting the plant at the beginning and end of the shift as well as on breaks.  *See* below Plaintiffs Discussion and Evidentiary Support at ¶¶ 59 - 60.

38.    Off the clock, Plaintiffs spend approximately 18 minutes a day performing compensable work such as obtaining equipment, donning equipment, sanitizing boots, waiting in line to clock in, and ensuing walk time after and before completing principal activities. *See* below Plaintiffs Discussion and Evidentiary Support at ¶¶ 72 - 78.

39.    Off the clock, as an integral and indispensable part of Plaintiffs' jobs, they must clear security. *See* below Plaintiffs Discussion and Evidentiary Support at ¶¶ 71.

## V. PROCEDURAL HISTORY

40.    November 3, 2006 Plaintiffs filed a Complaint against Defendant alleging they had not been paid for all compensable time worked and related overtime pursuant to 29 U.S.C. §§ 201, et seq.    July 5, 2007 Plaintiffs amended their Complaint to more accurately describe Defendant's pay practices.    Plaintiffs' initial Complaint did not contain allegations that Plaintiffs were paid according to "line time" or "master time" as Defendant has alleged. *See* Plf's Initial Complaint, Dckt 1.

41.    November 5, 2007 Plaintiffs' filed their First Motion for Court Supervised Notice. The Court granted Plaintiffs' Motion February 25, 2008.

42.    Defendant tried unsuccessfully at least three times to attack Plaintiffs' declarations and delay notice and on April 28, 2008 the Court approved the Notice Letter setting the opt-in period to close July 8, 2008.

43.    Defendant filed its Motion for Summary Judgment May 16, 2008.    The dispositive motion deadline is set for July 18, 2008.

## VI. STANDARD FOR SUMMARY JUDGMENT

44.    Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (quoting Fed.R.Civ.P. 56(c)).

After the moving party has met its burden, the nonmoving party must go beyond the pleadings and by its own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial. *Id.* at 324 (quoting Fed.R.Civ.P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however she may not merely rest on her pleadings. *Celotex*, 477 U.S. at 324. A dispute is genuine, as it is here "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Additionally, "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007); *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988).

Furthermore, credibility determinations, the weighing of evidence and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the Plaintiffs is to be believed and all justifiable inferences are to be drawn in their favor. *See Id.* at 255. (emphasis added). Drawing all inferences in favor of the Plaintiffs, it is clear genuine issues of material fact exist. Therefore this Court must deny Defendant's Motion for Summary Judgment.

## VII. ARGUMENT

A. Principal Activities vs. Preliminary and Postliminary Activities

45. In 1944, the Supreme Court defined work as physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business. *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944). That same year the Court went further clarifying that "exertion" was not in fact necessary for an activity to constitute "work" under the FLSA. *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944).

46. Three years later the Portal to Portal Act of 1947 was passed creating two narrow exemptions to what constitutes compensable work under the FLSA. Excluded from the FLSA is:

a. Walking, riding or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform,

b. Activities that are preliminary to postliminary to said principal activity or activities which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity. 29 U.S.C. § 254(a)(1) and (2).

47. But the Portal to Portal Act does not automatically exclude all pre or post shift activities. Pre and post shift activities are compensable and excluded from the Portal to Portal Act's coverage where they are an integral and indispensable part of the employee's

principal activity is compensable under the Portal to Portal Act. *Steiner v. Mitchell*, 350 U.S. 247 (1956); *Lindow v. United States*, 738 F.2d 1057, 1061 (9th Cir. 1984);

48. Importantly, the concept of the "principal activity is to be liberally construed to effectuate the remedial purpose of the FLSA. *Barrentine v. Arkansas-Best Freight System, Inc.* 750 F.2d 47, 50 (8th Cir. 1984)(quoting *Steiner v. Mitchell*, 350 U.S. 247, 256, (1956))

49. The Supreme Court in *Steiner* found that where an activity is a recognized part of industrial hygiene programs in the industry, required by law, "indispensable to the performance" of their jobs, and "integrally related thereto, that those activities should be compensated. *Steiner* at 251 – 252.

50. 11th Circuit precedent recognizes and further defines non-compensable pre and postliminary activities to be only those activities that predominately benefit the employee and as a result are excluded from the coverage of the FLSA via the Portal to Portal Act. *Dunlop v. City Elec.*, Inc. 527 F.2d 394 (5th Cir. 1976).[3] Under the FLSA, compensable "principal activities" are those that are performed as part of regular work of employees in ordinary course of business and performed at employer's behest and for benefit of business; only activities excluded from FLSA coverage are those undertaken for employees' own convenience, not being required by employer and not being necessary for performance of their duties for employer. *See Colindres v. QuietFlex Mfg.*, 427 F. Supp. 2d 737, 742 (S.D. Tex. 2006) (citing 29 U.S.C.A. § 254(a)(2)).

51. Defendant tries to distinguish and reduce the application and persuasiveness of the *Steiner* test to the case at hand by citing *Gorman v. Consol. Edison Corp.*, 488 F.3d

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as precedent decisions of the former Fifth Circuit rendered prior October 1, 1981.

586 (2nd Cir. 2007) and a string of cases (*Ciemnoczolowski v. Q.O. Ordinance Corp.*, 228 F.2d 929 (8th Cir. 1955), *Nardone v. General Motors, Inc.*, 207 F. Supp. 336 (D.N.J 1962) and *Anderson v. Pilgrim's Pride Corp.*, 147 F.Supp. 2d 556 (E.D.Tex.2001)) all of which made compensability decisions based not on the definition of principal activity but whether items were unique or non-unique and all but *Gorman* were decided prior the United States Supreme Court's decision in *IBP v. Alvarez*, 546 U.S. 21 (2005). *See* Def's Motion at 17. But in *IBP v. Alvarez*, the Supreme Court recognizes, endorses and references its holding in *Steiner v. Mitchell*, 350 U.S. 247, 254 (1956), concluding that in enacting the Portal-to-Portal Act Congress still intended that an employee's activities fall "within the protection of the FLSA," if they are an integral part of or are essential to the principal activities of the employees. *Alvarez*, 546 U.S. at 37. As such, the Supreme Court in *Alvarez* held, "that any activity that is integral and indispensable to a principal activity is itself a principle activity under § 4(a) of the Portal-to-Portal Act," and is thus compensable. *Id. See also*, Def's Motion, Exhibit H, DOL Advisory Memo at 3. The *Alvarez* Court dealing with consolidated pork and poultry cases involving burdensome armor commonly worn in the pork industry and less cumbersome equipment such as hair nets, smocks and ear plugs, commonly worn in the poultry industry, did not differentiate between the two types of equipment. In other words while other activities may qualify as principal activities, the donning of "gear (of any type) that is integral and indispensable to employees' work is a principle activity and thus under the continuous workday any walking time that occurs after the beginning of the employees' first principal activity and before the end of the employee's last principal activity is excluded from the scope of the Portal to Portal Act and is covered by the FLSA. *Alvarez*, 546 U.S. at 37, 40.

52. Under this interpretation Plaintiffs' are entitled to pay for any principal activity including walk time as well as compensation for the donning and doffing of any required clothing or gear, even ear plugs and or hair nets as well as all other activities that occur within the "continuous workday".

53. This interpretation is consistent with the Third Circuit's decision in *De Asencio v. Tyson*, in which on appeal the Court was required to address jury instructions defining work as that definition relates to the donning and doffing of hair nets, beard nets, ear plugs, safety glasses, and smocks. 500 F.3d 361, 364 (3rd Cir. 2007). At trial the District Court Judge improperly instructed the jury:

> [I]f the donning, doffing and washing at issue do not require physical or mental exertion, the activities are not work. Therefore, you may ask yourself, is the clothing heavy or burdensome, or is it lightweight and easy to put on or take off? Does an employee need to concentrate to wash their hands or gloves or put on or take off these items? *Id.* at 366.

Not unlike Defendant's argument that *Reich v. IBP* precludes compensation for these same items in this case, on appeal Tyson argued that the heavy and cumbersome language in the District Court's jury instruction was appropriate relying mainly upon *Reich v. IBP, Inc.* 38 F.3d 1123, 1125-26 (10th Cir. 1994)(holding that "the placement of a pair of safety glasses, a pair of earplugs and a hardhat into or onto the appropriate location on the head takes all of a few seconds and requires little or not concentration,: so that these activities did not meet the "physical or mental exertion requirement and accordingly could not be considered work under the FLSA).

The Third Circuit rejected *Reich* and concluded it was error for the jury instruction to direct the jury to consider whether the gear was cumbersome, heavy or required concentration to don and doff. *De Asencio* at 373. This language wrongly

focused the jury to consider the laborious degree of exertion rather than if the activity was controlled or required by the employer for the employer's benefit. *Id.* The Court further reasoned in light of the Supreme Court's decision in *Alvarez*, that such donning and doffing activity, the same activities at question in this case, constitute "work" as a matter of law. *Id* at 373.

Following the same rationale, at least one district court in the Tenth Circuit has rejected *Reich* post *Alvarez*. *Garcia v. Tyson Foods, Inc.*, 474 F.Supp.2d 1240 (D.Kan.2007). The *Garcia* court stated that it was convinced that the 10th Circuit if given the opportunity to revisit the issues in *Reich*, would approach its analysis of the pertinent issues differently in light of the Supreme Court's decision in *Alvarez*. *Id.* at 1246. In light of Alvarez, the Circuit revisiting *Reich* today would focus not on whether the donning and doffing constituted work with the meaning of *Tennessee Coal*, but on whether the standard protective clothing and gear are integral and indispensable to the work performed by production employees. *Id.; see also*, *Ballaris v. Wacker Siltronic Corp., 370 F.3d 901, 910-911* (9th Cir. 2004) (We further hold that in considering whether putting on and taking off safety goggles was excluded, the ease of donning and ubiquity of use did not make the donning of such equipment less integral and indispensable). Similarly, the Department of Labor has rejected the premise that non-unique equipment is distinguishable from unique equipment stating, "Accordingly, whether required gear is 'unique' or 'non-unique' is irrelevant to whether donning and doffing is a principal activity." *See* Def's Motion at 25 and Exhibit H at 3.

As to *Gorman v. Consol. Edison* and the 2nd Circuit's interpretation that *Steiner* is limited to "workplace dangers that transcend ordinary risks", that ruling has been

ridiculed as bizarre. *Spoerle v. Kraft Foods Global, Inc.* 527 F.Supp.2d 860, 864 (W.D. Wis. 2007). The *Spoerle* Court recognized the *Gorman* decision limits *Steiner* to only situations where work is performed in a lethal atmosphere and, and *Gorman*'s interpretation, unless the activity is necessary to prevent the employee from actually being killed the activity is not integral to the employee's principal activity. The *Spoerle* Court explains, from a public policy perspective, this reading is obviously troubling because it creates an uncomfortable distinction between hazards that kill and hazards that maim and suggests that an employee is entitled to compensation only for protecting herself from death. *Id* at 864 – 865. The 11th Circuit has also declined to follow *Gorman* because that court did not follow *Dunlop*, which is binding on the 11th Circuit, noting:

> *Gorman*, however, is less on point with the present action than Alvarez, as the Second Circuit there did not address donning and doffing claims in a meat or poultry processing plant, nor did it consider factors similar to *Dunlop's* three-part analysis. Therefore, while the Second Circuit espouses a narrow application of *Steiner*, binding, former Fifth Circuit precedent persuades the court that the Eleventh Circuit would more likely agree with the position of the Ninth Circuit as expressed in *Alvarez*.

*Chao v. Tyson Foods, Inc.*, 2008 WL 2020323 *7 (N.D. Ala.). After *Alvarez* there can be little doubt that donning and doffing protective gear at the beginning and end of the workday are "principal activities" under the Portal to Portal Act.

*Spoerle* at 865. Defendant also entices the Court to travel down the wrong road citing *Alford v. Perdue Farms, Inc. No.* 5:07-cv-87, 2008 WL 879413 (M.D.Ga. Mar. 28, 2008). Plaintiffs respectfully submit the court's order in *Alford* constitutes reversible error resulting in "manifest injustice" because the court: 1) failed to analyze whether the donning and doffing of non-unique equipment is integral and indispensable under Supreme Court precedent; 2) contrary to case law addressing this issue, the Court

impermissibly determined donning and doffing required little to no exertion and as such the activity was non-compensable; 3) determined donning and doffing of non-unique PPE was *de minimis* without the benefit of evidentiary support from either party; 4) made a factual determination- a jury question- as to whether plaintiffs in that matter were free to change into required clothing at home and 5) gave the Perdue Consent Judgment precedential consideration in relying on the definition of principal activity as it is defined in that judgment as well as applicable law at the time the judgment was entered into by the parties, and ignoring there has been an evolution in the case law since that date governing the compensability of donning and doffing. *See Alford*, 1:05-cv-22748-FAM, Doc. No. 64. Unbelievably, the court in *Alford* compared the activities at issue in this case to be synonymous to a banker, lawyer or bureaucrat putting on a tie in the morning or a bus driver putting on a uniform or a construction worker washing up after work, etc. *See Alford*, 1:05-cv-22748-FAM, Doc. No. 51 at 4 – 5. The Courts statement obtusely ignores the fact that the businessman, lawyer, and bureaucrat are overtime exempt employees pursuant to 29 U.S.C § 213 so such a comparison lacks merit. With regard to the other workers, the changing into of ordinary clothing at home, pinning of a name tag or other activities in those specific contexts were not integral and indispensable to the jobs themselves as described by the court. The activities in question in this case clearly are integral and indispensable.

As such, where an activity is required by the employer, law, or business necessity and the activity is integral and indispensable to the employee's principal activity, those activities are also principal activities and compensable under the law. Here Perdue requires employees to wear bump caps, hair nets, beard nets, ear plugs, and safety glasses

the entire time they are in the production areas of the plant and as such they cannot perform their principal job without wearing these items. Employees are subject to discipline including termination if they do not wear these items in production. Also, certain of these items are required by USDA regulation and others required by OSHA. The donning and doffing of these items benefit the employer in ensuring product wholesomeness, ensuring USDA and OSHA compliance, and ensuring employees are protected thereby reducing workers compensation costs. The wearing of these items in no way is for the benefit of the employee. As such, the donning and doffing of hair nets, beard nets, ear plugs, bump caps, boots and safety glasses constitutes principal activities.

B. Donning and Doffing of Hair Nets, Beard Nets, Ear Plugs, Bump Caps, Slip Resistant Boots and Safety Glasses as Principal Activities.

54. There is a genuine issue of material fact as to whether the donning and doffing of hair nets, beard nets, ear plugs, bump caps, boots, safety glasses are non-compensable preliminary or postliminary activities as asserted by Defendant or compensable principal activities as asserted by Plaintiffs. *Fox v. Tyson Foods, Inc.*, 2002 WL 32987224 *11 (N.D.Ala.) (Judge Bowdre adopting Mag. Judge Putnam's Report & Recommendation Denying Tyson's Motion for Summary Judgment finding whether an activity is a non-compensable preliminary or postliminary activity is a question of fact.).

55. Defendant has argued donning and doffing hair nets, beard nets, bump caps, ear plugs, and safety glasses, and boots are not compensable because the activities constitute preliminary and postliminary activities or in other words the donning and doffing of these items is not integral or indispensable to Plaintiffs principal job. *See* Def's Motion at 16. This argument is fatally flawed.

Defendant admits and it cannot be disputed these items are required by company rule and the law and it is impossible for Plaintiffs to perform their jobs without this equipment. *See* Def's Motion at 21; Exihibit 1, Def's Response to Pltf's Requests for Admission No. 54 - 56, 60, 63 – 64, 68, 72, 75 – 76, and 103; Exhibit 2, Tabinowski Depo at pg. 9 lines 20 – 25. pg. 10 lines 1- 2 and 22 – 25, pg. 11 line 1, pg. 12 lines 11 – 13 and lines 21 – 25, pg. 32 – 33 lines 5 – 18; Exhibit 3, Affidavit of Quality Control Employee Dixon at ¶ 5, ¶¶ 10 – 19;  Exhibit 4, Tab 1 of Rollins and Wilson Affidavit, GMP Prerequisite Program at ¶ 5, ¶¶ 10 – 11, ¶ 15, ¶ 21, and ¶ 24; 9 C.F.R. § 416.5 (requiring clean PPE each work day); 29 CFR § 1910.136 (requiring adequate foot protection); 29 CFR 1910.133 (requiring personal protective eye and face protection); 29 CFR §1910.134 (requiring head protection); 29 CFR §1910.95 (requiring hearing protection); and 29 CFR. § 1910.132 (employer required to provide employees at no cost PPE for all hazards).  Plaintiffs confirm this requirement and further testify that these items must be worn at all times when the employee is in the processing area. Exhibit 1, Def's Response to Pltf's Request for Admission No. 39, 54, 56 and 103; Exhibit 2, Tabinowski Depo at pg. 10 lines 1 – 4, pg. 12 lines 1 - 16, pg. 16 lines 3 – 13; Exhibit 3, Affidavit of Quality Control Employee Dixon  at ¶¶ 10 – 15,  Exhibit 4, Affidavit of Rollins and Wilson at ¶¶ 10 – 12, Tab 1 of Rollins and Wilson Affidavit, GMP Prerequisite Program at ¶¶ 10 – 11 and ¶¶ 15 – 16 and ¶ 24; Exhibit 5, Affidavits of Hicks at ¶¶ 10 – 17, Brackins at ¶¶ 12 - 17,  Ward at ¶¶ 10 – 19, Tiller at ¶¶ 12 - 19, Allen at ¶¶ 12 – 19, Snell at ¶¶ 10 – 16, Simon at ¶¶ 12 – 19,  Burkes at ¶¶ 12 - 18, Woodley at ¶¶ 10 - 19, Oliver at ¶¶ 11 - 16, Bynum at ¶¶ 11 - 18,  Brown at ¶¶ 10 – 19, and Washington  at ¶¶ 10 – 14; Exhibit 7, Def's Proffered Dec. of Banks at ¶ 5, Cawthon at

¶¶ 10 – 11, Green at ¶¶ 16 – 17, Johnson at ¶ 14, and Mack at ¶ 15; Exhibit 8, Def's Response to Pltf's Doc. Request, at Bates Stamp PER_AND000115, Slide titled "Starting Work" (Def's own training materials tell employees to have items described as personal on before swiping in at their assigned clock. The slide titled "Two Types of Items" on same page describes personal items ear plugs, hair nets, beard nets, safety boots and bump caps)). Furthermore, within the plant but before entering processing areas, Perdue posts signs that do not allow access beyond the signage without wearing the personal protective equipment in question. *Id.* Thus, bump caps, hair nets, beard nets, ear plugs, boots and safety glasses are integral and indispensable to each employee's principal job and thus donning and doffing these items is compensable as a principal activity. Activities that are necessary, integral, and indispensable in themselves are compensable principal activities and by definition under no situation can they be considered non-compensable preliminary or postliminary activities. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 22 (2005) (Supreme Court rejecting defendant's argument that a preliminary activity can be integral and indispensable to a principal activity but not be considered a principal activity itself.)

C. <u>Defendant's Assertion these Activites are Non Compensable because Employees have an Option to Take Their PPE Home</u>

56. Defendant argues that Plaintiffs are not entitled to compensation for the donning and doffing of this equipment because Plaintiffs can take these items home and allegedly wear these items to and from their home. Creating an issue of material fact, Plaintiffs contend that while they have the option to take the items home or store them in a locker (plaintiffs are financially responsible for these items), they do not have the option or ability to wear these items from home and they have never been told or trained that they

have this option. *See* Exhibit 5, Affidavits of Hicks at ¶¶ 33 – 36 and ¶41, Brackins at ¶¶ 32 - 35,  Ward at ¶¶ 30 – 36, Tiller at ¶¶ 30 - 36, Allen at ¶¶ 30 – 36, Line Leader Snell at ¶¶ 26 – 29, Simon at ¶¶ 30 – 36,  Burkes at ¶¶ 29 - 35, Woodley at ¶¶ 30 - 36, Oliver at ¶¶ 26 - 31, Bynum at ¶¶ 29 - 35,  Brown at  ¶¶ 30 – 36, and Washington  at ¶¶ 19 – 23; Wilson at  ¶¶ 12 – 14, Andrews at ¶¶ 27 – 32.   Plaintiffs also contend they and the majority of other employees with whom they work don and doff these items on the company's premises, whether in a parking lot, break room, hall, etc. Exhibit 5, Affidavits of Hicks at ¶ 14  and ¶¶ 33- 34, Brackins at ¶ 15 and ¶¶ 32 - 33,  Ward at ¶ 15 and ¶¶ 32 – 34, Tiller at ¶15 and ¶¶ 30 - 36, Allen at ¶15 and ¶¶ 32 – 34, Line Leader Snell at ¶ 14 and ¶¶ 25 – 27, Simon at ¶ 15 and ¶¶ 33 – 34,  Burkes at ¶ 14 and ¶¶ 29 - 35, Woodley at ¶ 15 and ¶¶ 30 - 36, Oliver at ¶ 13 and ¶¶ 29 - 31, Bynum at ¶14 and ¶¶ 32 - 33,  Brown at ¶15 and ¶¶ 33 – 34, Wilson at ¶¶ 12 – 14, Andrews at ¶14 and  ¶¶ 29 – 30.  In fact, two Plaintiffs testify that when observing an employee wearing a piece of equipment from home, they assumed that individual was breaking company policy.  *See* Exhibit 4, Affidavit of Rollins at ¶ ¶20 and Wilson at ¶ 21.  In addition, consistent with Plaintiffs affidavits, eleven of the sixteen declarations submitted by Defendant definitively state it is their normal practice to don and doff these items on Perdue's premises.  *See* Def's Motion at Exhibit E, Dec. of Banks, Cawthon, Clark, Durr, Hickman, Hudson, Johnson, Marsh, Reynolds, Richards, and Smith.  Lastly, Defendant's own new hire training materials do not indicate employees have the option to wear these items from their home. *See* generally Pltf's Exhibit 8, Bates Stamped pgs. PER_AND000101 – 113 and PER_AND000115, Slide Titled "Two Types of Items" (Personal Items Store in you locker or at home.  There is no indication employees are authorized to wear such items

from home). The only training document that Defendant offers evidencing that employees may be permitted to wear personal protective equipment to and from home is found at Exhibit C of Defendant's Motion for Summary Judgment. This document, not executed by any plaintiff or any other Perdue Dothan employee, is not authenticated nor does it represent evidence that employees were trained they have an option to wear these items from home. Placed in the light most favorable to Plaintiffs, this document is due little weight given Defendant's other training documents, Defendant's declarations, and Plaintiff's affidavits.

57. In establishing Defendant's defense that where employees have an option to take equipment home the donning and doffing of that equipment is non-compensable, Perdue relies upon a Wage and Hour Advisory Memorandum which states "it is our longstanding position that if employees have the <u>option</u> and <u>ability</u> to change into the required gear at home, changing into that gear is not a principal activity, even when it takes place at the plant". *See* Def's Motion at 25 and Exhibit H at 2 – 3. First, even if the Court were to believe employees have the option to change at home, there is no location limitation found within the FLSA which precludes compensation for activities that are integral and indispensable yet occur off the employer's premises. Second, the Eleventh Circuit does not require such an analysis when determining compensation. In the Ninth Circuit a District Court in the Northern District of California faced with a fact scenario where police officers had the option of donning and doffing police uniforms at home, the Court refused to accept a location limitation. *Lemmon v. City of San Leandro*, 538 F.Supp.2d 1200 (N.D.Cal.2007). The Court states,

> "...there is not explicit requirement in the Ninth Circuit that the preliminary or postliminary activity take place on employer's premises.

> This court, therefore, refuses to inject a location limitation into the analysis for finding compensability under the FLSA. In any event, most officers don and doff at the station in practice-this is a strong indicia that the donning and doffing of the uniform at the police station is a *de facto* requirement."

The Court here also should not employ such a limitation.

58. But, given that courts and litigants look to the DOL Advisory Memorandum for guidance, it is appropriate to discuss the test as set forth in the memorandum. *Kohleim v. Glyn County*, 915 F2d 1473, 1477 n.20 (11th Cir. 1990); *Bonilla v. Baker Concrete Constr., Inc.* 487 F.3d 1340, 1342 – 43 (11th Cir. 2007) (noting that "[t]hese statements are not promulgated regulation because Congress did not authorize the Secretary of Labor to issue regulations regarding the scope of exemptions [of the Portal to Portal Act]). Defendant's propose that employees have the option to don and doff these items at home but the test does not stop there. According to the DOL Advisory Memorandum the employee must also have the ability to don and doff the items at home not simply the option. Here, Plaintiffs do not have the ability to don and doff all their personal protective equipment at home. *See* Exhibit 4, Affidavit of Rollins at ¶ 29 and Wilson at ¶ 30; Exhibit 5, Affidavits of Brackins at ¶ 36, Ward at ¶ 37, Tiller at ¶¶ 36 - 37, Allen at ¶¶ 36 – 37, Simon at ¶¶ 36 – 37, Burkes at ¶¶ 35 - 36, Woodley at ¶¶ 36 - 37, Oliver at ¶¶ 30 - 32, Bynum at ¶¶ 35 - 36, Brown at ¶¶ 35 – 37, Washington at ¶ 24, Wilson at ¶ 15 and Andrews at ¶¶33. As a matter of public policy and highway safety it is ridiculous to expect that employees can safely operate their vehicles driving to and from work, often at night or early in the morning while it is still dark, wearing a hard hat, cheap plastic safety glasses, ear plugs inserted in their ears, wearing a beard net and large cumbersome rubber boots. Employees inability to see, hear ambulances, passengers and other drivers, and

difficulty in operating clutches, brake pedals, and gas pedals is foreseeable. *Fox v. Tyson Foods, Inc.*, 2002 WL 32987224 * 7 (N.D.Ala.) (Finding it unrealistic for Tyson workers to drive wearing sanitary and protective equipment (equipment at issue in the *Fox* case consisted of hair net, beard net, earplugs, safety glasses, boots, rubber gloves, smocks and other sanitary clothing and protective equipment) and stating the equipment at issue here cannot be regarded as mere analogs to everyday clothing, like a uniform might be; the equipment is necessary not for the convenience or modesty of the employee, but required for the very specific needs of the employer for sanitation and safety). Defendant tries to distinguish this case from *Fox* stating, "…in that case, the employer did not compensate employees for time spent donning and doffing any … gear, cleaning equipment, and waiting in line and asserted these activities were not work. *See* Def's Motion at 22. What Defendant is really saying is in *Fox*, Tyson didn't pay for <u>any</u> donning, doffing and related activities but we pay for <u>some</u>, so *Fox* isn't due any weight. A closer look behind the DOL's Advisory Memorandum, that where employees have the option and ability to put gear on at home those activities are non-compensable, reveals a disparity in the DOL's construction of this opinion. The DOL's Advisory Memorandum refers to the cite FOH Section 31b13 (dressing at home is not compensable). *See* Def's Motion at 25 and Exhibit H at 3. Attached as Exhibit 9 is Section 31b13 of the Department of Labor's Field Operation Handbook. Interestingly, Section 31b13 is appropriately titled, "Changing clothes at home." does not discuss gear, and it refers to changing a uniform at home. Section 31b13 is a consistent interpretation of 29 CFR 790.7(g) dealing with changing clothes under "normal" conditions, stating, "[O]ther types of activities which may be performed outside the workday and, when performed under the conditions

*normally* present, would be considered preliminary and postliminary activities, include... changing clothes...". The donning and doffing of beard nets, hair nets, bump caps, safety glasses can hardly be characterized as changing clothes under *normal* conditions.[4] This position is further clarified in fn. 66 of 29 CFR § 790.8 stating, on the other hand, if changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as "preliminary" or "postliminary" activity rather than a principal part of the activity. Here, as in *Spoerle* and *Fox*, it cannot be argued that the donning and doffing in question is tantamount to changing clothes for the convenience of the employee not related to his principal activities and as such the application of the Advisory Memorandum as it relates to issue is inappropriate.

For the forgoing reasons, Defendant's Motion for Summary Judgment is due to be denied because there are genuine issues of material fact as to whether the donning and doffing of hair nets, beard nets, safety glasses, bump caps and ear plugs constitute principal activities under the law. As such Plaintiffs are entitled to compensation for all time spent occurring between the first and last principal activity of the day. *See* 29 CFR § 790.6(a) – (b); 29 CFR § 790.7(c) explaining the Portal to Portal does not affect the compensability of time spent traveling from one principal activity to another; *See also*, *Alvarez* at 525.

D. Obtaining Equipment as a Principal Activity

---

[4] *Spoerle* at 865 – 866 (*Spoerle* Court commenting, because the equipment in this case is donned for safety purposes and is required by law and company policy, it cannot be said to be "merely" a convenience for the employee... I agree with those courts that have concluded that donning and doffing safety equipment cannot be equated with "changing clothes...under *normal* circumstances. E.g., *Fox v. Tyson Foods, Inc.* No. CV-99-BE-1612-M, 2002 WL 32987224, *11 (N.D.Ala. Feb.4,2002). Stating further most people do not need to put on a hard hat and safety goggles to perform their jobs. *Id.*

59. Defendant's Motion for Summary judgment presumes the analysis before this Court is only related to donning and doffing the equipment at hand, but it is well established the obtaining of equipment is an extension of donning and doffing and as such a principal activity. Donning includes obtaining equipment. *See Tum v. Barber Foods, Inc*. 331 F.3d 1, 8 - 9 (1st Cir. 2003) (The trial judge's instruction contained no error. The instruction adequately illuminated applicable law by stating that donning includes obtaining the item); *See also* Def's Motion, Exhibit H at 1, fn. 1.

60. Perdue employees must obtain PPE before they are allowed to "clock in" creating another issue of material fact justifying the denial of summary judgment. *See* Exhibit 3, Affidavit of Quality Control Employee Dixon at ¶ 5 and ¶¶ 22 – 23; Exhibit 5, Affidavits of Brackins at ¶ 11, Ward at ¶ 11, Tiller at ¶ 11, Allen at ¶ 11, Simon at ¶ 11, Burkes at ¶ 11, Woodley at ¶ 11, Brown at ¶ 11 and Andrews at ¶11). The very moment PPE is obtained is when the donning of the equipment begins and the Plaintiffs should be compensated for all time from that moment through completion of their last principal activity. *See* 29 CFR § 790.6(a) – (b); 9 CFR § 790.7(c); *Alvarez* at 525.

E. Employees Sanitizing Boots as a Principal Activity

61. Just like donning and doffing of required equipment, the sanitizing of equipment is also a principal activity because it is integral and indispensable to their principal job. Perdue requires Plaintiffs off the clock to sanitize their boots upon entering and exiting the processing area. This occurs at the beginning of the shift, at both breaks and at the end of the day.

62. In *Fox v. Tyson* the Plaintiffs claimed they were owed time for sanitizing equipment prior to clocking in and the court found,

> "The cleaning of the equipment similarly is required by and benefits Tyson. It is clear that in order to maintain the requisite level of cleanliness in its plants, Tyson must have its workers equipped with clean and sanitary knives, aprons, arm guards, and other equipment that comes into contact with the chicken. There is simply no evidence, and logic does not compel the conclusion, that the cleaning of the gear primarily benefits the employee."

2002 WL 32987224 *10 (N.D.Ala. 2002).

63. Similarly, here, the sanitizing of the boots is required by and benefits Perdue. This activity is not unlike the sanitizing of hands or rubber gloves where employees simply dip their hands in sanitizing liquid which Perdue considers a compensable activity. *See* Def's Motion at A, Tab 1, Consent Judgment at PER_AND000009; Def's Motion at Exhibit E, Declarations of Banks at ¶ 6, Cawthon at ¶6, Clark at ¶ 7, Davis at ¶ 5, Durr at ¶ 7, and Hudson at ¶ 4. It is clear that in order to maintain the requisite level of cleanliness in its plants Perdue must have its workers equipped with clean and sanitary footwear. There is simply no evidence, and logic does not compel the conclusion, that the sanitizing of the boots primarily benefits the employee and is not integral and indispensable to the employees' job. Therefore, a genuine issue of material fact exists as to whether the cleaning of the boots is a principal activity of the employees and whether walk time after sanitizing the boots but before clocking in and walk time after clocking out but before sanitizing the boots is compensable under the continuous workday rule.

F. Employees Performing Compensable Activities While on Break

64. There are genuine issues of material fact as to whether the activities performed by Plaintiffs while on break constitute work, whether breaks are compensable due to their short duration, and whether breaks constitute bona fide meal periods as asserted by Defendant.

65. Employees are not completely relieved from duty while on break. After clocking out for break, employees are prohibited from removing bump caps, hair nets, beard nets, safety glasses and ear plugs until they clear the double doors at the base of the two flights of stairs leading out of the processing areas. This limitation on Plaintiffs break in itself is approximately 6 – 12 minutes in duration. *See* Exhibit 5, *e.g.*, Hicks at ¶ 39, Brakins at ¶¶ 38 -39, Ward at ¶ 39. In addition, job necessity and Employer rules require that Plaintiffs perform additional compensable work while on break such as donning and doffing certain personal protective equipment, i.e. ear plugs and safety glasses, etc., after clocking out and before clocking back in, walk time after clocking out but before being completely relieved from work duty, sanitizing boots upon exiting for break after clocking out and sanitizing boots coming back from break before clocking back in, obtaining new clean PPE from Supply while on break, cleaning PPE such as safety glasses while on break, and waiting in line to clock back in after break having already performed compensable work and before clocking back in. *See* Exhibit 3, Affidavit of Quality Control Employee Dixon at ¶¶ 27 – 31; Exhibit 4, Affidavit of Rollins ¶ 12 and ¶ 16 and Wilson at ¶ 12 and ¶ 17; Exhibit 5, Affidavits of Hicks at ¶¶ 23 – 29, Brackins at ¶¶ 20 - 28, Ward at ¶¶ 21 – 29, Tiller at ¶¶ 21 - 29, Allen at ¶¶ 21 – 29, Snell at ¶¶ 20 – 22, Simon at ¶¶ 21 – 29, Burkes at ¶¶ 22 - 28, Woodley at ¶¶ 21 - 29, Oliver at ¶¶ 19 - 25, Bynum at ¶¶ 20 - 28, and Brown at ¶¶ 20 – 29. Thus, because of this work, employees effectively only utilize 15 - 20 minutes of each of their 30 minute breaks.[5]

[5] *See* Exhibit 4, Affidavit of Rollins at ¶ 17 and Wilson at ¶18, (testifying Plaintiffs spend 3 – 5 minutes of their break waiting in line to clock back in after donning equipment, sanitizing boots, and walking to the time clock); Exhibit 5, *e.g.*, Affidavits of Hicks at ¶ 27 (20 min. break), Brackins at ¶ 26 (20 min. break), Ward at ¶ 27 (20 min. break) and Andrews at ¶ 24 (15-20 min. break).

66. Under the Federal Regulations, breaks of short duration, running from 5 minutes to about 20 minutes are considered "rest periods" and as such are compensable because they promote efficiency and benefit the employer. 29 CFR § 785.18. As such, the short 15 to 20 minute duration of Plaintiffs' breaks makes the breaks compensable as "rest periods".

67. Plaintiffs argue that their 30 minute breaks are not bona fide meal periods as alleged by Perdue. A bona fide meal period is non-compensable, only if the employee is completely relieved from duty for the purposes of eating regular meals. Coffee breaks or snack breaks do not constitute bona fide meal periods. 29 CFR § 785.19. Ordinarily breaks 30 minutes in duration or longer is significant duration to establish a bona fide meal period. *Id.* A shorter period may suffice under special circumstances. Thus, the short duration of Plaintiffs' breaks calls into question the validity of the breaks as bona fide meal periods. Further, Plaintiffs argue that in addition to the time limitations, one of their 30 minute breaks is for the benefit of the employer, not the employee.

68. In determining if a break is a "rest period" or bona fide meal period, the Eleventh Circuit sets forth the test to determine whether a meal period is bona fide and non-compensable in *Kohlheim v. Glynn County Georgia*, 915 F,2d 1473 (11th Cir. 1990). *Kohlheim* determined that "what matters in meal period cases is whether employees are subject to real limitation on their personal freedom which inure to the benefit of the employer. *Kohlheim* at 1477 fn. 19. Plaintiffs have established due to the work they perform while on break, that their break is subject to significant limitations while on break. The likelihood that both 30 minute breaks are truly intended to be meal periods is further reduced by their time of day and their proximity to one another. *See, e.g.*, Def's

Motion at Exhibit E, Declaration of Banks at ¶ 7 and ¶ 10 (day shift 30 min. breaks at approx. 10:20 AM and 1:20 PM, Declaration of Clark at ¶ 8 (night shift breaks at approx. 1:00 AM and 4:00 M); *Brock v. The Claridge Hotel and Casino*, 664 F.Supp. 899, 908 (D.N.J.1986) (agreeing with plaintiffs that it is not logical to have multiple meal periods within a shift). This argument is even stronger on the night shift where both breaks occur within early morning. Plaintiffs assert the second prong of *Kohlheim* is met due to the fact that Perdue is required to provide onsite USDA Inspection Services a lunch period pursuant to 9 CFR § 307.4, which would occasion the plant to stop processing while still paying employees who are on the clock but not working.

69. Alternatively, if these breaks are determined to be a bona fide meal period, Plaintiffs still perform off the clock work during their break in which they are entitled to compensation.

G. Perdue Suffers or Permits its Employees to Perform Work

70. Even work that is not requested, but is "suffered or permitted" by an employer is compensable work time. It is well settled that duties performed by an employee before and after scheduled hours, even if not requested, must be compensated if the employer 'knows or has reason to believe' the employee is continuing to work. *See Allen v. Board of Public Education for Bibb County*, 495 F.3d 1306, 1314 (11th Cir. 2007)(finding that on appeal the district court erred in granting defendant summary judgment and plaintiffs had submitted evidence that there existed an issue as to whether their employer had constructive knowledge of the work they were performing); *See* also *Reich v. Dep't of Conservation and Nat. Res.*, 28 F.3d 1076, 1082 (11th Cir.1994); *Reyna v. ConAgra Foods, Inc.*, Slip Copy, 2006WK3667231 (M.D.Ga.). Perdue requires and demands the

work at issue from the Plaintiffs; however, "It is not relevant that the employer did not specifically ask the employee to do the work off the clock." *See* Defendant's Motion at 23; *Allen* at 1314. In order for the Plaintiffs to show Perdue Farms suffered or permitted Plaintiffs to work they must show two things: (1) he or she worked overtime without compensation and (2) Perdue knew or should have known of the overtime work. *Id.* at 1314-1315. In this case the Plaintiffs' affidavits and Defendant's admissions show that Perdue employees work(ed) on average 40 or more hours per week. *See* Exhibit 1, Def's Response to Pltf's Request for Admission No. 38; Exhibit 3, Affidavit of Dixon at ¶ 7; Exhibit 4, Affidavits of Rollins and Wilson at ¶¶ 6; Exhibit 5, Affidavits of Hicks, Brackins, Ward, Tiller, Allen, Snell, Simon, Burkes, Woodley, Oliver, Bynum, Brown, and Washington at ¶¶ 6). It follows that any time worked over 40 hours off the clock is overtime. Through its own admission Perdue knows employees perform compensable work off the clock, Defendant's Motion at 23; Def's Motion at Exhibit A, Tab 1, Consent Judgment at PER_AND000002, ¶3; Exhibit 1, Def's Response to Pltf's Request for Admission No. 39, 40, 56; Exhibit 3, Affidavit of Dixon at ¶¶ 10 - 17, ¶¶ 22 – 23 and ¶¶ 27 - 32; Exhibit 4, Affidavits of Rollins and Wilson at ¶¶ 8 - 13, ¶¶ 17 - 18; Exhibit 5, Affidavits of Hicks at ¶¶ 9 - 11, ¶¶ 14 – 16, ¶¶ 23 – 25 and ¶¶ 28 – 33, Brackins at ¶¶ 9 - 12, ¶¶ 15 – 17, ¶¶ 23 – 24, ¶ 27 and ¶¶ 31 – 33, Ward at ¶¶ 9 – 17, ¶¶ 23 - 25, ¶ 28 and ¶¶ 31 – 34, Tiller at ¶¶ 9 - 17, ¶¶ 23 – 28 and ¶¶ 30 – 34, Allen at ¶¶ 9 – 17, ¶¶24 - 35, Snell at ¶¶ 9 – 11, ¶ 15 and ¶¶ 20 – 28, Simon at ¶¶ 9 - 12, ¶¶ 15 – 17 and ¶¶ 23 - 36. Burkes at ¶¶ 9 - 12, ¶¶ 14 – 15, ¶¶ 23 – 24 and ¶¶ 28 – 33, Woodley at ¶¶ 9 - 12, ¶¶ 14 – 15, ¶¶ 23 – 24 and ¶¶ 28 – 33, Oliver at ¶¶ 9 - 11, ¶¶ 13 – 16, and ¶¶ 20 – 29, Bynum at ¶¶ 9 – 11, ¶¶ 14 – 16 and ¶¶ 23 - 34, Brown at ¶¶ 9 – 12, ¶¶ 15 – 18 and ¶¶ 23 – 35, and

Washington at ¶¶ 9 – 12, ¶¶ 16 -22. In fact, Defendant's supervisors are present at the time employees clock in and clock out and as such supervisors observe employees have already obtained PPE, donned PPE, continue to wear and doff PPE, all off the clock as well as sanitize their boots off the clock. *See* Def's Exhibit E, Declarations of Clark at ¶ 5, Davis at ¶ 4, Durr at ¶ 5, Floyd, Hudson at ¶ 3, Richards at ¶ 5, and Smith at ¶ 5; Exhibit 1, Def's Response to Pltf's Request for Admission No. 75 (evidence employer is aware employees obtain equipment off the clock). A reasonable jury, evaluating the evidence submitted by the employees, could draw an inference favoring the Plaintiffs. The inference is that Perdue employees work over 40 hours a week, the employer knew or should have known the employees were performing work off the clock and in fact, employees were not paid for the off the clock work, therefore Perdue suffered or permitted the Plaintiffs to work without compensation. This inference introduces a genuine issue of material fact and therefore the Defendant's Motion must be denied.

H. Clearing Security as a Principal Activity

71. There is a genuine issue as to whether clearing security is the employees' first principal activity. In determining whether clearing security is a principal activity the courts apply three factors: (1) whether the activity is required by the employer; (2) whether the activity is necessary for the employee to perform his duties; and (3) whether the activity primarily benefits the employer. *See Chao v. Tyson Foods, Inc.*, 2008 WL 2020323 (N. D. Ala., 2008)(citing *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 401 (5th Cir .1976)). All three factors of this test are satisfied. First, it is undisputed that Perdue employees are required to go through security before beginning their shift. *See, e.g.,* Exhibit 5, Affidavits of Hicks, Brackins, Ward, Tiller, Allen, Snell, Simon, Burkes at ¶¶

9; Exhibit 6 at PER_AND000022 and PER_AND000179. Second, because employees cannot enter the plant without first going through security, it would be impossible for them to perform their duties without clearing security. Exhibit 6 at AND000179. Finally, Perdue has this procedure set up for a reason: It is beneficial to them to have security at their plant. While it is true that employees benefit from security, Perdue benefits substantially more because maintaining a safe working environment, protecting the plant and the people inside and protecting the wholesomeness of product and the food supply are all in the best interest of Perdue and the third factor is satisfied.

I. Plaintiffs' Claims Are Not *De Minimis*

72. Perdue has failed to meet its burden under the summary judgment standard by failing to submit any evidence supporting its position that the work performed by the Plaintiffs is *de minimis* as a matter or law. Perdue asserts that the work performed by Plaintiffs is *de minimis* and therefore not compensable. *See* Defendant's Motion at 29 - 31. Counsel for Perdue has failed to submit any evidence regarding the amount of time it takes to perform the activities at issue. *See* Defendant's Motion at 29-31. The crux of the *de minimis* exception involves, among other criteria, the amount of time spent performing uncompensated work. Logically, without this information, a *de minimis* argument cannot properly be made and cannot overcome the summary judgment standard. *See Davis v. Charoen Pokphand (USA), Inc.*, 302 F.Supp.2d 1314, 1319 (M.D.Ala. 2004) (stating under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper.); *See also*, *Chao v. Tyson Foods, Inc.*, 2008 WL 2020323 *2 (N.D. Ala.) (finding the party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Perdue's counsel is attempting to persuade this Court with a general allegation, no evidentiary support, and a simple "string cite" of case law explaining the *de minimis* exception. Without **any** facts relating to the relevant law it is impossible for the Defendant to prove they are entitled to judgment as a matter of law. Conversely, Plaintiffs fully meet their burden under the standard by submitting evidence beyond the pleadings which prove that the *de minimis* exception is improper in this case. *See, e.g.*, Exhibit 5, Affidavits of Hicks at ¶39 (18 minutes), Brackins at ¶38 (18 minutes), Ward at ¶39 (36 minutes), Tiller at ¶38 (36 minutes), Allen at ¶39 (18 minutes), Simon at ¶39 (12 minutes), Burkes at ¶38 (18-30 minutes), Woodley at ¶39 (18 minutes), Bynum at ¶38 (18 minutes), Brown at ¶39 (18 minutes), Andrews at ¶35 (30-48 minutes).

<u>The time worked by Plaintiffs is compensable under the FLSA and does not fall victim to the *de minimus* exception.</u>

73. When applying the *de minimis* exception, "[N]o rigid rules can be laid down with mathematical certainty as to when the *de minimis* rule applies." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 07-cv-449-bbc *23 (W.D. Wis. 2008) (citing *Frank v. Wilson & Co.*, 172 F.2d 712, 716 (7th. Cir. 1949)). "The core purpose of the FLSA is to ensure that employers pay their employees for all hours worked. **Allowing an employer not to pay an employee merely because the amount of time worked is *de minimis* conflicts directly with that core purpose**." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 07-cv-449-bbc (W.D. Wis. 2008) (citing *Spoerle v. Kraft Foods Global, Inc.*, 527 F.Supp.2d 860 (W.D. Wis. 2007), stating, "[E]ven if the total time at issue is

only a few minutes, this would not necessarily mean that the time was not compensable") (emphasis added). In other words, "when providing compensation for a task imposes no additional burden on the employer, there is no justification for denying the employee compensation for the task, regardless of how fast the task was performed." *Kasten* at 23-24 (citing *Spoerle* at 869).

74. There is no statutory basis for the *de minimis* exception. *See e.g., Id.* The 1946 Supreme Court's decision in *Anderson v. Mt. Clements Pottery Co.*, 328 U.S. 680 is the only time the Supreme Court has considered the exception's application. *See Id.* In *Anderson* the Court determined, "[T]he precise scope of [the] application can be determined **only after the trier of facts makes more definite findings** as to the amount of walking time in issue." *Anderson* at 1195 (emphasis added). Whether the work performed by the Plaintiffs is *de minimis* is a question of fact to be determined by a jury. *See Chao*, 2008 WL 2020323 *13 (N.D. Ala.).

75. The Wage and Hour Memorandum No. 2006-2 Perdue attaches in support of its Motion analyzes the Supreme Court's opinion in *IBP v. Alvarez*. *See* Def's Motion at 25 and Exhibit H at 4. The subsection titled "De Minimus Activities" explains the 2005 Supreme Court ruling's impact on the *de minimis exception.* The memorandum outlines that while the Supreme Court did not specifically address the exception in *Alvarez*, it did remand a case to the 1st Circuit stating, "[D]uring a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded" from the Portal to Portal Act and is thus compensable. The Advisory Memo goes further stating *Alvarez* clearly stands for the proposition that where the aggregate time spent donning, walking, waiting, and

doffing exceeds the *de minimis* standard it is compensable and any other conclusion would be inconsistent with the continuous workday rule. *Id.*

76. In *Fox v. Tyson Foods*, 2002 WL 32987224 (N.D.Ala 2002) the employees claimed they spent 8 to 20 minutes a day donning and/or doffing along with cleaning without compensation. Tyson submitted a motion for summary judgment and while Defendant did not make a *de minimis* argument, Plaintiffs argued the time was not *de minimis*. *Id.* Regarding the *de minims* exception the court noted:

> Of course, it is possible that Tyson will be able to show that the plaintiffs have exaggerated or misstated the time it takes to don and doff the equipment and that the activity is not compensable because it falls within the *de minimis* exception; at this stage, however, the time is a disputed fact, and because all the plaintiffs assert that the **donning**, **doffing**, and cleaning takes at least about 8 minutes per day to about an hour per day, it would not appear to fall under the *de minimis* exception. *Id* at *9 fn. 11.

Plaintiffs submit evidence to this Court, in the form of affidavits, proving the fact that they worked anywhere from 18 to 40 minutes a day without compensation. *See, e.g.,* Exhibit 5, Affidavits of Hicks at ¶39 (18 minutes), Brackins at ¶38 (18 minutes), Ward at ¶39 (36 minutes), Tiller at ¶38 (36 minutes), Allen at ¶39 (18 minutes), Simon at ¶39 (12 minutes), Burkes at ¶38 (18-30 minutes), Woodley at ¶39 (18 minutes), Bynum at ¶38 (18 minutes), Brown at ¶39 (18 minutes), Andrews at ¶35 (30-48 minutes).

Perdue's counsel failed to mention and subsequently apply the test used by this Court to determine whether otherwise compensable time is *de minimis*. (See Defendant's Motion for Summary Judgment, 29-31). In *Davis v. Charoen Pokphand (USA), Inc., supra* this Court listed three factors to determine whether the *de minims* exception to the FLSA should be invoked:

(1) The practical administrative difficulty of recording the uncompensated time;

> (2) The aggregate amount of uncompensated time; and
> (3) The regularity of the uncompensated work.

302 F.Supp. 2d 1323 (holding that a genuine issue of material fact remained as to all three factors based on evidence presented by both the Plaintiff) (citing *Lindow v. United States*, 738 F.2d 1057, 1062 - 1063 (1984) (The *Lindow* test is actually a 4 pronged test analyzing: amount of time spent daily, administrative difficulty, aggregate size of claim, and regularity of off the clock work). In *Davis* the Plaintiffs - like Perdue employees - worked at a poultry processing plant and were required to don protective gear before they clocked in. *Id* at 1317-1320. The named Plaintiff, Jacqueline Davis, spent time before and after shift as well as during one of the two thirty minute "breaks" donning and doffing protective gear while not on the clock. *Id* at 1317-1319. Just like the instant case the Defendant asserted a *de minimis* argument. *Id* at 1325. This Court did not accept that defense holding, "[T]hat summary judgment is not appropriate on Davis's pre- and post-shift donning-and-doffing claim on a *de minimis* ground." *See Id.* at 1323. This Court applied the three factors above plus the *Lindow* 10 minute threshold:

> First, Davis testified that she spends between 15 and 17 minutes total donning her hairnet, rubber gloves, smock, boots, and jumpsuit. This obviously exceeds the ten-minute de minimis threshold cited in *Lindow*. *Davis* at 1325.

In this case the employees have testified that they spend over 18 minutes a day obtaining equipment, donning, doffing, walking and sanitizing which "obviously exceeds the ten-minute *de minimis* threshold cited in *Lindow* although periods as small as 4 minutes a day have survived the *de minimis* argument.. *See Kastans* at 24. "

> Second, Davis notes that Pokphand already requires its employees to "clock-in" prior to starting their shift, which is evidence that administrative means of recording time spent donning and doffing clothes and protective gear exist. *Id.*

Perdue employs the Kronos time system discussed below, which by there own admission is very high-tech, capable of capturing all principal activities without the need to round to the hour or the minute. *See* Exihibit 1, Def's Response to Pltf's Requests for Admission No. 91 – 92. As previously established above, Perdue's employees clock in and out at the beginning and end of their shifts as well as on breaks. This constitutes "evidence that administrative means of recording all compensable activities exists." (Defendant's Motion at 11, 2). The Kronos system appears to be similar to the system used by Tyson Foods in *Chao v. Tyson Foods, Inc*., 2008 WL 2020323; Defendant's Motion at 10. In *Chao v. Tyson,* Tyson had a system in place, the "Perstime" system, "which [could] track increments as small as one-hundredth of an hour." *Id.* at 11. The Court determined, "Therefore, Defendant is clearly capable of tracking small amounts of time that might otherwise be *de minimis*." *Id.* In *Kasten v. Saint-Gobain Performance Plastics Corp, supra*, the Defendant used the Kronos time keeping system, the same brand of system used by Perdue Farms. In that case the Defendant admitted that all time could be recorded to the minute. *See Id.* It is a fair assumption that the Kronos time system in *Saint-Gobain* calculate time similarly, if not exactly, the same way as they do in Perdue's facility. *See* Defendants Motion at 11, 12. According to Perdue, employee's time is captured by one of several Kronos time clocks that are designed to capture all principal work activities." *See* Second Dec. of Tabinowski ¶ 6. It is undisputed that a device as high-tech as the "Kronos time-keeping system" can account for the time it takes employees to don and doff **all** of their **required** protective gear, including boots, bump caps, earplugs, hairnets, beardnets and safety glasses, even if those clocks need to be moved to a different location. *See* Exihibit 1, Tab 1, Def's Response to Pltf's

Interrogatories No. 18 (Perdue states it has moved time clocks in the past at the request of USDA). The practical administrative difficulty of recording the uncompensated time at issue in this is yet another genuine issue of material fact under substantive law which must be decided by a jury.

> Thirdly, the aggregate amount of time that Davis claims she spends on donning and doffing her clothing and protective gear would amount to at least an hour per week. *Davis* at 1325.

The employees in the instant action spend at least 18 minutes a day obtaining sanitary clothing and or protective equipment, donning and doffing, sanitizing boots, and related walk time, which approaches an hour and thirty minutes per week.

> Finally, satisfying the 4th prong of *Lindow*, Davis' testimony suggests that she regularly spends this time donning and doffing her clothing and protective gear. Davis, therefore, has presented evidence creating a genuine issue of material fact as to whether the amount of time she spends donning and doffing her clothing and protective gear related to her job as a quality-assurance technician is *de minimis*. *Id.*

The record shows that Perdue employees are required to obtain equipment, don and doff the gear, go through security, sanitize their boots, and walk in between principal activites on a consistent daily basis. Applying these factors to the instant case shows that genuine issues of material facts exist, rendering summary judgment on behalf of Perdue Farms inappropriate and due to be denied.

77. In addition to the 3 prong test above, and an analysis of the aggregate size of the Plaintiff's claim, in determining whether a claim is *de minimis*, the courts have considered the aggregate size of all plaintiffs' claims, and have granted relief for claims that might have been considered minimal on a daily basis, but when aggregated, amount to a substantial sum." *Brusstar v. Southeastern Pennsylvania Transp. Authority*, Not Reported in F.Supp., 1988 WL 85657 (E.D.Pa.,1988) (citing *Lindow*, 738 F.2d at 1063);

See *also Landaas v. Canister Co.*, 188 F.2d 768, 771 (3d Cir.1951) ($21.67 to $256.88 per week over three years is not *de minimis*); 29 C.F.R. § 785.47. The record shows that six times a day, Plaintiffs spend approximately three – five minutes from the time they obtain or don their required PPE (bump caps, boots, safety glasses, earplugs, etc.) to the time they walk and arrive to the Kronos system to swipe in with their Kronos cards. *See, e.g.,* Exhibit 5, Affidavits of Hicks at ¶39, Brackins at ¶38, Ward at ¶39, Tiller at ¶38, Allen at ¶39, Simon at ¶39, Burkes at ¶38, Woodley at ¶39, Bynum at ¶38, Brown at ¶39, Andrews at ¶35. The employees make this walk 6 times a day which is approximately 18 minutes a day. *Id.* There are currently 385 Named and Opt-in Plaintiffs in this action and the notice period will not close for another month. Based on 385 Plaintiffs working approximately 18 unpaid minutes a day earning an average of $9.00 a hour[6], Plaintiffs have aggregated daily claims worth $1,159 a day (6930 min. divided by 60 min. = 115.5 OT hours times the OT rate of $13.50), or $7,800 a week or $34,000 a month or $405,000 a year. Clearly the daily, weekly, monthly and yearly claims are hardly unsubstantial

78. Clearly there are genuine issues of material fact and Perdue is NOT entitled to judgment as a matter of law. Because the Plaintiffs work off the clock from 18 to 40 minutes a day obtaining equipment, donning, doffing, walking, sanitizing and waiting this Court must rule in favor of the Plaintiffs and against the Defendant as to the *de minimis* exception. It is disingenuous for Perdue to argue that the employees' are insignificant. If the employees' are truly insignificant so that Perdue should be excused for liability it stands to reason good business practice dictates payment of these wages

---

[6] *Id.*

because while the amount may be insignificant to the Defendant, it is not to the employees as evidenced by the filing of this lawsuit.

**VIII. CONCLUSION**

79. A genuine issue of material fact exists as to whether the Defendant should be released from liability under the FLSA. The Plaintiffs have met there burden by going beyond the pleadings to show genuine issues of material fact exist. Plaintiffs argue that all of the work performed by them before and after the workday as well as during breaks is integral and indispensable to their jobs and to Perdue as their employer. The Plaintiffs believe that a jury should decide what activities are principal to the Plaintiffs' workday. The employees have shown that the work performed by them is not *de minimis* by any stretch of the imagination. The facts and issues in this case are not appropriate for summary judgment. Accordingly, Plaintiffs ask this Court to deny the Defendant's Motion for Summary Judgment in its entirety.

Dated: June 11, 2008

Respectfully submitted,

**THE COCHRAN FIRM, P.C.**

/s/ Robert J. Camp

**ROBERT J. CAMP**
505 North 20th Street, Suite 825
Birmingham, AL 35203
(205) 244-1115 (Phone)
(205) 244-1171 (Fax)

***Attorney for Plaintiffs***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA,**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS , INC.,** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |
| | § | |

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2008, the foregoing Response to Defendant's Motion for Summary Judgment has been filed with the clerk of the District Court by using the CM/ECF system which sent notification of such filing and/or placed same in the United States Mail, postage prepaid as follows:

James J. Kelley
Morgan, Lewis & Brockius, LLP
111 Pennsylvania Avenue NW
Washington, DC 20004
202-739-3000-phone
202-793-30001-fax
**jkelley@moganlewis.com**

Lexer I. Quamie
Morgan, Lewis & Brockius, LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
202-739-5955
**Lquamie@morganlewis.com**

Sandra Beth Reiss
Ogletree, Deakin, Nash, Smoak & Stewart, P.C.
1819 5th Avenue North
Suite 1000
Birmingham, Alabama 35203
205-328-1900-phone
205-328-6000-fax
**sandra.reiss@odnss.com**

This the 11th Day of June, 2008

s/Robert J. Camp
**ROBERT J. CAMP(ASB-1864-076C)**
The Cochran Firm, P.C.

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| **DARRYL ANDERSON, et al.** | § |
| | § |
| **PLAINTIFF(S)** | § |
| | § |
| **V.** | § **1:06-cv-1000-MEF-WC** |
| | § **JURY TRIAL DEMANDED** |
| **PERDUE FARMS INC.,** | § |
| | § |
| **DEFENDANT.** | |

**EXHIBIT LIST**
**FOR PLAINTIFF'S MEMORANDUM IN OPPOSITION OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Exhibit 1** Defendant's Response to Plaintiffs' Request for Admission

Tab 1 Defendant Perdue Farms, Inc., Responses to Plaintiffs' Fist Set of Interrogatories

**Exhibit 2** Deposition of Perdue's Internal Wage & Hour Auditor, David J. Tabinowski

**Exhibit 3** Affidavit of Quality Control Employee Marsha Dixon

**Exhibit 4** Affidavits of Napoleon Rollins & Queen Wilson

Tab 1 Good Manufacturing Practices (GMPs) Prerequisites 0.1

**Exhibit 5** Affidavits of Clarice Hicks, Olivia Brackins, Katrina M. Ward, Michelle Tiller, Gloria D. Allen, Eddie Charles Snell, Felisha Simon, Indya Burkes, Annie Woodley, Betty Oliver, Geneva Bynum, Gloria J. Brown, Mary L. Washington, Bobby Wimes Wilson, Horris Andrews

**Exhibit 6** Defendant's Responses to Plaintiffs' Request for Production-Standard Operating Procedure for Facility Security-Access to Associate Entrance

**Exhibit 7** Defendant's Proffered Declarations of Lisa Banks, Cheryn Cawthon, Lillie Green, Leticia Johnson, Brenda Mack

**Exhibit 8**     Defendant's Response to Plaintiffs' Request for Production-Orientation Materials

**Exhibit 9**     DOL Field Operations Handbook Excerpt

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.** | § | |
| | § | |
| **PLAINTIFF(S)** | § | |
| | § | |
| **V.** | § | **Case Action No.: 1:06-cv-1000-MEF-WC** |
| | § | |
| **PERDUE FARMS INCORPORATED** | § | |
| | § | |
| **DEFENDANT.** | | |

# EXHIBIT 1
# DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.

Plaintiffs,

v.

PERDUE FARMS INCORPORATED,

Defendant.

Case No.: 1:06-CV-1000-MEF-WC

**DEFENDANT PERDUE FARMS INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendant Perdue Farms Incorporated, ("Perdue" or "Defendant") hereby serves its Responses and Objections to the Plaintiffs' First Requests for Admissions.

## PRELIMINARY STATEMENT

Defendant's responses to Plaintiffs' Requests are based upon its current knowledge, information, and belief. Therefore, Defendant reserves the right at any time to clarify, alter, amend, supplement, modify, or otherwise revise these objections and responses if such alterations, amendments, supplements, modifications, or revisions become appropriate or warranted. Defendant reserves all objections as to the competency, relevance, materiality, privilege, or admissibility of its responses herein and any document or thing identified in these Responses.

## GENERAL OBJECTIONS

1. Defendant objects to any instruction, definition, or request for admission that attempts to impose obligations on Perdue that exceed its obligations under the Federal Rules of Civil Procedure. Defendant will respond to these Requests within the scope of those Rules.

2. To the extent that the Requests seek information which is protected by the attorney-client and/or work product privileges, Defendant objects to the Requests on the grounds of said privileges, or any other applicable privilege.

3. Any inadvertent admittance of any privileged information or identification shall not constitute a waiver of any of the rights or privileges of the Defendant.

4. Defendant objects to Plaintiffs' First Requests to the extent that they are vague, ambiguous, overly broad, unduly burdensome and seek information that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

5. Defendant objects to Plaintiffs' First Requests to the extent that they require that the Defendant discloses proprietary or confidential business information or private information concerning its employees without the benefit of a Confidentiality Order governing the use and disclosure of such information.

6. Defendant objects to Plaintiffs' First Requests to the extent that they seek information outside the relevant time period or for an overly broad period of time and responds to these Requests for Admissions for the time period of October 31, 2004 to the present.

7. Perdue objects to Plaintiffs' First Requests to the extent they ask about any facility other than the Perdue processing facility in Dothan, Alabama.

8. Defendant objects to Plaintiffs' First Requests to the extent the information sought is not within the possession, custody, or control of Defendant.

9. Defendant objects to Plaintiffs' First Requests to the extent they do not seek admissions of fact or the application of the law to specific facts, but rather seek purely legal interpretations or characterizations of statutes, correspondence, contracts, or other documents that should speak for themselves.

10. Defendant objects to Plaintiffs' First Requests to the extent they seek admissions for which Perdue does not have sufficient information to either admit or deny.

11. Each of these general objections, to the extent applicable, is incorporated into the responses below, and the recitation of additional specific objections or the failure specifically to reference these general objection in the responses below should not be construed as a waiver of such objections.

12. No adverse inference shall be drawn from Defendant's failure to admit or deny a request to which it has provided a reasonable objection.

**SPECIFIC OBJECTIONS AND RESPONSES TO ADMISSION REQUESTS**

All of the General Objections stated above shall be deemed reasserted as to each Request to which they are applicable as if fully set forth in response to that Request. In addition to the foregoing General Objections, and without waiver thereof, Defendant makes the following specific Objections and Responses to Plaintiffs' individual Requests:

**RESPONSES AND OBJECTIONS**
**(In addition to General Objections)**

1. Admit that Defendant received Social Security Mismatch Letters at any time during the last three (3) years.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

2. Admit that Social Security Mismatch Letters indicate problems with employee social security numbers.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

3. Admit that Defendant submitted W-2 tax forms to the IRS for all plaintiffs.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits this Request.

4. Admit that at any point during the last three (3) years that if an employee's social security number is present on a social security mismatch letter but that employee did not use their social security number as identification on their I-9 the Defendant continued to employ the individual.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

5. Admit Defendant has received, at any time during the last three (3) years, Social Security Mismatch Letters for employees who have not corrected their social security number problem after receiving from Defendant notice of the problem in the past.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

6. Admit Social Security Mismatch Letters received for the Dothan Plant in 2006 and 2007 contained less than 100 problem social security numbers.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

7. Admit Defendant notifies the state unemployment agency of new hire employees.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

8. Admit that the state unemployment agency notifies Defendant when a social security number does not appear to be proper.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to Request No. 8 on the grounds that the phrase "does not appear to be proper" is vague and ambiguous. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

9. Admit that social security offices contact the plant or Defendant when U.S. citizens complain that their social security number is being used by an employee of Defendant's.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

10. Admit that Defendant does not terminate an employee after his/her number is called into question by a social security office in response to a U.S. citizen complaining that there [sic] social security number is being used by an employee.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

11. Admit Defendant participates in [sic] Social Security Administration's Basic Pilot Program.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

12. Admit Defendant has knowledge that the Social Security Administration's Basic Pilot Program does not stop the occurrence of Social Security Mismatch Letters.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

13. Admit Defendant is a federal contractor or subcontractor.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

14. Admit English and Spanish are not the only languages spoken by employees in the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

15. Admit Defendant has FLSA required posters posted in English.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits it has FLSA required posters posted in English in the Dothan, Alabama processing facility.

16. Admit Defendant has FLSA required posters posted in Spanish.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits it has FLSA required posters posted in Spanish in the Dothan, Alabama processing facility.

17. Admit Defendant does not have FLSA required posters posted in any languages other than English or Spanish.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits it does not have FLSA required posters in any languages other than English or Spanish in the Dothan, Alabama processing facility.

18. Admit Defendant does not hold any training sessions verbally communicating to employees their rights under the FLSA.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 18, to the extent it is vague, overbroad, and unduly burdensome. Perdue denies Request No. 18 and states it trains employees on proper pay practices and policies under the FLSA.

19. Admit Defendant does not verbally communicate to employees in orientation their rights under the FLSA.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 19, to the extent it is vague and overbroad. Perdue denies Request No. 19 and states it communicates proper pay practices and policies to employees during orientation under the FLSA.

20. Admit that Defendant does not provide employees with any memoranda or written policies or procedures describing the employee's FLSA rights.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 20, to the extent it is vague and overbroad. Perdue denies Request No. 20 and states it provides employees with written material describing proper pay practices and policies under the FLSA.

21. Admit Defendant has knowledge that some employees cannot read nor write in their native tongue or any other language.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 21.

22. Admit Defendant has knowledge that some employees cannot speak English.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 22.

23. Admit Defendant has knowledge that some employees cannot speak English or Spanish.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 23.

24. Admit Defendant uses recruiters or staffing agencies to provide hourly labor.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 24.

25. Admit the plant has been subject to a USDA Notice of Intended Enforcement (NOIE) in the last five years.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

26. Admit Dr. Larry Smith is the plant's USDA District Manager.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

27. Admit Mr. Alfred Almanza is the plant's USDA District Manager.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

28. Admit Dr. Paul Resweber is the plant's USDA District Manager.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

29. Admit Mr. Steve Lalicker is the plant's USDA District Manager.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

30. Admit Mr. Marcia Endersby is the plant's USDA District Manager.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

31. Admit that a card swipe system is used to verify employees' identities before allowing access onto the plant property.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 31.

32. Admit that a hand scan system is used to verify employees' identities before allowing access onto the plant property.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 32.

33. Admit that a badge system is used to verify employees' identities before allowing access onto the plant property.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states employees are required to show their Perdue identification badge to a security guard to enter the Dothan facility.

34. Admit USDA maintains offices and personnel at the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

35. Admit USDA employees and veterinarians are present during plant production hours.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

36. Admit USDA has suspended or withdrawn inspection due to safety related issues at the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

37. Admit the payroll system used, for purposes of attendance and tardiness, records the date and time of arrival and departure of the employee.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 37 on the grounds that it is vague and ambiguous. Subject to these objections, Defendant admits that the payroll system collects and

stores the date and time of arrival and departure of the employee. Defendant denies the remainder of Request No. 37.

38. Admit that during one or more weeks during Plaintiffs' employ with Defendant, Plaintiff worked in excess of forty (40) hours in a workweek.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits the following Plaintiffs worked in excess of forty (40) hours in at least one work week since October 31, 2004.

Shanetha Adams
Darryle Anderson
Annie Woodley
Angela Williams
Katrina Ward
Randy Sol
Michelle Tiller
Hattie Smith
Felisha Simon
Billie Joe Newby
Don Murry
Carolyn McCoy
Brittanica McCoy
Horace Love
Harry Lett
Roy King
Laqunda Kegler
Clarice Hicks
Anthony Davis
Geneva Bynum
Norline Black
Olivia Brackins
Velverlyn Gibson
Veta Griffin
Walter Hamilton
Deanna Jackson

39. Admit plaintiffs paid under Perdue's time keeping system do not receive compensation for walk time from the point of access into the plant to the time clocks and vice versa after donning hair nets and ear plugs.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 39 on the grounds that it is vague and ambiguous. Subject to these objections Defendant states Plaintiffs are not compensated for time spent walking to the Kronos time keeping clocks to swipe in, or any time spent walking away from the Kronos time keeping clocks after swiping out. Defendant does not capture the time Plaintiffs spend donning and doffing hairnets and ear plugs.

40. Admit at breaks, hourly plaintiffs paid under Perdue's time keeping system do not receive compensation for walk time from the point of access into the plant to the time clocks and vice versa after donning hair nets and ear plugs.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 40 on the grounds that it is vague and ambiguous. Subject to these objections Defendant states Plaintiffs are not compensated for time spent walking to the Kronos time keeping clocks to swipe in, or any time spent walking away from the Kronos time keeping clocks after swiping out.

41. Admit plaintiffs wash themselves before break after clocking out.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 41 on the grounds that it is vague and ambiguous. Defendant lacks knowledge to form a belief as to what Plaintiffs do during their breaks.

42. Admit plaintiffs wash themselves after break before clocking back in to work.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant also objects to Request No. 42 on the grounds that it is vague and ambiguous. Defendant further objects to Request No. 42 because it lacks information or knowledge to provide a response.

43. Admit Plaintiffs are members of a collective bargaining unit.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 43.

44. Admit that the union on behalf of an employee has filed grievances related to wage and hour violations.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs are not members of a union and therefore denies Request No. 44.

45. Admit the current collective bargaining agreement contains provisions for payment of donning and doffing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs are not subject to the terms of a collective bargaining agreement and therefore denies Request No. 45.

46. Admit previous collective bargaining agreements have contained provisions for payment of donning and doffing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs are not and have not been subject to the terms of a collective bargaining agreement and therefore denies Request No. 46.

47. Admit previous collective bargaining agreements did not contain provisions for payment of donning and doffing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs are not and have not been subject to the terms of a collective bargaining agreement and therefore denies Request No. 47.

48. Admit that union officials have questioned Defendant's time keeping practices since any settlement with the Department of Labor for wage violations.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs are not members of a union and therefore denies Request No. 48.

49. Admit the Company must pay employees for all hours worked.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 49.

50. Admit employees have questioned any or all Defendant's time keeping practices made subject of this suit.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 50 on the grounds that the phrase "employees have questioned any or all Defendant's time keeping practices" is vague and ambiguous. Defendant further objects to Request No. 50 because it lacks information or knowledge to provide a response.

51. Admit Defendant communicates to hourly employees that its payroll practices comply with the law.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states it communicates to employees proper pay practices and procedures.

52. Admit that after the *IBP v. Alvarez* Supreme Court decision, Defendant reviewed its time keeping system and determined in light of the Department of Labor settlement, *IBP* did not affect their time keeping practices.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 52.

53. Admit the letter attached as Exhibit A accurately depicts Defendant's time keeping practices.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant further objects to Request No. 53 because there is no letter attached as Exhibit A, Defendant lacks knowledge or information to provide a response.

54. Admit employees, with facial hair, before entering the production areas of first or second processing, plaintiffs must don beard nets, hair nets, and ear plugs.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 54.

55. Admit USDA requires hairnets and beard nets to be worn in 1st and 2nd processing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 55.

56. Admit depending on the job, Defendant's policies require employees to wear items such as hair nets, beard nets, smocks, aprons, rubber gloves, cotton gloves, ear plugs, safety glasses, sleeve guards, and cut gloves some of which are donned prior to clocking in and some are donned subsequent to clocking in.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits that depending on which area Plaintiffs are working in, Defendant's policies require employees to wear items such as hair nets, beard nets, smocks, aprons, rubber gloves, ear plugs, safety glasses, sleeve guards, and cut gloves. A hair net, ear plugs, and safety goggles are donned prior to clocking in and if required for the department, a smock, apron, rubber gloves, sleeve guards, and /or cut gloves are donned subsequent to clocking in. Defendant denies that Plaintiffs are ever required to wear cotton gloves.

57. Admit Defendant is aware of incidences where employees have suffered rashes due to exposure to fecal or processing water.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 57 on the grounds that the phrase "rashes due to exposure to fecal or processing water" is vague and ambiguous. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

58. Admit Defendant is aware of employees suffering from incidences of "chicken rash."

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 58 on the grounds that the phrase "chicken rash" is vague and ambiguous. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

59. Admit an effective way of minimizing rashes resulting from exposure to process water and or fecal matter is the use of good hygiene and frequent washing of exposed areas of skin.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 59 on the grounds that the phrase "an effective way of minimizing rashes resulting from exposure to process water and or fecal matter is the use of good hygiene and frequent washing of exposed areas of skin" is vague and ambiguous and not susceptible to a precise response. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

60. Admit Defendant is aware of incidences where eye infections or eye injuries have occurred due to exposure to flying processing water, fecal material, or other exposure to processing by-product.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Defendant states it is aware of incidences of eye infections or eye injuries but Defendant lacks information or knowledge to provide a response as to the causes of Plaintiffs' eye infections or eye injuries.

61. Admit Defendant has had incidences of slip and fall accidents within the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Request No. 61 because it lacks information or knowledge to provide a response.

62. Admit Defendants 1st and 2nd processing are wet environments utilizing water in the process.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant admits Request No. 62.

63. Admit 1st and 2nd processing floors are wet with water.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant admits some areas in 1st and 2nd processing may be wet from time to time.

64. Admit 1st and 2nd processing floors are slippery due in part to chicken fat.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant admits some areas of 1st and 2nd processing are wet from time to time.

65. Admit Plaintiffs were not paid for the time it takes to wash themselves as well as equipment while on breaks.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 65 on the grounds that the phrase "wash themselves" is vague and ambiguous. Subject to these objections, Defendant states that Plaintiffs sanitize their equipment while "on the clock" before swiping out for their thirty-minute unpaid breaks. Defendant further states that Plaintiffs sanitize their outer garments and their person after they swipe back in from their thirty-minute breaks.

66. Admit customer specification or requirements sometimes dictate the personal protective equipment or sanitary clothing that must be worn.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 66.

67. Admit OSHA has cited the plant for violations related to personal protection equipment.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 67.

68. Admit employees have been disciplined or counseled, written or verbal, for not wearing required personal protection equipment or sanitary clothing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits some 1st and 2nd processing employees have been disciplined or counseled for not wearing personal protective equipment or sanitary clothing.

69. Admit Defendant has had OSHA recordable incidents related to hearing conservation.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to Request No. 69 on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

70. Admit USDA or employer rule precludes processing employees from wearing their smocks in the break room or outside the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 70.

71. Admit hourly 1st and 2nd processing employees wash clothing and personal protective equipment they take home or leave in lockers at the end of the shift.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states it lacks information or knowledge to provide a response as to what employees do with items such as ear plugs, safety goggles, and hair nets that they normally keep in their possession or leave in their lockers.

72. Admit hourly 1st and 2nd processing employees are not allowed via USDA rule to wear the prior day's soiled sanitary clothing or personal protective equipment.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states, pursuant to the Company's Good Manufacturing Practices policy, 1st and 2nd Processing employees must wear clean clothes and use clean personal protective equipment at the beginning of their shift.

73. Admit hourly 1st and 2nd processing employees wash their own smocks.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 73.

74. Admit 1st and 2nd processing employees who wash their own smocks are not paid for the time incurred in washing same.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant states that 1st and 2nd processing employees remove their smocks and place

them in a laundry bin or hook before clocking out. 1st and 2nd processing employees do not wash their own smocks.

75. Admit hourly 1st and 2nd processing employees must pay for replacement personal protection equipment or sanitary clothing if they lose the personal protection equipment or sanitary clothing issued to them.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 75.

76. Admit hourly 1st and 2nd processing employees must wear rubber footwear within the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states 1st and 2nd processing employees must wear slip-resistant footwear within the plant.

77. Admit hourly 1st and 2nd employees must pay for the rubber footwear they wear in the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states 1st and 2nd processing employees must pay for slip-resistant footwear they wear in the plant.

78. Admit hourly 1st and 2nd processing employees must wear slip-resistant footwear within the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 78.

79. Admit hourly 1st and 2nd employees must pay for the slip-resistant footwear they wear in the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 79.

80. Admit that at any time within the last three (3) years, Defendant has not changed its payroll policies or practices with regard to compensating hourly 1st and 2nd processing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant admits Request No. 80.

81. Admit Defendant compensates employees for walk time using plug time, additional minutes, added to the hourly employees' time on a daily basis.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant denies Request No. 81.

82. Admit Defendant has had local personnel or third parties perform time studies to estimate the time it takes to don and doff sanitary clothing and personal protection equipment at any time during the last three (3) years.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant denies Request No. 82.

83. Admit Defendant has had local personnel or third parties perform time studies estimating the time it takes employees to walk to their positions on the line at any time during the last three (3) years.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant denies Request No. 83.

84. Admit the areas in which employees don or doff clothing and equipment has not changed in the last three (3) years.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant admits Request No. 84.

85. Admit Plaintiffs receive two unpaid breaks.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Plaintiffs receive two thirty-minute unpaid meal breaks.

86. Admit Defendant deducts unpaid breaks from Plaintiffs' hours worked without regard for the actual time the individual spent on break not performing work.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that the phrase "without regard for the actual time the individual spent on break not performing work" is vague and ambiguous. Defendant states Plaintiffs receive two thirty-minute unpaid meal breaks.

87. Admit during Plaintiffs' unpaid breaks they must don and doff certain protective or sanitary clothing as well as walk to and from the line to the break area.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 87.

88. Admit pursuant to 9 CFR § 307.4 that USDA inspectors take a 30 minute, 45 minute or 60 minute lunch break four hours after the start of production but no later than five hours after the start of production. Once established lunch periods must remain relatively constant as to time and duration.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

89. Admit that while USDA inspectors are on their §307.4 break that production stops in the area that breaking inspectors are assigned.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

90. Admit Defendant's employees are sent to break while USDA inspectors are on their §307.4 break.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

91. Admit hours worked are rounded for purposes of calculating weekly wages.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 91.

92. Admit minutes worked are rounded for purposes of calculating weekly wages.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 92.

93. Admit that all remuneration and/or compensation paid to Plaintiff for services rendered to Defendant is reflected in the payroll records of Defendant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 93.

94. Admit that all remuneration and/or compensation paid to Plaintiffs by Defendant were correctly and properly reflected in the W-2 form provided to Plaintiff.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 94.

95. Admit incentive payments, performance bonuses, attendance bonuses, etc. were included in plaintiffs' regular rate of pay for overtime purposes.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs do not receive incentive payments

performance bonuses, or attendance bonuses. Defendant further states Plaintiffs may receive a seniority bonus which is included in their regular rate of pay for overtime purposes.

96. Admit that all remuneration and/or compensation paid to Plaintiffs by Defendant were correctly and properly reported to the Internal Revenue Service and Social Security Administration.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 96.

97. Admit that any and all remuneration and/or compensation paid to Plaintiffs by Defendant were properly reported to any and all worker's compensation insurers and/or carriers.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

98. Admit that no part of Plaintiff's remuneration and/or compensation was paid in the form of cash.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant admits Request No. 98.

99. Admit hourly employees within 1st processing are required to work any position in which a member of supervision or management places them.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

100. Admit hourly employees within 2nd processing are required to work any position in which a member of supervision or management places them.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

101.    Admit from time to time, due to staffing or attendance, hourly employees are required to work different positions within the plant.

   **RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 101.

102.    Admit due to ergonomic concerns, some hourly employees work different positions on a rotation in order to reduce the effects of repetitive motion jobs.

   **RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant admits Request No. 102.

103.    Defendant's policy related to "Good Manufacturing Practices" (GMP) requires hourly employees to cover their hair, beard, mustaches, and street clothing while in production areas of the plant.

   **RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 103.

Dated: April 4, 2008

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 4th day of April 2008, I caused a copy of the foregoing Defendant Perdue Farms Incorporated's Responses and Objections to Plaintiffs' First Requests for Admissions to be served via electronic mail and first class U.S. mail upon:

Robert J. Camp
505 North 20th Street Suite 825
Birmingham, AL 35203
(205) 930-6900 (Phone)
(205) 930-6910 (Fax)
rcamp@cochranfirm.com

***/s/ Lexer I. Quamie***
Lexer I. Quamie (admitted pro hac vice)
D.C. Bar No. 502908
202-739-5955
lquamie@morganlewis.com
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-739-3001 (fax)

*Counsel for Defendant, Perdue Farms Incorporated*

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL ANDERSON, et al. | § | |
| | § | |
| PLAINTIFF(S) | § | |
| | § | |
| V. | § | Case Action No.: 1:06-cv-1000-MEF-WC |
| | § | |
| PERDUE FARMS INCORPORATED | § | |
| | § | |
| DEFENDANT. | | |

**EXHIBIT 1**

**TAB 1**

# DEFENDANT PERDUE FARMS, INC., RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.

Plaintiffs,

v.

PERDUE FARMS INCORPORATED,

Defendant.

Case No.: 1:06-CV-1000-MEF-WC

**DEFENDANT PERDUE FARMS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Perdue Farms Incorporated ("Perdue"), hereby serves its Responses and Objections to Plaintiffs' First Set of Interrogatories.[1]

**GENERAL OBJECTIONS**

1. Perdue objects to these Interrogatories to the extent they are vague, overbroad, oppressive, or unduly burdensome, and to the extent they are not reasonably limited in time and scope.

2. Perdue objects to these Interrogatories to the extent they ask about activity beyond the relevant time period of October 31, 2004 to the present.

3. Perdue objects to Plaintiffs' First Set of Interrogatories to the extent it asks about any facility other than the Perdue processing facility in Dothan, Alabama.

4. Perdue objects to these Interrogatories to the extent they seek the production of documents and/or information that is of a confidential, proprietary, personal, or private nature to

[1] Defendant provides these Responses and Objections to the identical Interrogatories from each of the named Plaintiffs in lieu of submitting duplicate responses.

Perdue or its current or former employees, except pursuant to a stipulation of confidentiality between the parties.

5.    Perdue objects to these Interrogatories to the extent Plaintiffs seek information or documents that are protected from disclosure by one or more privileges including, but not limited to, the attorney-client privilege and the work-product doctrine.

6.    Perdue objects to these Interrogatories to the extent the information sought is cumulative or duplicative.

7.    Perdue objects to these Interrogatories to the extent they seek information that is not relevant or not reasonably calculated to lead to the discovery of admissible evidence.

8.    Perdue objects to the definitions and instructions section of the Interrogatories to the extent they purport to impose obligations upon Perdue greater than those required by the Federal Rules of Civil Procedure.

9.    To the extent Perdue objects herein to a particular Interrogatory but proceeds to respond to that Interrogatory, Perdue does not waive any objections.

10.    Perdue's investigation is continuing, and it reserves the right to amend or supplement its responses to these Interrogatories as may be necessary or appropriate in accordance with Federal Rule of Civil Procedure 26(e)(1).

11.    Perdue's responses to Plaintiffs' Interrogatories should not be deemed admissions. Perdue reserves the right to raise objections at trial regarding the admissibility of any of the information that it provides or agrees to provide in response to these Interrogatories.

12.    Perdue incorporates these General Objections into each and every response below to the extent applicable.

**RESPONSES AND OBJECTIONS**
**(In addition to General Objections)**

**Interrogatory No. 1:**

With respect to your current or former employees, please identify all individual(s) who, for the three (3) year period preceding the filing of this lawsuit, were responsible for maintaining, or who participated in the maintenance of, the records of: (i) the number of hours worked by Plaintiff each work day and work week; (ii) Plaintiff's rates of regular and overtime pay; and (iii) the amount of regular and overtime pay earned by Plaintiff.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Subject to and without waiving any objections, Perdue identifies: James Stewart, the Regional Accounting Manager for Perdue's processing plant in Dothan, Alabama.

**Interrogatory No. 2:**

State with specificity and in detail, the time, form, manner and amount in which Plaintiff is or was compensated by Defendant. Your response should specifically state the basis for the rate of such calculation (if the amount changed over time, state each amount, and when the amount changed), and include in detail whether Plaintiff was paid on an hourly wage, pursuant to a piece rate method of compensation plan, master time plan, or other compensation policy. Your response also should include a detailed description of the manner in which plaintiff's time spent at Defendant's facilities was recorded and the method for recording same.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Perdue also objects to this Interrogatory to the extent it is not reasonably limited in time and scope, or asks about any other facility other than Perdue's processing plant in Dothan, Alabama. Subject to and without waiving any objections, Perdue states the following:

The base rate of pay for 1st and 2nd processing employees on the day shift is $8.15 per hour. This amount increases to $9.35 after sixty days of employment with Perdue. The base rate of pay for 1st and 2nd processing employees on the evening shift is $8.25 per hour. This amount increases to $9.45 after sixty days of employment with Perdue. The base rate of pay for 1st and

2nd processing employees on the night shift is $8.45 per hour. This amount increases to $9.55 after sixty days of employment with Perdue. Perdue's time recording and pay practices were established in a close working arrangement with representatives from the United States Department of Labor (DOL) in accordance with a settlement agreement between Perdue and the DOL dated May 9, 2002. Pursuant to that settlement agreement, Perdue developed donning and doffing procedures and time recording practices compliant with the Fair Labor Standards Act ("FLSA"), which could be a model for the industry. Perdue's processing plant in Dothan, Alabama uses a Kronos electronic time recording system. Before donning or acquiring work-related equipment and clothing, or performing any other required work activities, Plaintiffs take their assigned access cards and swipe into the Kronos system at designated starting areas. After swiping into the system, the employees don their required clothing, collect their gear and walk to the production line or other work area. All of this occurs while on paid time. The process is reversed at the end of the work day. Employees sanitize, doff required departmental clothing and gear, and then swipe out on the designated Kronos time keeping clock.

The Dothan facility provides Plaintiffs with two unpaid thirty-minute break periods each shift. Employees leave the production line, doff their required clothing and gear at a designated place and swipe out on the Kronos time keeping clock before commencing each unpaid break period. Employees are not allowed to swipe back in until thirty minutes later, as the Kronos time keeping system will not permit employees to swipe back in within thirty minutes of when they swiped out. After swiping back in, employees don their gear and walk to the work station, on paid time, to resume work.

Plaintiffs are paid for all time captured by the Kronos system. Since this system was introduced at the Dothan facility in late 2002 Perdue has not calculated pay entitlements based on line time, master time cards, or any other similar practices.

**Interrogatory No. 3:**

> State with specificity and in detail the terms of all agreements or understandings between Defendant and Plaintiff regarding the basis of Plaintiff's compensation, the manner in which the hours of Defendant's recording of hours worked were explained to Plaintiff, and describe the records and documents that support, tend to support, refute, or tend to refute your response to this Interrogatory.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Perdue further objects to this Interrogatory to the extent it is duplicative of Interrogatory No. 2. In addition, Perdue objects to the terms "agreements" and "understandings" as used here, as vague, unclear, subjective, and not fairly susceptible to an accurate response. Perdue also objects to the extent this Interrogatory is not reasonably limited in time and scope, and refers to any other facility than the Perdue processing plant in Dothan, Alabama. Subject to and without waiving any objections, Perdue incorporates by reference its response to Interrogatory No. 2. Perdue further states there are no agreements between Defendant and Plaintiffs. Perdue further states it provides employees with an orientation and training regarding their compensation.

**Interrogatory No. 4:**

> If Defendant maintains records of the number of hours worked by Plaintiff, describe those records, the manner in which such records were compiled, the name of the individual(s) responsible for compiling those records, the place at which such records are maintained, and identify the person(s) who has custody of such records. This response should specifically include a detailed description of the manner in which Plaintiff's working time was recorded by Defendants, whether Plaintiff was required to punch in separately from the time recordings made by Defendant, and identify all documents that support, tend to support, refute, or tend to refute Defendant's response to this Interrogatory.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Perdue further objects to the extent the Interrogatory is not reasonably limited in time and scope. Perdue also objects to this Interrogatory to the extent it is duplicative of Interrogatory No. 2 and hereby incorporates its response to Interrogatory No 2. Subject to and without waiving any objections, Perdue further states time and attendance records are recorded by the Kronos web-based centralized time-keeping system and records are stored electronically and maintained on a processing server in Salisbury, Maryland.

**Interrogatory No. 5:**

> If Defendant claims that Plaintiff is not entitled to be paid time and one-half for every hour worked in excess of forty (40) hours per work week, please set forth the reason for your claim and the factual basis upon which you make that claim and describe the records and documents upon which you rely in responding to this Interrogatory.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Perdue also objects to the extent the Interrogatory is not reasonably limited in time and scope. Subject to and without waiving any objections, Perdue does not claim that Plaintiffs are not entitled to paid time and one-half for every hour worked in excess of forty (40) hours per work week. Perdue further refers Plaintiffs to the May 9, 2002 Consent Judgment and correspondence clarifying and implementing the Consent Judgment which outlines Perdue's pay practices established in a close working relationship with representatives from the DOL.

**Interrogatory No. 6:**

> If you claim that Plaintiff is or was exempt from the provisions of the Fair Labor Standards Act, please state the specific exemption upon which you rely, and indicate as part of your answer the factual basis for claiming such exemption and describe the records and documents upon which your rely in responding to this Interrogatory.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Subject to and without waiving any objections, Perdue does not claim that Plaintiffs are or were exempt from the provisions of the Fair Labor Standards Act.

**Interrogatory No. 7:**

If Defendant claims that it relied upon any ruling, regulation or interpretation or decision of any kind issued, promulgated or drafted by the United States Department of Labor in support of their alleged failure to pay Plaintiff time and one-half for all hours worked in excess of forty (40) per work week, describe and provide the citation of all such documents.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Subject to and without waiving any objections Perdue states it did not fail to pay Plaintiffs time and one-half for all hours worked in excess of forty (40) hours per work week. Perdue pays Plaintiffs time and one-half for all hours worked in excess forty (40) hours per work week. Perdue further states its time recording and pay practices were established in a close working arrangement with representatives from the DOL in accordance with a Consent Judgment and correspondence clarifying and implementing the Consent Judgment between Perdue and the DOL dated May 9, 2002.

**Interrogatory No. 8:**

If Defendant or any entity owned in whole or in part by Defendant has been sued or investigated by the U.S. Department of Labor or have received a claim by or demand from any employee regarding minimum wage or overtime compensation, state the name of the claimant for the suit, claim and/or investigation and describe in detail the factual basis of the suit, claim and/or investigation.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Subject to and without waiving any objections Perdue responds to this Interrogatory only with respect to its poultry processing plant in Dothan, Alabama. None of Perdue's other processing plants or facilities are at issue in this lawsuit and discovery requests about them are not likely to lead to admissible evidence. Perdue's Dothan Alabama facility worked with representatives from the DOL and entered a May 9, 2002 Consent Judgment and correspondence clarifying and implementing the Consent Judgment, which established Perdue's current pay policies.

**Interrogatory No. 9:**

State the name, address and telephone number of all Certified Public Accounting Firms, accounting services, bookkeeping services and payroll services which provided services to Defendant for the three years preceding the filing of this lawsuit.

**Response:**

Perdue objects to this Interrogatory to the extent it is vague, overbroad, or unduly burdensome. Perdue also objects to the extent the request is not relevant or reasonably likely to lead to the discovery of admissible evidence.

**Interrogatory No. 10:**

State whether you or any attorney or representative on your behalf has obtained statements, reports, memoranda or recordings from any person that in any way concerns the facts of this case or the matters alleged in your pleadings.

    a.   If your answer is in the affirmative, separately identify the author of each such statement, report memorandum or recording; the person or persons to whom the statement, report, memorandum or recording was issued, distributed or otherwise provided; the present location and custodian of each such statement, report, memorandum or recording; and state the date each such statement, report, memorandum or recording was prepared.

**Response:**

Perdue objects to this Interrogatory to the extent it is vague, overbroad, or unduly burdensome. Perdue also objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or work product doctrine.

**Interrogatory No. 11:**

Please identify the individual(s) or employee(s) of Defendant responsible for computing the weekly wages due to and/or paid to Plaintiff.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Perdue objects to this Interrogatory to the extent it is vague, overbroad, or unduly burdensome. Perdue further objects to the extent the Interrogatory is not reasonably limited in time and scope. Perdue objects to the term "computing" as used here, as vague, unclear, subjective, and not fairly susceptible to an accurate response. There is no single individual responsible for computing the weekly wages to due to Plaintiffs. Pursuant to the Kronos system, Plaintiffs' hours are recorded and tracked by the Kronos computerized time tracking system and stored on a server in Salisbury, Maryland. Plaintiffs' wages are calculated based on hours worked.

**Interrogatory No. 12:**

Please identify the person or persons (attorney, employee, consultant, etc.) most instrumental in crafting, creating or developing Defendant's pay policies, including the pay policy at issue as it applied to Plaintiff, during the three (3) years immediately preceding the filing of this lawsuit.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Perdue further objects to this Interrogatory, particularly the terms "most instrumental" and "pay policies" as used here, as vague, unclear, subjective, and not fairly susceptible to an accurate

response. Subject to and without waiving any objections, Perdue states Robert Heflin, Vice

President of Human Resources for Perdue Farms, Inc. is most instrumental in crafting, creating,

or developing Defendant's pay policies.

**Interrogatory No. 13:**

      Please identify all employees of Defendant (including former employees), whose duties
were similar to those performed by Plaintiff for Defendant, and who were compensated in
a manner similar to Plaintiff, and who were employed by Defendant within the three (3)
years preceding the filing of this lawsuit.

**Response:**

      Defendant incorporates by reference all general objections as set forth above. Subject to

and without waiving any objections, and pursuant to the Court's February 25, 2008 Order,

Perdue provided Plaintiff on March 26, 2008 with a list of the names and addresses of all 1st and

2nd Processing employees of the Dothan, Alabama facility since October 31, 2004.

**Interrogatory No. 14:**

      Separately identify each and every person who is known or believed by Defendant to
have knowledge of the amount paid to Plaintiff and/or the hours actually worked by
Plaintiff, and for each such person, summarize the nature and substance of their
knowledge.

**Response:**

      Defendant incorporates by reference all general objections as set forth above. Subject to

and without waiving any objections, Perdue states Perdue's processing server in Salisbury,

Maryland, rather than any individual person has knowledge of the amount paid to Plaintiff and/or

the hours actually worked by Plaintiffs.

**Interrogatory No. 15:**

      With respect to each and every affirmative defense or counterclaim raised by Defendant
in its response to Plaintiff's Complaint, state separately for each such defense or
counterclaim any and all factual and legal support for such defense or counterclaim and

identify all witnesses who have knowledge of the facts which support such defense or counterclaim.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Perdue further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or work product doctrine. Subject to and not waiving any objections, Perdue states Robert Heflin, its Vice-President of Human Resources, is the individual with knowledge of the facts which support Perdue's defenses.

**Interrogatory No. 16:**

Identify any and all non-privileged documents upon which Defendant relied in answering each of the above Interrogatories, and for each such document identified, please provide the Interrogatory Number that such document relates to.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Perdue further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or work product doctrine. Subject to and without waiving any objections, Perdue identifies the May 9, 2002 DOL Consent Judgment and correspondence clarifying and implementing the Consent Judgment, orientation materials, and the documents provided in response to Plaintiffs' First Request for Production of Documents.

**Interrogatory No. 17:**

In detail, describe any and all changes to Defendant's payroll system, time keeping system to record hours worked by employees, or payroll policies or procedures occurring in the last three (3) years and for each such change, identify/describe the: (a) the date of change; (b) the reason for the change; (c) any documents reflecting the details or circumstances regarding the change; (d) and the person(s) responsible for, and/or who were involved in, the implementation of this change.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Subject to and without waiving any objections, Perdue incorporates its Response to Interrogatory No. 2 and states there have been no changes to the payroll or time keeping system to record hours worked or payroll policies.

**Interrogatory No. 18:**

In detail, describe any and all procedural changes made in the last three (3) years related to the method or manner in which hourly employees clock in and out for purposes of calculating hours worked, and for each such change, identify/describe the: (a) the date of change; (b) the reason for the change; (c) any documents reflecting the details or circumstances regarding the change; (d) and the person(s) responsible for, and/or who were involved in, the implementation of this change.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Subject to and without waiving objections, Perdue states, 1st and 2nd Processing employees received a twenty-cent increase in December 2005, a twenty cent increase in December 2006, and a twenty-five cent increase in December 2007. These increases reflect an annual general increase. Perdue further states that in or around 2005, the Dothan facility moved five Kronos time keeping clocks from the second level to the facility, and then returned them to the second level. The decision was made by the corporate office, pursuant to United States Drug Administration guidance. Perdue further states that in 2006, it replaced the hardware of its Kronos time-keeping clocks, with new clocks that had better capabilities. John Toole, the Accounting Supervisor was responsible for implementing these changes.

**Interrogatory No. 19:**

In detail, describe any and all procedural changes made in the last three (3) years related to the method, manner, or location in which hourly employees are clocked in and out for

purposes of calculating hours worked and for each such change, identify/describe the: (a) the date of change; (b) the reason for the change; (c) any documents reflecting the details or circumstances regarding the change; (d) and the person(s) responsible for, and/or who were involved in, the implementation of this change.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Perdue further objects to this Interrogatory to the extent it is duplicative of Interrogatory No. 18. Subject to and without waiving any objections, Perdue incorporates by reference its response to Interrogatory No. 18.

**Interrogatory No. 20:**

In detail, describe the time system including how work hours are determined, how unpaid breaks are recorded, and when hours worked start and stop for first and second processing employees.

**Response:**

Defendant incorporates by reference all general objections as set forth above. Perdue further objects to this Interrogatory to the extent it is duplicative of Interrogatory No. 2 and hereby incorporates by reference its response to Interrogatory No. 2.

Dated: April 4, 2008

Respectfully submitted,

*/s/ Lexer I. Quamie*
James J. Kelley
(D.C. Bar No. 194746)*
202-739-5095
jkelley@morganlewis.com
Lexer I. Quamie
(D.C. Bar No. 502908)*
202-739-5955
lquamie@morganlewis.com
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
202-739-3001 (fax)

Sandra B. Reiss

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 4th day of April 2008, I caused a copy of the foregoing Defendant Perdue Farms Incorporated's Responses and Objections to Plaintiffs' First Set of Interrogatories to be served via electronic mail and first class U.S. mail upon:

Robert J. Camp
505 North 20th Street Suite 825
Birmingham, AL 35203
(205) 930-6900 (Phone)
(205) 930-6910 (Fax)
rcamp@cochranfirm.com

***/s/ Lexer I. Quamie***
Lexer I. Quamie (admitted pro hac vice)
D.C. Bar No. 502908
202-739-5955
lquamie@morganlewis.com
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-739-3001 (fax)

*Counsel for Defendant, Perdue Farms Incorporated*

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL ANDERSON, et al. | § | |
| | § | |
| PLAINTIFF(S) | § | |
| | § | |
| V. | § | Case Action No.: 1:06-cv-1000-MEF-WC |
| | § | |
| PERDUE FARMS INCORPORATED | § | |
| | § | |
| DEFENDANT. | | |

**EXHIBIT 2**

**DEPOSITION OF PERDUE'S INTERNAL WAGE AND HOUR AUDITOR DAVID J. TABINOWSKI**

**In The Matter Of:**

*David Alford, Sr., et al. v.*
*Perdue Farms, Inc.*

---

*David J. Tabinowski*
*December 12, 2007*

---

*American Court Reporting Company, Inc.*
*52 Executive Park S, Suite 5201*
*Atlanta, Georgia 30329*
*800-445-2842*
*WWW.ACRGA.COM*

Original File 54811.TXT, Pages 2-95 (94)

**Word Index included with this Min-U-Script®**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

DAVID ALFORD, SR., et al.,)
Plaintiff, ) CIVIL ACTION FILE
vs. ) NO. 5:07-CV-00087-CAR
PERDUE FARMS, INC.,
Defendant.

- - -

The deposition of DAVID J. TABINOWSKI, taken on behalf of the Plaintiff, pursuant to the stipulations agreed to herein, taken for the purpose of cross-examination and discovery and any other purpose authorized by the Georgia Civil Practice Act; the reading and signing of the deposition being reserved; taken before Alice E. Simmons, Registered Professional Reporter, commencing at 9:56 a.m., on this, the 12th day of December, 2007, at Morgan & Morgan, 191 Peachtree Street, N.E., Suite 4200, Atlanta, Georgia.

APPEARANCES OF COUNSEL:

For the Plaintiff:

RICHARD B. CELLER, ESQUIRE
DEIDRE JOHNSON, ESQUIRE
TISHA TALLMAN, ESQUIRE
MORGAN & MORGAN
191 Peachtree Street, N.E.
Suite 4200
Atlanta, Georgia 30303
E-mail: Djohnson@forthepeople.com

For the Defendant:

BRIAN E. LISS, ESQUIRE
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5579
E-mail: bliss@morganlewis.com

C O N T E N T S

E X A M I N A T I O N

| | Page |
|---|---|
| Examination by Mr. Celler . . . . . . . . . | 4, 87 |
| Examination by Mr. Liss . . . . . . . . . | 81 |

E X H I B I T S

FOR THE PLAINTIFF:

| Number | Description | Identified |
|---|---|---|
| 1 | Perdue Farms Incorporated Departmental Counseling Record regarding associate Maggie Lawson dated 3/15/05 | 14 |
| 2 | Disciplinary Record regarding associate Sharhonda Harrell dated 4/4/05 | 16 |
| 3 | Power Point Presentation, Bates stamped PER_ALF0000013 | 36 |
| 4 | First Principal Activity - Associate Performance Standards and Perry Plant Discipline Program | 49 |
| 5 | Declaration of Dave Tabinowski | 57 |
| 6 | Plaintiff's Notice of Taking Deposition for subject deposition | 65 |
| 7 | First Principal Activity - Associate Performance Standards and Perry Plant Discipline Program, signed by Annie J. Bray dated 3/16/07 | 69 |
| 8 | First Principal Activity - Associate Performance Standards and Perry Plant Discipline Program, signed by Mary L. Harrell dated 3/21/07 | 71 |
| 9 | Timecard for Thyasda Collier - 9/27/04-10/3/04 | 80 |

PROCEEDINGS

DAVID J. TABINOWSKI, having been duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. CELLER:

Q Good morning. I already know the answer to this, but please state your name.

A David J. Tabinowski.

Q And Mr. Tabinowski, are you currently employed?

A Yes.

Q Who do you work for?

A Perdue Farms.

Q And what do you do for Perdue Farms?

A I'm project lead in the internal audit department.

Q Can you give me what I will refer to as a Cliff Note version of what that means?

A Well, my duties in the internal audit department are related to payroll and immigration and first and last principal activity.

Q What type of training did you have -- or strike that.

Have you had any training with regard to

the Fair Labor Standards Act to determine what a principal or a final activity is?

A Well, training as far as from a wage and hour, I had 10-plus years as payroll manager and worked closely with HR. I was involved heavily with our agreement with the Department of Labor on our donning and doffing issues.

Q And when was that agreement or that consent decree issued, if you know?

A I believe it was signed by us in May of 2002.

Q And how long have you been in the current position that you hold for Perdue?

A In internal audit it's since 1999.

Q And have you held that position consistently throughout today?

A Yes.

Q As part of your job duties, are you responsible for reviewing recent case law decisions or decisions that come out of the courts that interpret donning and doffing or Fair Labor Standards Act?

A No.

Q Have you ever heard of a decision called Alvarez v. IVP?

A No.

Q Do you know whether the Supreme Court has modified its position in the last five years since the consent decree was issued with Perdue regarding what is considered compensable with regard to donning and doffing?

MR. LISS: Objection, calls for an answer that would require a legal interpretation.

MR. CELLER: That's fine.

BY MR. CELLER:

Q You can answer.

A No.

MR. CELLER: Brian, do you have a copy of the deposition notice?

MR. LISS: I have a copy of the first deposition notice.

MR. CELLER: Yeah, it's fine, I just want to make sure he's the proper corporate representative. Can I borrow it for one second?

MR. LISS: (Presents).

BY MR. CELLER:

Q Let me show you what we'll mark eventually as Exhibit 1, we're waiting for a copy, and ask you if you've ever seen that document before.

A (Reviews document). No.

Q Let me ask you a couple of questions about it and just make sure that ... Before I ask you that, where do you work out of?

A Salisbury, Maryland.

Q And do you have a division that you're responsible for at Perdue, like a region?

A No. We do not have divisions as far as poultry processing. So ... The answer to that is no.

Q Okay. How is it that if you work in Maryland you would be able to testify with regard to the practices in Perry, Georgia?

A Part of my job is to visit all the plants within the company.

Q And when is the last time that you visited the plant in Perry, Georgia?

A The early part of 2007.

Q Sometime in April of '07; is that correct?

A February, March, April, something like that.

Q And just so you know, I'm not trying to trick you, your declaration said April of '07.

A Said April, right.

Q I usually do this in the beginning, but have you ever had your deposition taken before?

A Yes, I've had depositions taken.

Q Just a couple of quick rules. The court reporter is taking down everything we're saying, and you're doing a great job. I need you to answer verbally. If I ask you a yes or no, please answer yes or no and if you want to explain, feel free to do so.

A Okay.

Q If I ask you a question and you don't understand it, let me know and I'm more than happy to rephrase it.

A Okay.

Q And if I ask you a question and you answer it, I'm going to assume that you understood it. Can I get your agreement on that?

A Yes.

Q Prior to April of 2007, when was the last time you visited the Perry, Georgia plant?

A That was the first time that I had visited the plant.

Q And what was the purpose of your visit?

A We were doing our ... I was doing my first and last principal activity audits.

Q Can you describe for me what that means?

A Basically I go into the plant and evaluate their compliance with our consent agreement.

Q Okay. Would it be fair to say that you limit your investigation to what the parameters are set forth in the consent decree?
A That is the primary part of the audits. If I do see something else that might be of some concern, then I'll bring it to somebody's attention. But it's primarily the consent agreement.
Q Are you familiar with the term principal activity as it's used in the Perdue nomenclature?
A Yes.
Q To your knowledge is there a standard definition at Perdue as to what First Principal Activity means?
A Yes.
Q Can you describe for me what your understanding of that term is?
A First Principal Activity at the beginning of a shift or start of the break is either doing actual work or donning and doffing the specific items.
Q Okay. We're going to talk a bit about the specific items at issue. Does Perdue require employees to wear hair nets on the line?
A It is an industry-wide requirement, and from a food safety standpoint also.
Q So would you agree that it's not optional

for an employee to wear a hair net on the line?
A It is not optional, but it's a personal item.
Q What do you mean by a personal item?
A They can wear it home with them, store it in their locker.
Q Are there any requirements that Perdue imposes upon employees for the washing or caring for of hair nets?
A They don't wash or care, they'll throw them away and get a new one.
Q If, for example, you determine that an employee wore a hair net home one day and then wore it back to work the next day, would that be considered acceptable?
A From my audit standpoint I would not look at that but from ... someone else maybe. I can't answer that question really.
Q What are some of the other items that Perdue considers to be personal?
A Beard net.
Q And would you agree that a beard net if an employee has a beard is required by Perdue as well?
A It's required pretty much by the industry.
Q Okay.

A It's food safety also.
Q Do you know who Jerry Garcia is? He's not an employee, he's a former rock musician.
A Oh, yeah. He just died a while back.
Q Correct. Do you remember what he looked like?
A Yeah.
Q If I were to show up at work to Perdue looking like Jerry Garcia with a beard out to my shoulders.
A Uh-huh (affirmative).
Q Would I be required to wear a hair net by Perdue? A beard net, I'm sorry.
A Any production facility would require that to be worn. Any food production.
Q Okay.
A Or ... you know, as far as I'm concerned food business would do it.
Q Okay.
A Even delis.
Q What are some other personal protective ... Can we refer to it as PPE, is that the right term?
A Well, there's different terms.
Q Okay, so let's just call it personal

equipment, let's use your terms. What are some other items of personal equipment that employees at Perdue are required to wear?
A Required?
Q Required.
MR. LISS: Objection. Required by whom?
BY MR. CELLER:
Q Either required by Perdue policy or by safety standards.
A Compensable or non-compensable?
Q Let's talk about non-compensable that Perdue does not pay employees to don or doff.
A Items similar to the hair net and beard net is also boots.
Q Okay. What type of boots?
A They are steel toed boots, steel toed tennis shoes. It is their preference in what they purchase.
Q Okay.
A And they can wear that home and wear it to wherever.
Q Are they required to wear them on the line either by Perdue or by safety standards in the industry?
A The industry would require those for safety reasons, yes.

Page 13

Q And if an employee was not wearing the appropriate boots on the line, they could be written up by Perdue, correct?
A I've never seen it happen but it probably has.
Q And just so we can circle back, the same question with regard to the hair net and beard net, if an employee is not wearing those on the line they could be written up by Perdue for doing so, correct, or for not doing so?
A Probably, yes.
Q And just so we can take out any of the ambiguity, let's go ahead and mark this as Plaintiff's Exhibit 1.
MR. CELLER: And Brian, I apologize, I got in yesterday so I don't have copies. But take your time and review it.
MR. LISS: Exhibit 2 you mean?
MR. CELLER: We didn't mark the other one yet.
MR. LISS: So you're not going to mark the notice?
MR. CELLER: I may at some point.
MR. LISS: Okay.
MR. CELLER: I'm still waiting for a copy.

Page 14

MR. LISS: So I will get a copy before I leave?
MR. CELLER: Yeah, we'll make copies of everything. And it's your production.
(Thereupon, Plaintiff's Exhibit Number 1 was marked for identification).
BY MR. CELLER:
Q Showing you what's been marked as Plaintiff's Exhibit Number 1. Do you recognize that document?
A No.
Q Have you ever seen a document issued by Perdue in that form?
A Just by the title ... I have not seen one in this form. I've seen other types of coaching sessions or whatever.
Q And -- go ahead.
MR. LISS: Excuse me. For the record, do you want to have him describe what this is?
MR. CELLER: Yeah, I'm going to do all that.
MR. LISS: Okay.
MR. CELLER: I want to lay a predicate first or a foundation.
BY MR. CELLER:

Page 15

Q Is there a signature on the bottom of that document by a human resource manager of Perdue? If you know.
A No, I can't ...
Q Let me take a look at that for a minute.
A I can't tell.
Q Okay. Take a look at the context of the document and if you can describe for me what you believe that document is.
A (Reviews document). It's a reprimand for wearing ... having their personal protective gear on.
Q So would you agree that based on -- Strike that.
Do you have any reason to believe that this is a document that was not issued by a Perdue manager to an employee at Perdue?
A Could you repeat that, please?
Q Sure. Do you have any reason to believe that this document was not a document issued by somebody on behalf of Perdue to an employee?
A I have no reason.
Q Okay. And would you agree that this is a document, what's been marked as Plaintiff's Exhibit Number 1, which reflects a reprimand to an employee for not properly adhering or wearing PPE equipment?

Page 16

A That appears to be what it is.
Q Okay, thanks.
Are ear plugs required by line employees either by Perdue or safety standards in the industry?
A It is an industry-wide requirement, it is a personal item that can be taken home.
Q And would you agree that Perdue does not pay employees for the donning or doffing of ear plugs?
A Is it not part of our consent agreement. That item was excluded from that as being a personal item that can be worn home.
Q So is the answer no to that question?
A Yes.
Q Would you agree that if an employee does not wear ear plugs on the line, he or she could be written up for that?
A Yes.
Q And have you ever heard of an employee or a human resources employee by the name of Anita Moreno?
A No, I have not.
(Thereupon, Plaintiff's Exhibit Number 2 was marked for identification).

Page 17

BY MR. CELLER:

Q Let's go ahead and show you what's been marked as Plaintiff's Exhibit Number 2. Let me give it to your counsel first.

MR. LISS: (Reviews document).

THE WITNESS: (Reviews document).

BY MR. CELLER:

Q Showing you what's been marked as Plaintiff's Exhibit Number 2. Do you recognize the form of that document?

A Yes, I do.

Q And what is it?

A It's a disciplinary record.

Q Can you describe just for the record in what context this disciplinary record was issued?

A Failure to wear ear plugs.

Q While on the line; is that correct?

A It doesn't really say that.

Q Okay. That's a good point.

A It just says "was not wearing her ear plugs."

Q And as you sit here today as the designated corporate representative, do you have any reason to believe that this document was not issued by Perdue to an employee?

Page 18

A I have no reason.

Q What are some other personal items that are either donned or doffed by employees, I'm going to the refer to it as off the clock.

A Okay.

Q Or for which they're not paid, other than what we've already discussed.

A The bump cap I don't believe we've talked about.

Q What's a bump cap?

A The bump cap is a protective head gear that can be worn out in the plant.

Q Is it required to be worn either by Perdue or industry standards?

A No, it's not.

Q That's an optional piece of equipment?

A Uh-huh (affirmative).

Q Can you answer verbally?

A Yes, I'm sorry.

Q Not a problem. What about shoe covers or slip covers, have you ever heard ...

A No, I've not seen them or heard of them.

Q What about safety goggles?

A They are ... Depending on the job, they are worn and I'm actually not sure if that is a personal

Page 19

item or not.

Q Okay. And --

A In most cases I do not see them wearing it.

Q Okay. Do you know whether in instances where employees do wear the safety goggles they're paid for the time in putting them on, do you know either way?

A In most cases they're wearing them they're put on at the line and they're on the clock.

Q Okay. Can you identify any other personal items other than what we've identified or described that employees are required to put on off the clock?

A No.

Q The rubber boots that we discussed, are those considered to be safety boots?

A Yeah, rubber boots are steel -- the steel toed boots that I had mentioned earlier.

Q Would you agree that prior to clocking in, Perdue requires employees to have these personal items on?

A From a safety standpoint through other organizations that is a requirement.

Q But specifically with regard to Perdue's policies, Perdue requires its employees to have that personal equipment on prior to clocking in, correct?

Page 20

A They're required to have some type of foot coverage or the other items also, yes.

Q And they're not paid for putting those items on, correct?

A No. In our consent agreement those items were agreed upon to be non-compensable items.

Q Let me ask you a question. Do you know whether since the date of the consent agreement the law has changed as to whether those personal items are now considered compensable if put on?

MR. LISS: Objection to the form of the question.

MR. CELLER: Yeah, it's not well asked. Let me ask it a different way.

BY MR. CELLER:

Q As you sit here today, do you know whether the law now requires that employees be paid for putting on the personal items that we've described?

MR. LISS: Objection to the form.

MR. CELLER: Fair enough.

BY MR. CELLER:

Q You can answer.

A In my opinion we are bound by the consent agreement and that's what we are conducting our operations by.

Q When's the first time you got a cell phone?
MR. LISS: Objection.
BY MR. CELLER:
Q In your life.
A Three, four years ago.
Q Was it one of those bigger cell phones?
A Not necessarily -- No.
Q Have you had the same cell phone for three or four years?
A No.
Q When did you get a new cell phone?
MR. LISS: Objection to the line of questions. Let's not play games and get to the point.
MR. CELLER: We're not but I --
THE WITNESS: Yeah, you've got to get home.
BY MR. CELLER:
Q I know, I know, but I'm almost done. I've got to fill some time and I've got to justify my existence to Atlanta. I guess the question --
A The answer to the question, my wife's phone broke so we got new ones.
Q Fair enough. I'll move off the cell

phones, I'm just having a little bit of fun with you.
I guess my question is this: Do you know whether Perdue has revised or revamped its donning and doffing procedures since the implementation of the consent decree in 2001 --
A 2002.
Q -- 2002 to become more current with the times?
A I'm not aware of that.
Q And as far as your investigations when you go out and do an audit on site, you're still operating solely within the parameters of the 2002 consent decree; is that correct?
A That is correct.
Q So, for example, when you do your audit, you don't count or look to see whether these personal items are being put on on or off the clock; is that right?
A The ones that are listed that we just discussed, yeah, I watch and see what they're putting on, but if it's a compensable item then it will be an issue.
Q Okay.
A But if not, then I just move on.

Q So would you agree that in doing your audits, you don't consider as compensable time the time employees spend putting on these ear plugs and walking to punch in, for example?
MR. LISS: Objection to the form. You've added now an element.
MR. CELLER: I'll take out the element. What's the element, the ear plugs?
MR. LISS: Walking.
MR. CELLER: Okay. We'll go to walking next.
BY MR. CELLER:
Q Would you agree that Perdue does not consider as compensable time the time employees spend putting on these personal items?
A Well, most of the times those items have already been put on when they get out of their car. They come to work with those items on and that was probably -- or, in fact, one of the basis for having them excluded from compensable time because they are put on out in the parking lot at home, they wear their boots to whatever.
Q How do you know that?
A I see them.
Q Have you ever seen them at the Perry

facility do that?
A Yes, walking from the parking lot.
Q How many days did you spend at the Perry facility doing your audit?
A I was three days at the Perry plant.
Q And you would agree that during those three days you also observed employees putting that equipment on, meaning the personal equipment, in the plant, correct?
MR. LISS: Objection to the form. We now have a list of personal equipment and I think you should specify. Of course you can answer.
BY MR. CELLER:
Q Right, all the items that we've been discussing that are excluded from being compensated, you would agree that you've seen employees put those items on prior to clocking in in the plant?
A Some, yes.
Q Okay. Now, have you ever done or do you know whether Perdue has ever done a time study to see how long it takes from the moment an employee walks in the front door of the plant to the front door of second processing to clock in?
MR. LISS: Objection to the form.
BY MR. CELLER:

Page 25

Q That's okay, you can answer.
A From the front door to where second processing clocks in? At the time Perry – No, there was never one done at the Perry facility.
Q Have you made that walk before?
A Yes.
Q How long does the walk take?
A 10 seconds.
Q It's your testimony that it's a 10 second walk from the front doors to the time clock at the Perry facility in second processing?
A Yeah. If you walk purposefully to the ...
Q Okay.
A There could be some people you want to talk to or whatever, and so it's a matter – if you want to walk from the front door to the clock, not very long.
Q Okay. Let me ask you the same question with regard to the front door to the first processing doors and time clock. Is it the same entrance?
A It's the same front entrance but not the same entrance to the clocks.
Q Do you know whether a time study has ever been done to determine how long it takes to walk from the front doors of the Perdue facility in Perry to the time clock in first processing?
A I am not aware of any.
Q Have you done that walk before?
A Yes.
Q And how long approximately does it take?
A A little bit less time than the one in second processing.
Q So it's closer to the front door?
A Yes.
Q Is there a break room that you're aware of at the Perry facility?
A Yes.
Q Do you know whether a time study has ever been done to determine how long it takes to walk from the second processing time clock to the break room?
A The second processing to the ... five seconds.
Q Okay.
A It's very close.
Q And what about with regard to the first processing, let me ask you the two questions, one, do you know whether a time study has ever been done?
A No, not to my knowledge.
Q And as far as the walk from the first processing to the break room, do you know approximately how long that takes?
A It's about the same time because there's two break rooms.
Q Okay, fair enough. Can you describe for me the process if you know, and we can break it down by first and second processing unless you think they're both the same for description purposes, how the procedure works from the time an employee walks in the door in the morning and the time they punch in for the beginning of their shift?
A Okay. It depends on the individual. They walk in and they'll sit in the break area, have coffee or whatever. And when they're scheduled time to start, they'll go in and swipe in and go in, put their gear on to go to their respective locations.
Q Do you know whether there's a line in the morning for employees to swipe in?
A There are sometimes; sometimes not. It depends on when they all get to the clock. It's their preference on what time to get there.
Q And if they're not on the line exactly at the time scheduled, they get reprimanded, correct?
A There's a period of time that is given to ... if there is a number of people going to the same department that are in line, there is a window of time that will not cause them to be late.
Q Okay. I believe it's approximately two minutes; is that correct?
A That's ... (Nods head affirmatively). In most cases, yes.
Q Okay. To your knowledge has Perdue ever examined how long employees will wait in line prior to punching in?
A To my knowledge, no.
Q Have you ever seen or personally have you ever personally observed how long an employee could wait in line to punch in?
A I have not paid attention to that fact.
Q And would you agree that while employees are waiting to punch in, they've already donned their personal gear as we've described previously during this deposition?
A Yeah.
Q Okay.
A There's a lot of times as I said some of them wear it from their car.
Q Okay. And some of them also put it on in the plant, though, correct?
A Yes.

Q Okay. Have you ever heard the expression "first processing"?
A Yes.
Q And what about "second processing"?
A Yes.
Q Can you give me again a brief Cliff Note description of what first processing means versus second processing?
A Okay. First processing is, in a Cliff Note version, is from live hang to the chillers.
Q And what about second processing?
A Second processing is from birds coming out of the chillers to a process designated by sales requirements or raw material requirements.
Q So, for example, would you agree that first processing -- and tell me if this is an accurate description -- is getting the birds ready to be cut and I guess manufactured for sale, and second processing would be the actual deboning and cutting of that product?
A Yes. First processing would be getting the bird ready for further processing.
Q Okay. Are all first and second processing employees paid the same way, not the same amount, but in the same way?

MR. LISS: Objection.
BY MR. CELLER:
Q Hourly, salary?
A Yes. Hourly.
Q Okay. And are they all subject to the same timekeeping system of individual swipes once they get in?
A They all use the Kronos clocks.
Q Would you agree that employees who work in first processing can be moved around in different positions on any given day within first processing?
A We ... There is a rotation plan within each department that we move people around within the department for carpal tunnel, you know, for work-related ... just the stress on the parts of the body. But that is ... that is an industry item also, where we just shift them around within the department.
Q Would you agree that employees within first processing, excuse the spin, are interchangeable?
A In first processing?
Q Yeah.
A That's a tough one to answer. Depending on the individual, I think they could all switch around, but would they want to is another question.

Q All right. Forgetting about what the employees want, if Perdue wants an employee to work in hanging on one day and -- What's another processing?
A Evisceration.
Q -- and evisceration the next day, Perdue could make the decision to switch them, correct?
A They would ask. They would ask for volunteers.
Q And would you agree that the people that work in both first and second processing would fall under the category of unskilled laborers, do you understand?
MR. LISS: Objection to the form of the question.
BY MR. CELLER:
Q Have you ever heard the expression unskilled labor?
A Yes.
Q What's your understanding of what unskilled labor means?
A My opinion is that they have just got on-the-job training and do the job as they've been shown and they have no formal type education. That's just my opinion on that.

Q Using your definition, would you agree that all employees in first and second processing perform unskilled labor for Perdue on the line?
A In that definition, yes.
Q Okay. And let me jump back for a moment. We were talking about how safety standards require the employees to put on that personal equipment that they're not compensated for, do you remember when we were discussing that earlier.
A (Nods head affirmatively).
Q Just answer verbally for me.
A Yes. I'm sorry.
Q That's okay.
Would you agree that Perdue benefits or receives a benefit from employees complying with these safety standards in the industry?
A No, I do not.
Q Okay. Does Perdue -- I'm sorry, go ahead.
A Other than complying with OSHA laws and things like that.
Q And if Perdue was not in compliance with OSHA laws, they can be subject to penalties and things like that, correct?
A Yes.
Q So then by requiring its employees to put

Page 33

on this personal gear that they're not compensated for, Perdue does receive a benefit by maintaining in compliance with OSHA standards, correct?

MR. LISS: Objection to the form of the question in that it's been asked and answered.

MR. CELLER: Sure.

BY MR. CELLER:

Q You can answer.

A I don't believe we receive, the company-wise as itself, any benefit other than being in compliance with OSHA or any other safety rules and the items that are listed in our consent agreement that they're allowed to wear.

Q Would you agree that by requiring its employees to wear these personal items, Perdue also benefits in the sense that it cuts down on workplace injuries or contamination of product?

A That's obvious, yes.

Q. Okay. So by wearing a hair net, that's likely going to prevent hair from going into the poultry, correct?

A That's industry standard, yes.

Q And as a customer of Perdue -- I don't know if you eat Perdue or not, if you eat Tyson I'm going to tell them -- but if you eat Perdue, you

Page 34

would agree you wouldn't want a hair in your chicken?

A That's right. And you wouldn't want a hair in your deli going to a Subway either.

Q Understood.

A So ...

Q Understood.

A That is we're complying.

Q Of all the personal equipment that we discussed that employees are not compensated for putting on -- and this will speed up the depo if it's the right answer, no pressure -- would you agree that all employees in first and second processing are required to wear that equipment?

MR. LISS: Objection to the form of the question.

THE WITNESS: They for safety reasons are worn, yes.

BY MR. CELLER:

Q And the reason why I ask, just so you know, is instead of us going through position by position in first processing and second processing, I'd rather just ask you generally if all the employees in first and second processing wear this personal gear.

Page 35

A Yes.

Q And they would be required to wear that gear for every work shift, correct?

A Yes.

Q You said that you were involved in the consent decree discussions with the Department of Labor back in 2001, correct?

A I was involved in meetings. My main function was to orchestrate or coordinate the back pay.

Q Okay. As you sit here today, do you have any knowledge as to why these personal items were excluded from being compensable by either Perdue or the Department of Labor?

A I was not involved in those discussions.

Q Do you know who would be or who would have knowledge of that item or topic other than Brian?

A Someone in our HR department. There was an individual who has retired that was the coordinator of all of that with the Department of Labor and with Kronos, so there are individuals that are still in the company that were involved in that.

Q Based on your experience at the Perry facility, your personal observations, do you have any knowledge as to whether some or most or none of

Page 36

the employees at Perry are illiterate, meaning unable to read?

A I can't answer that. It would only be my guess that yeah, there's some.

Q Okay.

A But I don't know that for a fact.

Q In disseminating policies and procedures to employees regarding donning and doffing, do you know whether Perdue undertakes any investigation or efforts to ensure that illiterate employees are explained how the procedures work?

A There are times during the new hire orientation where they are told the policies of the company and they are asked whether they understand them.

Q And is their response recorded or is it something that's handwritten?

A There is an item ... I believe in the Perry operation they have a check-off list where they initial the items that were discussed to them.

Q Okay.

(Thereupon, Plaintiff's Exhibit Number 3 was marked for identification).

BY MR. CELLER:

Q Let me show you what we've marked as

Page 37

Plaintiff's Exhibit Number 3. Let me give it to your attorney first. Which I'll represent to you is some type of -- it appears to be a Power Point training prepared by Perdue with regard to its donning and doffing procedures.

MR. LISS: (Reviews document).

THE WITNESS: (Reviews document).

BY MR. CELLER:

Q Showing you what's been marked as Plaintiff's Exhibit Number 3, I'll just ask you initially if you recognize that document.

A Yes.

Q What is it?

A It's new hire documentation that they go through with all new hires at the plant.

Q And would you agree that that Power Point describes, in short order, not in full detail, Perdue's current position on what is considered to be compensable as far as donning and doffing?

MR. LISS: Objection to the form of the question. You can ask what this witness' opinion is.

MR. CELLER: Yeah.

BY MR. CELLER:

Q Let's do it this way. Based on your

Page 38

corporate capacity as a testifying witness here today, would you agree -- I'll even say based on your opinion -- that that is an accurate description of Perdue's current policies and procedures regarding donning and doffing?

A (Reviews document). At the Perry plant, yes.

Q At the Perry plant. Is this the same Power Point -- actually it's irrelevant, I don't care what happens at other plants.

MR. CELLER: That's a collective action mentality.

BY MR. CELLER:

Q Let me show you a couple of pages from this and let's talk about them. Just for the record so we can mark it properly, this is marked ... the page is -- and I'm the idiot who Bates stamps and staples over it -- Perdue 16.

I'm showing you Perdue 16. Is that an accurate description of how Perdue defines donning and doffing?

A That is used as a -- the beginning part of the discussion of the donning and doffing.

Q Okay.

A As just a recap or a brief basic definition

Page 39

of the word donning and doffing.

Q Okay.

A And ... Okay, that's it.

Q That's fine. Now, you see the word clothing at the end of that sentence?

A (Nods head affirmatively).

Q Answer verbally, please.

A Yes.

Q Thanks.

Who decided to use that word "clothing," do you know?

A Don't know.

Q What is your understanding or your opinion as to what is deemed to be clothing pursuant to Perdue's description here?

A That is a reference where -- to the gear that is compensable.

Q Okay. Let's go to the next page. I'm showing you what I believe should be Perdue 14.

MR. LISS: What page?

MR. CELLER: I think it's 14, it's consecutive. Is that 14?

MR. LISS: I thought 16 was ...

MR. CELLER: Oh, I'm sorry, then 17. It's 17.

Page 40

BY MR. CELLER:

Q Showing you Perdue 17, can you take a look, please, and read into the record the description of how Perdue defines First Principal Activity?

A "The first physical act which is required by law, company, and/or nature of the job, by the associate (donning)."

Q Okay.

A In parentheses.

Q Now, we discussed previously that the personal items that are six that he employees respect not paid for are required, correct?

A By other organizations or agencies and you know foot safety, those type things.

Q Do you know whether there's a law, for example, an OSHA law or regulation that requires that equipment to be worn?

THE WITNESS: No.

MR. LISS: Objection to the form, calls for a legal analysis.

BY MR. CELLER:

Q If you know.

A I don't know.

Q Okay. Taking your prior testimony where

Case 1:06-cv-01000-MEF-WC Document 85-5 Filed 06/11/2008 Page 13 of 26

we agreed that it was required, not necessarily by Perdue but by some agency.

A I ...

Q Go ahead.

A The requirement is -- on our end is not a requirement by a compensable item, if we're talking about the items that we call personal that they can be taken home.

Q I understand what you're saying, but just to bring it into a more clear perspective, when we marked Plaintiff's Exhibits 1 and 2, Perdue does require these items to be worn because if employees don't wear them they get written up, correct?

A They're required for other reasons, safety reasons.

Q Regardless of the reasons, Perdue requires them to be worn?

A You could say that, yes.

Q So would you agree then based upon the requirement that they need to be worn, those items should fall based upon this definition in Perdue 17 as being compensable or as donning?

MR. LISS: Objection.

BY MR. CELLER:

Q You can answer.

A I don't believe so.

Q Why not?

MR. LISS: Objection.

THE WITNESS: We have an agreement with the government that excluded them because they can be worn home and they can be stored in the locker or taken home, they are not part of the production environment.

BY MR. CELLER:

Q Okay. Take a look at Last Principal Activity, which is the bullet point right underneath.

A Uh-huh (affirmative).

Q And I'm going to ask you the same line of questioning. First, can you read that into the record?

A Okay. "The last physical act which is required by law, company, and/or nature of the job, by the associate (doffing)".

Q Okay. Now, doffing essentially means taking off the gear at the end of the day, correct?

A At the end of the day, yes.

Q Or, for example, on a break?

A Yes.

Q Perdue does not pay its employees for the

time they take off that personal gear when they begin their break, correct?

A Nine ... Normally they do not take that gear off. They'll be in the break area with their hair nets still on. They may pull their beard net down over their face to eat, the ear plugs will be dangling from their bump cap, but normally they wear them when they go to break.

Q Are there any studies that you're aware of that Perdue has conducted at its Perry facility that will confirm what you just testified to?

A No, I'm not aware of any studies, no.

Q And at the end of the day when employees are done with their work shift, would you agree that Perdue does not pay them for taking off that personal equipment as they're leaving the plant?

A Depending on their preference, some may take them off and some may not.

Q Okay. But again --

A Some store them in their locker, which they're allowed, and some wear it home.

Q And if you can read the final bullet point into the record.

A "You get paid from the time you perform the First Principal Activity," which is in capital letters

FPA, "to the Last Principal Activity," which is in capital letters, LPA, "excluding any unpaid breaks."

Q Let me ask you a hypothetical question. Let's assume in some crazy world that somebody determined that the ear plugs were considered to be items that needed to be compensated when put on. Would you agree then that within these definitions of First Principal Activity and Last Principal Activity that they would be considered compensable?

MR. LISS: Objection to the form of the question.

BY MR. CELLER:

Q Please don't ask me to repeat it because I don't think I could.

A I'm trying to come up with an answer.

Q Okay, fair enough.

A In my area what I'm focusing on right now, that has not come up.. And if we were required by an adjustment I guess to our consent agreement to include it then we would, but right now the consent agreement does not include that.

Q Do you have any knowledge as to whether since the consent decree was created in 2002 Perdue has requested any type of updated guidance as to whether that agreement is still in compliance with

law?

MR. LISS: Objection.

BY MR. CELLER:

Q If you know.

A I'm not aware.

Q Do you know whether Perdue receives any types of case updates or, you know, law flashes from the Department of Labor to ensure that they're still complying with the laws and regulations?

MR. LISS: Objection.

BY MR. CELLER:

Q You can answer again, if you know.

A I'm not sure. I would assume somebody would but I'm not sure.

Q Let's go to the next part of it.

Okay. Showing you, what is that, 18? It should be 18.

A (Reviews document).

Q Why don't we just rip it apart and I'll re-staple it at the end.

A I believe it's 18.

Q You can just pull the whole thing apart, don't worry about it.

A It might rip the numbers off. It's 18.

Q That would make my job more difficult.

Take a look at bullet point 1 on number 18. And it says there, "All associates must be clocked in prior to," and it's bold and underlined, "donning supplies."

A (Nods head affirmatively).

Q I'm assuming based upon our prior conversations that Perdue excludes from the words supplies the personal equipment that we've discussed?

A Correct.

Q And the same thing with regard to the next bullet point where it says, "You must doff supplies prior to clocking out," again, Perdue does not consider those personal items to be considered supplies?

A Correct.

Q Is that right?

A (Nods head affirmatively).

Q Okay. If we go to Perdue 19, is this an accurate description of what Perdue considers on the left side of the document items that are not compensated for being put on or taken off, and on the right side items that employees are compensated for?

A Yes.

Q Next page.

MR. LISS: Just to be clear, do you want him to read into the record what's on the left side and what's on the right side?

MR. CELLER: Sure.

BY MR. CELLER:

Q Why don't you do that.

A On the ones that are not considered compensable are ear plugs, hair nets, beard nets, safety boots, and bump caps.

On the right side, which is in compensable, are lab coats, gloves, clip boards, tools, aprons, sleeves, paperwork, etc.

Q Let's go to number 20. Would you agree that this is consistent with what we've previously discussed, that employees are required to have those personal items that we just described on the left-hand side on prior to swiping in?

A Yes.

Q I think that may be it, sorry. I'm going to let you flip them.

A I could mess it up for you.

Q No, please, because then Brian's copies are going to be all screwed up. You can just flip the whole thing if you don't mind.

Do you know who prepared this Power Point?

A Now, this would be a guess on a specific person, but I'm going to guess someone in the human resource department because they are the ones that conduct or coordinate the new hire orientation.

MR. CELLER: Off the record for a second.

(Thereupon, an off-the-record discussion ensued).

(Thereupon, Plaintiff's Exhibit Number 4 was marked for identification).

BY MR. CELLER:

Q Showing you what's been marked as Plaintiff's Exhibit Number 4, do you recognize that document?

A (Reviews document).

Q What is it?

A It is a standard operating procedure for the Perry facility for start of shift, break, and end of shift.

Q And would you agree that that is an accurate statement of Perdue's current – I'm trying to think of a nice description for it – current policies and procedures regarding First Principal Activity at the Perry facility?

A (Reviews document).

Page 49

Q You can take your time and look through it.
A (Reviews document). Yes.
Q When the employees come in in the morning and they finally swipe their cards, they go out to the line and work for a finite period of time, correct?
A (Nods head affirmatively).
Q I'm just setting this up to explain where I'm going.
A Roundabout, yes. Yes.
Q How many lunch breaks do the employees who work in first and second processing get?
A They at the Perry plant receive two.
Q And do you know what times they ... Well, I assume that the times vary depending on department, correct?
A Yes.
Q What are the breaks that they get? Are they two 30-minute unpaid breaks?
A Yes.
Q Now, can you explain to me how employees know it's time to go to break?
A It depends. Well, they know when their supervisor tells them.

Page 50

Q When they are told to go to break, can you explain for me the procedures that they must undergo before clocking out as far as taking off their gear?
A There are designated areas where they hang their gear and then proceed to the clocks.
Q Once they punch out for lunch break, can you describe to me the process by -- or how employees go to break and then what the procedure is for coming back to break? Is that too vague of a question, do you want me to be more specific?
A No, I can answer that. It depends on the associate what they do after they swipe out. They get a full 30-minute break, they can do what they feel like doing, they can go outside if they want and eat their lunch out there if they brought it. Or there is a cafeteria at the Perry plant, they can eat at the cafeteria. Or they can just sit around in the break areas and chat. It all depends on them. There are microwaves there available for them to heat up their food.
Q And is there a bell or a whistle or something that notifies employees that their break period is almost over and they need to start heading back to work?
A No.

Page 51

Q So are employees aware or are they told that approximately five to seven minutes before their break is over they need to start heading back in?
A They are not told anything.
Q Do you know whether employees actually start heading toward the time clocks to put their gear on prior to the 30 minutes being over?
A There are some that head to the clocks sooner than others, but they are not forced.
Q How many employees based upon your knowledge typically go to break at once?
A It varies.
Q Can you give me the range based on your best observation?
A The maximum I want to say is around 200?
Q And what's the minimum?
A One.
Q Okay, understood.
How many time clocks are there in first processing for employees to punch in on?
A Five.
Q And are those the total number of time clocks where employees need to punch in for or punch out on for breaks or at the end of the day?

Page 52

A They use the same clocks.
Q How long approximately does it take to punch in and out?
A Oh, a matter of seconds to swipe them through the clock.
Q They're required to double swipe, right?
A That is their procedure.
Q At Perry?
A At Perry.
Q Have you ever seen at the end of a lunch break where let's say there's 200 employees where employees are waiting in line 10 deep to wait to swipe in on a time clock?
A I have seen that, yes.
Q And if employees are not on the line within I'll say 32 minutes, because they get a two minute grace period, after their lunch break, they would be written up, correct?
A Yes.
Q So if an employee is required to wait to punch in, what do you estimate to be --
A They are not required to wait to punch in.
Q You're right. If an employee is waiting to punch in, what do you estimate to be the wait time if there are 200 employees trying to clock in

Case 1:06-cv-01000-MEF-WC Document 85-5 Filed 06/11/2008 Page 16 of 26

to be on time?
A I wouldn't have the vaguest idea what an average would be.
Q Would you agree with me that the realities of the situation would require that an employee start getting in line to punch back in prior to the 30 minutes expiring so that they can be on time?
A In some of their thinkings, yes, they know it's a 30-minute break and there are clocks available in the break area where they could see what time their break is up and then they'll start heading to the clock, yes.
Q But they'll start heading toward the clock prior to the end of the 30-minute period?
A It's their preference to do that if they want. And if they want they feel comfortable going to the clock sooner than later, yeah.
Q Well, do you think it's feasible for 200 employees to head to the time clock and clock in within two minutes? Can that happen?
A Remember, there are a number of clocks, that they're not all on the same clock.
Q Okay. But I guess -- you said there were five clocks in first processing, right?
A Yes.

Q And how many in second processing?
A I believe there are six.
Q Okay. And based upon your observation, would you say maybe five seconds it takes maximum to swipe in and out?
A With two swipes, yes.
Q So then would you agree with me that employees are required -- not required, but the realities of the situation are that if an employee is going to be back on the line in a timely manner, they would have to leave their lunch period early to do so?
A In the reality of our breaks if ... and there are supervisors at the clocks, and if individuals are on the line and it does for some reason take longer than the two minutes, they are not written up. They are not written up just because they are late. Each occurrence or instance is looked into and the supervisor being there will see Mary was in line, she was toward the end, someone had a problem with their card, it took longer for them to get through, they would not be written up.
Q And I'm not focusing on the write-ups as much as I am whether employees actually have to leave their break early to clock in on time.

A They don't have to, not at the Perry facility.
Q I understand. Do you think it's realistic for an employee to take a full 30-minute lunch and then walk to the time clock to punch in to be back on the line for their scheduled shift?
A If they're in the break area they could do that, yes.
Q Okay. Are there locker rooms at the Perdue facility?
A In the Perry facility, yes.
Q I'm sorry, Perry, yes.
A Yes.
Q What is the purpose of having the locker rooms there?
A That's to store their coats, purses, personal items. They can store bump caps and things like that.
Q Does every employee have a locker?
A Now, I ... they should, but since the plant has grown, they -- and when I was down there I know they didn't have enough, they were going to get some more, but everyone will have one, and it may not be the case now but it depends on the growth of the plant.

Q Okay.
A But ...
Q Are the locker rooms separate for men and women?
A The locker rooms are not. Or the locker area, let me change that. It's not a room, it's a locker area. They have separate other rooms for men and woman.
Q Okay, fair enough.
At the end of the day, and we discussed about going to breaks and punching back in. At the end of the day when the employee's shift is over, can you describe for me from the time they clock out to the time they leave the doors what takes place? When I say leave the doors, leave the plant.
A They get off -- whenever the shift is done they'll doff their gears and dispose of them accordingly, whether to throw them away or put them in a bin for re-washing.
Q Okay.
A Clock out. And then either head to their car, head to their locker, go back to the cafeteria, sit down.
Q Okay.
A Have a coffee or whatever. They might be

carpooling with somebody. So there's various things that could be done.

Q Are they required to do any paperwork or anything else once they have clocked out at the end of the day?

A No. No one is required to do any paperwork after they've clocked out.

Q And would you agree that at the end of the day after they've clocked out, many of these employees at that point will then begin taking off their ear plugs and beard nets and hair nets?

A It's a possibility. Again, some of them wear it to their car.

Q Fair enough. Are they paid for that time from when they clock out to the time they walk to their car if they're still wearing their gear?

A No. That is a non-compensable item in our consent agreement.

Q Okay, fair enough.

(Thereupon, a brief recess ensued at approximately 10:55 a.m. and the proceedings subsequently resumed at approximately 11:00 a.m. with all parties present).

(Thereupon, Plaintiff's Exhibit Number 5 was marked for identification).

BY MR. CELLER:

Q Let me show you what's been marked as Plaintiff's Exhibit Number 5 and ask you to turn to the last page of the document and ask you -- not to the very last page, I guess the last page with your signature, or with a signature.

A Yes.

Q Is that your signature on that document?

A Yes.

Q And what is the document you're holding marked as Plaintiff's Exhibit 5?

A Declaration of Dave Tabinowski.

Q And did you prepare that? Did you type that yourself?

A No, I did not.

Q Do you know who typed it?

MR. LISS: Objection to the form of the question.

THE WITNESS: No, I don't know who typed it.

BY MR. CELLER:

Q Can you describe --

MR. CELLER: And, Brian, I'm cautious of the attorney-client issue, so if I encroach on it, just stop me.

BY MR. CELLER:

Q Can you describe to me how that document came to be?

MR. LISS: Objection to the form of the question. That's asking for attorney-client privileged information.

BY MR. CELLER:

Q What information did you rely upon to prepare that declaration?

A I didn't prepare it but I read it. And at the time I thought everything was accurate.

Q Did you make any edits to it prior to signing it?

A No, I did not.

Q How long did you review it before you signed it?

A I was on the road so it wasn't ... it was like a five minute deal.

Q Did you review any of your notes from the Perry facility, your on-site, prior to signing that declaration?

A No, I was not. I did not.

Q Did you take any notes when you were on-site at the Perry facility in April of '07?

A I have some audit papers, yes.

Q And where are those papers now?

A They are in our ... we have a software system called Auto Audit, we have electronic work papers.

MR. CELLER: Can I get those, Brian?

MR. LISS: You haven't requested it to date. Submit a request in writing and we'll review it for any potential objections and whether or not it's discoverable information.

MR. CELLER: I think you guys have to supplement, I mean, if documents ... But we'll talk about that after the deposition.

MR. LISS: I know we have an obligation to supplement when appropriate, I'm not saying that your request now is one that we would need to supplement for.

MR. CELLER: Fair enough.

BY MR. CELLER:

Q Are employees required to wash their hands -- Strike that.

Before we get there, as you sit here today, do you believe that everything that's contained within this declaration is true and accurate to the best of your knowledge?

A At this time, no.

Page 61

Q Can you tell what changes, if any, you would make?
A There are two items in here that should change.
Q Tell me what they are.
A When I got to back to the office, the audit was done in February of '07, and they do have two breaks versus one.
MR. LISS: Let me just ...
MR. CELLER: Yeah.
MR. LISS: Just to streamline this, because if you don't ask now I'm going to ask later.
MR. CELLER: Sure.
MR. LISS: Maybe it would be good to go to the paragraph and make the change on the record.
BY MR. CELLER:
Q Do it. Do you want a pen?
A I've got one right here.
MR. LISS: And why don't you describe what you're doing.
BY MR. CELLER:
Q Articulate it, yeah.
A Okay. On page 1 I am changing in item 2, it

Page 62

appears to be the second sentence, it says, "In April of this year I conducted a First Principal Activity Audit," I'm changing that from April to February.
And ... Let me find it. On the other one on page 3, item number 8 where it says, "Hourly poultry processing employees at Perdue's poultry processing plant in Perry, Georgia have one 30-minute unpaid break," I am changing the "one" 30-minute break to "two" 30-minute breaks.
Q Okay.
A Do you want me to initial it and date it?
MR. LISS: (Shakes head negatively).
BY MR. CELLER:
Q You're sitting here under oath so I have no issue with that.
MR. LISS: And I can tell you just on the record that we're going to supplement this with a second declaration, just to clarify it for the record.
MR. CELLER: And just so I understand, Brian, will those be the only changes in your declaration or will there be others?
MR. LISS: Those -- as far as I understand, this is Dave's declaration, these are the only two corrections that he has

Page 63

directed to my attention; if there are others we would certainly clarify as well.
MR. CELLER: Okay, fair enough.
MR. LISS: And there might also be a second declaration.
MR. CELLER: Okay, fair enough.
BY MR. CELLER:
Q Other than those two changes that you've made here today, are there any other changes that you would make to this declaration as you sit here today?
A Not to my knowledge right now.
Q And were you as truthful in preparing this declaration as you have been under oath here today?
A Yes.
Q Okay.
A With the changes.
Q Is there anything that you've testified to so far here today that you believe you may have mis-testified or that's inaccurate?
A No.
Q What did you do to prepare for your deposition here today? I don't want to know who you met with, I just want to know what you did.
A When I got back to the office after knowing

Page 64

that I was going to be deposed, I reviewed my audits at the Perry location.
Q You didn't bring those notes with you, did you?
A No.
Q Are you sure about that?
A No, I don't have them.
Q Are they in your car?
A I don't have a car here.
Q Anything other than ... Did you do anything other than review those audit notes from the February of '07 audit?
A Talk with people.
Q Other than your attorney or any attorneys that represent Perdue, did you speak with anybody at the Perry, Georgia facility to prepare for your deposition here today?
A I talked with an individual just to verify my notes that there were two breaks versus one.
Q Who was that individual?
A Steve Passwater.
Q What does he do for Perry?
A He is the regional accounting manager.
Q One more question on the notes. Are they in your luggage here today?

Case 1:06-cv-01000-MEF-WC Document 85-5 Filed 06/11/2008 Page 19 of 26

Page 65

A No. I have copies of this but that's it.
Q And by "this" you're referring to the declaration?
A Uh-huh (affirmative).
Q Okay. How long was your conversation with that gentleman you just identified?
A On that related matter?
Q Yeah.
A 30 seconds.
Q Did you speak with anybody else other than attorneys at Perdue's Perry facility regarding preparation for your deposition here today?
A No.
Q Did you review any other documents other than what you've identified as your audit notes to prepare for your deposition here today?
A No.
Q Let's go ahead and back-mark this as Plaintiff's Exhibit Number 6.
(Thereupon, Plaintiff's Exhibit Number 6 was marked for identification).
BY MR. CELLER:
Q I'll represent to you this is a Notice of Taking Deposition in this matter.
A Okay.

Page 66

Q And as Brian was trained, as was I, I'm not going to ask you if you're the person with the most knowledge, I'm just going to ask you if you're the appropriate corporate representative to testify to the three topics identified here today.
A Two of the three.
Q Which ones are you prepared to testify to?
A I am not able to testify on the knowledge of the hours worked by plaintiffs.
Q Okay. Do you know who would be?
A That would be Steve Passwater and possibly corporate payroll.
MR. CELLER: Brian, will you make them available for a reopening?
MR. LISS: I wanted to mention, this was actually the topic of my e-mail to Deidre.
MR. CELLER: Yeah.
MR. LISS: You know, certainly I can't imagine we would oppose you being able to depose Steve Passwater. I have to say, if you're really asking for information about hours worked by plaintiffs while employed by Perdue, that we could just give you the information.
MR. CELLER: Well, I guess here's the

Page 67

question. Are you guys willing to stipulate that whatever is on their time records is what Steve – what is it, Steve Passwater is it?
MR. LISS: Steve Passwater.
MR. CELLER: That he would testify that those are true and correct copies of the hours worked?
MR. LISS: You know, assuming that I would have a chance to review the documents and show them to him, I would imagine that would be the case, yes.
MR. CELLER: Okay. For now let's say we may want to depose him, but unlikely.
MR. LISS: Okay.
BY MR. CELLER:
Q The other two topics would you agree – Do you mind if I call you Dave?
A Yeah, that's fine.
Q Dave, would you agree that you're the person that's been designated as the proper representative –
A Yes.
Q Okay, fair enough.
Now, let me show you ... Let's go back and mark this or refer to what's been marked as

Page 68

Plaintiff's Exhibit Number 4. Do you recall looking at that document?
A Yes.
Q When was that document first implemented or prepared by Perdue?
A At the Perry location?
Q Yes.
A I'm not sure of the specific date. Once we ... it was shortly after the acquisition.
Q And when was the acquisition?
A 2004 I believe.
Q And who did you guys acquire it from, do you know?
A I believe it was Cagle.
Q And were all of the employees who were working at Cagle, not all of them but was the plan that whoever was working at Cagle just now stayed on as a Perdue employee?
A No. I believe they went and did a rehire of everyone.
Q Do you know whether the same number of employees – or strike that.
Do you know whether a number of employees that came over to Perdue were initially from Cagle's?

Page 69

A I can't answer it truthfully, but I'm going to say the majority of them were.
(Thereupon, Plaintiff's Exhibit Number 7 was marked for identification).
BY MR. CELLER:
Q Let me show you what we're going to mark as Plaintiff's Exhibit Number 7.
MR. LISS: Are they both number 7 or is one 7 and one 8?
MR. CELLER: No, one's 7 and one's going to be 8.
MR. LISS: Okay.
MR. CELLER: We'll mark Annie Bray as 7.
BY MR. CELLER:
Q I'm showing you what's been marked as Plaintiff's Exhibit Number 7, which I'll represent to you is a First Principal Activity Performance Standards and Perry Plant Discipline Program signed by one of our plaintiffs in this case, Annie Bray.
A Uh-huh (affirmative).
Q Here's my question for you. Ms. Bray has worked for Perdue since the time they acquired the plant is our understanding.
A (Nods head affirmatively).
Q Can you explain to me why for the first

Page 70

time in her file she was given a copy of this policy in March of '07?
MR. LISS: Objection to the form of the question.
BY MR. CELLER:
Q Strike that.
Let me ask you this question. Do you know why this document was first signed by Ms. Bray in '07?
MR. LISS: Objection. Again, it doesn't say that.
MR. CELLER: That's fine.
BY MR. CELLER:
Q You can answer it.
A No.
Q Subsequent to learning that Perdue was going to be sued, do you know whether Perry took any measures to ensure compliance with the overtime laws?
MR. LISS: Objection to the form of the question.
BY MR. CELLER:
Q If you know.
A Repeat that, please.
Q Strike. That's fine.

Page 71

Do you know whether Perdue upon learning of this lawsuit enacted any type of measures to determine whether its practices were in compliance with the Fair Labor Standards Act?
MR. LISS: Objection to the form of the question.
THE WITNESS: I'm not aware of any.
BY MR. CELLER:
Q And as you sit here today, do you know why this document was executed on March 16th, 2007?
A No, I cannot, truthfully.
Q Did Perdue require or does Perdue require each of its employees at the Perry facility to execute the document, the form of which is marked as Plaintiff's Exhibit Number 4?
A All new hires I believe according to the Power Point would be required to do that.
Q What about old hires?
A That would be a management decision whether to go back or not.
(Thereupon, Plaintiff's Exhibit Number 8 was marked for identification).
MR. CELLER: We'll do the next one as 8, Brian.
MR. LISS: Okay. (Reviews document).

Page 72

BY MR. CELLER:
Q Who in management by the way made that decision to determine whether employees were going to sign off on this document?
MR. LISS: Objection to the form of the question.
BY MR. CELLER:
Q You can answer.
A Each of our plants during the consent agreement phase prepared Standard Operating Procedures similar to this, not the same but similar to this that was reviewed by the government and approved by the government and they are reviewed by new hires during their orientation.
Q Did you --
A Some have them signed but Perry has them sign the bottom of it.
Q Is it your understanding that if an employee received this type of training at the Perry facility, they would have signed off on this document?
A If they received the new hire training, yes.
Q Do you know --
A Or in the case of -- in this case this was a new -- an older individual, or "older" being working

at the plant, they were -- they went through an orientation of that matter.

Q Do you know whether some employees who have worked at the Perry facility since 2005 do not have copies of what we've marked as Plaintiff's Exhibit Number 4 in their file?

A I am not aware of that.

Q Can you think of any reason why it wouldn't be in any of those employees' files?

A Not any reason, no.

Q Okay, is it -- Well, I'm not going to ask if it's possible.

Let's show you what's been marked as Plaintiff's Exhibit Number 8 which I'll represent to you is again another First Principal Activity Associate Performance Standards and Perry First Discipline Program executed by --

A Mary Harrell.

Q Mary Harrell. Who I'll also represent to you was hired well prior to March 18th of '07.

MR. LISS: Just for the record, you read the title wrong.

MR. CELLER: That's all right.

MR. LISS: But I can agree, we're talking about Exhibit 8, whatever it says on the top --

MR. CELLER: Fair enough.

MR. LISS: -- is what it says.

BY MR. CELLER:

Q Would you agree that -- Strike that.

Do you have any knowledge as to why this document was signed by her on March 18th, 2007?

A No.

Q Do you know whether prior to March 18th of 2007 this document or any form similar to that was given to her?

A No, I'm not aware.

Q Let me ask you the same question with regard to Plaintiff's Exhibit Number 7. Do you know whether prior to March 16th of 2007 this document or something similar to it was given to Ms. Bray?

A I'm not aware.

Q Are employees required to wash their hands prior to getting on the line?

A They wash their hands on the clock.

Q On the clock. Okay. And at the end of the day are they required to wash their hands?

A It is a personal preference to do so.

Q Okay. But are they required to do so?

A I've never seen that being a requirement to wash their hands to leave the plant, no.

Q Would there be -- To your knowledge based upon keeping in compliance with safety concerns -- Strike that.

When employees wash their hands, those that do at the end of the day, is it on or off the clock?

A They are given the opportunity to wash their hands on the clock. I have seen where they have gone straight to the bathroom off the clock and did the same.

Q Okay.

A So we give them the opportunity to wash their hands.

Q What about during breaks. When the break whistle blows, do employees wash their hands prior to going on break?

MR. LISS: Objection to the form of the question. There's no break whistle.

MR. CELLER: Strike that. No whistle, okay.

BY MR. CELLER:

Q Prior to employees going on break, are they required to wash their hands?

A They do that as a personal preference. There is no requirement to wash their hands, we give

them the opportunity to wash their hands. There are sinks available.

Q But while they're on the clock, there's no directive that they wash their hands prior to going to lunch break, correct?

A No. If they want to go eat their lunch, it's fine, they can go.

Q And what about washing their hands when they get back on the clock after their break?

A It's after the clock.

Q So they clock in and then wash their hands?

A Yes.

Q When employees -- Strike that.

How many bathrooms are there at the Perry facility for line employees to use?

A I don't know how many there are. There's two main ones, there's a men's and a ladies in the main area. I'm sure there's more but I don't know ... For my knowledge, one.

Q Do you know, for example, how many urinals or how many stalls are in each one?

A No.

Q Did you ever see any employees, based on your three-day experience at the Perry facility,

Page 77

lining up to use the bathroom or waiting to use the bathroom?

A I've never seen a line.

Q I want to talk a little bit ... When they go on break you mentioned some of the employees will, for example, hang their ear plugs off their ... I don't remember what you said, but their ear plugs hang?

A Yeah. There's a little strap in your bump cap where you can tie -- instead of -- you take them out, if you didn't have it tied to the bump cap they would fall off and you'd lose them. So the majority of them just put a loop on it and tie it to their bump cap so when they take it off, it's there. And then when they're getting ready to put them back in they just grab them.

Q Is it your testimony that Perdue does not require its employees to take off any of this gear -- when I say gear, the personal equipment that they're not compensated for -- prior to going to the break room?

A They're not required to take them off.

Q Let me ask you a question. Do you believe that there would be a safety concern, for example, let's say an employee was eating, I don't know, I

Page 78

know we're at a poultry facility, but sushi with raw fish or something and it gets on their beard net, is there not a concern that when they go back to work that there could be contamination of the poultry based upon what they ate?

A That's a possibility.

Q But Perdue does not require them to take this gear off, meaning anything that could possibly come back in contact?

A Not that I'm aware of there isn't any requirement.

Q Do you whether OSHA or the law requires Perdue to require these employees to take that gear off?

MR. LISS: Objection to the form of the question.

BY MR. CELLER:

Q If you know.

A I don't know.

Q Do you believe that, based on your experience in your employment with Perdue, do you believe it would be good safety hygiene for employees to remove these products prior to eating personal food?

MR. LISS: Objection to the form of the

Page 79

question and remind you of the nature of this deposition.

MR. CELLER: Understood.

BY MR. CELLER:

Q You can answer.

A That's an obvious, yes.

Q Do you have any knowledge as to why Perdue wouldn't require that?

A No, I don't.

Q Would you agree that if it was required, Perdue would be obligated to compensate employees for the time they spent taking that equipment off? If you know.

A If that was included in our consent agreement. Yeah, right.

Q Would it be fair to say that Perdue is essentially willing to live by or die by that consent decree as to what they're required to comply with under the law?

MR. LISS: Objection to the form of the question.

BY MR. CELLER:

Q You can answer.

A Yes, that's my opinion.

Q Fair enough.

Page 80

(Thereupon, Plaintiff's Exhibit Number 9 was marked for identification).

BY MR. CELLER:

Q I show you what's been marked as Plaintiff's Exhibit 9. I don't expect that you've ever seen this particular document, but have you seen anything similar to this issued by Perdue?

A Yes.

Q What is that?

A That's issued by Perdue. It's an electronically created generated time card created by the Kronos system.

Q And in that work week that's reflected in Plaintiff's Exhibit Number 9, would you agree that that employee worked overtime hours during that work week?

A Yes.

Q And would you agree that not included within the overtime hours worked would be the time that we've discussed ad nauseam here today regarding the donning and doffing of the personal gear that we've addressed?

MR. LISS: Objection to form of the question.

THE WITNESS: Yeah.

Page 81

BY MR. CELLER:
Q You can answer. Do you understand what I'm saying?
A Yeah, because they're not compensable items in our opinion.
Q Okay. And so you would agree that the time spent -- the time that employees spend putting that personal gear on is not reflected in their hours worked?
MR. LISS: Objection.
BY MR. CELLER:
Q You can answer.
A They are not reflected in that time, yes.
MR. CELLER: All good.
MR. LISS: I just have a few questions.
DIRECT EXAMINATION
BY MR. LISS:
Q Dave, are poultry processing employees ... Strike that.
Reference has been made to employees at various points throughout this deposition.
A Uh-huh (affirmative).
Q Have your answers been exclusively regarding hourly poultry processing employees?
A Yes.

Page 82

Q So I'll continue to use the word "employees" with that in mind.
A (Nods head affirmatively).
Q Are employees permitted to put on personal gear after they clock in?
A Yes.
Q Are employees permitted to doff personal gear before they clock out?
A Sure, yes.
Q And if one of those two were to happen, then the donning and doffing of personal gear would be compensable; is that right?
A Yes.
Q So in reference to Exhibit 9, this time card, do you know whether or not Ms. Collier chose to don or doff personal gear before or after she had clocked in or out?
A No, I do not.
Q So, in fact, she might have been paid for the donning or the doffing?
A Yes, it's a possibility.
MR. CELLER: Brian, I've got 3 if you're looking for it if you need it.
MR. LISS: Okay, I'm good. Thank you.
BY MR. LISS:

Page 83

Q Do you know if Perry conducts training for its employees after the initial new hire training?
A Training after the new hire orientation? There are coaching sessions given if needed. And there can be team meetings where they get together as a group where they would discuss that.
Q But you think that during those subsequent training meetings the supervisor would provide the associate, the employee, with written information?
MR. CELLER: Object to the form.
THE WITNESS: Provide them with a written form?
BY MR. LISS:
Q With any written information was my question.
A No, not necessarily.
Q Would it be possible?
A Possible, yes.
Q Again, just to clear up the record, we've been talking about swiping and punching. What word describes best how employees, you know, enter their time card at the time clock?
MR. CELLER: Form.
THE WITNESS: When they get to the clock they swipe in. And normally it's a green light

Page 84

to make sure that it is taken. In their training they require them to swipe a second time to show -- which would be an amber light saying punch restricted or swipe restricted. That would signify that the first swipe took and they proceed to their designated area to don their gear.
BY MR. LISS:
Q But it's a swipe?
A Yes.
Q Do all employees start their shift at the same time?
A No.
Q Are the shifts staggered?
A Yes.
Q How are they staggered?
A Based on product flow on the front end and production schedules on the second processing or back end.
Q And, similarly, are break times staggered?
A Yes.
Q How are they staggered?
A In a line dependent area which is first processing. Once the line hangers go on break, as the birds move down the line, the individuals as the birds

Case 1:06-cv-01000-MEF-WC Document 85-5 Filed 06/11/2008 Page 24 of 26

pass will go to break. So it's like a snowball -- or a rolling effect.

Second processing is pretty much dependent on product availability and requirements for production.

And most of the time they stagger their departments also.

Q You testified that there were five clocks in first processing?

A First processing is five, yes.

Q And that there were six in second processing?.

A Yes, I believe there are six.

Q Generally speaking, where are the time clocks located?

A There are four in both hallways leading to the production area, and one in the receiving area in first processing and one in what we call a Chick-Fil-A area.

Q What accounts for the location of the time clocks?

A The locations were -- I would have to assume they were -- the four were put in the hallways to protect it from sanitation waters and to keep them from breaking down if they ... and ease of access to

the production area.

Q You testified that you conducted a first and last Principal Activity Audit in February of 2007; is that right?

A Yes.

Q Did you have occasion to return to Perry after that time?

A Yes, I have.

Q Did you observe the First and Last Principal Activity process and procedures at Perry when you returned?

MR. CELLER: Object to form. You can answer.

THE WITNESS: It was an unofficial review of all of the steps that I was able to look at. It was not a formal audit, but I did review items that were addressed during the audit, the first audit.

BY MR. LISS:

Q What did you see?

A Every item that was noted in the first audit had been corrected and were working fine.

MR. LISS: No further questions.

MR. CELLER: I've just got a couple of redirect.

RECROSS-EXAMINATION

BY MR. CELLER:

Q When was it, Dave, that you went back after the February audit?

A Here's where I've got to think month-wise. I believe it was end of June or end of July of this year.

Q What prompted or initiated you having to go back if you had already done an audit just months prior?

A I was asked to go down to the plant.

Q Who asked you?

MR. LISS: Objection to the form of the question.

MR. CELLER: What's the problem with that one, Brian? What's the problem with that one?

MR. LISS: Form of the question.

BY MR. CELLER:

Q Do you understand the question?

A Yes.

Q All right. Who asked you?

A My boss.

Q Who's that?

A Stan Howath.

Q Can you say that again?

A Stan Howath is my boss.

Q Is Stan a lawyer?

A No, he's not.

Q Did Stan tell you why he wanted you to go to the plant?

MR. LISS: You can answer.

THE WITNESS: Yes.

BY MR. CELLER:

Q What was the purpose or what did he tell you was the reason?

A I was to meet Brian.

Q Okay. And I don't want to know anything you discussed with Brian. What did you do during that secondary visit in June or July of '07? What was the --

A Gave Brian a walk-through of the plant.

Q Okay. Were there times that you spent at the plant in that visit in June or July of '07, was there any work you did outside of Brian's presence?

A No.

Q During that visit in June or July of '07, did you specifically look at or do any type of analysis regarding the personal gear that we discussed Perdue doesn't pay for as being compensable?

A No.
Q Do you understand my question?
A I did not.
Q Was the focus of your June or July '07 visit simply to focus on whether the requirements of the 2002 consent decree were still being implemented or upheld?
A My primary purpose was to give Brian a walk-through.
Q Okay, fair enough.
Are employees given any type of extra minutes or credit at the end of the work week for any time spent donning or doffing these personal gear?
A No.
Q Now, you testified -- Brian asked you some questions whether employees are permitted to don and doff the personal equipment on the clock, do you remember that?
A Yes.
Q And you said that they are?
A They could, yes.
Q But that's not Perdue's policy, is it?
A They could walk through the door and put their ear plugs in.

Q Okay. But that's not Perdue's policy, correct?
A (Reviews document). That's that policy, yes.
Q Would you agree that what we've marked --
A I believe that -- Let me answer that. If they walked in without their ear plugs or bump cap on, they would not get written up, no.
Q I just want to make sure referring to Plaintiff's Exhibit 3 document 20 which you testified was accurate on direct.
A Right.
Q That employees according to this policy are required to have their personal gear on before swiping it, and you said yes, do you remember that?
A Yes, correct.
Q So, now, on cross you changed your answer and said no, they could put them on on the clock.
A They could.
Q Okay. If they could, it would be in violation of what we've identified as Plaintiff's Exhibit Number 3, document 20, correct?
A According to that, yes.
Q So there would be an inconsistency, would you agree, between the implementation of Perdue's

policy and the reality of the situation?
MR. LISS: Objection to the form of the question.
BY MR. CELLER:
Q Do you understand my question?
A Rephrase that a little bit.
Q You would agree with me that the written policy of Perdue is that employees must have personal items on before swiping in? Is that correct?
A In most cases they do, yes.
Q But not what they actually do, I'm asking about the policy. Would you agree that the policy is that they have -- the written policy is that they have to have these items on before swiping in?
A Yes. That document says have.
Q From what I understand from your testimony, would you agree that even though that's the written policy, it's not necessarily being enforced by Perdue?
MR. LISS: Objection, that wasn't his testimony.
MR. CELLER: That's okay.
BY MR. CELLER:
Q If you understand my question.

A Enforcement, as far as that question, no, they're probably not.
Q Are there any other policies which Perdue is relying on as part of their donning and doffing procedures that may be in writing that they may not be enforcing that stringently?
MR. LISS: Objection to the characterization of what Perdue is relying or not relying on. The question other than that is fine.
THE WITNESS: I wouldn't know.
MR. CELLER: Anything else?
Tell me about your cell phones. I'm just kidding, I've got no further questions.
THE WITNESS: I've got a picture of my granddog.
MR. CELLER: That's all right.
(Thereupon, the deposition was concluded at 11:33 a.m.).

CERTIFICATE

GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the proceedings were reduced to typewriting under my direction and control.

I further certify that the transcript is a true and correct record of the evidence given at the said proceedings.

I further certify that I am neither a relative or employee or attorney or counsel to any of the parties, nor financially or otherwise interested in this matter.

This the 14th day of December, 2007.

________________________

ALICE E. SIMMONS, B-1193

DISCLOSURE

STATE OF GEORGIA

COUNTY OF FULTON

DEPOSITION OF DAVID TABINOWSKI

Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as an independent contractor for American Court Reporting Company, Inc.

The firm was contacted by the offices of DEIDRE M. JOHNSON, Esquire, to provide court reporting services for this deposition. The firm will not be taking this deposition under any contract that is prohibited by OCGA 15-14-37 (a) and (b).

Option A: The firm has no contract/agreement to provide reporting services with any party to the case, any counsel to the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. The firm will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

(Signature of Attorneys optional)

____________________ December 12, 2007

ALICE E. SIMMONS, CCR B-1193

____________________ __________

Attorney for Plaintiff Date

____________________ __________

Attorney for Defendant Date

ERRATA SHEET

IN RE: DAVID ALFORD, SR. V. PERDUE FARMS, INC.

CIVIL ACTION FILE NO: 5:07-CV-00087-CAR

DEPOSITION TAKEN ON: December 12, 2007

I have read the transcript of my deposition and find that no changes are necessary.

Having read the transcript of my deposition, I wish to make the following changes (Please state reason.)

| Page / Line / | Change / Reason |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

________________________

DAVE TABINOWSKI

Sworn to and subscribed before me,

____________________, Notary Public.

This _____ day of _____________, 2007.

My Commission Expires:

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.** | § | |
| | § | |
| **PLAINTIFF(S)** | § | |
| | § | |
| **V.** | § | **Case Action No.: 1:06-cv-1000-MEF-WC** |
| | § | |
| **PERDUE FARMS INCORPORATED** | § | |
| | § | |
| **DEFENDANT.** | | |

# EXHIBIT 3

# AFFIDAVIT OF QUALITY CONTROL EMPLOYEE MARSHA DIXON

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT:**

1. My name is Marsha Dixon.

2. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

3. I have worked for Defendant for approximately 21 years. I have worked in QA for about 2.5 years. As part of QA I am titled HACCP/SSOP. HACCP stands for Hazard Analysis Critical Control Point. This is a term used for the program used to ensure wholesomeness of product and safe product recall. SSOP stands for Sanitation Standard Operation Procedures.

4. I had to attend a 3 week training program for this position.

5. As part of my job I ensure machines are sanitized, employees follow "good manufacturing procedures" or GMPs and the plant follows all other relevant food safety procedures.

6. I work night shift.

7. I average 45 – 55 hours per week

8. My rate of pay is $9.90.

9. I work in both 1st and 2nd processing.

10. Before 1st processing employees are allowed to clock in they have to put on their safety glasses, bump cap, hair net and beard net (if applicable), boots and ear plugs.

11. Before 2nd processing employees can go through the first door into the stairway leading up stairs to the processing area, they have to put on their safety glasses, bump cap, hair net, beard nets, boots and ear plugs.

12. Putting on this equipment is part of our "good manufacturing practices" and I must do a GMP audit to ensure employees comply with the requirements in paragraphs 10 and 11. If an employee does not have on safety glasses, bump cap, hair net, beard net, boots and ear plugs before clocking in I have to take the employees name and turn them in to my supervisor.

13. Hair nets and beard nets are required by Perdue and USDA.

14. Ear plugs, safety glasses, bump caps and boots are required by Perdue for safety reasons.

15. Employees must have their hair net, beard net, safety glasses, bump cap and ear plugs in before clocking in. They are not allowed to simply have these items in their possession or carry these items to the time clock.

16. I do GMP audits in 7 departments in both 1st and 2nd processing.

17. Before entering the processing area and before clocking in, employees also must sanitize their boots.

18. I personally have reported employees who fail to wear their ear plugs, hair nets, safety glasses or beard nets in the processing areas.

19. My supervisor maintains copies of GMP audits where employees have been reported for not complying with these personal protective equipment (PPE) requirements.

20. I am not aware of any written policy or procedure that allows employees to wear their hair net, safety glasses, boots, bump cap, and ear plugs from the house. I have not been trained that employees are allowed to wear these items from their home.

21. The vast majority of employees I observe get dressed at the plant on their own time because when you get to the time clock you have to have those items on.

22. The supply room is open at the beginning of each shift so employees can get hair nets, beard nets, ear plugs, and safety glasses before clocking in if needed. As part of my job responsibilities I have personally turned people around before they clocked in to obtain these items from supply if they didn't have them on.

23. Employees must have a clean hair net and beard net daily. If they are dirty, covered in chicken fat, chicken blood, feathers, fecal, dried or otherwise, etc. employees have to get a new net before shift starts or any time during the shift. I am required to report as part of my GMP audit when an employee is wearing an unsanitary net.

24. The beginning of this year Perdue took down a sign that was located on the door at the base of the flights of stairs to second processing and entrance to first processing. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in, before we go upstairs. This requirement has not changed.

25. At each time clock there is a sign stating that you must have on certain equipment before clocking in and certain equipment after clocking in. There are two pictures, a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall rubber boots with the pants tucked into them. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

26. Perdue has changed these signs as well, although I am not sure of the date. I noticed last night that the lady in the before picture is now wearing black short rubber boots up under her pants and her ear plugs are not in

her ears, they are around her neck. The new sign also does not show the employee wearing safety glasses.

27. At breaks employees clock out, sanitize their boots, and walk to the break room. Employees are not allowed to take off their hair nets, beard net, safety glasses or bump cap until they clear the door at the base of the stairs that is the entrance to first and second processing.

28. It is required these items be put back on before going through the same door after break. This is done off the clock as well.

29. I have observed employees cleaning their safety glasses on break and obtaining new clean nets while on break.

30. After breaks employees must again sanitize their boots before clocking in.

31. I have observed employees waiting in long lines to clock in after breaks due to the fact the entire shift is coming back off break. I would estimate it takes 2 - 3 minutes to get through the line to clock in. Before that it takes about 2 minutes to get from the first door at the base of the stairs to each employees' assigned time clock, and this happens 6 times a day.

32. At the end of the day employees clock out, walk to the processing exit, again sanitize their boots before exiting, and once they clear the door at the base of the stairs that is the entrance to first and/or second processing, they can take their hair net, beard net, safety glasses, and bump cap off. Not before.

33. I have observed most people take their bump cap, hair nets, safety glasses, and ear plugs off in the break area.

34. I have never heard of the DOL awareness training program. To the best of my knowledge, I have never been trained in this program.

35. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 4th day of June, 2008.

Marsha Dixon
PLAINTIFF'S NAME

[signature]
PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 4th day of June, 2008.

Sheri R. Hughes
NOTARY PUBLIC
My Commission Expires: 01/17/2011

[SEAL]

SHERI R. HUGHES
NOTARY PUBLIC
EXPIRES:
01-17-11
ALABAMA STATE AT LARGE

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **DARRYL ANDERSON, et al.** | § |
| | § |
| **PLAINTIFF(S)** | § |
| | § |
| **V.** | **§Case Action No.: 1:06-cv-1000-MEF-WC** |
| | § |
| **PERDUE FARMS INCORPORATED** | § |
| | § |
| **DEFENDANT.** | |

**EXHIBIT 4**

**AFFIDAVITS OF NAPOLEON ROLLINS AND QUEEN WILSON**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
SOUTHERN DIVISION

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

# AFFIDAVIT

1. My name is Napoleon Rollins.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant, as a poultry-processing laborer for approximately 18 years. I currently work in 2nd processing De Bone.

5. I work night shift.

6. I average 40 hours per week.

7. In my job I de bone front halves, weigh breasts, and tenders. My rate of pay is $9.45.

8. When I arrive to work I am required to go through security and show my ID badge. I cannot enter the plant without going through security.

9. I am required by Perdue to wear hair net, beard net, ear plugs, safety glasses, slip resistant boots, plastic sleeves, cloth and plastic gloves and smocks.

10. I cannot enter the production area of the plant without wearing my bump cap, hair net, beard nets, ear plugs, boots and safety glasses. I go through two sets of doors to enter the processing area with two flights of

stairs between each door. I do this off the clock after putting on my hair net, beard net, bump cap, ear plugs and safety glasses.

11. I put these items on at the plant before going through the door at the base of the stairs. I cannot go beyond this point without having those items on.

12. I must sanitize my boots each time I enter and exit the production area of the plant. Beginning of the shift, end of shift, and on breaks. I do this off the clock.

13. There is a sign on the door at the bottom of the stairs stating we must have on ear plugs and safety glasses before going beyond the door and up the stairs to processing.

14. Early this week, I believe Tuesday night, I was given a copy of the plant's Good Manufacturing Practices (GMPs). A true copy of the document I was provided is attached to this affidavit.

15. I was told to read over the document, I was told I must follow these procedures, and I had to sign a sheet confirming I had received a copy of the GMPs.

16. I was trained that I must have on my hard hat, ear plugs, beard net, hair nets, and safety glasses when in the processing area. Failure to do so will lead to discipline including termination.

17. When I arrive at the time clocks at the beginning of the shift after putting on my hair net, beard net, ear plugs, and bump cap, and after sanitizing my boots I have to wait in line 3 – 5 minutes to clock in because everyone assigned to my time clock is trying to clock in. At breaks I have to wait 2 - 3 minutes to clock in because everyone is coming back from break. This wait time is off the clock and happens daily.

18. In order to get to my assigned time clock on time I have to arrive at the plant 10 -15 minutes early in order to clear security, put on my boots, hair net, beard net, ear plugs, and bump cap, sanitize my boots and walk to the time clock. I do not socialize or talk with other employees. It takes that entire time to do the tasks required by Perdue before I clock in.

19. I have never been told I can wear my hair net, beard net, boots, bump cap, safety glasses from my house.

20. I did not know I had an option. I believe I have to put these items on at the plant although I have seen some people wear their boots and hair net from their house. I assumed they were violating company policy.

21. I throw my hair net and beard net away everyday because it gets wet with chlorinated water and it irritates my head and face. Other times I have to get rid of the nets because they get covered in chicken grease.

22. I go to the supply room to pick up my new hair net and beard net every morning because I had to throw away my old one the previous day.

23. Once I clock in I am allowed to put on Perdue's other required equipment such as coat, plastic sleeves, plastic and cloth gloves.

24. I then sanitize my plastic gloves in either the sink or at a dip station.

25. I get two breaks.

26. Once I clear the door at the bottom of the stairs I remove my hair net, beard net, safety glasses, boots, and ear plugs.

27. I have to clean my glasses and boots downstairs because they are dirty from the processing area and because the boot sanitzer doesn't get all the meat off my boots.

28. I take these items home because I am responsible for these items and I have to pay to replace them if they get lost.

29. Even if I could wear these items from home, I could not safely drive at night wearing ear plugs in my ears, safety glasses, a hard hat that hits the roof of my car and boots that make it difficult to mash the car's brake and gas pedals.

30. During my employment with Perdue, I personally observed that co-workers working along my side followed the same procedures described above.

31. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 6 day of June, 2008.

Napoleon Collins
PLAINTIFF'S NAME

Napoleon Collins
PLAINTIFF'S SIGNATURE

STATE OF Alabama
COUNTY OF Houston

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 6 day of June, 2008.

[SEAL]

Jennifer Leann Dean
NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
SOUTHERN DIVISION

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

## AFFIDAVIT

1. My name is Queen Wilson.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant, as a poultry-processing laborer for approximately 3 years. I currently work in 2nd processing De Bone.

5. I work night shift.

6. I average 40 hours per week.

7. In my job I de bone front halves, weigh breasts, and tenders. My rate of pay is $9.55.

8. When I arrive to work I am required to go through security and show my ID badge. I cannot enter the plant without going through security.

9. I am required by Perdue to wear hair net, ear muffs in lieu of ear plugs, safety glasses, slip resistant boots, plastic sleeves, cloth and plastic gloves and smocks. I bought my ear muffs from Perdue. I have to have on ear muffs or ear plugs as a requirement of Perdue.

10. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear muffs, boots and safety glasses. I go through two

sets of doors to enter the processing area with two flights of stairs between each door. I do this off the clock after putting on my hair net, bump cap, ear muffs and safety glasses.

11. I put these items on at the plant before going through the door at the base of the stairs. I cannot go beyond this point without having those items on. This is a Perdue requirement.

12. I must sanitize my boots each time I enter and exit the production area of the plant. Beginning of the shift, end of shift, and on breaks. I do this off the clock.

13. There is a sign on the door at the bottom of the stairs stating we must have on ear plugs and safety glasses before going beyond the door and up the stairs to processing.

14. At the beginning of this week, I was given a copy of the plant's Good Manufacturing Practices (GMPs). A true copy of the document I was provided is attached to this affidavit.

15. Everyone in my Department received a copy of the GMP document. The supervisors placed them in our pockets as we walked by leaving the line.

16. I was told to read over the document, I was told I must follow these procedures, and I had to sign a sheet confirming I had received a copy of the GMPs.

17. I was trained that I must have on my hard hat, ear muffs, hair nets, and safety glasses when in the processing area. Failure to do so will lead to discipline including termination.

18. When I arrive at the time clocks at the beginning of the shift after putting on my hair net, ear muffs, and bump cap, and after sanitizing my boots I have to wait in line 5 minutes to clock in because everyone assigned to my time clock is trying to clock in. At breaks I have to wait about 5 minutes to clock in because everyone is coming back from break. This wait time is off the clock and happens daily.

19. In order to get to my assigned time clock on time I have to arrive at the plant 10 minutes early in order to clear security, put on my boots, hair net,

beard net, ear plugs, and bump cap, sanitize my boots and walk to the time clock. I do not socialize or talk with other employees. It takes that entire time to do the tasks required by Perdue before I clock in.

20. I have never been told I can wear my hair net, boots, bump cap, ear muffs or safety glasses from my house.

21. I did not know I had an option. I believe I have to put these items on at the plant although I have seen some people wear their boots and hair net from their house. I assumed they were violating company policy.

22. I throw my hair net away about every other day because they get covered in chicken grease.

23. I go to the supply room to pick up my new hair net every other morning because I had to throw away my old one the previous day.

24. Once I clock in I am allowed to put on Perdue's other required equipment such as coat, plastic sleeves, plastic and cloth gloves.

25. I then sanitize my plastic gloves in either the sink or at a dip station.

26. I get two breaks.

27. Once I clear the door at the bottom of the stairs I remove my hair net, safety glasses, boots, and ear muffs.

28. I have to clean my glasses and boots downstairs because they are dirty from the processing area and because the boot sanitzer doesn't get all the meat off my boots.

29. I take these items home because I am responsible for these items and I have to pay to replace them if they get lost.

30. Even if I could wear these items from home, I could not safely drive at night wearing ear muff on my ears, safety glasses, and a hard hat that hits the roof of my car. I could not hear with my ear muffs on and the glare from the lights through my dirty scratched safety glasses would make it difficult to see.

31. During my employment with Perdue, I personally observed that co-workers working along my side followed the same procedures described above.

32. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 6 day of June, 2008.

Queen Wilson
PLAINTIFF'S NAME

Queen Wilson
PLAINTIFF'S SIGNATURE

STATE OF Alabama

COUNTY OF Houston

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 6 day of June, 2008.

Jennifer LeAnn Dean
NOTARY PUBLIC

[SEAL]

My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.** | § | |
| | § | |
| **PLAINTIFF(S)** | § | |
| | § | |
| **V.** | § | **Case Action No.: 1:06-cv-1000-MEF-WC** |
| | § | |
| **PERDUE FARMS INCORPORATED** | § | |
| | § | |
| **DEFENDANT.** | | |

**EXHIBIT 4**

**TAB 1**

# GOOD MANUFACTORING PRACTICES (GMPs) PREREQUISITES 0.1

# Good Manufacturing Practices (GMPs)

**Prerequisites 0.1**

**Purpose:** All personnel entering the processing areas must adhere to Good Manufacturing Practices in order to protect the products, team members, and the customers.

**Area:** All processing areas

**Procedure:**

1. Gloves are not to be worn outside the work area. Gloves will be sanitized prior to returning to your workstation. If gloves become ripped, torn, soiled beyond cleaning, or otherwise unserviceable, the team member will be responsible for immediately securing a replacement glove.
2. No <u>Visible</u> jewelry worn in any processing areas.
3. False eyelashes, etc. will not be worn or used in processing areas. Fingernails will be kept clean. Gloves must cover fingernail polish, false fingernails, and fingernail decorations while in the processing areas.
4. Drinking, eating food, chewing gum, cough drops, spitting, use of toothpicks, and tobacco use of any type in any processing area is strictly prohibited. The use of tobacco is allowed only in designated smoking areas. The only thing that should be in your mouth while you are in the processing area is your teeth and your tongue.
5. All team members will be clean and present a neat appearance. Clothing must be suitable for the expected work environment.
6. All team members will wear smocks and /or aprons in their respective processing areas. Snaps or ties will secure smocks. Buttons are not allowed. These items, including sleeve protectors and any required PPE, will be maintained in a clean and serviceable manner at all times. Nametags and company logos will be securely sewn.
7. The wearing of smocks, freezer coats / suits, rain suits, and aprons into bathrooms, cafeteria, break rooms and other non-processing areas, including outside the facility is strictly prohibited. You cannot wear a raincoat as an alternative to wearing a apron.
8. No items, to include pins, badges, pens, pencils, note pads, tobacco products, etc. will be allowed in exposed pockets above the waist.
9. Personal items, such as purses, bags, lunches, etc. are prohibited from any processing area. These must be left in the locker area or in your vehicle.
10. Hair will be completely secured under a close weave-type hair net. Vanity hairnets are not authorized. Hair clips, barrettes, pins, etc., are not to be outside hairnets, and their use should be discouraged.
11. All beards and mustaches will be secured under an approved beard/mustache net.
12. Hand washing facilities, to include hot potable water, non-perfumed USDA approved soap in single service dispensers, and non-reusable paper towels, will be made available. Used paper towels will be disposed of in the proper receptacle. (Not placed on racks or tables).

13. Hands/gloves/apron/sleeves will be sanitized when returning to your workstation and before touching any meat. Hands will be washed after using the rest room. Hands/ gloves will be washed and sanitized after handling potentially contaminated materials (pallets, waste container, product on floors, foot stands, brooms, hoses, smoking, etc.)
14. Condemned containers (Red) are never to be placed in contact with edible product, packaging material, equipment, conveyors or personnel. Only designated red apron team members are to touch or move condemned containers and product.
15. Hard hats or "bump caps" are required for this location. They should be adjusted for a comfortable fit and suspension systems should remain in place. Baseball type caps, wool hats and other similar headgear is not authorized. Associate's name must be visible on hat.
16. Hearing protection will be used in all areas of this location. Earplugs will be attached to a common cord. No cotton, tissues, or unsecured hearing protection will be used.
17. No radios and/or pagers are allowed in the plant unless provided by the company.
18. No sunglasses are to be worn in the production area. Exceptions for prescription glasses must be cleared with the Wellness Center.
19. Team members must be in good health, with no sickness or injury, and be physically able to perform their assigned task(s).
20. A waterproof dressing will cover all open or exposed sores, cuts, abrasions, wounds, etc. Gloves will be worn over all dressings. Any team member with a preexisting wound dressing must first see the Wellness Center prior to the start of work. Dressing must be changed as necessary to prevent contamination of product.
21. Team members should perform their jobs in such a way as to insure a sanitary work place. All products should be placed into designated totes, tubs, bins, barrels etc. and should not touch the floor or unsanitary surfaces.
22. Team members should take pride in a clean and safe work area. Any potential problems or hazards should be reported to your supervisor. Team Members should place litter in proper receptacles and should clean up their own trash after breaks
23. Products that occasionally fall on the floor should be promptly retrieved by the floor person and reconditioned or condemned according to current plant policy. Only designated associates should pick up and recondition product.
24. All Perdue team members are to receive this policy. Failure to follow these minimum standards may lead to disciplinary action up to, and including, termination.

# Good Manufacturing Practices (GMPs)

**Prerequisites 0.1**

**Purpose:** All personnel entering the processing areas must adhere to Good Manufacturing Practices in order to protect the products, team members, and the customers.

**Area:** All processing areas

**Procedure:**

1. Gloves are not to be worn outside the work area. Gloves will be sanitized prior to returning to your workstation. If gloves become ripped, torn, soiled beyond cleaning, or otherwise unserviceable, the team member will be responsible for immediately securing a replacement glove.
2. No <u>Visible</u> jewelry worn in any processing areas.
3. False eyelashes, etc. will not be worn or used in processing areas. Fingernails will be kept clean. Gloves must cover fingernail polish, false fingernails, and fingernail decorations while in the processing areas.
4. Drinking, eating food, chewing gum, cough drops, spitting, use of toothpicks, and tobacco use of any type in any processing area is strictly prohibited. The use of tobacco is allowed only in designated smoking areas. The only thing that should be in your mouth while you are in the processing area is your teeth and your tongue.
5. All team members will be clean and present a neat appearance. Clothing must be suitable for the expected work environment.
6. All team members will wear smocks and /or aprons in their respective processing areas. Snaps or ties will secure smocks. Buttons are not allowed. These items, including sleeve protectors and any required PPE, will be maintained in a clean and serviceable manner at all times. Nametags and company logos will be securely sewn.
7. The wearing of smocks, freezer coats / suits, rain suits, and aprons into bathrooms, cafeteria, break rooms and other non-processing areas, including outside the facility is strictly prohibited. You cannot wear a raincoat as an alternative to wearing a apron.
8. No items, to include pins, badges, pens, pencils, note pads, tobacco products, etc. will be allowed in exposed pockets above the waist.
9. Personal items, such as purses, bags, lunches, etc. are prohibited from any processing area. These must be left in the locker area or in your vehicle.
10. Hair will be completely secured under a close weave-type hair net. Vanity hairnets are not authorized. Hair clips, barrettes, pins, etc., are not to be outside hairnets, and their use should be discouraged.
11. All beards and mustaches will be secured under an approved beard/mustache net.
12. Hand washing facilities, to include hot potable water, non-perfumed USDA approved soap in single service dispensers, and non-reusable paper towels, will be made available. Used paper towels will be disposed of in the proper receptacle. (Not placed on racks or tables).

13. Hands/gloves/apron/sleeves will be sanitized when returning to your workstation and before touching any meat. Hands will be washed after using the rest room. Hands/ gloves will be washed and sanitized after handling potentially contaminated materials (pallets, waste container, product on floors, foot stands, brooms, hoses, smoking, etc.)
14. Condemned containers (Red) are never to be placed in contact with edible product, packaging material, equipment, conveyors or personnel. Only designated red apron team members are to touch or move condemned containers and product.
15. Hard hats or "bump caps" are required for this location. They should be adjusted for a comfortable fit and suspension systems should remain in place. Baseball type caps, wool hats and other similar headgear is not authorized. Associate's name must be visible on hat.
16. Hearing protection will be used in all areas of this location. Earplugs will be attached to a common cord. No cotton, tissues, or unsecured hearing protection will be used.
17. No radios and/or pagers are allowed in the plant unless provided by the company.
18. No sunglasses are to be worn in the production area. Exceptions for prescription glasses must be cleared with the Wellness Center.
19. Team members must be in good health, with no sickness or injury, and be physically able to perform their assigned task(s).
20. A waterproof dressing will cover all open or exposed sores, cuts, abrasions, wounds, etc. Gloves will be worn over all dressings. Any team member with a preexisting wound dressing must first see the Wellness Center prior to the start of work. Dressing must be changed as necessary to prevent contamination of product.
21. Team members should perform their jobs in such a way as to insure a sanitary work place. All products should be placed into designated totes, tubs, bins, barrels etc. and should not touch the floor or unsanitary surfaces.
22. Team members should take pride in a clean and safe work area. Any potential problems or hazards should be reported to your supervisor. Team Members should place litter in proper receptacles and should clean up their own trash after breaks
23. Products that occasionally fall on the floor should be promptly retrieved by the floor person and reconditioned or condemned according to current plant policy. Only designated associates should pick up and recondition product.
24. All Perdue team members are to receive this policy. Failure to follow these minimum standards may lead to disciplinary action up to, and including, termination.

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **DARRYL ANDERSON, et al.** | § |
| | § |
| **PLAINTIFF(S)** | § |
| | § |
| **V.** | §**Case Action No.: 1:06-cv-1000-MEF-WC** |
| | § |
| **PERDUE FARMS INCORPORATED** | § |
| | § |
| **DEFENDANT.** | |

**EXHIBIT 5**

**AFFIDAVITS OF CLARICE HICKS, OLIVIA BRACKINS, KATRINA M. WARD, MICHELLE TILLER, GLORIA D. ALLEN, EDDIE CHARLES SNELL, FELISA SIMON, INDYA BURKES, ANNIE WOODLEY, BETTY OLIVER, GENEVA BYNUM, GLORIA J. BROWN, MARY L. WASHINGTON, BOBBY WIMES WILSON, HORRIS ANDREWS**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA,**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT:**

1. My name is Clarice Hicks.
2. I am a Plaintiff in this action.
3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.
4. I worked for Defendant, as a poultry-processing laborer for approximately 10 years. I currently work in De Bone.
5. I work day shift.
6. Except for the last couple of months, I have averaged at least 40 hours per week
7. In my job I debone leg quarters.
8. My rate of pay is $9.35.
9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to go to the front of the plant to the office to get clearance. I cannot go into the plant if I don't have my ID bade until the office checks me in.

10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves, chain glove and smocks.

11. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I have to walk through a closed door at the bottom of two flights of stairs. I go up the stairs and open a second door to enter into the production area.

12. The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone but the procedure is the same. You must have on your hair net ear plugs, safety glasses and bump cap before going upstairs.

13. Also, if my supervisor, QA, HACCP, or safety sees me going up the stairs without my ear plugs, hair net, bump cap, or safety glasses on they will send me back down the stairs to put it on. I have seen this happen on multiple occasions.

14. I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs and before clocking in.

15. At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots. I do this off the clock as well.

16. I then walk to my assigned time clock and clock in for the day.

17. At each time clock there is a sign stating what equipment you must have on before clocking in and certain equipment after clocking in. There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an

employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

18.    Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves and my cut glove.

19.    At break I throw away my plastic sleeves and apron.  The coat goes on a hanger and the gloves go in the coat pocket.

20.    I put my chain glove and arm guard in a tub to be washed.

21.    I then clock out.

22.    I get two breaks.

23.    At break time after clocking out I walk to the stairs and sanitize my boots.

24.    Boots have to be sanitized each time you enter and exit the production area.

25.    I walk out the door at the top of the stairs and walk down the stairs.  I am required to have on my safety glasses, bump cap, hair net, and ear plugs walking down the stairs.

26.    Once I clear the door at the bottom of the stairs I remove ear plugs and safety glasses.  I cannot remove them prior.  I have to put them back on before going up the stairs again to processing.

27.    I spend about 20 minutes actually on break.

28.    I have to clean my glasses when I go to the bathroom because they get dirty with juice and water.

29.    After break I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs.  I walk up the stairs wearing my ear plugs, safety glasses, hair net and bump cap and go through the door at the top of the stairs.  I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift.  The process is the same on each break.

30. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves and apron in a container. I put my chain glove, arm guards, and knife sharpener in a bin and then I clock out.

31. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and sanitize my boots and walk through the door.

32. I walk down the stairs and out the bottom door.

33. I take my ear plugs, bump cap and safety glasses off once I get out the bottom door.

34. I take my boots off at the car.

35. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, and boots from my house.

36. I take my bump cap, ear plugs and hair net home because I have seen other employees take them home. I leave my safety glasses in my locker. I am responsible for these items or I have to pay to replace them.

37. I do not wear these items from my house.

38. I get to the plant 45 minutes early. I have to put on my hair net, bump cap, and safety glasses and leave the break room 5 – 7 minutes before shift start time to get to the time clock timely. After putting on my hair net, bump cap, and safety glasses and after sanitizing my boots I have to wait in line to clock in because of the shift change.

39. It takes me about 3 minutes to get to the time clock from the door at the bottom of the stairs where I must put on my hair net, ear plugs, safety glasses, and bump cap. I make this walk 6 times a day or approximately 18 minutes a day.

40. Once a year we have training on how to wear ear plugs when we have our hearing tests.

41. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

42. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

43. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3 day of June, 2008.

Clarice Hicks
PLAINTIFF'S NAME

PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION**

**DARRYL ANDERSON, et al.,** §
§
**Plaintiffs,** §
§
**v.** §
§
**PERDUE FARMS, LLC.** §
§
§
**Defendant.** §

**CIVIL ACTION NO. 1:06-cv-01000-MEF-WC**

## AFFIDAVIT:

1. My name is Olivia Brackins.
2. I am a Plaintiff in this action.
3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.
4. I worked for Defendant, as a poultry-processing laborer for approximately 15 years. I currently work in 2nd processing.
5. I work day shift.
6. I average 46 hours per week
7. In my job I train employees to cut shoulders.
8. My rate of pay is $9.85.
9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to wait on a supervisor to verify my identity to get clearance. I cannot go into the plant if I don't have my ID badge until the supervisor verifies my employment.
10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks.

11. Every other day I obtain hair nets from the supply room located down the hallway from the break room because hair nets get covered with chicken juice, and chicken parts. Every other week I obtain a new set of ear plugs. Whenever I obtain equipment it is before clocking in for that day.

12. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I have to walk through a closed door, then down the hallway.

13. The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in. This requirement has not changed.

14. Also, if my supervisor, QA, HACCP, or safety sees me going down the hall without my ear plugs, hair net, bump cap, or safety glasses on they will send me back to put it on.

15. I put on my hair net, ear plugs, safety glasses and bump cap before going into the door at the base of the stairs and before clocking in.

16. At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots.

17. At each time clock there is a sign stating that you must have on certain equipment before clocking in and certain equipment after clocking in. There are two pictures, a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

18. Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

19. I then sanitize my plastic gloves in either the sink or at a dip station.

20. At break I throw away my plastic sleeves and apron. The coat and gloves go in the coat pocket.

21. I then clock out.

22. I get two breaks.

23. At break time after clocking out I walk to the stairs and sanitize my boots. I walk out the door at the top of the stairs and walk down the stairs.

24. Once I clear the door at the bottom of the stairs I remove ear plugs and safety glasses so I can hear and see more clearly. I cannot remove them prior.

25. I go to the bathroom and wash my hands because I have been handling raw poultry.

26. I spend about 20 minutes actually on break.

27. I have to clean my glasses because they get dirty with chicken juice, water, etc.

28. I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs. I walk up the stairs and through the door at the top of the stair. I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

29. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves, smock and apron in a container. I then clock out.

30. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and sanitize my boots and walk through the door.

31. I walk down the stairs and out the bottom door.

32. I take my bump cap, ear plugs and safety glasses off once I get out the bottom door.

33. I take my boots off at the car.

34. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap and boots from my house.

35. I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

36. I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on. Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

37. I have to make sure I get to the plant at least 30 minutes before my shift starts to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock.

38. It takes me about 3 minutes to get to the time clock from the first door where I must put on my hair net, ear plugs, safety glasses, and bump cap. I make this walk 6 times a day or approximately 18 minutes a day.

39. It takes about 3.5 minutes to walk from the supply room to my time clock.

40. We have once a year training regarding ear plugs when we have our hearing tests.

41. To the best of my knowledge, I have never heard of or been trained in the DOL Awareness Training Program.

42. I have seen employees receive disciplinary warnings for not having on their safety glasses, ear plugs, or hair net. This has happened in the production area returning from break.

43. During my employment with Perdue, I personally observed that co-workers working along my side followed the same procedures described above.

44. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

45. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3 day of June, 2008.

Olivia Brackins
PLAINTIFF'S NAME

Olivia Brackins
PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

Jennifer Leann Dean
NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT:**

1. My name is Katrina M. Ward.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant, as a poultry-processing laborer for approximately 19 years. I currently work in 2nd processing.

5. I work day shift.

6. I average 40-41 hours per week

7. In my job I run the scale in the cut up department.

8. My rate of pay is $9.35.

9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to go to the front of the plant to the office to get clearance. I cannot go into the plant if I don't have my ID badge until the office checks me in.

10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks. Also, I have seen USDA go to supervisors and report employees aren't

appropriately wearing sanitary equipment. USDA cannot approach us directly

11. Every other day I obtain hair nets from the supply room located next to the break room because hair nets get covered with chicken juice, and chicken parts. Every other week I obtain a new set of ear plugs. Whenever I obtain equipment it is before clocking in for that day.

12. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I have to walk through a closed door at the bottom of two flights of stairs. I go up the stairs and open a second door to enter into the production area.

13. The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in, before we go upstairs. This requirement has not changed.

14. Also, if my supervisor, QA, HACCP, or safety sees me going up the stairs without my ear plugs, hair net, bump cap, or safety glasses on they will send me back down the stairs to put it on.

15. I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs and before clocking in.

16. At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots. I do this off the clock as well.

17. I then walk to my assigned time clock and clock in for the day.

18. At each time clock there is a sign stating what you must have on certain equipment before clocking in and certain equipment after clocking in

There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

19. Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

20. I then sanitize my plastic gloves in either the sink or at a dip station.

21. At break I throw away my plastic sleeves and apron. The gloves go in the coat pocket.

22. I then clock out.

23. I get two breaks.

24. At break time after clocking out I walk to the stairs and sanitize my boots. I walk out the door at the top of the stairs and walk down the stairs.

25. Once I clear the door at the bottom of the stairs I remove ear plugs and safety glasses so I can hear and see more clearly. I cannot remove them prior.

26. I go to the break room and wash my hands because I have been handling raw poultry.

27. I spend about 20 minutes actually on break.

28. I have to clean my glasses because they get dirty with chicken juice, water, etc.

29. I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs. I walk up the stairs and through the door at the top of the stair. I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

30. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves and apron in a container. I then clock out.

31. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and sanitize my boots and walk through the door.

32. I walk down the stairs and out the bottom door.

33. I take my ear plugs and safety glasses off once I get out the bottom door.

34. I take my boots and bump cap off at the car.

35. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, boots from my house.

36. I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

37. I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on. Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

38. I have to make sure I get to the plant at least 15 minutes before my shifts start to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock. I do not socialize before going to my assigned time clock.

39. It takes me about 6 minutes to get to the time clock from the door at the bottom of the stairs where I must put on my hair net, ear plugs, safety glasses, and bump cap. I make this walk 6 times a day or approximately 36 minutes a day.

40. It takes about 5 minutes to walk from the supply room to my time clock.

41. Once a year training ear plugs when we have our hearing tests.

42. I have seen employees receive disciplinary warnings for not having on there safety glasses, ear plugs, or hair net on. This has happened in the production area and in the stair well leading up to the production area.

43. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

44. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

45. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3 day of June, 2008

Katrina M. Ward

PLAINTIFF'S NAME

PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT:**

1. My name is Michelle Tiller.
2. I am a Plaintiff in this action.
3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.
4. I worked for Defendant, as a poultry-processing laborer for approximately 15 years. I currently work in 2nd processing.
5. I work day shift.
6. I average 40-41 hours per week
7. In my job I run the scale in the cut up department.
8. My rate of pay is $9.35.
9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to go to the front of the plant to the office to get clearance. I cannot go into the plant if I don't have my ID badge until the office checks me in.
10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks. Also, I have seen USDA go to supervisors and report employees aren't

appropriately wearing sanitary equipment. USDA cannot approach us directly

11. Every other day I obtain hair nets from the supply room located next to the break room because hair nets get covered with chicken juice, and chicken parts. Every other week I obtain a new set of ear plugs. Whenever I obtain equipment it is before clocking in for that day.

12. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I have to walk through a closed door at the bottom of two flights of stairs. I go up the stairs and open a second door to enter into the production area.

13. The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in, before we go upstairs. This requirement has not changed.

14. Also, if my supervisor, QA, HACCP, or safety sees me going up the stairs without my ear plugs, hair net, bump cap, or safety glasses on they will send me back down the stairs to put it on.

15. I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs and before clocking in.

16. At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots. I do this off the clock as well.

17. I then walk to my assigned time clock and clock in for the day.

18. At each time clock there is a sign stating what you must have on certain equipment before clocking in and certain equipment after clocking in

There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

19. Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

20. I then sanitize my plastic gloves in either the sink or at a dip station.

21. At break I throw away my plastic sleeves and apron. The gloves go in the coat pocket.

22. I then clock out.

23. I get two breaks.

24. At break time after clocking out I walk to the stairs and sanitize my boots. I walk out the door at the top of the stairs and walk down the stairs.

25. Once I clear the door at the bottom of the stairs I remove ear plugs and safety glasses so I can hear and see more clearly. I cannot remove them prior.

26. I go to the break room and wash my hands because I have been handling raw poultry.

27. I spend about 20 minutes actually on break.

28. I have to clean my glasses because they get dirty with chicken juice, water, etc.

29. I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs. I walk up the stairs and through the door at the top of the stair. I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

30. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves and apron in a container. I then clock out.

31. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and sanitize my boots and walk through the door.

32. I walk down the stairs and out the bottom door.

33. I take my ear plugs and safety glasses off once I get out the bottom door.

34. I take my boots and bump cap off at the car.

35. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, boots from my house.

36. I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

37. I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on. Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

38. I have to make sure I get to the plant at least 15 minutes before my shifts start to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock. I do not socialize before going to my assigned time clock.

39. It takes me about 6 minutes to get to the time clock from the door at the bottom of the stairs where I must put on my hair net, ear plugs, safety glasses, and bump cap. I make this walk 6 times a day or approximately 36 minutes a day.

40. It takes about 5 minutes to walk from the supply room to my time clock.

41. Once a year training ear plugs when we have our hearing tests.

42. I have seen employees receive disciplinary warnings for not having on there safety glasses, ear plugs, or hair net on. This has happened in the production area and in the stair well leading up to the production area.

43. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

44. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

45. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3 day of June, 2008.

Michelle Tiller
PLAINTIFF'S NAME

Michelle Tiller
PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

Jennifer Dean
NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## AFFIDAVIT:

1. My name is Gloria D. Allen.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant, as a poultry-processing laborer for approximately 21 years. I currently work in 2nd processing.

5. I work day shift.

6. I average 41 hours per week

7. In my job I rotate scaling, grading, and bagging paws.

8. My rate of pay is $9.35.

9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to go to the front of the plant to the office to get clearance. I cannot go into the plant if I don't have my ID badge until the office checks me in.

10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks. Also, I have seen USDA go to supervisors and report employees aren't

appropriately wearing sanitary equipment. USDA cannot approach us directly

11.    Every other day I obtain hair nets from the supply room located next to the break room because hair nets get covered with chicken juice, and chicken parts. Every other week I obtain a new set of ear plugs. Whenever I obtain equipment it is before clocking in for that day.

12.    I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I have to walk through a closed door at the bottom of two flights of stairs. I go up the stairs and open a second door to enter into the production area.

13.    The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in, before we go upstairs. This requirement has not changed.

14.    Also, if my supervisor, QA, HACCP, or safety sees me going up the stairs without my ear plugs, hair net, bump cap, or safety glasses on they will send me back down the stairs to put it on.

15.    I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs and before clocking in.

16.    At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots. I do this off the clock as well.

17.    I then walk to my assigned time clock and clock in for the day.

18.    At each time clock there is a sign stating what you must have on certain equipment before clocking in and certain equipment after clocking in

There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

19. Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

20. I then sanitize my plastic gloves in either the sink or at a dip station.

21. At break I throw away my plastic sleeves and apron. The gloves go in the coat pocket.

22. I then clock out.

23. I get two breaks.

24. At break time after clocking out I walk to the stairs and sanitize my boots. I walk out the door at the top of the stairs and walk down the stairs.

25. Once I clear the door at the bottom of the stairs I remove ear plugs and safety glasses so I can hear and see more clearly. I cannot remove them prior.

26. I go to the break room and wash my hands because I have been handling raw poultry.

27. I spend about 20 minutes actually on break.

28. I have to clean my glasses because they get dirty with chicken juice, water, etc.

29. I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs. I walk up the stairs and through the door at the top of the stair. I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

30. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves and apron in a container. I then clock out.

31. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and sanitize my boots and walk through the door.

32. I walk down the stairs and out the bottom door.

33. I take my ear plugs and safety glasses off once I get out the bottom door.

34. I take my boots and bump cap off at the car.

35. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, boots from my house.

36. I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

37. I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on. Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

38. I have to make sure I get to the plant at least 15 minutes before my shifts start to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock. I do not socialize before going to my assigned time clock.

39. It takes me about 3 minutes to get to the time clock from the door at the bottom of the stairs where I must put on my hair net, ear plugs, safety glasses, and bump cap. I make this walk 6 times a day or approximately 18 minutes a day.

40. It takes about 5 minutes to walk from the supply room to my time clock.

41. Once a year training ear plugs when we have our hearing tests.

42. I have seen employees receive disciplinary warnings for not having on there safety glasses, ear plugs, or hair net on. This has happened in the production area and in the stair well leading up to the production area.

43. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

44. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

45. I understand the above allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3 day of June, 2008.

Gloria D. Allen
PLAINTIFF'S NAME

Gloria Allen
PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

Jennifer LeAnn Dean
NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## AFFIDAVIT:

1. My name is Eddie Charles Snell.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I have worked for Defendant, as a poultry-processing laborer for approximately 17 years. I currently work in 2nd processing as a Line Leader.

5. I work day shift.

6. I average 50 hours per week

7. In my job I supervise employees. I have completed line leader training. I have another line leader class scheduled next week. I have been trained in the time clock procedure of the company.

8. My rate of pay is $9.85.

9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. I cannot go into the plant if I don't have my ID badge. The same holds true for all processing employees.

10. I and the associates I supervise are required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks.

11. We cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to the production area we have to walk through a closed door at the bottom of two flights of stairs. We go up the stairs and open a second door to enter into the production area.

12. I noticed the beginning of this year Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means employees must put on all the equipment required by Perdue other than those items they put on after clocking in, before going upstairs. This requirement has not changed even though the sign has changed.

13. I clock in at a time clock located near the door at the base of the stairway.

14. I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs.

15. At the top of the stairs I go through the second door. I and employees have to sanitize our boots in a foam bath before going any further. We are not allowed to go any further into production without first sanitizing our boots. I do this on the clock but the non-lead employees do this off the clock.

16. At each time clock there is a sign stating what equipment employees must have on before clocking in and certain equipment after clocking in There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows

an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

17. At break employees throw away their plastic sleeves and apron. They hang their coat and gloves on a hook.

18. They then clock out.

19. Employees get two breaks.

20. At break time after clocking out employees walk to the stairs and sanitize their boots. They walk out the door at the top of the stairs and walk down the stairs, all off the clock still wearing hair nets, beard nets, bump caps and safety glasses.

21. Once employees clear the door at the bottom of the stairs I have observed that the majority remove at least their ear plugs and safety glasses.

22. Breaks are approximately 20 minutes long due to employees having to wash, and return to the line in within the 30 minutes. Before clocking back in at their time clock upstairs employees must put on their bump caps, hair nets, and safety glasses before walking up stairs. They again have to sanitize their boots before going to their assigned time clock.

23. At the end of the day employees throw away rubber gloves, plastic sleeves and plastic apron. They put the cloth gloves and apron in a container. They then clock out.

24. Still wearing their bump cap, hair net, ear plugs, and safety glasses they walk to the stairs and sanitize their boots and walk through the door.

25. They walk down the stairs and out the bottom door.

26. They cannot take off the hair nets, ear plugs, and safety glasses or bump cap until they clear the bottom door.

27. I have observed the majority of employees do not wear their hair nets, ear plugs, safety glasses, and bump caps from the house or home. If they do, I have observed some employees wearing a hair net.

28. I have never been trained nor have I been trained to tell others we have the option to wear ear plugs, hair net, safety glasses, beard nets, bump cap, and boots from their house.

29. I have never heard of DOL Awareness Training.

30. I am responsible for training employees in wearing their safety glasses, and other personal protective equipment such as ear plugs as it relates to the plant.

31. I have given employees verbal warnings for not having on their safety glasses, ear plugs, and or hair net.

32. During my employment with Perdue, I personally observed, that non-lead co-workers working along my side follow the same procedures described above.

33. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3rd day of June, 2008.

Eddie Charles Snell
PLAINTIFF'S NAME

[signature]
PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[signature]

[SEAL]

NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA,**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT:**

1. My name is Felisha Simon.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant, as a poultry-processing laborer for approximately 7 years. I currently work in 2nd processing.

5. I work day shift.

6. I average 42-43 hours per week

7. In my job I run the scale and dumpter, drops the meat in a box, in the cut up department.

8. My rate of pay is $9.35.

9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to go to the front of the plant to the office to get clearance. I cannot go into the plant if I don't have my ID badge until the office checks me in.

10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks.

Also, I have seen USDA go to supervisors and report employees aren't appropriately wearing sanitary equipment. USDA cannot approach us directly

11. Every other day I obtain hair nets from the supply room located next to the break room because hair nets get covered with chicken juice, and chicken parts. Every other week I obtain a new set of ear plugs. Whenever I obtain equipment it is before clocking in for that day.

12. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I have to walk through a closed door at the bottom of two flights of stairs. I go up the stairs and open a second door to enter into the production area.

13. The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in, before we go upstairs. This requirement has not changed.

14. Also, if my supervisor, QA, HACCP, or safety sees me going up the stairs without my ear plugs, hair net, bump cap, or safety glasses on they will send me back down the stairs to put it on.

15. I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs and before clocking in.

16. At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots. I do this off the clock as well.

17. I then walk to my assigned time clock and clock in for the day.

18. At each time clock there is a sign stating what you must have on certain equipment before clocking in and certain equipment after clocking in There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

19. Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

20. I then sanitize my plastic gloves in either the sink or at a dip station.

21. At break I throw away my plastic sleeves and apron. The gloves go in the coat pocket.

22. I then clock out.

23. I get two breaks.

24. At break time after clocking out I walk to the stairs and sanitize my boots. I walk out the door at the top of the stairs and walk down the stairs.

25. Once I clear the door at the bottom of the stairs I remove ear plugs and safety glasses so I can hear and see more clearly. I cannot remove them prior.

26. I go to the break room and wash my hands because I have been handling raw poultry.

27. I spend about 20 minutes actually on break.

28. I have to clean my glasses because they get dirty with chicken juice, water, etc.

29. I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs. I walk up the stairs and through the door at the top of the stair. I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

30. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves and apron in a container. I then clock out.

31. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and sanitize my boots and walk through the door.

32. I walk down the stairs and out the bottom door.

33. I take my ear plugs and safety glasses off once I get out the bottom door.

34. I take my boots and bump cap off at the car.

35. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, boots from my house.

36. I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

37. I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on. Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

38. I have to make sure I get to the plant at least 5 minutes before my shifts start to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock. I do not socialize before going to my assigned time clock.

39. It takes me about 2 minutes to get to the time clock from the door at the bottom of the stairs where I must put on my hair net, ear plugs, safety glasses, and bump cap. I make this walk 6 times a day or approximately 12 minutes a day.

40. It takes about 3-4 minutes to walk from the supply room to my time clock.

41. Once a year training ear plugs when we have our hearing tests.

42. I have seen employees receive disciplinary warnings for not having on there safety glasses, ear plugs, or hair net on. This has happened in the production area and in the stair well leading up to the production area.

43. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

44. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

45. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3 day of June, 2008.

Felisha Simon
PLAINTIFF'S NAME

PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

NOTARY PUBLIC

My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA,**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT:**

1. My name is Indya Burkes.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant, as a poultry-processing laborer for approximately 7-8 months. I currently work in 2nd processing.

5. I work day shift.

6. I average 40 hours per week

7. In my job I would get the number on the gloves, arm guard, and knives and scissors. Also, I had to make sure the meat was laid out correctly.

8. My rate of pay is $8.90.

9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to go to the front of the plant to the office to get clearance. I cannot go into the plant if I don't have my ID badge until the office checks me in.

10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks.

11. Every other day I obtain hair nets from the supply room located next to the break room because hair nets get covered with chicken juice, and chicken parts. Whenever I obtain equipment it is before clocking in for that day.

12. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I have to walk through a closed door at the bottom of two flights of stairs. I go up the stairs and open a second door to enter into the production area.

13. Also, if my supervisor, QA, HACCP, or safety sees me going up the stairs without my ear plugs, hair net, bump cap, or safety glasses on they will send me back down the stairs to put it on.

14. I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs and before clocking in.

15. At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots. I do this off the clock as well.

16. I then walk to my assigned time clock and clock in for the day.

17. At each time clock there is a sign stating what you must have on certain equipment before clocking in and certain equipment after clocking in There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

18. Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

19. I then sanitize my plastic gloves in either the sink or at a dip station.

20. At break I throw away my plastic sleeves and apron. The gloves go in the coat pocket.

21. I then clock out.

22. I get two breaks.

23. At break time after clocking out I walk to the stairs and sanitize my boots. I walk out the door at the top of the stairs and walk down the stairs.

24. Once I clear the door at the bottom of the stairs I remove ear plugs and safety glasses so I can hear and see more clearly. I cannot remove them prior.

25. I go to the bathroom and wash my hands because I have been handling raw poultry.

26. I spend about 20 minutes actually on break.

27. I have to clean my glasses because they get dirty with chicken juice, water, etc.

28. I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs. I walk up the stairs and through the door at the top of the stair. I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

29. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves and smock in a container. I then clock out.

30. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and sanitize my boots and walk through the door.

31. I walk down the stairs and out the bottom door.

32. I take my ear plugs and safety glasses off once I get out the bottom door.

33. I take my boots and bump cap off at the car.

34. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, boots from my house.

35.   I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

36.   I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on.  Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

37.   I have to make sure I get to the plant at least 10-15 minutes before my shifts start to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock.

38.   It takes me about 3-5 minutes to get to the time clock from the door at the bottom of the stairs where I must put on my hair net, ear plugs, safety glasses, and bump cap.  I make this walk 6 times a day or approximately 18-30 minutes a day.

39.   It takes about 5 minutes to walk from the supply room to my time clock.

40.   I have never heard of or been trained in the DOLE Awarness Training.

41.   Once a year training ear plugs when we have our hearing tests.

42.   I have seen employees receive disciplinary warnings for not having on there safety glasses, ear plugs, or hair net on.  This has happened in the production area and in the stair well leading up to the production area.

43.   During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

44.   I personally have worked many positions in the plant.  The procedures described above were the same regardless of where I worked.

45.   I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the ________ day of June, 2008.

Indya Burkes
PLAINTIFF'S NAME

PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION**

**DARRYL ANDERSON, et al.,** §
§
**Plaintiffs,** §
§
**v.** §
§
**PERDUE FARMS, LLC.** §
§
§
**Defendant.** §

**CIVIL ACTION NO. 1:06-cv-01000-MEF-WC**

**AFFIDAVIT:**

1. My name is Annie Woodley.
2. I am a Plaintiff in this action.
3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.
4. I worked for Defendant, as a poultry-processing laborer for approximately 7 years. I currently work in 2nd processing.
5. I work day shift.
6. I average 43 hours per week
7. In my job I run the scanner the TSM, Slicing, and B22.
8. My rate of pay is $9.60.
9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to go to the front of the plant to the office to get clearance. I cannot go into the plant if I don't have my ID badge until the office checks me in.
10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks.

11. Every other day I obtain hair nets from the supply room located next to the break room because hair nets get covered with chicken juice, and chicken parts. Whenever I obtain equipment it is before clocking in for that day.

12. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I have to walk through a closed door at the bottom of two flights of stairs. I go up the stairs and open a second door to enter into the production area.

13. The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in, before we go upstairs. This requirement has not changed.

14. Also, if my supervisor, QA, HACCP, or safety sees me going up the stairs without my ear plugs, hair net, bump cap, or safety glasses on they will send me back down the stairs to put it on.

15. I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs and before clocking in.

16. At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots. I do this off the clock as well.

17. I then walk to my assigned time clock and clock in for the day.

18. At each time clock there is a sign stating what you must have on certain equipment before clocking in and certain equipment after clocking in There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses,

hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

19. Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

20. I then sanitize my plastic gloves in either the sink or at a dip station.

21. At break I throw away my plastic sleeves and apron. The gloves go in the coat pocket.

22. I then clock out.

23. I get two breaks.

24. At break time after clocking out I walk to the stairs and sanitize my boots. I walk out the door at the top of the stairs and walk down the stairs.

25. Once I clear the door at the bottom of the stairs I remove ear plugs and safety glasses so I can hear and see more clearly. I cannot remove them prior.

26. I go to the bathroom and wash my hands because I have been handling raw poultry.

27. I spend about 20 minutes actually on break.

28. I have to clean my glasses because they get dirty with chicken juice, water, etc.

29. I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs. I walk up the stairs and through the door at the top of the stair. I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

30. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves and smock in a container. I then clock out.

31. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and sanitize my boots and walk through the door.

32. I walk down the stairs and out the bottom door.

33. I take my ear plugs and safety glasses off once I get out the bottom door.

34. I take my boots and bump cap off at the car.

35. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, boots from my house.

36. I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

37. I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on. Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

38. I have to make sure I get to the plant at least 15-20 minutes before my shifts start to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock.

39. It takes me about 3 minutes to get to the time clock from the door at the bottom of the stairs where I must put on my hair net, ear plugs, safety glasses, and bump cap. I make this walk 6 times a day or approximately 18 minutes a day.

40. It takes about 4-5 minutes to walk from the supply room to my time clock.

41. I have never heard of or been trained in the DOLE Awarness Training.

42. Once a year training ear plugs when we have our hearing tests.

43. I have seen employees receive disciplinary warnings for not having on there safety glasses, ear plugs, or hair net on. This has happened in the production area and in the stair well leading up to the production area.

44. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

45. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

46. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3 day of June, 2008.

Annie S. Woodley
PLAINTIFF'S NAME

PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

Jennifer LeAnn Dean
NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA,**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| v. | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT:**

1. My name is Betty Oliver.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I have worked for Defendant, as a poultry-processing laborer for approximately 5 years. I currently work in 1st processing.

5. I work night shift.

6. I average 41.5 hours per week

7. In my job clean paws.

8. My rate of pay is $9.55.

9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to go to the front of the plant to the office to get clearance. I cannot go into the plant if I don't have my ID badge until the office checks me in.

10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks and bump hat. About once a month I obtain hair nets from the supply room

located next to the break room because hair nets get covered with chicken juice, and chicken parts. About three times a year I obtain a new set of ear plugs. Whenever I obtain new equipment it is before clocking in for that day.

11. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses.

12. The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in, before we go upstairs. This requirement has not changed.

13. I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs and before clocking in.

14. At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots.

15. At each time clock there is a sign stating what you must have on certain equipment before clocking in and certain equipment after clocking in There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

16. Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

17. I then sanitize my plastic gloves either in the sink or at a dip station.

18. At break I throw away my plastic sleeves and apron. The coat and gloves go in the coat pocket.

19. I get two breaks.

20. Before each break I sanitize my boots. I walk out the door at the top of the stairs and walk down the stairs. I then clock out for break

21. Once I clear the door at the bottom of the stairs I remove safety glasses see more clearly. I cannot remove them prior.

22. I go to the break room and wash my hands because I have been handling raw poultry.

23. I spend about 20 minutes actually on break.

24. I have to clean my glasses because they get dirty with chicken juice, water, etc.

25. I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs. I walk up the stairs and through the door at the top of the stair. I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

26. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves and apron in a container. I then clock out.

27. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and walk through the door.

28. I walk down the stairs and out the bottom door.

29. I take my name badge, ear plugs, safety glasses and bump cap off at the car.

30. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, boots from my house.

31. I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

32. I wouldn't wear these items, except for my hairnet, from my house if I had the option because I would look foolish and it would not be safe to drive

with your ear plugs and safety glasses on. Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

33. I have to make sure I get to the plant at least 15 minutes before my shifts start to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock. I do not socialize before going to my assigned time clock.

34. It takes about 4 minutes to get from security to my time clock. It takes about 1 minute to walk from the supply room to my time clock.

35. Once a year I receive training about ear plugs when we have our hearing tests.

36. I have seen employees receive disciplinary warnings for not having on there safety glasses, ear plugs, or hair net on. This has happened in the production area and in the stair well leading up to the production area.

37. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

38. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

39. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3 day of June, 2008.

Betty Oliver
PLAINTIFF'S NAME

Betty Oliver
PLAINTIFF'S SIGNATURE

STATE OF alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-01000-MEF-WC |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

**AFFIDAVIT:**

1. My name is Geneva Bynum.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant, as a poultry-processing laborer for approximately 7 and ½ years. I am not employed by Defendant anymore.

5. I worked the night shift.

6. I averaged 40 hours per week

7. In my job I worked in the wing area.

8. My rate of pay is $9.55.

9. When I arrived I walked to security and showed my ID badge. I could not enter the plant without going through security. If I forgot my ID badge I had to go to the front of the plant to the office to get clearance. I could not go into the plant if I did not have my ID badge until the office checked me in.

10. I was required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks. Approximately, every night I obtained hair nets from the supply

room located next to the break room because hair nets get covered with chicken juice, and chicken parts. About twice a month I bought a new set of ear plugs. Whenever I obtained equipment it is before clocking in for that day.

11.    I could not enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I had to walk through a closed door at the bottom of two flights of stairs. I went up the stairs and opened a second door to enter into the production area.

12.    The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in, before we go upstairs. This requirement has not changed. This happened while I was an employee of Perdue Farms.

13.    Also, if HACCP saw me going up the stairs without my ear plugs, hair net, bump cap, or safety glasses on they would send me back down the stairs to put it on.

14.    I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs and before clocking in.

15.    At the top of the stairs I went through the second door. I had to sanitize my boots in a foam bath before going any further. I was not allowed to go any further into production without first sanitizing my boots. I did this off the clock as well.

16.    I then walked to my assigned time clock and clocked in for the day.

17.    At each time clock there was a sign stating that you must have on certain equipment before clocking in and certain equipment after clocking in There are two pictures a before and after clocking in picture. The before

clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

18. Once I clocked in I was allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

19. I then sanitized my plastic gloves in either in the sink or at a dip station.

20. At break I threw away my plastic sleeves and apron. The coat and gloves went in the coat pocket.

21. I then clocked out.

22. I get two breaks.

23. At break time after clocking out I walked to the stairs and sanitized my boots. I walked out the door at the top of the stairs and walked down the stairs.

24. Once I cleared the door at the bottom of the stairs I removed ear plugs and safety glasses so I could hear and see more clearly. I could not remove them prior.

25. I went to the break room and washed my hands because I had been handling raw poultry.

26. I spent about 20 minutes actually on break.

27. I had to clean my glasses because they got dirty with chicken juice, water, etc.

28. I put back on my ear plugs and safety glasses and walked through the door at the base of the stairs. I walked up the stairs and through the door at the top of the stair. I sanitized my boots on the other side of the door and walked to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

29. At the end of the day I threw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves and apron in a container. I then clocked out.

30. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walked to the stairs and walk through the door.

31. I walked down the stairs and out the bottom door.

32. I took my ear plugs and safety glasses off once I get out the bottom door.

33. I then went to my locker and left my all PPE except for boots which I wore home.

34. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, boots from my house.

35. I only took home my boots and left all other PPE in my assigned locker at the end of my shift.

36. I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on. Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

37. I had to make sure I got to the plant at least 15 minutes before my shifts started to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock. I did not socialize before going to my assigned time clock.

38. It took me about 3 minutes to get to the time clock from the door at the bottom of the stairs where I must put on my hair net, ear plugs, safety glasses, and bump cap. I make this walk 6 times a day or approximately 18 minutes a day.

39. It took about 3 minutes to walk from the supply room to my time clock.

40. Once a year we received training for ear plugs when we had our hearing tests.

41. I have seen employees receive disciplinary warnings for not having on there safety glasses, ear plugs, or hair net on. This has happened in the production area and in the stair well leading up to the production area.

42. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

43. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

44. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3 day of June, 2008.

Geneva Bynum
PLAINTIFF'S NAME

[signature]
PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

[signature]
NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-01000-MEF-WC |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT:

1. My name is Gloria J. Brown.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant, as a poultry-processing laborer for approximately 15 years. I currently work in 2nd processing.

5. I work day shift.

6. I average 40 - 41 hours per week

7. In my job I rotate scaling, grading, and bagging paws.

8. My rate of pay is $9.35.

9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to go to the front of the plant to the office to get clearance. I cannot go into the plant if I don't have my ID bade until the office checks me in.

10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks. Also, I have seen USDA go to supervisors and report employees aren't

appropriately wearing sanitary equipment. USDA cannot approach us directly

11. Every other day I obtain hair nets from the supply room located next to the break room because hair nets get covered with chicken juice, and chicken parts. Every other week I obtain a new set of ear plugs. Whenever I obtain equipment it is before clocking in for that day.

12. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I have to walk through a closed door at the bottom of two flights of stairs. I go up the stairs and open a second door to enter into the production area.

13. The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in, before we go upstairs. This requirement has not changed.

14. Also, if my supervisor, QA, HACCP, or safety sees me going up the stairs without my ear plugs, hair net, bump cap, or safety glasses on they will send me back down the stairs to put it on.

15. I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs and before clocking in.

16. At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots. I do this off the clock as well.

17. I then walk to my assigned time clock and clock in for the day.

18. At each time clock there is a sign stating what you must have on certain equipment before clocking in and certain equipment after clocking in

There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

19. Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

20. I then sanitize my plastic gloves in either in the sink or at a dip station.

21. At break I throw away my plastic sleeves and apron. The coat and gloves go in the coat pocket.

22. I then clock out.

23. I get two breaks.

24. At break time after clocking out I walk to the stairs and sanitize my boots. I walk out the door at the top of the stairs and walk down the stairs.

25. Once I clear the door at the bottom of the stairs I remove ear plugs and safety glasses so I can hear and see more clearly. I cannot remove them prior.

26. I go to the break room and wash my hands because I have been handling raw poultry.

27. I spend about 20 minutes actually on break.

28. I have to clean my glasses because they get dirty with chicken juice, water, etc.

29. I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs. I walk up the stairs and through the door at the top of the stair. I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

30. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. I put the cloth gloves and apron in a container. I then clock out.

31. Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and sanitize my boots and walk through the door.

32. I walk down the stairs and out the bottom door.

33. I take my ear plugs and safety glasses off once I get out the bottom door.

34. I take my boots and bump cap off at the car.

35. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, boots from my house.

36. I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

37. I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on. Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

38. I have to make sure I get to the plant at least 15 minutes before my shifts start to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock. I do not socialize before going to my assigned time clock.

39. It takes me about 3 minutes to get to the time clock from the door at the bottom of the stairs where I must put on my hair net, ear plugs, safety glasses, and bump cap. I make this walk 6 times a day or approximately 18 minutes a day.

40. It takes about 3.5 minutes to walk from the supply room to my time clock.

41. Once a year training ear plugs when we have our hearing tests.

42. I have seen employees receive disciplinary warnings for not having on there safety glasses, ear plugs, or hair net on. This has happened in the production area and in the stair well leading up to the production area.

43. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

44. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

45. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 3 day of June, 2008.

GLORIA J. BROWN
PLAINTIFF'S NAME

Gloria J Brown
PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3 day of June, 2008

[SEAL]

NOTARY PUBLIC

My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
SOUTHERN DIVISION

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT:**

1. My name is Mary L. Washington.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant, as a poultry-processing laborer for approximately 18 years. I currently work in 1st processing.

5. I work night shift.

6. I average 45 hours per week

7. In my current job I put chlorine tablets in the water, that is then tested. Then I write the number down. Inside, I take temperature of the water. In the past I have worked in the de bone department, the Ice Pack department, I have also been a bone checker and a line leader.

8. My rate of pay is $9.55.

9. When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to go to the front of the plant to the office to get clearance. I cannot go into the plant if I don't have my ID badge until the office checks me in.

10. I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks.

11. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses.

12. I put on my hair net, ear plugs, safety glasses, bump cap before clocking in.

13. At each time clock there is a sign stating what you must have on certain equipment before clocking in and certain equipment after clocking in There are two pictures a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

14. Once I clock in I am allowed to put on the other required equipment such as coat, etc.

15. I get two breaks.

16. After I clock out, I remove ear plugs and safety glasses so I can see and hear. I usually have to wash my safety glasses while on break because they get filthy during production.

17. I spend about 25 minutes actually on each break.

18. I put back on my ear plugs and safety glasses and then I clock back in. I sanitize my boots. The process beyond that point is the same as at the beginning of the shift. The process is the same on each break.

19. At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron. Because of my job handling chemicals I also throw away my cloth gloves at the end of the day. Then I clock out.

20. I clock out at the end of the day still wearing my bump cap, hair net, ear plugs, and safety glasses.

21. I take these items off in the break room and at my car. I wear my hair net home.

22. I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap, boots from my house. I wear my hair net home and no one has ever said anything to me so I kept doing it.

23. I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

24. I have never tried to wear the other items to or from home because it would be unsafe to drive at night with safety glasses on and ear plugs in my ears. Also, I don't think I could ride down the road with my bump cap on because it would hit the roof of my car.

25. I have to make sure I get to the plant at least 30-45 minutes before my shifts starts in order to leisurely get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock. I do not socialize before going to my assigned time clock. If I rush I could get to the plant 10 – 15 minutes early and still get to my assigned time clock on time.

26. Once a year training ear plugs when we have our hearing tests.

27. I have seen employees receive disciplinary warnings for not having on there safety glasses, ear plugs, or hair net on. This has happened in the production area.

28. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

29. I personally have worked many positions in the plant. The procedures described above were the same regardless of where I worked.

30. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 6 day of June, 2008.

MARY L. WASHINGTON
PLAINTIFF'S NAME

Mary L. Washington
PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 6 day of June, 2008

[SEAL]

Jennifer Leann Dean
NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## AFFIDAVIT:

1. My name is Bobbie Wimes Wilson.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant, as a poultry-processing laborer for approximately 4 years. When I left I was working in 2nd processing in slicing. I have worked for the school system since I left.

5. I worked day and night shift.

6. I average 40 hours per week

7. In my job I rotated to different positions on the slicing machine.

8. When I arrived I walked to security and showed my ID badge. I could not go into the plant if I don't have my ID badge until the office checks me in.

9. I was required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, and gloves and smocks.

10. Every day I obtain hair net, ear plugs from the supply room located next to the break room

11. I could not enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses.

12. I never wore my boots, hair net, ear plugs, bump cap, or safety glasses from or to my home.

13. I knew I could take those items home but no one told me I could wear it from home.

14. I stored my safety glasses, bump cap and boots at my home. I would wash them each day when I got home and store them in a special place.

15. I could not wear these items while driving because it was unsafe. I was hard to see through the safety glasses, the ear plugs would have made it difficult to hear, and the bump cap would hit the roof of my car. The problem was compounded at night.

16. I took me about 3 - 5 minutes to put my boots, hair net, ear plugs, and safety glasses at the beginning and end of the day.

17. I have seen employees receive disciplinary write ups for not having on their safety glasses, ear plugs, or hair net on.

18. During my employment with Perdue, I personally observed, that co-workers working along my side followed the same procedures described above.

19. I personally have worked multiple positions in the plant. The procedures described above were the same regardless of where I worked.

20. I understand the above allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 5 day of June, 2008.

Bobbie Wims Wilson
PLAINTIFF'S NAME

Bobbie Wims Wilson
PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 5 day of June, 2008

[SEAL]

NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-01000-MEF-WC |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

**AFFIDAVIT:**

1. My name is Horris Andrews.

2. I am a Plaintiff in this action.

3. I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4. I worked for Defendant as a poultry-processing laborer for approximately seven years and left my employment in October 2004.

5. I worked both day and night shifts during my employment.

6. I averaged 38-40 hours per week.

7. In my last job at Perdue I worked on the IP Cone Line, I worked as a Pallet Jack Operator, I worked in the Live Hang Department and I also worked on the Kill Floor.

8. My rate of pay when I left Perdue was $9.60.

9. When I arrived I walk to security and show my ID badge. I couldn't enter the plant without going through security. If I forgot my ID badge I had to go to the front of the plant to the office to get clearance. I couldn't go into the plant if I don't have my ID badge until the office checked me in.

10. I was required by Perdue to wear hair net, hard hat, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks.

11. Every day I would obtain hair nets from the supply room located next to the break room because hair nets would get covered with chicken juice, and chicken parts. Every other week I would obtain a new set of ear plugs. Whenever I would obtain equipment it was before clocking in for that day.

12. I couldn't enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I would have to walk through a closed door at the bottom of two flights of stairs. I would go up the stairs and open a second door to enter into the production area and would have to wait in line to clock in.

13. Also, if my supervisor, QA, HACCP, or safety saw me going up the stairs without my ear plugs, hair net, bump cap or safety glasses on they, would send me back down the stairs to put it on.

14. I would put on my hair net, ear plugs, safety glasses and bump cap before going into the door at the base of the stairs and before clocking in.

15. At the top of the stairs I would go through the second door. I would have to sanitize my boots in a foam bath before going any further. I was not allowed to go any further into production without first sanitizing my boots. I did this off the clock as well.

16. I then walk to my assigned time clock and clocked in for the day.

17. Once I clocked in I was allowed to put on the other required equipment such as white coat, plastic sleeves, plastic apron, plastic and cloth gloves.

18. At break I would hang all of my equipment on a nail on the wall.

19. I would then clock out.

20. I had two breaks a day during my employment.

21. At break time after clocking out I would then walk out the door at the top of the stairs and walk down the stairs.

22. Once I cleared the door at the bottom of the stairs I removed ear plugs and safety glasses so I could hear and see more clearly. I couldn't remove them prior.

23. I would go to the bathroom and wash my hands because I had been handling raw poultry.

24. I spent about 15-20 minutes actually on break.

25. I would have to clean my safety glasses because they would get dirty with chicken juice, water, etc.

26. I would put back on my ear plugs and safety glasses and walk through the door at the base of the stairs. I would walk up the stairs and through the door at the top of the stairs. I would walk to my assigned time clock and clock back in. The process beyond that point was the same as at the beginning of the shift. The process was the same on each break.

27. At the end of the day, I would clock out then I would throw away rubber gloves, plastic sleeves and plastic apron.

28. I would walk down the stairs and out the bottom door.

29. I would take my ear plugs and safety glasses off once I get out the bottom door.

30. I would take my boots and bump cap off when I got outside the plant.

31. I was never told I have the option to wear my ear plugs, hair net, safety glasses, bump cap and boots from my house.

32. I would take these items home because I had seen other employees take them home and I was responsible for these items or I had to pay to replace them.

33. I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on. Also, I wouldn't ride down the road with my bump cap on because it would hit the roof.

34. I had to make sure I got to the plant at least 15-20 minutes before my shifts started to get to the plant on time in order to walk to the plant, which took 10 minutes, put on my boots, hair nets, ear plugs, safety glasses, clear

security and walk to my assigned time clock. Most of the time I did not have time to socialize before going to my assigned time clock.

35. It took me about 5-8 minutes to get to the time clock from the door at the bottom of the stairs where I had to put on my hair net, ear plugs, safety glasses, and bump cap. I made this walk 6 times a day or approximately 30-48 minutes a day.

36. It took me about 2 minutes to walk from the supply room to my time clock.

37. We had training once a year about use of ear plugs when we would have our hearing tests.

38. I saw employees receive disciplinary warnings for not having on their safety glasses, ear plugs or hair net. This happened in the production area and in the stair well leading up to the production area.

39. During my employment with Perdue, I personally observed co-workers working along my side following the same procedures described above.

40. I personally worked many positions in the plant. The procedures described above were the same regardless of where I worked.

41. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 5 day of June, 2008.

Horris Andrews
PLAINTIFF'S NAME

[signature]
PLAINTIFF'S SIGNATURE

STATE OF Alabama,
COUNTY OF Houston.

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 5 day of June, 2008

[SEAL]

NOTARY PUBLIC

My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.** | § | |
| | § | |
| **PLAINTIFF(S)** | § | |
| | § | |
| **V.** | § | **Case Action No.: 1:06-cv-1000-MEF-WC** |
| | § | |
| **PERDUE FARMS INCORPORATED** | § | |
| | § | |
| **DEFENDANT.** | | |

**EXHIBIT 6**

**DEFENDANT'S RESPONSES TO PLAINTIFFS' REQUEST FOR PRODUCTION: STANDARD OPERATING PROCEDURE FOR FACILITY SECURITY ACCESS TO ASSOCIATE ENTRANCE**

1. All associates will be required to show their Perdue ID badge if the guard is on duty. Without the proper ID, the associate's supervisor must be contacted and the guard must receive authorization to grant the associate entrance. The associate must exhibit some form of picture ID to identify himself or herself.

2. No associate will be permitted access if they have any type of recording and/or picture taking device. The associate will be directed to remove the device(s) from Perdue Property. The only persons permitted to have permanent approval to have a recording device are the QA Manager, Plant Manager, Safety Manager and HR Manager.

3. No one under the age of 18 will be permitted entrance into the facility. All persons under the age of 18 seeking to visit his/her parent(s) or guardian will be directed to the Complex Human Resources Managers' office. With the exception of those that have an appointment at the Wellness Center.

4. Associates entering or leaving the Perdue premises will be subject to having all containers they are carrying searched. A container could be a paper or plastic bag, brief case, over-sized pocketbook, sports bag, cardboard box or any other container that would be capable of carrying more than just ordinary articles carried in pant or coat pockets or a ladies purse.
Any contraband discovered will require prompt action.
Contraband would include:

a. **Firearms** – No associate will be permitted to enter onto any Perdue property possessing a firearm, unless permitted by local or state law,i.e. (KY). This includes having the firearm on their person or in their vehicle. The complex human resources manager must be notified immediately to handle the situation.

b. **Recording Devices and Cameras** - No associate is permitted to enter onto any Perdue property possessing these devices. The complex human resources manager must be notified immediately to handle this situation.

c. **Stolen Perdue Property** -Any Perdue property seen inside the container will be assumed to have been stolen unless the associate can produce written authorization to remove this property. In absence of the permit, the complex human resources manager must be notified immediately to handle this matter.

d. **Illegal Drugs** - If suspected illegal drugs are discovered the complex human resources manager will be notified immediately. The suspected drugs will not be confiscated by any Perdue associate or its agents. The local law enforcement officials are to be notified immediately and they will make the determination as to the type of drug it is and whether to confiscate and arrest the associate.

e. **Alcohol** - Any container with alcohol detected is not permitted on Perdue property, and the complex human resources manager will be notified immediately to handle the situation.

ASSOCIATE'S NAME Geneva Bynum DATE 2/9/05

DEPARTMENT Cut up LOCATION

Reason for ~~Discipline~~ Coaching: Not having or showing your company badge to Security coming thru gate

**OFFENSE** (Check One)

____ First Offense ____ Second Offense ____ Third Offense ____ Fourth Offense

**~~DISCIPLINE~~**

____ Oral warning issued to associate. This report to Personnel File.

____ Written notice issued to associate. This report to Personnel File.

____ Written notice issued to associate. ____ day(s) suspension given

From ____ To ____ Return ____ Time ____

____ Extraordinary offense warranting a need for immediate and serious disciplinary action. This report to Personnel File.

____ Termination effective ____. Last day worked ____

____ Original copy of this report to Personnel File.

Comments: It is very important that you bring and show your company I.D. everytime you walk thru the gate coming on to company premises. This is a part of everyone's job requirements and is for your safety. Thank you for your cooperation in resolving this issue.

Margaret Griffen
Supervisor's Signature — Date 2/9/05 JEt

Geneva B. Bynum
Associate's Signature — Date 2-9-05

Human Resources Representative's Signature — Date

☐ *Check if comments are continued on reverse side.*

Revised 3/01/93 White copy - Human Resources Yellow copy - Associate Pink copy - Foreman PER/001

PER_AND000179

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.** | § | |
| | § | |
| **PLAINTIFF(S)** | § | |
| | § | |
| **V.** | § | **Case Action No.: 1:06-cv-1000-MEF-WC** |
| | § | |
| **PERDUE FARMS INCORPORATED** | § | |
| | § | |
| **DEFENDANT.** | | |

**EXHIBIT 7**

**DEFENDANT'S PROFFERED DECLARATION OF LISA BANKS, CHERYN CAWTHON, LILLIE GREEN, LETICIA JOHNSON, BRENDA MACK**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.,

Plaintiffs,

v.

PERDUE FARMS INCORPORATED,

Defendant.

Case Action No.: 1:06-CV-1000-MEF-WC
JURY TRIAL DEMANDED

**DECLARATION OF LISA BANKS**

I, Lisa Banks, depose and state the following based on my personal knowledge:

1. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation or coercion.

2. I began working with Perdue's Dothan, Alabama facility on November 19, 2004. I first began working in the hand portions department which was second processing. I began am currently working on the kill floor in August 2006.

3. My shift begins at 5:42 AM and ends at approximately 2:45 PM. I am paid $9.85 per hour.

4. When I drive to work I have my work boots on. I then walk through the guard check and flash my identification card.

5. After I enter the building, I go to my locker and put my lunch in my locker. I choose to leave my hair net, safety glasses, and bump hat in my locker. I remove these items from my licker and put them on, because I must have them on before I swipe in.

6. At 5:42, I swipe in at the kill floor time clock. The time clock is right by locker.

After I swipe in, I go through two sets of double doors. I then take my smock off of a numbered hook. I put on my smock, apron, and gloves. I go through another set of doors, sanitize my gloved hands in chlorinated water and go to my assigned work station.

7. I have recently been promoted to a trainer, so now I work in whatever station I am needed to work in.

8. I take my first break at 8:15 AM. When my line leader tells me it is time for break, I throw away my plastic sleeves and hang up my smock and my apron on a hook, and place my gloves in my smock pocket.

9. I then go through two sets of double doors and swipe my card through the time clock. After I swipe out for break, I choose to go to my locker, remove my safety glasses and bump hat, and get my jacket and a drink. I then leave the facility and walk around the parking lot to get exercise.

10. Before my thirty minutes are over I return to my locker, get my bump cap and safety glasses, and return to the time clock by 8:45. The time clock will not allow me to swipe in before thirty minutes are up.

11. After I swipe back in, I proceed to put on my apron, smocks, sleeves, and my gloves. I then sanitize my hands and begin working until it is time for my second break.

12. I take my second break at 11:15 AM. I follow the same procedure for removing my equipment. After swiping out, I choose to go to the bathroom, and then to the breakroom and eat my lunch. After about twenty-eight minutes I go back to my locker, and get my bump cap, ear plugs which are connected to my hat, and safety glasses.

13. I swipe back in at 11:45 AM, and put on my gloves, sleeves, apron, and smock, and sanitize my hands and begin to work. At the end of my shift I remove my gloves, sleeves, apron, and smock and swipe out.

14. My locker is right by my time clock. I takes me less then a minute to get to my locker. I go to my locker and put away my bump cap, ear plugs, safety glasses, and retrieve my personal items. I then leave the building and return to my car.

15. If I work for more than forty hours in one week, I receive time and a half my salary. I have never been asked to do any work on my own time.

16. When I first started at Perdue, a trainer showed me how to use my Kronos time-keeping card. The trainer and my supervisors told me what items I could not put on until I swiped in.

17. There are also very large signs and visual aids in English and Spanish at the time clocks showing me what I should have on.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

Lisa Banks
Lisa Banks

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** **Plaintiffs,** v. **PERDUE FARMS INCORPORATED,** **Defendant.** | ) | **Case Action No.: 1:06-CV-1000-MEF-WC** **JURY TRIAL DEMANDED** |

**DECLARATION OF CHERYN CAWTHON**

I, Cheryn Cawthon, depose and state the following based on my personal knowledge:

1. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2. I began working with the Perdue plant in Dothan, Alabama on November 3, 2003. I work on the cone line cutting tenders.

3. I work from 7:45 AM to 5 PM, Mondays through Fridays. Sometimes I work on Saturdays and get paid time and a half for hours worked over forty. I get paid $9.35 per hour.

4. I drive to work from Blakely Georgia, and arrive here early at around 7AM to avoid traffic. I bring my hat, ear plugs, hair net, safety badge, and safety glasses with me from home.

5. I sit in my car until about 7:20 AM and then walk through security. I stand in the hallway until it is time to swipe in.

6. At about 7:44 AM, I go up one flight of stairs and swipe in to my assigned clock. After I swipe in, I go to the coat rack and put on my lab coat, apron, sleeves, and gloves. I dip

my hand in the chlorinated water and do hand exercises. I then begin cutting the bones out of chicken breasts. I work until my first break at 10:20 AM. Before I go to break, I take off my lab coat, arm guard, and cutting gloves. I throw away my sleeves and apron. I then swipe out on my assigned time clock. I keep on my bump cap and hair net during break. I sit in the break room or go outside. About four minutes before I need to swipe in, I get up and walk upstairs toward the time clock. I wait until thirty minutes have passed before swiping in. I swipe in at 10:50 AM.

7. After swiping in, I put on my lab coat, sleeves, apron, gloves, and cutting glove. I then sanitize my hands, bind my arm guard and then go back to cutting tenders.

8. I do this until my second break at 1:20 PM. I repeat the process during my second break. After returning from my second break, I cut tenders and may rotate to cutting breasts until about 4:30. I may leave earlier depending on the amount of chicken we have.

9. When it is time to go home, I lay my knife down, take my arm guard off, remove my apron, and cutting gloves, and throw away my sleeves. I then swipe out and go downstairs to leave. I keep my safety glasses on until I get downstairs, and I keep my bump cap and hair net on until I get to my car.

10. When I first began working at Perdue, my supervisor told me I had to have my bump cap on before swiping in. She also taught me how to use my Kronos time-keeping card.

11. Above the time clocks, there are signs that show what I should have on before I swipe in and after I swipe in.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

Cheryn Cawthon

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.,

Plaintiffs,

v.

PERDUE FARMS INCORPORATED,

Defendant.

Case Action No.:
1:06-CV-1000-MEF-WC
JURY TRIAL DEMANDED

**DECLARATION OF LILLIE GREEN**

I, Lillie Green, depose and state the following based on my personal knowledge:

1. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2. I began working with the Dothan facility of Perdue on August 11, 2003. I first began working in the deboning department sorting rib cages. I still work in the deboning area but now I do scrape tests.

3. My shift begins at 7:15 AM and ends between 3 and 5 PM, depending on the chicken processors. I work Monday through Friday, and am paid $9.35 per hour. If I work overtime, I receive time and a half my hourly wage.

4. I carpool to work everyday and bring with me my bump hat, ear plugs, hair net, safety glasses, work boots, Kronos time-keeping badge, and identification badge. I arrive at the plant around 7 AM or five minutes after 7.

5. I walk to the front gate and pass through security. I put my badge up as I walk past security, and then enter the building. When I enter the building, I go to the break room or get a soda on the first floor.

6. Around 7:14 AM I leave the break room and go upstairs to my assigned time clock. At 7:15 AM I swipe my Kronos time-keeping card.

7. After I swipe in, I put on my smock first and then my plastic sleeves. I get dip pans from the tub room for sanitizing gloves. I set up my machine to get ready for the scrape tests. I then begin scraping rib cages and measuring the meat that is on there. I continue to work until my first unpaid meal break at 10:30.

8. Around twenty-five minutes after the hour, I remove my arm guard, I clean my machine and then close it. I take off my smock and put it on my numbered hook. I put my gloves in the pockets of my smock. I then take off my sleeves, and my plastic apron and throw them away.

9. I swipe out at my assigned clock, which is fourth from the door. This is the same clock I used to swipe in, and the clock my supervisor assigned me to.

10. I keep on my bump hat, hair net, ear plugs, safety glasses, and work boots. When I get to the bottom of the stairs from the deboning department I take off my safety glasses.

11. During my break, I choose to use the ladies room, then I go to the food area, eat food, and then sit and eat. I eat for thirty minutes and come back at 11AM and swipe in at the same clock I swiped out from.

12. After I swipe in, it takes me about a couple of seconds to go back to my department, and put on my smock, then my sleeves, my apron, and gloves. I begin working until my second break which is at 1:30 PM. I repeat the process of taking off my items for my second break.

During my break, I sit in the break room. It takes me a couple of seconds to get to the break room from the clock where I swipe out. It's not that far away.

13. I swipe back in at 2PM. I put back on my smock, my sleeves, my apron, my gloves, sanitize my gloves, and then I begin scraping the rib cages. I continue to work until 3 or 5 PM, depending on the amount chickens we receive in the department.

14. When it is time to go home, I clean my machine, pull off my gloves, arm guard, knives, and sharpener, and return them to the line leader. I throw away my plastic sleeves and my apron. I put my smock in the laundry basket and then I clock out.

15. After I clock out I may walk to my locker and put my bump cap and ear plugs in my locker. Or, I may take them home with me, with my safety glasses and my work boots.

16. When I first began working with Perdue, my supervisor showed me how to use my equipment, how to put on my safety clothing and what items I needed to have on before I swipe in. My supervisor also showed me how to use my Kronos time-keeping card and where to use it.

17. There are signs by the break room that show everything I need to have on before and after I swipe in. The signs are all around the break room.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

Lillie Green

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.,

Plaintiffs,

v.

PERDUE FARMS INCORPORATED,

Defendant.

Case Action No.:
1:06-CV-1000-MEF-WC
JURY TRIAL DEMANDED

**DECLARATION OF LETICIA JOHNSON**

I, Leticia Johnson, depose and state the following based on my personal knowledge:

1. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2. I began working with the Perdue plant in Dothan, Alabama on August 2, 1999. I have always worked in the leg deboning department.

3. I work from 7:15 AM to 5PM Monday through Friday. Sometimes I work on Saturdays and get paid time and a half for hours worked over forty. I get paid $9.35 per hour.

4. I arrive early at 6:30 AM, so that I can get my bump hat, hair net, safety glasses, my badge and stop watch out of my trunk. I also have to put my boots on which are located in my trunk. I choose to take these items home with me.

5. After putting on these items, I walk through the gate past security. I enter the facility and I may sit in the break room and drink a cappuccino until about 7:05. At around 7:10 AM, I

get up and walk to my assigned Kronos time clock. I make sure I have on my bump hat, ear plugs, hair net, and safety glasses before going upstairs to swipe in.

6. At 7:15, I swipe in at the third time clock. I get a smock and gloves and then sanitize my hands. Because I am a support leader, I help set up the equipment the department needs to work with that day. I do this until the other leg deboners come in. I make sure I set up and sanitize their mouse traps, arm guards, chain gloves, and extra latex gloves. I also use the same equipment when I debone. I then debone until it is time for my first thirty-minute unpaid meal break.

7. Around 10:20 AM when it is time for me to take a break, I clean off, take off my chain glove and leave it in a tub, place my rubber gloves in the pocket of my smock, hang my smock, and throw away my plastic sleeves and apron. I then swipe out for break. I keep on my bump hat, safety glasses, ear plugs, and work boots.

8. During my break I may go to the cafeteria, or get in my car and drive to get something eat if there is a long line in the cafeteria. I can do whatever I want during my break, as long as I'm back within thirty minutes.

9. Around 10:45 I walk back upstairs to make sure I clock in on time. At 10:50 AM, I clock back into my area. I then go back to the designated area, where we hang our coats. I put on my smock, apron, sleeves, and gloves. I then sanitize my hands and my apron and put on my chain glove.

10. I debone until about 1:20 PM. When it is time for my second break, I repeat the same process. During my second break, I get soda, water, and chips and sit in the break room. Around 1:45 I head back upstairs from the table. I try to go upstairs early because other people

may be swiping in at the same time. I swipe in at 1:50 PM. I cannot swipe in before my thirty minutes are up.

11. I put back on my smock, apron, sleeves, and gloves. I then sanitize my hands and my apron and put on my chain glove. I get on the line and wait for my lead person to give me a knife. I work until it is time to go home.

12. When it is time to go home, I wash my hands, put my chain glove in the tub, throw away my rubber gloves, plastic sleeves and apron. I throw my dirty smock and cotton gloves into a big yellow cart.

13. I finally clock out to go home around 5PM. I keep on my safety glasses until after I clock out. I keep on my bump hat, hair net, ear plugs, and work boots until I get back to the parking lot. I put those items in my car trunk and drive home.

14. When I first started at Perdue, I attended orientation. I learned about when to clock in and clock out, and how to clock in and out when it is time for my break. I also received training on what items I need to have on before I clock in.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

Leticia Johnson

Leticia Johnson

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL ANDERSON, et al.,

Plaintiffs,

v.

PERDUE FARMS INCORPORATED,

Defendant.

Case Action No.: 1:06-CV-1000-MEF-WC
JURY TRIAL DEMANDED

## DECLARATION OF BRENDA MACK

I, Brenda Mack, depose and state the following based on my personal knowledge:

1. I am over the age of eighteen and am not a party to this action. I understand that I am not required to sign this declaration and that I would suffer no retaliation if I decided not to sign. I am signing this declaration voluntarily and without any duress, threats, intimidation, or coercion.

2. I began working with Perdue's Dothan, Alabama facility on May 7, 2007. I work in TSM making chicken breast tenders.

3. I work Monday through Friday and occasionally on Saturdays, for which I get paid over time. My shift begins at 8:00 AM and ends at 5:00 PM. I am paid $9.35 per hour.

4. When I arrive at work in the morning, I have on my hair net, ear plugs, hard hat, and water resistant shoes. I do not have to use safety glasses because I wear prescription glasses. When I get out of my car, I walk past the booth with two security guards and show my Perdue identification badge as I past by the guards.

5. As soon as I enter the building I walk to the breakroom and talk with friends until three minutes to eight. At three minutes to eight I walk upstairs to my department

time clock. At 8 AM I swipe my Kronos time-keeping badge at clock number two which is for my department. I have never had to wait to swipe in.

6. After I swipe in, I have three minutes to put on my Perdue smock, my white apron, my cotton gloves, rubber gloves, and sanitize my hands. I then do a hand exercise led by line leader.

7. After that, I begin working in any position I choose, such as the loader, the patter, the slicer, or separater.

8. At either 10 AM or 10:30 I will take my first break. My line leader will announce when it's break. When it is time for break I take off my rubber sleeves, my rubber gloves, cotton gloves, apron, and my white Perdue smock. I place my white Perdue smock on a hook with my name on it. I then go to my assigned clock and swipe out.

9. I swipe out, I walk to the cafeteria. It takes about two to three minutes to get to the cafeteria. I eat a small meal with friends. I may use the restroom after I eat. During my break I have own my bump hat, hair net, ear plugs, work boots, and my badges. I give myself three minutes before the end of my break period to go back upstairs to swipe back in. If I took my break at 10:30 AM, I would swipe back in at 11 AM.

10. I follow the same process I went through in the morning after I swipe. I remove my smock from my hook, put it on, then put on my plastic sleeves, my apron, my cotton gloves, and rubber gloves. I sanitize my hands.

11. I then begin working in the next rotation from where I started in the morning. I work in that rotation until my second unpaid meal break begins at 1:30. I repeat the same process to remove my equipment. I walk to a different breakroom right next to the cafeteria, where I sit and talk with friends, until three minutes until it is time to go back up to the floor.

12. At 2PM I swipe in to begin my last round of work for the day. After I swipe back in, I get dressed and sanitize again while on the clock. I then work at my next rotation until it is time to go home. Around 5PM, my supervisor announces that the day is over.

13. When my supervisor announces the end of my workday, I make sure all of my meat is out of my tray. I throw away all of my disposable items, such as my rubber gloves, apron, and sleeves. I place my cotton gloves and my smock into two separate barrels for laundry. Then, I swipe out and walk out of the building. It takes me about four minutes to get to the exit of the building.

14. When I get back in my car I still have on my boots, my bump hat, my hair net, and my ear plugs. As soon as I get into my car, I take these items off.

15. When I first began working with Perdue, I had one week of orientation. I learned about what goes on in the other departments of the plant and about safety. I also learned how to use my Kronos time-keeping badge. I learned that we must have our bump hat, ear plugs, hair net, and shoes on before we swipe in, and that we could not touch any other items until after we swipe in.

16. At all the time clocks, there are before and after signs showing me what is appropriate to wear before and after I swipe in.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: January 3, 2008

Brenda Mack

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **DARRYL ANDERSON, et al.** | § |
| | § |
| **PLAINTIFF(S)** | § |
| | § |
| **V.** | §**Case Action No.: 1:06-cv-1000-MEF-WC** |
| | § |
| **PERDUE FARMS INCORPORATED** | § |
| | § |
| **DEFENDANT.** | |

**EXHIBIT 8**

**DEFENDANT'S RESPONSE TO PLAINTIFS' REQUEST FOR PRODUCTION ORIENTATION MATERIALS**

# Welcome to HR ORIENTATION

**OBJECTIVES**

- Human Resource Functions
- Basics of Your Career
- Perdue Handbook
- Perdue Policies & Procedures
- Benefits

## HR Functions

- Hiring
- Orientation & Training
- Benefits
- Associate Relations
- Safety
- Security

## Basics of your Career

- Introductory Period
- Personnel File
- Payday
- Communication

## Introductory Period

- 60 Days
- Learning Period
- Feedback-Verbal & Written

## Personnel File

- Starts with application
- Confidential
- No information is released without consent except as required by law
- You may discuss contents of your file by contacting HR
- Important to keep personal information updated.

## Payday

- Weekly
  - Day Shift — Fridays
  - Night Shift — Thursday Nights
  - Sanitation — Thursday Evenings
- Department Pay Rates
- Direct Deposit
- Reading Your Check Stub

## Overtime

- Overtime for Perdue associates is anything over 40 hrs regular time. This is calculated as an "OT" premium by Perdue.
- EXAMPLE: If an associate works 32 hrs regular time and takes a PTO day on Friday, they would have to work an additional 8 hrs regular time before they would receive OT pay.
- The first thing you need to understand is how Perdue calculates OT & how it shows up on the paychecks.
- In the example below, if you worked 8 hrs OT it would show up on the check as 48 hrs regular time rate($10) and 8 hrs half time rate ($5).
- Base rate $10, associate works 48 hrs

  48 hrs regular time X $10/hr = $480

  8 hrs half time X $5/hr = $40

  Total pay = $520

PAY STUB

## Keeping You Informed

- Supervisors
- Team Meetings
- Human Resources
- Bulletin Boards
- Newsletters
- Home Mailings
- Pay Check Attachments

## Company Handbook

PERDUE FARMS ASSOCIATE HANDBOOK

## Equal Opportunity Employment

- EEO/AAP
  - Equal Employment Opportunity
    - Each associate/applicant is treated impartially without regard to race, color, religion, sex, age, marital status, national origin, disability, or Vietnam-era veteran status
  - Affirmative Action Program
    - AAP is in place to ensure EEO
    - EEO Officer for Dothan Processing Plant is Tol Dozier
    - Associate right to view

## Religious Accommodation

**The company respects the religious beliefs and practices of all associates without distinction or exception and, upon written requests, will make an accommodation for such religious beliefs and practices whenever a reasonable accommodation is available that does not create an undue hardship on the Company's business. An associate whose religious beliefs or practices conflict with his/her job, work schedule, or other aspect of employment, and who seeks a religious accommodation must submit a request for the accommodation to the Human Resources Manager. The request must include the type of religious conflict that exists and the employee's suggested accommodation. Please consult the Human Resources Manager if you have any questions about this policy.**

Effective: February 01, 2005

## Code of Ethics

- Confidential Company Information
  - Communication of false or derogatory information about Perdue Farms, customers, or associates
  - The taking of photographs, audio taping, or video taping inside any Perdue facility except with management authorization
- Making Statements to News Media
  - Only designated spokespersons may provide statements to the news media
- Violations are Grounds for Disciplinary Action

## Solicitation Policy

- **No Solicitation**
  - Solicitation or distribution of material to associates by persons not employed by Perdue, is strictly prohibited at all times
- **Our Position on Unions**
  - It is Perdue's preference that this be a non-union company
  - It is Perdue's belief that a union would not work to our associates benefit
- **Bulletin Boards**
  - For official use only
  - All postings must be authorized

## No Tolerance Policy

- Automatic Suspension Pending Termination
  - Workplace Safety (Violence In The Work Place)
  - Harassment
  - Drug and Alcohol
  - Unauthorized Leaving Of Premises
- In Some Cases - *Not Eligible For Rehire*

## Personal Conduct

- High Standards of Conduct are Expected
- Examples of Unacceptable Conduct
  - Refusal to work
  - Destruction of company property
  - Theft
  - Insubordination
  - Unlawful activities
  - Abusive language
  - Falsifying company records
  - Safety violations

## Disciplinary Action

- Corrective Counseling
  - First step for minor offenses and work performance
- 1 Category for Disciplinary Action
  - General/Safety
- Four Offense Levels
  - 1st Offense Oral Warning
  - 2nd Offense Written Warning
  - 3rd Offense Suspension
  - 4th Offense Suspension & Termination

## Extraordinary Offense

- Accelerates Disciplinary Process
- May Result in Termination
- Same offense within 2 years results in Termination

## Disciplinary Record

- Length of 'active' status
  - Regular – 6 months
  - Extraordinary – 1 year
- Active disciplinary records prevent transfer/promotion opportunities

**Disciplinary Record**

**Peer Review/Management Review Policies**

- Open Door Policy
- Peer Review
  - Disciplinary actions
  - Terminations
  - Consistent application of company policies
  - 5 days to apply
- Management Review
  - Policy change

**Protecting Our Company**

- Open Door Policy
- "It's Your Call" confidential hotline:

  1.877.587.2463
- Food Safety (separate section)
- Poultry Welfare (separate section)

*All Perdue associates are expected to act according to our company values-honesty, integrity, trust, and teamwork-and to uphold and protect the reputation of the PERDUE brand and our company.*

## Attendance Policy

- No Fault Policy
- Tracked for all associates
- If you are going to be absent,
  - Notify supervisor or human resources as soon as possible

## Attendance Tracking Sheet

Attendance Tracking Sheet

Dept: 39 Date: 10.10.05 (abs)

[illegible]

___ written warning with counseling (copy to ___ file)

___ written warning with counseling (copy to ___ file)

___ (final) written warning with counseling (copy to ___ file)

___ day suspension pending termination (copy to ___ file)

Supervisor: ___ Date: ___

Associate: ___ Date: ___

[illegible]

## Benefits

- Wellness Centers/Medical Clinics (separate section)
- Paid Time Off
- Leaves of Absence
- Medical/Dental/Vision Coverage
- Life Insurance
- Short Term Disability
- 401k Savings Plan
- Extras!

## Paid Time Off

- Paid Time Off (Group 4)
  - 1 to 3 years 6 days
  - 3 to 10 years 11 days
  - 10 to 20 years 16 days
  - 20 or more 21 days
- Holidays
  - Eligible after 60 day Introductory Period
  - Must work day before & day after holiday

## Leave Of Absence (LOA)

- Types of LOA
  - Personal
  - Medical
  - Family (FMLA)
  - Military
  - Jury Duty
  - Funeral Leave

## LOA Form

REQUEST FOR LEAVE OF ABSENCE

[illegible]

REASON FOR LEAVE

[illegible]

APPROVALS

[illegible]

## Health Insurance

- Plans
  - Medical
  - Prescription Drug
  - Dental
  - Vision
- Eligible for Coverage
  - Associate
  - Associate plus one
  - Associate plus family
- Weekly Contribution
  - Payroll deduction
- Benefits Orientation
  - 1st day of the month following 90 days of service

## More Benefits

- Life Insurance
- Short Term Disability
- 401k Savings Plan
  - Eligible to start contributing through payroll deductions after 30 days of service

## Going the Extra Mile

- Service Awards/Service Recognition
- Milestones
- Christmas Club
- Jimmy Bucks
- Product Sales
- Scholarship Program
- Educational Assistance
- Training & Development

**Service Awards/Service Recognition**

| Years of Service | Award |
|---|---|
| 5 | $250 |
| 10 | $500 |
| 15 | $750 |
| 20 | $1000 |
| 25 | $1250 |
| 30 | $1500 |
| 35 | $1750 |
| 40 | $2000 |
| 45 | $2250 |
| 50 | $2500 |

**Summary**

- Topics Discussed
  - HR Functions
  - Basics of Your Career
  - Company Handbook
  - Perdue Policies & Procedures
  - Benefits
- Questions
- Collect Signed Paperwork



PER_AND000113



PERDUE
Donning and Doffing
PERDUE
First/Last Principal Activity
PERDUE
Donning and Doffing Practices
The lunch break must last 30 minutes! NO MORE NO LESS!

PER_AND000114

2







PER_AND000115







PERDUE
Lunch (Unpaid break)
Must doff Departmental Items before swiping out
Must take full 30 minutes
When swiping out
Look at time on the clock
Any Associate who fails to clock in/out properly will fall under the disciplinary process.

PERDUE
At End Of Shift
Remove Departmental items in department
Swipe out
Personal items can go home or in locker

PERDUE
Clocking Out??
?Chequando Salida?

PER_AND000116

4

PERDUE

A Family Commitment to Quality

# Important

Each time you swipe you should swipe twice:

- The first time you should see your name and a green light.
- The second time you should see "Re Punch [illegible]"
- If you do not see these, contact your supervisor before reporting to the line.

If you forget card: let supervisor know before shift starts.

Lost swipe card: $10.00

PER_AND000117

5

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **DARRYL ANDERSON, et al.** | § |
| | § |
| **PLAINTIFF(S)** | § |
| | § |
| **V.** | §**Case Action No.: 1:06-cv-1000-MEF-WC** |
| | § |
| **PERDUE FARMS INCORPORATED** | § |
| | § |
| **DEFENDANT.** | |

**EXHIBIT 9**

# DEPARTMENT OF LABOR FIELD OPERATIONS HANDOOK EXCERPT

Chapter 31

# HOURS WORKED

Table of Contents

31a PERIODS OF INACTIVITY

31a00 Employees sent home for lack of work.
31a01 Rest periods.
31a02 Homeworker's waiting time.
31a03 Idle time during the normal workday while in travel status.

31b SLEEPING TIME AND CERTAIN OTHER ACTIVITIES

31b00 Less than 24 hours duty.
31b01 Clothes changing and washup time where collective bargaining agreement makes no mention of practice.
31b01a Clothes changing and washup time on a formula basis.
31b02 Employees residing temporarily on employer's premises.
31b04 Radio announcers and performers.
31b05 Participation in athletic contests.
31b07 Knife sharpening.
31b08 Emergency Government employment and disaster relief work.
31b09 Hours worked by truck drivers, including team drivers.
31b10 Medical treatment during "normal workday".
31b11 Book review by newspaper, radio, or television employees.
31b12 Duty of 24 hours or more - sleeping time.
31b13 Changing clothes at home.
31b14 "On-call" employees required to remain at home.
31b15 Fire and disaster drills.
31b16 Inspections under the Occupational Safety and Health Act of 1970.
31b17 Training courses and programs.
31b18 Employees residing on employers' premises - recording working time.
31b19 Hours of work for firemen and policemen.
31b20 Employees residing on employers' premises for five days a week.
31b21 Meal periods for employees under Sec 7(k).
31b22 Fire fighters – time spent sleeping.
31b23 Meal periods of less than 30 minutes.

31c TRAVEL TIME

31c00 Employees required to perform duties while traveling.
31c01 Operating employer's vehicle for employee's convenience.
31c02 Driving employer's vehicle transporting other employees.
31c03 Owner-drivers.
31c04 Travel where heavy, burdensome equipment is carried.
31c05 Homeworker's travel.

## Chapter 31

### Table of Contents - Page 2

31c06 Emergency calls.
31c07 Travel by boat or helicopter.
31c08 Layover or on call time of drivers and helpers.
31c09 Temporary help firms.
31c10 Compensability of travel time of employees who voluntarily drive company vehicles between home and work sites.

**31d SPECIAL PROBLEMS**

31d00 Ambulance services.
31d01 Community residences for the mentally retarded, and others in need of custodial care.

31b10 **Medical treatment during "normal workday".**

If an employer directs an employee, or any group of employees, to work beyond the regularly scheduled workshift, the "normal workday" of such employee, or group of employees, has been extended, and the same principle in IB 785.43 applies.

31b11 **Book reviews by newspaper, radio, or television employees.**

In some instances an employee of a newspaper or radio or television station will read a particular book with the view to a possible book review story for use in the newspaper or on the air. This presents no problem as to hours worked where the reading is done in the course of the employee's regular duties at the establishment or elsewhere at any time at the employer's specific request. However, the reading may be done away from the employer's establishment and outside duty hours, such as at the employee's home in the evening, and on a speculative basis - that is, with the thought that a book review might be prepared. In such cases there is a substantial question as to whether the reading was done for the benefit of the employer or for the pleasure or information of the employee. In such cases, WH will not assert that such reading is hours worked even though the book is subsequently reviewed in the newspaper or on the air.

31b12 **Duty of 24 hours or more - sleeping time.**

(a) If an employee is required to be on duty 24 hours or more, the employer and employee may agree to exclude a bona fide regularly scheduled sleeping period, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. (See IB 785.22.)

(b) It is the position of WH that a reasonable night's sleep means that an employee obtains at least five hours of sleep during the scheduled period. These five hours need not be five continuous uninterrupted hours of sleep. However, if interruptions are so frequent as to prevent reasonable periods of sleep totaling not less than five hours, the entire period would be considered hours worked.

31b13 **Changing clothes at home.**

Employees who dress to go to work in the morning are not working while dressing even though the uniforms they put on at home are required to be used in the plant during working hours. Similarly, any changing which takes place at home at the end of the day would not be an integral part of the employees' employment and is not working time.

31b14 **"On-call" employees required to remain at home.**

Where an "on-call" employee performs services for his employer at home and yet has long periods of uninterrupted leisure during which he can engage in the normal activities of living, Wage-Hour will accept any reasonable agreement of the parties for determining the number of hours worked. As an example, this policy will apply to an "on-call" employee who is required by the employer to remain at home to receive telephone calls from customers when the company office is closed. The agreement should take into account not only the actual time spent in answering the calls but also some allowance for the restriction on the employee's freedom to engage in personal activities resulting from the duty of answering the telephone.