**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

|  |  |  |
|---|---|---|
| | § | |
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Case Action No.:** |
| **v.** | § | **1:06-cv-1000-MEF-WC** |
| | § | |
| **PERDUE FARMS, INC.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |
| | § | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' CROSS-MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

## I.    INTRODUCTION

In *IBP. v. Alvarez*, the Supreme Court held: "[A]ny activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under §4(a) of the Portal-to-Portal Act." 546 U.S. 21 at 36-37 (2005).  The undisputed facts show that the Plaintiffs' "principal job" or "principal activity" is to *safely* process *uncontaminated* poultry.  The undisputed facts further show that the equipment required by Perdue is indeed "integral and indispensable" to safe processing of uncontaminated poultry.  It follows that the donning, doffing and sanitizing of the "integral and indispensable" equipment at issue in this case is also "integral and indispensable" and is therefore NOT a "preliminary or postliminary activity" under the Portal-to-Portal Act.  The Plaintiffs ask this Court to hold that the unpaid donning, doffing and sanitizing required by Perdue is "integral and indispensable" as a matter of law.[1]

---

[1] It is worth noting that the employees, at this time, are not asking for adjudication on any issue except that the donning, doffing and sanitizing is an integral and indispensable activity.  Whether the employees can take sanitary and protective equipment home if they choose is not relevant to this inquiry.  If the sanitary and protective equipment is integral and indispensable to the plant and the processing of chicken, it is integral and indispensable *wherever* it is donned or doffed.  Put simply, the question is: Why does Perdue

1

There is no situation under which a reasonable jury could find the donning and doffing of this safety and sanitary equipment made subject of this suit not integral and indispensable.  Post-*Alvarez* cases deciding the issue at hand have found that, **"[a]fter *Alvarez*, there can be little doubt that donning and doffing protective gear at the beginning and end of the workday are principal activities…**" *Spoerle v. Kraft Foods Global, Inc.*, 527 F.Supp.2d 860, 865 (W.D. Wis. 2007); *Jordan v. IBP, Inc.*, 542, F.Supp.2d 790, 806-807 (M.D. Tenn. 2008); *Garcia v. Tyson Foods, Inc.* 474 F.Supp.2d 1240, 1246-1247 (D. Kan 2007); *see generally DeAsencio v. Tyson Foods, Inc.*, 500 F.3d 361, 371 (3rd Cir. 2007)(emphasis added).  Because the Plaintiffs' principal activity is to safely produce uncontaminated poultry products, and to do so they are required by Perdue and government regulation to wear the equipment and clothing at issue prior to entering the processing area, Perdue should admit that the donning, doffing and sanitizing of said equipment is integral and indispensable and as such compensable under the law.

## II.    RELEVANT UNDISPUTED FACTS

The Plaintiffs in this collective action are employed by the Defendant, Perdue Farms, to safely produce uncontaminated poultry.[2]  Perdue requires the employees in this

---

consider some sanitary and protective equipment integral and indispensable, while other sanitary and protective equipment not integral and indispensable?

[2] *See* PX 3, Dixon ¶¶ 3 - 5, 10 - 19; PX 4 at 2 (Perdue's intent to control all safety hazards to comply with federal state and local laws and employees' job responsibility to work in a manner which is safe and healthful for them and their co-workers), at 5 (Managements' statement that Perdue will not operate if it cannot operate safely; production and safety go hand in hand and safety and production are one in the same), at 26 (Senior Mgt. must give safety the same emphasis as production, quality, cost control and delivery); PX 6 (Principle 1: Safety is equal in importance to quality and production; Principle 3: Working safely is a condition of employment); PX 7, ¶21 (Team members should perform their jobs in such a way as to insure a sanitary work place.); PX 8 at 3 (Food Handling:  At Perdue Farms, Inc., food safety is a top priority); PX11 at PER_AN00474 (Jim Perdue stating nothing is more critical than Perdue's food safety plan), at PER_AND000475 (All employees are responsible for protecting Perdue's customers, consumers, and Perdue's business, as well, all employees must meet government food safety regulations in order to operate), at PER_AND000476 (each associate must practice safe product handling and use proper equipment), at PER_AND000479 (employees must know and follow good manufacturing processes "GMP"), at PER_AND000483 (if government food safety regulations and company policies and standards

action to don, doff and sanitize certain sanitary and protective equipment ("PPE") including, aprons, smocks, gloves, boots, earplugs, hair net, beard nets, bump caps and safety glasses.[3]  Perdue pays its employees while they don, doff and sanitize certain PPE such as the aprons, gloves, cut gloves and smocks, however, the employees are not paid while donning, sanitizing and doffing other required PPE which includes hair nets, beard nets, earplugs, boots, bump caps and safety glasses.[4]  Perdue, as well as sections of the Code of Federal Regulations and the Occupational Safety and Health Administration requires this PPE and sanitary equipment.[5]  Perdue refuses to pay its employees for time spent donning, doffing and sanitizing the required hair nets, beard nets, earplugs, bump caps, boots and safety glasses.[6]  This is evidenced by Perdue's policy that the items in question *must* be donned and sanitized before clocking in and doffed and sanitized after clocking out.[7]

## III.    SUMMARY JUDGMENT STANDARD

In *Davis v. Charoen Pokphand (USA), Inc*, 302 F.Supp.2d 1314 (2004) this Court described the summary judgment standard of review as follows:

> Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[3] See PX1 Def's Response to Request for Admission No. 54–56, 60, 63–64, 68, 72, 75–76 and 103; PX2, Snell ¶10; PX 3, Dixon ¶¶ 10-15; PX7 at ¶¶ 1, 5, 6, 10, 11, 13, 15, 16, 21; PX18, Tabinowski Depo at 9:20–25, 10:1-2, 22-25, 11:1, 12:11-13, 21-25, 32:5-33:18.

[4] See Def's Motion for Summary Judgment, Doc. , at ¶16; PX1, Def's Admissions No. 39 and 56; PX2, Snell ¶¶10-16; PX 3, Dixon ¶10-15; PX 18, 10:1-4, 12:1-16, 16:3-13; PX19, at PER_AND000115 (Perdue's training materials direct employees to have itmes described as personal on before swiping in on the time clock and describing personal items as ear plugs, hair nets, beard nets, safety boots and bump caps)

[5] See 21 C.F.R. 110.l0(b)(6) (requiring hair nets and bump caps); 9 C.F.R. § 416.5 (requiring clean PPE each work day); 29 CFR § 1910.136 (requiring adequate foot protection); 29 CFR 1910.133 (requiring personal protective eye and face protection); 29 CFR §1910.134 (requiring head protection); and 29 CFR §1910.95 (requiring hearing protection); 29 CFR. § 1910.132 (effective 2008, employers required to provide PPE to employees at no cost).

[6] See fn. 4 supra.

[7] See fn. 4 supra; PX18, Tabinowski 91:12-16.

moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); see also *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir.1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings. Fed.R.Civ.P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

*Id.* at 1319.

## IV.   ARGUMENT

<u>The Donning, Doffing and Sanitizing are Integral and Indispensable to the Principal Job Activity and are Therefore Compensable Activities Under the FLSA, Portal-to-Portal Act and Relevant Case Law.</u>

The FLSA requires an employer to compensate employees for all of the time which the employer requires employees to "work", commonly defined as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tum v. Barber Foods, Inc.*, 331 F.3d 1, 5 (1st Cir. 2003) (citing 29 U.S.C. § 201, et seq.); *see also*, *Steiner v. Michell*, 350 U.S. 247 (1956); *Tennessee Coal, Iron & R. Co.*, 321 U.S. 590 (1944). However, under the Portal-to-Portal Act (PPA) the employer is not required to compensate for "preliminary" or "postliminary" activities, unless those activities are integral and indispensable to the employees' principal activities. *See Id.* (citing *Lindow v. United States*, 738 F.2d 1057, 1060 (9th Cir.1984). The Eleventh Circuit recognizes non-

4

compensable pre and postliminary activities to be only those that predominately benefit the employee. *Dunlop v. City Elec.*, Inc. 527 F.2d 394 (5th Cir. 1976) (11th Circuit has adopted as precedent decisions of the former 5th Cir. Prior to Oct. 1, 1981, *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981)). In the instant case the Plaintiffs have correctly asserted that the donning and doffing of hair nets, beard nets, special boots, earplugs, bump caps and safety glasses are integral and indispensable to their principal activity of producing uncontaminated poultry and these activities predominately benefit Perdue. In determining whether an activity is integral and indispensable this Court has previously held that: (1) an activity must be necessary to the business and; (2) performed primarily for the benefit of the employer. *Davis*, 302 F.Supp.2d 1314 at 1322. Other Courts have utilized a three (3) part test to determine what constitutes compensable "work" that is "integral and indispensable" to a principal activity. The standard three-part test is (1) whether the activity is required by the employer, (2) whether the activity is necessary to the employee's principal activity and (3) whether the benefit of the activity inures primarily to the employer. *Jordan*, 542 F.Supp.2d at 807-808; *Dunlop*, 527 F.2d at 398-401; *Bonilla v. Baker Concrete Const.*, Inc. 487 F.3d, 1340, 1344 (11th Cir. 2007); *Ballaris v. Wacker Siltronic Corp.*, 370 Fl.3d 901, 910 (9th Cir. 2004); *Alvarez v. IBP, Inc.,* 546 U.S. 21 (2005).

1.    **The Activities are Required by Perdue and Necessary to the Business of Safely Processing Uncontaminated Poultry Products**

The only published ruling in this case dealt with whether notice was appropriate, in *Anderson v. Perdue Farms*, 2008 U.S. Dist. LEXIS 13918 (2008). In *Anderson* this Court found:

> Defendant argues that Plaintiffs' declarations contain unsubstantiated legal conclusions, such as (1) line activities are "necessary, integral, and

> indispensable to the declarant's overall activities…**The first conclusion is obvious** because the equipment that declarants' work involved killing, disemboweling, inspecting, cleaning, cutting, weighing, and packing poultry. **Therefore, the sanitation was necessary for the processing of work**.

*See Id.* at \*7 (emphasis added). This Court agrees with the Plaintiffs that the PPE at issue is "obviously" integral and indispensable to the production of uncontaminated poultry. *Id.* Further, no reasonable jury could determine that the required PPE is not integral and indispensable to the Plaintiffs principal work activity, as the impossibility of performing Plaintiffs principal job without said equipment is <u>glaring</u>.

At the heart of Perdue's business is its "good manufacturing practices" or GMPs which are incorporated into its Food Safety Plan. *See* PX7 and PX11 at PER_AND000479 – 000480, PER_AND000483, PER_AND000487-000488 (GMPs are necessary to ensure food safety). Perdue requires its employees to affirm receipt of the GMP policy, as well as learn, implement and comply with all GMPs, stating failure to do so will result in disciplinary action up to termination. *See* PX7 at ¶24 and PX14. No less than annually, over a four day period, Perdue's Dothan facility is audited by the Corporate office to ensure GMP compliance. *See* PX12. On an ongoing basis, the Plant conducts GMP audits identifying GMP violations including violations associated with employees' failure to wear hair nets, beard nets, earplugs, bump caps and safety glasses. *See* PX13. As shown by Table 1, below, the equipment at issue in this case is required by Perdue's GMP policy and Perdue's safety policies. These policies are not promulgated to simply ease the production process or for the convenience or comfort of employees but to ensure Perdue's compliance with USDA and OSHA regulations codified in the federal regulations.

| TABLE 1 | | |
|---|---|---|
| **PPE** | **PERDUE'S REQUIREMENTS** | **C.F.R.** |
| **Hair nets and beard nets** | Hair will be completely secured under a close weave-type hair net. All beards and mustaches will be secured under an approved beard/mustache net. PX7, ¶¶10-11; PX17, Poultry Worker Job Description. | Methods of maintaining cleanliness include: Wearing…hair nets…beard covers. 21 C.F.R. § 110.10(b)(6). |
| **Boots** | Employees are required to don and doff as well as sanitize their boots each day. PX3, Dixon; PX4 at 12 (HEEF Policy: Head, Eyes, Ears, Feet); PX5 at 8; PX3:1, Brackins, ¶16; PX9 at PER_AND000922 and 000925; PX17, Poultry Worker Job Description. | Outer clothing…must be of material that is readily cleanable. 9 C.F.R. 416.5(b); 21 C.F.R. §110.10(b)(1); Adequate foot protection is required 29 C.F.R. § 1910.136. |
| **Bump caps** | Bump caps are required for this location. PX4 at 12 (HEEF Policy: Head, Eyes, Ears, Feet); PX5 at 6; PX7,¶15; PX9 at PER_AND000922 and PER_AND000925; PX17, Poultry Worker Job Description. | Methods of maintaining cleanliness include: Wearing…[bump] caps. 21 C.F.R.§ 110.10(b)(6); Head protection is required. 29 CFR §1910.134. |
| **Earplugs** | Hearing protection will be used in all areas of this location. PX4 at 12 (HEEF Policy: Head, Eyes, Ears, Feet); PX5 at 7, 30-31; PX7, ¶16; PX9 at PER_AND000922; PX10; PX17, Poultry Worker Job Description. | Hearing protection is required. 29 C.F.R. § 1910.95. |
| **Safety glasses** | Employees are required to wear safety glasses every day. PX4 at 12 (HEEF Policy: Head, Eyes, Ears, Feet); PX5 at 9; PX7, ¶14; PX9 at PER_AND000922; PX17, Poultry Worker Job Description. | Personal eye equipment is required. 29 CFR 1910.133. |

As further evidence that GMPs originate from federal regulations, the Court can see other GMPs not relevant to this suit derive their roots from these regulations. *See, e.g.,* PX7, ¶2 compared to 21 C.F.R. §110.10(b)(4); PX7, ¶4 compared to 21 C.F.R. §110.10(b)(8); PX7, ¶12 compared to 21 C.F.R. §110.37(d); PX7, ¶¶5 – 7 compared to 9 C.F.R. §416.5 and 21 C.F.R. §110.(b)-(b)(1).   Perdue prides itself on its USDA compliance and as

stated previously disciplines employees who fail to don, doff and sanitize the safety and sanitary equipment listed above.[8]  The table above illustrates the fact that by requiring the sanitary and protective equipment, Perdue is able to comply with federal regulations and therefore continue running its poultry processing plant since failure to comply can result in the plant closing.  *See* PX21 (USDA shuts down Perdue).  Furthermore, the undisputed fact Quality Control personnel are in charge of rigorously monitoring and enforcing Perdue's donning, doffing and sanitation policies further shows Perdue requires the activities at issue and that those activities are necessary to their business.  If these activities were not necessary to Perdue's business, and employees performed these activities as a convenience or for their own benefit, Perdue would not go to such means to ensure employees performed these activities.  Perdue employees are not required by law to don, doff and sanitize the equipment in question off the clock.[9]  Instead, the responsibility is on Perdue to comply with OSHA and USDA requirements and it is their decision alone to require employees perform these activities off the clock.

2.      **The Necessary Activities Primarily Benefit Perdue Farms**

It has already been established in this case that the donning, doffing and sanitizing of the PPE and sanitary equipment is necessary. *See Anderson, supra*. Therefore, the necessary donning, doffing and sanitizing of the PPE must also primarily benefit Perdue Farms.  The fact that the Plaintiffs *may* receive *some* benefit is not enough to preclude summary judgment.   Should Perdue not require hair nets, beard nets,

---

[8] PX4 at 8 (Enforcement Procedure); PX7, ¶24 (Failure to follow these *minimum* standards may lead to disciplinary action up to, and including, termination); According to Perdue, "There is no substitute for confidence in the safety of our products.  Our audited process…[including] live production and processing are a model for the poultry industry.  It's why we are rated USDA #1." *See also* PX20; "All Perdue team members are to receive this policy; PX13 (GMP audits documenting employees' non-compliance with PPE requirements); PX15 (Memo adding beard nets to Perdue's list of GMPs).
[9] PX21, "Perdue Farms in Ohio County was forced to shut down by the USDA after USDA found procedural and documentation errors. See "USDA Shuts Down Perdue Farms"; See also PX22, FSIS report where Perdue Farms was shut down for non-compliance with sanitation procedures.

earplugs, special boots, bump caps and safety glasses the repercussions would be grave for Perdue, while it would have little effect on the employees. The employees receive no benefit from the sanitary equipment in question such as hairnets, boots or beard nets. This benefit rests squarely on Perdue's shoulders. Perdue benefits from the use of the rubber boots because employees can readily sanitize and wash down their foot wear preventing contamination. PX3, Dixon, ¶17, ¶27 and ¶30. Perdue benefits from the use of beard nets and hair nets because human hair is prevented from contacting their product. Even if it is argued the personal protective equipment such as boots, earplugs, safety glasses, and bump caps benefits employees by protecting their person, this PPE still *primarily* benefits Perdue in avoiding costly workers' compensation claims, OSHA citations, and regulatory sanctions all of which would eventually lead to loss of business and profits. Furthermore, the fact that Perdue requires employees obtain these items from Perdue's supply room, Perdue provides these items at no cost unless lost or broken, and Perdue requires employees pay for replacement items purchased from them, evidences the control and benefit Perdue receives from issueing and requiring such items. PX16. In *Jordan v. IBP*, a case very similar to the case at hand but for IBP's use of master time, the court rejected a poultry company's argument that PPE was for the primary benefit of the employee:

> Though it is perhaps the case that the [PPE] provide[s] a benefit to the plaintiffs, that does not alter the fact that the reason the defendants require their employees to wear [PPE] is motivated not by the employees' needs, but rather by the defendants' need to maintain a sanitary production floor… The fact is that the [PPE] enables the defendants to maintain the cleanliness of their facilities and prevent their product from becoming contaminated. This benefit is enormous when one considers the damage that would result to the defendants if they were to sell a contaminated food product… As such, there is no question that, as a matter of law, it is the defendants who reap not only *some* benefit from the donning and doffing…, but the *primary* benefit of doing so.

9

542 F. Supp. 2d 790 at 807 (M.D. Tenn. 2008). While the PPE considered in *Jordan* was smocks, this case deals with safety and sanitary equipment which serve the same purposes as smocks, the safe production of uncontaminated poultry products. In another similar case, *Fox v. Tyson*, the Northern District of Alabama was asked to decide whether the donning and doffing of PPE worn by chicken workers was non-compensable under the Portal to Portal Act:

> The defendant cites several examples in which washing and clothes changing have been deemed not compensable, and argues that "in ordinary circumstances" clothes changing and washing are not compensable activities. The court, however, declines to agree that the Tyson workers' donning, doffing, and cleaning of sanitary and protective gear is an "ordinary circumstance" that can be likened to a police officer donning his uniform, as defendant asserts. **As already discussed extensively, the need for Tyson to maintain a sanitary environment for chicken processing dictates the use of the equipment involved in this case.** Donning of the smocks, aprons, boots, and other gear in this case is directly related to that goal and, thus, integral and indispensable to the work the plaintiffs perform. It is not merely preliminary or postliminary as those terms have been applied by the Supreme Court in *Steiner* or the Eleventh Circuit Court of Appeals in *Dunlop*. Consequently, the court finds that Tyson has failed to demonstrate that the plaintiffs' claims for compensation for the donning, doffing, and cleaning of sanitary and protective equipment is non-compensable under the Portal-to-Portal Act, and the motion for partial summary judgment on this issue is due to be denied.

2001 U.S. Dist. LEXIS 26050 *39-39 (emphasis added). As is the case here, Perdue's own GMPs begin by stating: "All personnel entering the processing area must adhere to Good Manufacturing Practices in order to protect the products, team members, and the customers." *See* PX7 top of page under "Purpose". It is undisputed that these activities: the inserting of earplugs, donning of hairnets and beard nets, donning and sanitizing boots, wearing of safety glasses and donning of bump caps, are not "ordinary circumstances." In fact, if the employees had a choice not to don, doff and sanitize these items, it is safe to say that they would choose not to do so. The employees wear these

items to avoid being fired, and so they may enter the processing area in order to perform their jobs. Perdue is the *primary* beneficiary of the activities at issue. Thus, the donning and doffing and sanitary activities made issue in this case are integral and indispensable under the *Davis* test.

Another court addressing whether donning, doffing and sanitizing PPE were integral and indispensable was *Spoerle v. Kraft Foods Global, Inc.*, 527 F. Supp. 2d 860 (W.D. Wis. 2007). *Spoerle* held, "Because plaintiffs need to put on the equipment in order to perform their job safely, their doing so is "an integral and indispensable part" of a "principal activity." *Id.* at 864. Through Perdue's own admission the employees need to don, doff and sanitize the equipment in order to perform their job safely, and under *Sporle* this is enough to find the donning, doffing and sanitizing of ALL required PPE to be integral and indispensable. *See* PX7 (All personnel must adhere to GMPs…to protect…team members).

Plaintiffs have satisfied the 2-part test set forth in *Davis* and the standard 3-part test set forth *Jordan*, as such partial summary judgment is appropriate.

## V.     CONCLUSION

Applying the undisputed facts to the precedential case law no reasonable jury could find the equipment and sanitary clothing in question is not integral and indispensable to the Plaintiffs' principal work activity of safely processing uncontaminated poultry. In this case, this Court has already held that the equipment and clothing in question are obviously necessary to Perdue's business. The primary beneficiary of this necessary activity inures to Perdue. Therefore, the Plaintiffs ask this Court to find that the donning and doffing of special boots, hair nets, bump caps, beard nets, safety glasses and earplugs, as well as sanitizing boots and safety glasses in this case

are integral and indispensable to Plaintiffs' principal activity of safely processing uncontaminated poultry.

Dated:  June 23, 2008                    Respectfully submitted,

                                         **THE COCHRAN FIRM, P.C.**

                                         /s/ Robert J. Camp
                                         **ROBERT J. CAMP**
                                         505 North 20th Street, Suite 825
                                         Birmingham, AL  35203
                                         (205) 244-1115 (Phone)
                                         (205) 244-1171 (Fax)

                                         ***Attorney for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2008, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to:

Sandra B. Reiss                         Lance Harrison Swanner
sandra.reiss@odnss.com          lswanner@cochranfirm.com

James J. Kelley                          Bernard D. Nomberg
jkelley@morganlewis.com         bnomberg@cochranfirm.com

Lexer I. Quarmie                       Samuel A. Cherry, Jr.
lquamie@morganlewis.com       scherry@cochranfirm.com


/s/ Robert J. Camp
**ROBERT J. CAMP**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## **EXHIBIT 1**
## **DEFENDANT'S RESPONSE TO PLAINTIFF'S**
## **REQUEST FOR ADMISSION**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DARRYL ANDERSON, et al.      )
                    )
     Plaintiffs,       )
                    )    Case No.: 1:06-CV-1000-MEF-WC
                    )
v.                      )
                    )
PERDUE FARMS INCORPORATED,   )
                    )
     Defendant.       )

## DEFENDANT PERDUE FARMS INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST REQUESTS FOR ADMISSIONS

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendant Perdue Farms Incorporated, ("Perdue" or "Defendant") hereby serves its Responses and Objections to the Plaintiffs' First Requests for Admissions.

## PRELIMINARY STATEMENT

Defendant's responses to Plaintiffs' Requests are based upon its current knowledge, information, and belief. Therefore, Defendant reserves the right at any time to clarify, alter, amend, supplement, modify, or otherwise revise these objections and responses if such alterations, amendments, supplements, modifications, or revisions become appropriate or warranted. Defendant reserves all objections as to the competency, relevance, materiality, privilege, or admissibility of its responses herein and any document or thing identified in these Responses.

## GENERAL OBJECTIONS

1.      Defendant objects to any instruction, definition, or request for admission that attempts to impose obligations on Perdue that exceed its obligations under the Federal Rules of Civil Procedure. Defendant will respond to these Requests within the scope of those Rules.

2.    To the extent that the Requests seek information which is protected by the attorney-client and/or work product privileges, Defendant objects to the Requests on the grounds of said privileges, or any other applicable privilege.

3.    Any inadvertent admittance of any privileged information or identification shall not constitute a waiver of any of the rights or privileges of the Defendant.

4.    Defendant objects to Plaintiffs' First Requests to the extent that they are vague, ambiguous, overly broad, unduly burdensome and seek information that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

5.    Defendant objects to Plaintiffs' First Requests to the extent that they require that the Defendant discloses proprietary or confidential business information or private information concerning its employees without the benefit of a Confidentiality Order governing the use and disclosure of such information.

6.    Defendant objects to Plaintiffs' First Requests to the extent that they seek information outside the relevant time period or for an overly broad period of time and responds to these Requests for Admissions for the time period of October 31, 2004 to the present.

7.    Perdue objects to Plaintiffs' First Requests to the extent they ask about any facility other than the Perdue processing facility in Dothan, Alabama.

8.    Defendant objects to Plaintiffs' First Requests to the extent the information sought is not within the possession, custody, or control of Defendant.

9.    Defendant objects to Plaintiffs' First Requests to the extent they do not seek admissions of fact or the application of the law to specific facts, but rather seek purely legal interpretations or characterizations of statutes, correspondence, contracts, or other documents that should speak for themselves.

10.    Defendant objects to Plaintiffs' First Requests to the extent they seek admissions for which Perdue does not have sufficient information to either admit or deny.

11.    Each of these general objections, to the extent applicable, is incorporated into the responses below, and the recitation of additional specific objections or the failure specifically to reference these general objection in the responses below should not be construed as a waiver of such objections.

12.    No adverse inference shall be drawn from Defendant's failure to admit or deny a request to which it has provided a reasonable objection.

### SPECIFIC OBJECTIONS AND RESPONSES TO ADMISSION REQUESTS

All of the General Objections stated above shall be deemed reasserted as to each Request to which they are applicable as if fully set forth in response to that Request. In addition to the foregoing General Objections, and without waiver thereof, Defendant makes the following specific Objections and Responses to Plaintiffs' individual Requests:

### RESPONSES AND OBJECTIONS
#### (In addition to General Objections)

1.    Admit that Defendant received Social Security Mismatch Letters at any time during the last three (3) years.

**RESPONSE:**  Defendant incorporates by reference all general objections as set forth above.  Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

2.    Admit that Social Security Mismatch Letters indicate problems with employee social security numbers.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

3.    Admit that Defendant submitted W-2 tax forms to the IRS for all plaintiffs.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits this Request.

4.    Admit that at any point during the last three (3) years that if an employee's social security number is present on a social security mismatch letter but that employee did not use their social security number as identification on their I-9 the Defendant continued to employ the individual.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

5.    Admit Defendant has received, at any time during the last three (3) years, Social Security Mismatch Letters for employees who have not corrected their social security number problem after receiving from Defendant notice of the problem in the past.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

6.    Admit Social Security Mismatch Letters received for the Dothan Plant in 2006 and 2007 contained less than 100 problem social security numbers.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

7.    Admit Defendant notifies the state unemployment agency of new hire employees.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

8.    Admit that the state unemployment agency notifies Defendant when a social security number does not appear to be proper.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to Request No. 8 on the grounds that the phrase "does not appear to be proper" is vague and ambiguous. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

9.    Admit that social security offices contact the plant or Defendant when U.S. citizens complain that their social security number is being used by an employee of Defendant's.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

10.    Admit that Defendant does not terminate an employee after his/her number is called into question by a social security office in response to a U.S. citizen complaining that there [sic] social security number is being used by an employee.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

11.    Admit Defendant participates in [sic] Social Security Administration's Basic Pilot Program.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

12.    Admit Defendant has knowledge that the Social Security Administration's Basic Pilot Program does not stop the occurrence of Social Security Mismatch Letters.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

13.    Admit Defendant is a federal contractor or subcontractor.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

14.    Admit English and Spanish are not the only languages spoken by employees in the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

15.    Admit Defendant has FLSA required posters posted in English.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits it has FLSA required posters posted in English in the Dothan, Alabama processing facility.

16.    Admit Defendant has FLSA required posters posted in Spanish.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits it has FLSA required posters posted in Spanish in the Dothan, Alabama processing facility.

17.    Admit Defendant does not have FLSA required posters posted in any languages other than English or Spanish.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits it does not have FLSA required posters in any languages other than English or Spanish in the Dothan, Alabama processing facility.

18.      Admit Defendant does not hold any training sessions verbally communicating to employees their rights under the FLSA.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 18, to the extent it is vague, overbroad, and unduly burdensome. Perdue denies Request No. 18 and states it trains employees on proper pay practices and policies under the FLSA.

19.      Admit Defendant does not verbally communicate to employees in orientation their rights under the FLSA.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 19, to the extent it is vague and overbroad. Perdue denies Request No. 19 and states it communicates proper pay practices and policies to employees during orientation under the FLSA.

20.      Admit that Defendant does not provide employees with any memoranda or written policies or procedures describing the employee's FLSA rights.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 20, to the extent it is vague and overbroad. Perdue denies Request No. 20 and states it provides employees with written material describing proper pay practices and policies under the FLSA.

21.      Admit Defendant has knowledge that some employees cannot read nor write in their native tongue or any other language.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 21.

22.    Admit Defendant has knowledge that some employees cannot speak English.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 22.

23.    Admit Defendant has knowledge that some employees cannot speak English or Spanish.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 23.

24.    Admit Defendant uses recruiters or staffing agencies to provide hourly labor.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 24.

25.    Admit the plant has been subject to a USDA Notice of Intended Enforcement (NOIE) in the last five years.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

26.    Admit Dr. Larry Smith is the plant's USDA District Manager.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

27.    Admit Mr. Alfred Almanza is the plant's USDA District Manager.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

28.    Admit Dr. Paul Resweber is the plant's USDA District Manager.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

29.    Admit Mr. Steve Lalicker is the plant's USDA District Manager.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

30.    Admit Mr. Marcia Endersby is the plant's USDA District Manager.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

31.    Admit that a card swipe system is used to verify employees' identities before allowing access onto the plant property.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 31.

32.    Admit that a hand scan system is used to verify employees' identities before allowing access onto the plant property.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 32.

33.    Admit that a badge system is used to verify employees' identities before allowing access
       onto the plant property.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant states employees are required to show their

Perdue identification badge to a security guard to enter the Dothan facility.

34.    Admit USDA maintains offices and personnel at the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to this Request on the grounds that it is not relevant and/or not

reasonably calculated to lead to the discovery of admissible evidence.

35.    Admit USDA employees and veterinarians are present during plant production hours.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to this Request on the grounds that it is not relevant and/or not

reasonably calculated to lead to the discovery of admissible evidence.

36.    Admit USDA has suspended or withdrawn inspection due to safety related issues at the
       plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to this Request on the grounds that it is not relevant and/or not

reasonably calculated to lead to the discovery of admissible evidence.

37.    Admit the payroll system used, for purposes of attendance and tardiness, records the date
       and time of arrival and departure of the employee.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to Request No. 37 on the grounds that it is vague and

ambiguous. Subject to these objections, Defendant admits that the payroll system collects and

stores the date and time of arrival and departure of the employee. Defendant denies the
remainder of Request No. 37.

38.   Admit that during one or more weeks during Plaintiffs' employ with Defendant, Plaintiff
      worked in excess of forty (40) hours in a workweek.

      **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant admits the following Plaintiffs worked in excess

of forty (40) hours in at least one work week since October 31, 2004.

| | | |
|---|---|---|
| Shanetha Adams | Billie Joe Newby | Anthony Davis |
| Darryle Anderson | Don Murry | Geneva Bynum |
| Annie Woodley | Carolyn McCoy | Norline Black |
| Angela Williams | Brittanica McCoy | Olivia Brackins |
| Katrina Ward | Horace Love | Velverlyn Gibson |
| Randy Sol | Harry Lett | Veta Griffin |
| Michelle Tiller | Roy King | Walter Hamilton |
| Hattie Smith | Laqunda Kegler | Deanna Jackson |
| Felisha Simon | Clarice Hicks | |

39.   Admit plaintiffs paid under Perdue's time keeping system do not receive compensation
      for walk time from the point of access into the plant to the time clocks and vice versa
      after donning hair nets and ear plugs.

      **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to Request No. 39 on the grounds that it is vague and

ambiguous. Subject to these objections Defendant states Plaintiffs are not compensated for time

spent walking to the Kronos time keeping clocks to swipe in, or any time spent walking away

from the Kronos time keeping clocks after swiping out. Defendant does not capture the time

Plaintiffs spend donning and doffing hairnets and ear plugs.

40.   Admit at breaks, hourly plaintiffs paid under Perdue's time keeping system do not receive
      compensation for walk time from the point of access into the plant to the time clocks and
      vice versa after donning hair nets and ear plugs.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 40 on the grounds that it is vague and ambiguous. Subject to these objections Defendant states Plaintiffs are not compensated for time spent walking to the Kronos time keeping clocks to swipe in, or any time spent walking away from the Kronos time keeping clocks after swiping out.

41. Admit plaintiffs wash themselves before break after clocking out.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 41 on the grounds that it is vague and ambiguous. Defendant lacks knowledge to form a belief as to what Plaintiffs do during their breaks.

42. Admit plaintiffs wash themselves after break before clocking back in to work.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant also objects to Request No. 42 on the grounds that it is vague and ambiguous. Defendant further objects to Request No. 42 because it lacks information or knowledge to provide a response.

43. Admit Plaintiffs are members of a collective bargaining unit.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 43.

44. Admit that the union on behalf of an employee has filed grievances related to wage and hour violations.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs are not members of a union and therefore denies Request No. 44.

45.    Admit the current collective bargaining agreement contains provisions for payment of donning and doffing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs are not subject to the terms of a collective bargaining agreement and therefore denies Request No. 45.

46.    Admit previous collective bargaining agreements have contained provisions for payment of donning and doffing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs are not and have not been subject to the terms of a collective bargaining agreement and therefore denies Request No. 46.

47.    Admit previous collective bargaining agreements did not contain provisions for payment of donning and doffing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs are not and have not been subject to the terms of a collective bargaining agreement and therefore denies Request No. 47.

48.    Admit that union officials have questioned Defendant's time keeping practices since any settlement with the Department of Labor for wage violations.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states Plaintiffs are not members of a union and therefore denies Request No. 48.

49.    Admit the Company must pay employees for all hours worked.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 49.

50.   Admit employees have questioned any or all Defendant's time keeping practices made subject of this suit.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 50 on the grounds that the phrase "employees have questioned any or all Defendant's time keeping practices" is vague and ambiguous. Defendant further objects to Request No. 50 because it lacks information or knowledge to provide a response.

51.   Admit Defendant communicates to hourly employees that its payroll practices comply with the law.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states it communicates to employees proper pay practices and procedures.

52.   Admit that after the *IBP v. Alvarez* Supreme Court decision, Defendant reviewed its time keeping system and determined in light of the Department of Labor settlement, *IBP* did not affect their time keeping practices.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 52.

53.   Admit the letter attached as Exhibit A accurately depicts Defendant's time keeping practices.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant further objects to Request No. 53 because there is no letter attached as Exhibit A, Defendant lacks knowledge or information to provide a response.

54.   Admit employees, with facial hair, before entering the production areas of first or second processing, plaintiffs must don beard nets, hair nets, and ear plugs.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 54.

55.    Admit USDA requires hairnets and beard nets to be worn in 1st and 2nd processing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 55.

56.    Admit depending on the job, Defendant's policies require employees to wear items such as hair nets, beard nets, smocks, aprons, rubber gloves, cotton gloves, ear plugs, safety glasses, sleeve guards, and cut gloves some of which are donned prior to clocking in and some are donned subsequent to clocking in.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits that depending on which area Plaintiffs are working in, Defendant's policies require employees to wear items such as hair nets, beard nets, smocks, aprons, rubber gloves, ear plugs, safety glasses, sleeve guards, and cut gloves. A hair net, ear plugs, and safety goggles are donned prior to clocking in and if required for the department, a smock, apron, rubber gloves, sleeve guards, and /or cut gloves are donned subsequent to clocking in. Defendant denies that Plaintiffs are ever required to wear cotton gloves.

57.    Admit Defendant is aware of incidences where employees have suffered rashes due to exposure to fecal or processing water.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 57 on the grounds that the phrase "rashes due to exposure to fecal or processing water" is vague and ambiguous. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

58.    Admit Defendant is aware of employees suffering from incidences of "chicken rash."

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to Request No. 58 on the grounds that the phrase "chicken

rash" is vague and ambiguous. Defendant further objects to this Request on the grounds that it is

not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

59.    Admit an effective way of minimizing rashes resulting from exposure to process water
       and or fecal matter is the use of good hygiene and frequent washing of exposed areas of
       skin.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to Request No. 59 on the grounds that the phrase "an effective

way of minimizing rashes resulting from exposure to process water and or fecal matter is the use

of good hygiene and frequent washing of exposed areas of skin" is vague and ambiguous and not

susceptible to a precise response. Defendant further objects to this Request on the grounds that it

is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

60.    Admit Defendant is aware of incidences where eye infections or eye injuries have
       occurred due to exposure to flying processing water, fecal material, or other exposure to
       processing by-product.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to this Request on the grounds that it is not relevant and/or not

reasonably calculated to lead to the discovery of admissible evidence. Defendant states it is

aware of incidences of eye infections or eye injuries but Defendant lacks information or

knowledge to provide a response as to the causes of Plaintiffs' eye infections or eye injuries.

61.    Admit Defendant has had incidences of slip and fall accidents within the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Request No. 61 because it lacks information or knowledge to provide a response.

62.    Admit Defendants 1st and 2nd processing are wet environments utilizing water in the process.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant admits Request No. 62.

63.    Admit 1st and 2nd processing floors are wet with water.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant admits some areas in 1st and 2nd processing may be wet from time to time.

64.    Admit 1st and 2nd processing floors are slippery due in part to chicken fat.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant admits some areas of 1st and 2nd processing are wet from time to time.

65.    Admit Plaintiffs were not paid for the time it takes to wash themselves as well as equipment while on breaks.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to Request No. 65 on the grounds that the phrase "wash themselves" is vague and ambiguous. Subject to these objections, Defendant states that Plaintiffs sanitize their equipment while "on the clock" before swiping out for their thirty-minute unpaid breaks. Defendant further states that Plaintiffs sanitize their outer garments and their person after they swipe back in from their thirty-minute breaks.

66. Admit customer specification or requirements sometimes dictate the personal protective equipment or sanitary clothing that must be worn.

   **RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 66.

67. Admit OSHA has cited the plant for violations related to personal protection equipment.

   **RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 67.

68. Admit employees have been disciplined or counseled, written or verbal, for not wearing required personal protection equipment or sanitary clothing.

   **RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits some 1st and 2nd processing employees have been disciplined or counseled for not wearing personal protective equipment or sanitary clothing.

69. Admit Defendant has had OSHA recordable incidents related to hearing conservation.

   **RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to Request No. 69 on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

70.    Admit USDA or employer rule precludes processing employees from wearing their smocks in the break room or outside the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 70.

71.    Admit hourly 1st and 2nd processing employees wash clothing and personal protective equipment they take home or leave in lockers at the end of the shift.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states it lacks information or knowledge to provide a response as to what employees do with items such as ear plugs, safety goggles, and hair nets that they normally keep in their possession or leave in their lockers.

72.    Admit hourly 1st and 2nd processing employees are not allowed via USDA rule to wear the prior day's soiled sanitary clothing or personal protective equipment.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant states, pursuant to the Company's Good Manufacturing Practices policy, 1st and 2nd Processing employees must wear clean clothes and use clean personal protective equipment at the beginning of their shift.

73.    Admit hourly 1st and 2nd processing employees wash their own smocks.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 73.

74.    Admit 1st and 2nd processing employees who wash their own smocks are not paid for the time incurred in washing same.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant states that 1st and 2nd processing employees remove their smocks and place

them in a laundry bin or hook before clocking out. 1st and 2nd processing employees do not

wash their own smocks.

75.  Admit hourly 1st and 2nd processing employees must pay for replacement personal
     protection equipment or sanitary clothing if they lose the personal protection equipment
     or sanitary clothing issued to them.

     **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant admits Request No. 75.

76.  Admit hourly 1st and 2nd processing employees must wear rubber footwear within the
     plant.

     **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant states 1st and 2nd processing employees must

wear slip-resistant footwear within the plant.

77.  Admit hourly 1st and 2nd employees must pay for the rubber footwear they wear in the
     plant.

     **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant states 1st and 2nd processing employees must pay

for slip-resistant footwear they wear in the plant.

78.  Admit hourly 1st and 2nd processing employees must wear slip-resistant footwear within
     the plant.

     **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant admits Request No. 78.

79.  Admit hourly 1st and 2nd employees must pay for the slip-resistant footwear they wear in
     the plant.

     **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant admits Request No. 79.

80.    Admit that at any time within the last three (3) years, Defendant has not changed its payroll policies or practices with regard to compensating hourly 1st and 2nd processing.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above.  Subject to these objections, Defendant admits Request No. 80.

81.    Admit Defendant compensates employees for walk time using plug time, additional minutes, added to the hourly employees' time on a daily basis.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above.  Subject to these objections, Defendant denies Request No. 81.

82.    Admit Defendant has had local personnel or third parties perform time studies to estimate the time it takes to don and doff sanitary clothing and personal protection equipment at any time during the last three (3) years.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above.  Subject to these objections, Defendant denies Request No. 82.

83.    Admit Defendant has had local personnel or third parties perform time studies estimating the time it takes employees to walk to their positions on the line at any time during the last three (3) years.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above.  Subject to these objections, Defendant denies Request No. 83.

84.    Admit the areas in which employees don or doff clothing and equipment has not changed in the last three (3) years.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above.  Subject to these objections, Defendant admits Request No. 84.

85.    Admit Plaintiffs receive two unpaid breaks.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Plaintiffs receive two thirty-minute unpaid meal breaks.

86.  Admit Defendant deducts unpaid breaks from Plaintiffs' hours worked without regard for the actual time the individual spent on break not performing work.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that the phrase "without regard for the actual time the individual spent on break not performing work" is vague and ambiguous. Defendant states Plaintiffs receive two thirty-minute unpaid meal breaks.

87.  Admit during Plaintiffs' unpaid breaks they must don and doff certain protective or sanitary clothing as well as walk to and from the line to the break area.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant denies Request No. 87.

88.  Admit pursuant to 9 CFR § 307.4 that USDA inspectors take a 30 minute, 45 minute or 60 minute lunch break four hours after the start of production but no later than five hours after the start of production. Once established lunch periods must remain relatively constant as to time and duration.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

89.  Admit that while USDA inspectors are on their §307.4 break that production stops in the area that breaking inspectors are assigned.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

90.     Admit Defendant's employees are sent to break while USDA inspectors are on their §307.4 break.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant objects to this Request on the grounds that it is not relevant and/or not

reasonably calculated to lead to the discovery of admissible evidence.

91.     Admit hours worked are rounded for purposes of calculating weekly wages.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant denies Request No. 91.

92.     Admit minutes worked are rounded for purposes of calculating weekly wages.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant denies Request No. 92.

93.     Admit that all remuneration and/or compensation paid to Plaintiff for services rendered to Defendant is reflected in the payroll records of Defendant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant admits Request No. 93.

94.     Admit that all remuneration and/or compensation paid to Plaintiffs by Defendant were correctly and properly reflected in the W-2 form provided to Plaintiff.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant admits Request No. 94.

95.     Admit incentive payments, performance bonuses, attendance bonuses, etc. were included in plaintiffs' regular rate of pay for overtime purposes.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant states Plaintiffs do not receive incentive payments

performance bonuses, or attendance bonuses. Defendant further states Plaintiffs may receive a

seniority bonus which is included in their regular rate of pay for overtime purposes.

96.  Admit that all remuneration and/or compensation paid to Plaintiffs by Defendant were
     correctly and properly reported to the Internal Revenue Service and Social Security
     Administration.

     **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Subject to these objections, Defendant admits Request No. 96.

97.  Admit that any and all remuneration and/or compensation paid to Plaintiffs by Defendant
     were properly reported to any and all worker's compensation insurers and/or carriers.

     **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to this Request on the grounds that it is not relevant and/or not

reasonably calculated to lead to the discovery of admissible evidence.

98.  Admit that no part of Plaintiff's remuneration and/or compensation was paid in the form
     of cash.

     **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to this Request on the grounds that it is not relevant and/or not

reasonably calculated to lead to the discovery of admissible evidence. Subject to these

objections, Defendant admits Request No. 98.

99.  Admit hourly employees within 1st processing are required to work any position in which
     a member of supervision or management places them.

     **RESPONSE:** Defendant incorporates by reference all general objections as set forth

above. Defendant further objects to this Request on the grounds that it is not relevant and/or not

reasonably calculated to lead to the discovery of admissible evidence.

100. Admit hourly employees within 2nd processing are required to work any position in which
     a member of supervision or management places them.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

101.    Admit from time to time, due to staffing or attendance, hourly employees are required to work different positions within the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 101.

102.    Admit due to ergonomic concerns, some hourly employees work different positions on a rotation in order to reduce the effects of repetitive motion jobs.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Defendant further objects to this Request on the grounds that it is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Defendant admits Request No. 102.

103.    Defendant's policy related to "Good Manufacturing Practices" (GMP) requires hourly employees to cover their hair, beard, mustaches, and street clothing while in production areas of the plant.

**RESPONSE:** Defendant incorporates by reference all general objections as set forth above. Subject to these objections, Defendant admits Request No. 103.

Dated: April 4, 2008

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 4th day of April 2008, I caused a copy of the

foregoing Defendant Perdue Farms Incorporated's Responses and Objections to Plaintiffs' First

Requests for Admissions to be served via electronic mail and first class U.S. mail upon:

Robert J. Camp
505 North 20th Street Suite 825
Birmingham, AL 35203
(205) 930-6900 (Phone)
(205) 930-6910 (Fax)
rcamp@cochranfirm.com


/s/ *Lexer I. Quamie*
Lexer I. Quamie (admitted pro hac vice)
D.C. Bar No. 502908
202-739-5955
lquamie@morganlewis.com
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-739-3001 (fax)

*Counsel for Defendant, Perdue Farms Incorporated*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## EXHIBIT 2
## AFFIDAVIT OF LINE LEADER EDDIE CHARLES SNELL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-01000-MEF-WC |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT:

1.    My name is Eddie Charles Snell.

2.    I am a Plaintiff in this action.

3.    I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.    I have worked for Defendant, as a poultry-processing laborer for approximately 17 years. I currently work in 2nd processing as a Line Leader.

5.    I work day shift.

6.    I average 50 hours per week

7.    In my job I supervise employees. I have completed line leader training. I have another line leader class scheduled next week. I have been trained in the time clock procedure of the company.

8.    My rate of pay is $9.85.

9.    When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. I cannot go into the plant if I don't have my ID badge. The same holds true for all processing employees.

10.   I and the associates I supervise are required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks.

11.   We cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses.  In order to go to the production area we have to walk through a closed door at the bottom of two flights of stairs.  We go up the stairs and open a second door to enter into the production area.

12.   I noticed the beginning of this year Perdue took down a sign that was located on the door at the base of the flights of stairs.  The sign said ear plugs, hair nets, safety glasses required beyond this point.  Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area.  The old sign is gone.  The new sign still means employees must put on all the equipment required by Perdue other than those items they put on after clocking in, before going upstairs.  This requirement has not changed even though the sign has changed.

13.   I clock in at a time clock located near the door at the base of the stairway.

14.   I put on my hair net, ear plugs, safety glasses, bump cap before going into the door at the base of the stairs.

15.   At the top of the stairs I go through the second door.  I and employees have to sanitize our boots in a foam bath before going any further.  We are not allowed to go any further into production without first sanitizing our boots.  I do this on the clock but the non-lead employees do this off the clock.

16.   At each time clock there is a sign stating what equipment employees must have on before clocking in and certain equipment after clocking in  There are two pictures a before and after clocking in picture.  The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots.  The after clocking in pictures shows

2

an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

17.    At break employees throw away their plastic sleeves and apron. They hang their coat and gloves on a hook.

18.    They then clock out.

19.    Employees get two breaks.

20.    At break time after clocking out employees walk to the stairs and sanitize their boots. They walk out the door at the top of the stairs and walk down the stairs, all off the clock still wearing hair nets, beard nets, bump caps and safety glasses.

21.    Once employees clear the door at the bottom of the stairs I have observed that the majority remove at least their ear plugs and safety glasses.

22.    Breaks are approximately 20 minutes long due to employees having to wash, and return to the line in within the 30 minutes. Before clocking back in at their time clock upstairs employees must put on their bump caps, hair nets, and safety glasses before walking up stairs. They again have to sanitize their boots before going to their assigned time clock.

23.    At the end of the day employees throw away rubber gloves, plastic sleeves and plastic apron. They put the cloth gloves and apron in a container. They then clock out.

24.    Still wearing their bump cap, hair net, ear plugs, and safety glasses they walk to the stairs and sanitize their boots and walk through the door.

25.    They walk down the stairs and out the bottom door.

26.    They cannot take off the hair nets, ear plugs, and safety glasses or bump cap until they clear the bottom door.

27.    I have observed the majority of employees do not wear their hair nets, ear plugs, safety glasses, and bump caps from the house or home. If they do, I have observed some employees wearing a hair net.

28.    I have never been trained nor have I been trained to tell others we have the option to wear ear plugs, hair net, safety glasses, beard nets, bump cap, and boots from their house.

3

29.    I have never heard of DOL Awareness Training.

30.    I am responsible for training employees in wearing their safety glasses, and other personal protective equipment such as ear plugs as it relates to the plant.

31.    I have given employees verbal warnings for not having on their safety glasses, ear plugs, and or hair net.

32.    During my employment with Perdue, I personally observed, that non-lead co-workers working along my side follow the same procedures described above.

33.    I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the _3rd_ day of June, 2008.

_Eddie Charles Snell_
PLAINTIFF'S NAME

_Eddie Charles Snell_
PLAINTIFF'S SIGNATURE

STATE OF Alabama ,
COUNTY OF Houston .

I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the ___3___ day of June, 2008

[SEAL]

NOTARY PUBLIC
My Commission Expires: 4/20/10

JENNIFER LEANN DEAN
NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES APRIL 20, 2010

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

DARRYL ANDERSON, et al.,          §
                                   §
         Plaintiffs,               §
                                   §          **CIVIL ACTION NO.**
v.                                 §          **1:06-cv-1000-MEF**
                                   §
PERDUE FARMS, LLC.                 §
                                   §
                                   §
                                   §
         Defendant.                §

## EXHIBIT 3
## AFFIDAVIT OF QA EMPLOYEE
## MARSHA DIXON

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## AFFIDAVIT:

1.    My name is Marsha Dixon.

2.    I swear this affidavit is true, accurate, and based on my personal knowledge.  I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

3.    I have worked for Defendant for approximately 21 years.  I have worked in QA for about 2.5 years.  As part of QA I am titled HACCP/SSOP. HACCP stands for Hazard Analysis Critical Control Point.  This is a term used for the program used to ensure wholesomeness of product and safe product recall.  SSOP stands for Sanitation Standard Operation Procedures.

4.    I had to attend a 3 week training program for this position.

5.    As part of my job I ensure machines are sanitized, employees follow "good manufacturing procedures" or GMPs and the plant follows all other relevant food safety procedures.

6.    I work night shift.

7.    I average 45 – 55 hours per week

8.    My rate of pay is $9.90.

9.    I work in both 1st and 2nd processing.

10.    Before 1st processing employees are allowed to clock in they have to put on their safety glasses, bump cap, hair net and beard net (if applicable), boots and ear plugs.

11.    Before 2nd processing employees can go through the first door into the stairway leading up stairs to the processing area, they have to put on their safety glasses, bump cap, hair net, beard nets, boots and ear plugs.

12.    Putting on this equipment is part of our "good manufacturing practices" and I must do a GMP audit to ensure employees comply with the requirements in paragraphs 10 and 11.  If an employee does not have on safety glasses, bump cap, hair net, beard net, boots and ear plugs before clocking in I have to take the employees name and turn them in to my supervisor.

13.    Hair nets and beard nets are required by Perdue and USDA.

14.    Ear plugs, safety glasses, bump caps and boots are required by Perdue for safety reasons.

15.    Employees must have their hair net, beard net, safety glasses, bump cap and ear plugs in before clocking in.  They are not allowed to simply have these items in their possession or carry these items to the time clock.

16.    I do GMP audits in 7 departments in both 1st and 2nd processing.

17.    Before entering the processing area and before clocking in, employees also must sanitize their boots.

18.    I personally have reported employees who fail to wear their ear plugs, hair nets, safety glasses or beard nets in the processing areas.

19.    My supervisor maintains copies of GMP audits where employees have been reported for not complying with these personal protective equipment (PPE) requirements.

20.    I am not aware of any written policy or procedure that allows employees to wear their hair net, safety glasses, boots, bump cap, and ear plugs from the house.  I have not been trained that employees are allowed to wear these items from their home.

2

21.    The vast majority of employees I observe get dressed at the plant on their own time because when you get to the time clock you have to have those items on.

22.    The supply room is open at the beginning of each shift so employees can get hair nets, beard nets, ear plugs, and safety glasses before clocking in if needed. As part of my job responsibilities I have personally turned people around before they clocked in to obtain these items from supply if they didn't have them on.

23.    Employees must have a clean hair net and beard net daily. If they are dirty, covered in chicken fat, chicken blood, feathers, fecal, dried or otherwise, etc. employees have to get a new net before shift starts or any time during the shift. I am required to report as part of my GMP audit when an employee is wearing an unsanitary net.

24.    The beginning of this year Perdue took down a sign that was located on the door at the base of the flights of stairs to second processing and entrance to first processing. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in, before we go upstairs. This requirement has not changed.

25.    At each time clock there is a sign stating that you must have on certain equipment before clocking in and certain equipment after clocking in. There are two pictures, a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall rubber boots with the pants tucked into them. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

26.    Perdue has changed these signs as well, although I am not sure of the date. I noticed last night that the lady in the before picture is now wearing black short rubber boots up under her pants and her ear plugs are not in

3

her ears, they are around her neck. The new sign also does not show the employee wearing safety glasses.

27.    At breaks employees clock out, sanitize their boots, and walk to the break room. Employees are not allowed to take off their hair nets, beard net, safety glasses or bump cap until they clear the door at the base of the stairs that is the entrance to first and second processing.

28.    It is required these items be put back on before going through the same door after break. This is done off the clock as well.

29.    I have observed employees cleaning their safety glasses on break and obtaining new clean nets while on break.

30.    After breaks employees must again sanitize their boots before clocking in.

31.    I have observed employees waiting in long lines to clock in after breaks due to the fact the entire shift is coming back off break.   I would estimate it takes 2 - 3 minutes to get through the line to clock in. Before that it takes about 2 minutes to get from the first door at the base of the stairs to each employees' assigned time clock, and this happens 6 times a day.

32.    At the end of the day employees clock out, walk to the processing exit, again sanitize their boots before exiting, and once they clear the door at the base of the stairs that is the entrance to first and/or second processing, they can take their hair net, beard net, safety glasses, and bump cap off.   Not before.

33.    I have observed most people take their bump cap, hair nets, safety glasses, and ear plugs off in the break area.

34.    I have never heard of the DOL awareness training program.   To the best of my knowledge, I have never been trained in this program.

35.    I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

       I declare under penalty of perjury that the foregoing is true and correct.

4

Executed on this the ___4th___ day of June, 2008.


_Marsha Dixon_                      _Marsha Dixon_
**PLAINTIFF'S NAME**                **PLAINTIFF'S SIGNATURE**


STATE OF ___Alabama___,
COUNTY OF ___Houston___.


I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the ___4th___ day of June, 2008.


_Sheri R. Hughes_
NOTARY PUBLIC
My Commission Expires: _01/17/2011_

[SEAL] SHERI R. HUGHES NOTARY PUBLIC EXPIRES: 01-17-11 ALABAMA STATE AT LARGE

5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| v. | § | **1:06-cv-1000-MEF** |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## EXHIBIT 3 TAB 1
## AFFIDAVIT OF BRACKINS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-01000-MEF-WC** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## <u>AFFIDAVIT:</u>

1.    My name is Olivia Brackins.

2.    I am a Plaintiff in this action.

3.    I swear this affidavit is true, accurate, and based on my personal knowledge. I am over the age of 18 years and competent to testify to the matters contained within this Declaration.

4.    I worked for Defendant, as a poultry-processing laborer for approximately 15 years. I currently work in 2nd processing.

5.    I work day shift.

6.    I average 46 hours per week

7.    In my job I train employees to cut shoulders.

8.    My rate of pay is $9.85.

9.    When I arrive I walk to security and show my ID badge. I cannot enter the plant without going through security. If I forget my ID badge I have to wait on a supervisor to verify my identity to get clearance. I cannot go into the plant if I don't have my ID badge until the supervisor verifies my employment.

10.    I am required by Perdue to wear hair net, ear plugs, safety glasses, slip resistant boots, aprons, plastic sleeves, cloth and plastic gloves and smocks.

11. Every other day I obtain hair nets from the supply room located down the hallway from the break room because hair nets get covered with chicken juice, and chicken parts. Every other week I obtain a new set of ear plugs. Whenever I obtain equipment it is before clocking in for that day.

12. I cannot enter the production area of the plant without wearing my bump cap, hair net, ear plugs, boots and safety glasses. In order to go to my assigned time clock in the production area I have to walk through a closed door, then down the hallway.

13. The end of last year, beginning of this year, Perdue took down a sign that was located on the door at the base of the flights of stairs. The sign said ear plugs, hair nets, safety glasses required beyond this point. Now, the door at the bottom of the stairs has a sign stating that we must have our PPE on before entering the processing area. The old sign is gone. The new sign still means we must put on all the equipment required by Perdue other than those items we put on after clocking in. This requirement has not changed.

14. Also, if my supervisor, QA, HACCP, or safety sees me going down the hall without my ear plugs, hair net, bump cap, or safety glasses on they will send me back to put it on.

15. I put on my hair net, ear plugs, safety glasses and bump cap before going into the door at the base of the stairs and before clocking in.

16. At the top of the stairs I go through the second door. I have to sanitize my boots in a foam bath before going any further. I am not allowed to go any further into production without first sanitizing my boots.

17. At each time clock there is a sign stating that you must have on certain equipment before clocking in and certain equipment after clocking in. There are two pictures, a before and after clocking in picture. The before clocking in picture shows an employee wearing a hair net, safety glasses, hard hat, and tall yellow rubber boots. The after clocking in pictures shows an employee with hair net, safety glasses, hard hat, boots, coat, apron, gloves, sleeves, and a knife holster.

2

18.    Once I clock in I am allowed to put on the other required equipment such as coat, plastic sleeves, plastic apron, plastic and cloth gloves.

19.    I then sanitize my plastic gloves in either the sink or at a dip station.

20.    At break I throw away my plastic sleeves and apron.  The coat and gloves go in the coat pocket.

21.    I then clock out.

22.    I get two breaks.

23.    At break time after clocking out I walk to the stairs and sanitize my boots.  I walk out the door at the top of the stairs and walk down the stairs.

24.    Once I clear the door at the bottom of the stairs I remove ear plugs and safety glasses so I can hear and see more clearly.  I cannot remove them prior.

25.    I go to the bathroom and wash my hands because I have been handling raw poultry.

26.    I spend about 20 minutes actually on break.

27.    I have to clean my glasses because they get dirty with chicken juice, water, etc.

28.    I put back on my ear plugs and safety glasses and walk through the door at the base of the stairs.  I walk up the stairs and through the door at the top of the stair.  I sanitize my boots on the other side of the door and walk to my assigned time clock and clock back in. The process beyond that point is the same as at the beginning of the shift.  The process is the same on each break.

29.    At the end of the day I throw away rubber gloves, plastic sleeves and plastic apron.  I put the cloth gloves, smock and apron in a container.  I then clock out.

30.    Still wearing my bump cap, hair net, ear plugs, and safety glasses I walk to the stairs and sanitize my boots and walk through the door.

31.    I walk down the stairs and out the bottom door.

32.    I take my bump cap, ear plugs and safety glasses off once I get out the bottom door.

3

33.    I take my boots off at the car.

34.    I have never been told I have the option to wear my ear plugs, hair net, safety glasses, bump cap and boots from my house.

35.    I take these items home because I have seen other employees take them home and I am responsible for these items or I have to pay to replace them.

36.    I wouldn't wear these items from my house if I had the option because I would look foolish and it would not be safe to drive with your ear plugs and safety glasses on.  Also, I don't think I could ride down the road with my bump cap on because it would hit the roof.

37.    I have to make sure I get to the plant at least 30 minutes before my shift starts to get to the plant on time in order to put on my boots, hair nets, ear plugs, safety glasses, clear security and walk to my assigned time clock.

38.    It takes me about 3 minutes to get to the time clock from the first door where I must put on my hair net, ear plugs, safety glasses, and bump cap.  I make this walk 6 times a day or approximately 18 minutes a day.

39.    It takes about 3.5 minutes to walk from the supply room to my time clock.

40.    We have once a year training regarding ear plugs when we have our hearing tests.

41.    To the best of my knowledge, I have never heard of or been trained in the DOL Awareness Training Program.

42.    I have seen employees receive disciplinary warnings for not having on their safety glasses, ear plugs, or hair net.  This has happened in the production area returning from break.

43.    During my employment with Perdue, I personally observed that co-workers working along my side followed the same procedures described above.

44.    I personally have worked many positions in the plant.  The procedures described above were the same regardless of where I worked.

4

45. I understand and aver the allegations contained within this Declaration are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the ___3___ day of June, 2008.


Olivia Brackins

**PLAINTIFF'S NAME**                    **PLAINTIFF'S SIGNATURE**


STATE OF Alabama,

COUNTY OF Houston.


I, the undersigned, a Notary Public in and for said State and County aforesaid, hereby certify that the aforementioned, whose name is signed to the foregoing, and who is known to me, acknowledged before me on this date that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the ___3___ day of June, 2008

[SEAL]

**NOTARY PUBLIC**

My Commission Expires: 4/20/10

**JENNIFER LEANN DEAN**
**NOTARY PUBLIC**
**STATE OF ALABAMA AT LARGE**
**MY COMMISSION EXPIRES APRIL 20, 2010**

5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-1000-MEF |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

# EXHIBIT 4
## EXCERPT FROM ASSOCIATE SAFETY HANDBOOK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# EXHIBIT 5
# PERDUE SAFETY AND HEALTH PRESENTATION

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# EXHIBIT 6
# PERDUE'S TEN PRINCIPLES OF SAFETY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-1000-MEF |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# EXHIBIT 7
# PERDUE'S GOOD MANUFACTORING PRACTICES

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

DARRYL ANDERSON, et al.,           §
                                   §
          Plaintiffs,              §
                                   §        CIVIL ACTION NO.
v.                                 §        1:06-cv-1000-MEF
                                   §
PERDUE FARMS, LLC.                 §
                                   §
                                   §
          Defendant.               §

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

DARRYL ANDERSON, et al.,          §
                                  §
        Plaintiffs,               §
                                  §          CIVIL ACTION NO.
                                  §          1:06-cv-1000-MEF
v.                                §
                                  §
PERDUE FARMS, LLC.                §
                                  §
                                  §
        Defendant.                §

# EXHIBIT 8
## EXCERPTS FROM ORIENTATION HANDBOOK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-1000-MEF |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## EXHIBIT 9
## PERSONAL PROTECTIVE EQUIPMENT
## SAFETY POLICY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-1000-MEF |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-1000-MEF |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

# EXHIBIT 10
## HEARING CONSERVATION SAFETY POLICY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

DARRYL ANDERSON, et al.,           §
                                   §
    Plaintiffs,          §
                                   §          CIVIL ACTION NO.
                                   §          1:06-cv-1000-MEF
v.                                 §
                                   §
PERDUE FARMS, LLC.                 §
                                   §
                                   §
    Defendant.           §

## EXHIBIT 11
## EXCERPTS FROM PERDUE FOOD SAFETY
## ORIENTATION PROGRAM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-1000-MEF |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

DARRYL ANDERSON, et al.,    §
                              §
     Plaintiffs,          §
                              §       CIVIL ACTION NO.
v.                      §        1:06-cv-1000-MEF
                              §
PERDUE FARMS, LLC.     §
                              §
                              §
     Defendant.         §

**EXHIBIT 12**
**2006 GMP FOOD SAFETY AUDIT**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-1000-MEF |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## EXHIBIT 13
## GMP AUDIT SHEETS

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# EXHIBIT 14
## GMP EXECUTED BY ASSOCIATES

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| v. | § | **1:06-cv-1000-MEF** |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## EXHIBIT 15
## ASSOCIATE MEMORANDUM REGARDING
## FOOD SAFETY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

DARRYL ANDERSON, et al.,     §
                              §

     Plaintiffs,          §

                              §       CIVIL ACTION NO.
v.                         §       1:06-cv-1000-MEF
                              §

PERDUE FARMS, LLC.        §
                              §

     Defendant.         §

# EXHIBIT 16
# PAYROLL DEDUCTION FOR
# PERDUE ISSUED PPE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

DARRYL ANDERSON, et al.,           §
                                   §
        Plaintiffs,                §
                                   §          CIVIL ACTION NO.
v.                                 §          1:06-cv-1000-MEF
                                   §
PERDUE FARMS, LLC.                 §
                                   §
                                   §
        Defendant.                 §

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 1:06-cv-1000-MEF |
| | § | |
| PERDUE FARMS, LLC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## EXHIBIT 17
## JOB DESCRIPTION-POULTRY WORKER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# INTENTIONALLY OMITTED
# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

**DARRYL ANDERSON, et al.,**          §
                                      §
      **Plaintiffs,**                  §
                                      §          **CIVIL ACTION NO.**
**v.**                                §          **1:06-cv-1000-MEF**
                                      §
**PERDUE FARMS, LLC.**                §
                                      §
                                      §
                                      §
      **Defendant.**                   §

## EXHIBIT 18
## <u>DEPOSITION OF PERDUE</u>
## <u>WAGE AND HOUR AUDITOR</u>

# In The Matter Of:

*David Alford, Sr., et al. v.*
*Perdue Farms, Inc.*

*David J. Tabinowski*
*December 12, 2007*

*American Court Reporting Company, Inc.*
*52 Executive Park S, Suite 5201*
*Atlanta, Georgia  30329*
*800-445-2842*
*WWW.ACRGA.COM*

Original File 54811.TXT, Pages 2-95 (94)

**Word Index included with this Min-U-Script®**

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

DAVID ALFORD, SR., et al.,)
)
Plaintiff,    ) CIVIL ACTION FILE
)
vs.    ) NO. 5:07-CV-00087-CAR
)
PERDUE FARMS, INC.,    )
)
)
Defendant.    )
_____/

- - -

The deposition of DAVID J. TABINOWSKI, taken on behalf of the Plaintiff, pursuant to the stipulations agreed to herein, taken for the purpose of cross-examination and discovery and any other purpose authorized by the Georgia Civil Practice Act; the reading and signing of the deposition being reserved; taken before Alice E. Simmons, Registered Professional Reporter, commencing at 9:56 a.m., on this, the 12th day of December, 2007, at Morgan & Morgan, 191 Peachtree Street, N.E., Suite 4200, Atlanta, Georgia.

**Page 3**

C O N T E N T S

E X A M I N A T I O N

Page

Examination by Mr. Celler . . . . . . . . . .  4, 87
Examination by Mr. Liss . . . . . . . . . .  81

E X H I B I T S

FOR THE PLAINTIFF:

| Number | Description | Identified |
|---|---|---|
| 1 | Perdue Farms Incorporated Departmental Counseling Record regarding associate Maggie Lawson dated 3/15/05 | 14 |
| 2 | Disciplinary Record regarding associate Sharhonda Harrell dated 4/4/05 | 16 |
| 3 | Power Point Presentation, Bates stamped PER_ALF0000013 | 36 |
| 4 | First Principal Activity - Associate Performance Standards and Perry Plant Discipline Program | 48 |
| 5 | Declaration of Dave Tabinowski | 57 |
| 6 | Plaintiff's Notice of Taking Deposition for subject deposition | 63 |
| 7 | First Principal Activity - Associate Performance Standards and Perry Plant Discipline Program, signed by Annie J. Bray dated 3/16/07 | 69 |
| 8 | First Principal Activity - Associate Performance Standards and Perry Plant Discipline Program, signed by Mary L. Harrell dated 3/21/07 | 71 |
| 9 | Timecard for Rhynada Collier - 9/27/04-10/3/04 | 80 |

**Page 2**

[1] APPEARANCES OF COUNSEL:
[2] For the Plaintiff:
[3]    RICHARD B. CELLER, ESQUIRE
       DEIDRE JOHNSON, ESQUIRE
[4]    TISHA TALLMAN, ESQUIRE
       MORGAN & MORGAN
[5]    191 Peachtree Street, N.E.
       Suite 4200
[6]    Atlanta, Georgia  30303
       E-mail: Djohnson@forthepeople.com
[7]
    For the Defendant:
[8]
       BRIAN E. LISS, ESQUIRE
[9]    MORGAN, LEWIS & BOCKIUS, LLP
       1111 Pennsylvania Avenue, N.W.
[10]   Washington, D.C.  20004
       (202) 739-5579
[11]   E-mail: bliss@morganlewis.com
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 4**

[1]    P R O C E E D I N G S
[2]    DAVID J. TABINOWSKI,
[3] having been duly sworn, was examined and
[4] testified as follows:
[5]    CROSS-EXAMINATION
[6] BY MR. CELLER:
[7]    Q    Good morning.  I already know the answer
[8] to this, but please state your name.
[9]    A    David J. Tabinowski.
[10]    Q    And Mr. Tabinowski, are you currently
[11] employed?
[12]    A    Yes.
[13]    Q    Who do you work for?
[14]    A    Perdue Farms.
[15]    Q    And what do you do for Perdue Farms?
[16]    A    I'm project lead in the internal audit
[17] department.
[18]    Q    Can you give me what I will refer to as a
[19] Cliff Note version of what that means?
[20]    A    Well, my duties in the internal audit
[21] department are related to payroll and immigration and
[22] first and last principal activity.
[23]    Q    What type of training did you have -- or
[24] strike that.
[25]    Have you had any training with regard to

**Page 5**

[1] the Fair Labor Standards Act to determine what a
[2] principal or a final activity is?
[3]     A   Well, training as far as from a wage and
[4] hour, I had 10-plus years as payroll manager and
[5] worked closely with HR. I was involved heavily with
[6] our agreement with the Department of Labor on our
[7] donning and doffing issues.
[8]     Q   And when was that agreement or that
[9] consent decree issued, if you know?
[10]     A   I believe it was signed by us in May of
[11] 2002.
[12]     Q   And how long have you been in the current
[13] position that you hold for Perdue?
[14]     A   In internal audit it's since 1999.
[15]     Q   And have you held that position
[16] consistently throughout today?
[17]     A   Yes.
[18]     Q   As part of your job duties, are you
[19] responsible for reviewing recent case law decisions
[20] or decisions that come out of the courts that
[21] interpret donning and doffing or Fair Labor
[22] Standards Act?
[23]     A   No.
[24]     Q   Have you ever heard of a decision called
[25] Alvarez v. IVP?

**Page 7**

[1]     A   (Reviews document). No.
[2]     Q   Let me ask you a couple of questions about
[3] it and just make sure that ... Before I ask you
[4] that, where do you work out of?
[5]     A   Salisbury, Maryland.
[6]     Q   And do you have a division that you're
[7] responsible for at Perdue, like a region?
[8]     A   No. We do not have divisions as far as
[9] poultry processing. So ... The answer to that is no.
[10]     Q   Okay. How is it that if you work in
[11] Maryland you would be able to testify with regard to
[12] the practices in Perry, Georgia?
[13]     A   Part of my job is to visit all the plants
[14] within the company.
[15]     Q   And when is the last time that you visited
[16] the plant in Perry, Georgia?
[17]     A   The early part of 2007.
[18]     Q   Sometime in April of '07; is that correct?
[19]     A   February, March, April, something like that.
[20]     Q   And just so you know, I'm not trying to
[21] trick you, your declaration said April of '07.
[22]     A   Said April, right.
[23]     Q   I usually do this in the beginning, but
[24] have you ever had your deposition taken before?
[25]     A   Yes, I've had depositions taken.

**Page 6**

[1]     A   No.
[2]     Q   Do you know whether the Supreme Court has
[3] modified its position in the last five years since
[4] the consent decree was issued with Perdue regarding
[5] what is considered compensable with regard to
[6] donning and doffing?
[7]       MR. LISS: Objection, calls for an answer
[8]     that would require a legal interpretation.
[9]       MR. CELLER: That's fine.
[10] BY MR. CELLER:
[11]     Q   You can answer.
[12]     A   No.
[13]       MR. CELLER: Brian, do you have a copy of
[14]     the deposition notice?
[15]       MR. LISS: I have a copy of the first
[16]     deposition notice.
[17]       MR. CELLER: Yeah, it's fine, I just want
[18]     to make sure he's the proper corporate
[19]     representative. Can I borrow it for one
[20]     second?
[21]       MR. LISS: (Presents).
[22] BY MR. CELLER:
[23]     Q   Let me show you what we'll mark eventually
[24] as Exhibit 1, we're waiting for a copy, and ask you
[25] if you've ever seen that document before.

**Page 8**

[1]     Q   Just a couple of quick rules. The court
[2] reporter is taking down everything we're saying, and
[3] you're doing a great job. I need you to answer
[4] verbally. If I ask you a yes or no, please answer
[5] yes or no and if you want to explain, feel free to
[6] do so.
[7]     A   Okay.
[8]     Q   If I ask you a question and you don't
[9] understand it, let me know and I'm more than happy
[10] to rephrase it.
[11]     A   Okay.
[12]     Q   And if I ask you a question and you answer
[13] it, I'm going to assume that you understood it. Can
[14] I get your agreement on that?
[15]     A   Yes.
[16]     Q   Prior to April of 2007, when was the last
[17] time you visited the Perry, Georgia plant?
[18]     A   That was the first time that I had visited
[19] the plant.
[20]     Q   And what was the purpose of your visit?
[21]     A   We were doing our ... I was doing my first
[22] and last principal activity audits.
[23]     Q   Can you describe for me what that means?
[24]     A   Basically I go into the plant and evaluate
[25] their compliance with our consent agreement.

**Page 9**

[1]   Q   Okay. Would it be fair to say that you
[2] limit your investigation to what the parameters are
[3] set forth in the consent decree?
[4]   A   That is the primary part of the audits. If
[5] I do see something else that might be of some concern,
[6] then I'll bring it to somebody's attention. But it's
[7] primarily the consent agreement.
[8]   Q   Are you familiar with the term principal
[9] activity as it's used in the Perdue nomenclature?
[10]   A   Yes.
[11]   Q   To your knowledge is there a standard
[12] definition at Perdue as to what First Principal
[13] Activity means?
[14]   A   Yes.
[15]   Q   Can you describe for me what your
[16] understanding of that term is?
[17]   A   First Principal Activity at the beginning of
[18] a shift or start of the break is either doing actual
[19] work or donning and doffing the specific items.
[20]   Q   Okay. We're going to talk a bit about the
[21] specific items at issue. Does Perdue require
[22] employees to wear hair nets on the line?
[23]   A   It is an industry-wide requirement, and from
[24] a food safety standpoint also.
[25]   Q   So would you agree that it's not optional

**Page 10**

[1] for an employee to wear a hair net on the line?
[2]   A   It is not optional, but it's a personal
[3] item.
[4]   Q   What do you mean by a personal item?
[5]   A   They can wear it home with them, store it in
[6] their locker.
[7]   Q   Are there any requirements that Perdue
[8] imposes upon employees for the washing or caring for
[9] of hair nets?
[10]   A   They don't wash or care, they'll throw them
[11] away and get a new one.
[12]   Q   If, for example, you determine that an
[13] employee wore a hair net home one day and then wore
[14] it back to work the next day, would that be
[15] considered acceptable?
[16]   A   From my audit standpoint I would not look at
[17] that but from ... someone else maybe. I can't answer
[18] that question really.
[19]   Q   What are some of the other items that
[20] Perdue considers to be personal?
[21]   A   Beard net.
[22]   Q   And would you agree that a beard net if an
[23] employee has a beard is required by Perdue as well?
[24]   A   It's required pretty much by the industry.
[25]   Q   Okay.

**Page 11**

[1]   A   It's food safety also.
[2]   Q   Do you know who Jerry Garcia is? He's not
[3] an employee, he's a former rock musician.
[4]   A   Oh, yeah. He just died a while back.
[5]   Q   Correct. Do you remember what he looked
[6] like?
[7]   A   Yeah.
[8]   Q   If I were to show up at work to Perdue
[9] looking like Jerry Garcia with a beard out to my
[10] shoulders.
[11]   A   Uh-huh (affirmative).
[12]   Q   Would I be required to wear a hair net by
[13] Perdue? A beard net, I'm sorry.
[14]   A   Any production facility would require that
[15] to be worn. Any food production.
[16]   Q   Okay.
[17]   A   Or ... you know, as far as I'm concerned
[18] food business would do it.
[19]   Q   Okay.
[20]   A   Even delis.
[21]   Q   What are some other personal
[22] protective ... Can we refer to it as PPE, is that
[23] the right term?
[24]   A   Well, there's different terms.
[25]   Q   Okay, so let's just call it personal

**Page 12**

[1] equipment, let's use your terms. What are some
[2] other items of personal equipment that employees at
[3] Perdue are required to wear?
[4]   A   Required?
[5]   Q   Required.
[6]       MR. LISS: Objection. Required by whom?
[7] BY MR. CELLER:
[8]   Q   Either required by Perdue policy or by
[9] safety standards.
[10]   A   Compensable or non-compensable?
[11]   Q   Let's talk about non-compensable that
[12] Perdue does not pay employees to don or doff.
[13]   A   Items similar to the hair net and beard net
[14] is also boots.
[15]   Q   Okay. What type of boots?
[16]   A   They are steel toed boots, steel toed tennis
[17] shoes. It is their preference in what they purchase.
[18]   Q   Okay.
[19]   A   And they can wear that home and wear it to
[20] wherever.
[21]   Q   Are they required to wear them on the line
[22] either by Perdue or by safety standards in the
[23] industry?
[24]   A   The industry would require those for safety
[25] reasons, yes.

Page 13

[1] **Q** And if an employee was not wearing the
[2] appropriate boots on the line, they could be written
[3] up by Perdue, correct?
[4] **A** I've never seen it happen but it probably
[5] has.
[6] **Q** And just so we can circle back, the same
[7] question with regard to the hair net and beard net,
[8] if an employee is not wearing those on the line they
[9] could be written up by Perdue for doing so, correct,
[10] or for not doing so?
[11] **A** Probably, yes.
[12] **Q** And just so we can take out any of the
[13] ambiguity, let's go ahead and mark this as
[14] Plaintiff's Exhibit 1.
[15] **MR. CELLER:** And Brian, I apologize, I got
[16] in yesterday so I don't have copies. But take
[17] your time and review it.
[18] **MR. LISS:** Exhibit 2 you mean?
[19] **MR. CELLER:** We didn't mark the other one
[20] yet.
[21] **MR. LISS:** So you're not going to mark the
[22] notice?
[23] **MR. CELLER:** I may at some point.
[24] **MR. LISS:** Okay.
[25] **MR. CELLER:** I'm still waiting for a copy.

Page 15

[1] **Q** Is there a signature on the bottom of that
[2] document by a human resource manager of Perdue? If
[3] you know.
[4] **A** No, I can't ...
[5] **Q** Let me take a look at that for a minute.
[6] **A** I can't tell.
[7] **Q** Okay. Take a look at the context of the
[8] document and if you can describe for me what you
[9] believe that document is.
[10] **A** (Reviews document). It's a reprimand for
[11] wearing ... having their personal protective gear on.
[12] **Q** So would you agree that based on -- Strike
[13] that.
[14]      Do you have any reason to believe that
[15] this is a document that was not issued by a Perdue
[16] manager to an employee at Perdue?
[17] **A** Could you repeat that, please?
[18] **Q** Sure. Do you have any reason to believe
[19] that this document was not a document issued by
[20] somebody on behalf of Perdue to an employee?
[21] **A** I have no reason.
[22] **Q** Okay. And would you agree that this is a
[23] document, what's been marked as Plaintiff's Exhibit
[24] Number 1, which reflects a reprimand to an employee
[25] for not properly adhering or wearing PPE equipment?

Page 14

[1] **MR. LISS:** So I will get a copy before I
[2] leave?
[3] **MR. CELLER:** Yeah, we'll make copies of
[4] everything. And it's your production.
[5]      (Thereupon, Plaintiff's Exhibit Number 1
[6] was marked for identification).
[7] **BY MR. CELLER:**
[8] **Q** Showing you what's been marked as
[9] Plaintiff's Exhibit Number 1. Do you recognize that
[10] document?
[11] **A** No.
[12] **Q** Have you ever seen a document issued by
[13] Perdue in that form?
[14] **A** Just by the title ... I have not seen one in
[15] this form. I've seen other types of coaching sessions
[16] or whatever.
[17] **Q** And -- go ahead.
[18] **MR. LISS:** Excuse me. For the record, do
[19] you want to have him describe what this is?
[20] **MR. CELLER:** Yeah, I'm going to do all
[21] that.
[22] **MR. LISS:** Okay.
[23] **MR. CELLER:** I want to lay a predicate
[24] first or a foundation.
[25] **BY MR. CELLER:**

Page 16

[1] **A** That appears to be what it is.
[2] **Q** Okay, thanks.
[3]      Are ear plugs required by line employees
[4] either by Perdue or safety standards in the
[5] industry?
[6] **A** It is an industry-wide requirement, it is a
[7] personal item that can be taken home.
[8] **Q** And would you agree that Perdue does not
[9] pay employees for the donning or doffing of ear
[10] plugs?
[11] **A** Is it not part of our consent agreement.
[12] That item was excluded from that as being a personal
[13] item that can be worn home.
[14] **Q** So is the answer no to that question?
[15] **A** Yes.
[16] **Q** Would you agree that if an employee does
[17] not wear ear plugs on the line, he or she could be
[18] written up for that?
[19] **A** Yes.
[20] **Q** And have you ever heard of an employee or
[21] a human resources employee by the name of Anita
[22] Moreno?
[23] **A** No, I have not.
[24]      (Thereupon, Plaintiff's Exhibit Number 2
[25] was marked for identification).

**BY MR. CELLER:**

[1] **BY MR. CELLER:**

[2]  **Q**  Let's go ahead and show you what's been

[3] marked as Plaintiff's Exhibit Number 2. Let me give

[4] it to your counsel first.

[5]  MR. LISS: (Reviews document).

[6]  THE WITNESS: (Reviews document).

[7] **BY MR. CELLER:**

[8]  **Q**  Showing you what's been marked as

[9] Plaintiff's Exhibit Number 2. Do you recognize the

[10] form of that document?

[11]  **A**  Yes, I do.

[12]  **Q**  And what is it?

[13]  **A**  It's a disciplinary record.

[14]  **Q**  Can you describe just for the record in

[15] what context this disciplinary record was issued?

[16]  **A**  Failure to wear ear plugs.

[17]  **Q**  While on the line; is that correct?

[18]  **A**  It doesn't really say that.

[19]  **Q**  Okay. That's a good point.

[20]  **A**  It just says "was not wearing her ear

[21] plugs."

[22]  **Q**  And as you sit here today as the

[23] designated corporate representative, do you have any

[24] reason to believe that this document was not issued

[25] by Perdue to an employee?

Page 20

[1]  item or not.

[2]  **Q**  Okay. And --

[3]  **A**  In most cases I do not see them wearing it.

[4]  **Q**  Okay. Do you know whether in instances

[5] where employees do wear the safety goggles they're

[6] paid for the time in putting them on, do you know

[7] either way?

[8]  **A**  In most cases they're wearing them they're

[9] put on at the line and they're on the clock.

[10]  **Q**  Okay. Can you identify any other personal

[11] items other than what we've identified or described

[12] that employees are required to put on off the clock?

[13]  **A**  No.

[14]  **Q**  The rubber boots that we discussed, are

[15] those considered to be safety boots?

[16]  **A**  Yeah, rubber boots are steel -- the steel

[17] toed boots that I had mentioned earlier.

[18]  **Q**  Would you agree that prior to clocking in,

[19] Perdue requires employees to have these personal

[20] items on?

[21]  **A**  From a safety standpoint through other

[22] organizations that is a requirement.

[23]  **Q**  But specifically with regard to Perdue's

[24] policies, Perdue requires its employees to have that

[25] personal equipment on prior to clocking in, correct?

Page 18

[1]  **A**  I have no reason.

[2]  **Q**  What are some other personal items that

[3] are either donned or doffed by employees, I'm going

[4] to the refer to it as off the clock.

[5]  **A**  Okay.

[6]  **Q**  Or for which they're not paid, other than

[7] what we've already discussed.

[8]  **A**  The bump cap I don't believe we've talked

[9] about.

[10]  **Q**  What's a bump cap?

[11]  **A**  The bump cap is a protective head gear that

[12] can be worn out in the plant.

[13]  **Q**  Is it required to be worn either by Perdue

[14] or industry standards?

[15]  **A**  No, it's not.

[16]  **Q**  That's an optional piece of equipment?

[17]  **A**  Uh-huh (affirmative).

[18]  **Q**  Can you answer verbally?

[19]  **A**  Yes, I'm sorry.

[20]  **Q**  Not a problem. What about shoe covers or

[21] slip covers, have you ever heard ...

[22]  **A**  No, I've not seen them or heard of them.

[23]  **Q**  What about safety goggles?

[24]  **A**  They are ... Depending on the job, they are

[25] worn and I'm actually not sure if that is a personal

Page 20

[1]  **A**  They're required to have some type of foot

[2] coverage or the other items also, yes.

[3]  **Q**  And they're not paid for putting those

[4] items on, correct?

[5]  **A**  No. In our consent agreement those items

[6] were agreed upon to be non-compensable items.

[7]  **Q**  Let me ask you a question. Do you know

[8] whether since the date of the consent agreement the

[9] law has changed as to whether those personal items

[10] are now considered compensable if put on?

[11]  MR. LISS: Objection to the form of the

[12] question.

[13]  MR. CELLER: Yeah, it's not well asked.

[14]  Let me ask it a different way.

[15] **BY MR. CELLER:**

[16]  **Q**  As you sit here today, do you know whether

[17] the law now requires that employees be paid for

[18] putting on the personal items that we've described?

[19]  MR. LISS: Objection to the form.

[20]  MR. CELLER: Fair enough.

[21] **BY MR. CELLER:**

[22]  **Q**  You can answer.

[23]  **A**  In my opinion we are bound by the consent

[24] agreement and that's what we are conducting our

[25] operations by.

**Page 21**

[1]   Q   When's the first time you got a cell
[2] phone?
[3]       MR. LISS:  Objection.
[4] BY MR. CELLER:
[5]   Q   In your life.
[6]   A   Three, four years ago.
[7]   Q   Was it one of those bigger cell phones?
[8]   A   Not necessarily -- No.
[9]   Q   Have you had the same cell phone for three
[10] or four years?
[11]   A   No.
[12]   Q   When did you get a new cell phone?
[13]       MR. LISS:  Objection to the line of
[14] questions.  Let's not play games and get to the
[15] point.
[16]       MR. CELLER:  We're not but I --
[17]       THE WITNESS:  Yeah, you've got to get
[18] home.
[19] BY MR. CELLER:
[20]   Q   I know, I know, but I'm almost done.  I've
[21] got to fill some time and I've got to justify my
[22] existence to Atlanta.  I guess the question --
[23]   A   The answer to the question, my wife's phone
[24] broke so we got new ones.
[25]   Q   Fair enough.  I'll move off the cell

**Page 23**

[1]   Q   So would you agree that in doing your
[2] audits, you don't consider as compensable time the
[3] time employees spend putting on these ear plugs and
[4] walking to punch in, for example?
[5]       MR. LISS:  Objection to the form.  You've
[6] added now an element.
[7]       MR. CELLER:  I'll take out the element.
[8] What's the element, the ear plugs?
[9]       MR. LISS:  Walking.
[10]       MR. CELLER:  Okay.  We'll go to walking
[11] next.
[12] BY MR. CELLER:
[13]   Q   Would you agree that Perdue does not
[14] consider as compensable time the time employees
[15] spend putting on these personal items?
[16]   A   Well, most of the times those items have
[17] already been put on when they get out of their car.
[18] They come to work with those items on and that was
[19] probably -- or, in fact, one of the basis for having
[20] them excluded from compensable time because they are
[21] put on out in the parking lot at home, they wear their
[22] boots to whatever.
[23]   Q   How do you know that?
[24]   A   I see them.
[25]   Q   Have you ever seen them at the Perry

**Page 22**

[1] phones, I'm just having a little bit of fun with
[2] you.
[3]       I guess my question is this:  Do you know
[4] whether Perdue has revised or revamped its donning
[5] and doffing procedures since the implementation of
[6] the consent decree in 2001 --
[7]   A   2002.
[8]   Q   -- 2002 to become more current with the
[9] times?
[10]   A   I'm not aware of that.
[11]   Q   And as far as your investigations when you
[12] go out and do an audit on site, you're still
[13] operating solely within the parameters of the 2002
[14] consent decree; is that correct?
[15]   A   That is correct.
[16]   Q   So, for example, when you do your audit,
[17] you don't count or look to see whether these
[18] personal items are being put on or off the clock;
[19] is that right?
[20]   A   The ones that are listed that we just
[21] discussed, yeah, I watch and see what they're putting
[22] on, but if it's a compensable item then it will be an
[23] issue.
[24]   Q   Okay.
[25]   A   But if not, then I just move on.

**Page 24**

[1] facility do that?
[2]   A   Yes, walking from the parking lot.
[3]   Q   How many days did you spend at the Perry
[4] facility doing your audit?
[5]   A   I was three days at the Perry plant.
[6]   Q   And you would agree that during those
[7] three days you also observed employees putting that
[8] equipment on, meaning the personal equipment, in the
[9] plant, correct?
[10]       MR. LISS:  Objection to the form.  We now
[11] have a list of personal equipment and I think
[12] you should specify.  Of course you can answer.
[13] BY MR. CELLER:
[14]   Q   Right, all the items that we've been
[15] discussing that are excluded from being compensated,
[16] you would agree that you've seen employees put those
[17] items on prior to clocking in in the plant?
[18]   A   Some, yes.
[19]   Q   Okay.  Now, have you ever done or do you
[20] know whether Perdue has ever done a time study to
[21] see how long it takes from the moment an employee
[22] walks in the front door of the plant to the front
[23] door of second processing to clock in?
[24]       MR. LISS:  Objection to the form.
[25] BY MR. CELLER:

**Page 25**

[1]    Q    That's okay, you can answer.

[2]    A    From the front door to where second

[3] processing clocks in?  At the time Perry — No, there

[4] was never one done at the Perry facility.

[5]    Q    Have you made that walk before?

[6]    A    Yes.

[7]    Q    How long does the walk take?

[8]    A    10 seconds.

[9]    Q    It's your testimony that it's a 10 second

[10] walk from the front doors to the time clock at the

[11] Perry facility in second processing?

[12]    A    Yeah.  If you walk purposefully to the ...

[13]    Q    Okay.

[14]    A    There could be some people you want to talk

[15] to or whatever, and so it's a matter -- if you want to

[16] walk from front door to the clock, not very long.

[17]    Q    Okay.  Let me ask you the same question

[18] with regard to the front door to the first

[19] processing doors and time clock.  Is it the same

[20] entrance?

[21]    A    It's the same front entrance but not the

[22] same entrance to the clocks.

[23]    Q    Do you know whether a time study has ever

[24] been done to determine how long it takes to walk

[25] from the front doors of the Perdue facility in Perry

**Page 26**

[1] to the time clock in first processing?

[2]    A    I am not aware of any.

[3]    Q    Have you done that walk before?

[4]    A    Yes.

[5]    Q    And how long approximately does it take?

[6]    A    A little bit less time than the one in

[7] second processing.

[8]    Q    So it's closer to the front door?

[9]    A    Yes.

[10]    Q    Is there a break room that you're aware of

[11] at the Perry facility?

[12]    A    Yes.

[13]    Q    Do you know whether a time study has ever

[14] been done to determine how long it takes to walk

[15] from the second processing time clock to the break

[16] room?

[17]    A    The second processing to the ... five

[18] seconds.

[19]    Q    Okay.

[20]    A    It's very close.

[21]    Q    And what about with regard to the first

[22] processing, let me ask you the two questions, one,

[23] do you know whether a time study has ever been done?

[24]    A    No, not to my knowledge.

[25]    Q    And as far as the walk from the first

**Page 27**

[1] processing to the break room, do you know

[2] approximately how long that takes?

[3]    A    It's about the same time because there's two

[4] break rooms.

[5]    Q    Okay, fair enough.  Can you describe for

[6] me the process if you know, and we can break it down

[7] by first and second processing unless you think

[8] they're both the same for description purposes, how

[9] the procedure works from the time an employee walks

[10] in the door in the morning and the time they punch

[11] in for the beginning of their shift?

[12]    A    Okay.  It depends on the individual.  They

[13] walk in and they'll sit in the break area, have coffee

[14] or whatever.  And when they're scheduled time to

[15] start, they'll go in and swipe in and go in, put their

[16] gear on to go to their respective locations.

[17]    Q    Do you know whether there's a line in the

[18] morning for employees to swipe in?

[19]    A    There are sometimes; sometimes not.  It

[20] depends on when they all get to the clock.  It's their

[21] preference on what time to get there.

[22]    Q    And if they're not on the line exactly at

[23] the time scheduled, they get reprimanded, correct?

[24]    A    There's a period of time that is given

[25] to ... if there is a number of people going to the

**Page 28**

[1] same department that are in line, there is a window of

[2] time that will not cause them to be late.

[3]    Q    Okay.  I believe it's approximately two

[4] minutes; is that correct?

[5]    A    That's ... (Nods head affirmatively).  In

[6] most cases, yes.

[7]    Q    Okay.  To your knowledge has Perdue ever

[8] examined how long employees will wait in line prior

[9] to punching in?

[10]    A    To my knowledge, no.

[11]    Q    Have you ever seen or personally have you

[12] ever personally observed how long an employee could

[13] wait in line to punch in?

[14]    A    I have not paid attention to that fact.

[15]    Q    And would you agree that while employees

[16] are waiting to punch in, they've already donned

[17] their personal gear as we've described previously

[18] during this deposition?

[19]    A    Yeah.

[20]    Q    Okay.

[21]    A    There's a lot of times as I said some of

[22] them wear it from their car.

[23]    Q    Okay.  And some of them also put it on in

[24] the plant, though, correct?

[25]    A    Yes.

Page 29

[1]   Q   Okay. Have you ever heard the expression
[2]   "first processing"?
[3]   A   Yes.
[4]   Q   And what about "second processing"?
[5]   A   Yes.
[6]   Q   Can you give me again a brief Cliff Note
[7]   description of what first processing means versus
[8]   second processing?
[9]   A   Okay. First processing is, in a Cliff Note
[10]  version, is from live hang to the chillers.
[11]  Q   And what about second processing?
[12]  A   Second processing is from birds coming out
[13]  of the chillers to a process designated by sales
[14]  requirements or raw material requirements.
[15]  Q   So, for example, would you agree that
[16]  first processing -- and tell me if this is an
[17]  accurate description -- is getting the birds ready
[18]  to be cut and I guess manufactured for sale, and
[19]  second processing would be the actual deboning and
[20]  cutting of that product?
[21]  A   Yes. First processing would be getting the
[22]  bird ready for further processing.
[23]  Q   Okay. Are all first and second processing
[24]  employees paid the same way, not the same amount,
[25]  but in the same way?

Page 30

[1]       MR. LISS: Objection.
[2]  BY MR. CELLER:
[3]   Q   Hourly, salary?
[4]   A   Yes. Hourly.
[5]   Q   Okay. And are they all subject to the
[6]  same timekeeping system of individual swipes once
[7]  they get in?
[8]   A   They all use the Kronos clocks.
[9]   Q   Would you agree that employees who work in
[10]  first processing can be moved around in different
[11]  positions on any given day within first processing?
[12]  A   We ... There is a rotation plan within each
[13]  department that we move people around within the
[14]  department for carpal tunnel, you know, for
[15]  work-related ... just the stress on the parts of the
[16]  body. But that is ... that is an industry item also,
[17]  where we just shift them around within the department.
[18]  Q   Would you agree that employees within
[19]  first processing, excuse the spin, are
[20]  interchangeable?
[21]  A   In first processing?
[22]  Q   Yeah.
[23]  A   That's a tough one to answer. Depending on
[24]  the individual, I think they could all switch around,
[25]  but would they want to is another question.

Page 31

[1]   Q   All right. Forgetting about what the
[2]  employees want, if Perdue wants an employee to work
[3]  in hanging on one day and -- What's another
[4]  processing?
[5]   A   Evisceration.
[6]   Q   -- and evisceration the next day, Perdue
[7]  could make the decision to switch them, correct?
[8]   A   They would ask. They would ask for
[9]  volunteers.
[10]  Q   And would you agree that the people that
[11]  work in both first and second processing would fall
[12]  under the category of unskilled laborers, do you
[13]  understand?
[14]      MR. LISS: Objection to the form of the
[15]  question.
[16]  BY MR. CELLER:
[17]  Q   Have you ever heard the expression
[18]  unskilled labor?
[19]  A   Yes.
[20]  Q   What's your understanding of what
[21]  unskilled labor means?
[22]  A   My opinion is that they have just been
[23]  on-the-job training and do the job as they've been
[24]  shown and they have no formal type education. That's
[25]  just my opinion on that.

Page 32

[1]   Q   Using your definition, would you agree
[2]  that all employees in first and second processing
[3]  perform unskilled labor for Perdue on the line?
[4]   A   In that definition, yes.
[5]   Q   Okay. And let me jump back for a moment.
[6]  We were talking about how safety standards require
[7]  the employees to put on that personal equipment that
[8]  they're not compensated for, do you remember when we
[9]  were discussing that earlier.
[10]  A   (Nods head affirmatively).
[11]  Q   Just answer verbally for me.
[12]  A   Yes. I'm sorry.
[13]  Q   That's okay.
[14]      Would you agree that Perdue benefits or
[15]  receives a benefit from employees complying with
[16]  these safety standards in the industry?
[17]  A   No, I do not.
[18]  Q   Okay. Does Perdue -- I'm sorry, go ahead.
[19]  A   Other than complying with OSHA laws and
[20]  things like that.
[21]  Q   And if Perdue was not in compliance with
[22]  OSHA laws, they can be subject to penalties and
[23]  things like that, correct?
[24]  A   Yes.
[25]  Q   So then by requiring its employees to put

[1] on this personal gear that they're not compensated
[2] for, Perdue does receive a benefit by maintaining in
[3] compliance with OSHA standards, correct?
[4]   MR. LISS: Objection to the form of the
[5]   question in that it's been asked and answered.
[6]   MR. CELLER: Sure.
[7] BY MR. CELLER:
[8]   Q   You can answer.
[9]   A   I don't believe we receive, the company-wise
[10] as itself, any benefit other than being in compliance
[11] with OSHA or any other safety rules and the items that
[12] are listed in our consent agreement that they're
[13] allowed to wear.
[14]   Q   Would you agree that by requiring its
[15] employees to wear these personal items, Perdue also
[16] benefits in the sense that it cuts down on workplace
[17] injuries or contamination of product?
[18]   A   That's obvious, yes.
[19]   Q   Okay. So by wearing a hair net, that's
[20] likely going to prevent hair from going into the
[21] poultry, correct?
[22]   A   That's industry standard, yes.
[23]   Q   And as a customer of Perdue — I don't
[24] know if you eat Perdue or not, if you eat Tyson I'm
[25] going to tell them — but if you eat Perdue, you

---

[1]   A   Yes.
[2]   Q   And they would be required to wear that
[3] gear for every work shift, correct?
[4]   A   Yes.
[5]   Q   You said that you were involved in the
[6] consent decree discussions with the Department of
[7] Labor back in 2001, correct?
[8]   A   I was involved in meetings. My main
[9] function was to orchestrate or coordinate the back
[10] pay.
[11]   Q   Okay. As you sit here today, do you have
[12] any knowledge as to why these personal items were
[13] excluded from being compensable by either Perdue or
[14] the Department of Labor?
[15]   A   I was not involved in those discussions.
[16]   Q   Do you know who would be or who would have
[17] knowledge of that item or topic other than Brian?
[18]   A   Someone in our HR department. There was an
[19] individual who has retired that was the coordinator of
[20] all of that with the Department of Labor and with
[21] Kronos, so there are individuals that are still in the
[22] company that were involved in that.
[23]   Q   Based on your experience at the Perry
[24] facility, your personal observations, do you have
[25] any knowledge as to whether some or most or none of

---

Page 34

[1] would agree you wouldn't want a hair in your
[2] chicken?
[3]   A   That's right. And you wouldn't want a hair
[4] in your deli going to a Subway either.
[5]   Q   Understood.
[6]   A   So ...
[7]   Q   Understood.
[8]   A   That is we're complying.
[9]   Q   Of all the personal equipment that we
[10] discussed that employees are not compensated for
[11] putting on — and this will speed up the depo if
[12] it's the right answer, no pressure — would you
[13] agree that all employees in first and second
[14] processing are required to wear that equipment?
[15]   MR. LISS: Objection to the form of the
[16]   question.
[17]   THE WITNESS: They for safety reasons are
[18]   worn, yes.
[19] BY MR. CELLER:
[20]   Q   And the reason why I ask, just so you
[21] know, is instead of us going through position by
[22] position in first processing and second processing,
[23] I'd rather just ask you generally if all the
[24] employees in first and second processing wear this
[25] personal gear.

---

Page 36

[1] the employees at Perry are illiterate, meaning
[2] unable to read?
[3]   A   I can't answer that. It would only be my
[4] guess that yeah, there's some.
[5]   Q   Okay.
[6]   A   But I don't know that for a fact.
[7]   Q   In disseminating policies and procedures
[8] to employees regarding donning and doffing, do you
[9] know whether Perdue undertakes any investigation or
[10] efforts to ensure that illiterate employees are
[11] explained how the procedures work?
[12]   A   There are times during the new hire
[13] orientation where they are told the policies of the
[14] company and they are asked whether they understand
[15] them.
[16]   Q   And is their response recorded or is it
[17] something that's handwritten?
[18]   A   There is an item ... I believe in the Perry
[19] operation they have a check-off list where they
[20] initial the items that were discussed to them.
[21]   Q   Okay.
[22]   (Thereupon, Plaintiff's Exhibit Number 3
[23] was marked for identification).
[24] BY MR. CELLER:
[25]   Q   Let me show you what we've marked as

Page 37

[1] Plaintiff's Exhibit Number 3. Let me give it to
[2] your attorney first. Which I'll represent to you is
[3] some type of -- it appears to be a Power Point
[4] training prepared by Perdue with regard to its
[5] donning and doffing procedures.
[6]     MR. LISS: (Reviews document).
[7]     THE WITNESS: (Reviews document).
[8] BY MR. CELLER:
[9]     Q    Showing you what's been marked as
[10] Plaintiff's Exhibit Number 3, I'll just ask you
[11] initially if you recognize that document.
[12]     A    Yes.
[13]     Q    What is it?
[14]     A    It's new hire documentation that they go
[15] through with all new hires at the plant.
[16]     Q    And would you agree that that Power Point
[17] describes, in short order, not in full detail,
[18] Perdue's current position on what is considered to
[19] be compensable as far as donning and doffing?
[20]     MR. LISS: Objection to the form of the
[21]     question. You can ask what this witness'
[22]     opinion is.
[23]     MR. CELLER: Yeah.
[24] BY MR. CELLER:
[25]     Q    Let's do it this way. Based on your

Page 38

[1] corporate capacity as a testifying witness here
[2] today, would you agree -- I'll even say based on
[3] your opinion -- that that is an accurate description
[4] of Perdue's current policies and procedures
[5] regarding donning and doffing?
[6]     A    (Reviews document). At the Perry plant,
[7] yes.
[8]     Q    At the Perry plant. Is this the same
[9] Power Point -- actually it's irrelevant, I don't
[10] care what happens at other plants.
[11]     MR. CELLER: That's a collective action
[12]     mentality.
[13] BY MR. CELLER:
[14]     Q    Let me show you a couple of pages from
[15] this and let's talk about them. Just for the record
[16] so we can mark it properly, this is marked ... the
[17] page is -- and I'm the idiot who Bates stamps and
[18] staples over it -- Perdue 16.
[19]         I'm showing you Perdue 16. Is that an
[20] accurate description of how Perdue defines donning
[21] and doffing?
[22]     A    That is used as a -- the beginning part of
[23] the discussion of the donning and doffing.
[24]     Q    Okay.
[25]     A    As just a recap or a brief basic definition

Page 39

[1] of the word donning and doffing.
[2]     Q    Okay.
[3]     A    And ... Okay, that's it.
[4]     Q    That's fine. Now, you see the word
[5] clothing at the end of that sentence?
[6]     A    (Nods head affirmatively).
[7]     Q    Answer verbally, please.
[8]     A    Yes.
[9]     Q    Thanks.
[10]         Who decided to use that word "clothing,"
[11] do you know?
[12]     A    Don't know.
[13]     Q    What is your understanding or your opinion
[14] as to what is deemed to be clothing pursuant to
[15] Perdue's description here?
[16]     A    That is a reference where -- to the gear
[17] that is compensable.
[18]     Q    Okay. Let's go to the next page. I'm
[19] showing you what I believe should be Perdue 14.
[20]     MR. LISS: What page?
[21]     MR. CELLER: I think it's 14, it's
[22]     consecutive. Is that 14?
[23]     MR. LISS: I thought 16 was ...
[24]     MR. CELLER: Oh, I'm sorry, then 17. It's
[25]     17.

Page 40

[1] BY MR. CELLER:
[2]     Q    Showing you Perdue 17, can you take a
[3] look, please, and read into the record the
[4] description of how Perdue defines First Principal
[5] Activity?
[6]     A    "The first physical act which is required by
[7] law, company, and/or nature of the job, by the
[8] associate (donning)."
[9]     Q    Okay.
[10]     A    In parentheses.
[11]     Q    Now, we discussed previously that the
[12] personal items that are six that he employees
[13] respect not paid for are required, correct?
[14]     A    By other organizations or agencies and you
[15] know foot safety, those type things.
[16]     Q    Do you know whether there's a law, for
[17] example, an OSHA law or regulation that requires
[18] that equipment to be worn?
[19]     THE WITNESS: No.
[20]     MR. LISS: Objection to the form, calls
[21]     for a legal analysis.
[22] BY MR. CELLER:
[23]     Q    If you know.
[24]     A    I don't know.
[25]     Q    Okay. Taking your prior testimony where

Perdue Farms, Inc.

Page 41

[1] we agreed that it was required, not necessarily by
[2] Perdue but by some agency.
[3]    A   I ...
[4]    Q   Go ahead.
[5]    A   The requirement is -- on our end is not a
[6] requirement by a compensable item, if we're talking
[7] about the items that we call personal that they can be
[8] taken home.
[9]    Q   I understand what you're saying, but just
[10] to bring it into a more clear perspective, when we
[11] marked Plaintiff's Exhibits 1 and 2, Perdue does
[12] require these items to be worn because if employees
[13] don't wear them they get written up, correct?
[14]    A   They're required for other reasons, safety
[15] reasons.
[16]    Q   Regardless of the reasons, Perdue requires
[17] them to be worn?
[18]    A   You could say that, yes.
[19]    Q   So would you agree then based upon the
[20] requirement that they need to be worn, those items
[21] should fall based upon this definition in Perdue 17
[22] as being compensable or as donning?
[23]    MR. LISS:  Objection.
[24] BY MR. CELLER:
[25]    Q   You can answer.

Page 43

[1] time they take off that personal gear when they
[2] begin their break, correct?
[3]    A   Nine ... Normally they do not take that gear
[4] off.  They'll be in the break area with their hair
[5] nets still on.  They may pull their beard net down
[6] over their face to eat, the ear plugs will be dangling
[7] from their bump cap, but normally they wear them when
[8] they go to break.
[9]    Q   Are there any studies that you're aware of
[10] that Perdue has conducted at its Perry facility that
[11] will confirm what you just testified to?
[12]    A   No, I'm not aware of any studies, no.
[13]    Q   And at the end of the day when employees
[14] are done with their work shift, would you agree that
[15] Perdue does not pay them for taking off that
[16] personal equipment as they're leaving the plant?
[17]    A   Depending on their preference, some may take
[18] them off and some may not.
[19]    Q   Okay.  But again --
[20]    A   Some store them in their locker, which
[21] they're allowed, and some wear it home.
[22]    Q   And if you can read the final bullet point
[23] into the record.
[24]    A   "You get paid from the time you perform the
[25] First Principal Activity," which is in capital letters

Page 42

[1]    A   I don't believe so.
[2]    Q   Why not?
[3]    MR. LISS:  Objection.
[4]    THE WITNESS:  We have an agreement with
[5] the government that excluded them because they
[6] can be worn home and they can be stored in the
[7] locker or taken home, they are not part of the
[8] production environment.
[9] BY MR. CELLER:
[10]    Q   Okay.  Take a look at Last Principal
[11] Activity, which is the bullet point right
[12] underneath.
[13]    A   Uh-huh (affirmative).
[14]    Q   And I'm going to ask you the same line of
[15] questioning.  First, can you read that into the
[16] record?
[17]    A   Okay.  "The last physical act which is
[18] required by law, company, and/or nature of the job, by
[19] the associate (doffing)".
[20]    Q   Okay.  Now, doffing essentially means
[21] taking off the gear at the end of the day, correct?
[22]    A   At the end of the day, yes.
[23]    Q   Or, for example, on a break?
[24]    A   Yes.
[25]    Q   Perdue does not pay its employees for the

Page 44

[1] FPA, "to the Last Principal Activity," which is in
[2] capital letters, LPA, "excluding any unpaid breaks."
[3]    Q   Let me ask you a hypothetical question.
[4] Let's assume in some crazy world that somebody
[5] determined that the ear plugs were considered to be
[6] items that needed to be compensated when put on.
[7] Would you agree then that within these definitions
[8] of First Principal Activity and Last Principal
[9] Activity that they would be considered compensable?
[10]    MR. LISS:  Objection to the form of the
[11] question.
[12] BY MR. CELLER:
[13]    Q   Please don't ask me to repeat it because I
[14] don't think I could.
[15]    A   I'm trying to come up with an answer.
[16]    Q   Okay, fair enough.
[17]    A   In my area what I'm focusing on right now,
[18] that has not come up.  And if we were required by an
[19] adjustment I guess to our consent agreement to include
[20] it then we would, but right now the consent agreement
[21] does not include that.
[22]    Q   Do you have any knowledge as to whether
[23] since the consent decree was created in 2002 Perdue
[24] has requested any type of updated guidance as to
[25] whether that agreement is still in compliance with

Page 45

[1] law?

[2]     MR. LISS: Objection.

[3] BY MR. CELLER:

[4]   Q   If you know.

[5]   A   I'm not aware.

[6]   Q   Do you know whether Perdue receives any

[7] types of case updates or, you know, law flashes from

[8] the Department of Labor to ensure that they're still

[9] complying with the laws and regulations?

[10]     MR. LISS: Objection.

[11] BY MR. CELLER:

[12]   Q   You can answer again, if you know.

[13]   A   I'm not sure. I would assume somebody would

[14] but I'm not sure.

[15]   Q   Let's go to the next part of it.

[16]     Okay. Showing you, what is that, 18? It

[17] should be 18.

[18]   A   (Reviews document).

[19]   Q   Why don't we just rip it apart and I'll

[20] re-staple it at the end.

[21]   A   I believe it's 18.

[22]   Q   You can just pull the whole thing apart,

[23] don't worry about it.

[24]   A   It might rip the numbers off. It's 18.

[25]   Q   That would make my job more difficult.

Page 47

[1]   Q   Next page.

[2]     MR. LISS: Just to be clear, do you want

[3] him to read into the record what's on the left

[4] side and what's on the right side?

[5]     MR. CELLER: Sure.

[6] BY MR. CELLER:

[7]   Q   Why don't you do that.

[8]   A   On the ones that are not considered

[9] compensable are ear plugs, hair nets, beard nets,

[10] safety boots, and bump caps.

[11]     On the right side, which is in

[12] compensable, are lab coats, gloves, clip boards,

[13] tools, aprons, sleeves, paperwork, etc.

[14]   Q   Let's go to number 20. Would you agree

[15] that this is consistent with what we've previously

[16] discussed, that employees are required to have those

[17] personal items that we just described on the

[18] left-hand side on prior to swiping in?

[19]   A   Yes.

[20]   Q   I think that may be it, sorry. I'm going

[21] to let you flip them.

[22]   A   I could mess it up for you.

[23]   Q   No, please, because then Brian's copies

[24] are going to be all screwed up. You can just flip

[25] the whole thing if you don't mind.

Page 46

[1]     Take a look at bullet point 1 on number

[2] 18. And it says there, "All associates must be

[3] clocked in prior to," and it's bold and underlined,

[4] "donning supplies."

[5]   A   (Nods head affirmatively).

[6]   Q   I'm assuming based upon our prior

[7] conversations that Perdue excludes from the words

[8] supplies the personal equipment that we've

[9] discussed?

[10]   A   Correct.

[11]   Q   And the same thing with regard to the next

[12] bullet point where it says, "You must doff supplies

[13] prior to clocking out," again, Perdue does not

[14] consider those personal items to be considered

[15] supplies?

[16]   A   Correct.

[17]   Q   Is that right?

[18]   A   (Nods head affirmatively).

[19]   Q   Okay. If we go to Perdue 19, is this an

[20] accurate description of what Perdue considers on the

[21] left side of the document items that are not

[22] compensated for being put on or taken off, and on

[23] the right side items that employees are compensated

[24] for?

[25]   A   Yes.

Page 48

[1]     Do you know who prepared this Power Point?

[2]   A   Now, this would be a guess on a specific

[3] person, but I'm going to guess someone in the human

[4] resource department because they are the ones that

[5] conduct or coordinate the new hire orientation.

[6]     MR. CELLER: Off the record for a second.

[7]     (Thereupon, an off-the-record discussion

[8] ensued).

[9]     (Thereupon, Plaintiff's Exhibit Number 4

[10] was marked for identification).

[11] BY MR. CELLER:

[12]   Q   Showing you what's been marked as

[13] Plaintiff's Exhibit Number 4, do you recognize that

[14] document?

[15]   A   (Reviews document).

[16]   Q   What is it?

[17]   A   It is a standard operating procedure for the

[18] Perry facility for start of shift, break, and end of

[19] shift.

[20]   Q   And would you agree that that is an

[21] accurate statement of Perdue's current – I'm trying

[22] to think of a nice description for it – current

[23] policies and procedures regarding First Principal

[24] Activity at the Perry facility?

[25]   A   (Reviews document).

**Page 49**

[1]   Q   You can take your time and look through
[2] it.
[3]   A   (Reviews document).  Yes.
[4]   Q   When the employees come in in the morning
[5] and they finally swipe their cards, they go out to
[6] the line and work for a finite period of time,
[7] correct?
[8]   A   (Nods head affirmatively).
[9]   Q   I'm just setting this up to explain where
[10] I'm going.
[11]   A   Roundabout, yes.  Yes.
[12]   Q   How many lunch breaks do the employees who
[13] work in first and second processing get?
[14]   A   They at the Perry plant receive two.
[15]   Q   And do you know what times they ... Well,
[16] I assume that the times vary depending on
[17] department, correct?
[18]   A   Yes.
[19]   Q   What are the breaks that they get?  Are
[20] they two 30-minute unpaid breaks?
[21]   A   Yes.
[22]   Q   Now, can you explain to me how employees
[23] know it's time to go to break?
[24]   A   It depends.  Well, they know when their
[25] supervisor tells them.

**Page 50**

[1]   Q   When they are told to go to break, can you
[2] explain for me the procedures that they must undergo
[3] before clocking out as far as taking off their gear?
[4]   A   There are designated areas where they hang
[5] their gear and then proceed to the clocks.
[6]   Q   Once they punch out for lunch break, can
[7] you describe to me the process by -- or how
[8] employees go to break and then what the procedure is
[9] for coming back to break?  Is that too vague of a
[10] question, do you want me to be more specific?
[11]   A   No, I can answer that.  It depends on the
[12] associate what they do after they swipe out.  They get
[13] a full 30-minute break, they can do what they feel
[14] like doing, they can go outside if they want and eat
[15] their lunch out there if they brought it.  Or there is
[16] a cafeteria at the Perry plant, they can eat at the
[17] cafeteria.  Or they can just sit around in the break
[18] areas and chat.  It all depends on them.  There are
[19] microwaves there available for them to heat up their
[20] food.
[21]   Q   And is there a bell or a whistle or
[22] something that notifies employees that their break
[23] period is almost over and they need to start heading
[24] back to work?
[25]   A   No.

**Page 51**

[1]   Q   So are employees aware or are they told
[2] that approximately five to seven minutes before
[3] their break is over they need to start heading back
[4] in?
[5]   A   They are not told anything.
[6]   Q   Do you know whether employees actually
[7] start heading toward the time clocks to put their
[8] gear on prior to the 30 minutes being over?
[9]   A   There are some that head to the clocks
[10] sooner than others, but they are not forced.
[11]   Q   How many employees based upon your
[12] knowledge typically go to break at once?
[13]   A   It varies.
[14]   Q   Can you give me the range based on your
[15] best observation?
[16]   A   The maximum I want to say is around 200?
[17]   Q   And what's the minimum?
[18]   A   One.
[19]   Q   Okay, understood.
[20]       How many time clocks are there in first
[21] processing for employees to punch in on?
[22]   A   Five.
[23]   Q   And are those the total number of time
[24] clocks where employees need to punch in for or punch
[25] out for breaks or at the end of the day?

**Page 52**

[1]   A   They use the same clocks.
[2]   Q   How long approximately does it take to
[3] punch in and out?
[4]   A   Oh, a matter of seconds to swipe them
[5] through the clock.
[6]   Q   They're required to double swipe, right?
[7]   A   That is their procedure.
[8]   Q   At Perry?
[9]   A   At Perry.
[10]   Q   Have you ever seen at the end of a lunch
[11] break where let's say there's 200 employees where
[12] employees are waiting in line 10 deep to wait to
[13] swipe in on a time clock?
[14]   A   I have seen that, yes.
[15]   Q   And if employees are not on the line
[16] within I'll say 32 minutes, because they get a two
[17] minute grace period, after their lunch break, they
[18] would be written up, correct?
[19]   A   Yes.
[20]   Q   So if an employee is required to wait to
[21] punch in, what do you estimate to be --
[22]   A   They are not required to wait to punch in.
[23]   Q   You're right.  If an employee is waiting
[24] to punch in, what do you estimate to be the wait
[25] time if there are 200 employees trying to clock in

[1] to be on time?

[2] A   I wouldn't have the vaguest idea what an

[3] average would be.

[4] Q   Would you agree with me that the realities

[5] of the situation would require that an employee

[6] start getting in line to punch back in prior to the

[7] 30 minutes expiring so that they can be on time?

[8] A   In some of their thinkings, yes, they know

[9] it's a 30-minute break and there are clocks available

[10] in the break area where they could see what time their

[11] break is up and then they'll start heading to the

[12] clock, yes.

[13] Q   But they'll start heading toward the clock

[14] prior to the end of the 30-minute period?

[15] A   It's their preference to do that if they

[16] want.  And if they want they feel comfortable going to

[17] the clock sooner than later, yeah.

[18] Q   Well, do you think it's feasible for 200

[19] employees to head to the time clock and clock in

[20] within two minutes?  Can that happen?

[21] A   Remember, there are a number of clocks, that

[22] they're not all on the same clock.

[23] Q   Okay.  But I guess -- you said there were

[24] five clocks in first processing, right?

[25] A   Yes.

[1] A   They don't have to, not at the Perry

[2] facility.

[3] Q   I understand.  Do you think it's realistic

[4] for an employee to take a full 30-minute lunch and

[5] then walk to the time clock to punch in to be back

[6] on the line for their scheduled shift?

[7] A   If they're in the break area they could do

[8] that, yes.

[9] Q   Okay.  Are there locker rooms at the

[10] Perdue facility?

[11] A   In the Perry facility, yes.

[12] Q   I'm sorry, Perry, yes.

[13] A   Yes.

[14] Q   What is the purpose of having the locker

[15] rooms there?

[16] A   That's to store their coats, purses,

[17] personal items.  They can store bump caps and things

[18] like that.

[19] Q   Does every employee have a locker?

[20] A   Now, I ... they should, but since the plant

[21] has grown, they -- and when I was down there I know

[22] they didn't have enough, they were going to get some

[23] more, but everyone will have one, and it may not be

[24] the case now but it depends on the growth of the

[25] plant.

Page 54

Page 56

[1] Q   And how many in second processing?

[2] A   I believe there are six.

[3] Q   Okay.  And based upon your observation,

[4] would you say maybe five seconds it takes maximum to

[5] swipe in and out?

[6] A   With two swipes, yes.

[7] Q   So then would you agree with me that

[8] employees are required -- not required, but the

[9] realities of the situation are that if an employee

[10] is going to be back on the line in a timely manner,

[11] they would have to leave their lunch period early to

[12] do so?

[13] A   In the reality of our breaks if ... and

[14] there are supervisors at the clocks, and if

[15] individuals are on the line and it does for some

[16] reason take longer than the two minutes, they are not

[17] written up.  They are not written up just because they

[18] are late.  Each occurrence or instance is looked into

[19] and the supervisor being there will see Mary was in

[20] line, she was toward the end, someone had a problem

[21] with their card, it took longer for them to get

[22] through, they would not be written up.

[23] Q   And I'm not focusing on the write-ups as

[24] much as I am whether employees actually have to

[25] leave their break early to clock in on time.

[1] Q   Okay.

[2] A   But ...

[3] Q   Are the locker rooms separate for men and

[4] women?

[5] A   The locker rooms are not.  Or the locker

[6] area, let me change that.  It's not a room, it's a

[7] locker area.  They have separate other rooms for men

[8] and woman.

[9] Q   Okay, fair enough.

[10]     At the end of the day, and we discussed

[11] about going to breaks and punching back in.  At the

[12] end of the day when the employee's shift is over,

[13] can you describe for me from the time they clock out

[14] to the time they leave the doors what takes place?

[15] When I say leave the doors, leave the plant.

[16] A   They get off -- whenever the shift is done

[17] they'll doff their gears and dispose of them

[18] accordingly, whether to throw them away or put them in

[19] a bin for re-washing.

[20] Q   Okay.

[21] A   Clock out.  And then either head to their

[22] car, head to their locker, go back to the cafeteria,

[23] sit down.

[24] Q   Okay.

[25] A   Have a coffee or whatever.  They might be

Page 57

[1] carpooling with somebody. So there's various things
[2] that could be done.
[3]    Q    Are they required to do any paperwork or
[4] anything else once they have clocked out at the end
[5] of the day?
[6]    A    No. No one is required to do any paperwork
[7] after they've clocked out.
[8]    Q    And would you agree that at the end of the
[9] day after they've clocked out, many of these
[10] employees at that point will then begin taking off
[11] their ear plugs and beard nets and hair nets?
[12]    A    It's a possibility. Again, some of them
[13] wear it to their car.
[14]    Q    Fair enough. Are they paid for that time
[15] from when they clock out to the time they walk to
[16] their car if they're still wearing their gear?
[17]    A    No. That is a non-compensable item in our
[18] consent agreement.
[19]    Q    Okay, fair enough.
[20]        (Thereupon, a brief recess ensued at
[21]    approximately 10:55 a.m. and the proceedings
[22]    subsequently resumed at approximately 11:00
[23]    a.m. with all parties present).
[24]        (Thereupon, Plaintiff's Exhibit Number 5
[25]    was marked for identification).

Page 59

[1] BY MR. CELLER:
[2]    Q    Can you describe to me how that document
[3] came to be?
[4]        MR. LISS:  Objection to the form of the
[5]    question. That's asking for attorney-client
[6]    privileged information.
[7] BY MR. CELLER:
[8]    Q    What information did you rely upon to
[9] prepare that declaration?
[10]    A    I didn't prepare it but I read it. And at
[11] the time I thought everything was accurate.
[12]    Q    Did you make any edits to it prior to
[13] signing it?
[14]    A    No, I did not.
[15]    Q    How long did you review it before you
[16] signed it?
[17]    A    I was on the road so it wasn't ... it was
[18] like a five minute deal.
[19]    Q    Did you review any of your notes from the
[20] Perry facility, your on-site, prior to signing that
[21] declaration?
[22]    A    No, I was not. I did not.
[23]    Q    Did you take any notes when you were
[24] on-site at the Perry facility in April of '07?
[25]    A    I have some audit papers, yes.

Page 58

[1] BY MR. CELLER:
[2]    Q    Let me show you what's been marked as
[3] Plaintiff's Exhibit Number 5 and ask you to turn to
[4] the last page of the document and ask you -- not to
[5] the very last page, I guess the last page with your
[6] signature, or with a signature.
[7]    A    Yes.
[8]    Q    Is that your signature on that document?
[9]    A    Yes.
[10]    Q    And what is the document you're holding
[11] marked as Plaintiff's Exhibit 5?
[12]    A    Declaration of Dave Tabinowski.
[13]    Q    And did you prepare that? Did you type
[14] that yourself?
[15]    A    No, I did not.
[16]    Q    Do you know who typed it?
[17]        MR. LISS:  Objection to the form of the
[18]    question.
[19]        THE WITNESS:  No, I don't know who typed
[20]    it.
[21] BY MR. CELLER:
[22]    Q    Can you describe --
[23]        MR. CELLER:  And, Brian, I'm cautious of
[24]    the attorney-client issue, so if I encroach on
[25]    it, just stop me.

Page 60

[1]    Q    And where are those papers now?
[2]    A    They are in our ... we have a software
[3] system called Auto Audit, we have electronic work
[4] papers.
[5]        MR. CELLER:  Can I get those, Brian?
[6]        MR. LISS:  You haven't requested it to
[7]    date. Submit a request in writing and we'll
[8]    review it for any potential objections and
[9]    whether or not it's discoverable information.
[10]        MR. CELLER:  I think you guys have to
[11]    supplement, I mean, if documents ... But we'll
[12]    talk about that after the deposition.
[13]        MR. LISS:  I know we have an obligation to
[14]    supplement when appropriate, I'm not saying
[15]    that your request now is one that we would need
[16]    to supplement for.
[17]        MR. CELLER:  Fair enough.
[18] BY MR. CELLER:
[19]    Q    Are employees required to wash their
[20] hands -- Strike that.
[21]        Before we get there, as you sit here
[22] today, do you believe that everything that's
[23] contained within this declaration is true and
[24] accurate to the best of your knowledge?
[25]    A    At this time, no.

**Page 61**

[1]     Q   Can you tell what changes, if any, you
[2] would make?
[3]     A   There are two items in here that should
[4] change.
[5]     Q   Tell me what they are.
[6]     A   When I got to back to the office, the audit
[7] was done in February of '07, and they do have two
[8] breaks versus one.
[9]     MR. LISS: Let me just ...
[10]     MR. CELLER: Yeah.
[11]     MR. LISS: Just to streamline this,
[12] because if you don't ask now I'm going to ask
[13] later.
[14]     MR. CELLER: Sure.
[15]     MR. LISS: Maybe it would be good to go to
[16] the paragraph and make the change on the
[17] record.
[18] BY MR. CELLER:
[19]     Q   Do it. Do you want a pen?
[20]     A   I've got one right here.
[21]     MR. LISS: And why don't you describe what
[22] you're doing.
[23] BY MR. CELLER:
[24]     Q   Articulate it, yeah.
[25]     A   Okay. On page 1 I am changing in item 2, it

**Page 62**

[1] appears to be the second sentence, it says, "In April
[2] of this year I conducted a First Principal Activity
[3] Audit," I'm changing that from April to February.
[4]     And ... Let me find it. On the other one
[5] on page 3, item number 8 where it says, "Hourly
[6] poultry processing employees at Perdue's poultry
[7] processing plant in Perry, Georgia have one
[8] 30-minute unpaid break," I am changing the "one"
[9] 30-minute break to "two" 30-minute breaks.
[10]     Q   Okay.
[11]     A   Do you want me to initial it and date it?
[12]     MR. LISS: (Shakes head negatively).
[13] BY MR. CELLER:
[14]     Q   You're sitting here under oath so I have
[15] no issue with that.
[16]     MR. LISS: And I can tell you just on the
[17] record that we're going to supplement this with
[18] a second declaration, just to clarify it for
[19] the record.
[20]     MR. CELLER: And just so I understand,
[21] Brian, will those be the only changes in your
[22] declaration or will there be others?
[23]     MR. LISS: Those -- as far as I
[24] understand, this is Dave's declaration, these
[25] are the only two corrections that he has

**Page 63**

[1] directed to my attention; if there are others
[2] we would certainly clarify as well.
[3]     MR. CELLER: Okay, fair enough.
[4]     MR. LISS: And there might also be a
[5] second declaration.
[6]     MR. CELLER: Okay, fair enough.
[7] BY MR. CELLER:
[8]     Q   Other than those two changes that you've
[9] made here today, are there any other changes that
[10] you would make to this declaration as you sit here
[11] today?
[12]     A   Not to my knowledge right now.
[13]     Q   And were you as truthful in preparing this
[14] declaration as you have been under oath here today?
[15]     A   Yes.
[16]     Q   Okay.
[17]     A   With the changes.
[18]     Q   Is there anything that you've testified to
[19] so far here today that you believe you may have
[20] mis-testified or that's inaccurate?
[21]     A   No.
[22]     Q   What did you do to prepare for your
[23] deposition here today? I don't want to know who you
[24] met with, I just want to know what you did.
[25]     A   When I got back to the office after knowing

**Page 64**

[1] that I was going to be deposed, I reviewed my audits
[2] at the Perry location.
[3]     Q   You didn't bring those notes with you, did
[4] you?
[5]     A   No.
[6]     Q   Are you sure about that?
[7]     A   No, I don't have them.
[8]     Q   Are they in your car?
[9]     A   I don't have a car here.
[10]     Q   Anything other than ... Did you do
[11] anything other than review those audit notes from
[12] the February of '07 audit?
[13]     A   Talk with people.
[14]     Q   Other than your attorney or any attorneys
[15] that represent Perdue, did you speak with anybody at
[16] the Perry, Georgia facility to prepare for your
[17] deposition here today?
[18]     A   I talked with an individual just to verify
[19] my notes that there were two breaks versus one.
[20]     Q   Who was that individual?
[21]     A   Steve Passwater.
[22]     Q   What does he do for Perry?
[23]     A   He is the regional accounting manager.
[24]     Q   One more question on the notes. Are they
[25] in your luggage here today?

[1] A. No. I have copies of this but that's it.

[2] Q. And by "this" you're referring to the

[3] declaration?

[4] A. Uh-huh (affirmative).

[5] Q. Okay. How long was your conversation with

[6] that gentleman you just identified?

[7] A. On that related matter?

[8] Q. Yeah.

[9] A. 30 seconds.

[10] Q. Did you speak with anybody else other than

[11] attorneys at Perdue's Perry facility regarding

[12] preparation for your deposition here today?

[13] A. No.

[14] Q. Did you review any other documents other

[15] than what you've identified as your audit notes to

[16] prepare for your deposition here today?

[17] A. No.

[18] Q. Let's go ahead and back-mark this as

[19] Plaintiff's Exhibit 6.

[20] (Thereupon, Plaintiff's Exhibit Number 6

[21] was marked for identification).

[22] BY MR. CELLER:

[23] Q. I'll represent to you this is a Notice of

[24] Taking Deposition in this matter.

[25] A. Okay.

[1] question. Are you guys willing to stipulate

[2] that whatever is on their time records is what

[3] Steve -- what is it, Steve Passwater is it?

[4] MR. LISS: Steve Passwater.

[5] MR. CELLER: That he would testify that

[6] those are true and correct copies of the hours

[7] worked?

[8] MR. LISS: You know, assuming that I would

[9] have a chance to review the documents and show

[10] them to him, I would imagine that would be the

[11] case, yes.

[12] MR. CELLER: Okay. For now let's say we

[13] may want to depose him, but unlikely.

[14] MR. LISS: Okay.

[15] BY MR. CELLER:

[16] Q. The other two topics would you agree -- Do

[17] you mind if I call you Dave?

[18] A. Yeah, that's fine.

[19] Q. Dave, would you agree that you're the

[20] person that's been designated as the proper

[21] representative --

[22] A. Yes.

[23] Q. Okay, fair enough.

[24] Now, let me show you ... Let's go back and

[25] mark this or refer to what's been marked as

---

Page 66

[1] Q. And as Brian was trained, as was I, I'm

[2] not going to ask you if you're the person with the

[3] most knowledge, I'm just going to ask you if you're

[4] the appropriate corporate representative to testify

[5] to the three topics identified here today.

[6] A. Two of the three.

[7] Q. Which ones are you prepared to testify to?

[8] A. I am not able to testify on the knowledge of

[9] the hours worked by plaintiffs.

[10] Q. Okay. Do you know who would be?

[11] A. That would be Steve Passwater and possibly

[12] corporate payroll.

[13] MR. CELLER: Brian, will you make them

[14] available for a reopening?

[15] MR. LISS: I wanted to mention, this was

[16] actually the topic of my e-mail to Deidre.

[17] MR. CELLER: Yeah.

[18] MR. LISS: You know, certainly I can't

[19] imagine we would oppose you being able to

[20] depose Steve Passwater. I have to say, if

[21] you're really asking for information about

[22] hours worked by plaintiffs while employed by

[23] Perdue, that we could just give you the

[24] information.

[25] MR. CELLER: Well, I guess here's the

Page 68

[1] Plaintiff's Exhibit Number 4. Do you recall looking

[2] at that document?

[3] A. Yes.

[4] Q. When was that document first implemented

[5] or prepared by Perdue?

[6] A. At the Perry location?

[7] Q. Yes.

[8] A. I'm not sure of the specific date. Once

[9] we ... it was shortly after the acquisition.

[10] Q. And when was the acquisition?

[11] A. 2004 I believe.

[12] Q. And who did you guys acquire it from, do

[13] you know?

[14] A. I believe it was Cagle.

[15] Q. And were all of the employees who were

[16] working at Cagle, not all of them but was the plan

[17] that whoever was working at Cagle just now stayed on

[18] as a Perdue employee?

[19] A. No. I believe they went and did a rehire of

[20] everyone.

[21] Q. Do you know whether the same number of

[22] employees -- or strike that.

[23] Do you know whether a number of employees

[24] that came over to Perdue were initially from

[25] Cagle's?

---

**Page 69**

[1]  A  I can't answer it truthfully, but I'm going
[2]  to say the majority of them were.
[3]      (Thereupon, Plaintiff's Exhibit Number 7
[4]  was marked for identification).
[5]  BY MR. CELLER:
[6]  Q  Let me show you what we're going to mark
[7]  as Plaintiff's Exhibit Number 7.
[8]      MR. LISS:  Are they both number 7 or is
[9]  one 7 and one 8?
[10]     MR. CELLER:  No, one's 7 and one's going
[11] to be 8.
[12]     MR. LISS:  Okay.
[13]     MR. CELLER:  We'll mark Annie Bray as 7.
[14] BY MR. CELLER:
[15] Q  I'm showing you what's been marked as
[16] Plaintiff's Exhibit Number 7, which I'll represent
[17] to you is a First Principal Activity Performance
[18] Standards and Perry Plant Discipline Program signed
[19] by one of our plaintiffs in this case, Annie Bray.
[20] A  Uh-huh (affirmative).
[21] Q  Here's my question for you.  Ms. Bray has
[22] worked for Perdue since the time they acquired the
[23] plant is our understanding.
[24] A  (Nods head affirmatively).
[25] Q  Can you explain to me why for the first

**Page 71**

[1]  Q  Do you know whether Perdue upon learning
[2]  of this lawsuit enacted any type of measures to
[3]  determine whether its practices were in compliance
[4]  with the Fair Labor Standards Act?
[5]      MR. LISS:  Objection to the form of the
[6]  question.
[7]      THE WITNESS:  I'm not aware of any.
[8]  BY MR. CELLER:
[9]  Q  And as you sit here today, do you know why
[10] this document was executed on March 16th, 2007?
[11] A  No, I cannot, truthfully.
[12] Q  Did Perdue require or does Perdue require
[13] each of its employees at the Perry facility to
[14] execute the document, the form of which is marked as
[15] Plaintiff's Exhibit Number 4?
[16] A  All new hires I believe according to the
[17] Power Point would be required to do that.
[18] Q  What about old hires?
[19] A  That would be a management decision whether
[20] to go back or not.
[21]     (Thereupon, Plaintiff's Exhibit Number 8
[22] was marked for identification).
[23]     MR. CELLER:  We'll do the next one as 8,
[24] Brian.
[25]     MR. LISS:  Okay.  (Reviews document).

**Page 70**

[1]  time in her file she was given a copy of this policy
[2]  in March of '07?
[3]      MR. LISS:  Objection to the form of the
[4]  question.
[5]  BY MR. CELLER:
[6]  Q  Strike that.
[7]      Let me ask you this question.  Do you know
[8]  why this document was first signed by Ms. Bray in
[9]  '07?
[10]     MR. LISS:  Objection.  Again, it doesn't
[11] say that.
[12]     MR. CELLER:  That's fine.
[13] BY MR. CELLER:
[14] Q  You can answer it.
[15] A  No.
[16] Q  Subsequent to learning that Perdue was
[17] going to be sued, do you know whether Perry took any
[18] measures to ensure compliance with the overtime
[19] laws?
[20]     MR. LISS:  Objection to the form of the
[21] question.
[22] BY MR. CELLER:
[23] Q  If you know.
[24] A  Repeat that, please.
[25] Q  Strike.  That's fine.

**Page 72**

[1]  BY MR. CELLER:
[2]  Q  Who in management by the way made that
[3]  decision to determine whether employees were going
[4]  to sign off on this document?
[5]      MR. LISS:  Objection to the form of the
[6]  question.
[7]  BY MR. CELLER:
[8]  Q  You can answer.
[9]  A  Each of our plants during the consent
[10] agreement phase prepared Standard Operating Procedures
[11] similar to this, not the same but similar to this that
[12] was reviewed by the government and approved by the
[13] government and they are reviewed by new hires during
[14] their orientation.
[15] Q  Did you —
[16] A  Some have them signed but Perry has them
[17] sign the bottom of it.
[18] Q  Is it your understanding that if an
[19] employee received this type of training at the Perry
[20] facility, they would have signed off on this
[21] document?
[22] A  If they received the new hire training, yes.
[23] Q  Do you know —
[24] A  Or in the case of — in this case this was a
[25] new — an older individual, or "older" being working

**Page 73**

[1] at the plant, they were — they went through an
[2] orientation of that matter.
[3] **Q** Do you know whether some employees who
[4] have worked at the Perry facility since 2005 do not
[5] have copies of what we've marked as Plaintiff's
[6] Exhibit Number 4 in their file?
[7] **A** I am not aware of that.
[8] **Q** Can you think of any reason why it
[9] wouldn't be in any of those employees' files?
[10] **A** Not any reason, no.
[11] **Q** Okay, is it — Well, I'm not going to ask
[12] if it's possible.
[13] Let's show you what's been marked as
[14] Plaintiff's Exhibit Number 8 which I'll represent to
[15] you is again another First Principal Activity
[16] Associate Performance Standards and Perry First
[17] Discipline Program executed by —
[18] **A** Mary Harrell.
[19] **Q** Mary Harrell. Who I'll also represent to
[20] you was hired well prior to March 18th of '07.
[21] **MR. LISS:** Just for the record, you read
[22] the title wrong.
[23] **MR. CELLER:** That's all right.
[24] **MR. LISS:** But I can agree, we're talking
[25] about Exhibit 8, whatever it says on the top —

**Page 74**

[1] **MR. CELLER:** Fair enough.
[2] **MR. LISS:** — is what it says.
[3] **BY MR. CELLER:**
[4] **Q** Would you agree that — Strike that.
[5] Do you have any knowledge as to why this
[6] document was signed by her on March 18th, 2007?
[7] **A** No.
[8] **Q** Do you know whether prior to March 18th of
[9] 2007 this document or any form similar to that was
[10] given to her?
[11] **A** No, I'm not aware.
[12] **Q** Let me ask you the same question with
[13] regard to Plaintiff's Exhibit Number 7. Do you know
[14] whether prior to March 16th of 2007 this document or
[15] something similar to it was given to Ms. Bray?
[16] **A** I'm not aware.
[17] **Q** Are employees required to wash their hands
[18] prior to getting on the line?
[19] **A** They wash their hands on the clock.
[20] **Q** On the clock. Okay. And at the end of
[21] the day are they required to wash their hands?
[22] **A** It is a personal preference to do so.
[23] **Q** Okay. But are they required to do so?
[24] **A** I've never seen that being a requirement to
[25] wash their hands to leave the plant, no.

**Page 75**

[1] **Q** Would there be — To your knowledge based
[2] upon keeping in compliance with safety concerns —
[3] Strike that.
[4] When employees wash their hands, those
[5] that do at the end of the day, is it on or off the
[6] clock?
[7] **A** They are given the opportunity to wash their
[8] hands on the clock. I have seen where they have gone
[9] straight to the bathroom off the clock and did the
[10] same.
[11] **Q** Okay.
[12] **A** So we give them the opportunity to wash
[13] their hands.
[14] **Q** What about during breaks. When the break
[15] whistle blows, do employees wash their hands prior
[16] to going on break?
[17] **MR. LISS:** Objection to the form of the
[18] question. There's no break whistle.
[19] **MR. CELLER:** Strike that. No whistle,
[20] okay.
[21] **BY MR. CELLER:**
[22] **Q** Prior to employees going on break, are
[23] they required to wash their hands?
[24] **A** They do that as a personal preference.
[25] There is no requirement to wash their hands, we give

**Page 76**

[1] them the opportunity to wash their hands. There are
[2] sinks available.
[3] **Q** But while they're on the clock, there's no
[4] directive that they wash their hands prior to going
[5] to lunch break, correct?
[6] **A** No. If they want to go eat their lunch,
[7] it's fine, they can go.
[8] **Q** And what about washing their hands when
[9] they get back on the clock after their break?
[10] **A** It's after the clock.
[11] **Q** So they clock in and then wash their
[12] hands?
[13] **A** Yes.
[14] **Q** When employees — Strike that.
[15] How many bathrooms are there at the Perry
[16] facility for line employees to use?
[17] **A** I don't know how many there are. There's
[18] two main ones, there's a men's and a ladies in the
[19] main area. I'm sure there's more but I don't know ...
[20] For my knowledge, one.
[21] **Q** Do you know, for example, how many urinals
[22] or how many stalls are in each one?
[23] **A** No.
[24] **Q** Did you ever see any employees, based on
[25] your three-day experience at the Perry facility,

[1] lining up to use the bathroom or waiting to use the
[2] bathroom?
[3]    A   I've never seen a line.
[4]    Q   I want to talk a little bit ... When they
[5] go on break you mentioned some of the employees
[6] will, for example, hang their ear plugs off
[7] their ... I don't remember what you said, but their
[8] ear plugs hang?
[9]    A   Yeah.  There's a little strap in your bump
[10] cap where you can tie -- instead of -- you take them
[11] out, if you didn't have it tied to the bump cap they
[12] would fall off and you'd lose them.  So the majority
[13] of them just put a loop on it and tie it to their bump
[14] cap so when they take it off, it's there.  And then
[15] when they're getting ready to put them back in they
[16] just grab them.
[17]    Q   Is it your testimony that Perdue does not
[18] require its employees to take off any of this gear
[19] -- when I say gear, the personal equipment that
[20] they're not compensated for -- prior to going to the
[21] break room?
[22]    A   They're not required to take them off.
[23]    Q   Let me ask you a question.  Do you believe
[24] that there would be a safety concern, for example,
[25] let's say an employee was eating, I don't know, I

[1]       question and remind you of the nature of this
[2]       deposition.
[3]          MR. CELLER:  Understood.
[4] BY MR. CELLER:
[5]    Q   You can answer.
[6]    A   That's an obvious, yes.
[7]    Q   Do you have any knowledge as to why Perdue
[8] wouldn't require that?
[9]    A   No, I don't.
[10]    Q   Would you agree that if it was required,
[11] Perdue would be obligated to compensate employees
[12] for the time they spent taking that equipment off?
[13] If you know.
[14]    A   If that was included in our consent
[15] agreement.  Yeah, right.
[16]    Q   Would it be fair to say that Perdue is
[17] essentially willing to live by or die by that
[18] consent decree as to what they're required to comply
[19] with under the law?
[20]       MR. LISS:  Objection to the form of the
[21]       question.
[22] BY MR. CELLER:
[23]    Q   You can answer.
[24]    A   Yes, that's my opinion.
[25]    Q   Fair enough.

Page 78

[1] know we're at a poultry facility, but sushi with raw
[2] fish or something and it gets on their beard net, is
[3] there not a concern that when they go back to work
[4] that there could be contamination of the poultry
[5] based upon what they ate?
[6]    A   That's a possibility.
[7]    Q   But Perdue does not require them to take
[8] this gear off, meaning anything that could possibly
[9] come back in contact?
[10]    A   Not that I'm aware of there isn't any
[11] requirement.
[12]    Q   Do you whether OSHA or the law requires
[13] Perdue to require these employees to take that gear
[14] off?
[15]       MR. LISS:  Objection to the form of the
[16]       question.
[17] BY MR. CELLER:
[18]    Q   If you know.
[19]    A   I don't know.
[20]    Q   Do you believe that, based on your
[21] experience in your employment with Perdue, do you
[22] believe it would be good safety hygiene for
[23] employees to remove these products prior to eating
[24] personal food?
[25]       MR. LISS:  Objection to the form of the

Page 80

[1]       (Thereupon, Plaintiff's Exhibit Number 9
[2]       was marked for identification).
[3] BY MR. CELLER:
[4]    Q   I show you what's been marked as
[5] Plaintiff's Exhibit 9.  I don't expect that you've
[6] ever seen this particular document, but have you
[7] seen anything similar to this issued by Perdue?
[8]    A   Yes.
[9]    Q   What is that?
[10]    A   That's issued by Perdue.  It's an
[11] electronically created generated time card created by
[12] the Kronos system.
[13]    Q   And in that work week that's reflected in
[14] Plaintiff's Exhibit Number 9, would you agree that
[15] that employee worked overtime hours during that work
[16] week?
[17]    A   Yes.
[18]    Q   And would you agree that not included
[19] within the overtime hours worked would be the time
[20] that we've discussed ad nauseam here today regarding
[21] the donning and doffing of the personal gear that
[22] we've addressed?
[23]       MR. LISS:  Objection to form of the
[24]       question.
[25]       THE WITNESS:  Yeah.

Page 81

[1] BY MR. CELLER:
[2]   Q   You can answer. Do you understand what
[3] I'm saying?
[4]   A   Yeah, because they're not compensable items
[5] in our opinion.
[6]   Q   Okay. And so you would agree that the
[7] time spent -- the time that employees spend putting
[8] that personal gear on is not reflected in their
[9] hours worked?
[10]       MR. LISS: Objection.
[11] BY MR. CELLER:
[12]   Q   You can answer.
[13]   A   They are not reflected in that time, yes.
[14]       MR. CELLER: All good.
[15]       MR. LISS: I just have a few questions.
[16]       DIRECT EXAMINATION
[17] BY MR. LISS:
[18]   Q   Dave, are poultry processing employees ...
[19] Strike that.
[20]       Reference has been made to employees at
[21] various points throughout this deposition.
[22]   A   Uh-huh (affirmative).
[23]   Q   Have your answers been exclusively
[24] regarding hourly poultry processing employees?
[25]   A   Yes.

Page 83

[1]   Q   Do you know if Perry conducts training for
[2] its employees after the initial new hire training?
[3]   A   Training after the new hire orientation?
[4] There are coaching sessions given if needed. And
[5] there can be team meetings where they get together as
[6] a group where they would discuss that.
[7]   Q   But you think that during those subsequent
[8] training meetings the supervisor would provide the
[9] associate, the employee, with written information?
[10]       MR. CELLER: Object to the form.
[11]       THE WITNESS: Provide them with a written
[12]   form?
[13] BY MR. LISS:
[14]   Q   With any written information was my
[15] question.
[16]   A   No, not necessarily.
[17]   Q   Would it be possible?
[18]   A   Possible, yes.
[19]   Q   Again, just to clear up the record, we've
[20] been talking about swiping and punching. What word
[21] describes best how employees, you know, enter their
[22] time card at the time clock?
[23]       MR. CELLER: Form.
[24]       THE WITNESS: When they get to the clock
[25]   they swipe in. And normally it's a green light

Page 82

[1]   Q   So I'll continue to use the word
[2] "employees" with that in mind.
[3]   A   (Nods head affirmatively).
[4]   Q   Are employees permitted to put on personal
[5] gear after they clock in?
[6]   A   Yes.
[7]   Q   Are employees permitted to doff personal
[8] gear before they clock out?
[9]   A   Sure, yes.
[10]   Q   And if one of those two were to happen,
[11] then the donning and doffing of personal gear would
[12] be compensable; is that right?
[13]   A   Yes.
[14]   Q   So in reference to Exhibit 9, this time
[15] card, do you know whether or not Ms. Collier chose
[16] to don or doff personal gear before or after she had
[17] clocked in or out?
[18]   A   No, I do not.
[19]   Q   So, in fact, she might have been paid for
[20] the donning or the doffing?
[21]   A   Yes, it's a possibility.
[22]       MR. CELLER: Brian, I've got 3 if you're
[23]   looking for it if you need it.
[24]       MR. LISS: Okay, I'm good. Thank you.
[25] BY MR. LISS:

Page 84

[1]   to make sure that it is taken. In their
[2]   training they require them to swipe a second
[3]   time to show -- which would be an amber light
[4]   saying punch restricted or swipe restricted.
[5]   That would signify that the first swipe took
[6]   and they proceed to their designated area to
[7]   don their gear.
[8] BY MR. LISS:
[9]   Q   But it's a swipe?
[10]   A   Yes.
[11]   Q   Do all employees start their shift at the
[12] same time?
[13]   A   No.
[14]   Q   Are the shifts staggered?
[15]   A   Yes.
[16]   Q   How are they staggered?
[17]   A   Based on product flow on the front end and
[18] production schedules on the second processing or back
[19] end.
[20]   Q   And, similarly, are break times staggered?
[21]   A   Yes.
[22]   Q   How are they staggered?
[23]   A   In a line dependent area which is first
[24] processing. Once the line hangers go on break, as the
[25] birds move down the line, the individuals as the birds

[1] pass will go to break. So it's like a snowball -- or
[2] a rolling effect.
[3]     Second processing is pretty much dependent
[4] on product availability and requirements for
[5] production.
[6]     And most of the time they stagger their
[7] departments also.
[8]     Q    You testified that there were five clocks
[9] in first processing?
[10]     A    First processing is five, yes.
[11]     Q    And that there were six in second
[12] processing?.
[13]     A    Yes, I believe there are six.
[14]     Q    Generally speaking, where are the time
[15] clocks located?
[16]     A    There are four in both hallways leading to
[17] the production area, and one in the receiving area in
[18] first processing and one in what we call a Chick-Fil-Á
[19] area.
[20]     Q    What accounts for the location of the time
[21] clocks?
[22]     A    The locations were -- I would have to assume
[23] they were -- the four were put in the hallways to
[24] protect it from sanitation waters and to keep them
[25] from breaking down if they ... and ease of access to

---

**Page 86**

[1] the production area.
[2]     Q    You testified that you conducted a first
[3] and last Principal Activity Audit in February of
[4] 2007; is that right?
[5]     A    Yes.
[6]     Q    Did you have occasion to return to Perry
[7] after that time?
[8]     A    Yes, I have.
[9]     Q    Did you observe the First and Last
[10] Principal Activity process and procedures at Perry
[11] when you returned?
[12]     MR. CELLER:  Object to form.  You can
[13]     answer.
[14]     THE WITNESS:  It was an unofficial review
[15]     of all of the steps that I was able to look at.
[16]     It was not a formal audit, but I did review
[17]     items that were addressed during the audit, the
[18]     first audit.
[19] BY MR. LISS:
[20]     Q    What did you see?
[21]     A    Every item that was noted in the first audit
[22] had been corrected and were working fine.
[23]     MR. LISS:  No further questions.
[24]     MR. CELLER:  I've just got a couple of
[25]     redirect.

---

**Page 87**

[1]     RECROSS-EXAMINATION
[2] BY MR. CELLER:
[3]     Q    When was it, Dave, that you went back
[4] after the February audit?
[5]     A    Here's where I've got to think month-wise.
[6] I believe it was end of June or end of July of this
[7] year.
[8]     Q    What prompted or initiated you having to
[9] go back if you had already done an audit just months
[10] prior?
[11]     A    I was asked to go down to the plant.
[12]     Q    Who asked you?
[13]     MR. LISS:  Objection to the form of the
[14]     question.
[15]     MR. CELLER:  What's the problem with that
[16]     one, Brian?  What's the problem with that one?
[17]     MR. LISS:  Form of the question.
[18] BY MR. CELLER:
[19]     Q    Do you understand the question?
[20]     A    Yes.
[21]     Q    All right.  Who asked you?
[22]     A    My boss.
[23]     Q    Who's that?
[24]     A    Stan Howath.
[25]     Q    Can you say that again?

---

**Page 88**

[1]     A    Stan Howath is my boss.
[2]     Q    Is Stan a lawyer?
[3]     A    No, he's not.
[4]     Q    Did Stan tell you why he wanted you to go
[5] to the plant?
[6]     MR. LISS:  You can answer.
[7]     THE WITNESS:  Yes.
[8] BY MR. CELLER:
[9]     Q    What was the purpose or what did he tell
[10] you was the reason?
[11]     A    I was to meet Brian.
[12]     Q    Okay.  And I don't want to know anything
[13] you discussed with Brian.  What did you do during
[14] that secondary visit in June or July of '07?  What
[15] was the --
[16]     A    Gave Brian a walk-through of the plant.
[17]     Q    Okay.  Were there times that you spent at
[18] the plant in that visit in June or July of '07, was
[19] there any work you did outside of Brian's presence?
[20]     A    No.
[21]     Q    During that visit in June or July of '07,
[22] did you specifically look at or do any type of
[23] analysis regarding the personal gear that we
[24] discussed Perdue doesn't pay for as being
[25] compensable?

---

**Page 89**

[1]  A  No.

[2]  Q  Do you understand my question?

[3]  A  I did not.

[4]  Q  Was the focus of your June or July '07

[5]  visit simply to focus on whether the requirements of

[6]  the 2002 consent decree were still being implemented

[7]  or upheld?

[8]  A  My primary purpose was to give Brian a

[9]  walk-through.

[10]  Q  Okay, fair enough.

[11]      Are employees given any type of extra

[12]  minutes or credit at the end of the work week for

[13]  any time spent donning or doffing these personal

[14]  gear?

[15]  A  No.

[16]  Q  Now, you testified — Brian asked you some

[17]  questions whether employees are permitted to don and

[18]  doff the personal equipment on the clock, do you

[19]  remember that?

[20]  A  Yes.

[21]  Q  And you said that they are?

[22]  A  They could, yes.

[23]  Q  But that's not Perdue's policy, is it?

[24]  A  They could walk through the door and put

[25]  their ear plugs in.

**Page 91**

[1]  policy and the reality of the situation?

[2]      MR. LISS:  Objection to the form of the

[3]  question.

[4]  BY MR. CELLER:

[5]  Q  Do you understand my question?

[6]  A  Rephrase that a little bit.

[7]  Q  You would agree with me that the written

[8]  policy of Perdue is that employees must have

[9]  personal items on before swiping in?  Is that

[10]  correct?

[11]  A  In most cases they do, yes.

[12]  Q  But not what they actually do, I'm asking

[13]  about the policy.  Would you agree that the policy

[14]  is that they have — the written policy is that they

[15]  have to have these items on before swiping in?

[16]  A  Yes.  That document says have.

[17]  Q  From what I understand from your

[18]  testimony, would you agree that even though that's

[19]  the written policy, it's not necessarily being

[20]  enforced by Perdue?

[21]      MR. LISS:  Objection, that wasn't his

[22]  testimony.

[23]      MR. CELLER:  That's okay.

[24]  BY MR. CELLER:

[25]  Q  If you understand my question.

**Page 90**

[1]  Q  Okay.  But that's not Perdue's policy,

[2]  correct?

[3]  A  (Reviews document).  That's that policy,

[4]  yes.

[5]  Q  Would you agree that what we've marked —

[6]  A  I believe that — Let me answer that.  If

[7]  they walked in without their ear plugs or bump cap on,

[8]  they would not get written up, no.

[9]  Q  I just want to make sure referring to

[10]  Plaintiff's Exhibit 3 document 20 which you

[11]  testified was accurate on direct.

[12]  A  Right.

[13]  Q  That employees according to this policy

[14]  are required to have their personal gear on before

[15]  swiping it, and you said yes, do you remember that?

[16]  A  Yes, correct.

[17]  Q  So, now, on cross you changed your answer

[18]  and said no, they could put them on on the clock.

[19]  A  They could.

[20]  Q  Okay.  If they could, it would be in

[21]  violation of what we've identified as Plaintiff's

[22]  Exhibit Number 3, document 20, correct?

[23]  A  According to that, yes.

[24]  Q  So there would be an inconsistency, would

[25]  you agree, between the implementation of Perdue's

**Page 92**

[1]  A  Enforcement, as far as that question, no,

[2]  they're probably not.

[3]  Q  Are there any other policies which Perdue

[4]  is relying on as part of their donning and doffing

[5]  procedures that may be in writing that they may not

[6]  be enforcing that stringently?

[7]      MR. LISS:  Objection to the

[8]  characterization of what Perdue is relying or

[9]  not relying on.  The question other than that

[10]  is fine.

[11]      THE WITNESS:  I wouldn't know.

[12]      MR. CELLER:  Anything else?

[13]      Tell me about your cell phones.  I'm just

[14]  kidding, I've got no further questions.

[15]      THE WITNESS:  I've got a picture of my

[16]  granddog.

[17]      MR. CELLER:  That's all right.

[18]      (Thereupon, the deposition was concluded at

[19]  11:33 a.m.).

## Page 93

[1]            C E R T I F I C A T E
[2]   G E O R G I A:
[3]   COUNTY OF FULTON:
[4]        I hereby certify that the foregoing transcript
[5]   was taken down, as stated in the caption, and the
[6]   proceedings were reduced to typewriting under my
[7]   direction and control.
[8]        I further certify that the transcript is a true
[9]   and correct record of the evidence given at the said
[10]  proceedings.
[11]       I further certify that I am neither a relative or
[12]  employee or attorney or counsel to any of the parties,
[13]  nor financially or otherwise interested in this
[14]  matter.
[15]       This the 14th day of December, 2007.
[16]
[17]                         ALYCE E. SIMMONS, B-1193
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

## Page 95

[1]            E R R A T A   S H E E T
[2]   IN RE:  DAVID ALFORD, SR. V. PERDUE FARMS, INC.
[3]   CIVIL ACTION FILE NO: 5:07-CV-00087-CAR
[4]   DEPOSITION TAKEN ON:  December 12, 2007
[5]        I have read the transcript of my deposition
      and find that no changes are necessary.
[6]
[7]        Having read the transcript of my deposition,
      I wish to make the following changes (Please state
[8]   reason.)
[9]   Page / Line /            Change / Reason
[10]  _____    _____
[11]  _____    _____
[12]  _____    _____
[13]  _____    _____
[14]  _____    _____
[15]  _____    _____
[16]  _____    _____
[17]  _____    _____
[18]  _____    _____
[19]
[20]
[21]                     DAVE TABINOWSKI
[22]  Sworn to and subscribed before me,
[23]  _____, Notary Public.
[24]  This _____ day of _____, 2007.
[25]  My Commission Expires:

## Page 94

[1]                        DISCLOSURE
[2]   STATE OF GEORGIA
[3]   COUNTY OF FULTON
[4]   DEPOSITION OF DAVID TABINOWSKI
[5]
[6]        Pursuant to Article 8.B. of the Rules and
      Regulations of the Board of Court Reporting of the
[7]   Judicial Council of Georgia, I make the following
      disclosure:
[8]
[9]        I am a Georgia Certified Court Reporter.  I am
[10]  here as an independent contractor for American
      Court Reporting Company, Inc.
[11]       The firm was contacted by the offices of
[12]  DEIDRE M. JOHNSON, Esquire, to provide court reporting
      services for this deposition.  The firm will not be
[13]  taking this deposition under any contract that is
      prohibited by OCGA 15-14-37 (a) and (b).
[14]       Option A:  The firm has no contract/agreement
[15]  to provide reporting services with any party to the
      case, any counsel to the case, or any reporter or
[16]  reporting agency from whom a referral might have
      been made to cover this deposition.  The firm will
[17]  charge its usual and customary rates to all parties
      in the case, and a financial discount will not be
[18]  given to any party to this litigation.
[19]
[20]       (Signature of Attorneys optional)
[21]
                               December 12, 2007
      ALICE E. SIMMONS, CCR B-1193
[22]
[23]
      _____    _____
[24]  Attorney for Plaintiff       Date
[25]  Attorney for Defendant       Date

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## EXHIBIT 19
## <u>DEFENDANT'S  RESPONSE TO PLAINTIFF'S</u>
## <u>DOCUMENT REQUEST</u>







PER_AND000113

1

























PER_AND000116

4



PER_AND000117

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## EXHIBIT 20
## EXCERPTS FROM PERDUE WEBSITE

**PERDUE**

*A Family Commitment to Quality Since 1920™*



Jim Richardson manages one of our company's hatcheries.

## Vertical Integration

Perdue Farms is what is known as a vertically integrated agribusiness. That means our company is involved in every step of the supply chain – from eggs and feed ingredients all the way through processing, distribution and marketing. This vertical integration enables us to ensure the quality of our poultry products at every step.

## The Perdue Pedigree

Our quality begins with our own breed of chicken. Our geneticists carefully select individual pedigree birds to be the great-great-grandparents of our chickens. These pedigree birds are to poultry what champion racers are to the horse world – proven performers whose winning traits are passed on to subsequent generations of PERDUE® chickens.

## Breeder Operations

Our company's Primary Breeder Operations supply the offspring of our pedigree birds to independent farmers who operate breeder farms under contract with Perdue. These farms supply eggs to our hatcheries. Breeder houses are specially equipped, with room for the hens and roosters to move about, access to sufficient food and water, and elevated nesting areas.

## Hatcheries

Our hatcheries give our birds a strong, healthy start even before they're born. Automated incubators maintain the ideal temperature and humidity levels, even turning the eggs to mimic the mother hen's actions. Just as with most newborns, our chicks are vaccinated against common diseases. The day-old chicks are transported to independent family farms, where the contract producers have prepared their poultry houses for the arrival of the young birds.

## Feed Manufacturing

Perdue Farms purchases grain from local farmers and we manufacture our own poultry feeds from all-natural ingredients, free of pesticides and carefully blended to meet the nutritional requirements of our birds at every growth stage. Our feed mills operate in accordance with FDA regulations and our own quality control ensures wholesomeness and nutritional value.

## Growout

Our birds are raised on family-owned farms by more than 2,400 independent farm-family partners. All of our birds are grown in temperature-controlled houses, protected from the elements, predators and disease. Our poultry are free to move about with access to food and water. Our lighting and ventilation programs maximize bird comfort and minimize stress, creating an ideal environment for growing healthy birds.

Flocks are closely monitored and carefully tended to ensure their health, comfort and well-being. Our flock supervisors, veterinarians and poultry welfare officers – backed by an advanced team of scientists and laboratory technicians working with the industry's leading research and analytical equipment – assist our producers and maintain adherence to our strict standards for food safety, bird health, poultry welfare and environmental stewardship. All producers and all associates handling live birds receive poultry welfare training.

The partnership between Perdue and its producers ensures that our birds are handled carefully and kept healthy. That's one of the

reasons we're able to consistently produce a premium quality product.

We do not use antibiotics for growth promotion in chickens, nor do we use antibiotics continuously for any reason. We've never used hormones or steroids. In fact, the use of hormones and steroids in poultry has been banned since the 1950s.

**Processing and Food Production**

We operate food plants throughout the eastern half of the United States for processing and cooking. All associates working in food production receive mandatory training in food safety and quality. Each of our food plants has onsite USDA inspectors and all of our Quality Assurance Managers are trained as Certified Food Safety Professionals. In addition, each Perdue facility has a Food Protection Manager, certified through ServSafe, the leading food safety education program.

**Distribution and Transportation**

We operate our own distribution network, including a truck fleet, distribution and replenishment centers, and dedicated cold storage and export facilities. This ensures quality, food safety and product security all the way to the customer.

Our transportation fleet also operates the specialized vehicles used for delivering eggs, chicks, feed and live birds.

**Business Products Resources Poultry School** Segments & Trends    Other Perdue Sites

888-PERDUE-2    **PRODUCTS**
More on this product

Home / Products / **Food Safety**

✉ **Tell A Friend**
☎ **Request Cont**

Featured Products
*Perdue*® Breed
Product Catalog
Food Safety
FAQ
Our Money Back
Guarantee
Menu Ideas
Healthy Eating


└ Learn More!


Learn More!

### A farm-to-fork approach to safety



There is no substitute for confidence in the safety of our products. Our audited processes from hatcheries and feed mills through live production and processing are a model for the poultry industry. It's why we are rated USDA #1.

We do everything possible to ensure confidence in every *Perdue*® product you buy.

### Here are some important safety practices we follow:

- Extensive and formal food safety training of all associates
- Quality Assurance managers in every plant are trained as Certified Food Safety Professionals—a designation recognized by the National Environmental Health Association
- Food Protection Managers certified by ServeSafe™, the leading food safety education program, at all processing facilities
- Strict food safety and cleanliness guidelines
- Thorough and complete sanitation processes approved each morning by USDA inspectors
- Absolute separation between fully cooked products and raw poultry in every plant
- Rigid disciplines regarding associate clothing and hygiene

Safety at the microbial level is crucial, too, and no other poultry company has done more to develop and establish plant safety guidelines. In fact, Perdue helped pilot-test the USDA's Hazard Analysis and Critical Control Points (HACCP) system to identify and contain any contaminations. Testing includes:

- Daily microbial tests in specialized labs in every plant
- The due diligence of a staff of microbiologists who work to meet established safety goals and enhance standards even more


Consumer Pro

View

Abbreviation

**CN** = Chil
Nutr
Labe

**CVP** = *Cryo*
Pack

**DWE** = Drie
Who

**FC** = Fully
Cool

**HOS** = Hot

**IF** = Indiv
Froz

**IQF** = Indiv
Quic
Froz

**ISP** = Isola
Prote

**RPC** = Refr
Porti
Cont

**RTC** = Read
Cool

**SPC** = Soy
Conc

**BUSINESS L**

Our business

*You can tell the Perdue difference.*

partnerships a
connections k
all in the know

www.eatturke
www.eatchick
www.restaura

**Home** | **Legal** | **Privacy** | **FAQ** | **Contact Us**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

DARRYL ANDERSON, et al.,           §
                                   §
    Plaintiffs,            §
                                   §          **CIVIL ACTION NO.**
v.                                 §          **1:06-cv-1000-MEF**
                                   §
PERDUE FARMS, LLC.                 §
                                   §
                                   §
    Defendant.             §

# EXHIBIT 21
# <u>USDA SHUTS DOWN PERDUE</u>



C🖨 PRINT THIS

Powered by 🅒Clickability

**USDA Shuts Down Perdue Farms**

Reporter: Ryan Dearbone

Email Address: ryan.dearbone@wbko.com

---

Perdue Farms employees were told to head home early Thursday. The Ohio County chicken processing plant was shut down around noon by the United States Department of Agriculture. This is the first time the plant's been shut down by the USDA.

A Perdue Farms employee, who wants to remain anonymous, says the closing happened without any warning.

"We were working. The next thing we know at 11 a.m. they called us and told us to shut down all lines, that production is stopped. Tell everyone to go downstairs and take a break. They didn't know how long they'd be down or anything," she says.

Perdue employees are still very much in the dark as to why the facility is shutting down until further notice.

"No, they ain't told us nothing yet. We got a paper saying we got a number to call to check and see if we work tomorrow," says employee of 10 years, Tex Basham.

According to someone close to the situation, the closing comes 60 days after a USDA inspection found procedural and documentation problems. The source says Thursday, Perdue officials sent the USDA a 160 page document explaining how they planned on fixing these violations. The USDA rejected the proposed solutions and called for the building to be shut down.

One employee says that despite the doors being closed temporarily... it shouldn't affect Perdue's product in grocery stores.

"Weigh-Price-Label and Shipping, its not really affected them too much. There's chicken in our inventory that we can ship out, that we still have that we're not waiting on," she says.

Right now, all employees can do is wait and hope that the plant re-opens soon. Perdue Farms spokesperson, Julie De Young, told WBKO that after the plant was shut down Thursday, some of the staff conducted training sessions.

She also said they are currently working with the USDA to bring their facility up to code as quickly as possible.

**Find this article at:**
http://www.wbko.com/home/headlines/7566117.html

☐ Check the box to include the list of links referenced in the article.

Copyright © 2002-2008 - Gray Television Group, Inc.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **1:06-cv-1000-MEF** |
| | § | |
| **PERDUE FARMS, LLC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# EXHIBIT 22
# (FSIS) FOOD SAFETY AND INSPECTION SERVICE
# QUARTERLY ENFORCEMENT REPORT

### UNITED STATES DEPARTMENT OF AGRICULTURE
### FOOD SAFETY AND INSPECTION SERVICE
### QUARTERLY ENFORCEMENT REPORT
#### April 1, 2007 through June 30, 2007

## INTRODUCTION

This is the Food Safety and Inspection Service's (FSIS) Quarterly Enforcement Report.  The
report provides a summary of the enforcement actions FSIS has taken to ensure that products that
reach consumers are safe, wholesome, and properly labeled.  Although this report focuses on
enforcement actions taken, it is important to recognize that this is only one aspect of the
Agency's work.  The Agency's main purpose is to protect public health by achieving compliance
with laws and regulations.

FSIS inspects products produced in more than 6,000 meat, poultry, and egg product plants.
Since January 1998, meat and poultry plants have been operating HACCP Systems.  Publication
of this information is another step in the Agency's commitment to openness and transparency in
its work to protect the public from adulterated or misbranded meat, poultry, and egg products.

The report is presented in sections that correspond with the category of action.  Activities
reported within the categories are either pending or experienced new activity during the reporting
period.  FSIS also coordinates administrative actions, where regulatory or other authorities are
applied in inspected plants and manages USDA participation in criminal cases pending in
Federal courts.  These actions, along with the thousands of inspections performed each day in
plants throughout the country, form strong underpinnings for promoting compliance with food
safety laws.  Each section of this report is described and reported in more detail as follows:

FSIS ENFORCEMENT PROCESSES
NONCOMPLIANCE RECORDS AND APPEALS
PRODUCT CONTROL ACTIONS
NOTICES OF WARNING
ADMINISTRATIVE ACTIONS
CRIMINAL ACTIONS
CIVIL ACTIONS

**FSIS ENFORCEMENT PROCESSES**

USDA's Food Safety and Inspection Service (FSIS) is charged with ensuring that meat, poultry, and egg products are safe, wholesome, and properly labeled. FSIS, in cooperation with State counterparts, inspects, monitors, and verifies the proper processing, handling, and labeling of meat and poultry products from the delivery of animals to the slaughterhouse until the products reach consumers. FSIS, in cooperation with FDA and the states, provides similar coverage for egg products – the processed whole egg ingredients used in manufacturing other foods. (More information concerning egg products inspection and enforcement is provided in the FSIS publication "Focus on Shell Eggs" that can be accessed at: http://www.fsis.usda.gov/Fact_Sheets/Focus_On_Shell_Eggs/index.asp. If FSIS detects problems with any products it regulates, the Agency takes product control and enforcement actions to protect consumers.

USDA conducts monitoring and verification activities at plants that slaughter amenable animals and process products to ensure that products at these establishments are produced in a sanitary environment and potential food safety hazards are identified and eliminated. These establishments must apply for a grant of inspection from FSIS and demonstrate the ability to meet all applicable regulatory requirements for producing safe, wholesome, and accurately labeled food products. Requirements include meeting sanitation, facility, and operational standards, and having preventive systems in place to ensure the production of safe and unadulterated meat, poultry, and egg products. Products from official establishments are labeled with the mark of inspection, indicating that they have been inspected and passed by USDA and can be sold in interstate commerce.

FSIS assigns investigators throughout the chain of distribution to detect and detain potentially hazardous meat, poultry, and egg products in commerce and to investigate violations of law. Even if products are produced under conditions that are safe and sanitary, mishandling can occur on their way to the consumer. For example, if products are transported in trucks that are too warm, or if exposed to contamination, the products can become adulterated and can cause illness.

FSIS also works closely with USDA's Office of Inspector General (OIG), which assists FSIS in pursuing complex criminal cases. In addition, many state and local jurisdictions have enforcement authorities that apply to USDA-regulated products. FSIS cooperates with these other jurisdictions in investigations and case presentations. FSIS also participates with OIG and the U.S. Department of Justice in monitoring conditions of probation orders and pretrial diversion agreements developed to resolve cases.

This report provides a summary of enforcement actions, including actions that address the Pathogen Reduction/HACCP regulatory requirements FSIS has taken to ensure that products that reach consumers are safe, wholesome and properly labeled. The Agency recognizes that this report is a snapshot in time of a dynamic process. Some information will be out-of-date by the time this report is published. For example, many matters shown as under appeal will have been resolved by the time this report is published. Other actions could be appealed or closed after this reporting period. This information will be updated on a quarterly basis and made available to the public through future reports.

## NONCOMPLIANCE RECORDS AND APPEALS

FSIS inspection program personnel perform thousands of inspection procedures each day to determine whether or not inspected plants are in compliance with regulatory requirements. Each time inspection program personnel make a non-compliance determination they complete a report explaining the nature of the regulatory action. They notify plant managers of problems through a written Noncompliance Record (NR).

NRs document noncompliance with FSIS regulations and notify the plant that it must take action to remedy the situation and should take measures to prevent its recurrence. If this is done, then the plant will continue to operate without interruption. Noncompliance reported on NRs vary from minor labeling discrepancies to serious breakdowns in food safety controls. When noncompliance occurs repeatedly, or when the plant fails to prevent adulterated product from being produced or shipped, FSIS takes action to control products and may take an action to withhold or suspend inspection.

During this quarterly reporting period, FSIS performed 2,124,715 verification procedures. **Table 1a** provides numbers of NRs issued by FSIS inspection personnel between April 1, 2007 and June 30, 2007. **Table 1b** shows the number of appeals and the dispositions of the appeals filed by plants during this reporting period.

**Table 1a. Noncompliance Record Totals (4/01/07 to 6/30/07)**

**NRs Issued**:   29,549

**Table 1b.  Appeals NRs (4/01/07 to 6/30/07)**

**Number of Plants Filing Appeals:**   227

| Appeal of NR Granted | Appeal of NR Denied | Appeal of NR Pending | Total Appeals Resulting In Modified NR | Total NRs Appealed |
|---|---|---|---|---|
| 130 | 214 | 24 | 54 | 422 |

## PRODUCT CONTROL ACTIONS

FSIS takes product control actions to gain physical control over products when there is reason to believe they are adulterated or misbranded.  The actions are designed to ensure that those products do not enter commerce or, if they are already in commerce, that they do not reach consumers.

In official establishments, FSIS inspectors may retain products whenever there is evidence of unwholesomeness, or if products are adulterated or mislabeled.  FSIS inspectors condemn animals for disease, contamination, or adulteration to prevent their use as human food.   Figures for condemnations of livestock for the reporting period are as follows:

- FSIS inspected 34,965,137 livestock carcasses; 54,546 carcasses were condemned.
- FSIS inspected 2,368,330,649 poultry carcasses; 11,041,235 carcasses were condemned.

Detentions

FSIS investigators, import officers and other designated FSIS personnel will detain any product that may be adulterated or misbranded when found in commerce. If product cannot be disposed of within 20 days, then FSIS may request any U.S. District or other court to seize the product as provided for in the Federal Meat Inspection Act and Poultry Products Inspection Act. Most detentions result in voluntary disposal of the product and do not require court actions. **Tables 2a., 2b.,** and **2c.** provide the number of detentions and the pounds of product involved in these actions for meat and poultry products for this quarterly reporting period. Table 2a. provides the information on detentions made by Compliance and Investigations Division (CID), Office of Program Evaluation, Enforcement and Review investigators. Table 2b. provides the detention information for the Office of International Affairs. Table 2c. provides the detention information for the Office of Field Operations.

## Table 2a.  Detention Summary
### (4/01/07 to 6/30/07)

## Detentions:  CID Regions

| | | |
|---|---|---|
| **Total number of detentions** | **90** | |
| **Total pounds of product detained** | **2,278,375** | |
| | **Detentions** | **Pounds Detained** |
| WESTERN | 30 | 183,504 |
| SOUTHWEST | 35 | 1,100,457 |
| MIDWEST | 6 | 38,784 |
| SOUTHEAST | 13 | 953,143 |
| NORTHEAST | 6 | 2,487 |
| **Totals** | **90** | **2,278,375** |

## Table 2b.  Detention Summary
### (4/01/07 to 6/30/07)

## Detentions:  OIA Regions

| | | |
|---|---|---|
| **Total number of detentions** | **19** | |
| **Total pounds of product detained** | **31,526** | |
| | **Detentions** | **Pounds Detained** |
| WESTERN  (Los Angeles) | 15 | 25,799 |
| SOUTHERN  (Miami) | 0 | 0 |
| NORTHERN  (Detroit) | 0 | 0 |
| NORTHEAST  (Philadelphia) | 4 | 5,727 |
| **Totals** | **19** | **31,526** |

8

**Table 2c. Detention Summary**
**(4/01/07 to 6/30/07)**

## Detentions: OFO Districts

| Total number of detentions | 9 | |
|---|---|---|
| Total pounds of product detained | 88.85 | |
| | **Detentions** | **Pounds Detained** |
| MINNEAPOLIS | 3 | 25.10 |
| PHILADELPHIA | 6 | 63.75 |
| **Totals** | 9 | 88.85 |

Recalls

A recall is a firm's voluntary removal of adulterated or misbranded products from trade or consumer channels. Class I recalls involve a health hazard for which there is a reasonable probability that the use of the product will cause serious adverse health consequences or death. Class II recalls involve a potential health hazard where there is a remote probability of adverse health consequences from use of the product. Class III recalls involve a situation in which use of the product will not cause adverse health consequences. In cases where a firm decides not to accept the FSIS recommendation and chooses not to conduct a recall, FSIS will detain any product that would have been subject to a recall that it finds in commerce. FSIS, Congressional and Public Affairs (CPA) will issue a press release informing the public that product that appears to be adulterated or misbranded has been shipped by the responsible firm and that the firm has refused to recall it. For current information on recalls, go to the FSIS recalls web page at: http://www.fsis.usda.gov/Fsis_Recalls/index.asp .

9

Port-of-Entry Reinspection

FSIS conducts port-of-entry reinspections of imported meat, poultry, and egg products. It is important to note that this activity is a <u>reinspection</u> of products that have already been inspected and passed by an equivalent foreign inspection system. Thus, imported product reinspection is a monitoring activity for verifying on an on-going basis the equivalence of a foreign country's inspection system.

Port-of-entry reinspection is directed by the Automated Import Information System (AIIS), a centralized computer database that generates reinspection assignments and stores results. After clearing U.S. Customs and Border Protection and the Animal and Plant Health Inspection Service (APHIS), every imported meat, poultry, or egg product shipment must be presented to FSIS.[1] When a meat or poultry shipment is presented for reinspection, the AIIS scans its records to verify eligibility. Shipments are denied reinspection and refused entry if the foreign country is not eligible to export to the United States, if the establishment that produced the product has not been certified for export to this country, if the product presented for reinspection is not eligible, if the shipping marks are not unique, or if APHIS has animal health restrictions on the country.

All imported product shipments are reinspected for general condition, labeling, proper certification, and accurate count. In addition, other types of inspection (TOI) may be generated by the AIIS. These could include a physical examination of the product for visible defects, collection of samples for microbiological analysis, sampling for food chemistry analyses, and samples to be analyzed for drug and chemical residues. Shipments are randomly selected for

---

[1] Egg products are imported only from Canada. Dry egg products may be reinspected at the border or may proceed directly to their destination for reinspection. Liquid egg products are always reinspected at their destination for food safety reasons. Egg product reinspections are presently scheduled separately from meat and poultry, but will be brought under the AIIS.

reinspection using a statistical sampling plan that allocates samples by HACCP process categories. The level of sampling is based on the volume imported from the country within each category. Products that fail reinspection are rejected and must be re-exported, converted to non-human food, or destroyed. Product rejections cause the AIIS to automatically generate an increased rate of reinspection for future shipments of like product from the same establishment.

This HACCP-based sampling approach began in August 2002 as the new AIIS3 system was launched, and was fully implemented in the quarter beginning October 1, 2002. Implementation of AIIS3 provides an opportunity for FSIS to present meat and poultry reinspection data in a new reporting format that has been constructed to better represent reinspection results (**Table 3a**). This new format is based on pounds of product rather than lots of product because the lotting of product for reinspection is a commercial decision made by the importer or broker, and the term "lot" has no regulatory definition. **Table 3b** presents egg product reinspection results in the same format they appear in past quarters, minus lots for the reason given above. The new reporting format will be applied to these products when they are incorporated into the AIIS3 system. It should be noted that data reports at the end of a fiscal quarter are the best available information for reinspection activities conducted during the preceding three months, but those data are preliminary until all ongoing inspection activities are completed. For example, pending reinspection activities include open TOI's, in particular samples taken for laboratory analysis, but also could include organoleptic product examinations, and refused entries which may stay open for up to 45 days. A report of quarterly reinspection data will not be "final" until all open entries are closed. These normally small adjustments in past quarter data will be reflected in subsequent quarterly reports.

11

## Table 3a.  Imported Meat and Poultry Products
### Pounds of Product by Fiscal Year Quarter

## Presented, Reinspected, and Refused Entry

| FY 2007 | | | | | | | |
|---------|-----------|---------|--------------|----------|----------|----------|-------------------------------|
| Quarter | Presented | Refused [1] | Reinspected | TOIs Perf [2] | Accepted | Rejected [3] | Combined Rejected and Refused |
| Q-1 (Oct – Dec) | 936,006,746 | 12,381 | 110,545,902 | 12,179 | 933,240,278 | 2,754,087 | 2,766,468 |
| Q-2 (Jan – Mar) | 956,404,204 | 0 | 103,099,104 | 12,189 | 954,110,901 | 2,293,303 | 2,293,303 |
| Q-3 (Apr – Jun) | 1,057,038,119 | 91,082 | 123,290,993 | 13,443 | 1,054,502,356 | 2,444,681 | 2,535,763 |
| Q-4 (Jul – Sep) | | | | | | | 0 |
| Cumulative Totals | 2,949,449,069 | 103,463 | 336,935,999 | 37,811 | 2,941,853,535 | 7,492,071 | 7,595,534 |

## Table 3b.  Imported Egg Products
### Pounds of Product by Fiscal Year Quarter

## Presented, Reinspected, and Refused Entry

| FY 2007 | | |
|---------|-----------|------------|
| QUARTER | PRESENTED | REFUSED [4] |
| Q-1 (Oct – Dec) | 4,296,089 | 0 |
| Q-2 (Jan – Mar) | 5,870,970 | 0 |
| Q-3 (Apr – Jun) | 4,713,770 | 0 |
| Q-4 (Jul – Sep) | | |
| Cumulative Totals | 14,880,829 | 0 |

---

[1] Products are refused reinspection if: (1) the foreign country is not eligible; (2) the foreign establishment is not listed; (3) Animal and Plant Health Inspection Service (APHIS) has placed animal disease restrictions on the country; (4) product presented for reinspection is not eligible; and (5) duplicate shipping marks.
[2] Types of Inspection (TOI) Performed.  The number of reinspection assignments performed during the quarter.
[3] Products are rejected if product presented for reinspection fails to meet U.S. import requirements.
[4] Refused entry and rejected upon reinspection data are collapsed in the present egg products database, but will be separated when this commodity is incorporated into the AIIS.

12

**NOTICES OF WARNING**

FSIS issues Notices of Warning (NOW) for minor violations of law that are not referred to

United States Attorneys for prosecution.  FSIS may also issue these warnings when a United

States Attorney declines to prosecute a case or bring action against a specific business or person.

These letters warn that FSIS may seek criminal action based on continued violations.  Notices of

Warning may be issued to any individual or business, including Federal plants, wholesalers,

distributors, restaurants, retail stores and other entities that process, store, or distribute meat and

poultry products. **Table 4** shows Notices of Warning issued by the Office of Program

Evaluation, Enforcement and Review (OPEER) headquarters office and by each of the CID

Regions during the reporting period.

**Table 4. Notices of Warning for Criminal Actions
(4/01/07 to 6/30/07)**

## Notices of Warning for Criminal Violations

| | |
|---|---|
| **Total number of NOWs issued for violations:** | **156** |
| **Number issued by Headquarters:** | **1** |

| CID Region | Number of NOWs Issued by Region |
|---|---|
| WESTERN | 54 |
| SOUTHWEST | 20 |
| MIDWEST | 12 |
| SOUTHEAST | 44 |
| NORTHEAST | 25 |
| **Total number issued** | **155** |

## ADMINISTRATIVE ACTIONS

FSIS inspects meat and poultry products and applies the marks of inspection when inspectors are able to determine that products are not adulterated. FSIS may temporarily withhold the marks of inspection from specific products, suspend inspection, or withdraw a grant of inspection if a plant is not meeting regulatory requirements.

Effective January 25, 2000, FSIS amended its Rules of Practice that apply to Agency enforcement actions. The Rules of Practice, which are located in 9 CFR Part 500, define each type of enforcement action FSIS can take, the conditions under which it is likely to take these actions, and the procedures FSIS will follow in doing so.

## Withholding the Marks of Inspection

If a plant fails to prevent preparation and shipment of adulterated products or develops a pattern of noncompliance showing the plant's sanitation or process control systems have failed, FSIS may notify plant managers that the USDA mark of inspection is being withheld from some or all of the products in the plant. This action effectively shuts down affected operations, because it is illegal to sell products in commerce that do not bear the USDA mark of inspection. Other non-affected parts of the plant, if any, may still operate.

## Suspension of Inspection

FSIS may temporarily suspend the assignment of inspectors if a plant fails to prevent preparation and shipment of adulterated products, fails to present a corrective action plan to bring the plant sanitation or process control systems into compliance, or for other reasons specified in the Rules of Practice. As with withholding actions, a suspension shuts down all or part of the plant's operations. USDA may place the suspension in abeyance if corrections are presented, put into effect, and effectively prevent additional problems. FSIS District Offices have established procedures to monitor and verify a plant's corrective and preventive actions.

## Notification to Establishments of Intended Enforcement Actions

FSIS has an established procedure to notify establishments of intended enforcement actions related to certain types of noncompliance that have not resulted in actual shipment of adulterated products. Under this procedure, a notice is issued to an establishment when the Inspector-in-Charge determines that the establishment has experienced multiple, recurring noncompliances, or for other reasons, as specified in the Rules of Practice, the establishment has failed to implement

adequate corrective and preventive measures.   The Notice informs the establishment of the

nature and scope of the noncompliance and that FSIS intends to withhold the marks of inspection

or suspend the assignment of inspectors.   The Notice explains the basis of and references

documentation for the intended enforcement action, and provides the establishment three

business days to contest the basis for the proposed enforcement action or to demonstrate how

compliance has been or will be achieved.   In appropriate situations, USDA may defer a decision

based on corrections submitted by the establishment.


Withdrawal of Inspection

In some situations, FSIS may decide that it is necessary to withdraw inspection from a plant.   In

these cases, FSIS withdraws inspection from a Federal plant by filing a complaint with the

USDA Hearing Clerk.   The plant may request a hearing before an Administrative Law Judge.   If

the action is based on insanitation, the plant will remain closed while proceedings go forward.   In

other cases that do not involve a threat to public health, operations may continue.   These actions

may be resolved by FSIS and the plant entering into a consent decision, which allows the plant to

operate under certain specified conditions. Once inspection is withdrawn, a closed plant must

reapply to receive Federal inspection.


As specified in the Rules of Practice, USDA may initiate withholding, suspension, or withdrawal

actions to limit a plant's slaughtering or processing, or prevent the plant from operating

altogether, based on reasons related to the PR/HACCP regulations such as:

- failure to collect and analyze samples for the presence of generic *E. coli* and record test results,
- failure to develop or implement Sanitation Standard Operating Procedures, or
- failure to develop or implement a required HACCP plan.


16

In addition, USDA may initiate a withholding, suspension, or withdrawal action for other reasons such as:

- failure to meet "sanitation performance standards,"
- insanitary conditions,
- inhumane handling or slaughtering of livestock,
- failure to destroy condemned product, or
- interference with inspection personnel.

**Tables 5, 6, and 7** list administrative actions (other than actions based on convictions) by establishment, initiated, pending, or closed, for the period, along with whether the action is based on an SSOP or HACCP Systems failure, or for some other reason, such as inhumane handling. In some plants, FSIS may find more than one basis for taking enforcement action or may take more than one action. For example, the plant has sanitation problems and is not conducting *E. coli* testing or a sanitation problem occurs more than once. These tables list actions taken at large, small, and very small plants. The enforcement action can be for any of the identified reasons. During this period, activity is reported concerning 115 plants. Forty-seven of the actions in these plants were initiated during this reporting period. Twenty-eight were closed by letters of warning or other means during this period.

**Tables 5, 6, and 7** also identify those cases in which an appeal of the suspension action may have been made, along with whether the appeal was granted or the administrative action was sustained (appeal denied). When decisions on appeals have not been made during the period of this report, the appeal is shown as pending and will be reported in the next quarterly report. There were no appeal of suspension actions filed during this period.

17

## Table 5.  Administrative Actions: Large HACCP Plants
### (4/01/07 to 6/30/07)

**Administrative Actions Pending or Taken at Large HACCP Plants [Includes actions initiated in prior quarters]**

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension In Abeyance | Basis for Action | | | | | | Closure | | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | |
| CARGILL MEAT SOLUTIONS CORPORATION 00086H M PLAINVIEW, TX | 3/1/07 | | 3/8/07 | 3/9/07 | X | X | | | | X | | | On 6/13/07, a withholding action concerning labels for Advanced Meat Recovery System product was taken in accordance with 9 CFR Part 50D2 |
| CASE FARMS OF NC, INC. 00419 P MORGANTON, NC | | | 3/15/07 | 3/17/07 | X | X | X | | | | | 5/30/07 | On 3/15/07, suspension was reinstated. |
| CLOUGHERTY PKG. CO 00380 M00380 P VERNON, CA | | | 9/7/06 | 9/7/06 | | | | X | | | | 5/30/07 | |
| | | | 9/8/06 | 9/8/06 | | | | X | | | | | On 9/8/06, suspension was reinstated. |
| CRIDER POULTRY INC. 06519 M06519 P STILLMORE, GA | 2/26/07 | 4/4/07 | | | X | X | | | | | | 6/11/07 | |
| GREATER OMAHA PACKING COMPANY 00960 M OMAHA, NE | 2/9/07 | 2/20/07 | | | X | X | | | | | | 6/11/07 | |
| KOCH FOODS LLC 19152 P MORRISTONW, TN | 2/28/07 | 3/9/07 | | | X | X | | | | | | 6/21/07 | |
| MOUNTAIRE FARMS OF NORTH CAROLINA 07470 P LUMBER BRIDGE, NC | 2/2/07 | 2/22/07 | | | X | X | | | | | | | |

18

**ABBREVIATION KEY**

| | |
|---|---|
| SPS | Sanitation performance standards |
| INH | Inhumane treatment/slaughter |
| INT | Interference/Assault |
| LOI | Letter of Information |
| LOW | Letter of Warning |

## Administrative Actions Pending or Taken at Large HACCP Plants [includes actions initiated in prior quarters]

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension In Abeyance | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NATIONAL BEEF PACKING CO. 00208A M LIBERAL, KS | | | | | | x | | | | x | | | On 5/29/07, a withholding action concerning labels for Advanced Meat Recovery System product was taken in accordance with 9 CFR Part 500. |
| NEBRASKA BEEF, LTD. 18336 M OMAHA, NE | 8/3/06 | 8/14/06 | | | x | x | | | | x | | 4/6/07 | Plant failed to meet regulatory requirements for Escherichia coli Biotype 1 (E. coli). |
| OK FOODS INC 00165H P HEAVENER, OK | 5/7/07 | 5/25/07 | | | x | x | x | | | | | | |
| PERDUE FARMS INCORPORATED 19112 P BEAVER DAM, KY | 5/9/07 | | 5/17/07 | 5/19/07 | x | x | x | | | | | | |
| PM BEEF HOLDINGS 00683 M WINDOM, MN | | | 4/18/07 | 4/18/07 | | | | | x | | | | |
| | 6/1/07 | 6/7/07 | | | x | x | x | | | x | | | Plant failed to meet regulatory requirements for Escherichia coli Biotype 1 (E. coli). The enforcement action included, as a basis, failure of the establishment to comply with Agency requirements concerning specified risk material. |
| ROCHELLE FOODS, INC 01092, M16789 P ROCHELLE, IL | 4/4/07 | | | | x | x | x | | | | | | |
| TYSON FOODS INC. 01352 P NOEL, MO | 5/18/06 | 6/23/06 | | | x | x | | | | | | | |
| TYSON FRESH MEATS 00244I M LOGANSPORT, IN | 3/19/07 | 4/3/07 | | | x | x | x | | | | | | |
| TYSON FRESH MEATS INC. 00244D M EMPORIA, KS | | | | | | x | | | | x | | | On 12/23/04, a withholding action concerning labels for Advanced Meat Recovery System product was taken in accordance with 9 CFR Part 500. |

ABBREVIATION KEY
SPS   Sanitation performance standards
INH   Inhumane treatment/slaughter
INT   Interference/Assault
LOI   Letter of Information
LOW   Letter of Warning

**Administrative Actions Pending or Taken at Large HACCP Plants (includes actions initiated in prior quarters)**

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension in Effect | Suspension in Abeyance | Basis for Action | | | | | | Closure | | | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | | |
| TYSON FRESH MEATS INC. 09268 M PASCO, WA | | | | | | X | | | | X | | | | On 7/28/04, a withholding action concerning labels for Advanced Meat Recovery System product was taken in accordance with 9 CFR Part 500.6. |
| | 10/20/06 | 12/11/06 | | | | | | | | X | | 4/19/07 | | Plant failed to meet regulatory requirements for Escherichia coli Biotype 1 (E. coli). |
| TYSON'S FOODS, INC. 07221 M07721 P ROGERS, AR | 5/7/07 | 5/25/07 | | | X | X | X | | | | | | | |
| WAYNE FARMS, LLC 33890 M33885 P DECATUR, AL | 3/5/07 | 3/15/07 | | | X | X | | | | | | | | |

20

ABBREVIATION KEY
SPS   Sanitation performance standards
INH   Inhumane treatment/slaughter
INT   Interference/Assault
LOI   Letter of Information
LOW   Letter of Warning

## Table 6. Administrative Actions: Small HACCP Plants
### (4/01/07 to 6/30/07)

**Administrative Actions Pending or Taken at Small HACCP Plants [Includes actions initiated in prior quarters]**

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension In Abeyance | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Basis for Action** | | | | | | **Closure** | | |
| 21ST CENTURY FOODS LTD 31588 M31588 P SAN ANTONIO, TX | 11/29/06 | 12/7/06 | | | X | X | X | X | | | | | |
| ARIES PREPARED BEEF CO. 06037 M06037 P BURBANK, CA | 5/10/07 | 6/13/07 | | | X | X | X | | | | | | |
| ARISTA FOODS CORPORATION 07658 M07658 P ANAHEIM, CA | 6/1/07 | | | | X | X | | | | X | | | The enforcement action included, as a basis, failure of the establishment to comply with Agency requirements concerning specified risk material. |
| ASTRA FOODS, INC. 09591 M09591 P UPPER DARBY, PA | 6/14/07 | 6/22/07 | | | X | X | | | | | | | |
| BENEDETTI FARMS INC. 18216 M18216 P SONOMA, CA | 2/28/07 | | 3/2/07 | 3/16/07 | X | X | X | | | | | | |
| C.W. BROWN & COMPANY 08671 M MOUNT ROYAL, NJ | | | 8/9/05 | | X | X | | | | | | | |
| CAROLINA CULINARY FOODS 19676 M19676 P WEST COLUMBIA, SC | 3/15/07 | 3/26/07 | | | X | X | X | | | | | | |
| COLEMAN NATURAL FOODS 07569 M07569 P WILLIAMSTOWN, NJ | | | 6/27/07 | | X | X | X | | | | | | |
| CONAGRA FOODS 17491 M17491 P NEWPORT, TN | 5/4/07 | 5/11/07 | | | X | X | X | | | | | | |

**ABBREVIATION KEY**
SPS  Sanitation performance standards
INH  Inhumane treatment/slaughter
INT  Interference/Assault
LOI  Letter of Information
LOW  Letter of Warning

21

# Administrative Actions Pending or Taken at Small HACCP Plants (includes actions initiated in prior quarters)

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension In Abeyance | Basis for Action | | | | | | Closure | | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | |
| CRAVE ENTERPRISES, INC. 27348 M27348 P LOS ANGELES, CA | | | 6/1/06 | 6/23/06 | X | | X | | | | | | |
| DAVIS CREEK MEATS AND SEAFOOD, LLC 01947A M01947A P KALAMAZOO, MI | | 6/7/06 | 5/18/07 | 6/5/07 | | X | | | | X | | | Plant failed to meet regulatory requirements for Escherichia coli Biotype 1 (E. coli). |
| DAY-LEE FOODS, L.P. 17309 M17309 P SANTA FE SPRINGS, CA | 5/16/06 | | 10/18/06 | 1/24/07 | X | X | | | | | | | |
| DEAN SAUSAGE COMPANY/KENTUCKY FARM KITCHENS 06621A M ATTALLA, AL | 6/15/07 | 6/29/07 | | | X | | X | | | | | | |
| FOOD SOURCE, L.P. 13130 M13130 P MCKINNEY, TX | 4/13/07 | 4/24/07 | | | X | X | | | | | | | |
| FORMOSA MEAT COMPANY, INC. 08256 M08256 P RANCHO CUCAMONGA, CA | 3/9/07 | 3/19/07 | | | X | X | X | | | | | | |
| FULTON PROCESSORS INC 00930 P FULTON, CA | 2/21/07 | 3/23/07 | | | X | X | X | | | | | | |
| HOSS'S FRESH EXPRESS, INC. 19058 M19058 P CLAYSBURG, PA | | | 4/20/07 | 5/11/07 | X | X | | | | | | | |
| IMPERIAL MEAT COMPANY 04847 M04847 P MONTEREY PARK, CA | | | 2/15/07 | 2/17/07 | X | | X | | | | | | |
| KOCH FOODS OF ALABAMA, LLC 06529 P MONTGOMERY, AL | 11/30/06 | 12/13/06 | | | X | X | X | | | X | | | Plant failed to meet regulatory requirements for Escherichia coli Biotype 1 (E. coli). |

22

**ABBREVIATION KEY**
SPS  Sanitation performance standards
INH  Inhumane treatment/slaughter
INT  Interference/Assault
LOI  Letter of Information
LOW  Letter of Warning

# Administrative Actions Pending or Taken at Small HACCP Plants [Includes actions initiated in prior quarters]

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension In Abeyance | Basis for Action | | | | | | Closure | | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | |
| KOCH FOODS OF ALABAMA, LLC 33837 P MONTGOMERY, AL | 6/21/07 | | | | X | X | X | | | | | | |
| KONANYAN MEATS 00645 M02401 P LOS ANGELES, CA | 10/17/06 | 11/2/06 | | | X | X | X | | | | | | |
| MANDA FINE MEATS 08746 M08746 P BATON ROUGE, LA | 6/19/07 | 6/29/07 | | | X | X | X | | | | | | |
| MEADOW FARMS SAUSAGE COMPANY 08028 M06028 P LOS ANGELES, CA | 9/1/06 | 9/13/06 | | | X | X | | | | | | | |
| MINNESOTA BEEF INDUSTRIES, INC. 17466 M BUFFALO LAKE, MN | 9/21/05 | 9/29/05 | | | | X | | | | | | | |
| NDK FOODS, INC. 17427 M17427 P BELL GARDENS, CA | | | 9/7/06 | 9/29/06 | X | | X | | | | | | |
| NORTH AMERICAN BISON COOPERATIVE 18859 M18859 P NEW ROCKFORD, ND | | | 4/19/07 | 4/20/07 | | | | X | | | | | |
| NORTHERN PACKING COMPANY INC. 00571 M BRIAR HILL, NY | 12/9/05 | 12/23/05 | 6/21/07 | | X | X | X | | | X | | | The enforcement action included, as a basis, failure of the establishment to comply with Agency requirements concerning specified risk material. |
| OLD SETTLER'S JERKY INC. 09875 M09875 P COVINA, CA | | | 4/25/06 | 4/29/06 | X | | X | | | | | | |
| | | | 7/25/06 | 7/28/06 | X | | X | | | | | | On 7/25/06, suspension was reinstated. |

23

ABBREVIATION KEY
SPS   Sanitation performance standards
INH   Inhumane treatment/slaughter
INT   Interference/Assault
LOI   Letter of Information
LOW   Letter of Warning

# Administrative Actions Pending or Taken at Small HACCP Plants [includes actions initiated in prior quarters]

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension In Abeyance | Basis for Action | | | | | | Closure | | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | |
| ORVAL KENT FOOD COMPANY, INC. dba CHEF SOLUTIONS 02499 M02499 P WHEELING, IL | 9/15/06 | 10/6/06 | 1/22/07 | 2/13/07 | X | X | X | | | | | | |
| PERFECTION FOODS CO. INC 21762 M21762 P PHILADELPHIA, PA | 5/18/07 | 5/25/07 | | | X | X | | | | | | | |
| PETE'S FOOD PRODUCTS 04172 M LOS ANGELES, CA | | | 12/27/06 | 1/3/07 | | | | | X | | | | |
| PILGRIM'S PRIDE 06719 P CHATTANOOGA, TN | 3/14/07 | 3/22/07 | | | X | X | | | | | | | |
| R.A.B. FOOD GROUP LLC 01406 M00761 P NEWARK, NJ | | | 3/16/07 | | X | | X | | | | | | |
| RESSLER'S FOOD PRODUCTS CO. 01524 M01524 P PHILADELPHIA, PA | 3/9/07 | 3/20/07 | 5/22/07 | 5/25/07 | X | X | X | | | | | | |
| RICE FIELD CORPORATION 20153 M20153 P CITY OF INDUSTRY, CA | 4/13/07 | | 4/24/07 | 5/1/07 | X | X | X | | | | | | |
| SCALA PACKING CO., INC. 01731 M CHICAGO, IL | 3/23/07 | 4/5/07 | | | X | X | | | | | | | |
| SIERRA MADRE FOODS 06009 M MONTEREY PARK, CA | | | 1/18/05 | 1/24/05 | X | | X | | | | | | |
| STAGNO'S MEAT COMPANY 02875 M MODESTO, CA | 5/17/07 | | 5/24/07 | 6/6/07 | X | X | | X | | X | | | The enforcement action included, as a basis, failure of the establishment to comply with Agency requirements concerning specified risk material. Plant failed to meet regulatory requirements for Escherichia for Escherichia coli Biotype 1 (E. coli). |

ABBREVIATION KEY
SPS    Sanitation performance standards
INH    Inhumane treatment/slaughter
INT    Interference/Assault
LOI    Letter of Information
LOW    Letter of Warning

24

# Administrative Actions Pending or Taken at Small HACCP Plants (includes actions initiated in prior quarters)

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension In Abeyance | Basis for Action | | | | | | Closure | | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | |
| THE PORK CO. 20608 M WARSAW, NC | 4/19/07 | 4/25/07 | | | X | X | X | | | | | | |
| U.S. CHOICE, INC. 04128 M04128 P LOS ANGELES, CA | | | 10/19/06 | 10/30/06 | | | | | | X | | | |
| WINTER SAUSAGE MANUFACTURING COMPANY, INC. 10158 M10158 P EASTPOINTE, MI | 8/21/07 | | | | | X | | | | | | | |

25

ABBREVIATION KEY
SPS   Sanitation performance standards
INH   Inhumane treatment/slaughter
INT   Interference/Assault
LOI   Letter of Information
LOW   Letter of Warning

## Table 7.  Administrative Actions: Very Small HACCP Plants (4/01/07 to 6/30/07)

**Administrative Actions Pending or Taken at Very Small HACCP Plants (includes actions initiated in prior quarters)**

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension In Abeyance | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABE'S PLACE DELICACIES 20339 M20339 P ALLENTOWN, PA | 4/26/07 | 5/15/07 | | | X | X | | | | | | | |
| AL'S HICKORY HOUSE BARBEQUE 10760 M SHELBYVILLE, TN | 5/31/07 | 6/25/07 | | | X | X | | | | | | | |
| BACH CUC BEEF JERKY 18895 M18895 P SOUTH EL MONTE, CA | 7/5/06 | 7/18/06 | | | X | X | | | | | | | |
| BASKIN BROWN'S MEAT LOCKER INC. 07055 M07055 P STRATFORD, TX | 11/27/06 | 12/8/06 | | | X | X | | | | | | 6/4/07 | |
| BENTON'S SMOKY MOUNTAIN HAMS 0x127 M MADISONVILLE, TN | 4/4/07 | 5/2/07 | | | X | X | X | | | | | | |
| BILLINGS MEATS & PROCESSING 20586 M GORDO, AL | 3/15/07 | 4/5/07 | | | X | X | | | | | | | |
| BRYANT'S MEATS INC. 06697 M06697 P TAYLORSVILLE, MS | 6/28/07 | | | | | X | | | | | | | |
| CECINA LOS AMIGOS 21653 M21653 P CARSON, CA | | | 6/14/06 | 7/18/06 | X | X | | | | | | | |
| COAST PACKING CO. 00724A M00724A P COLTON, CA | | | 9/15/06 | 9/21/06 | | | X | | | | | 4/21/07 | |

**ABBREVIATION KEY**
SPS Sanitation performance standards
INH Inhumane treatment/slaughter
INT Interference/Assault
LOI Letter of Information
LOW Letter of Warning

26

# Administrative Actions Pending or Taken at Very Small HACCP Plants [includes actions initiated in prior quarters]

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension in Abeyance | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COASTAL FOODSERVICE & PROVISION 17398 M/17398 P PROVIDENCE, RI | 10/31/06 | | 2/1/07 | 2/1/07 | | x | | | | | | 4/17/07 | |
| COUNTRYSIDE QUALITY MEATS, L.L.C. 10147 M10147 P UNION CITY, MI | | 11/9/06 | | | x | x | | | | | | 4/6/07 | |
| CPK QUALITY FOODS 32016 M32016 P BLAINE, MN | 5/15/07 | 5/25/07 | | | | x | | | | | | | |
| EARL OF SAUSAGE, INC. 31844 M WILLERNIE, MN | | | 4/23/07 | 6/15/07 | | x | | | | x | | 5/3/07 | The enforcement action included, as basis, failure of the establishment to comply with Agency requirements concerning specified risk material. |
| G&W MEAT & BAVARIAN STYLE SAUSAGE CO. 08713 M08713 P ST. LOUIS, MO | 10/5/06 | 10/26/06 | | | x | x | x | | | x | | | |
| GARDELLA'S RAVIOLI CO. & ITALIAN DELI, LLC 05444 M VINELAND, NJ | 6/15/07 | 6/28/07 | | | | x | | | | | | | |
| GIBSON PACKING COMPANY 05843 M05843 P SEYMOUR, MO | 9/21/06 | 10/20/06 | | | x | x | x | | | x | | 4/6/07 | Plant failed to meet regulatory requirements for Escherichia coli Biotype 1 (E. coli). The enforcement action included, as a basis, failure of the establishment to comply with Agency requirements concerning specified risk material. |
| GRILLER'S PRIDE, LLC 31952 M31952 P DORAVILLE, GA | 1/25/07 | 4/23/07 | 5/23/05 | 8/17/05 | x | x | | | | x | | 4/4/07 | Plant failed to meet regulatory requirements for Escherichia coli Biotype 1 (E. coli). |
| GRIZZLY'S CUSTOM CUTTING 21554 M21554 P HUNT, NY | 5/10/05 | | 10/5/05 | 5/23/06 | x | x | | | | | | 4/4/07 | On 2/16/06, an appeal was received. The appeal was denied on 3/31/06. On 10/5/05, suspension was reinstated. |

**ABBREVIATION KEY**
SPS   Sanitation performance standards
INH   Inhumane treatment/slaughter
INT   Interference/Assault
LOI   Letter of Information
LOW   Letter of Warning

27

# Administrative Actions Pending or Taken at Very Small HACCP Plants [Includes actions initiated in prior quarters]

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension in Abeyance | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INDIAN VALLEY MEATS, INC. 18154 M18154 P INDIAN, AK | 9/14/06 | | 10/13/06 | 10/27/06 | X | X | X | | X | | | 6/1/07 | On 11/9/06, plant appealed the suspension. On 3/15/07, plant's appeal was denied. |
| J.M. PACKING, CO. 19804 M19804 P PONCE, PR | | | 11/21/05 | 4/26/07 | X | X | | | | | | | |
| JOINES MEAT PROCESSING 21703 M21703 P CHILHOWIE, VA | 4/3/07 | 4/26/07 | | | | X | | | | | | | |
| JOS. SANDERS, INC. 10269 M CUSTER, MI | 12/1/06 | 12/15/06 | | | X | X | | | | | | 4/24/07 | |
| KADEJAN INC 18888 P GLENWOOD, MN | 4/17/07 | 4/27/07 | | | X | X | X | | | | | | |
| KIOWA LOCKER SYSTEMS 21585 M21585 P KIOWA, KS | 1/17/07 | | | | X | X | | | | | | | |
| KUBISCH SAUSAGE CO. 10116 M10116 P SHELBY TWP, MI | 3/1/06 | 3/27/06 | | | X | X | | | | | | 5/14/07 | |
| L & J MEAT MARKET, INC. 10131 M10131 P LAKE CITY, MI | | | 4/19/07 | 4/20/07 | | | | X | | | | | |
| LE GOURMET LORRAIN INC 08604 M08604 P HYATTSVILLE, MD | 1/3/07 | 1/16/07 | 2/1/07 | | X | X | | | | | | | |
| LOS GALLEGUITOS CORP 05447 M20142 P UNION CITY, NJ | | | 8/16/06 | 9/15/06 | | X | | | | | | 5/18/07 | |
| MAYARS HALAL MEAT PROCESSING 21595 M21595 P LIVINGSTON, CA | | | 7/21/06 | 7/26/06 | | | | | X | | | | |
| | | | 11/29/06 | 12/4/06 | | | | | X | | | | On 11/29/06, suspension was reinstated. |

28

ABBREVIATION KEY
SPS   Sanitation performance standards
INH   Inhumane treatment/slaughter
INT   Interference/Assault
LOI   Letter of Information
LOW   Letter of Warning

## Administrative Actions Pending or Taken at Very Small HACCP Plants [includes actions initiated in prior quarters]

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension In Abeyance | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MICKELSEN PACKING INC 11070 M11070 P BLACKFOOT, ID | 1/10/07 | 2/5/07 | | | X | X | X | | | X | | | Plant failed to meet regulatory requirements for Escherichia coli Biotype 1 (E. coli). |
| MICROWARE ROASTERS INC 31770 M SELMA, AL | 2/28/07 | 3/6/07 | | | X | X | X | | | | | | |
| MITCHELL MEAT COMPANY 07295 M07296 P CHILLICOTHE, MO | 12/5/06 | 1/11/07 | | | | X | | | | | | 4/17/07 | |
| MOUNTAIN MEAT PACKING, INC 04979 M04979 P FRUITA, CO | | | 6/19/07 | 6/29/07 | | | | X | | | | | |
| MUNSEY MEATS 31575 M MORRISTOWN, TN | 6/8/07 | 6/15/07 | | | X | X | | | | | | | |
| MAMAN'S MEAT COMPANY, INC 27429 M 27429 P MOBILE, AL | 4/9/07 | 4/17/07 | | | X | X | X | | | | | | |
| NANA AND PAPA'S BAR-B-QUE 06737 M06737 P RUTHERFORD, TN | 4/11/07 | 6/7/07 | | | X | X | X | | | | | | |
| NORCO RANCH INCORPORATED 01063 G NORCO, CA | | | 6/21/07 | | | | X | | | | | | |
| PACFOODS, USA 09889 M09889 P HAYWARD, CA | | | 8/26/02 | 10/17/02 | X | X | | | | | | | |
| | | | 10/23/02 | | X | X | | | | | | | On 10/23/02, suspension was reinstated. |
| PEL-FREEZ ARKANSAS, LLC 00202 P ROGERS, AR | 6/29/07 | | | | X | X | X | | | X | | | Plant failed to meet regulatory requirements for Escherichia coli Biotype 1 (E. coli). |

**ABBREVIATION KEY**
SPS   Sanitation performance standards
INH   Inhumane treatment/slaughter
INT   Interference/Assault
LOI   Letter of Information
LOW   Letter of Warning

29

# Administrative Actions Pending or Taken at Very Small HACCP Plants [includes actions initiated in prior quarters]

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension In Abeyance | Basis for Action | | | | | | Closure | | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | |
| PERCIVAL PACKING L.L.C. 34001 M34001 P SCOTT CITY, KS | 4/10/07 | 4/18/07 | | | X | X | | | | | | | |
| PRAIRIE PACKING INC. 07644 M07644 P WILLISTON, ND | 3/30/07 | 5/2/07 | | | X | X | X | | | | | | |
| R&P GOURMET FOOD PROCESSING, INC. 22002 M22002 P CARLOS, MN | 11/30/06 | 12/8/06 | | | X | X | | | | | | 4/27/07 | |
| RICHARDSON CHICKEN FARM 10830 P WHITE MARSH, MD | 2/12/07 | 3/15/07 | | | X | X | | | | | | 6/6/07 | |
| ROBERSONVILLE PACKING CO 22064 M22064 P ROBERSONVILLE, NC | | | 5/2/07 | 5/3/07 | | | | X | | | | | |
| ROBERSONVILLE PACKING CO 22064 M22064 P ROBERSONVILLE, NC | | | 5/9/07 | 5/14/07 | | | | X | | | | | On 05/9/07, suspension was reinstated. |
| SHANGHAI EGG ROLLS 19212 M19212 P BECKLEY, WV | 2/12/07 | | 3/5/07 | 4/4/07 | X | X | X | | | | | 6/18/07 | |
| SPECIAL AMERICA'S BBQ 11179 M OPA-LOCKA, FL | | | 12/13/05 | | | X | | | | | | | |
| SUENO, LLC 20538 M20538 P PITTSBORO, NC | 3/12/07 | | 3/21/07 | 4/16/07 | X | X | | | | | | | |
| T.L. HERRING & CO. 11504 M11504 P WILSON, NC | 4/24/07 | | 5/2/07 | 6/5/07 | X | X | X | | | | | | |
| ULEN LOCKER 31916 M31916 P ULEN, MN | 11/17/06 | 11/30/06 | | | X | X | X | | | | | 4/20/07 | |

30

ABBREVIATION KEY
SPS    Sanitation performance standards
INH    Inhumane treatment/slaughter
INT    Interference/Assault
LOI    Letter of Information
LOW    Letter of Warning

## Administrative Actions Pending or Taken at Very Small HACCP Plants [includes actions initiated in prior quarters]

| Establishment/ Estab. Number Location | NOIE | Deferral | Suspension In Effect | Suspension in Abeyance | Basis for Action | | | | | | Closure | | Appeals and Actions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SSOP | HACCP | SPS | INH | INT | Other | LOI | LOW | |
| UNION SLAUGHTER HOUSE, INC. 13189 M DEL RIO, TX | | | 2/14/07 | 2/15/07 | | | | X | | | | 6/12/07 | |
| USA PORK PACKERS, INC. 20760 M20760 P HAZELTON, PA | 2/14/07 | 3/7/07 | | | X | | X | | | X | | 6/19/07 | Plant failed to meet regulatory requirements for Escherichia coli Biotype 1 (E. coli). |
| WALT'S HOMESTYLE FOODS, INC 17443 M17443 P YANKTON, SD | 6/19/07 | | | | | X | | | | | | | |
| WENNEMAN MEAT CO. INC. 27499 M27499 P ST. LIBORY, IL | 1/22/07 | 2/1/07 | | | X | X | X | | | | | 5/24/07 | |
| WHITT'S BARBECUE 07302 M07302 P ANTIOCH, TN | 12/6/06 | 12/15/06 | | | X | X | | | | | | 5/18/07 | |
| YEE TUNG INC. 19014 P WESTVILLE, NY | 6/14/07 | 6/27/07 | | | X | | X | | | | | | |

**ABBREVIATION KEY**
SPS    Sanitation performance standards
INH    Inhumane treatment/slaughter
INT    Interference/Assault
LOI    Letter of Information
LOW    Letter of Warning

<u>Formal Adjudicatory Actions for Food Safety</u>

Under the statutes it administers, FSIS can, in appropriate cases, move to withdraw grants of federal inspection from plants and plant owners based on the failure of a recipient of inspection service to meet critical sanitation and food safety regulatory requirements [e.g., Sanitation Standard Operating Procedures (SSOP) or Hazard Analysis and Critical Control Point (HACCP) system regulations] necessary to protect the public health.  In some situations, FSIS also can seek to deny inspection service to an applicant for failure to meet certain food safety regulatory requirements.  These actions are taken in accordance with the FSIS Rules of Practice (9 CFR Part 500) and Department regulations governing formal adjudicatory proceedings (7 CFR Part 1, Subpart H).  Plants and plant owners are provided with the opportunity for a hearing before a federal administrative law judge.  **Table 8** identifies refusal and withdrawal actions pending or taken (other than outstanding consent decisions) on this basis for this reporting period.  There were no actions initiated during this reporting period.

Withdrawal for Unfitness

Under the statutes it administers, FSIS also can move to withdraw inspection, after opportunity for a hearing, based on the unfitness of an applicant for or a recipient of inspection because of a felony conviction or more than one violation involving food. Actions pending or taken (other than outstanding consent decisions) are reported. **Table 9** identifies actions pending or taken (other than outstanding consent decisions) on this basis for this reporting period. There were no new unfitness actions initiated this reporting period.

### Table 9. Withdrawal for Unfitness
### (4/01/07 to 6/30/07)

**Administrative Actions Pending or Taken for Unfitness [includes actions initiated in prior quarters]**

| Establishment | Complaint to Deny/Withdraw Inspection | Consent Order | Decision and Order | Action Summary |
|---|---|---|---|---|
| ALMACENES DE TEJAS, L.P. d/b/a ADT, AND ALLEN JACKSON HAUSMAN 17083 M SAN ANTONIO, TX | 03/15/07 | | 06/27/07 | On March 15, 2007, FSIS filed a complaint to withdraw voluntary reimbursable inspection service based on the conviction of the corporation, Almacenes De Tejas, L.P. d/b/a ADT, and its president, Allen Jackson Hausman on two (2) each misdemeanor counts related to food. On June 27, 2007, the firm and its owner, Mr. Hausman, entered into a Consent Decision and Order (Order), with FSIS as a result of an administrative withdrawal action. The Order requires, among other things, compliance with SSOP, sanitation performance standards, written control procedures of FSIS controlled products, and ethical business practice training. The Order is effective for two (2) years. |
| BLUE RIDGE POULTRY OF ATHENS, INC. AND ROBERT T. HARRIS, JR. 08307 P ATHENS, GA | 03/15/07 | | | On March 15, 2007, FSIS filed a complaint to withdrawal inspection service based on the conviction of the corporate president, Robert T. Harris, Jr., on three (3) misdemeanor counts related to food. On May 18, 2007, an Administrative Law Judge issued an Order dismissing the complaint. |
| BRESTENSKY MEAT MARKET, INC., AND STEPHEN T. BRESTENSKY 09407 M FREEPORT, PA | | | 04/26/07 | On April 26, 2007, the firm, Brestensky Meat Market, Inc., and Stephen T. Brestensky, President, entered into an Amended Stipulation and Consent Decision (Amended Decision) with FSIS. The Amended Decision extends Agency jurisdiction for five (5) years and contains provisions to ensure compliance with SSOP, HACCP and recordkeeping requirements. |

<u>Removing Exempt Privilege</u>

The meat and poultry laws exempt certain custom, retail, or other operations from inspection. For example, custom exempt businesses slaughter animals or poultry, or process meat and poultry for owners of the animals or products. When insanitary conditions create health hazards, FSIS may remove custom or other exempt privileges through issuance of a Notice of Ineligibility (complaint), and require the business to cease operations until sanitary conditions are restored. FSIS can also take action when custom or other exempt facilities fail to properly label product as "Not for Sale." These exempt businesses have the opportunity to correct violations prior to such actions, contest the basis for such actions at hearings, and to enter settlement agreements (consent orders) to resolve actions. **Table 10** lists exempt actions pending or taken (other than outstanding consent orders) on this basis for this reporting period. There were two new actions initiated this reporting period.

### Table 10. Exempt Actions
### (4/01/07 to 6/30/07)

### Administrative Actions Taken at Exempt Facilities

| Name | Complaint Served | Consent Order | Decision and Order | Action Summary |
|------|------------------|---------------|--------------------|----------------|
| BANCROFT MEAT PROCESSORS, INC. HOWARD PETERSEN, OWNER BANCROFT, NE | | 04/23/07 | | On April 23, 2007, the firm and Mr. Petersen entered into an Amended Consent Agreement (Agreement) with FSIS as settlement of an administrative withdrawal of custom exempt eligibility. The Agreement is applicable for eighteen (18) months and requires Bancroft to ensure that operations are conducted in a sanitary manner and that products are not adulterated,2 and to monitor and document pre-operational and operational sanitation. |
| BUTCHER BLOCK LAURN AND KAY OLTMER, OWNERS INDIANOLA, NE | 04/10/07 | | | On April 10, 2007, a Notice of Ineligibility to conduct custom exempt operations was issued to the firm. |
| CARROLL L. SCHISLER, SR. AND CARROLL L. SCHISLER, JR. NEW WINDSOR, MD | 04/21/06 | | | On April 20, 2006, a Notice of Ineligibility to conduct custom exempt operations was issued to the firm. A pending administrative hearing is unscheduled at this time. |

**CRIMINAL ACTIONS**

If evidence is found that a person or business has engaged in violations of the Federal Meat Inspection

Act, Poultry Products Inspection Act, or Egg Products Inspection Act, USDA may refer

the case to the appropriate United States Attorney to pursue criminal prosecution.  Conviction for a

criminal offense can result in a fine, imprisonment, or both. **Table 11** lists criminal actions and criminal

cases in categories according to the status of the case, which may be indictment or information issued,

pleas, convictions, or acquittals, and sentences rendered during this reporting period.

## Table 11. Criminal Actions
## (4/01/07 to 6/30/07)

### Criminal Actions

| Name | Indictment | Information | Plea | Sentencing | Action Summary |
|---|---|---|---|---|---|
| ANSTINE ENTERPRISES, INC. dba KINGSVILLE HOG MARKET AND RICK D. ANSTINE, AND QUEEN'S MARKET LLC AND KIM HUE HUYNH AND NHAN PHU PHAM<br>KANSAS CITY, MO | 08/24/06 | | | | On August 24, 2006, in the U.S. District Court for the Western District of Missouri, Mr. Rick D. Anstine and Anstine Enterprises, Inc. dba Kingsville Hog Market, and Kim Hue Huynh and Nhan Phu "John" Pham and Queen's Market LLC, were indicted on twenty-two (22) counts of conspiring to commit mail fraud, violate the FMIA, distribute adulterated food, and offer for sale uninspected and inedible food. |
| DOWNSVILLE FOODS, LLC, BRENT CREEL AND CARL W. BROWN<br>MONROE, LA | | | 06/21/07 | | On June 21, 2007, in the Western District of Louisiana, Downsville Foods, LLC, Mr. Brent Creel and Carl Brown entered guilty pleas to charges of violating the FMIA and PPIA. The individuals plead guilty to two (2) counts of violating the FMIA and one (1) count of violating the PPIA. Mr. Thomas Wayne Creel, Agent-in-Fact, for Downsville Foods, LLC, plead guilty on behalf of the corporation to two (2) counts, one (1) count of violating the FMIA and one count violating the PPIA. Downsville Foods, LLC agreed to fines of $50,000 per count ($100,000 total), reimbursement of FSIS cost of investigations ($26,230) and a special assessment of $250. The sentencing of the individuals, Mr. Creel and Mr. Brown will be held September 17, 2007. |
| WOOLF INTERNATIONAL CORPORATION, HOWARD J. WOOLF, PRESIDENT AND INTERNATIONAL PACKERS CORPORATION, LAWRENCE GREENBERG, OWNER RUSSELL B. SKIDDS WAYNE CIARAMITARO JOSEPH SCRENCI JAMES D. TAYLOR JOSEPH YURITTA<br>BOSTON, MA | | | 05/30/07 | 05/30/07 | On May 30, 2007, in the United States District Court for the District of Massachusetts, defendants Woolf International Corporation and International Packers Corporation plead guilty to charges stemming from illegal meat repackaging and to other crimes. Mr. Howard J. Woolf, President, Woolf International Corporation, was sentenced on three (3) felony counts of conspiracy, mail fraud, and filing false tax returns, placed on one (1) year probation, and fined $1000 and a special assessment fee of $400. Lawrence Greenberg, owner, International Packers Corporation, was sentenced on six (6) felony counts and received 90 days incarceration in a halfway house, five (5) years probation, 100 hours of community service, $40,000 fine, and a $600 special assessment fee. The remaining defendants received varying probationary terms and fines. Russell B. Skidds was sentenced on two (2) felony counts, placed on three (3) years probation, and fined a $300 special assessment fee. Wayne Ciaramitaro was sentenced on two (2) felony counts, placed on two (2) years probation, and fined $1000 and a $300 special assessment fee. Joseph Screnci was sentenced on three (3) felony counts, placed on one (1) year probation, and fined $5,000 and a $300 special assessment fee. James D. Taylor was sentenced on two (2) felony counts, placed on one (1) year probation, and fined $2,000 and a $300 special assessment fee. Joseph Yuritta was sentenced on two (2) felony counts, placed on one (1) year probation, and fined $500 and a $300 special assessment fee. |

36

PRE-TRIAL DIVERSION AGREEMENTS

In certain situations, United States Attorneys may enter into Pre-Trial Diversion (PTD) agreements. Under these agreements, the government agrees not to proceed with criminal prosecution if the alleged violator meets certain terms and conditions. The terms and conditions of a PTD are tailored to fit each individual case. FSIS frequently monitors these agreements so that it can assist the United States Attorneys in determining whether prosecution should be re-instituted. If the divertee successfully completes the program, no criminal charges are filed. If, on the other hand, the divertee does not successfully complete the program, criminal charges may be reinstated.

There were two pre-trial diversion agreements this quarter. One agreement involved a managing official at a warehouse distribution firm in the Northeastern United States. The firm and managing official were cited for apparent violations of the FMIA involving adulterated products. The pre-trial diversion is effective for a 6-month period and prohibits the firm and individual involved from violating any Federal, state or local laws. The agreement also stipulates that the individual must perform one hundred hours of community service. Another agreement involved a managing official at a meat slaughter and processing firm in the Northeastern United States. The managing official was cited for apparent violations of the FMIA involving adulterated products. The pre-trial diversion is effective for a 6-month period and prohibits the individual involved from violating any Federal, state or local laws.

**CIVIL ACTIONS**

FSIS also has authority to seek a variety of civil actions and case dispositions in Federal Court.

Seizures

When FSIS has reason to believe distributed products are adulterated, misbranded, or otherwise in violation of law, the Agency will, through the USDA Office of the General Counsel and United States Attorney, institute a seizure action against the product. The product is held pending an

adjudication of its status. If the court finds that the product is adulterated, misbranded, or otherwise in violation of FSIS laws, it will condemn the product. Condemned product cannot be further processed to be used for human food. **Table 12** lists seizure actions and seizure cases. There were no seizure actions initiated during this reporting period.

Injunctions

FSIS, through the U.S. Attorney, may request a U.S. District Court to enjoin ongoing or repetitive violations of the FMIA, PPIA, or EPIA. The Agency seeks injunctions to stop, for example, uninspected retail stores from processing products without required inspection for wholesale business or to prevent or restrain other violations of law. **Table 13** lists civil actions and civil cases. There was one injunction initiated during this reporting period.

**Table 13. Civil Actions**
**(4/01/07 to 6/30/07)**

## Civil Actions

| Name | Complaint | Injunction | Action Summary |
|------|-----------|------------|----------------|
| KAMKEU ORIENTAL MARKET (KAMKEU) FANG Y. CENG, PRESIDENT SOMERVILLE, NJ | 05/1/07 | 06/20/07 | On June 20, 2007, in the United States Court, District of New Jersey, Kamkeu Oriental Market (Kamkeu), a retailer in the designated State of New Jersey, entered into a Consent Decree that permanently enjoins the owner and the firm from violating the Federal Meat Inspection Act. Kamkeu was charged with selling, transporting and offering for sale uninspected and misbranded meat food products required to be federally inspected within the State of New Jersey. |

<u>False Claims Act and Other Actions</u>

The Department of Justice Affirmative Civil Enforcement (ACE) program is used by U.S. Attorneys to recover damages when a violation of law involves fraud against the Federal government. Under the False Claims Act, the government may recover three times its estimated losses. FSIS typically seeks action under this program for cases involving products, not in compliance, sold to the military, to public schools engaged in the school lunch program, or to other Federal institutions. **Table 14** lists ACE actions and other cases involving civil enforcement or settlement. There were no ACE program or other civil case actions reported for this period.

**FOR MORE INFORMATION:**

| | |
|---|---|
| Media Inquiries: | (202) 720-9113 |
| Freedom of Information Act Requests: | (202) 720-2109 |
| Congressional Inquiries: | (202) 720-3897 |
| Constituent Inquiries: | (202) 720-9113 |

Consumer Inquiries:    Call USDA's Meat and Poultry Hotline at
1-888-674-6854 or 1-800-256-7072 for the hearing impaired,
10 a.m. to 4 p.m., Eastern Time.

FSIS Web site:    http://www.fsis.usda.gov