**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

|  |  |  |
|---|---|---|
| | § | |
| **DARRYL ANDERSON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No.:** |
| **v.** | § | **1:06-cv-1000-MEF-WC** |
| | § | |
| **PERDUE FARMS, INC.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |
| | § | |

**PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S EXHIBIT C**
**FROM THE RECORD**

COMES NOW Plaintiffs ("Employees"), and move this Court to strike a portion of Defendant's evidentiary submissions submitted with Defendant's ("Perdue" or "Company") Motion for and Memorandum in Support of Summary Judgment. In support of this Motion Employees state as follows:

**A.      Grounds**

1.      **Evidence Which is Not Authenticated or Identified is Inadmissible.**

In ruling on a summary judgment motion this Court may consider only evidence that would be admissible at trial. *See White v. Wells Fargo Guard Servs.*, 908 F.Supp 1570, 1577 (M.D. Ala. 1995). Documents must be properly authenticated in order for them to be considered on summary judgment. *See APA Excelsior III, L.P. v. Windley*, 329 F. Supp. 2d 1328 (M.D. Ga. 2004) (citing *Burnett v. Stagner Hotel Courts, Inc.*, 821 F. Supp. 678, 683 (N.D. Ga. 1993). Under the Federal Rules of Evidence, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by

evidence sufficient to support a finding that the matter in question is what its proponent claims." FRE 901(a).

B. **Defendant's Exhibit C Accompanying Its Motion for Summary Judgment Is Not Authenticated and Therefore Not Admissible.**

The document is question is titled "First Principal Activity – Associate Performance Standards and Dothan Plant Discipline Program" and was filed as Exhibit C in the Defendant's Motion for Summary Judgment. *See* PX1. In the Plaintiffs' Response to Summary Judgment the Employees notified this Court of the potential problems concerning authentication of this document. The Defendant purports that this document shows that employees are aware that they have a choice to wear PPE - hairnets, earplugs, bump caps, safety glasses, LOTO equipment and boots - from home. PX1 at PER_AND000128. There is a signature line at the bottom of each page to serve as proof of receipt. *See* PX1. In over 5,000 documents produced by Perdue in discovery, including declaration, there is not *any* mention of this document. Heflin's and Tabinowski's declarations never authenticated this document. *See* PX2; PX3. Further, there is no proof that any employee ever received this document or that this document was ever seen by any of the Plaintiffs. Under FRE 901(a), there is no "evidence sufficient to support a finding that the matter in question is what its proponent claims." Under the rules this document is not authentic and cannot be admissible at trial therefore it must be stricken from the record.

Dated: June 25, 2008

Respectfully submitted,

**THE COCHRAN FIRM, P.C.**

/s/ Robert J. Camp
**ROBERT J. CAMP**
505 North 20th Street, Suite 825
Birmingham, AL  35203
(205) 244-1115 (Phone)
(205) 244-1171 (Fax)

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2008, I electronically filed the forgoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to:

| | |
|---|---|
| Sandra B. Reiss | Lance Harrison Swanner |
| sandra.reiss@odnss.com | lswanner@cochranfirm.com |
| | |
| James J. Kelley | Bernard D. Nomberg |
| jkelley@morganlewis.com | bnomberg@cochranfirm.com |
| | |
| Lexer I. Quarmie | Samuel A. Cherry, Jr. |
| lquamie@morganlewis.com | scherry@cochranfirm.com |

/s/ Robert J. Camp
**ROBERT J. CAMP**

# EXHIBIT 1

# First Principal Activity - Associate Performance Standards and Dothan Plant Discipline Program

## Purpose:

To provide management/supervision with guidelines for managing the First Principal Activity Plan and provide associates with information needed in order to be compliant.

## Scope:

All plant associates performing work that is line driven or associates who are required to handle product in any form.

## Required Procedures for Compliance with Performance Standards:

## Start of Shift

Associates covered by the First Principal Activity Compliance Plan may not punch a time clock until their designated starting time. Starting times are assigned by work station and will be made known to all associates.

Associates must clock their time card in before putting on aprons, lab coats, rain suits, freezer suits, gloves or

Signature: _____   Date: _____

PER_AND000127

any other item of apparel provided by the company. Exceptions are personal protective equipment, i.e., hairnets, earplugs, bump cap, safety glasses, LOTO equipment and boots, which may be worn from home or put on before clocking their time card in.

Associates must put on **_required_ gear (aprons, lab coats, rain suits, freezer suites, and gloves),** sanitize if required, then proceed to their designated work station within an acceptable amount of time to be determined by management, but not to exceed 2 minutes.

## Start/Return From 30 Minute Break

Associates must clock their time card out for the 30 minute lunch/dinner break. A lunch/dinner break of less than 30 minutes is not permissible. Supervisors will establish the department or individual times for this break.

At the designated time for a 30 minute break, associates must first remove their required gear and place in predetermined location, and then proceed to designated time clock in an acceptable amount of time as determined by management, but not to exceed 2 minutes, to clock their time card out. Associates will not be allowed to wear any required gear (hairnets, ear plugs, boots, bump caps, glasses and LOTO equipment are allowed) outside their work area during these 30 minutes, however normal procedures as required by USDA or Quality Assurance apply during the two company paid breaks.

Signature: _____    Date: _____

PER_AND000128

Associates returning from 30 minute lunch/dinner break must clock time card in before putting on any required gear. After clocking time card in, gearing up, and sanitizing if required, proceed to work station in an acceptable amount of time as determined by management, but not to exceed 2 minutes.

## End of Shift

Associates must remove any required gear before clocking their time card out. At a time announced by management, associates remove required gear and place in predetermined location and proceed to designated time clocks in an acceptable amount of time as determined by management, but not to exceed 2 minutes to clock their time card out. **See *paragraph below, "Miscellaneous Provisions" *regarding the use of lockers after clocking out.**

## Miscellaneous Provisions

Associates who have assigned lockers **may not** store aprons, lab coats, rain suits, freezer suits, or gloves in lockers at any time. Personal items such as: jackets, coats, purses, carry bags, boots, shoes, food, etc. may be kept in assigned lockers.

Associates are required to clock time cards at assigned time clocks only. Supervisors will inform associates of assigned time clock and its location.

Signature: _____    Date:_____

PER_AND000129

<u>Disciplinary Action</u>

**Associates are required as a condition of employment to follow the above procedures regarding clocking in and out, the donning and doffing of required apparel, the acceptable time to go to and from the time clocks to the work station, and the necessity to take a full 30 minute unpaid break. Associates who fail to abide by the provisions of the above procedures will be in violation of the standards of acceptable personal conduct at work and therefore subject to the** Perdue Farms Disciplinary Procedures **as outlined on page 28, "Disciplinary Action", of the Associate Handbook.**

Effective August 12, 2002

Signature: _____    Date: _____

PER_AND000130

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Action No.: |
| v. | ) | 1:06-CV-1000-MEF-WC |
| | ) | JURY TRIAL DEMANDED |
| PERDUE FARMS INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SECOND DECLARATION OF ROBERT H. HEFLIN

I, Robert H. Heflin, depose and state the following based on my personal knowledge:

1.      I have been the Vice President of Human Resources for Perdue Farms, Inc.

("Perdue"), the nation's third largest poultry company, since approximately 1998. As Vice

President of Human Resources I am responsible for all of Perdue's training, employee

development, compensation, benefits, and employee relations functions. I have held a number of

other jobs since I was first hired by Perdue in 1977, including Director of Human Resources for

Poultry Operations, Director of Human Resources for Fresh Poultry Division, Director of Human

Resources for the Northeast Region, Manager of Training and Development, Manager of

Corporate Recruitment, and Human Resources Manager of Non-processing.

2.      I submitted a Declaration in this case dated January 10, 2008. This Second

Declaration contains additional information and is intended to supersede my prior Declaration.

3.      The time recording and pay practices at Perdue's poultry processing plants,

including the poultry processing plant in Dothan, Alabama, were established in a close working

arrangement with representatives from the United States Department of Labor ("DOL").

1-WA/2972473.1                    1

Post-it® Fax Note   7671   Date 5/15   # of pages ▶ 7
To Joey Quarrie   From Kim Caray
Co./Dept.   Co.
Phone #   Phone #
Fax # 202 739 3001   Fax #

4.    In 1997 and 2000, the DOL Wage and Hour Division conducted systematic investigations of the nation's poultry processing plants. The purpose of the investigations was to identify wage and hour compliance issues and to encourage the poultry industry to improve employee working conditions. The investigation revealed what the DOL contended to be violations of wage and hour and overtime laws throughout the nation's poultry industry.

5.    On May 9, 2002, after negotiating and reaching an agreement with the DOL, Perdue entered into a Consent Judgment with the DOL regarding Perdue's timekeeping and pay practices. A copy of the Consent Judgment and correspondence clarifying the Consent Judgment is attached to this Declaration at Tab 1. The Consent Judgment is the result of a landmark settlement with the DOL of its investigation into Perdue's donning and doffing policies and procedures. The Consent Judgment included, among other things, a plant-by-plant inspection by the DOL's Wage and Hour Administration and a final certification of compliance with all FLSA time recording and pay practices in all of Perdue's poultry processing plants. The Dothan, Alabama facility was the third facility visited by the Wage and Hour Administration. The Consent Judgment mandated Perdue's compliance within one year of the entry of the Consent Judgment. The Wage and Hour Administration and compliance team returned to Dothan to finally approve the process in application. A copy of the letter from the DOL confirming that Perdue is complying with the terms of the Consent Judgment is attached to this Declaration at Tab 2.

6.    Perdue was the first major poultry processor to enter into a Consent Decree with the DOL concerning the donning and doffing of work clothing by hourly poultry processing employees and so-called "line time," "gang time," or "master time" work time recording practices that have been prevalent in the poultry industry for many years. Perdue's Consent

Judgment with the DOL reflects a distinct break from the "line time", "gang time," and "master time" practices framework for marking the first principal activity of hourly poultry processing employees' compensable work shifts. On information and belief, Perdue was the first, and may be one of only a few poultry processing companies to abandon the "line time," "gang time," and "master time" practices.

7.      "Line time" would begin at a predetermined time for each department—when the first chicken arrived at the first employee's individual work station on a particular line. Employees were required to be at their duty station on the line by the time the first chicken arrived at that point. The ending time was captured when a supervisor or line worker manually inserted a punch card into a time clock located near the production line. Employees were permitted to leave their duty stations when the last chicken crossed their place on the line. The "line time" system did not compensate employees for time spent putting on and taking off their special protective gear and equipment, such as gloves, hand or arm guards, aprons or smocks, and cutting equipment.

8.      The Consent Judgment expressly states that Perdue's hourly poultry processing employees will be paid for all hours worked from their first principal activity of the work day until the end of the last principal activity of the work day, except for any time taken for bona fide unpaid meal breaks or other bona fide off-duty time.

9.      The Consent Judgment states that "first principal activity" could include: (1) the donning of clothing and equipment at the plant, but not including items that the employee is free to put-on at home, such as hair nets, bump caps, ear plugs, glasses, and footwear; (2) any subsequent time taken for employees to sanitize themselves and their equipment; and (3) the time spent walking or waiting after the first principal activity is performed. The Consent Judgment

also states that hourly poultry processing employees will be paid until the end of their last principal activity.

10.     The Consent Judgment makes it clear that Perdue will record and pay for the time taken by its hourly poultry processing employees to perform donning and doffing before and after their bona fide unpaid break periods.

11.     Pursuant to the Consent Judgment, Perdue undertook to develop donning and doffing procedures and time recording practices, which are fully compliant with the terms of the Consent Judgment. Perdue representatives and representatives from the DOL's Office of the Solicitor and the DOL's Wage and Hour Administration, along with a Regional Solicitor and the Director of the Poultry Task Force, worked together, plant by plant, in all of Perdue's processing facilities, over a period of one year, to develop systems which captured all compensable time from the first principal activity to the last principal activity in a typical work day in a Perdue poultry processing plant.

12.     Within a one-year period following the entry of the Consent Judgment, Perdue brought all of its plants into compliance with the Consent Judgment and the DOL certified that each of the covered plant's pay practices were consistent with the requirements of the Consent Judgment and the clarifying side letter agreement.

13.     Perdue's compliance with the Consent Judgment included the time and attendance recording system, developed with the assistance of the Kronos Corporation ("Kronos"), which captures hours worked from the employees' first principal activity of the day until the end of the last principal activity of the work day. The Perdue Kronos time recording system and pay practices were developed with the specific assistance and approval of the DOL.

14.     The Kronos time-keeping system captures the time employees spend performing donning and doffing before and after their bona fide thirty-minute unpaid meal breaks. Kronos clock and card-swiping systems are strategically placed at various locations throughout the poultry processing plant. Each Perdue hourly poultry processing employee is assigned a swipe card and each employee uses the card to swipe in and out each day. Perdue employees are paid for all time captured by the Kronos system, which includes all compensable time from the first principal activity to the last principal activity of each hourly poultry processing employee.

15.     Since the Kronos system was introduced in Perdue's poultry processing plants, including the one in Dothan, Alabama, Perdue has not calculated pay entitlements based on line time, master time cards, or any other similar practices. In Perdue's poultry processing plants, there is no "off the clock" donning and doffing, walking or waiting, and Perdue does not use "line time" to determine hours of work for compensation purposes.

16.     The process Perdue devised in Dothan—which is the same process that is in all Perdue's other poultry processing facilities—is very different from the allegations set forth in the Amended Complaint filed against Perdue in this case. Under the Perdue system, hourly poultry processing employees don and doff Company supplied work clothing items on compensable time and walk to the work station from the clock, also on compensable time. All hourly poultry processing employees are provided two thirty minute unpaid meal breaks during which they are relieved from work duty. Hourly poultry processing employees doff required gear before the meal breaks commence and don gear for the remainder of their shift after the period ends. The time clocks help Perdue regulate the meal periods. They do not permit an employee to clock back in until at least thirty minutes has passed since the employee clocked out.

17.    As stated above, Perdue does not use any type of "line time" or "master time" time recording system and has not used such a system since 2002. Perdue no longer uses "line time" practices and now records the first principal activity with an electronic time clock recording system.

18.    All hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama are trained to comply with the Consent Judgment and the donning and doffing guidelines contained therein.

19.    The Consent Judgment and subsequent design and implementation of Perdue's donning and doffing and time keeping policies and practices came at no small cost to Perdue. A DOL press release issued contemporaneously with the Consent Judgment reported that the Consent Judgment was worth approximately $10 million to Perdue's hourly poultry processing employees. A copy of the press release can be found at Tab 3 to this Declaration. The press release also stated that Perdue had agreed to compensate more than 25,000 current and former employees for time spent donning and doffing work clothing and protective gear. A copy of a letter confirming payment can be found at Tab 4 to this Declaration.

20.    In addition, the DOL used the signing and execution of Perdue's Consent Judgment as an opportunity to tout its own efforts to enforce compliance with the applicable wage and hour rules and regulations. Secretary of Labor Elaine Chao was quoted in the DOL's press release as saying she was pleased that Perdue signed the Consent Judgment and that it was a major victory for workers. Similarly, Tammy McCutchen, who at the time was the DOL's Administrator of the Wage and Hour Division, stated that Perdue's decision to change its pay practices was a significant development and should be a model for the industry.

I-WA/2972473.1                                        6

I declare under penalty of perjury that the forgoing is true and correct.

Dated: May 15th, 2008

Robert H. Heflin
_____
Robert H. Heflin

# EXHIBIT 3

No.0024  P. 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DARRYL ANDERSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case Action No.: |
| v. ) | 1:06-CV-1000-MEF-WC |
| ) | JURY TRIAL DEMANDED |
| PERDUE FARMS INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

## SECOND DECLARATION OF DAVE TABINOWSKI

I, Dave Tabinowski, depose and state the following based on my personal knowledge:

1.      I am currently employed by Perdue Farms, Inc. ("Perdue") as the Company's Internal Audit—Project Lead. I am also a Certified Internal Auditor. As Perdue's Internal Audit—Project Lead, I am responsible, inter alia, for auditing and monitoring Perdue's practices related to wage and hour issues including payroll, capturing first and last principal activity, and the Kronos time recording system.

2.      I submitted a Declaration in this case dated January 9, 2008. This Second Declaration contains additional information and is intended to supersede my prior Declaration.

3.      Through my job as Perdue's Internal Audit—Project Lead, I am very familiar with Perdue's time recording and pay practices for hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama, and at Perdue's other locations around the country. In September 2005 I conducted a routine "First and Last Principal Activity Audit" at Perdue's poultry processing plant in Dothan, Alabama, and I returned in March 2007 to conduct an additional on-site review. As a result, I know how hourly poultry processing employees in Dothan are paid and how their time is recorded.

Jan.19. 2000 12:15AM

4.      Perdue's poultry processing plant in Dothan, Alabama plant operates five days per week, three shifts per day. Poultry processing is performed on the night shift (the third shift) and the day shift (the first shift). The base rate of pay for hourly poultry processing employees on the day shift at Perdue's poultry processing plant in Dothan, Alabama is $8.15 per hour. This amount increases to $9.35 per hour after sixty days of employment with Perdue. The base rate of pay for hourly processing employees on the night shift is $8.45 per hour. This amount increases to $9.55 after sixty days of employment with Perdue. Hourly poultry processing employees are scheduled to work 37.5 hours per a five-day week. Hourly poultry processing employees may be asked to work a sixth day based on production needs and, in fact, depending upon product demand, a significant amount of overtime may be worked. Whenever overtime is worked, it is paid at time and a half each employee's regular rate of pay.

5.      First Processing is the area of the plant where live chickens are introduced into the plant and placed or hung on hooks or shackles for killing, cleaning, eviscerating, and chilling. Employees who work in this area of the plant are called "First Processing employees." Second Processing employees receive the chickens by conveyor from First Processing. Chickens are cut-up, marinated, de-boned, weighed, sized, and packed in Second Processing.

6.      Perdue's poultry processing plant in Dothan, Alabama using the "Kronos," time-recording system which is a "state of the art" web-based centralized electronic system that records the time worked by hourly poultry processing employees. Time and attendance records are recorded by Kronos, and these records are stored electronically and maintained on a processing server at Perdue's corporate headquarters in Salisbury, Maryland. Each hourly poultry processing employee is provided a personal Kronos "swipe" card, which assigns an individual electronic number to that employee. Employees' time is captured by one of several

Kronos time clocks that are designed to capture all principal work activities. There are two Kronos time clocks in the First Processing section of the facility. There are six Kronos time clocks in the Second Processing section of the facility.

7.     Perdue provides a parking lot on the facility complex for its Dothan employees to use. Processing employees park their cars in the parking lot and then walk to their designated entrance door to the facility. On their way to the facility entrance, employees walk through a gate in a chain link fence. Employees visibly display their Perdue identification cards to a third-party security guard as they pass the security guard's booth. They do not have to stop, or even pause, as they pass the guard. Employees do not swipe in at the gate.

8.     In the Dothan facility, there are locker rooms, rest rooms, and break rooms for use by the employees. Many employees proceed to the employee break room before starting their shift. While employees await the beginning of their shift, they are not required to account for their time or activities.

9.     At the employee's specific start time, and before donning or acquiring work-related equipment and clothing, or performing any other required work activities, hourly poultry processing employees take their assigned Kronos access cards and swipe into their assigned Kronos system time-clocks at designated starting areas. After swiping into the system, the hourly poultry processing employees enter their department, don their required clothing, and collect their required gear from hooks, shelves, or bins. Employees sanitize after they put on their required departmental clothing and gear. Employees then walk to their work stations and begin to work. All of this occurs while on paid time.

10.     The process is reversed at the end of the work day. When their supervisor notifies them that their shift has ended, employees remove their gloves, aprons, and any other required

clothing and gear and dispose of them. Some employees choose to remove their earplugs, hair nets, and beard nets at this time. Employees then swipe out on the designated Kronos time clocks. After swiping out at their assigned Kronos time clocks, processing employees may place their personal items—ear plugs, hair and beard nets, and safety goggles—in their lockers, or take the items home with them. Employees exit the facility and return to the employee parking lot.

11.     Required clothing and gear include smocks, cut gloves, and hand or arm guards. The hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama also wear personal items such as bump caps, slip resistant footwear, hair and beard nets, and ear plugs, which they may choose to don on their own time. Donning of these personal items is not compensable, but hourly poultry processing employees are permitted to don non-unique items after clocking-in, and many choose to do so.

12.     Hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama are paid for all time captured by the Kronos system. Since the Kronos system was introduced at the Dothan poultry processing facility in 2002, Perdue has not calculated pay entitlements based on line time, master time cards, or any other similar practices.

13.     Hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama have two 30-minute unpaid meal breaks in each 8 hour shift, during which time they are relieved from work duty. Employees may take their 30-minute meal breaks wherever they choose, such as the break room or cafeteria, or they may go outside.

14.     Supervisors notify their employees when it is time for their breaks to begin. Their first break generally occurs approximately two hours after their shifts begin. When it is time for their break, the hourly poultry processing employees leave their work area and walk to their designated doffing area, where they doff their required clothing and gear. All of this occurs

I-WA/2972469.2                                    4

while the hourly poultry processing employees are "on-the-clock," which means they are paid for this time. After the hourly poultry processing employees doff their required clothing and gear, they then walk to their designated Kronos time clock and swipe-out using their Kronos access card. While on break, employees retain their hair nets, beard nets, and ear plugs, and do not remove their boots.

15.    Hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama start their unpaid meal breaks only after they swipe out using the Kronos system. The system does not permit hourly poultry processing employees to swipe back in until thirty minutes later. In fact, the Kronos system will not allow hourly poultry processing employees to swipe back in within thirty minutes of when they swiped out. Near the end of the break period, employees walk to their assigned Kronos time clock near their work station to swipe in. After swiping back in, poultry processing employees don their gear, pick-up any necessary equipment, and walk to the work station, on paid time, to resume work for the remainder of their shift. Employees also sanitize their outer garments before resuming their work.

16.    There are signs instructing the hourly poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama not to perform "work" before clocking-in. These signs are in English and Spanish and are located near the Kronos time clocks. In addition, signs remind employees to clock in before touching any required items. Poultry processing employees are warned that failure to comply with these rules could result in disciplinary action.

17.    When Perdue instituted the Kronos system in Dothan, it trained all hourly employees on its use. Since that time, all new poultry processing employees are given

No.0024   P. 7

orientation and training that describe the relevant donning, doffing, and time clock policies and procedures.

18.     The orientation and training materials define "donning," "doffing," and "first and last principal activities," and also make it clear that the Department of Labor and the Fair Labor Standards Act require employees to be paid for time spent donning and doffing required items, and that employees get paid from the first principal activity until the last principal activity, excluding unpaid breaks. The materials also describe in detail the appropriate donning and doffing practices, including: the requirements to clock-in prior to donning supplies at the shift start time and when returning from unpaid break; the requirements to clock-out after doffing when leaving at the end of the shift or on an unpaid break; and the fact that all unpaid lunch breaks may be no less than 30 minutes long. The orientation and training materials remind each poultry processing employee that failure to comply with these policies could lead to disciplinary action.

19.     Poultry processing employees at Perdue's poultry processing plant in Dothan, Alabama can review their time worked as recorded by Kronos, but they do not need to review their time in order to be paid. Supervisors review the time as recorded by Kronos before the end of each week to correct any mistakes. Sometimes employees forget to clock in or clock out, and supervisors can correct these issues to make sure that each employee is paid properly. Once the time is approved by a supervisor, it is submitted electronically for payment.

20.     If poultry-processing employees find an error on their paycheck, they may approach a supervisor to help correct the error. If the supervisor verifies that a mistake has been made, he inputs a retroactive pay correction into the current week's Kronos time card. Typically,

Jan.19. 2000 12:16AM

the next scheduled paycheck will reflect the required correction, however, in some cases, a separate check is sent to make the poultry-processing employees whole.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: May _16_, 2008

_Dave Tabinowski_
Dave Tabinowski

1-WA/2922469.2                    7